## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
## BRUNSWICK DIVISION

| | |
|---|---|
| CLOVER INSURANCE COMPANY, <br><br>       *Plaintiff*, <br><br>   v. <br><br> DEPARTMENT OF HEALTH AND HUMAN SERVICES; CENTERS FOR MEDICARE & MEDICAID SERVICES; ROBERT F. KENNEDY, JR., in his official capacity as Secretary of the United States Department of Health and Human Services; MEHMET OZ, in his official capacity as Administrator, Centers for Medicare & Medicaid Services, <br><br>       *Defendants*. | Civil Action No. _____ |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff Clover Insurance Company ("Clover") brings this suit against Defendants the United States Department of Health and Human Services ("HHS"); Robert F. Kennedy, Jr., in his official capacity as Secretary of HHS; the Centers for Medicare & Medicaid Services ("CMS"); and Mehmet Oz, in his official capacity as Administrator of CMS, and alleges as follows:

### PRELIMINARY STATEMENT

1.    This case concerns Defendants' actions in determining Clover's 2026 Star Rating in a manner that unlawfully penalizes Clover, despite it delivering superior clinical quality and health outcomes to Medicare beneficiaries.

2.    Clover is an AI-powered technology and physician-enablement company that provides Medicare Advantage plans to over 100,000 beneficiaries, focusing on providing high-quality, affordable care. Clover's proprietary platform, Clover Assistant, analyzes data from over

100 sources (claims, labs, electronic health records, etc.) to deliver personalized, evidence-based recommendations to physicians at the point of care. This enables physicians and other providers to deliver better clinical quality and health outcomes. For example, Clover's data shows that doctors empowered with Clover Assistant start their diabetes patients on oral medications three years earlier on average,[1] which is associated with reduced reliance on insulin and lower incidence of hypoglycemia (low blood sugar). Similarly, doctors empowered with Clover Assistant diagnose and manage chronic kidney disease over 1.5 years earlier,[2] and have markedly higher rates of recommended cancer screenings.[3] In short, Clover is dedicated to preventing and diagnosing chronic conditions, enabling earlier and more successful interventions that benefit patients.

3.     Clover provides Medicare Advantage plans to thousands of members within this District, including members in Glynn, Camden, McIntosh, Long, Wayne, Appling, and Jeff Davis counties. Clover also serves many thousands of additional members spread across Georgia, along with South Carolina, New Jersey, Pennsylvania, and Texas.[4]

---

[1] *See* Clover Health, *Clover Assistant Use and Diagnosis, Treatment, and Progression of Diabetes* (Oct. 12, 2023), https://tinyurl.com/54b8b4bt.

[2] *See* Clover Health, *Clover Assistant Use and Diagnosis and Progression of Chronic Kidney Disease* (Aug. 2023), https://tinyurl.com/bdcspd79.

[3] Counterpart Health, *Counterpart Assistant Drives Clinical Excellence: Enabling Clover Health to Achieve Industry-Leading HEDIS Quality Scores* at 4 (Nov. 2024), https://tinyurl.com/yc6k5zrw.

[4] Clover refers to Medicare "beneficiaries" that select a given Clover plan as "members." For the most part, Medicare beneficiaries are "seniors," along with a smaller number of beneficiaries with a qualifying disability, End-Stage Renal Disease, or Amyotrophic Lateral Sclerosis. For purposes of this Complaint, Clover uses the term "seniors" for ease of reference, but the same allegations applicable to "seniors" apply to these broader populations as well.

4.     Congress created what is now known as the Medicare Advantage program—also known as Medicare Part C—in 1997.[5]  Under that program, the Secretary of HHS, acting through CMS, contracts with private healthcare plans like Clover to provide benefits that meet or exceed the benefits provided by government-run Medicare.  Balanced Budget Act of 1997, Pub. L. No. 105-33, § 4001, 111 Stat. 251, 275-327 (1997).

5.     By creating a system founded on the principle of private competition—both among private plans and against traditional government-run Medicare—Congress sought to provide seniors greater choice and higher quality healthcare.

6.     Congress specifically envisioned that plans would compete on plan quality. Congress's principal tool to promote such competition is known as a "Star Rating," which synthesizes a range of quality data about each plan into a summary rating of 1 to 5 Stars (including half-Stars in between).  Congress specified the data to be used in calculating Star Ratings to ensure that seniors have ready access to meaningful information to select the plan that best meets their needs.  And Congress provides significant financial resources to plans (and, in turn, their members) that achieve 4 Stars or greater.

7.     The first step in calculating a plan's Star Rating is to determine a "measure score" on various "measures," such as how often plan members obtain recommended mammograms and other cancer screenings, and how well their blood sugar and blood pressure are controlled.  Next, CMS engages in a multi-step process to grade plans relative to other plans, akin to grading on a "curve" in a college course.

---

[5] Between 1997 and 2003, prior versions of the Medicare Advantage program went by other names, such as "Medicare+Choice."  For ease of reference, the term "Medicare Advantage" is used in this Complaint to refer to both the current version of the program and the historical versions as well.

8.     The problem that brings Clover to court is that CMS has *admittedly* departed from the measures of clinical quality and health outcomes that Congress authorized, instead relying on a host of other measures that have little or nothing to do with quality.  As a result, CMS unlawfully scored Clover at 3.5 Stars, rather than 4 Stars, harming its reputation and depriving Clover and its members of approximately $120 million in statutorily mandated quality bonus and related payments.

9.     CMS's departure from its statutory authority has had profound consequences, not just for Clover, but for the Medicare system.  The Star Ratings system, as currently implemented, is broken.  The Medicare Payment Advisory Commission ("MedPAC"), a nonpartisan independent legislative branch agency that provides Congress with analysis and policy advice on Medicare, has identified that the measures that CMS is currently using in its Star Ratings are "flawed and inconsistent with the Commission's [MedPAC's] principles for quality measurement."  MedPAC, *Report to the Congress: Medicare and the Health Care Delivery System* 243 (June 2019).  That is because CMS includes over 40 measures that are "weakly correlated with health outcomes of importance to beneficiaries and the program," *id.* at 248, and that "no longer provide an accurate description of the quality of care in MA [Medicare Advantage]."  MedPAC, *Report to the Congress: Medicare and the Health Care Delivery System* 51 (June 2020).  MedPAC recently reiterated to Congress that "the current system for MA quality measurement and reporting is flawed and does not provide a reliable basis for evaluating quality across MA plans."  MedPAC, *Report to the Congress: Medicare and the Health Care Delivery System* 321 (June 2025).

10.     *This is not the system Congress designed or authorized CMS to implement*.  To ensure that plans' financial incentives remain aligned with Congress's own vision to make seniors

healthier—not to reward plans for ballooning non-clinical overhead—Congress specifically provided a limited universe of data on quality that CMS may consider in determining Star Ratings.

11.    Since Medicare Advantage's inception, Congress has required each plan to maintain an ongoing "quality assurance program," § 4001, 111 Stat. at 275-327, known since 2003 as a "quality improvement program," 42 U.S.C. § 1395w-22(e)(1).  Initially, in connection with those programs, Congress granted CMS broad authority to require plans to collect any quality data that CMS determined to be "appropriate."  42 U.S.C. §§ 1395w-22(e)(1), (e)(2)(A)(xii) (1997).

12.    What followed was several years of uncertainty and vacillation during which CMS proposed a host of different quality measures and potential performance standards, which CMS indicated that it could and would modify annually at its discretion.  *See, e.g.*, 63 Fed. Reg. 34,968, 34,993 (June 26, 1998); 65 Fed. Reg. 40,170, 40,220-21 (June 29, 2000).  Medicare Advantage plans raised serious concerns with this approach.  They warned that CMS's constantly changing measures and standards would add significant administrative costs.  Such moving targets would impose arbitrary data collection and quality standards unrelated to clinical quality and healthcare outcomes.  And the lack of consistency would waste resources without improving healthcare for seniors.  *See* 65 Fed. Reg. at 40,220-21 (listing many pages of plans' concerns about "significant" and "excessive" "administrative costs" and changing standards that do not "address the health issues" of seniors).  Yet CMS refused to modify its approach.  *Id.* (CMS reserving its right to "impos[e] further requirements" on plans at its discretion "in future years").

13.    In 2003, Congress intervened to put an end to this chaos, amending the statute to essentially freeze in place CMS's existing quality measures.  Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 108-173, § 722(a)(2), 117 Stat. 2066, 2347-48 (2003).  To accomplish this, Congress imposed two critical limitations on CMS:  (1) As

part of quality improvement programs, CMS could only require quality data that were "the types of data that were collected by the Secretary as of November 1, 2003." 42 U.S.C. § 1395w-22(e)(3)(B). And (2) CMS could only change the types of data that must be collected after submitting a report to Congress on the reasons for such changes, prepared in consultation with Medicare Advantage plans and private accrediting bodies. *Id*.

14.    In 2004, CMS admitted that it was now constrained under § 1395w-22(e), and that going forward CMS would rely only on its existing, pre-2003 measurement systems of clinical quality, health outcomes, and beneficiary satisfaction, known as the Healthcare Effectiveness Data and Information Set ("HEDIS"), Health Outcomes Survey ("HOS"), and Consumer Assessment of Healthcare Providers and Systems ("CAHPS"). 69 Fed. Reg. 46,866, 46,886 (Aug. 3, 2004).

15.    But through sub-regulatory guidance, CMS found a way to work around Congress's limitations. In 2008, CMS began publishing annual Star Ratings, which synthesized data into ratings of 1 to 5 Stars for each plan. CMS prominently publicized these Star Ratings, including to Medicare beneficiaries. 75 Fed. Reg. 71,190, 71,218 (Nov. 22, 2010). Those Star Ratings included data on two Medicare programs: (1) Medicare Advantage, and (2) Medicare Part D, an optional prescription drug benefit that beneficiaries may opt into. (Medicare Part D is available to enrollees in traditional Medicare, or in Medicare Advantage. Medicare Advantage plans that also include Part D coverage are called Medicare Advantage-Prescription Drug ("MA-PD") plans.)

16.    CMS *combined together* in its Star Ratings (1) data collected pursuant to CMS's authority in § 1395w-22(e) as part of plans' quality improvement programs (*i.e.*, HEDIS, CAHPS, and HOS data), *and* (2) data collected under other unrelated statutory authorities, for example, data

on telephonic customer service hold times and Part D prescription drug benefits.[6]

17.     CMS possesses a host of unrelated, broader authorities to collect other data via other mechanisms besides quality improvement programs.  CMS disseminates that information to the public.  *See, e.g.*, 42 U.S.C. §§ 1395w-21(d)(1), 1395w-101(c)(1), 1395w-104(d).

18.     Relying on these other authorities, CMS's sub-regulatory Star Ratings recreated the same problem that Congress had intervened to solve in 2003.  Before, CMS forced *plans* to collect constantly changing "quality" data and meet changing standards on CMS's chosen measures.  After Congress rightfully forbade that practice in its 2003 amendments to § 1395w-22(e), CMS took it upon itself to collect and report to the public shifting "quality" data under other authorities.  CMS then publicized the results, directly impacting plans.  The result was the same problem that Congress had previously taken action to solve:  Plans were subjected to shifting quality standards on CMS's chosen measures.

19.     In 2010, Congress applied much the same solution that it had adopted seven years earlier in its 2003 amendments, and expanded upon that solution to govern the *entire Star Ratings system*.  Congress instructed CMS to stop morphing its quality measures from year to year, and instead utilize the measures of clinical quality and health outcomes that Congress instructed in 2003.  *See id.* § 1395w-23(o)(4)(A).  The integrity of the codified Star Ratings program was important to Congress for an additional reason as well:  Congress at the same time incorporated the Star Ratings into statutory formulas that determine certain additional payments to Medicare Advantage plans that in turn benefit their beneficiaries.  *See* Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, § 1102(c)-(2), 124 Stat. 1029, 1043-46 (2010).

---

[6] *See, e.g.*, CMS, *Medicare Health Plan Quality & Performance Ratings Tech. Notes, Pt. C* (2010) *and* CMS, *Medicare Health Plan Quality & Performance Ratings Tech. Notes, Pt. D* (2010), *both available at* https://www.cms.gov/medicare/health-drug-plans/part-c-d-performance-data.

20.     Congress therefore codified in part, and overrode in part, CMS's sub-regulatory Star Ratings system, instructing instead that Star Ratings "shall be determined according to a 5-star rating system (based on the data collected *under section 1395w-22(e) . . . .*)." *Id.* (emphasis added).  That is, Congress selected the *same* solution that it had adopted seven years earlier in its 2003 amendments.  Congress required the Star Ratings to be based upon predictable types of data collected under plans' quality improvement programs (*i.e.*, HEDIS, HOS, and CAHPS data on quality, outcomes, and satisfaction) that plans had collected as of November 1, 2003, and required CMS to consult with plans and private accrediting bodies and report to Congress if CMS intended to change these types of data.  42 U.S.C. § 1395w-22(e)(3)(A)(i).

21.     Rather than heed Congress's command, CMS once again forged ahead with calculating Star Ratings based on a host of other authorities and data sources that CMS *admits*— in sources no less formal than the Federal Register and the Code of Federal Regulations—are not collected under § 1395w-22(e) as part of plans' quality improvement programs:

> there are several measures in the Stars Ratings System that are based on performance that address telephone customer service, members' complaints, disenrollment rates, and appeals; however these *additional measures are not collected directly from the sponsoring organizations for the primary purpose of quality measurement so they are not information collections governed by section 1852(e)) [§ 1395w-22(e)]*.  These additional measures are calculated from information that CMS has gathered *as part of the administration of the Medicare program*, such as information on appeals forwarded to the Independent Review Entity under subparts M, enrollment, and compliance and enforcement actions.

83 Fed. Reg. 16,440, 16,531-32 (Apr. 16, 2018) (emphases added); *see also* 82 Fed. Reg. 56,336, 56,382 (Nov. 28, 2017) (same); 82 Fed. Reg. at 56,497 (similar).  As CMS's own binding regulation acknowledges, "CMS bases Part C Star Ratings on the type of data specified in section 1852(e) of the Act [§ 1395w-22(e)] *and on CMS administrative data*."  42 C.F.R. § 422.162(c)(1) (2024) (emphasis added).

22.    In making these statements, CMS appears to have overlooked the full import of its admissions.  CMS seems to believe it can utilize any sources of data that it wishes to determine Star Ratings, whether or not the data are "information collections governed by section 1852(e)." 83 Fed. Reg. at 16,531-32.  But Congress imposed a more stringent statutory constraint than CMS recognizes:  The Star Ratings must be "based on the data collected under section 1395w-22(e) of this title," not other authorities.  42 U.S.C. § 1395w-23(o)(4)(A).

23.    It is therefore absolutely clear that CMS erred as a matter of law in determining Clover's 2026 Star Rating.  To determine Star Ratings, Congress instructed CMS to rely on data collected as part of plans' quality improvement programs under § 1395w-22(e).  CMS admits that it relies on other sources of data not collected under § 1395w-22(e) to determine several Star Ratings measures.  That is dispositive.  *See Catalyst Pharms., Inc. v. Becerra*, 14 F.4th 1299, 1312 (11th Cir. 2021) (explaining that it is "the end of the matter" where an agency acts "contrary to the clear statutory language enacted by Congress").

24.    CMS's use of these measures based on data beyond its § 1395w-22(e) authority resulted in CMS's unlawful determination of Clover's Star Rating at 3.5 Stars.  Because CMS's determination of Clover's 2026 Star Rating was contrary to law, the Administrative Procedure Act ("APA") requires that it be set aside.  5 U.S.C. § 706(2).

25.    This error in calculating Clover's Star Rating illustrates a broader problem:  The Executive Branch itself has expressed concern that agencies' unauthorized and overbroad sub-regulatory guidance results in "massive costs" while reducing overall "quality of life" for Americans.[7]  These sorts of concerns are *why* Congress limited CMS's authority under § 1395w-

---

[7] Unleashing Prosperity Through Deregulation, Exec. Order No. 14.192, 90 Fed. Reg. 9065, 9065 (Feb. 6, 2025).

22(e).  CMS plainly exceeded that authority in determining Clover's 2026 Star Rating.

26.    But that's not all.  CMS made additional mistakes that also harmed Clover's 2026 Star Ratings.

27.    *First*, even with respect to data that CMS claims *are* collected under § 1395w-22(e) as part of plans' quality improvement programs, some of those data are not in fact "the types of data that were collected by the Secretary as of November 1, 2003," as required under § 1395w-22(e)(3)(B).

28.    As noted, CMS has taken the position that the relevant "types of data" that CMS may rely on under § 1395w-22(e)(3)(B) are any data collected within CMS's "measurement systems" used to collect data as of 2003, *i.e.*, the HEDIS, HOS, and CAHPS measurement systems. 69 Fed. Reg. at 46,886; *see also* 83 Fed. Reg. at 16,531-32.  These systems measure, broadly speaking, clinical quality (HEDIS), outcomes (HOS), and beneficiary satisfaction (CAHPS).  69 Fed. Reg. at 46,886.  From that premise, CMS found that § 1395w-22(e) encompasses any types of data relating to quality, so long as that data is collected under the HEDIS, HOS, or CAHPS systems.  *Id.* (asserting CMS may "add, delete, or modify [Star Ratings] measures within these systems"); 83 Fed. Reg. at 16,531-32 (explaining that CMS may rely on HEDIS, HOS, and CAHPS for "clinical measures, beneficiary experiences, and changes in physical and mental health").

29.    While CMS is correct that data from *outside* the HEDIS, HOS, and CAHPS measurement systems are unlikely to be the "types of data" collected as of November 1, 2003 (since those were the systems used to collect data then), CMS is incorrect in taking the position that *any* data bearing on plan quality (from the CAHPS, HEDIS, and HOS systems) may be used in the Star Ratings.  *Id.*  Congress chose a different design.  It required that CMS "shall not collect

. . . data *on quality, outcomes, and beneficiary satisfaction* to facilitate consumer choice and program administration *other than the types of data* that were collected by the Secretary as of November 1, 2003." 42 U.S.C. § 1395w-22(e)(3)(B)(i) (emphases added). Therefore, the permissible "types of data" from 2003 must be narrower than "quality, outcomes, and beneficiary satisfaction," because otherwise, the "types of data" clause in § 1395w-22(e)(3)(B)(i) would be surplusage.

30.     Rather, as detailed below, the "types of data" collected as of November 1, 2003 means data in common with the specific data collections, *i.e.*, the specific survey questions, under CAHPS, HEDIS, and HOS as of November 1, 2003. *Id.* This interpretation honors, rather than makes surplusage of, Congress's statutory constraints.

31.     Despite these limitations, CMS determined Clover's 2026 Star Rating based on types of data concerning quality, outcomes, and satisfaction that CMS did not collect as of November 1, 2003, including, as just one illustrative example, the quality of interpretation services provided to CMS contractors when they place "test" foreign-language calls to Clover's customer service line.

32.     *Second*, CMS determined Clover's 2026 Star Rating based on measures that had not gone through notice and comment in the manner required by CMS's regulations, 42 C.F.R. §§ 422.164(c)(2), (d)(2) (2024), nor had been codified "by regulation" in the manner required by CMS's governing statute, 42 U.S.C. § 1395hh(a)(2). Specifically, CMS has bound itself under its regulations that CMS will only adopt a new or substantially modified measure in its Star Ratings if CMS first publicly proposes the measure (on its website), elicits public feedback prior to the measurement year, *and then* formally engages in notice-and-comment rulemaking. 42 C.F.R. § 422.164(c)(2). CMS calculated Clover's 2026 Star Rating using measures known as Improving

or Maintaining Physical Health (C04), Improving or Maintaining Mental Health (C05), and Getting Appointments and Care Quickly (C23).  This action violated the APA, because CMS did not subject these measures to notice and comment following the series of procedural steps required by §§ 422.164(c)(2), (d)(2), and identified above, prior to their adoption.

33.    Moreover, the statute itself requires CMS to codify new measures as formal regulations (*i.e.*, in the Code of Federal Regulations).  CMS did not do so—not just with these two measures, but with a range of other measures as well.  *See* 42 U.S.C. § 1395hh(a)(2) (requiring CMS to promulgate "by regulation" certain legal standards).

34.    *Third*, CMS calculated Clover's Star Rating using multiple measures that are arbitrary and capricious and contrary to law, because they are divorced from clinical quality, outcomes, and satisfaction.  As one example, under its measures known as Medication Adherence for Diabetes, Hypertension, and Cholesterol Medications (D08, D09, D10), CMS repeatedly penalized Clover's Star Ratings in hundreds of cases because patients discontinued medications (therefore, medications were not dispensed) *as directed by their doctors*.  *See* CMS, *Medicare 2026 Pt. C & D Star Ratings Tech. Notes*, at 96-104 (2025) (hereinafter *2026 Pt. C & D Star Ratings Tech. Notes*).  Each time, the doctor had determined that treatment discontinuation was medically *appropriate or necessary*—which CMS does not dispute.  Yet, under this measure, CMS rewards other plans when a patient is dispensed drugs for periods after the drugs are no longer medically appropriate or necessary—and in some cases, potentially harmful.  *Id.*

35.    *Finally*, CMS calculated Clover's 2026 Star Rating by unlawfully delegating core government functions with respect to the determination of the measure "Reviewing Appeal Decision" (C32) to a private contractor known as the "Independent Review Entity" ("IRE").  This measure reflects the percentage of appeals from Clover's coverage decisions that are upheld by

the IRE, as opposed to overturned.  Because Clover's measure-specific Star Rating depends solely

on the IRE's view of the validity of Clover's coverage decision, this measure violates the private

nondelegation doctrine and is unlawful.  *FCC v. Consumers' Rsch.*, 145 S. Ct. 2482, 2507 (2025).

36.    In summary, the following classes of errors impacted the following measures that

CMS applied in determining Clover's 2026 Star Ratings.

| | **Data Not Collected under 1395w-22(e)** | **Post-2003 Data** | **Measures Without Notice and Comment** | **Arbitrary and Capricious Measures** | **Private Non-Delegation Doctrine** |
|---|---|---|---|---|---|
| Appeal Decisions (C32) | ✔ | ✔ | ✔ | | ✔ |
| Phone Call Center (C33) | ✔ | ✔ | ✔ | ✔ | |
| Medication Adherence, Diabetes (D08) | ✔ | ✔ | ✔ | ✔ | |
| Medication Adherence, Hypertension (D09) | ✔ | ✔ | ✔ | ✔ | |
| Medication Adherence, Cholesterol (D10) | ✔ | ✔ | ✔ | ✔ | |
| Phone Call Center (D01) | ✔ | ✔ | ✔ | ✔ | |
| Rating of Drug Plan (D05) | ✔ | ✔ | ✔ | | |
| Getting Needed Drugs (D06) | ✔ | ✔ | ✔ | | |
| Medication Therapy Management Completion (D11) | ✔ | ✔ | ✔ | | |
| Pharmacy Statin Use (D12) | ✔ | ✔ | ✔ | | |
| Improving Mental Health (C05) | | ✔ | ✔ | | |
| Reducing Falling (C15) | | ✔ | ✔ | | |
| Getting Needed Care (C22) | | ✔ | ✔ | | |
| Rating of Health Care Quality (C25) | | ✔ | ✔ | | |
| Care Coordination (C27) | | ✔ | ✔ | | |
| Improving Bladder Control (C16) | | | ✔ | | |
| Annual Flu Vaccine (C03) | | | ✔ | | |
| Improving Physical Health (C04) | | | ✔ | | |
| Getting Care Quickly (C23) | | | ✔ | | |
| Customer Service (C24) | | | ✔ | | |

37.    The  upshot  is  that  CMS  unlawfully  calculated  Clover's  2026  Star  Rating  by

determining Clover's Star Rating:

(1)    based on data not collected under § 1395w-22(e);

(2)     based on data other than the types of data that were collected under plans' quality assurance programs as of November 1, 2003;

(3)     based on measures that had not gone through notice and comment in the manner required by CMS's regulations, 42 C.F.R. §§ 422.164(c)(2), (d)(2), nor had been codified "by regulation" in the manner required by 42 U.S.C. § 1395hh(a)(2);

(3)     based on multiple measures that are arbitrary and capricious and contrary to law, because they are divorced from clinical quality, outcomes, and satisfaction; and

(4)     by delegating core government functions to determine Clover's score on the measure "Reviewing Appeal Decision" (C32) to the IRE in violation of the private nondelegation doctrine.

38.     Before CMS determined and published its final 2026 Star Ratings, Clover identified the errors in Clover's 2026 Star Rating to CMS. CMS nevertheless published Clover's final Star Rating as 3.5 Stars on or about October 9, 2025, rejecting Clover's requested corrections.

39.     Clover overperformed on the traditional measures of clinical quality and healthcare outcomes that Congress authorized CMS to rely upon. For example, Clover obtained 5-Star ratings on rates of breast cancer screening, colorectal cancer screening, management of osteoporosis, blood sugar control, and control of high blood pressure, among many others. Yet CMS discounted that performance by relying on other, unlawful measures that Congress prohibited.

40.     Worse, many of the measures that CMS now relies on allow plans to "game" the Star Ratings system. *See* MedPAC, *Report to the Congress: Medicare and the Health Care Delivery System* 51-55 (June 2020). Instead of spending funds on improving clinical quality and

healthcare outcomes, some plans engage in "priming" campaigns to encourage beneficiaries to respond more favorably to customer satisfaction surveys. *See id.* For example, Hallmark touts that plans' purchasing and mailing its greeting cards (*e.g.*, around the holidays and birthdays) improves plans' Star Ratings.[8] Moreover, some plans exercise control over their own, affiliated providers, pharmacies, and/or pharmacy benefit managers to issue and maintain prescriptions that are not medically indicated but cost taxpayers. *See id.*

41.    And because, in general, CMS rates plans on a "curve" that evaluates plans relative to other plans, rather than relative to fixed cut points (*i.e.*, established, minimum quality standards), gaming by one plan diminishes the ratings of other plans. *Id.* The result is a self-perpetuating cycle: Plans invest resources to score better on CMS's flawed measures; this causes the required benchmarks to earn "4 Stars" on those flawed measures to increase from year to year; and then more resources must be diverted each year from clinical quality and health outcomes to administrative scale and overhead to address these rising benchmarks.

42.    Unless Congress's chosen safeguards are enforced, the problem will get worse: More misdirected resources without delivering better quality and outcomes for patients.

43.    As a result of CMS's unlawful determination of Clover's Star Rating of 3.5 Stars, Clover will lose approximately $120 million in quality bonus payments and rebates to which Clover would otherwise be entitled had CMS correctly determined its Star Rating as 4 Stars as required under governing law. Clover will also suffer significant reputational and competitive harms as a result of CMS's unlawful actions. To prevent Clover from suffering this harm and to facilitate CMS's timely implementation of any remedy awarded by the Court, Clover respectfully

---

[8] Jada Subdeck, *Revitalizing Medicare Advantage Member Engagement with Direct Mail*, Hallmark Business Connections, https://tinyurl.com/3b38ep3v.

requests that the Court expedite resolution of this matter, vacate Clover's 2026 Star Rating, and order CMS to recalculate Clover's 2026 Star Rating without reliance on the unlawful measures identified herein **by May 29, 2026, the time period during which CMS has previously identified that CMS may readily update a plan's Star Ratings in response to judicial decision-making** and make resulting changes to quality bonus and related payments.

## PARTIES

44.     Clover is a leading provider of Medicare Advantage insurance plans.   It is incorporated in and has its principal place of business in New Jersey.

45.     HHS is a department of the Executive Branch of the United States.  Its headquarters and principal place of business are at 200 Independence Ave, SW, Washington, DC 20201.  Its governmental activities occur nationwide.

46.     Robert F. Kennedy, Jr., sued solely in his official capacity, is Secretary of HHS.  In this capacity, Secretary Kennedy has ultimate responsibility for activities at HHS, including the actions complained of herein.  His governmental activities occur nationwide.

47.     CMS is a federal agency within HHS.  Its headquarters and principal place of business are at 7500 Security Boulevard, Baltimore, MD 21244.  Its governmental activities occur nationwide.

48.     Dr. Mehmet Oz, sued solely in his official capacity, is Administrator of CMS.  In this capacity, Administrator Oz has ultimate responsibility for activities at CMS, including the actions complained of herein.  His governmental activities occur nationwide.

## JURISDICTION, VENUE, AND EXHAUSTION

49.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

50.     This action arises under the APA, 5 U.S.C. §§ 701-06 and the United States Constitution.  Clover's prayers for a declaratory judgment and injunctive relief are authorized by

the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, the APA, 5 U.S.C. §§ 701-706, and 28 U.S.C. § 1361.

51.     Venue is proper in this District under 28 U.S.C. § 1391(e) because a substantial part of the events or omissions giving rise to the claims occurred in this District.  Clover provides Medicare Advantage plans to thousands of seniors located across the Southern District of Georgia, including within Glynn, Camden, McIntosh, Long, Wayne, Appling, and Jeff Davis counties, along with practically every other county within this District.  By unlawfully decreasing Clover's 2026 Star Rating from 4 to 3.5 Stars and broadly publicizing that determination within this District, CMS has harmed Clover's reputation and ability to attract and retain members in this District, and ability to continue expanding within this District.  With a 3.5 Star Rating, Clover will also be forced to consider reducing its operations in certain locations.  Most prominently, absent judicial relief, Clover will likely be forced to reduce or cease its operations within counties in the Southern District of Georgia, including Glynn, Camden, McIntosh, Long, Wayne, Appling, and Jeff Davis counties.  Moreover, CMS erroneously determined Clover's 2026 Star Rating by relying on unauthorized forms of data concerning Clover's members located within this District, which erroneously and unlawfully misrepresent Clover's plan's performance in this District.

52.     Any requirement for administrative exhaustion has been satisfied.  CMS allows plans to examine the data used to calculate their Star Rating and appeal certain determinations.  It does not, however, allow plans to challenge "the methodology for calculating the star ratings."  42 C.F.R § 422.260(c)(3)(ii).  Thus, any challenge to the lawfulness of measures applied to a plan is not subject to any administrative review process.  *See Scan Health Plan v. HHS*, No. 23-CV-3910, 2024 WL 2815789, at *4 n.3 (D.D.C. June 3, 2024).  Nevertheless, Clover raised its concerns about the use of these measures to determine Clover's 2026 Star Rating to CMS including through

submissions on April 30, 2025, May 21, 2025, June 13, 2025, August 12, 2025, August 16, 2025, and September 16, 2025.  CMS responded, including on April 30, 2025, August 5, 2025, August 14, 2025, August 26, 2025, and September 18, 2025, refusing to grant Clover its requested relief or alter Clover's Star Ratings in response to its objections stated herein.

## BACKGROUND

### A.    The Medicare Advantage Program

53.    The Medicare program provides government-funded health insurance to seniors and the disabled.  *See* 42 U.S.C. § 1395, *et seq*.

54.    Under the Act, beneficiaries enrolled under "Original Medicare" (Medicare Parts A and B) receive benefits for covered medical services directly from the federal government.  *See* 42 U.S.C. §§ 1395c to 1395i-6, 1395j to 1395w-6.

55.    Under "Medicare Part C," beneficiaries may alternatively elect coverage under the "Medicare Advantage" program, which Congress created in 1997.  *See id*. § 1395w-21; § 4001, 111 Stat. 275-327.  This program allows CMS to contract with private Medicare Advantage plans, which provide Medicare-covered benefits.

56.     As a part of the Medicare Modernization Act of 2003, Congress also established Medicare Part D, effective in 2006.  § 101, 117 Stat. at 2071-72.  Medicare Part D is an optional prescription drug benefit.  Enrollees in Medicare Advantage plans may choose whether to enroll in these optional Part D benefits.  *See generally* 42 U.S.C. §§ 1395w-101 to 1395w-104.

57.    Medicare Advantage plans must include the same level of benefits offered by Original Medicare (Medicare Parts A and B)—although Medicare Advantage plans may also offer supplemental benefits, such as optical or dental benefits.  *See generally* 42 U.S.C. § 1395w-22.

58.    Medicare Advantage plans compete to encourage beneficiaries to select their plans by offering high-quality care, supplemental benefits, and lower premiums.  *See id.*

59.     To fund Medicare Advantage benefits, the government pays plans a pre-determined monthly sum for each plan enrollee, determined through a bidding system. *See id.* § 1395w-23.

60.     Each year, CMS establishes "benchmark" rates that are meant to represent what it would cost CMS to provide Medicare benefits to an average enrollee in each county. *See id.* § 1395w-23(b)(1)(B). Plans then submit bids for the estimated cost for covering Medicare-defined standard benefits to an average enrollee for the upcoming year. *See id.* § 1395w-23(a)(1)(B).

61.     If a plan bids below the benchmark, CMS returns a portion of the difference to the plan as a "rebate," which plans can use, among other things, to reduce member cost sharing, lower Part D premiums, and offer supplemental benefits not included in traditional Medicare. *See, e.g.*, *id.* §§ 1395w-23(a)(1)(E), 1395w-24(a)(6)(A).

**B.     Medicare Quality Assurance Programs (1997-2003)**

62.     Under the Balanced Budget Act of 1997, each Medicare Advantage plan was required to "have arrangements . . . for an ongoing quality assurance program." § 4001, 111 Stat. at 291 (codified at 42 U.S.C. § 1395w-22(e)(1) (1997)).

63.     The statute provided for collection, analysis, and reporting of data by plans to allow CMS to monitor plans and provide beneficiaries information on plan quality. *Id.* § 1395w-22(e)(2)(A)(i), (vi), (xii) (1997).

64.     Prior to 2003, CMS had express authority to choose the "quality and outcomes measures" that the Secretary "determine[d] to be appropriate" as part of plans' quality assurance programs. *Id.* § 1395w-22(e)(1), (e)(2)(A)(xii) (1997).

65.     CMS's implementing regulations required each insurer to "[m]easure performance . . . using standard measures required by [CMS]," which "may be specified in uniform data collection and reporting instruments required by [CMS]." 42 C.F.R. § 422.152(c)(1) (1998).

66.     At that time, CMS had "already begun requiring reporting of standardized quality

measurement data through instruments such as [HEDIS], as well as reporting of standardized consumer satisfaction data through [CAHPS]." 63 Fed. Reg. at 34,993.

67.    Because CMS wanted "flexibility for the specific reporting and performance requirements to progress" so it could "respond rapidly to new developments," CMS's regulations did not "specify[] the particular measures for which reporting [would] be required." *Id.*

68.    CMS admitted from the beginning that it did not know what measures of quality it would ultimately deem appropriate to evaluate plan quality each year:  Instead, CMS committed to inform plans of its chosen measures "through the [annual] contracting process." *Id.*

69.    CMS believed that it would take years for CMS to determine which "minimum performance levels" were appropriate. 63 Fed. Reg. at 34,994 ("Because the process of identifying achievable, meaningful and equitable minimum performance levels will require a significant amount of data collection and analysis, we expect that it will be several years before a full complement of minimum performance levels can be established.").

70.    Each year, as CMS determined what measures and performance levels were required, plans would have *one year* to meet those new requirements, at which point CMS could "decline to renew" a noncompliant plan's contract as a Medicare Advantage insurer. *Id*.

71.    In response, plans warned that CMS's framework of adopting constantly changing measures and standards would add significant administrative costs, impose arbitrary data collection and quality standards unrelated to clinical quality and outcomes, and waste resources without improving healthcare for seniors. 65 Fed. Reg. at 40,220-21.

72.    Rather than addressing the natural consequences of its approach, CMS reiterated its authority to "impos[e] further requirements" on insurers in its discretion. *Id.*

**C.    The Medicare Modernization Act Of 2003**

73.    The Medicare Modernization Act of 2003 substantially amended the statutory

provisions discussed above.  § 722(a)(2), 117 Stat. 2066, 2347-48.

74.    Similar to the prior statute, Congress provided that "[e]ach MA [Medicare Advantage] organization shall have an ongoing quality improvement program for the purpose of improving the quality of care provided to enrollees in each MA [Medicare Advantage] plan offered."  42 U.S.C. § 1395w-22(e)(1).

75.    The amendments added a new § 1395w-22(e)(3), entitled "Data," which remains effective today.  Subparagraph (A)(i) requires that, "as part of the quality improvement program under paragraph (1), each MA [Medicare Advantage] organization shall provide for the collection, analysis, and reporting of data that permits the measurement of health outcomes and other indices of quality."  *Id.* § 1395w-22(e)(3)(A)(i).

76.    Subparagraph (B) further restricts the types of data that CMS can require as part of plans' quality improvement programs (as set forth in Subparagraph (A)(i)), providing:

> (B) Limitations.
>
> (i) Types of data.—The Secretary *shall not collect under subparagraph (A)* data on quality, outcomes, and beneficiary satisfaction to facilitate consumer choice and program administration *other than the types of data that were collected by the Secretary as of November 1, 2003*.
>
> (ii) Changes in types of data.—Subject to subclause (iii), the Secretary may only change the types of data that are required to be submitted under subparagraph (A) after *submitting to Congress a report on the reasons for such changes that was prepared in consultation with MA [Medicare Advantage] organizations and private accrediting bodies*.

*Id.* § 1395w-22(e)(3)(B)(i)–(ii) (emphases added).

77.    Congress thus limited the types of data CMS could require from each plan's quality improvement program.  In its subsequent rulemaking, CMS interpreted the amendments to mean that the agency could continue to collect data from existing measurement systems concerning plan

quality, including HEDIS, HOS, and CAHPS data, as part of those programs. *See* 69 Fed. Reg. at 46,886 ("We interpret section 1852(e)(3)(B)(i) of the Act [§ 1395w-22(e)] to mean that we can continue to require MA [Medicare Advantage] coordinated care plans to collect, analyze, and report their performance by using the measurement systems that are currently required, such as HEDIS, Health Outcomes of Seniors (HOS), and CAHPS.").

78.    CMS expressly recognized that requiring data from *new* performance measurement systems, *i.e.*, systems *other* than HEDIS, HOS, or CAHPS, as part of plans' quality improvement programs under § 1395w-22(e), would require a report to Congress in consultation with plans and private accrediting bodies:  "If, in the future, we believe that a new measurement system should be used to assess MA [Medicare Advantage] plans' performance, we are required under section 1852(e)(3)(B)(ii) of the Act [§ 1395w-22(e)] to submit a report to Congress that is prepared in consultation with MA [Medicare Advantage] organizations and private accrediting organizations." *Id.*

### D.    CMS's Sub-Regulatory Star Ratings System (2008-2010)

79.    CMS has published raw data about Medicare Advantage plan quality and performance since 1998. *See* 83 Fed. Reg. at 16,520.  But in 2008, CMS began publishing annual Star Ratings. *Id.*

80.    In 2008, Congress did not expressly authorize Star Ratings.  Instead, Star Ratings were purely a creature of CMS sub-regulatory guidance. *See id.*

81.    These sub-regulatory Star Ratings served two purposes:  (1) to provide beneficiaries information on plan performance to consider when choosing a plan; and (2) to assist CMS in identifying low performing plans for compliance actions. *See* 75 Fed. Reg. at 71,219.

82.    CMS's sub-regulatory Star Ratings depended in large part on data collected under § 1395w-22(e), as discussed above (*i.e.*, HEDIS, HOS, and CAHPS data).  But critically, a

significant portion of CMS's chosen data for ratings of Part C coverage, and *all* of CMS's chosen data for ratings of Part D coverage, were *not* collected under CMS's authority under § 1395w-22(e), but rather, drawn from other aspects of CMS's program administration.[9]

83.    CMS has admitted that, during this time, it determined Star Ratings based on other data sources beyond § 1395w-22(e), 83 Fed. Reg. at 16520, which, again, was constrained to plans' quality improvement systems, *i.e.*, the HEDIS, HOS, and CAHPS measurement systems.

84.    CMS has separate, broad authorities to collect data *itself*, and, furthermore, to disseminate data concerning plan quality *itself* to beneficiaries.  These authorities are separate from CMS's § 1395w-22(e) authority, which requires *plans* to provide for data collection, analysis, and reporting as part of their quality improvement systems.  Specifically, in establishing these sub-regulatory Star Ratings, CMS relied on, *inter alia*, § 1395w-21(d)(1) (section 1851(d) of the Medicare Act) and § 1395w-101(c)(1) (section 1860D-1(c) of the Medicare Act).  Those parallel provisions under Part C and Part D authorize CMS *itself* to disseminate a broader range of information to beneficiaries *that CMS itself collects*.  83 Fed. Reg. at 16520 ("We originally acted upon our authority to disseminate information to beneficiaries as the basis for developing and publicly posting the 5-star ratings system (section[] 1851(d) . . . of the Act) . . . . The Part D statute (at section 1860D-1(c)) imposes a parallel information dissemination requirement.").

85.    These *other* authorities authorize *CMS itself to* "provide for activities under this subsection to broadly disseminate information to [M]edicare beneficiaries (and prospective [M]edicare beneficiaries) on the coverage options . . . in order to promote an active, informed

---

[9] *See, e.g.*, CMS, *Medicare Health Plan Quality & Performance Ratings Tech. Notes, Pt. C* (2010) *and* CMS, *Medicare Health Plan Quality & Performance Ratings Tech. Notes, Pt. D* (2010), *both available at* https://www.cms.gov/medicare/health-drug-plans/part-c-d-performance-data.

selection among such options," including CMS mailings to beneficiaries and a CMS-run website and telephone line.  42 U.S.C. § 1395w-21(d)(1); *see also id.* § 1395w-101(c)(1) (similar).

86.    Amalgamating these varied authorities, CMS essentially asserted that, if CMS possessed data drawn from *any source* as part of Medicare, CMS could disseminate that information to beneficiaries through the sub-regulatory Star Ratings.  *See* 83 Fed. Reg. at 16520.

87.    That was essentially the *same* position that CMS had asserted prior to Congress's 2003 amendments:  That CMS could unilaterally determine the relevant measures and standards of quality for a plan, and change them annually at will.  *See* 63 Fed. Reg. at 34,993.

88.    In doing so, CMS continued to saddle plans with significant administrative costs, imposed arbitrary and unpredictable quality standards unrelated to health quality and outcomes, and failed to improve healthcare for seniors.  *See id.*; 65 Fed. Reg. at 40,220-21.

**E.    Statutory Star Ratings And Quality Bonus Payments (2010 To Present)**

89.    In 2010, Congress codified in part, and overrode in part, CMS's Star Ratings system.

90.    The Affordable Care Act—as amended by the Healthcare and Education Reconciliation Act—introduced the Quality Bonus Payment program, which incorporated Star Ratings into two statutory formulas that determine certain payments to Medicare Advantage plans.  *See* § 1102(c)-(d), 124 Stat. at 1043-46.

91.    The first formula, codified at 42 U.S.C. § 1395w-23(o) and known as the quality bonus payment, rewards Medicare Advantage plans rated 4 Stars or higher with an increased 5 percent benchmark against which to bid.  That effectively either increases the total amount of money the plan is eligible to receive, including in the form of a rebate (if its bid is below the benchmark) or reduces the premium the plan must charge its members (if its bid is above the benchmark).

92.    The second formula, codified at 42 U.S.C. § 1395w-24(b)(1)(C), gives higher-rated plans a larger portion of the difference between their bid and their benchmark back as a rebate as follows: 3 Stars and lower receive 50 percent; 3.5 and 4 Stars receive 65 percent, and 4.5 and 5 Stars receive 70 percent.  Rebates are used to lower patient cost-sharing and premiums, and fund supplemental benefits not offered under traditional Medicare, such as dental and vision benefits. *See, e.g.*, 85 Fed. Reg. 33,885, 33,885-56 (June 2, 2020).

93.    Critically, Congress needed to decide *which* data sources CMS could utilize for these revamped Star Ratings, given their significant financial importance under the revised statutory scheme.

94.    Congress could have adopted the status quo, permitting CMS to continue to rely on (1) data from quality improvement programs under § 1395w-22(e) (HEDIS, HOS, and CAHPS), (2) Part C administrative data under § 1395w-21(d)(1), and (3) Part D data under § 1395w-101(c)(1).

95.    Alternatively, Congress could have just allowed CMS to select "appropriate" data at will, the same authority that CMS possessed between 1997 and 2003.

96.    Congress declined to adopt either approach.  Instead, Congress provided that the "quality rating for a plan shall be determined according to a 5-star rating system (based on the *data collected under section 1395w-22(e) of this title*)."  *Id.* § 1395w-23(o)(4)(A) (emphasis added). That is, Congress applied much the same solution that it had adopted seven years earlier in its 2003 amendments, and expanded that solution *to the entire Star Ratings system*:  Congress required the Star Ratings to be based upon the data collected under plans' quality assurance programs as of November 1, 2003.  *Id.* § 1395w-22(e)(3)(A)(i).

97.    In this way, Congress required CMS to focus on well-established types of data

concerning clinical quality, health outcomes, and beneficiary satisfaction.  *See id.*

98.    As detailed below, despite Congress's explicit instruction, CMS decided to essentially maintain its existing sub-regulatory Star Ratings based on a host of other data that CMS admits are not collected pursuant to § 1395w-22(e), which CMS changes each and every year, without making any report to Congress in consultation with Medicare Advantage plans and private accrediting bodies.

### F.    CMS's Annual Determination And Publication Of Star Ratings

99.    Star Ratings are determined annually, in what boils down to a four-step process:

100.    *First,* CMS calculates a raw "measure score" on dozens of "measures."  *See* CMS, *2026 Star Ratings Measures and Weights* (2025) [hereinafter *2026 Star Ratings Measures & Weights*], https://www.cms.gov/files/document/2026-star-ratings-measures.pdf.  A "measure score" is the plan's raw score on each measure—usually expressed as a percentage.  *See* 42 C.F.R. §§ 422.162(a), 422.166(a)(1), (a)(4) (Part C); *id.* §§ 423.182(a), 423.186(a)(1), (a)(4) (Part D).  A Medicare Advantage plan will receive over 40 of these raw measure scores each year on various measures.  *See generally 2026 Star Ratings Measures & Weights.*  Each measure is derived from a specified data source, such as HEDIS, HOS, CAHPS, or administrative data, with that source identified in CMS's annual Technical Notes.  83 Fed. Reg. at 16,537-46.

101.    *Second,* CMS uses statistical "clustering" to identify plans with similar "measure scores" and set "cut points" for these "measure scores."  By doing so, CMS divides plans between the Star Rating levels.  42 C.F.R. §§ 422.166(a)(1), (a)(4), (a)(2), 423.186(a)(1), (a)(2), (a)(4).

102.    *Third,* CMS converts the raw measure score, for each measure, into a measure-specific Star Rating between 1 and 5.  42 C.F.R. §§ 422.166(a)(1), (a)(4), 423.186(a)(1), (a)(4).

103.    *Fourth*, CMS takes a weighted average of all the plan's individual measure-specific Star Ratings.  *See* 42 C.F.R. §§ 422.166(c)(1), (d)(1), 423.186(c)(1), (d)(1).  This weighted average determines the plan's overall Star Rating.

104.    The annual Star Ratings are released each October, prior to the annual open enrollment period for Medicare Advantage.  The year associated with Star Ratings corresponds to the year for the open enrollment period.  For example, the Star Ratings released on October 9, 2025 are referred to as the "2026 Medicare Part C & D Star Ratings" because they are published prior to the 2026 open enrollment period, which occurs in late 2025.  *2026 Pt. C & D Star Ratings Tech. Notes*, at 1.  Meanwhile, the *data* underlying the 2026 Star Ratings were collected during 2024, and the 2026 Star Ratings will impact *payments to plans* in 2027.  *See e.g.*, *id.* at 54 (noting the data time frame for a measure was within 2024).

105.    CMS displays Star Ratings as part of its online "Plan Finder" tool, which seniors use to research, compare, and sign up for Medicare Advantage plans.  Higher-rated plans are displayed higher than lower-rated plans, thus helping them attract a disproportionate share of enrollment.

### G.    Notice And Comment On The Star Ratings Measures

106.    Under CMS's current methodology, Star Ratings measures change each year.  Due to these "regular updates and revisions," CMS does not codify its Star Ratings measures in the Code of Federal Regulations, but rather lists out its measures for a given year in its annual Technical Notes.  83 Fed. Reg. at 16,537.

107.    The Technical Notes provide a partial, summary description of the specifications for each measure.  To actually determine each measure, however, it is necessary to utilize the detailed specifications contained in CMS's other sub-regulatory guidance, including specific "Technical Notes" pertaining to each measure.  *See, e.g.*, CMS, *Medicare Pt. C & D Call Center*

*Monitoring Accuracy & Accessibility Study Tech. Notes* (2022) (partially specifying calculation of C33 and D01 measures, among other sources of guidance).

108.    For 2026 Star Ratings, CMS utilized 33 measures for Part C ("C01-C33") and 12 measures for Part D ("D01-D12").  *See generally 2026 Star Ratings Measures & Weights*.

109.    Before evaluating a plan with a given Star Ratings measure, CMS must undertake public notice-and-comment rulemaking concerning that measure.  This obligation stems from two separate sources of law relevant to this case.

110.    *First*, CMS's regulations provide that, before adding a "new" measure, or making substantial changes to a measure's specifications, CMS must first publicly propose the measure (on its website), elicit public feedback prior to the measurement year, *and then* formally engage in notice-and-comment rulemaking.  *See* 42 C.F.R. § 422.164(c)(2) ("In advance of the measurement period, CMS will announce potential new measures and solicit feedback through the process described for changes in and adoption of payment and risk adjustment policies in section 1853(b) of the Act [42 U.S.C. § 1395w-23] and then subsequently will propose and finalize new measures through rulemaking."); *id.* § 423.184(c)(2) (same for part D); *id.* §§ 422.164(d)(2), 423.184(d)(2) (same procedure applies for substantial changes to measure).

111.    *Second*, CMS has a statutory obligation to promulgate Star Ratings measures "by regulation."  CMS must promulgate "by regulation" any "rule, requirement, or other statement of policy" that "establishes or changes a substantive legal standard governing the scope of benefits, the payment for services, or the eligibility of individuals, entities, or organizations to furnish or receive services or benefits under this subchapter" pursuant to 42 U.S.C. § 1395hh(a)(2); *Azar v. Allina Health Servs.*, 587 U.S. 566, 569-70 (2019) (recognizing that "Congress chose to write a new, Medicare-specific" "notice-and-comment regime" under § 1395hh).

**H.    CMS Unlawfully Determines Clover's 2026 Star Rating Using Measures Based On Data *Not* Collected As Part Of Plans' Quality Improvement Programs**

112.    CMS determined Clover's 2026 Star Rating using measures based on data that plans did *not* provide for collection, analysis, or reporting of as part of their required quality improvement programs, and were therefore outside CMS's authority under § 1395w-22(e).

113.    Again, Congress has restricted CMS to calculating Star Ratings based on "data collected under section 1395w-22(e) of this title." 42 U.S.C. § 1395w-23(o)(4)(A).

114.    And § 1395w-22(e) provides that "each MA [Medicare Advantage] organization shall provide for the collection, analysis, and reporting of data that permits the measurement of health outcomes and other indices of quality." *Id.* § 1395w-22(e)(1); *id.* § 1395w-22(e)(3)(A)(i).

115.    CMS's regulations implement this requirement.    42 C.F.R. § 422.152(e)(2) (requiring that a plan must "measure performance" using standard measures, "report its performance to CMS," and "[c]ollect, analyze, and report quality performance data identified by CMS").

116.    Yet even CMS concedes that it determines Star Ratings using data not collected as part of plans' quality improvement programs under § 1395w-22(e):

> there are several measures in the Stars Ratings System that are based on performance that address telephone customer service, members' complaints, disenrollment rates, and appeals; however these *additional measures are not collected directly from the sponsoring organizations for the primary purpose of quality measurement so they are not information collections governed by section 1852(e)) [§ 1395w-22(e)]*.    These additional measures are calculated from information that CMS has gathered *as part of the administration of the Medicare program*, such as information on appeals forwarded to the Independent Review Entity under subparts M, enrollment, and compliance and enforcement actions.

83 Fed. Reg. at 16,531-32 (emphases added); 82 Fed. Reg. at 56,382 (same); *AvMed, Inc. v. Becerra*, No. 20-3385, 2021 WL 2209406, at *11 (D.D.C. June 1, 2021) (noting CMS's admissions on this score).

117.    CMS also admitted as much in the Code of Federal Regulations:  "CMS bases Part C Star Ratings on the type of data specified in section 1852(e) of the Act [§ 1395w-22e] *and on CMS administrative data*."  42 C.F.R. § 422.162(c)(1) (emphasis added); *see also* 83 Fed. Reg. at 16,532 (conceding "that the type of data used for Star Ratings will be data consistent with the section 1852(e) [§ 1395w-22e] limits *and data gathered from CMS administration of the MA [Medicare Advantage] program*" (emphasis added)); *see also* 82 Fed. Reg. at 56,497 (same).

118.    CMS's repeated concessions follow from the statutory text:  The only permissible sources of data are those that plans "provide for" collection, analysis, and reporting of "as part of the quality improvement program," *i.e.*, that plans themselves arrange to collect, analyze, and report as part of their quality improvement programs.  *Provide*, The American Heritage Dictionary of the English Language (4th ed. 2003) (defining "provide" as "[t]o make available," "[t]o supply something needed or desired," or "[t]o take[] measures in preparation."); *In re Restorff*, 932 N.W.2d 12, 19 (Minn. 2019) (construing "provide for" as to "create and execute a plan for"); *Banfield v. Cortés*, 110 A.3d 155, 167 (Penn. 2015) (construing "provide for" to mean "to make available for use or supply" or "make adequate preparation for (a possible event)," *i.e.*, the "ability to generate or supply the required records on demand").

119.    As CMS has explained, Congress imposed this limitation on data collection from plans under § 1395w-22(e)(3)(A)(i) because Congress was "concerned with the reporting burden that the Secretary might place on insurers, and wanted to know before the Secretary imposed new requirements" on Medicare Advantage plans themselves.  *AvMed*, 2021 WL 2209406, at *11.

120.    Accordingly, Congress "limited the Secretary's authority" under § 1395w-22(e)(3) in order to "minimize [the] reporting burden for the industry."  *Id*. (citing 83 Fed. Reg. at 16,520).

121.    More fundamentally, Congress was obviously aware of CMS's Star Rating system when Congress codified it *only in part* in its 2010 amendments.  42 U.S.C. § 1395w-23(o)(4)(A). Congress could have codified the status quo, permitting CMS to continue to rely on any source of data from the Medicare program.  Instead, Congress authorized CMS solely to utilize data pertaining to quality, outcomes, and satisfaction provided through plans' longstanding quality improvement plans.  *See id.*  Those data (within HEDIS, HOS, and CAHPS) are focused on preventing, screening for, diagnosing, and efficiently treating chronic conditions, allowing for earlier and more successful interventions.  *See, e.g.*, *2026 Pt. C & D Star Ratings Tech. Notes*, at 29-30, 36-37, 71-72.

122.    Yet CMS based Clover's 2026 Star Rating on data Clover *did not* provide under its quality improvement program pursuant to § 1395w-22(e).

123.    For example, some of CMS's new, novel measures are based on data simply drawn from private CMS contractors.  These measures include the Part C and Part D "Call Center – Foreign Language Interpreter and TTY Availability" measures (C33 and D01), which both evaluate the percentage of time that TTY services and foreign language interpretation were available when a CMS contractor (a "test" caller) speaking a foreign language called the plan's customer service line.  *2026 Pt. C & D Star Ratings Tech. Notes*, at 82, 84.

124.    Likewise, the "Reviewing Appeals Decisions" (C32) measure is based on data collected from a CMS contractor known as the IRE, to determine how often coverage decisions are upheld on appeal by the IRE.  *Id.* at 79-82.

125.    Other measures applied in unlawfully determining Clover's 2026 Star Ratings are based on data collected under Medicare Part D, concerning the quality of Part D prescription drug plans.  These, too, are not data collections under CMS's authority *under Part C* that "each *MA*

*[Medicare Advantage] organization shall provide f*or the collection, analysis, and reporting of data that permits the measurement of health outcomes and other indices of quality" as part of their quality improvement programs under Medicare Part C.  42 U.S.C. § 1395w-22(e).

126.    Indeed, just a glancing review of CMS's regulations and guidance documents governing Medicare Advantage plans' quality improvement programs shows *zero* reference to any requirement for Medicare Advantage plans to collect, analyze, or report data concerning Part D prescription drugs pursuant to § 1395w-22(e).  *See* 42 C.F.R. § 422.152(e)(2); *see also* CMS, *Medicare Managed Care Manual Chapter 5 - Quality Improvement Program* § 30 (2014) (Discussing "Standard . . . Reporting Requirements for HEDIS, HOS, and CAHPS").

127.    On the contrary, as CMS has admitted, such Part D data are "not collected directly from the sponsoring organizations for the primary purpose of quality measurement so they are not information collections governed by section 1852(e)) [§ 1395w-22(e)]."  83 Fed. Reg. at 16,531-32.

128.    This makes sense:  As noted, quality improvement programs must be directed to "improving the *quality of care* provided to enrollees" under Medicare Part C.  42 U.S.C. § 1395w-22(e)(1) (emphasis added).  Delivery of optional Part D drug benefits is a different matter from the quality of "care."  Indeed, as noted, CMS itself does not construe the "quality of care" under Part C to encompass delivery of pharmacy benefits under Part D.  *See* CMS, *Medicare Managed Care Manual Chapter 5 - Quality Improvement Program* § 30 (2014).

129.    Moreover, several Part D measures, including measures Medication Adherence for Diabetes Medication, Hypertension, and Cholesterol (D08, D09, and D10) and Pharmacy Statin Use with Diabetes (D12), are based on Prescription Drug Event ("PDE") data, which are summary extracts of prescribing information generated each time a beneficiary fills a prescription under

Medicare Part D, whether or not that beneficiary is part of Medicare Advantage. Those data, too, are not collected, analyzed, or reported as part of plans' quality improvement programs, which again, under § 1395w-22(e), are limited to Medicare Part C.[10]

130.    Other Part D measures, including the measure Pharmacy Medication Therapy Management Program Completion Rate (D11), are based on "Plan D Reporting" data, which is data reported by plans to CMS to meet the requirements of 42 C.F.R. § 423.514 under Medicare Part D to report a plan's costs of operations and other data relevant to Part D. *E.g.*, *2026 Pt. C & D Star Ratings Tech. Notes*, at 105 ("The data for this measure were reported by contracts to CMS per the 2024 Part D Reporting Requirements . . . .").

131.    In summary, the 2026 Star Ratings measures that are based on data from these Part D sources, rather than collected under § 1395w-22(e), include:

- Rating of Drug Plan (D05):  Defined as how members view their drug plan, from best to worst (stemming from CAHPS survey data collected outside Medicare Advantage plans' quality improvement programs under § 1395w-22(e)). *2026 Pt. C & D Star Ratings Tech. Notes*, at 91-92; 83 Fed. Reg. at 16,532 (explaining that CMS's authority to collect Part D prescription drug plan customer satisfaction data derives from "Section 1860D–4(d) of the Act," *i.e.* 42 U.S.C. § 1395w-104(d) within Part D).

- Getting Needed Prescription Drugs (D06):  Defined as the rate at which members believe that they can easily obtain prescription drugs when using their plan (stemming from CAHPS survey data collected outside Medicare Advantage plans' quality improvement

---

[10] *See 2026 Pt. C & D Star Ratings Tech. Notes*, at 97, 99, 102, 107 (describing that PDE data stems from the "annual Part D payment reconciliation"); CMS, *Questions and Answers on Obtaining Prescription Drug Event ("PDE") Data*, https://www.cms.gov/medicare/prescription-drug-coverage/prescriptiondrugcovgenin/downloads/partdclaimsdataqa.pdf.

programs under § 1395w-22(e)).  *2026 Pt. C & D Star Ratings Tech. Notes*, at 92-93; 83 Fed. Reg. at 16,532.

- Medication Adherence for Diabetes Medication, Hypertension, and Cholesterol (D08, D09, and D10):  Defined as "[t]he percentage of plan members with a prescription for [certain] medication[s] who fill their prescription often enough to cover 80% or more of the time they are taking the medication" (stemming from Prescription Drug Event data collected under Part D).  *2026 Pt. C & D Star Ratings Tech. Notes*, at 97-104.

- Pharmacy Medication Therapy Management Program Completion Rate (D11):  Defined as the percentage of certain plan members who have had an assessment of their medications from a plan (stemming from Plan D Reporting data).  *Id.* at 104-106.

- Pharmacy Statin Use with Diabetes (D12):  Defined as the rate of certain plan members who were dispensed at least two diabetes medication fills on unique dates of service and received a statin medication fill during the measurement period (stemming from Prescription Drug Event data collected under Part D).  *Id.* at 107-09.

132.    CMS unlawfully determined Clover's 2026 Star Rating using these measures, even though these measures are not based on data collected under § 1395w-22(e).

**I.    CMS Unlawfully Determines Clover's 2026 Star Rating Utilizing Measures Based On Types Of Data Not Collected As Of November 1, 2003**

133.    The preceding problem alone renders invalid CMS's application of several measures as part of Clover's 2026 Star Ratings.  But even if CMS were to try to walk away from its prior admissions that these data on which CMS relied are *not* collected under § 1395w-22(e), there would be an additional problem:  CMS also determined Clover's 2026 Star Rating by utilizing data that are *not* the "types of data that were collected by the Secretary [of HHS] as of

November 1, 2003" as part of plans' quality assurance programs.    42 U.S.C. § 1395w-22(e)(3)(B)(i).

134.    Congress's limitation on these data sources makes good sense:  Congress was "concerned with the reporting burden that the Secretary might place on insurers, and wanted to know before the Secretary imposed new requirements—presumably, so that Congress could act if it saw the need." *AvMed*, 2021 WL 2209406, at *11.

135.    As explained above, CMS has never conformed its Star Ratings to the further limitation *within* § 1395w-22(e) that CMS may only rely upon "the types of data that were collected by the Secretary as of November 1, 2003." 42 U.S.C. § 1395w-22(e)(3)(B)(i).  As noted, CMS has asserted that the "types of data" that CMS may rely on under § 1395w-22(e)(3)(B) are any data concerning plan quality, so as long as the data are collected within CMS's "measurement systems" used to collect data as of 2003, *i.e.*, HEDIS, HOS, and CAHPS.  69 Fed. Reg. at 46,886; *see also* 83 Fed. Reg. at 16,531-32.

136.    That is incorrect.  Instead, the "types of data" collected as of November 1, 2003 means data in common with the specific data collections, *i.e.*, the specific survey questions, under CAHPS, HEDIS, and HOS as of November 1, 2003.  *Id.*

137.    Determining these "types" of data requires a comparative exercise, identifying whether CMS's current data share the relevant "common traits or characteristics" of the data CMS collected in 2003.  *Type*, The American Heritage Dictionary of the English Language (4th ed. 2003); *see also Type*, Merriam-Webster's Collegiate Dictionary (11th ed. 2003) ("[A] particular kind, class, or group.").

138.    The statute's text, structure, and history elucidate the proper level of generality for this comparative exercise.  *See United States v. Rigel Ships Agencies, Inc.*, 432 F.3d 1282, 1288

(11th Cir. 2005) ("In any question of statutory interpretation, we do not look at one word or term in isolation, but instead we look to the entire statutory context.").

139.    Congress provided that CMS "shall not collect . . . data on quality, outcomes, and beneficiary satisfaction to facilitate consumer choice and program administration other than the types of data that were collected by the Secretary as of November 1, 2003." 42 U.S.C. § 1395w-22(e)(3)(B)(i). If the permissible "types of data" from 2003 were the equivalent of the broad "quality, outcomes, and beneficiary satisfaction" categories, as CMS has suggested, the limiting phrase "types of data" would be rendered entirely superfluous.

140.    It is a "cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001). Therefore, the statutory text and structure dictate that the "types of data" clause must refer to a narrower set of specific types of information than just quality, outcomes, and satisfaction.

141.    This interpretation is confirmed by the adjacent requirement that Medicare Advantage organizations must already collect, analyze, and report data that permits the measurement of "health outcomes and other indices of quality." 42 U.S.C. § 1395w-22(e)(3)(A)(i)). If the limitation in (B)(i) were read broadly to include any measure of quality or outcomes, the entirety of the statutory restriction in (B)(i) would be surplusage, as the data collection under Medicare Advantage quality improvement programs must inherently relate to outcomes and other indices of quality. *Id.*; *see also Ala. Ass'n of Realtors v. De't of Health & Hum. Servs.*, 594 U.S. 758, 763-64 (2021) (per curiam) (explaining that even broad delegations of authority to agencies must be read in the context of the broader statutory framework).

142.     While CMS is correct that data that was not subject to the CAHPS, HEDIS, and HOS measurement systems in 2003 generally will not qualify as "types of data that were collected by the Secretary [of HHS] as of November 1, 2003" under plans' quality assurance programs, 42 U.S.C. § 1395w-22(e)(3)(B)(i), CMS cannot evade Congress's chosen limitations by jamming any type of data concerning quality, outcomes, or satisfaction it wishes into the CAHPS, HEDIS, and HOS measurement systems (like data on whether doctors advise on the risks of gun ownership). As explained *supra* ¶¶ 133-139, this would render Congress's direction to limit the types of data collected meaningless. *See Rubin v. Islamic Republic of Iran*, 583 U.S. 202, 213 (2018) ("[A] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant.").

143.     Recall that the reason Congress enacted this "types of data" limitation in the first place was that CMS had previously overreached in exercising its authority to require data collections and set minimum performance standards as it found "appropriate." *See AvMed*, 2021 WL 2209406, at *11.  CMS told plans that it would inform them of its chosen measures and required performance levels "through the [annual] contracting process," and provide plans *one year* to comply or face termination.  63 Fed. Reg. at 34,993.  Plans objected that CMS's shifting "minimum performance levels" and "measures" would impose undue burdens and harm plans and patients.  65 Fed. Reg. at 40,222.  In 2003, and then 2010, Congress sought to end these moving goalposts and stop CMS from imposing different or additional reporting and performance requirements on plans.  *See* 42 U.S.C. § 1395w-22(e)(3)(A)(i)).

144.     Congress thus intentionally chose *not* to permit CMS to regulate through free-flowing, standardless sub-regulatory guidance.  Congress knew that such regulatory overreach increased costs and administrative overhead without benefiting patients, and adopted guardrails to

prevent such overreach again.  *See id.*

145.    Despite these limitations, CMS determined Clover's 2026 Star Rating based on types of data concerning quality, outcomes, and beneficiary satisfaction that CMS did not collect as of November 1, 2003, including the following measures:

- Reviewing Appeals Decisions (C32):  Defined as the percentage of a plan's coverage decisions that are upheld by the IRE, as opposed to overturned.  *2026 Pt. C & D Star Ratings Tech. Notes*, at 80-81.  Data concerning the IRE's evaluation of appeals of coverage decisions were not the type of data collected as part of plans' quality assurance programs prior to November 1, 2003.

- Call Center—Foreign Language Interpreter / TTY (C33):  Defined as the percent of time interpretation and TTY services were available for individuals who called a plan's prospective enrollee customer service line.  *Id.* at 82.  Data concerning call center interpretation and TTY quality were not the type of data collected as part of plans' quality assurance programs prior to November 1, 2003.

- Care Coordination (C27):  Defined as how well the plan coordinates members' care (such as whether a primary care doctor seemed up-to-date about a member's care from a specialist).  *Id.* at 71.  Data concerning care coordination were not the type of data collected as part of plans' quality assurance programs prior to November 1, 2003.

- Reducing the Risk of Falling (C15):  Defined as rates of beneficiaries discussing falls and fall prevention with providers.  *Id.* at 53.  Data concerning risk of falling—let alone whether beneficiaries had reason to or discussed risk of falling—were not collected as part of plans' quality assurance programs prior to November 1, 2003.

- Rating of Healthcare Quality (C25):  Defined as how members rate their health care.  *Id.* at 69.  Data concerning members' subjective rating of their health care were not the type of data collected as part of plans' quality assurance programs prior to November 1, 2003.  (Members rated their health *plans*, the quality measure Congress instructed CMS to use.)

- Improving or Maintaining Mental Health (C05):  Defined as the percent of plan members who feel their mental health was the same or better than expected after two years.  *Id.* at 35.  Comparative data concerning members' subjective view of changes in mental health were not the type of data collected as part of plans' quality assurance programs prior to November 1, 2003.

- Getting Needed Care (C22):  Defined as how members rate their ease of getting needed care, including by obtaining appointments quickly with specialists.  *Id.* at 65.  Data on obtaining appointments with specialists were not the type of data collected as part of plans' quality assurance programs prior to November 1, 2003.

- Call Center – Foreign Language Interpreter / TTY (D01):  Defined as the percent of time interpretation and TTY services were available for individuals who called a drug plan's prospective enrollee customer service line.  *Id.* at 85.  Data concerning call center interpretation and TTY quality were not collected as part of plans' quality assurance programs prior to November 1, 2003.

- Rating of Drug Plan (D05):  Defined as how members rate their drug plan.  *Id.* at 92.  Data concerning Part D prescription drug benefits were not collected as part of plans' quality assurance programs prior to November 1, 2003:  Among other reasons, Medicare Part D benefits did not exist at that time.  This same problem impacts the other Part D measures.

- Getting Needed Prescription Drugs (D06):  Defined as how easily members believe they can obtain prescription drugs when using their plan.  *Id.* at 93.

- Medication Adherence for Diabetes, Hypertension, and Cholesterol Medications (D08, D09, D10):  Defined as the percentage of plan members with certain medications who fill their prescription often enough to cover 80% or more of a given year.  *Id.* at 96-104.

- Pharmacy Medication Therapy Management Program Completion Rate (D11):  Defined as the percentage of certain plan members who have had an assessment of their medications from a plan.  *Id.*

- Pharmacy Statin Use with Diabetes (D12):  Defined as the rate of certain plan members who were dispensed at least two diabetes medication fills on unique dates of service and received a statin medication fill during the measurement period.  *Id.* at 107.

146.    CMS unlawfully determined Clover's 2026 Star Rating using these measures, which are not based on the types of data collected as of November 1, 2003.

### J.    CMS Unlawfully Determines Clover's 2026 Star Rating Based On Measures Adopted Without Required Notice And Comment Under 42 C.F.R. § 422.164

147.    CMS also used several new and/or substantially modified measures to determine Clover's 2026 Star Rating.

148.    These new measures included Improving or Maintaining Physical Health (C04) (measuring the percentage of plan members whose physical health was the same or better than expected after two years) and Improving or Maintaining Mental Health (C05) (measuring the percentage of plan members whose mental health was the same or better than expected after two years).  *2026 Pt. C & D Star Ratings Tech. Notes*, at 2, 130, 160 (acknowledging that these were "new" measures for the 2026 Star Ratings).

149.    Variations on Maintaining Physical Health (C04) and Improving or Maintaining Mental Health (C05), with different measurement designs, were previously used in prior Star Ratings, but they were removed as measures from the 2022-2025 Star Ratings years, and re-introduced for 2026. *See 2026 Star Ratings Measures & Weights*.

150.    Although CMS correctly identified these measures as "new" for purposes of the 2026 Star Ratings, *see* CMS, *Advance Notice of Methodological Changes for Calendar Year (CY) 2026 for Medicare Advantage (MA) Capitation Rates & Pt. C & Pt. D Payment Policies* ("*Advance Notice*") (January 10, 2025), https://www.cms.gov/files/document/2026-advance-notice.pdf, it applied these measures to Clover without following the required notice-and-comment procedure under 42 C.F.R. § 422.164(c)(2).

151.    CMS's regulations provide that, before adding a "new" measure, CMS must engage in a two-step process.  42 C.F.R. § 422.164(c)(2).  First, CMS must "announce potential new measures and solicit feedback" through the "annual call" process in 42 U.S.C. § 1395w-23(b)(1)—which CMS accomplishes by posting the proposed changes to its website.  42 C.F.R. § 422.164(c)(2).[11]

152.    Second, after that "annual call" and before the relevant measure period, CMS must "propose and finalize new measures through rulemaking." *Id.* § 422.164(c)(2).  CMS also uses this two-step process for major changes to measures, which CMS refers to as "substantive updates." *Id.* § 422.164(d)(2).

---

[11] The "annual call" process under 42 U.S.C. § 1395w-23(b)(1) requires CMS to announce any changes to Star Ratings measures by April the year before any change is made, and allows plans 30 days for comment.  42 U.S.C. § 1395w-23(b)(1)(B)(i), (b)(2).

153.    On February 18, 2020, CMS proposed major changes to the Improving or Maintaining Physical Health and Improving or Maintaining Mental Health measures (C04-C05) in the Federal Register.  85 Fed. Reg. 9,002, 9,045 (Feb. 18, 2020).

154.    In response to comments, CMS took the position that, rather than making these proposed changes immediately, these measures would be removed from the Star Ratings for several years.  86 Fed. Reg. 5,864, 5,919 (Jan. 19, 2021).

155.    As noted, CMS added Improving or Maintaining Physical Health and Improving or Maintaining Mental Health measures (C04-C05) as "new" measures for the 2026 Star Ratings as CMS had suggested it would do at the conclusion of its 2021 rulemaking.  86 Fed. Reg. at 5,919.  But CMS did not "announce [the] potential new measures and solicit feedback" through the "annual call" process described in 42 U.S.C. § 1395w-23(b)(1) *prior to* engaging in rulemaking concerning these measures; nor did CMS engage in this "annual call" process *prior to* the 2024 measurement year for these new measures.  *See* 42 C.F.R. § 422.164(c)(2); *see also id.* § 422.164(d)(2) (same procedures required for substantive updates); *Cahaba Riverkeeper v. EPA*, 938 F.3d 1157, 1164 (11th Cir. 2019) (highlighting that agency cannot act in a manner that is inconsistent with its regulations).

156.    CMS made essentially the same error with respect to the measure Getting Appointments and Care Quickly (C23).  Prior to the 2026 Star Ratings, CMS re-specified this measure to cut down the specified questions from 3 questions to 2 questions, by dropping the question, "In the last 6 months, how often did you see the person you came to see within 15 minutes of your appointment time."  *Compare* CMS, *Medicare 2024 Pt. C & D Star Ratings Tech. Notes*, at 68 *with 2026 Pt. C & D Star Ratings Tech. Notes*, at 66.

157.    In removing this question from measure C23 in 2024, CMS deemed this change "non-substantive," and therefore did not subject the change to notice and comment.  CMS, *Announcement of Calendar Year (CY) 2024 Medicare Advantage (MA) Capitation Rates & Pt. C and Pt. D Payment Policies* 178; *see generally* 89 Fed. Reg. 30,448 (Apr. 23 2024).

158.    Non-substantive updates are limited by regulation.  42 C.F.R. § 422.164(d)(1).  A non-substantive update is one that (1) narrows the denominator of the measure, (2) does not impact the numerator or denominator of the measure, (3) updates certain clinical codes, (4) provides clarifications (such as the addition of further instructions), or (5) adds alternative data sources to expand modes of data collection.  *Id.* § 422.164(d)(1).

159.    Reducing the data upon which this measure is based to exclude a question that was previously measured is not within the five, preceding categories.  It therefore falls outside the ambit of a non-substantive update, and is therefore a substantive update.  *Id.*

160.    Nor does this change fall within the ordinary, public meaning of "non-substantive." Beneficiaries obviously care whether they are seen within 15 minutes, or an hour-and-15-minutes. The remaining questions pertaining to this measure instead test how quickly beneficiaries can *get scheduled* to see a provider.  *2026 Pt. C & D Star Ratings Tech. Notes*, at 66.

161.    Unsurprisingly, CMS conceded that this change would "reduce the reliability of the measure."[12]

162.    As noted, such substantive changes require notice and comment rulemaking.  *See* § 422.164(d)(2).  CMS did not do so when it substantially changed measure C23.

---

[12] CMS, *Announcement of Calendar Year (CY) 2024 Medicare Advantage (MA) Capitation Rates & Pt. C & Pt. D Payment Policies* 178 (Mar. 31, 2023).

163.    Accordingly, CMS may not apply these three measures to Clover as part of Clover's 2026 Star Ratings.

### K.    CMS Unlawfully Determines Clover's 2026 Star Rating Using Measures Adopted Without Promulgation By Regulation And Required Rulemaking Under 42 U.S.C. § 1395hh(a)(2)

164.    In determining Clover's 2026 Star Rating, CMS also utilized measures without adopting those measures' specifications as regulations through required notice-and-comment rulemaking under 42 U.S.C. § 1395hh(a)(2).

165.    Under the Medicare Act, "no rule, requirement, or other statement of policy . . . that establishes or changes a substantive legal standard governing the scope of benefits, the payment for services, or the eligibility of individuals, entities, or organizations to furnish or receive services or benefits under this subchapter shall take effect unless it is promulgated by the Secretary by regulation."  42 U.S.C. § 1395hh(a)(2).

166.    CMS's Star Ratings measures can determine CMS's payments to Clover, Clover's benefits offered to beneficiaries, Clover's payments to providers, and Clover's eligibility to participate in the Medicare Advantage program.   42 U.S.C. §§ 1395w-23(o)(1); 1395w-24(b)(1)(C); 1395w-24(b)(1)(C)(v); 42 C.F.R. §§ 422.260, 422.266(a)(2)(ii); *Scan Health Plan*, 2024 WL 2815789, at * 1 (highlighting that CMS is "obligated" to "offer additional funding to plans with better Star Ratings" and "higher-rated plans can then use those extra funds to lower costs for their beneficiaries or to provide them with additional benefits").

167.    In addition, CMS terminates plans that have Part C Star Ratings below three stars for three consecutive years.  *See* 42 C.F.R. § 422.510(a)(4)(xi).

168.    The specification of each of the Star Ratings measures identified herein thus amounts to a "rule, requirement, or other statement of policy" that "establishes or changes a substantive legal standard governing the scope of benefits, the payment for services, or the

eligibility of individuals, entities, or organizations to furnish or receive services or benefits under this subchapter." 42 U.S.C. § 1395hh(a)(2); *Allina Health Servs. v. Price*, 863 F.3d 937, 943 (D.C. Cir. 2017) (recognizing that HHS's measures "used to calculate the payment that providers will receive for providing healthcare services to low-income patients" fell under § 1395hh(a)(2)), *aff'd*, 587 U.S. 566 (2019).

169.    Because the specification of each Star Ratings measure sets "the scope of benefits" and "payment for services," and Clover's "eligibility" to participate in Medicare Advantage, these measures must be promulgated "by regulation."  *See* 42 U.S.C. § 1395hh(a)(2).

170.    Consistent with § 1395hh(a)(2), CMS has codified in the Code of Federal Regulations almost every material aspect of its Star Rating system, including procedures governing how the Star Ratings are calculated each year.  *See generally* 42 C.F.R. §§ 422.160-166, 423.180-186.

171.    But CMS has chosen to treat the *specification* of *measures* differently, on the theory that publishing measure specifications as regulations in the Code of Federal Regulations would diminish CMS's ability to morph these specifications from year to year.  83 Fed. Reg. at 16,537 ("CMS will not codify a list of measures and specifications in regulation text in light of the regular updates and revisions contemplated" by CMS.).

172.    The problem with CMS's failure to codify the measures' specifications as regulations is that Congress requires CMS to do so.  42 U.S.C. § 1395hh(a)(2) ("No rule, requirement, or other statement of policy (other than a national coverage determination) that establishes or changes a substantive legal standard governing the scope of benefits, the payment for services, or the eligibility of individuals, entities, or organizations to furnish or receive services

or benefits under this subchapter shall take effect unless it is promulgated by the Secretary by regulation under paragraph (1).").

173.    CMS did not promulgate "by regulation" *any* of the specifications for the following measures that it applied to Clover in determining Clover's 2026 Star Ratings:

- Annual Flu Vaccine (C03),

- Improving or Maintaining Physical Health (C04),

- Improving or Maintaining Mental Health (C05),

- Reducing the Risk of Falling (C15),

- Improving Bladder Control (C16),

- Getting Needed Care (C22),

- Getting Appointments and Care Quickly (C23),

- Customer Service (C24),

- Rating of Health Care Quality (C25),

- Care Coordination (C27),

- Reviewing Appeals Decisions (C32),

- Call Center – Foreign Language Interpreter / TTY (C33),

- Call Center – Foreign Language Interpreter / TTY (D01),

- Rating of Drug Plan (D05),

- Getting Needed Prescription Drugs (D06),

- Medication Adherence for Diabetes Medication, Hypertension, and Cholesterol (D08, D09, and D10),

- Pharmacy Medication Therapy Management Program Completion Rate (D11), and

- Pharmacy Statin Use with Diabetes (D12).

174.    Moreover, even if CMS were to take the position that promulgating these measures' specifications "by regulation" is met by publishing these measures in the Federal Register, CMS did not do that, either.  To be sure, CMS has listed out the names and high-level descriptions of the measures in prior Federal Register announcements.  But CMS has not provided in the Federal Register the specifications for how the measures are determined.  83 Fed. Reg. at 16,531-32.

175.    To actually determine the Star Ratings measures each year, at least two additional sets of specifications of the measures are necessary, beyond just listing their names in the Federal Register:  (1) the over 200 pages of summary specifications in CMS's Star Ratings Technical notes, which CMS publishes annually, and (2) the voluminous, *detailed* specifications and Technical Notes for *each measure*, found in CMS's sub-regulatory guidance outside of the Star Ratings Technical notes.  *See, e.g.*, CMS, *Medicare Pt. C & D Call Center Monitoring Accuracy & Accessibility Study Tech. Notes* (2022) (specifying calculation of C33 and D01 measures).

176.    So even if publication in the Federal Register sufficed to promulgate a standard "by regulation," CMS has failed to publish within the Federal Register the actual specifications necessary to determine the measures identified above.  As the D.C. Circuit has explained, "[t]he real dividing point between regulations and general statements of policy is publication in the Code of Federal Regulations, which the statute authorizes to contain only documents 'having general applicability *and legal effect*,' 44 U.S.C. § 1510 (1982) (emphasis added), and which the governing regulations provide shall contain only 'each Federal *regulation* of general applicability and current or future effect,' 1 C.F.R. § 8.1 (1986)."  *Brock v. Cathedral Bluffs Shale Oil Co*., 796 F.2d 533, 538-39 (D.C. Cir. 1986) (emphasis added); *see also Wilderness Soc'y v. Norton*, 434 F.3d 584, 596 (D.C. Cir. 2006) (same).

177.    Accordingly, CMS cannot apply the measures identified above to Clover because

they were not promulgated "by regulation" as required by 42 U.S.C. § 1395hh(a)(2).

**L.    CMS Unlawfully Determines Clover's 2026 Star Rating Using Measures Disconnected From Its Quality, Outcomes, And Beneficiary Satisfaction**

178.    In determining Clover's 2026 Star Rating, CMS also applied measures that did not evaluate the quality of the plan as required by 42 U.S.C. § 1395w-22(e)(3)(B)(i).  And to the extent it even arguably attempted to do so, CMS did so in a manner that was arbitrary and capricious.

179.    CMS has authority to evaluate only a health plan's "quality, outcomes, and beneficiary satisfaction."  42 U.S.C. § 1395w-22(e)(3)(B)(i).

180.    But after failing to adhere to Congressional directives on authorized forms of data, *see supra* ¶¶ 112-46, or undergo required notice-and-comment, *see supra* ¶¶ 147-77, CMS used several measures to determine Clover's 2026 Star Rating that are utterly disconnected from quality of care, outcomes, or satisfaction, and are arbitrary and capricious and contrary to law.

181.    *First*, CMS's Medication Adherence measures (D08, D09, and D10), weighted *three times higher* than many other measures, purport to evaluate the percentage of plan members who fill certain prescriptions often enough to cover 80% or more of a given year.  *2026 Pt. C & D Star Ratings Tech. Notes*, at 96-104; *Star Ratings Measures & Weights*.

182.    Rather than measure adherence (*i.e.*, whether a patient takes a prescribed medication as directed by a provider), these measures assess "patterns of prescription fills and not actual consumption" of medication by beneficiaries.[13]

183.    Whether efforts to "improve adherence scores represent true improvements in actual patient adherence," then, is an open question, and "the potential for 'gaming' of these

---

[13] Joel F. Farley & Benjamin Y. Urick, *Is it Time to Replace the Star Ratings Adherence Measures?* 27 J. MANAG. CARE SPEC. PHARM. 3, 402 (2021).

metrics cannot be discounted."[14] *See also infra* ¶ 195 (describing how 90-day prescriptions and auto-refills can be used to improve adherence scores without reflecting true patient adherence).

184.     These measures of medication "adherence," however, also fail to measure actual adherence because they do not account for instances where patients are instructed by their doctors to discontinue a course of treatment and are no longer prescribed the relevant medications.

185.     For instance, patients may have their medication regimen changed based on directions that their physician deemed clinically appropriate, or may have discontinued a therapy based on documented intolerance, allergy, or other adverse reaction.

186.     CMS's Medication Adherence measures do not account for these instances of legitimate, and sometimes necessary, treatment discontinuance.    Instead, the Medication Adherence measures (D08, D09, and D10) treat these occurrences of medically recommended or required medication discontinuation as patient non-adherence, and improperly reduce Clover's Star Rating accordingly.  *See Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 43 (1983) (agency action is arbitrary and capricious where the agency relies "on factors which Congress has not intended it to consider").

187.     As CMS itself admitted in its August 5, 2025 response to Clover, if a member discontinues one of these medications due to intolerance or adverse effects, he or she could be coded as non-adherent in the Star Ratings measures for that measurement year, because he or she may fill prescriptions for less than 80% for that year.  But in subsequent years, that same member will be "excluded" from the medication adherence measures so as to "no longer impact the measure[s]," because that individual would not fill *any* prescriptions for that medication during that year.  CMS, *Response to Clover Health* (Aug. 5, 2025).  Because CMS concedes the patient

---

[14] *Id.*

was *not* non-adherent in those later years, it makes no sense to then turn around and code that same patient as non-adherent for the first year in which he or she discontinued treatment. *See Nat'l Ass'n of State Util. Consumer Advocates v. FCC*, 457 F.3d 1238, 1253 (11th Cir. 2006) (explaining that "unexplained inconsistency" is arbitrary and capricious).

188.    CMS's practice also stands in contrast to its Star Ratings Technical Notes, which make clear that the Medication Adherence Measures are only intended to test the percentage of patients "who adhere" to a "prescribed" drug therapy. *E.g.*, *2026 Pt. C & D Star Ratings Tech. Notes*, at 101 ("This measure is defined as the percentage of Medicare Part D beneficiaries, 18 years and older, who adhere to their *prescribed* drug therapy for statin cholesterol medications." (emphasis added)). Indeed, CMS's Star Ratings Technical Notes specifically limit this measure to plan members "with a prescription" for the medications. *Id.* at 96, 99, 101.

189.    CMS's prior Technical Notes were even more explicit. For years, the Star Ratings Technical Notes expressly required the taking of these medications "*as directed.*" *See, e.g.*, CMS, *2023 Medicare Pt. C & D Star Ratings Tech. Notes*, at 90, 92, 95 (2022); CMS, *2024 Medicare Pt. C & D Star Ratings Tech. Notes*, at 97, 100, 103 (2023); CMS, *2025 Medicare Pt. C & D Star Ratings Tech. Notes*, at 92, 95, 98 (2024).

190.    Describing each of those measures, CMS stressed in its 2025 Star Ratings Technical Notes, "[o]ne of the most important ways people with [diabetes, high blood pressure, or high cholesterol] can manage their health is by taking medication *as directed*." CMS, *2025 Medicare Pt. C & D Star Ratings Tech. Notes*, at 92, 95, 98 (2024) (emphasis added).

191.    On May 21, 2025, Clover wrote to CMS, pointing out the inconsistency between its instruction to measure medication adherence when medication is taken "as directed," and CMS's treatment of legitimate treatment discontinuation as nonadherence. *See id.* Shortly after

Clover's inquiry, CMS inexplicably removed this text from its 2026 Star Ratings Technical Notes, while otherwise keeping the text concerning measures D08, D09, and D10 unchanged. *Compare id. with 2026 Pt. C & D Star Ratings Tech. Notes*, at 96-104.

192.    CMS cannot reverse its policy of tracking use of medication "as directed" through *sub silentio* deletions of guidance language after the issue is identified. Before changing its position, CMS was required to "display awareness that it [was] changing position" and offer "good reasons for the new policy." *See Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221-22 (2016).

193.    This explanation, moreover, must account for plans' "serious reliance interests." *Id.* But after instructing plans that it would measure whether members were taking medications "*as directed*," including throughout 2024 when plans were collecting data for the 2026 Star Ratings year, *see supra* ¶ 104, 189-90, CMS pulled a "surprise switcheroo" by changing its approach after the measurement year ended without accounting for plans' reliance interests. That is also arbitrary and capricious. *E.g. Allina*, 587 U.S. at 571; *Env't Integrity Project v. EPA*, 425 F.3d 992, 996 (D.C. Cir. 2005).

194.    Through these Medication Adherence measures, CMS *rewards* plans that continue to provide drugs to patients who do not need them, and financially *punishes* plans, including Clover's plan, whose members follow their physicians' advice to discontinue a given medication. *See supra* ¶¶ 34, 184-8. These harms, in turn, harm plan members.

195.    This is not speculative: To improve their Star Ratings, some plans engage in mass enrollment of seniors into automatic 90-day refills for medications that are not medically indicated, through the plans' controlled providers, pharmacies, and pharmacy benefit managers. For example, if a patient receives an automatic 90-day refill of a medication on October 1, and the provider discontinues treatment on October 15, that patient will be viewed as *adherent* under these

Medication Adherence measures, even if the patient does not take the medication thereafter.  By contrast, smaller plans that use traditional providers to provide conventional 30- or 60-day prescriptions will see that same patient designated by CMS as *non-adherent*, since their prescription ended during the year.  But the difference is *not* in the patient's healthcare quality, only the amount of medically unwarranted drugs that are dispensed at taxpayer expense.  As a result, less-wasteful plans that cease medically unnecessary dispenses as soon as possible are graded unfavorably compared to plans that push unnecessary treatments onto patients and keep patients on them for longer.

196.    In short, these measures *penalize* plans (and in turn, their members) that responsibly support physician-directed treatment and reduce medication and taxpayer waste–not once, but twice.  The first time by treating responsible, non-wasteful dispensing practices as "non-adherent." The second time, by grading these responsible, non-wasteful practices on a curve (and negatively) against plans that push more drugs than medically necessary (often through mass-enrolled, 90-day automatic refills).

197.    The upshot is that these purported "adherence" measures are utterly disconnected from "improving the quality of care provided to enrollees."  42 U.S.C. § 1395w-22(e)(1).

198.    These measures are also inconsistent with other 2026 Star Ratings measures because they fail to incorporate relevant exclusions included in other similar measures.

199.    For example, the Part C measure Statin Therapy for Patients with Cardiovascular Disease (C19) measures the percent of plan members with heart disease who get cholesterol-lowering drugs (statins).  *2026 Pt. C & D Star Ratings Tech. Notes*, at 59.  The measure incorporates exclusions for patients with various conditions for which statins are contraindicated such as cirrhosis, end stage renal disease (ESRD), Myalgia, myositis, myopathy, or

rhabdomyolysis, as well as patients who died.  *Id.*  But the Medication Adherence measures contain only 2-3 exclusions each, rather than including a full range of exclusions in circumstances where use of a given drug is contraindicated, and unlike other, similar measures.  *Id.* at 96-104.  As Clover explained to CMS, there is no legitimate medical reason for this.

200.    CMS itself has admitted that these Medication Adherence measures are broken. After Clover raised concerns about these measures to CMS, CMS's response to Clover was that while it was "unable" to make a change "to account for medication discontinuation or to add additional exclusions," CMS, in fact, is able and planning to make changes to these measures in the future to attempt to make them more accurate.  *See also* 88 Fed. Reg. 22120, 22265-70 (Apr. 12, 2023) (finalizing proposal to implement risk adjustment for Medication Adherence measures).

201.    *Second*, CMS's Part C measure Call Center – Foreign Language Interpreter / TTY (C33) and Part D measure Call Center – Foreign Language Interpreter / TTY (D01), used to evaluate Clover, largely measure the happenstance of the quality of communication and connectivity between a CMS-selected vendor, on the one hand, and plans, on the other.

202.    A "perfect" score is generally required to obtain five stars, and just one or a handful of calls can result in a multi-star drop, even when it is caused by minor technical issues not attributable to the plan.  *See, e.g.*, *UnitedHealthcare Benefits of Tex., Inc. v. CMS*, No. 24-cv-357 2024 WL 4870771, at *2 (E.D. Tex. Nov. 22, 2024) (noting that the entire case came "down to a single disputed foreign-language test call" which reduced the plan's overall Star Rating by one-half star).

203.    This gives rise to an annual process in which plans appeal to CMS, and then courts, to adjudicate technical and communication issues, like phone line quality and the *test callers'* language proficiency, that are unrelated to plan quality, on a *single* call-by-call basis.  *See id.* at

*8-9.

204.    More fundamentally, CMS has never made any showing as to why Star Ratings should vary dramatically, with implications to the tune of hundreds of millions of dollars, based on the outcome of one or a handful of "test" phone calls, while requiring, in essence, a 100% score on all or practically all calls to score well.  CMS is well aware of this problem of "a small number of calls causing significant shifts in performance."[15]  But CMS has provided *zero* explanation for why such significant changes bear any rational relationship to plan quality.

205.    CMS is currently considering discontinuing use of these "call center" measures, conceding that these measures "may be better suited as measures to monitor plan performance and compliance rather than as quality measures in the Part C and D Star Ratings program, especially since ratings for many of these measures are sensitive to small changes in performance."[16]

206.    These measures are also unconnected to any showing of any interpretation-related need from Medicare beneficiaries.  Plans must have interpreters available for all of the "150 to 180 languages" offered by the "largest commercial interpretation service providers in the U.S."  76 Fed. Reg. 21,432, 21,502 (Apr. 15, 2011).  CMS made *no effort whatsoever* to determine whether these services were needed, deferring instead to "these organizations" as "experts in assessing the languages for which interpretation services are needed."  *Id.*

---

[15] *See* CMS, *Announcement of Calendar Year (CY) 2026 Medicare Advantage (MA) Capitation Rates & Pt. C and Pt. D Payment Policies* 107-09 (Apr. 7, 2025), https://www.cms.gov/files/document/2026-announcement.pdf.

[16] *See Id.* at 107-08.

**M.    Clover Raises Its Concerns To CMS**

207.    CMS provides a process allowing plans to examine the data used to calculate their Star Rating and raise concerns to CMS.  CMS's process does not, however, allow plans to challenge "the methodology for calculating the star ratings."  42 C.F.R § 422.260(c)(3)(ii).

208.    Clover nevertheless identified the preceding errors through submissions to CMS, including on April 30, 2025, May 21, 2025, June 13, 2025, August 12, 2025, August 16, 2025, and September 16, 2025.

209.    On April 30, 2025, Clover wrote to CMS, identifying a subset of members that were treated as non-adherent for Medication Adherence for Cholesterol (D10) despite clinical documentation showing that the members had discontinued statins for clinically supported reasons, as directed by their doctors.

210.    Although Clover requested CMS's review of these measures, CMS responded later the same day, directing Clover to the Measure Specifications of the Adherence Measures User Guide.

211.    On May 21, 2025, Clover provided data to CMS to show that CMS's Medication Adherence measures (D08, D09, and D10) were arbitrary and capricious.  In addition to the issues identified above, Clover identified 733 members who were directed by doctors to stop taking certain prescribed medications, but were treated as instances of medication non-adherence.  Clover also identified 393 members who were no longer prescribed the relevant drugs during treatment because their doctors determined the therapy was medically inappropriate.  Members in this District were affected by these errors and among these identified individuals.

212.    CMS responded to Clover on August 5, 2025, stating that it was unable to change the measure specifications for 2026 Star Ratings, and thus would not alter the Medication Adherence measures applied to Clover to exclude instances of legitimate treatment discontinuance.

55

213.    Then, on August 6, 2025, CMS released the data it intended to use in scoring Clover as part of its "First Plan Preview." *See* 42 C.F.R. §§ 422.166(h)(2), 423.186(h)(2).

214.    Clover reiterated its concerns regarding the Medication Adherence Measures (D08, D09, and D10) to CMS on August 12, 2025 and August 16, 2025.

215.    CMS responded on August 14, 2025 and August 26, 2025, referring Clover to CMS's earlier response.

216.    As a part of CMS's "Second Plan Preview" on September 9, 2025, CMS released Clover's preliminary Star Ratings for each measure, along with its projected overall Star Rating.

217.    After reviewing data from the Second Plan Preview, Clover determined that it was unexpectedly underperforming on measures that either relied upon unauthorized data or failed to adhere to CMS's required procedures.  Whereas Clover had expected its 2026 Star Rating to be at or otherwise close to 4 Stars, in fact, CMS's application of these unlawful measures reduced Clover's Star Rating to 3.5 Stars, while promoting other, inferior plans to 4 Stars.

218.    So, on September 16, 2025, Clover wrote again to CMS, requesting that it exclude these measures from its Star Rating and re-calculate Clover's Star Rating at 4 Stars.

219.    On September 18, 2025, CMS responded, declining to make the requested changes to Clover's 2026 Star Ratings and stating that Clover's objections involved issues "outside of the scope of the plan preview" process.

**N.    CMS Unlawfully Determines Clover's 2026 Star Rating**

220.    On October 9, 2025, CMS issued Clover' 2026 Star Rating as 3.5 Stars.

221.    CMS unlawfully determined Clover's Star Rating using the impermissible data and measures identified above.  *See supra* ¶¶ 36, 112-206.

222.    CMS thus erroneously reduced Clover's Star Rating (Contract Number H5141) from 4.0 to 3.5 Stars.

223. For measures based on data that Congress actually authorized, Clover received higher Star Ratings, including 5 Stars on measures such as rates of Breast Cancer Screening (C01), Colorectal Cancer Screening (C02), Controlling High Blood Pressure (C14), and Diabetes Care – Blood Sugar Controlled (C12), among many others.

224. By contrast, the unlawful measures described above had a negative impact on Clover's overall Star Rating:

| Measure | Weight | Stars |
|---|---|---|
| Annual Flu Vaccine (C03) | 1 | 3 |
| Improving Physical Health (C04) | 1 | 3 |
| Improving Mental Health (C05) | 1 | 3 |
| Reducing Falling (C15) | 1 | 3 |
| Improving Bladder Control (C16) | 1 | 2 |
| Getting Needed Care (C22) | 2 | 2 |
| Getting Appointments and Care Quickly (C23) | 2 | 2 |
| Customer Service (C24) | 2 | 1 |
| Rating of Health Care Quality (C25) | 2 | 3 |
| Care Coordination (C27) | 2 | 3 |
| Appeal Decisions (C32) | 2 | 2 |
| Call Center (C33) | 2 | 3 |
| Call Center (D01) | 2 | 3 |
| Rating of Drug Plan (D05) | 2 | 3 |
| Getting Needed Drugs (D06) | 2 | 3 |
| Medication Adherence, Diabetes (D08) | 3 | 2 |
| Medication Adherence, Hypertension (D09) | 3 | 2 |
| Medication Adherence, Cholesterol (D10) | 3 | 1 |
| Medication Therapy Management Completion (D11) | 1 | 3 |
| Pharmacy Statin Use (D12) | 1 | 3 |
| **Overall Average** | | 2 Stars |

225. Had CMS calculated Clover's 2026 Star Rating without these unlawful measures, Clover's Star Rating would have improved above 3.5 Stars, entitling Clover to over $120 million in additional funding, which would benefit Clover and its members.

O.  **Clover Suffers And Will Continue To Suffer Harm From CMS's Unlawful Determination Of Its 2026 Star Rating**

226.  CMS's unlawful determination of Clover's Star Rating at 3.5 Stars has harmed and will continue to harm Clover and its members.

227.  Clover's Star Rating is a critical factor in determining CMS's payments to Clover.

228.  A Star Rating of 3.5 Stars leaves Clover ineligible for a quality bonus payment. Without the quality bonus payment, Clover will also receive a smaller rebate than it would otherwise receive.  This will result in a direct loss of at least approximately $120 million in 2027, that Clover would have been entitled to with a 4 Star Rating.

229.  CMS's unlawful determination of Clover's Star Rating at 3.5 Stars has also caused significant harm to Clover's reputation and goodwill, which will compound if it is left in place.

230.   Star Ratings are publicized on CMS's website during the annual open enrollment period, and CMS informs beneficiaries that Star Ratings reflect a plan's quality.

231.  By assigning Clover a 3.5 Star Rating, CMS has erroneously indicated to beneficiaries that Clover's quality has dropped and is inferior to that of other competing plans.

**COUNT I: VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT AGENCY ACTION THAT IS NOT IN ACCORDANCE WITH LAW, IN VIOLATION OF STATUTORY RIGHT, IN EXCESS OF STATUTORY AUTHORITY**
**Violation of 5 U.S.C. § 706**

232.  Paragraphs Nos. 1-26, 38-43, 73-105, 112-32, and 207-31 are incorporated by reference as if set forth in full herein.

233.  The APA prohibits Defendants from acting in any way that is not in accordance with the law, or that is in excess of statutory authority or short of statutory right.  5 U.S.C. § 706(2)(A), (C).

234.  Congress has limited the data on which Star Ratings may be based to data for which a Medicare Advantage plan provides for the collection, analysis, or reporting as part of its quality

improvement program. 42 U.S.C. § 1395w-23(o)(4)(A) (providing that Star Ratings should be based on "data collected under section 1395w-22(e) of this title").

235.    As CMS itself has repeatedly admitted, CMS determines Star Ratings utilizing measures based on data that are not collected under § 1395w-22(e) as part of plans' quality improvement programs. *See, e.g.*, 83 Fed. Reg. at 16,531-32.

236.    These measures include:

| Measure | Source | Weight | Rating |
|---------|--------|--------|--------|
| Appeal Decisions (C32) | CMS Contractors | 2 | 2 |
| Call Center (C33) | CMS Contractors | 2 | 3 |
| Call Center (D01) | CMS Contractors | 2 | 3 |
| Rating of Drug Plan (D05) | Part D Data | 2 | 3 |
| Getting Needed Drugs (D06) | Part D Data | 2 | 3 |
| Medication Adherence, Diabetes (D08) | Part D Data | 3 | 2 |
| Medication Adherence, Hypertension (D09) | Part D Data | 3 | 2 |
| Medication Adherence, Cholesterol (D10) | Part D Data | 3 | 1 |
| Medication Therapy Management Completion (D11) | Part D Data | 1 | 3 |
| Pharmacy Statin Use (D12) | Part D Data | 1 | 3 |

237.    Because CMS determined Clover's 2026 Star Rating based on data not collected under § 1395w-22(e), its action is not in accordance with law, in excess of statutory authority, and short of statutory right. *See* 5 U.S.C. § 706(2)(A), (C); 42 U.S.C. § 1395w-23(o)(4)(A).

238.    The Court should set aside Clover's unlawful 2026 Star Rating and order CMS to recalculate Clover's Star Rating without inclusion of these measures.

**COUNT II: VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT
AGENCY ACTION THAT IS NOT IN ACCORDANCE WITH LAW, IN VIOLATION
OF STATUTORY RIGHT, IN EXCESS OF STATUTORY AUTHORITY
Violation of 5 U.S.C. § 706**

239.    Paragraphs Nos. 1-14, 27-31, 38-43, 73-105, 133-46, and 207-31 are incorporated by reference as if set forth in full herein.

240.    The APA prohibits Defendants from acting in any way that is not in accordance with the law, or that is in excess of statutory authority or short of statutory right. 5 U.S.C. § 706(2)(A), (C).

241.    Congress has limited the data on which Star Ratings may be based to the "types of data that were collected by the Secretary as of November 1, 2003." 42 U.S.C. § 1395w-22(e)(3)(B)(i); *see also id.* § 1395w-23(o)(4)(A).

242.    CMS determined Clover's 2026 Star Rating using measures based on data that were not the "types of data" collected by the Secretary as of November 1, 2003.

243.    Those measures include:

| Measure | Weight | Stars |
|---|---|---|
| Improving Mental Health (C05) | 1 | 3 |
| Reducing Falling (C15) | 1 | 3 |
| Getting Needed Care (C22) | 2 | 2 |
| Rating of Health Care Quality (C25) | 2 | 3 |
| Care Coordination (C27) | 2 | 3 |
| Appeal Decisions (C32) | 2 | 2 |
| Call Center (C33) | 2 | 3 |
| Call Center (D01) | 2 | 3 |
| Rating of Drug Plan (D05) | 2 | 3 |
| Getting Needed Drugs (D06) | 2 | 3 |
| Medication Adherence, Diabetes (D08) | 3 | 2 |
| Medication Adherence, Hypertension (D09) | 3 | 2 |
| Medication Adherence, Cholesterol (D10) | 3 | 1 |
| Medication Therapy Management Completion (D11) | 1 | 3 |
| Pharmacy Statin Use (D12) | 1 | 3 |

244.    CMS has not made any report to Congress in consultation with Medicare Advantage plans and private accrediting bodies regarding changes to the types of data collected such that it is even arguably authorized for CMS to rely upon this data in accordance with § 1395w-22(e)(3)(B)(ii).

245.    Because CMS determined Clover's 2026 Star Rating based on data that was not the types of data collected by the Secretary of HHS on November 1, 2003, and without providing the

statutorily required report to Congress prepared in consultation with plans and private accrediting bodies, its determination is not in accordance with law, in excess of statutory authority, and short of statutory right. *See* 5 U.S.C. § 706(2)(A), (C). The Court should set aside Clover's unlawful 2026 Star Rating and order CMS to recalculate Clover's Star Rating without inclusion of these measures.

### COUNT III: VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT AGENCY ACTION THAT IS WITHOUT OBSERVANCE OF PROCEDURE REQUIRED BY LAW AND NOT IN ACCORDANCE WITH LAW
**Violation of 5 U.S.C. § 706; 42 C.F.R. § 422.164.**

246.    Paragraphs Nos. 1-13, 32-33, 38-43, 106-11, 147-63, and 207-31 are incorporated by reference as if set forth in full herein.

247.    The APA prohibits Defendants from acting in any way that is without observance of procedure required by law or not in accordance with law. 5 U.S.C. § 706(2)(A), (D).

248.    CMS's regulations require CMS to adopt "new" measures through notice-and-comment rulemaking. 42 C.F.R. § 422.164(c)(2).

249.    CMS adopted two "new" measures for the 2026 Star Ratings period: Improving or Maintaining Physical Health (C04) and Improving or Maintaining Mental Health (C05). *2026 Pt. C & D Star Ratings Tech. Notes*, at 130 ("*Improving or Maintaining Physical Health and Improving or Maintaining Mental Health measures have a weight of 1 for the 2026 Star Ratings because they are considered *new* measures." (emphasis added)); *see also id.* at 2, 161 (similar concessions).

250.    CMS did not, however, propose and finalize these new measures through the required process including notice-and-comment rulemaking after the "annual call" process (prior to the relevant measurement year).

251.   CMS made essentially the same error with respect to the measure Getting Appointments and Care Quickly (C23), making a substantive change to the measure without engaging in rulemaking.  CMS, *Announcement of Calendar Year (CY) 2024 Medicare Advantage (MA) Capitation Rates & Pt. C & Pt. D Payment Policies* 178.

252.   The Court should set aside Clover's unlawful 2026 Star Rating and order CMS to recalculate Clover's Star Rating without inclusion of these measures.

**COUNT IV: VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT**
**AGENCY ACTION THAT IS WITHOUT OBSERVANCE OF PROCEDURE**
**REQUIRED BY LAW AND NOT IN ACCORDANCE WITH LAW**
**Violation of 5 U.S.C. § 706; 42 U.S.C. § 1395hh(a)(2)**

253.   Paragraphs Nos. 1-13, 32-33, 38-43, 106-11, 164-77, and 207-31 are incorporated by reference as if set forth in full herein.

254.   The APA prohibits Defendants from acting in any way that is without observance of procedure required by law or not in accordance with law.  5 U.S.C. § 706(2)(A), (C), (D).

255.   Congress has mandated that CMS must engage in notice-and-comment rulemaking and codify "by regulation" any "rule, requirement, or other statement of policy" that "establishes or changes a substantive legal standard governing the scope of benefits, the payment for services, or the eligibility of individuals, entities, or organizations to furnish or receive services or benefits under [Medicare]"   *Allina*, 587 U.S. at 570 (brackets in original) (quoting 42 U.S.C. § 1395hh(a)(2)).

256.   CMS did not engage in notice-and-comment rulemaking and codify "by regulation" several measures and their specifications that it applied to Clover in determining its 2026 Star Ratings:

| Measure | Weight | Stars |
|---|---|---|
| Annual Flu Vaccine (C03) | 1 | 3 |
| Improving Physical Health (C04) | 1 | 3 |
| Improving Mental Health (C05) | 1 | 3 |
| Reducing Falling (C15) | 1 | 3 |
| Improving Bladder Control (C16) | 1 | 2 |
| Getting Needed Care (C22) | 2 | 2 |
| Getting Appointments and Care Quickly (C23) | 2 | 2 |
| Customer Service (C24) | 2 | 1 |
| Rating of Health Care Quality (C25) | 2 | 3 |
| Care Coordination (C27) | 2 | 3 |
| Appeal Decisions (C32) | 2 | 2 |
| Call Center (C33) | 2 | 3 |
| Call Center (D01) | 2 | 3 |
| Rating of Drug Plan (D05) | 2 | 3 |
| Getting Needed Drugs (D06) | 2 | 3 |
| Medication Adherence, Diabetes (D08) | 3 | 2 |
| Medication Adherence, Hypertension (D09) | 3 | 2 |
| Medication Adherence, Cholesterol (D10) | 3 | 1 |
| Medication Therapy Management Completion (D11) | 1 | 3 |
| Pharmacy Statin Use (D12) | 1 | 3 |

257.    The Court should set aside Clover's unlawful 2026 Star Rating and order CMS to recalculate Clover's Star Rating without inclusion of these measures.

**COUNT V: VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT
AGENCY ACTION THAT IS CONTRARY TO LAW
AND ARBITRARY AND CAPRICIOUS
Violation of 5 U.S.C. § 706**

258.    Paragraphs Nos. 1-13, 34, 38-43, 51-105, and 178-231 are incorporated by reference as if set forth in full herein.

259.    The APA prohibits CMS from acting in any way that is contrary to law or arbitrary and capricious.  5 U.S.C. § 706(2)(A), (C).

260.    An agency action is arbitrary and capricious where the "agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the

agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

261.    CMS has authority to evaluate only a health plan's "quality, outcomes, and beneficiary satisfaction." 42 U.S.C. § 1395w-22(e)(3)(B)(i).

262.    CMS's failure to rely upon congressionally authorized data and follow required notice-and-comment procedures has led CMS to apply measures to evaluate Clover that are so disconnected from the quality of the health plan, and from the underlying indicia of quality that CMS purports to measure, that they are arbitrary and capricious and contrary to law:

| Measure | Weight | Stars |
|---|---|---|
| Call Center (C33) | 2 | 3 |
| Call Center (D01) | 2 | 3 |
| Medication Adherence, Diabetes (D08) | 3 | 2 |
| Medication Adherence, Hypertension (D09) | 3 | 2 |
| Medication Adherence, Cholesterol (D10) | 3 | 1 |

263.    Moreover, in its 2026 Star Ratings, CMS inexplicably reversed itself in approach to the Medication Adherence measures (D08, D09, and D10), without acknowledging the reversal and providing good reasons (or indeed, any reasons) for the change.

264.    Nor did CMS take into account plans' serious reliance interests in measuring medication adherence for drugs taken "as directed" before CMS switched positions *after the measurement year had elapsed. Allina*, 587 U.S. at 571 (recognizing that an agency may not "pull[] a surprise switcheroo" and do "the opposite of what it had proposed"); *Env't Integrity Project*, 425 F.3d at 996 (similar).

265.    The Court should set aside Clover's unlawful 2026 Star Rating and order CMS to recalculate Clover's rating without inclusion of these measures.

## COUNT VI: PRIVATE NON-DELEGATION VIOLATION
**Contractors' exercise of executive power violates Article II, § 1 and Amendment V of the U.S. Constitution (U.S. Const. art. II, § 1; amend. V)**

266.    Paragraphs Nos. 1-13, 35, 38-43, 51-105, 124, and 207-231 are incorporated by reference as if set forth in full herein.

267.    Article II of the Constitution vests "[t]he executive Power" with the President and is "essentially a grant of the power to execute the laws."  U.S. Const., art II, § 1; *Myers v. United States*, 272 U.S. 52, 17 (1926).   Accordingly, the private nondelegation doctrine forbids outsourcing governance to non-governmental entities. *Consumers' Rsch.*, 145 S. Ct. at 2508.

268.    This ensures that a delegation is not made to "private persons whose interests are often adverse to the interests of others."  *Id.* (internal quotation marks and citations omitted).

269.    A violation of the doctrine occurs when an agency outsources to private parties governmental decision-making functions, including the evaluation of the quality of Medicare Advantage plans.  *See id.* at 2510.

270.    CMS violated the private non-delegation doctrine by determining Clover's 2026 Star Rating utilizing the Reviewing Appeals Decisions (C32) measure.

271.    The Reviewing Appeal Decision measure reflects the percentage of Clover's coverage determinations that are upheld by the IRE, a CMS contractor.  This measure is based entirely on the IRE's view of whether a coverage determination was appropriate.  The IRE is thus left to evaluate Clover's performance, exercising the IRE's broad discretion and independent judgment. *See supra* ¶¶ 35, 124.

272.    By allowing a CMS contractor to determine Clover's performance, CMS outsourced its decision-making function to determine Clover's Reviewing Appeals Decisions (C32) measure score, and in turn, Clover's overall 2026 Star Rating.  *See supra* ¶¶ 35, 99-103, 124.

273.    The Court should set aside Clover's unlawful 2026 Star Rating and order CMS to recalculate Clover's Star Rating without inclusion of this measure.

## PRAYER FOR RELIEF

WHEREFORE, Clover respectfully requests that this Court enter judgment in its favor and grant the following relief:

i)    A declaration pursuant to 28 U.S.C. § 2201 that the use of the following measures to determine Clover's 2026 Star Rating was unlawful and in violation of the APA: Annual Flu Vaccine (C03), Improving or Maintaining Physical Health (C04), Improving or Maintaining Mental Health (C05), Reducing the Risk of Falling (C15), Improving Bladder Control (C16), Getting Needed Care (C22), Getting Appointments and Care Quickly (C23), Customer Service (C24), Rating of Health Care Quality (C25), Care Coordination (C27), Reviewing Appeals Decisions (C32), Call Center – Foreign Language Interpreter / TTY (C33), Call Center – Foreign Language Interpreter / TTY (D01), Rating of Drug Plan (D05), Getting Needed Prescription Drugs (D06), Medication Adherence for Diabetes Medication, Hypertension, and Cholesterol (D08, D09, and D10), Pharmacy Medication Therapy Management Program Completion Rate (D11), and Pharmacy Statin Use with Diabetes (D12).

ii)    An order setting aside and vacating Clover's 2026 Star Rating.

iii)    An order directing CMS to recalculate Clover's 2026 Star Rating.

iv)    An order directing CMS to determine Clover's 2026 Star Rating as 4 Stars.

v)    An order awarding Clover its costs and attorneys' fees and expenses as allowed by law.

vi)    Such other and further relief as the Court deems just and proper.

Dated: November 7, 2025                    Respectfully submitted,

                                           /s/ *James B. Durham*
                                           James B. Durham
                                           Georgia Bar No. 235526
                                           Felix B. Kloc
                                           Georgia Bar No. 920613
                                           Hall Booth Smith, P.C.
                                           3528 Darien Highway
                                           Suite 300
                                           Brunswick, GA 31525
                                           Tel: (912) 554-0093
                                           Email: JDurham@hallboothsmith.com
                                                   FKloc@hallboothsmith.com

                                           Andrew D. Prins (pro hac vice forthcoming)
                                           Rachael L. Westmoreland (pro hac vice
                                           forthcoming)
                                           LATHAM & WATKINS LLP
                                           555 Eleventh Street NW, Suite 1000
                                           Washington, DC 20004
                                           Tel: (202) 637-2200
                                           Fax: (202) 637-2201
                                           Email: andrew.prins@lw.com
                                                   rachael.westmoreland@lw.com

                                           Nicholas L. Schlossman (pro hac vice
                                           forthcoming)
                                           LATHAM & WATKINS LLP
                                           300 Colorado Street, Suite 2400
                                           Austin, TX 78701
                                           Tel: (737) 910-7300
                                           Fax: (737) 910-7301
                                           Email: nicholas.schlossman@lw.com

                                           *Attorneys for Plaintiff Clover Insurance
                                           Company*