# Exhibit 1

**From:** CMS PartC&DStarRatings
**To:** Robert Davis
**Cc:** wendy.richey@cloverhealth.com; CMS PartC&DStarRatings
**Subject:** RE: Med adherence star rating inquiry
**Date:** Monday, January 13, 2025 1:49:02 PM

Hi Robert,

Based on PQA's current methodology, it does not account for medication discontinuations.

If you have more questions regarding this, please reach out to the PQA at www.pqaalliance.org/tech-assist-form since the PQA is the measure steward who developed the measures.

Best,
Part C & D Star Ratings

---

**From:** Robert Davis <robert.davis@cloverhealth.com>
**Sent:** Friday, December 13, 2024 4:37 PM
**To:** CMS PartC&DStarRatings <PartCandDStarRatings@cms.hhs.gov>
**Cc:** wendy.richey@cloverhealth.com
**Subject:** Re: Med adherence star rating inquiry

Good afternoon and thank you for such a prompt response. For clarification, does the highlighted language below mean that a bene cannot be excluded although the prescriber changed the prescription? Or can they be excluded? Thanks.

Thank you for your email. Please feel free to refer to the Patient Safety Analysis Adherence (ADH) Measures Report User Guide available on the Help Documents page of the Patient Safety Analysis Web Portal. Please note that the current methodology does not account for discontinuation of medications.

On Fri, Dec 13, 2024 at 2:31 PM CMS PartC&DStarRatings <PartCandDStarRatings@cms.hhs.gov> wrote:

> Hi Robert,
>
> Thank you for your email. Please feel free to refer to the Patient Safety Analysis Adherence (ADH) Measures Report User Guide available on the Help Documents page of the Patient Safety Analysis Web Portal. Please note that the current methodology does not account for discontinuation of medications.
>
> Additionally, per section 2 'Measure Overview' of the General Report User Guide, all

Patient Safety measures are adapted from measures developed and endorsed by the Pharmacy quality Alliance (PQA). Should you have further questions regarding the methodology for calculating the Adherence measures, please consult PQA's Web Page or contact them at www.pqaalliance.org/tech-assist-form. Upon submission, you will receive a confirmation of your request with an associated request ID number for easy referencing. Feel free to check out PQA's website for frequently asked questions as well.

Thanks,
Part C & D Star Ratings

---

**From:** Robert Davis <robert.davis@cloverhealth.com>
**Sent:** Thursday, December 12, 2024 1:22 PM
**To:** CMS PartC&DStarRatings <PartCandDStarRatings@cms.hhs.gov>
**Cc:** wendy.richey@cloverhealth.com
**Subject:** Med adherence star rating inquiry

Good morning. We have an inquiry requesting clarification on excluding a member from a measure due to a change in the prescription as initially prescribed. We have a member in our plan who was prescribed Jardiance by a cardiologist for heart failure without the comorbidity of diabetes. The cardiologist later discontinued the medication after two fills and switched the member to Entresto (the change is supported by medical records). Our interpretation of the Stars technical manual for measure D08 is that since this member received 2 fills of Jardiance, they would be included in the denominator for measure D08, despite not having a diabetes diagnosis. This would cause a failure in the measure because the cardiologist discontinued Jardiance and thus the member stopped filling it. Is our understanding correct, or should the member be excluded given Jardiance was prescribed for its alternate clinical indication of heart failure? If exclusion is possible, how might we pursue that? Also, can this be applied to similar situations? Thanks.

Robert Davis
Senior Director, Compliance
Clover Health
201-320-0506

| | |
|---|---|
| **From:** | CMS PartC&DStarRatings |
| **To:** | Cheree Pasalakis |
| **Cc:** | Vivian Meras; Cynthia Alexander; Cameron Pringle; CMS PartC&DStarRatings; PatientSafety; CMS PartC&DStarRatings |
| **Subject:** | RE: February Med Adherence Appeal |
| **Date:** | Thursday, February 20, 2025 11:16:45 AM |

Dear Cheree,

In our communication with Part D sponsors regarding the December 2024 and January 2025 Patient Safety Reports Release, we let sponsors know that the statin medications that were commercially available after the July 2024 NDC Value Sets were not used in the Patient Safety Reports.

All Patient Safety measures are calculated using the Pharmacy Quality Alliance (PQA) measure specifications and Value Sets. Per Section 3.1 'Medication and Diagnosis Codes List' of the General User Guides (PS-General-YOS2024-Report-Guide-Apr-2024), the codes list is available with the contract report packages and in the 'Help Documents' section of the Patient Safety Analysis Web Portal. The PQA developed and owns the value sets.

The PQA comprehensively produces three value sets for a given measurement year: the first version is published in February of the measurement year, then updated in July of the measurement year, and finalized in February of the subsequent year. Therefore, for a given measurement year, three PQA Value Sets are used to calculate the Patient Safety measure rates. For example, in measurement year 2024, the first version of the PQA Value Sets for the measurement year 2024 were published in February 2024, updated in July 2024, and will be finalized in February 2025. Between NDC list updates, sponsors may observe differences between their internal monitoring reports and the Patient Safety Reports, especially if applying more real-time NDC changes or capturing PDE data not yet submitted to or processed by CMS. The PQA Value Sets published in February 2025 will include all NDCs for products that were marketed from July 1, 2023, through December 31, 2024, and will be used to calculate the final measure rates for the measurement year 2024.

As a reminder, once we receive the updated February PQA Value Sets, the updated PQA Value Sets are incorporated into the Patient Safety reports in approximately 1-2 monthly reporting cycles.

If you are interested in us investigating your contract further, please provide us with detailed information about the issue or request. A secure submission window will be opened in the Patient Safety Analysis Web Portal once we receive the following information **only**:

- **Contract Number**:
- **Patient Safety Report** (e.g. June 2024 Reports):
- **Year of Service** (e.g. YOS 2024):

- **Patient Safety Measure** (e.g. Star Ratings Adherence):
- **Description of the Inquiry**:

Your request will be reviewed in its entirety and if appropriate, a secure submission window will be opened in the Patient Safety Analysis Web Portal, and we will provide you with further instructions on how to submit your data.

Due to our security policy, we want to remind you not to send any PII/PHI information through email, only via the secure submission window in the Patient Safety Analysis Web Portal.

Thank you,
Part C & D Star Ratings

---

**From:** Cheree Pasalakis <cheree.pasalakis@cloverhealth.com>
**Sent:** Wednesday, February 19, 2025 3:19 PM
**To:** CMS PartC&DStarRatings <PartCandDStarRatings@cms.hhs.gov>
**Cc:** Vivian Meras <vivian.meras@cloverhealth.com>; Cynthia Alexander <cynthia.alexander@vendors.cloverhealth.com>; Cameron Pringle <cameron.pringle@cloverhealth.com>
**Subject:** February Med Adherence Appeal

Good afternoon,

The attached letter is our appeal request for February Med Adherence. We tried to upload via the Acumen portal but could not get the letter to upload successfully. We request your review and consideration.

Thank you.

# Clover Health

February 13, 2025

To whom it may concern,

As a representative of Clover Health, I am writing related to the most recent published Acumen member details regarding the Statin and Diabetes measure data. Clover has done an internal evaluation of the members that we see in our 2024 medication statin & diabetes adherence measures that were most recently calculated at 80% PDC that in the Acumen member details do not have these members calculating at 80%. In particular, I am looking to highlight a set of members that we feel have missed claims based on new drug NDCs that have come to market since the latest drug list refresh. Our analysis indicates that there are ~4,740 members that would change from below 80% PDC (non-adherent) to above 80% PDC reporting as adherent in December. These members who are below 80% PDC in Acumen and above 80% in our internal audit all have an under-reported amount of Statin and Diabetes claims with the NDCs listed below.

4,735 members in the Statin measure using the additional NDCs:

| NDC | DESCRIPTION |
|---|---|
| 70710177200 | ATORVASTATIN CALCIUM TAB 40 MG |
| 70710177509 | ATORVASTATIN CALCIUM TAB 20 MG |
| 43598009805 | ATORVASTATIN CALCIUM TAB 10 MG |
| 70710177000 | ATORVASTATIN CALCIUM TAB 80 MG |
| 62135069290 | ROSUVASTATIN CALCIUM TAB 20 MG |
| 43598010105 | ATORVASTATIN CALCIUM TAB 40 MG |
| 43598010305 | ATORVASTATIN CALCIUM TAB 80 MG |
| 69097078912 | PRAVASTATIN SODIUM TAB 20 MG |

| | |
|---|---|
| 69097079112 | PRAVASTATIN SODIUM TAB 40 MG |
| 70710177500 | ATORVASTATIN CALCIUM TAB 20 MG |
| 43598009905 | ATORVASTATIN CALCIUM TAB 20 MG |
| 70710177700 | ATORVASTATIN CALCIUM TAB 10 MG |
| 62135069190 | ROSUVASTATIN CALCIUM TAB 10 MG |

**4 members that should be passing in the diabetes** measure using the below NDCs:

| NDC | DESCRIPTION |
|---|---|
| 68094080450 | METFORMIN HCL TAB ER 24HR 750 |
| 00480366722 | LIRAGLUTIDE SOLN PEN-INJECTOR |
| 00480366720 | LIRAGLUTIDE SOLN PEN-INJECTOR |
| 68094048060 | METFORMIN HCL TAB 1000 MG |

We would be happy to provide evidence of these claims to ensure these members are correctly reported in Acumen. Please advise how we should proceed to get these members evaluated.

Thank you,

Cameron Pringle

**From:** Mareyba Fawad
**To:** Cheree Pasalakis
**Cc:** Cameron Pringle; Vivian Meras; Robert Davis; CMS PartC&DStarRatings; PatientSafety
**Subject:** RE: Hospice Med Adherence Appeal
**Date:** Wednesday, April 2, 2025 12:23:45 PM

Hello Cheree,

Thank you for your inquiry. We reviewed the responses you provided below in your previous email. The ICD-10 code Z51.5 that you have specified is an ICD-10 code for palliative care. Per Section 2.1.3 'Measure Exclusions' of the Star Ratings and Display Page Adherence (ADH) Measures User Guide (PS-SR-ADH-YOS2024-Report-Guide-Apr-2024 and PS-DPM-ADH-YOS2024-Report-Guide-Apr-2024) available with the contract report packages and on the Help Documents page of the Patient Safety Analysis Web Portal, palliative care is not an exclusion criterion for the ADH measures. Medicare Part D beneficiaries are excluded from the ADH measures' denominator if they have elected to receive hospice care with at least one day of hospice coverage during the measurement period. Please note that hospice coverage ~~information~~ is determined based on the hospice coverage start and end dates sourced from the Common Medicare Environment (CME) data, rather than the Common Working File (CWF) or the Encounter Data System (EDS), which uses ICD-10 codes.

If you have further questions, please feel free to reach out.

Best,
Acumen, LLC.

**From:** Cheree Pasalakis <cheree.pasalakis@cloverhealth.com>
**Sent:** Monday, March 31, 2025 11:18 AM
**To:** CMS PartC&DStarRatings <PartCandDStarRatings@cms.hhs.gov>; PatientSafety <PatientSafety@acumenllc.com>
**Cc:** Cameron Pringle <cameron.pringle@cloverhealth.com>; Vivian Meras <vivian.meras@cloverhealth.com>; Robert Davis <robert.davis@cloverhealth.com>
**Subject:** Hospice Med Adherence Appeal

Good afternoon,
We are requesting your review of the below information. Thank you.

- **Contract Number**: H1541
- **Patient Safety Report:** December report
- **Year of Service:** YOS 2024
- **Patient Safety Measure:** Star Ratings Adherence for DM, Star Ratings Adherence for RAS, Star Ratings Adherence for Statins
- **Description of the Inquiry**:

Clover has done an internal evaluation of the members that we see in our 2024 medication adherence measures and we believe there are at least 56 members that are currently included in our patient safety report but should

be excluded based on their utilization of Hospice care (yet are not indicated as hospice on our monthly membership report). In particular, the evidence shows that these members have utilized hospice care (through documentation of a hospice care ICD-10 code Z51.5 as recognized by CMS). Therefore, at least 56 members should be excluded from our patient safety measures based on our December 2024 reporting.

---

**This e-mail, including any attachments, may contain confidential, privileged and/or proprietary information which is solely for the use of the intended recipient(s). If you are not the intended recipient, you are hereby warned that it is prohibited to use, disclose, copy, retain, or alter any portion of this email and any of its attachments. No part of this email and any of its attachments can be used in another context without written consent of the sender. Unauthorized disclosure and/or use of information contained in this e-mail or its attachments may result in civil and criminal liability. If you are not an intended recipient, please notify the sender and delete this e-mail, any attachments, and all copies.**

**From:** CMS PartC&DStarRatings
**To:** Cheree Pasalakis
**Cc:** PatientSafety; Cameron Pringle; Vivian Meras; Robert Davis; CMS PartC&DStarRatings
**Subject:** RE: Injectable Statin Appeal - H5141
**Date:** Tuesday, May 27, 2025 11:50:00 AM

---

Hi Cheree,

We will forward your email with your measure specification concerns to the Pharmacy Quality Alliance (PQA). The Part D Patient Safety measures are developed and endorsed by the PQA through a consensus-based process. The measures are calculated based on the PQA measure specifications and Value Sets. Updates to measure specifications are also vetted through the PQA's processes.

To make changes to the Parts C and D Star Ratings measure specifications, as codified at §§ 422.164(d)(2), and 423.184(d)(2), substantive updates (that is, changes) must be proposed and finalized through rulemaking in advance of the measurement period. CMS uses the Advance Notice and Rate Announcement process to announce non-substantive measure updates during or in advance of the measurement period as described at §§ 422.164(d)(1) and 423.184(d)(1) and to initially solicit feedback on substantive measure updates. If the PQA finalizes measure changes and issues its documentation, CMS will follow these steps as outlined in regulation to update Stars Ratings measures.

Best,
Part C & D Star Ratings

---

**From:** Cheree Pasalakis <cheree.pasalakis@cloverhealth.com>
**Sent:** Friday, May 16, 2025 9:45 AM
**To:** CMS PartC&DStarRatings <PartCandDStarRatings@cms.hhs.gov>
**Cc:** PatientSafety <PatientSafety@acumenllc.com>; Cameron Pringle <cameron.pringle@cloverhealth.com>; Vivian Meras <vivian.meras@cloverhealth.com>; Robert Davis <robert.davis@cloverhealth.com>
**Subject:** Re: Injectable Statin Appeal - H5141

Good morning,
Thank you for your response. We are happy to discuss these issues with PQA, and please feel free to share our email with them.

But while PQA may have helped design these measures, CMS adopts (or does not adopt) the measures as CMS deems appropriate. Because CMS is responsible for these measures, we have raised (and continue to maintain) these challenges with CMS.

We would appreciate a response to our concerns, as the identified members should

have been excluded under CMS's own standards and guidance, as well as governing law--as explained in our April 2025 letter. We reserve all rights.

Thank you.

On Wed, Apr 30, 2025 at 1:03 PM CMS PartC&DStarRatings <PartCandDStarRatings@cms.hhs.gov> wrote:

> Hi Cheree,
>
> Thank you for reaching out to us. Please review Section 2.1 Measure Specifications of the Adherence Measures User Guide, available in the Help Documents section of the PS Web Portal, for more details on the methodology for calculating the Adherence Measure's rates. Please note that the current methodology does not account for medication discontinuations.
>
> Additionally, per section 2 'Measure Overview' of the General Report User Guide, all Patient Safety measures are adapted from measures developed and endorsed by the Pharmacy Quality Alliance (PQA). Should you have further questions regarding the methodology for calculating the Adherence measures, please consult PQA's Web Page or contact them at www.pqaalliance.org/tech-assist-form. Upon submission, you will receive a confirmation of your request with an associated request ID number for easy referencing. Feel free to check out PQA's website for frequently asked questions as well.
>
> Can we share your email with the PQA?
>
> Please let us know if you have any additional questions.
>
> Best,
> Part C & D Star Ratings
>
> ---
>
> **From:** Cheree Pasalakis <cheree.pasalakis@cloverhealth.com>
> **Sent:** Wednesday, April 30, 2025 10:45 AM
> **To:** CMS PartC&DStarRatings <PartCandDStarRatings@cms.hhs.gov>; PatientSafety <PatientSafety@acumenllc.com>
> **Cc:** Cameron Pringle <cameron.pringle@cloverhealth.com>; Vivian Meras <vivian.meras@cloverhealth.com>; Robert Davis <robert.davis@cloverhealth.com>
> **Subject:** Injectable Statin Appeal - H5141
>
> Good morning,

We are requesting your review of the below information. Thank you.

- **Contract Number**: H5141
- **Patient Safety Report:** April Patient Safety Report
- **Year of Service:** 2024
- **Patient Safety Measure:** D10 - Medication **Adherence** for Cholesterol (**Statins**)
- **Description of the Inquiry**: Following an internal review, we have identified a subset of members currently included in this measure. Based on clinical documentation and treatment history, the patients' medical providers appropriately transitioned them from statin therapy to non-statin lipid-lowering agents, including PCSK9 inhibitors such as evolocumab (Repatha), inclisiran (Leqvio) and alirocumab (Praluent). These members have discontinued statins for clinically supported reasons, as directed by their physicians, including documented intolerance or inadequate therapeutic response, and have instead been prescribed PCSK9 inhibitors.

# Clover Health

**To whom it may concern,**

On behalf of Clover Health, I am writing to formally appeal the inclusion of certain members in the latest 2024 patient safety report (published on April 1st), specifically within the Statin medication adherence measure.

Following an internal review, we have identified a subset of members currently included in this measure. Based on clinical documentation and treatment history, the patients' medical providers appropriately transitioned them from statin therapy to non-statin lipid-lowering agents, including PCSK9 inhibitors such as evolocumab (Repatha), inclisiran (Leqvio) and alirocumab (Praluent). These members have discontinued statins for clinically supported reasons, as directed by their physicians, including documented intolerance or inadequate therapeutic response, and have instead been prescribed PCSK9 inhibitors. Not only is such discontinuation of statins medically appropriate or necessary in accordance with current ACC/AHA guidelines, CMS methodology in the Technical Specifications recognizes the importance of such discontinuation under Measure D08 - Medication Adherence for Diabetes Medications. Labeling the measure as "Taking Diabetes as Directed," CMS stresses, "One of the most important ways people with diabetes can manage their health is by taking their medication *as directed*."[1] (Emphasis added). Therefore, the measure should include only "members *with a prescription* for diabetes medication who fill their prescription often enough to cover 80% or more of the time they are supposed to be taking the medication." (Emphasis added).[2]

Here, the members' physicians "directed" them not to take statins and therefore did not provide a "prescription" for statins. Thus, these members should not be included in the measure. But contrary to CMS' own description for "Medication Adherence for Diabetes Medications," the statin adherence measure relied on Part D claims data for statins without accounting for members who receive appropriate alternative therapy via Part D injectables not on the PQA list. As a result, these members were inaccurately classified as non-adherent despite continuing to receive lipid-lowering treatment that meets the clinical specifications of the measure.

Moreover, it is important to emphasize that these patients' providers determined that Part D-administered injectables were more appropriate for the patients. Thus, for these patients to have continued on statin therapy would have been medically unnecessary (and perhaps

[1] https://www.cms.gov/files/document/mmpperformancedatatechnotes.pdf.
[2] https://www.cms.gov/files/document/mmpperformancedatatechnotes.pdf.

harmful) not to mention unduly costly. Given the voluminous statutes, CMS regulations and guidance on medical necessity, patient harm, and undue cost, the medication adherence measure certainly does not require patients to receive medically unnecessary (and inappropriate) treatments.

**Summary of Affected Members Based on Clinically Appropriate Statin Replacement Therapy:**

- Statin Measure: 91 members with documented PCSK9 escalation from a statin therapy that was not effective in controlling their cholesterol

**Clinical Rationale**:

- Statin intolerance (e.g., myalgia, liver enzyme elevations) is a well-established clinical reason for discontinuing statin therapy, as recognized in the 2018 ACC/AHA Multisociety Cholesterol Management Guidelines.

- PCSK9 inhibitors (e.g., Repatha, Praluent) are recommended for patients who are unable to tolerate statins or who do not achieve adequate LDL-C reduction with statins alone (ACC/AHA, 2018).

- Continuation of statin therapy despite intolerance may expose patients to increased risk of adverse events, including severe muscle-related side effects and liver toxicity, without proportional benefit.

We appreciate your consideration of this appeal and respectfully request that CMS exclude such members from the Statin adherence measure. We would be happy to provide a list of members and supporting documentation of PCSK9 use as a follow up.

Sincerely,

Dr. Shelly Gupta
Chief Medical Officer
Clover Health

**From:** Ketcham, Michelle (CMS/CM)
**To:** Will Chang; Duran, Vanessa (CMS/CM)
**Subject:** RE: Patient Safety Measures- D10, D08, and D09
**Date:** Wednesday, July 30, 2025 12:37:49 PM

Hello Will,

Yes, we are in receipt of your correspondence. Vanessa is on vacation until next week. I will connect with Vanessa after she returns, and then we will follow up on your request.

Thank you,
Michelle

**Michelle B. Ketcham, PharmD, MBA** | Director, Division of Clinical and Operational Performance (DCOP) | Medicare Drug Benefit and C&D Data Group (MDBG) | Centers for Medicare & Medicaid Services (CMS) | U.S. Department of Health and Human Services (DHHS) | Phone 410.786.3371

**From:** Will Chang <william.chang@cloverhealth.com>
**Sent:** Tuesday, July 29, 2025 1:08 PM
**To:** Duran, Vanessa (CMS/CM) <Vanessa.Duran@cms.hhs.gov>; Ketcham, Michelle (CMS/CM) <michelle.ketcham@cms.hhs.gov>
**Subject:** Fwd: Patient Safety Measures- D10, D08, and D09

This message was sent securely using Zix®

Dear Ms. Duran and Dr. Ketcham,

On behalf of Clover Health, I respectfully request a meeting to discuss the calculation of the 2026 Star Ratings, specifically the data used to calculate the Medication Adherence measures. We believe the current calculation does not include data needed to accurately reflect the methodology as written, which specifies that beneficiaries should take their medication "as directed" by their physician, and that the data should include only members with a prescription for a diabetes medication.

It is also important to emphasize that these patients' providers determined that these medications were no longer appropriate for the patients. Thus, for these patients to have continued on therapy would have been medically unnecessary (and perhaps harmful) not to mention unduly costly.

We greatly appreciate your time and are available to meet at your convenience, though if possible we respectfully request that the meeting is held prior to the first plan preview period.

We attach the most recent correspondence for your reference, which CMS confirmed receipt of.

Regards,
Will Chang
Vice President and Deputy General Counsel

---------- Forwarded message ---------
From: **Cheree Pasalakis** <cheree.pasalakis@cloverhealth.com>
Date: Fri, Jun 13, 2025 at 9:37 AM

Subject: Patient Safety Measures- D10, D08, and D09
To: CMS PartC&DStarRatings <PartCandDStarRatings@cms.hhs.gov>, PatientSafety <PatientSafety@acumenllc.com>
Cc: Cameron Pringle <cameron.pringle@cloverhealth.com>, Robert Davis <robert.davis@cloverhealth.com>, Will Chang <william.chang@cloverhealth.com>, <vanessa.duran@cms.hhs.gov>, <elizabeth.goldstein@cms.hhs.gov>, Shelly Gupta <shelly.gupta@cloverhealth.com>

Good morning,

We are requesting your review of the below and attached information. Thank you.

- **Contract Number**: H5141
- **Patient Safety Report:** May Patient Safety Report
- **Year of Service:** 2024
- **Patient Safety Measure:** D10 - Medication **Adherence** for Cholesterol (**Statins**), D08 **-** Medication Adherence for diabetes medications, D09 Medication Adherence for Hypertension (RAS antagonists)
- **Description of the Inquiry**:

On behalf of Clover Health, we respectfully reiterate our ongoing challenge to CMS's decision to include certain members in the latest 2024 patient safety report (published on April 1st)--within Measure D10, Medication Adherence for Cholesterol (Statins). In addition, we respectfully challenge CMS's decision to include certain members within Measure D08, Medication Adherence for Diabetes Medication and Measure D09, Medication Adherence for Hypertension (RAS antagonists).

As explained in Clover Health's April 30, 2025 letter, it is inappropriate for Measure D10 to penalize plans with members who have discontinued statins for medically appropriate reasons. It is also inappropriate for Measures D08 and D09 to penalize plans with members who have discontinued diabetes medications or RAS antagonists for medically appropriate reasons. The doctors of these members or CMS's own guidance has determined that continuing statins, diabetes medications, or RAS antagonists would have been medically unnecessary and perhaps harmful for the members–not to mention unduly costly. Given the voluminous statutes, CMS regulations, and guidance on medical necessity, patient harm, and undue cost, Star Ratings measures cannot–and should not–require medically unnecessary and inappropriate treatments in order to achieve compliance under those measures.

In your April 30, 2025 response, CMS did not address–let alone dispute–the substantive merits of our challenge. Instead, CMS simply says "that the current methodology does not account for medication discontinuations" and "all Patient Safety measures are adapted from measures developed and endorsed by the Pharmacy Quality Alliance." CMS then directs us to the Pharmacy Quality Alliance (PQA) to address our challenges.

Respectfully, CMS's reliance on the measures is arbitrary, capricious, and otherwise not in accordance with law. And while CMS may consult and adopt measures developed by PQA, under the Medicare Act and the Administrative Procedure Act, CMS must ensure that any adopted measure design is methodologically sound and non-arbitrary. In short, CMS is legally responsible for Measures D08, D09, and D10 (and other Star

Ratings measures). CMS cannot avoid that responsibility by pointing us to PQA.

Under CMS's Medicare 2025 Part C & D Star Ratings Technical Notes, federal law, and other applicable authorities, CMS must exclude the members identified in our prior letter as well as the additional members identified in this letter for at least four independent reasons.

This message was secured by Zix®.

Excel File Produced in Native Format

05.A Exhibit A w_o PHI.xlsx

This document contains confidential, commercial proprietary information or confidential personnel or medical files exempt from disclosure under Exemptions 4 and 6 of FOIA.

# Clover Health

May 21, 2025

**To whom it may concern,**

On behalf of Clover Health, we respectfully reiterate our ongoing challenge to CMS's decision to include certain members in the latest 2024 patient safety report (published on April 1st)--within Measure D10, Medication Adherence for Cholesterol (Statins).[1] In addition, we respectfully challenge CMS's decision to include certain members within Measure D08, Medication Adherence for Diabetes Medication and Measure D09, Medication Adherence for Hypertension (RAS antagonists).

As explained in Clover Health's April 30, 2025 letter, it is inappropriate for Measure D10 to penalize plans with members who have discontinued statins for medically appropriate reasons.[2] It is also inappropriate for Measures D08 and D09 to penalize plans with members who have discontinued diabetes medications or RAS antagonists for medically appropriate reasons. The doctors of these members or CMS's own guidance has determined that continuing statins, diabetes medications, or RAS antagonists would have been medically unnecessary and perhaps harmful for the members–not to mention unduly costly. Given the voluminous statutes, CMS regulations, and guidance on medical necessity, patient harm, and undue cost, Star Ratings measures cannot–and should not–require medically unnecessary and inappropriate treatments in order to achieve compliance under those measures.

In your April 30, 2025 response, CMS did not address–let alone dispute–the substantive merits of our challenge.[3] Instead, CMS simply says "that the current methodology does not account for medication discontinuations" and "all Patient Safety measures are adapted from measures developed and endorsed by the Pharmacy Quality Alliance."[4] CMS then directs us to the Pharmacy Quality Alliance (PQA) to address our challenges.[5]

Respectfully, CMS's reliance on the measures is arbitrary, capricious, and otherwise not in accordance with law.[6] And while CMS may consult and adopt measures developed by PQA, under the Medicare Act and the Administrative Procedure Act, CMS must ensure that any adopted measure design is

---

[1] *See* Exhibit A for members who should have been excluded. PHI has been withheld, including supporting documentation containing, among other things, patient medical information. We can make the PHI available to CMS upon request.

[2] *See* Exhibit B.

[3] *See* Exhibit C.

[4] *See* Exhibit C.

[5] *See* Exhibit C.

[6] 5 U.S.C. § 706(2)(A).

This document contains confidential, commercial proprietary information or confidential personnel or medical files exempt from disclosure under Exemptions 4 and 6 of FOIA.

methodologically sound and non-arbitrary. In short, CMS is legally responsible for Measures D08, D09, and D10 (and other Star Ratings measures). CMS cannot avoid that responsibility by pointing us to PQA.

Under CMS's Medicare 2025 Part C & D Star Ratings Technical Notes, federal law, and other applicable authorities, CMS must exclude the members identified in our prior letter as well as the additional members identified in this letter for at least four independent reasons.

*First*, as set forth in the supporting clinical documentation and our prior letter, at least 293 members were directed by their physicians *not* to take statins.[7] At least 218 members were directed by their physicians *not* to take diabetes medication.[8] And at least 222 members were directed by their physicians *not* to take RAS antagonists.[9]

CMS has repeatedly made clear that, to be included in Measures D10 (statins), D09 (RAS antagonists), and D08 (diabetes medication), the members must "[t]ak[e] ... medication *as [d]irected*."[10] Describing each of those measures,, CMS has stressed, "One of the most important ways people with [diabetes, high blood pressure, or high cholesterol] can manage their health is by taking medication *as directed*. The plan, doctor, and the member can work together to do this."[11] Here, the plan, doctor, and the member did exactly as CMS had instructed.

The supporting documentation shows that the doctors of the identified 733 members directed them not to take statins, RAS antagonists, or diabetes medication for clinical reasons, including intolerance or inadequate therapeutic response.[12] And the plan supported that treatment "as directed." Therefore, under CMS's Technical Notes, these members should have been excluded under Measures D08, D09, and D10. CMS's failure to do so is unlawful: "For an agency to say one thing[,] . . . and do another . . . is the essence of arbitrary action."[13]

*Second*, at least 393 members were *no longer* prescribed statins, diabetes medication, or RAS antagonists at a certain point during the measurement period–because their doctors determined that continuing such therapy would be medically inappropriate.[14] And CMS Technical Notes for Measure D10 "Metric" states, "This measure is defined as the percent of Medicare Part D beneficiaries 18 years and

---

[7] *See* Exhibit A.

[8] *See* Exhibit A.

[9] *See* Exhibit A.

[10] https://www.cms.gov/files/document/2025-star-ratings-technical-notes.pdf, at 92, 95, 98 (emphasis added).

[11] https://www.cms.gov/files/document/2025-star-ratings-technical-notes.pdf, at 92, 95, 98 (emphasis added).

[12] *See* Exhibit A.

[13] *Pub. Citizen v. Heckler*, 653 F. Supp. 1229, 1237 (D.D.C. 1986).

[14] *See* Exhibit A.

This document contains confidential, commercial proprietary information or confidential personnel or medical files exempt from disclosure under Exemptions 4 and 6 of FOIA.

older who adhere to their *prescribed* drug therapy for" diabetes medications, RAS antagonists, or statin cholesterol medications.[15]

Regarding the members at issue, the supporting documentation shows that their doctors ceased prescribing diabetes medications, RAS antagonists, or statins for clinical reasons. Therefore, under CMS's Technical Notes, at least 393 members should have been excluded under Measures D08, D09, and D10. CMS's failure to do so is unlawful, because "an '[u]nexplained inconsistency' in agency policy is 'a reason for holding an interpretation to be an arbitrary and capricious change from agency practice.'"[16]

*Third*, Measure D10 fails to incorporate exclusions that CMS has for Measure C16 - Statin Therapy for Patients with Cardiovascular Disease. Statin therapy for patients with cardiovascular disease (Measure C16) is a subset of statin therapy for cholesterol (Measure D10). Therefore, the exclusions that apply to the latter (Measure D10) should include, *at the very least*, the same exclusions that apply to the former (Measure C16).

Yet CMS failed to do so. For Measure C16, there are at least *eleven* exclusions, including but not limited to Cirrhosis, end stage renal disease (ESRD), Myalgia, myositis, myopathy, or rhabdomyolysis during the measurement year.[17] By contrast, measure D10 has only *two* exclusions.[18] Among other conditions, Measure D10 does not exclude Cirrhosis, ESRD, Myalgia, myositis, myopathy, or rhabdomyolysis during the measurement year.

There is no legitimate basis (clinical or otherwise) for this discrepancy. For example, a patient who has Cirrhosis generally should not be on statins regardless of whether the therapy is for cardiovascular disease or cholesterol. And such discrepancies are unlawful, because "an agency must treat similar cases in a similar manner unless it can provide a legitimate reason for failing to do so."[19] CMS has not–because it cannot–do so.

Without this unlawful discrepancy whereby Measure D10 arbitrarily and capriciously fails to include the exclusions in Measure C16, at least 666 members should be excluded.[20]

*Fourth*, under federal law and longstanding CMS regulations and guidance, Medicare beneficiaries should not receive medically unnecessary care.[21] In the case of each of the identified members, their

15 https://www.cms.gov/files/document/2025-star-ratings-technical-notes.pdf, at 92, 95, 98 (emphasis added).

16 *See Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016).

17 https://www.cms.gov/files/document/2025-star-ratings-technical-notes.pdf, at 56-57.

18 https://www.cms.gov/files/document/2025-star-ratings-technical-notes.pdf, at 99.

19 *See Bracco Diagnostics, Inc. v. Shalala*, 963 F. Supp. 20, 27 (D.D.C. 1997).

20 *See* Exhibit A.

21 *See, e.g.*, 18 U.S.C. section 1349; https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/Downloads/Fraud-Abuse-MLN4649244.pdf at 5 (CMS explaining that "Medicare fraud include[s] … [k[nowingly ordering medically necessary … services for patients.").

This document contains confidential, commercial proprietary information or confidential personnel or medical files exempt from disclosure under Exemptions 4 and 6 of FOIA.

doctors determined that statin therapy would be medically unnecessary, and in some cases, cause patient harm. Under well-established law, CMS Star Ratings cannot require illegal or harmful therapy (in violation of federal statute and CMS guidance) in order to satisfy a medication adherence measure.[22]

In CMS's April 30, 2025 response to our similar challenges regarding Measure D10, CMS directed us to bring such challenges to PQA. While we understand that CMS often bases its Star Rating measures on the measure steward's specifications (for example, PQA) for each measure, ultimately under both the Medicare Act and the Administrative Procedure Act, it is CMS's obligation to ensure that measure design–inlcuding D08, D09, and D10–is methodologically sound and non-arbitrary.[23]

* * *

For the above reasons, Clover Health continues to challenge CMS's use of the measure and respectfully asks that CMS rescind the measure, unless and until it is appropriately modified to exclude members who have discontinued statins for clinically supported reasons. We appreciate your consideration of this challenge and respectfully request that CMS exclude such members from Measures D08, D09, and D10. We reserve all rights.

Sincerely,

Dr. Shelly Gupta
Chief Medical Officer
Clover Health

Will Chang
Vice President and Deputy General Counsel
Clover Health

CC: Vanessa Duran, vanessa.duran@cms.hhs.gov
Elizabeth Goldstein, elizabeth.goldstein@cms.hhs.gov

[22] *See* SSA § 1801 (prohibiting federal interference with or control over the practice of medicine); *see also Mylan Lab'ys Ltd. v. U.S. Food & Drug Admin.*, 910 F. Supp. 2d 299, 306 (D.D.C. 2012) (agencies cannot act "inconsistent with the statutory mandate" or "frustrate[s] the policy that Congress sought to implement.").

[23] *See* Social Security Act (SSA) § 1852(e); *see also id.* §§ 1853(o), 1856(b).

**CMS Response:**

CMS has reviewed Clover Health's concerns. CMS is unable to make an ad hoc methodology change to account for medication discontinuation or to add additional exclusions after the measurement year for the three Medication Adherence measures. For the Medicare Part C & D Star Ratings program, we cannot make substantive changes to measure specifications without rigorous measure development, testing, and rulemaking processes ahead of the measurement period. As codified at 42 CFR §§ 422.164(d)(2) and 423.184(d)(2), substantive updates (that is, changes) must be proposed and finalized through rulemaking in advance of the measurement period and only after we have solicited feedback through the Advance Notice and Rate Announcement process. In addition, we must announce any non-substantive measure updates through the Advance Notice and Rate Announcement process during or in advance of the measurement period as described at 42 CFR §§ 422.164(d)(1) and 423.184(d)(1). Therefore, we are limited as to when measure specification updates can be implemented. At this time, we are unable to implement changes to measure specifications for the 2026 Star Ratings (measurement year 2024), including the changes to the Medication Adherence measures requested by Clover Health. Moreover, to the extent Clover Health seeks one-off, post-hoc exceptions or adjustments to the measure specifications to be applied solely to its plans, we cannot grant that request, as the inconsistent application of measure specifications would erode measure validity across the Part D Star Ratings program.

Furthermore, the current measure specifications for the Part D Medication Adherence measures are appropriate to assess and promote evidence-based medication adherence, while also taking discontinuation into account to the extent feasible. If a patient discontinues the target medication due to intolerance or adverse effects, they may appear non-adherent for the remainder of the measurement year. However, in subsequent years, if the patient has no further claims for the target medication, they are excluded from the denominator and no longer impact the measure. Accordingly, any discontinuation due to intolerance has only a transient effect on measure calculations. This design ensures that clinical appropriateness and shared decision-making are preserved, without compromising the integrity of the adherence metric.

Also, as a reminder, the Proportion of Days Covered (PDC) threshold is 80% (in other words, CMS does not expect 100% adherence). As we noted in the contract year (CY) 2019 Medicare Advantage and Part D final rule (83 FR 16553), the 80% compliance threshold reflects the potential for changes in therapy, including medication discontinuation.

Additionally, as we explained in the CY 2019 Medicare Advantage and Part D final rule (83 FR 16553), incorporating medication discontinuation into the Part D Medication Adherence measures would raise significant data integrity concerns. We do not currently have beneficiary-level medication discontinuation data, and there is a lack of standardized data sources for supporting clinical documentation, such as electronic medical record (EMR) care notes. Furthermore, there is a lack of standardized access to this type of data across different Part D plan sponsors, including stand-alone Prescription Drug Plans (PDPs), which do not have access to medical records. If Part D sponsors were to attempt to collect the data, it is unclear how sponsors could implement sufficient

internal controls to meet audit standards necessary to ensure the quality of the data. A standardized data source is required for CMS to validate and verify that the beneficiary discontinued the medication based on a provider's direction. Based on the HPMS memorandum dated May 11, 2012, which addresses the prohibition on submitting Prescription Drug Event (PDE) data for non-Part D prescriptions due to concerns related to beneficiary privacy protections and data validation, and the HPMS memorandum dated April 23, 2013, regarding the May 2013 updates to the Drug Data Processing System, we cannot accept supplemental data. Accepting non-standardized and unvalidated data could potentially lead to data integrity issues.

Without verification using a standardized data source across all plans that CMS can appropriately validate, Part D Star Ratings measures are at risk of potential gaming. It is imperative that CMS apply consistent standards and methodology across all Part D plan sponsors to avoid gamification and data integrity issues, which could undermine the reliability of plan ratings. In addition, the requested adjustments could risk incentivizing plans and providers to discontinue indicated therapy due to adherence concerns to improve performance, undermining the measure intent.

Furthermore, the exclusions utilized in the Part C Statin Therapy for Patients with Cardiovascular Disease (SPC) measure are applied based on a different set of data sources than those applicable to the Medication Adherence for Cholesterol (Statins) measure. The Medication Adherence for Cholesterol (Statins) measure was developed for use in the Part D Star Ratings using administrative PDE data to identify the eligible population because PDPs have limited to no access to medical claims. In contrast, the SPC measure is a Part C measure that aligns with the broader Healthcare Effectiveness Data and Information Set (HEDIS) ecosystem. HEDIS measures require calculation by certified vendors and allow use of broader data sources beyond administrative data, including clinical and other data sources.

Finally, we note that Clover Health is not uniquely impacted by the Medication Adherence measure specifications. Medication discontinuation may occur for beneficiaries across all Part D contracts. The Star Ratings methodology for assigning stars for the Medication Adherence measures is not based on predetermined or static cut points but is based on a clustering methodology using scores from all contracts (stratified by MA-PDs and PDPs) at the end of the measurement year. Star Ratings are assigned based on a contract's performance relative to other contracts, and measure specifications are applied consistently to all Part D sponsors.

**CMS PartC&DStarRatings**

**From:** CMS PartC&DStarRatings
**Sent:** Wednesday, April 30, 2025 2:03 PM
**To:** Cheree Pasalakis; PatientSafety
**Cc:** Cameron Pringle; Vivian Meras; Robert Davis; CMS PartC&DStarRatings; CMS PartC&DStarRatings
**Subject:** RE: Injectable Statin Appeal - H5141

Hi Cheree,

Thank you for reaching out to us. Please review Section 2.1 Measure Specifications of the Adherence Measures User Guide, available in the Help Documents section of the PS Web Portal, for more details on the methodology for calculating the Adherence Measure's rates. Please note that the current methodology does not account for medication discontinuations.

Additionally, per section 2 'Measure Overview' of the General Report User Guide, all Patient Safety measures are adapted from measures developed and endorsed by the Pharmacy Quality Alliance (PQA). Should you have further questions regarding the methodology for calculating the Adherence measures, please consult PQA's Web Page or contact them at www.pqaalliance.org/tech-assist-form. Upon submission, you will receive a confirmation of your request with an associated request ID number for easy referencing. Feel free to check out PQA's website for frequently asked questions as well.

Can we share your email with the PQA?

Please let us know if you have any additional questions.

Best,
Part C & D Star Ratings

---

**From:** Cheree Pasalakis <cheree.pasalakis@cloverhealth.com>
**Sent:** Wednesday, April 30, 2025 10:45 AM
**To:** CMS PartC&DStarRatings <PartCandDStarRatings@cms.hhs.gov>; PatientSafety <PatientSafety@acumenllc.com>
**Cc:** Cameron Pringle <cameron.pringle@cloverhealth.com>; Vivian Meras <vivian.meras@cloverhealth.com>; Robert Davis <robert.davis@cloverhealth.com>
**Subject:** Injectable Statin Appeal - H5141

Good morning,
We are requesting your review of the below information. Thank you.

- **Contract Number**: H5141
- **Patient Safety Report:** April Patient Safety Report
- **Year of Service:** 2024
- **Patient Safety Measure:** D10 - Medication **Adherence** for Cholesterol (**Statins**)
- **Description of the Inquiry**: Following an internal review, we have identified a subset of members currently included in this measure. Based on clinical documentation and treatment history, the patients' medical providers appropriately transitioned them from statin therapy to non-statin lipid-lowering agents, including PCSK9 inhibitors such as evolocumab (Repatha),

inclisiran (Leqvio) and alirocumab (Praluent). These members have discontinued statins for clinically supported reasons, as directed by their physicians, including documented intolerance or inadequate therapeutic response, and have instead been prescribed PCSK9 inhibitors.

| | |
|---|---|
| **From:** | CMS PartC&DStarRatings |
| **To:** | Cheree Pasalakis |
| **Cc:** | Jaye Johnston; Will Chang; Wendy Richey; Jamie Reynoso; Kim Williams; CMS PartC&DStarRatings |
| **Subject:** | RE: Secure - Plan Preview #1 - Appeal Documentation for H5141 and H8010 |
| **Date:** | Wednesday, August 13, 2025 3:29:33 PM |

We noticed in your attachments that you provided enrollee names. As is stated in our Plan Preview memo, no PHI should be sent through email. Please delete these files from your system. If you need to provide PHI, as stated you need to request a secure means for transferring the information.

Below we provide feedback about each of the case numbers in your email regarding the Part C appeals measures.

Case 1-13931154263- When your plan submitted the case file to Maximus, there was not sufficient information about the WOL date issue. Thank you for providing additional information and Maximus will change the appeal request date to 3/28/24. In the future, please try to make these requests earlier if your plan incorrectly entered the appeal receipt date.

Case 1-14156837886- No changes will be made. There is no evidence of an issue with the signature date in the case file sent to Maximus. The WOL has a date stamp of when the plan received this via fax that explicitly states 2/1/24 at 16:20:11. This was a valid WOL as per the documentation sent to Maximus so we see no issues to correct.

1-14575068066- It looks like your plan entered the wrong date when the case was submitted to Maximus. We are having Maximus update the date to 8/22/2024.

1-14506371416- This case was submitted nearly a month after the first one that you claim is a duplicate. This is an expedited appeal, and it is very common for a patient to request multiple appeals for the same item/service if their clinical circumstances change. It also does not look like you requested a reopening of this case. No changes are being made to this case.

1-14506371416- Your plan submitted this case as an expedited appeal and no changes can be made to change the appeal priority. For this appeal your plan notes that this is an expedited request in multiple places in the file submitted to maximus.

1-14595402316- Reopening decisions do not impact the timeliness measure. Reopenings are not related to the timeliness calculations. Reopenings only affect Reviewing Appeals Decisions measure, not the Plan Makes Timely Decisions measure.

1-14385393292- Maximus does not have medical records related to this case so no updates can be made.

For all of the cases related to re-openings, Clover did not request a reopening within 180 days of the Maximus decision. It appears that Clover is saying on their own initiative that they reopened the cases while the appeals were being processed. Clover is not able to reopen a decision after they receive an appeal request. Please see the below citation.

**42 CFR § 405.980(a)(4)** – When a party has filed a valid request for an appeal of an initial determination, redetermination, reconsideration, ALJ or attorney adjudicator decision, or Council review, no adjudicator has jurisdiction to reopen an issue on a claim that is under appeal until all appeal rights for that issue are exhausted. Once the appeal rights for the issue have been exhausted, the contractor, QIC, ALJ or attorney adjudicator, or Council may reopen as set forth in this section.

We also checked the dates related to the below cases and corrections are in red.

- **1-13664105851** - Initial Determination denial on January 18, 2024 (Attachment O); reopening by Clover to approve coverage on January 22, 2024 (Attachment A; *see also* Attachment T).
    - Initial denial on December 26, 2023; Plan received appeal request on January 17, 2024; plan forwarded to Maximus on January 19, 2024
- **1-13814982651** - Initial determination denial on February 21, 2024 (Attachment P); reopening by Clover to approve coverage on March 25, 2024 (Attachment D; *see also* Attachment U).
    - Initial determination denied on January 25, 2024; plan received appeal request on February 14, 2024; plan forwarded to Maximus on March 4, 2024
- **1-13976245156** - Initial determination denial on April 18, 2024 (Attachment Q); reopening by Clover to approve coverage on April 22, 2024 (Attachment F; *see also* Attachment V).
    - Initial determination denied on April 12, 2024; plan received appeal request on April 17, 2024; plan forwarded to Maximus on April 19, 2024
- **1-14005223730** - Initial determination denial on April 29, 2024 (Attachment R); reopening by Clover to approve coverage on May 1, 2024 (Attachment F; *see also* Attachment W).
    - Initial determination denied on April 26, 2024; plan received appeal request on April 26, 2024; plan forwarded to Maximus on April 29, 2024

- **1-14173810816** - Initial determination denial on June 5, 2024 (Attachment S); reopening by Clover to approve coverage on August 13, 2024 (Attachment J; *see also* Attachment X).
  - Initial determination denied on February 16, 2024; plan received appeal request on April 13, 2024; plan forwarded to Maximus on June 09, 2024
- **1-14196773261** - Initial determination denial on June 16, 2024 (Attachment N); reopening by Clover to approve coverage on July 7, 2024 (Attachment L; *see also* Attachment Y).
  - Initial determination denied on June 4, 2024; plan received appeal request on June 13, 2024; plan forwarded to Maximus on June 16, 2024

Part C and D Star Ratings Team

---

**From:** Cheree Pasalakis <cheree.pasalakis@cloverhealth.com>
**Sent:** Tuesday, August 12, 2025 7:15 PM
**To:** CMS PartC&DStarRatings <PartCandDStarRatings@cms.hhs.gov>; CMS CallCenterMonitoring <CallCenterMonitoring@cms.hhs.gov>
**Cc:** Jaye Johnston <jaye.johnston@cloverhealth.com>; Will Chang <william.chang@cloverhealth.com>; Wendy Richey <wendy.richey@cloverhealth.com>; Jamie Reynoso <jamie.reynoso@cloverhealth.com>; Kim Williams <kim.williams@cloverhealth.com>
**Subject:** Secure - Plan Preview #1 - Appeal Documentation for H5141 and H8010

This message was sent securely using Zix®

Good afternoon,
Attached is our appeal documentation for plan preview #1. Thank you in advance for your review and consideration.

Cheree Pasalakis
Manager, Compliance
615.426.5531

CONFIDENTIALITY NOTICE: This e-mail message and all attachments accompanying it may contain confidential information intended solely for the use of the addressee. If the reader of this message is not the intended recipient or has received this in error, be notified that any reading, dissemination, distribution, copying or other use of this message or its attachments, as well as the asking of any action in reliance on the contents of this information, is strictly prohibited. Any unauthorized interception of this transmission is illegal under the law. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY ME IMMEDIATELY BY A REPLY E-MAIL OR PHONE AND PERMANENTLY DELETE THE ORIGINAL E-MAIL AND ANY ATTACHMENTS FROM ALL STORAGE DEVICES WITHOUT RETAINING A COPY. THANK YOU.

This message was secured by **Zix**®.

**From:** CMS CallCenterMonitoring
**To:** Wendy Richey
**Cc:** Cheree Pasalakis; CMS PartC&DStarRatings; Jaye Johnston; Will Chang; Jamie Reynoso; Kim Williams
**Subject:** RE: Secure - Plan Preview #1 - Appeal Documentation for H5141 and H8010
**Date:** Thursday, August 14, 2025 12:48:58 PM
**Attachments:** ~WRD0567.jpg
image001.png

---

Good afternoon,

Thank you for reaching out with your questions. We have completed our review and found the following.

Your plan IVR was presenting a message that stated the call center was closed. CMS also noted being asked to leave a message with the closed message on several calls. Your plan agrees that your IVR was presenting a message that the call center was closed. The results remain as is

Thank you again for reaching out with your questions.

Very respectfully,

**Call Center Monitoring Team**
Medicare Drug Benefit and C&D Data Group (MDBG)
CallCenterMonitoring@cms.hhs.gov

***Confidentiality and Restricted Disclosure Notice:*** This e-mail is intended only for the use of the named addressee(s) and may contain information that is confidential, privileged or regulated under federal and/or state law, including The Privacy Act and HIPAA. If you are not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this e-mail is strictly prohibited. If you have received this e-mail in error, please notify the sender immediately by replying to the e-mail and destroy all copies of the original message. If you are the intended recipient, you are notified that you have the obligation to ensure that any further dissemination, distribution or copying is consistent with applicable law.

---

**From:** Wendy Richey <wendy.richey@cloverhealth.com>
**Sent:** Tuesday, August 12, 2025 9:29 PM
**To:** CMS CallCenterMonitoring <CallCenterMonitoring@cms.hhs.gov>
**Cc:** Cheree Pasalakis <cheree.pasalakis@cloverhealth.com>; CMS PartC&DStarRatings <PartCandDStarRatings@cms.hhs.gov>; Jaye Johnston <jaye.johnston@cloverhealth.com>; Will Chang <william.chang@cloverhealth.com>; Jamie Reynoso <jamie.reynoso@cloverhealth.com>; Kim Williams <kim.williams@cloverhealth.com>
**Subject:** Re: Secure - Plan Preview #1 - Appeal Documentation for H5141 and H8010

This message was sent securely using Zix®

Thank you. Appreciate your quick response. Have a great evening

Wendy Richey
Medicare Compliance Officer
Clover Health
551-225-2014

CONFIDENTIALITY NOTICE: This e-mail message and all attachments accompanying it may contain confidential information intended solely for the use of the addressee. If the reader of this message is not the intended recipient or has received this in error, be notified that any reading, dissemination, distribution, copying or other use of this message or its attachments, as well as the asking of any action in reliance on the contents of this information, is strictly prohibited. Any unauthorized interception of this transmission is illegal under the law. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY ME IMMEDIATELY BY A REPLY E-MAIL OR PHONE AND PERMANENTLY DELETE THE ORIGINAL E-MAIL AND ANY ATTACHMENTS FROM ALL STORAGE DEVICES WITHOUT RETAINING A COPY. THANK YOU

On Tue, Aug 12, 2025 at 8:15 PM CMS CallCenterMonitoring <CallCenterMonitoring@cms.hhs.gov> wrote:

> Good evening,
>
> Thank you for reaching out with your questions. We will review and be in touch.
>
> Very respectfully,
>
> **Call Center Monitoring Team**
> Medicare Drug Benefit and C&D Data Group (MDBG)
> CallCenterMonitoring@cms.hhs.gov

***Confidentiality and Restricted Disclosure Notice:*** This e-mail is intended only for the use of the named addressee(s) and may contain information that is confidential, privileged or regulated under federal and/or state law, including The Privacy Act and HIPAA. If you are not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this e-mail is strictly prohibited. If you have received this e-mail in error, please notify the sender immediately by replying to the e-mail and destroy all copies of the original message. If you are the intended recipient, you are notified that you have the obligation to ensure that any further dissemination, distribution or copying is consistent with applicable law.

**From:** Cheree Pasalakis <cheree.pasalakis@cloverhealth.com>
**Sent:** Tuesday, August 12, 2025 7:15 PM
**To:** CMS PartC&DStarRatings <PartCandDStarRatings@cms.hhs.gov>; CMS CallCenterMonitoring <CallCenterMonitoring@cms.hhs.gov>
**Cc:** Jaye Johnston <jaye.johnston@cloverhealth.com>; Will Chang <william.chang@cloverhealth.com>; Wendy Richey <wendy.richey@cloverhealth.com>; Jamie Reynoso <jamie.reynoso@cloverhealth.com>; Kim Williams <kim.williams@cloverhealth.com>
**Subject:** Secure - Plan Preview #1 - Appeal Documentation for H5141 and H8010

This message was sent securely using Zix®

Good afternoon,
Attached is our appeal documentation for plan preview #1. Thank you in advance for your review and consideration.

Cheree Pasalakis
Manager, Compliance
615.426.5531

CONFIDENTIALITY NOTICE: This e-mail message and all attachments accompanying it may contain confidential information intended solely for the use of the addressee. If the reader of this message is not the intended recipient or has received this in error, be notified that any reading, dissemination, distribution, copying or other use of this message or its attachments, as well as the asking of any action in reliance on the contents of this information, is strictly prohibited. Any unauthorized interception of this

transmission is illegal under the law. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY ME IMMEDIATELY BY A REPLY E-MAIL OR PHONE AND PERMANENTLY DELETE THE ORIGINAL E-MAIL AND ANY ATTACHMENTS FROM ALL STORAGE DEVICES WITHOUT RETAINING A COPY. THANK YOU.

This message was secured by **Zix**®.

This message was secured by **Zix**®.

**HPMS Appeal – 2026 Plan Preview: Measures D08 (Medication Adherence for Diabetes Medication), D09 (Medication Adherence for Hypertension: RAS antagonists), D10 (Medication Adherence for Cholesterol: Statins)**

**Contract No.(s):** H5141

---

**Executive Summary:**

Clover Health (Contract No.: H5141) respectfully objects to CMS's inclusion of certain members in the calculation of Clover Health's performance on Measures D08 (Medication Adherence for Diabetes Medication), D09 (Medication Adherence for Hypertension: RAS antagonists), and D10 (Medication Adherence for Cholesterol: Statins). These medication adherence measures improperly include members who have discontinued the applicable medications for clinically appropriate reasons.

CMS's failure to exclude such members from these measures is contrary to law, arbitrary and capricious, an abuse of discretion, and otherwise unlawful in violation of the Administrative Procedure Act (APA). This failure materially harms Clover Health, and is projected to lower Measure performance for D08 from 85.5% to 84.5%, for D09 from 86.1% to 85.5%, and for D10 from 83.5% to 81.8%. Clover Health has previously raised objections to these measures. On August 5, 2025, CMS provided a response indicating that it cannot implement the corrective actions requested by Clover Health because, in CMS's view, the agency "cannot make substantive changes to measure specifications" without notice-and-comment rulemaking or otherwise grant "post-hoc exceptions or adjustments."[1]

We understand CMS's August 5, 2025, response to mean that the agency believes that further administrative review of Clover's objections is unavailable through the Star Rating and QBP appeal processes—including for purposes of administrative appeal under 42 C.F.R. § 422.260.[2]

---

1 CMS Response at 1 (Aug. 5, 2025) (*See* Appendix A).

2 *See also* 42 C.F.R. § 422.260(c)(3)(ii) ("An administrative review cannot be requested for the following: the methodology for calculating the star ratings (including the calculation of the overall star ratings); cut-off points for determining measure thresholds; the set of measures included in the star rating system; and the methodology for determining QBP determinations

**This document and its appendices contain confidential, commercial proprietary information or confidential personnel or medical files exempt from disclosure under Exemptions 4 and 6 of FOIA.**

However, we submit this appeal for the avoidance of doubt and to reserve all rights related to challenge of CMS's determination of Clover Health's measure scores for the three medication adherence measures: D08, D09, and D10.

**Background:**

Clover has documented evidence of three different types of impact to these measures that are appropriate clinical care, but CMS does not take into account how medication adherence is currently documented.

1. Patients had their regimen changed based on directions that their physician deemed clinically appropriate (e.g., a pause in regimen due to intolerance, a reduction in dose not followed through into pharmacy claims, or a pause due to "control of the condition")
2. Discontinuation of the therapy as a result of the physicians judgement that occurred after the patient had received two prescriptions that year
3. Documented intolerance / allergy and / or adverse reaction to statins that are allowed as exclusions as part of the C16 statin measure (e.g., myalgia, myositis, rhabdomyalgia)

The impact of these measures can be summarized in the following table of unique member counts (note that there are overlaps in members between these identified discrepancies / exclusions):

| **Measure for contract H5141** | **1. As directed** | **2. Discontinued** | **3. C16 equivalent exclusion** |
|---|---|---|---|
| D08 - Diabetes | 218 | 115 | |
| D09 - Hypertension | 222 | 34 | |

for low enrollment contracts and new MA plans."); *Scan Health Plan v. HHS*, No. 1:23-CV-3910 (CJN), 2024 WL 2815789, at *4 n.3 (D.D.C. June 3, 2024).

**This document and its appendices contain confidential, commercial proprietary information or confidential personnel or medical files exempt from disclosure under Exemptions 4 and 6 of FOIA.**

| | | | |
|---|---|---|---|
| D10 - Cholesterol | 293 | 244 | 666 |

**Data Discrepancy:**

Clover reiterates the following concerns, which were previously raised in detailed objections submitted to the agency on April 30, 2025 and June 13, 2025.[3]

*First*, CMS has improperly treated 733 cases as non-adherent across the three medication adherence measures (D08, D09, and D010), where the clinical documentation shows that the applicable medications were discontinued because their treating clinician directed the patient to discontinue his or her course of treatment:

- **D08 (Medication Adherence for Diabetes Medication)**: 218 members where medication was discontinued because the members were directed by their physician to discontinue diabetes medication.
- **D09 (Medication Adherence for Hypertension: RAS antagonists)**: 222 members where RAS antagonists were discontinued because the members were directed by their physician to discontinue such medication.
- **D10 (Medication Adherence for Cholesterol: Statins)**: 293 patients where statins were discontinued at the physicians' direction (e.g., due to documented PCSK9 escalation from a statin therapy that was not effective in controlling their cholesterol).[4]

By treating these cases as non-adherent, CMS has artificially deflated Clover Health's Part D medication adherence measure scores. CMS's 2026 Star Ratings Technical Notes make clear that these measures test the percentage of patients "who adhere" to a prescribed drug therapy.[5] Where a course of treatment has been discontinued at the direction of a patient's physician, adherence to the treatment regimen requires *discontinuing* the therapy. In other words, Clover Health cannot be penalized for medication "non-adherence" where a patient's physician

3 Clover Health also incorporates by reference all arguments raised in its prior submissions, which (as noted) are included in Appendix A.

4 *See* Appendix B (supporting clinical documentation).

5 2026 Medicare Part C & D Star Ratings Technical Notes 96 (Measure D08), 99 (Measure D09), 101 (Measure D10).

**This document and its appendices contain confidential, commercial proprietary information or confidential personnel or medical files exempt from disclosure under Exemptions 4 and 6 of FOIA.**

directs that it is medically appropriate to discontinue the course of treatment and a patient adheres to this treatment direction.

CMS's prior Technical Notes were even more explicit. The 2025 Star Ratings Technical Notes expressly required taking of medications "*as directed*."[6] The unexplained removal of this language from CMS's 2026 Star Ratings Technical Notes only further reinforces the arbitrariness of the agency's position. CMS cannot reverse its policy of tracking use of medication "as directed" through *sub silentio* deletions of guidance language. A basic premise of both administrative law and due process is that if an agency is changing its policies it must "acknowledge that it is in fact changing its position and "show that there are good reasons for the new policy."[7]

Second, for 393 cases, the applicable medical records show that the members were no longer prescribed statins, diabetes medication, or RAS antagonists at a certain point during the measurement period–because their doctors determined that continuing such therapy would be medically inappropriate.[8] These cases should be excluded because CMS's Technical Notes describing each of these measures make clear that the measures only include plan members "with a prescription" for the applicable medication.[9] This is further reinforced by language in the Technical Instructions making clear that the metric tracks patients "who adhere to their *prescribed* medications," which facially excludes patients who no longer have prescriptions.[10]

*Third*, CMS's measure design is arbitrary and capricious because CMS fails to incorporate relevant exclusions in the three Part D medication adherence measures that are included in other, similar measures. For example, Measure C19 (statin therapy for patients with cardiovascular disease) incorporates a series of exclusions for, among other things, cirrhosis, end stage renal disease (ESRD), Myalgia, myositis, myopathy, or rhabdomyolysis during the measurement year—but similar exclusions are not included in Measure D10 (Medication Adherence for Cholesterol: Statins). In fact, Measure D10 only has two exclusions—whereas

6 2025 Medicare Part C & D Star Ratings Technical Notes 92 (Measure D08), 95 (Measure D09), 98 (Measure D10), *available at* https://www.cms.gov/files/document/2025-star-ratings-technical-notes.pdf.

7 *FCC v. Fox Television Stations, Inc.*, 132 S.Ct. 2307, 2315–16 (2012).

8 *See* Appendix A.

9 *See* 2026 Medicare Part C & D Star Ratings Technical Notes at 96 (D08), 99 (D09), 101 (D10).

10 *See id.* at 96 (D08), 99 (D09), 101 (D10) (emphasis added).

**This document and its appendices contain confidential, commercial proprietary information or confidential personnel or medical files exempt from disclosure under Exemptions 4 and 6 of FOIA.**

Measure C16 incorporates fully *eleven* separate exclusions.[11] There is no valid clinical or other basis for such differential treatment, and CMS's failure to incorporate comparable exclusions is arbitrary and capricious. A basic premise of administrative law is that agencies must treat "similar cases in a similar manner," unless there is a legitimate and statutorily relevant basis for failing to do so.[12]

*Fourth*, CMS's approach is inconsistent with Medicare policy. In the first place, it interferes with clinical decision-making in contravention of federal law.[13] It is also inconsistent with CMS's long-standing policy prohibiting medically unnecessary care.[14]

**Evidence of Data Discrepancy:**

Clover includes at **Appendix A** copies of all prior submissions by Clover Health objecting to CMS's medication adherence measures and copies of CMS's responses—including CMS's most recent August 5, 2025 response. Clover includes at **Appendix B** as supporting evidence of CMS's erroneous treatment of the impacted cases.

*Commented [1]: HL NOTE: Do we have other documentation of the underlying records beyond what it previously submitted?*

*The spreadsheet that was previously sent to CMS is just a summary of what Clover says the medical records reflect. Do we want to provide additional documentation beyond?*

*Commented [2R1]: HL NOTE: Also: The previous submission redacted the member IDs—but that means there no mechanism to verify the accuracy of what we're saying. Does Clover want to submit unredacted versions?*

*(We included the FOIA disclaimer assuming they may want to consider doing so)*

*Commented [3R1]: We will submit the unredacted version. We have the original records and the tie to them that we can share. It is a significant amount of data and so the summary would be easier to submit prior to them*

**Has this issue been raised to CMS/NCQA already this year? If so, what was their response?:**

Clover Health has previously raised its concerns to CMS, and CMS has previously indicated that it is unable to make the adjustments requested by Clover Health. As noted, Clover

---

11 *Compare id.* 59-60 (measure C19 exclusions—including for, among other things, cirrhosis; myalgia, myositis, myopathy, or rhabdomyolysis during the measurement year; member death; member palliative care; member hospice, ESRD diagnosis or dialysis; pregnancy, in vitro fertilization, etc.) *with id.* at 103 (measure D10 exclusions for hospice and ESRD diagnosis or dialysis coverage).

12 *Bracco Diagnostics, Inc. v. Shalala*, 963 F. Supp. 20, 27 (D.D.C. 1997).

13 Social Security Act (SSA) § 1801 (prohibiting federal interference with or control over the practice of medicine); *see also Mylan Lab'ys Ltd. v. U.S. Food & Drug Admin.*, 910 F. Supp. 2d 299, 306 (D.D.C. 2012) (agencies cannot act "inconsistent with the statutory mandate" or "frustrate[s] the policy that Congress sought to implement.").

14 *See, e.g.*, https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/Downloads/Fraud-Abuse-MLN4649244.pdf at 5 (CMS explaining that "Medicare fraud include[s] … [k[nowingly ordering medically necessary … services for patients.").

**This document and its appendices contain confidential, commercial proprietary information or confidential personnel or medical files exempt from disclosure under Exemptions 4 and 6 of FOIA.**

provides complete copies of our prior submissions to CMS and CMS's responses in **Appendix A.**

**Why should CMS change the manner in which it calculates these medication adherence measures?:**

It would be arbitrary, capricious, and otherwise unlawful for CMS to continue to apply its medication adherence measures without excluding cases where a patient's course of treatment was discontinued by the patient's treating physician. Clover Health notes the following in reply to CMS's August 5, 2025 response.

*First*, CMS suggests that current measure specifications are "appropriate" because "any discontinuation due to intolerance has only a transient effect on measure calculations," i.e., it only impacts scoring for the measurement year in which the medication is discontinued and not future years.[15] This rationale is illogical. Star Rating performance is always "transient," in the sense that Star Ratings are updated every year based on data from the latest measurement year. CMS's reasoning would permit the agency to use unlimited bad data in any given year—because that data would *always* be replaced in the subsequent year. Such an outcome "entirely fails to consider an important aspect of the problem," because it completely disregards the impact of using erroneous data from a given measurement year on a plan's Star Ratings *during the performance year*.[16] It also disregards that new clinical discontinuances will constantly be occurring. As a consequence, the flaws in the measure data will never truly be transient; new errors will continually be introduced each new measurement year to replace the errors in the prior measurement year.

An"as directed" approach[17] could address this issue–if it actually requires consideration of data demonstrating that patients took/or ceased taking their drugs based on the directives of the patients' physicians (e.g., instructions to discontinue the drug or a termination of the

---

15 CMS Response at 1 (Appendix A).

16 *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 US 29, 43 (1983).

17 As discussed above, although CMS has silently removed this term in the 2026 Technical Notes–the instructions continue to incorporate this idea through the language stating that the measure only tracks patients "who adhere" to a prescribed course of treatment. *See also* 2026 Medicare Part C & D Star Ratings Technical Notes 96 (Measure D08), 99 (Measure D09), 101 (Measure D10).

**This document and its appendices contain confidential, commercial proprietary information or confidential personnel or medical files exempt from disclosure under Exemptions 4 and 6 of FOIA.**

prescription). But CMS' position appears to be that, contrary to the plain language of its own program instruction, CMS does *not* consider whether patients took their drugs "as directed," and thus the true flaw is with CMS's *methodology*—which persists beyond any particular measurement year.

*Second*, CMS suggests that the drug adherence measures' "80% compliance threshold reflects the potential for changes in therapy, including medication discontinuation."[18] This response misses the point: No matter what threshold is applied, CMS's measure design fails to distinguish between medically appropriate discontinuations and genuine nonadherence. A lower threshold does not change the fact that plans can be penalized when patients follow their prescriber's instructions. In other words, the implication that an 80% compliance threshold is reasonable because CMS "could have" set a 100% compliance threshold relies on a false comparison: Both thresholds are arbitrary because they result in plans being penalized for factors wholly outside of their control, including for discontinuances that were indisputably clinically appropriate. Clover Health also emphasizes that the 80% compliance threshold does not offset the range of discontinuances that can occur for reasons outside of Clover Health's control. In Clover Health's case, medically appropriate decisions (including discontinuations) and documented statin intolerance alone account for fully 8% of all cases being considered to be "non-adherent" by CMS. More specifically, it accounts for 8% of the "non-adherence" identified by CMS for Measure D08, 4% of the "non-adherence" identified for Measure D09, and 11% of the "non-adherence" identified for Measure D10.

At bottom, CMS's 80% threshold is arbitrary and capricious. It is wholly unrealistic and inadequate to account for clinically appropriate medication discontinuances and other reasons why there could be instances of patient non-adherence that are outside of plans' control. For example, compliance will be different depending on numerous factors, including when the patient first started on the drug during the year and when the discontinuation occurred or when the physician ceased prescribing the drug. An arbitrary 80 percent threshold is just that–arbitrary. CMS nowhere (including in the regulatory materials) accounts for these commonly understood realities of prescribing drugs and when things (such a discontinuation) may occur.

Rather than attempting to obscure material differences with a blunt, indifferent "compliance threshold," CMS must actually attempt to assess the facts that bear on plans' quality. Any

---

18 CMS Response at 1 (Appendix A).

**This document and its appendices contain confidential, commercial proprietary information or confidential personnel or medical files exempt from disclosure under Exemptions 4 and 6 of FOIA.**

other approach risks penalizing plans for failing to provide medically *unnecessary* care or for the conduct of independent third parties.[19]

As is documented below, the 80% threshold does not appropriately account for patients that have had their medications discontinued, directed by their physician to change behavior or have reactions to a statin as the average PDC for these patients is significantly below 80%

| | **1. As directed** | **2. Discontinued** | **3. C16 equivalent exclusion** |
|---|---|---|---|
| D08 - Diabetes | 64% | 62% | N/a |
| D09 - Hypertension | 71% | 63% | N/a |
| D10 - Cholesterol | 60% | 60% | 63% |

*Third*, CMS asserts "data integrity concerns."[20] The agency also states that not all Part D plans may collect medical records and "if Part D sponsors were to attempt to collect the data, it is unclear how sponsors could implement sufficient internal controls to meet audit standards," and expresses concern about "potential gaming" if there is no mechanism to audit or otherwise verify such data.[21] Nothing prevents a plan from collecting medical records relevant to its processed claims. Moreover, "[t]o the extent that a [Part D plan (PDP)] offered by a PDP sponsor maintains medical records or other health information regarding Part D enrollees, the PDP sponsor must meet the same requirements regarding confidentiality and accuracy of enrollee records as MA organizations offering MA plans must currently meet under 42 CFR 422.118."[22] CMS also regularly validates claims on the basis of such medical records through auditing and other claims; for example, this is standard practice across all of Medicare fee-for-service.[23]

19 *See generally Alliance for Cannabis Therapeutics v. DEA*, 930 F.2d 936, 940 (D.C. Cir. 1991) ("Impossible requirements imposed by an agency are perforce unreasonable.").
20 CMS Response at 1 (Appendix A).
21 *Id.* at 1–2.
22 Medicare Prescription Drug Policy Manual, ch. 5 § 80.
23 *See* Medicare Program Integrity Manual, ch. 1 § 1.3 (describing contractor medical record reviews, as well as other program integrity reviews).

**This document and its appendices contain confidential, commercial proprietary information or confidential personnel or medical files exempt from disclosure under Exemptions 4 and 6 of FOIA.**

Ultimately, any "data integrity concern" is a problem of CMS's own creation. It is CMS's responsibility to ensure that it has the ability to validate data submitted by plans.[24] CMS cannot create a requirement and then foreclose plans from submitting data to show that they have complied with the requirement. Doing so is the very definition of arbitrary and capricious.[25]

*Fourth*, CMS also asserts that the Part D medication adherence measures differ from certain other Medicare Advantage measures that incorporate more robust exclusions—because the Part D and Medicare Advantages measures rely on different data sources and have different data integrity controls. This response again disregards that *CMS* is the entity that is ultimately responsible for adopting sound, reliable, and non-arbitrary Star Rating measures—including by selecting appropriate data sources and validation metrics.[26] CMS has shown that it is able to develop or adopt appropriate measure designs in the Medicare Advantage context. Nothing precludes CMS from doing the same in the Part D measure context, and CMS's failure to do so is arbitrary and capricious.[27]

*Fifth*, and finally, CMS asserts that "Clover Health is not uniquely impacted by the Medication Adherence measure specifications" and that "Star Ratings are assigned based on a contract's performance relative to other contracts."[28] This rationale fails on its face. CMS's approach necessarily harms some plans more than others–depending on their membership mix, and there is no indication that CMS ever gave due consideration or weight to this concern.[29] CMS's failure to do so is arbitrary and capricious: Not only does CMS's approach "entirely fail[] to consider as important aspect of the problem" intended to be solved by a quality comparison

24 *See generally* SSA §§ 1851(d), 1852(e), 1853(o), 1854(b)(1)(C), 1860D–1(c)).

25 *See Motor Vehicle Mfrs. Assn. of United States, Inc.*, 463 US at 43 (agencies cannot ignore evidence that runs counter to the agency's position or ignore an important aspect of the problem that it purports to be addressing).

26 *See generally* SSA §§ 1851(d), 1852(e), 1853(o), 1854(b)(1)(C), 1860D–1(c)).

27 *See generally Bracco Diagnostics, Inc.*, 963 F. Supp. at 27; *see also* discussion above regarding a comparison of Measure C19 (statin therapy for patients with cardiovascular disease) vs. Measure D10 (Medication Adherence for Cholesterol: Statins).

28 CMS Response at 2.

29 *See also, e.g.*, 83 Fed. Reg. 16,440, 15,553, Tbl. 3D (Apr. 16, 2018) (no meaningful discussion of disparate impacts based on plan demographics—except for a cursory discussion of standalone PDPs).

**This document and its appendices contain confidential, commercial proprietary information or confidential personnel or medical files exempt from disclosure under Exemptions 4 and 6 of FOIA.**

system, but it also undermines Congress's intent in requiring CMS to establish a system for making valid quality comparisons between different plans.[30]

**Recommended CMS Action:**
Consistent with the foregoing, CMS should exclude the impacted cases from its D08, D09, and D10 medication adherence measures.

30 *See Motor Vehicle Mfrs. Assn. of United States, Inc.*, 463 US at 43.

**This document and its appendices contain confidential, commercial proprietary information or confidential personnel or medical files exempt from disclosure under Exemptions 4 and 6 of FOIA.**

# Appendix B

---------- Forwarded message ---------
From: **Cheree Pasalakis** <cheree.pasalakis@cloverhealth.com>
Date: Wed, Apr 30, 2025 at 10:44 AM
Subject: Injectable Statin Appeal - H5141
To: CMS PartC&DStarRatings <PartCandDStarRatings@cms.hhs.gov>, PatientSafety <PatientSafety@acumenllc.com>
Cc: Cameron Pringle <cameron.pringle@cloverhealth.com>, Vivian Meras <vivian.meras@cloverhealth.com>, Robert Davis <robert.davis@cloverhealth.com>

Good morning,
We are requesting your review of the below information. Thank you.

- **Contract Number**: H5141
- **Patient Safety Report:** April Patient Safety Report
- **Year of Service:** 2024
- **Patient Safety Measure:** D10 - Medication **Adherence** for Cholesterol (**Statins**)
- **Description of the Inquiry**: Following an internal review, we have identified a subset of members currently included in this measure. Based on clinical documentation and treatment history, the patients' medical providers appropriately transitioned them from statin therapy to non-statin lipid-lowering agents, including PCSK9 inhibitors such as evolocumab (Repatha), inclisiran (Leqvio) and alirocumab (Praluent). These members have discontinued statins for clinically supported reasons, as directed by their physicians, including documented intolerance or inadequate therapeutic response, and have instead been prescribed PCSK9 inhibitors.

**One attachment** • Scanned by Gmail Security Sandbox

**Clover Health**

Injectable statin ...

# Clover Health

**To whom it may concern,**

On behalf of Clover Health, I am writing to formally appeal the inclusion of certain members in the latest 2024 patient safety report (published on April 1st), specifically within the Statin medication adherence measure.

Following an internal review, we have identified a subset of members currently included in this measure. Based on clinical documentation and treatment history, the patients' medical providers appropriately transitioned them from statin therapy to non-statin lipid-lowering agents, including PCSK9 inhibitors such as evolocumab (Repatha), inclisiran (Leqvio) and alirocumab (Praluent). These members have discontinued statins for clinically supported reasons, as directed by their physicians, including documented intolerance or inadequate therapeutic response, and have instead been prescribed PCSK9 inhibitors. Not only is such discontinuation of statins medically appropriate or necessary in accordance with current ACC/AHA guidelines, CMS methodology in the Technical Specifications recognizes the importance of such discontinuation under Measure D08 - Medication Adherence for Diabetes Medications. Labeling the measure as "Taking Diabetes as Directed," CMS stresses, "One of the most important ways people with diabetes can manage their health is by taking their medication *as directed*."[1] (Emphasis added). Therefore, the measure should include only "members *with a prescription* for diabetes medication who fill their prescription often enough to cover 80% or more of the time they are supposed to be taking the medication." (Emphasis added).[2]

Here, the members' physicians "directed" them not to take statins and therefore did not provide a "prescription" for statins. Thus, these members should not be included in the measure. But contrary to CMS' own description for "Medication Adherence for Diabetes Medications," the statin adherence measure relied on Part D claims data for statins without accounting for members who receive appropriate alternative therapy via Part D injectables not on the PQA list. As a result, these members were inaccurately classified as non-adherent despite continuing to receive lipid-lowering treatment that meets the clinical specifications of the measure.

Moreover, it is important to emphasize that these patients' providers determined that Part D-administered injectables were more appropriate for the patients. Thus, for these patients to have continued on statin therapy would have been medically unnecessary (and perhaps

[1] https://www.cms.gov/files/document/mmpperformancedatatechnotes.pdf.
[2] https://www.cms.gov/files/document/mmpperformancedatatechnotes.pdf.

harmful) not to mention unduly costly. Given the voluminous statutes, CMS regulations and guidance on medical necessity, patient harm, and undue cost, the medication adherence measure certainly does not require patients to receive medically unnecessary (and inappropriate) treatments.

**Summary of Affected Members Based on Clinically Appropriate Statin Replacement Therapy:**

- Statin Measure: 91 members with documented PCSK9 escalation from a statin therapy that was not effective in controlling their cholesterol

**Clinical Rationale**:

- Statin intolerance (e.g., myalgia, liver enzyme elevations) is a well-established clinical reason for discontinuing statin therapy, as recognized in the 2018 ACC/AHA Multisociety Cholesterol Management Guidelines.

- PCSK9 inhibitors (e.g., Repatha, Praluent) are recommended for patients who are unable to tolerate statins or who do not achieve adequate LDL-C reduction with statins alone (ACC/AHA, 2018).

- Continuation of statin therapy despite intolerance may expose patients to increased risk of adverse events, including severe muscle-related side effects and liver toxicity, without proportional benefit.

We appreciate your consideration of this appeal and respectfully request that CMS exclude such members from the Statin adherence measure. We would be happy to provide a list of members and supporting documentation of PCSK9 use as a follow up.

Sincerely,

Dr. Shelly Gupta
Chief Medical Officer
Clover Health

---------- Forwarded message ---------
From: **CMS PartC&DStarRatings** <PartCandDStarRatings@cms.hhs.gov>
Date: Wed, Apr 30, 2025 at 2:03 PM
Subject: RE: Injectable Statin Appeal - H5141
To: Cheree Pasalakis <cheree.pasalakis@cloverhealth.com>, PatientSafety <PatientSafety@acumenllc.com>
Cc: Cameron Pringle <cameron.pringle@cloverhealth.com>, Vivian Meras <vivian.meras@cloverhealth.com>, Robert Davis <robert.davis@cloverhealth.com>, CMS PartC&DStarRatings <PartCandDStarRatings@cms.hhs.gov>

Hi Cheree,

Thank you for reaching out to us. Please review Section 2.1 Measure Specifications of the Adherence Measures User Guide, available in the Help Documents section of the PS Web Portal, for more details on the methodology for calculating the Adherence Measure's rates. Please note that the current methodology does not account for medication discontinuations.

Additionally, per section 2 'Measure Overview' of the General Report User Guide, all Patient Safety measures are adapted from measures developed and endorsed by the Pharmacy Quality Alliance (PQA). Should you have further questions regarding the methodology for calculating the Adherence measures, please consult PQA's Web Page or contact them at www.pqaalliance.org/tech-assist-form. Upon submission, you will receive a confirmation of your request with an associated request ID number for easy referencing. Feel free to check out PQA's website for frequently asked questions as well.

Can we share your email with the PQA?

Please let us know if you have any additional questions.

Best,
Part C & D Star Ratings

Clover

**Fwd: Patient Safety Measures- D10, D08, and D09**
2 messages

---------- Forwarded message ---------
From: **Cheree Pasalakis** <cheree.pasalakis@cloverhealth.com>
Date: Fri, Jun 13, 2025 at 9:37 AM
Subject: Patient Safety Measures- D10, D08, and D09
To: CMS PartC&DStarRatings <PartCandDStarRatings@cms.hhs.gov>, PatientSafety <PatientSafety@acumenllc.com>
Cc: Cameron Pringle <cameron.pringle@cloverhealth.com>, Robert Davis <robert.davis@cloverhealth.com>, Will Chang <william.chang@cloverhealth.com>, <vanessa.duran@cms.hhs.gov>, <elizabeth.goldstein@cms.hhs.gov>, Shelly Gupta <shelly.gupta@cloverhealth.com>

Good morning,
We are requesting your review of the below and attached information. Thank you.

- **Contract Number**: H5141
- **Patient Safety Report:** May Patient Safety Report
- **Year of Service:** 2024
- **Patient Safety Measure:** D10 - Medication **Adherence** for Cholesterol (**Statins**), D08 - Medication Adherence for diabetes medications, D09 Medication Adherence for Hypertension (RAS antagonists)
- **Description of the Inquiry**:

On behalf of Clover Health, we respectfully reiterate our ongoing challenge to CMS's decision to include certain members in the latest 2024 patient safety report (published on April 1st)--within Measure D10, Medication Adherence for Cholesterol (Statins). In addition, we respectfully challenge CMS's decision to include certain members within Measure D08, Medication Adherence for Diabetes Medication and Measure D09, Medication Adherence for Hypertension (RAS antagonists).

As explained in Clover Health's April 30, 2025 letter, it is inappropriate for Measure D10 to penalize plans with members who have discontinued statins for medically appropriate reasons. It is also inappropriate for Measures D08 and D09 to penalize plans with members who have discontinued diabetes medications or RAS antagonists for medically appropriate reasons. The doctors of these members or CMS's own guidance has determined that continuing statins, diabetes medications, or RAS antagonists would have been medically unnecessary and perhaps harmful for the members–not to mention unduly costly. Given the voluminous statutes, CMS regulations, and guidance on medical necessity, patient harm, and undue cost, Star Ratings measures cannot–and should not–require medically unnecessary and inappropriate treatments in order to achieve compliance under those measures.

In your April 30, 2025 response, CMS did not address–let alone dispute–the substantive merits of our challenge. Instead, CMS simply says "that the current methodology does not account for medication discontinuations" and "all Patient Safety measures are adapted from measures developed and endorsed by the Pharmacy Quality Alliance." CMS then directs us to the Pharmacy Quality Alliance (PQA) to address our challenges.

Respectfully, CMS's reliance on the measures is arbitrary, capricious, and otherwise not in accordance with law. And while CMS may consult and adopt measures developed by PQA, under the Medicare Act and the Administrative Procedure Act, CMS must ensure that any adopted measure design is methodologically sound and non-arbitrary. In short, CMS is legally responsible for Measures D08, D09, and D10 (and other Star Ratings measures). CMS cannot avoid that responsibility by pointing us to PQA.

Under CMS's Medicare 2025 Part C & D Star Ratings Technical Notes, federal law, and other applicable authorities, CMS must exclude the members identified in our prior letter as well as the additional members identified in this letter for at least four independent reasons.

**2 attachments**

**Exhibit A w_o PHI.xlsx**
56K

**May 2025 Omnibus Appeal.docx**
686K

---------- Forwarded message ---------
From: **CMS PartC&DStarRatings** <PartCandDStarRatings@cms.hhs.gov>
Date: Tue, Aug 5, 2025 at 11:23AM
Subject: RE: Patient Safety Measures- D10, D08, and D09
To: Cheree Pasalakis <cheree.pasalakis@cloverhealth.com>
Cc: Cameron Pringle <cameron.pringle@cloverhealth.com>, Robert Davis <robert.davis@cloverhealth.com>, Will Chang <william.chang@cloverhealth.com>, Duran, Vanessa (CMS/CM) <Vanessa.Duran@cms.hhs.gov>, Goldstein, Elizabeth (CMS/CM) <Elizabeth.Goldstein@cms.hhs.gov>, Shelly Gupta <shelly.gupta@cloverhealth.com>, CMS PartC&DStarRatings <PartCandDStarRatings@cms.hhs.gov>

Hello,

Please review the attached response from CMS Part C & D Star Ratings.

Thank you
Part C & D Star Ratings

**CMS Response:**

CMS has reviewed Clover Health's concerns. CMS is unable to make an ad hoc methodology change to account for medication discontinuation or to add additional exclusions after the measurement year for the three Medication Adherence measures. For the Medicare Part C & D Star Ratings program, we cannot make substantive changes to measure specifications without rigorous measure development, testing, and rulemaking processes ahead of the measurement period. As codified at 42 CFR §§ 422.164(d)(2) and 423.184(d)(2), substantive updates (that is, changes) must be proposed and finalized through rulemaking in advance of the measurement period and only after we have solicited feedback through the Advance Notice and Rate Announcement process. In addition, we must announce any non-substantive measure updates through the Advance Notice and Rate Announcement process during or in advance of the measurement period as described at 42 CFR §§ 422.164(d)(1) and 423.184(d)(1). Therefore, we are limited as to when measure specification updates can be implemented. At this time, we are unable to implement changes to measure specifications for the 2026 Star Ratings (measurement year 2024), including the changes to the Medication Adherence measures requested by Clover Health. Moreover, to the extent Clover Health seeks one-off, post-hoc exceptions or adjustments to the measure specifications to be applied solely to its plans, we cannot grant that request, as the inconsistent application of measure specifications would erode measure validity across the Part D Star Ratings program.

Furthermore, the current measure specifications for the Part D Medication Adherence measures are appropriate to assess and promote evidence-based medication adherence, while also taking discontinuation into account to the extent feasible. If a patient discontinues the target medication due to intolerance or adverse effects, they may appear non-adherent for the remainder of the measurement year. However, in subsequent years, if the patient has no further claims for the target medication, they are excluded from the denominator and no longer impact the measure. Accordingly, any discontinuation due to intolerance has only a transient effect on measure calculations. This design ensures that clinical appropriateness and shared decision-making are preserved, without compromising the integrity of the adherence metric.

Also, as a reminder, the Proportion of Days Covered (PDC) threshold is 80% (in other words, CMS does not expect 100% adherence). As we noted in the contract year (CY) 2019 Medicare Advantage and Part D final rule (83 FR 16553), the 80% compliance threshold reflects the potential for changes in therapy, including medication discontinuation.

Additionally, as we explained in the CY 2019 Medicare Advantage and Part D final rule (83 FR 16553), incorporating medication discontinuation into the Part D Medication Adherence measures would raise significant data integrity concerns. We do not currently have beneficiary-level medication discontinuation data, and there is a lack of standardized data sources for supporting clinical documentation, such as electronic medical record (EMR) care notes. Furthermore, there is a lack of standardized access to this type of data across different Part D plan sponsors, including stand-alone Prescription Drug Plans (PDPs), which do not have access to medical records. If Part D sponsors were to attempt to collect the data, it is unclear how sponsors could implement sufficient

internal controls to meet audit standards necessary to ensure the quality of the data. A standardized data source is required for CMS to validate and verify that the beneficiary discontinued the medication based on a provider's direction. Based on the HPMS memorandum dated May 11, 2012, which addresses the prohibition on submitting Prescription Drug Event (PDE) data for non-Part D prescriptions due to concerns related to beneficiary privacy protections and data validation, and the HPMS memorandum dated April 23, 2013, regarding the May 2013 updates to the Drug Data Processing System, we cannot accept supplemental data. Accepting non-standardized and unvalidated data could potentially lead to data integrity issues.

Without verification using a standardized data source across all plans that CMS can appropriately validate, Part D Star Ratings measures are at risk of potential gaming. It is imperative that CMS apply consistent standards and methodology across all Part D plan sponsors to avoid gamification and data integrity issues, which could undermine the reliability of plan ratings. In addition, the requested adjustments could risk incentivizing plans and providers to discontinue indicated therapy due to adherence concerns to improve performance, undermining the measure intent.

Furthermore, the exclusions utilized in the Part C Statin Therapy for Patients with Cardiovascular Disease (SPC) measure are applied based on a different set of data sources than those applicable to the Medication Adherence for Cholesterol (Statins) measure. The Medication Adherence for Cholesterol (Statins) measure was developed for use in the Part D Star Ratings using administrative PDE data to identify the eligible population because PDPs have limited to no access to medical claims. In contrast, the SPC measure is a Part C measure that aligns with the broader Healthcare Effectiveness Data and Information Set (HEDIS) ecosystem. HEDIS measures require calculation by certified vendors and allow use of broader data sources beyond administrative data, including clinical and other data sources.

Finally, we note that Clover Health is not uniquely impacted by the Medication Adherence measure specifications. Medication discontinuation may occur for beneficiaries across all Part D contracts. The Star Ratings methodology for assigning stars for the Medication Adherence measures is not based on predetermined or static cut points but is based on a clustering methodology using scores from all contracts (stratified by MA-PDs and PDPs) at the end of the measurement year. Star Ratings are assigned based on a contract's performance relative to other contracts, and measure specifications are applied consistently to all Part D sponsors.

Excel File Excluded Because It Contains Protected Health Information

Exhibit A w_ PHI.xlsx

This document contains confidential, commercial proprietary information or confidential personnel or medical files exempt from disclosure under Exemptions 4 and 6 of FOIA.

# Clover Health

May 21, 2025

**To whom it may concern,**

On behalf of Clover Health, we respectfully reiterate our ongoing challenge to CMS's decision to include certain members in the latest 2024 patient safety report (published on April 1st)--within Measure D10, Medication Adherence for Cholesterol (Statins).[1] In addition, we respectfully challenge CMS's decision to include certain members within Measure D08, Medication Adherence for Diabetes Medication and Measure D09, Medication Adherence for Hypertension (RAS antagonists).

As explained in Clover Health's April 30, 2025 letter, it is inappropriate for Measure D10 to penalize plans with members who have discontinued statins for medically appropriate reasons.[2] It is also inappropriate for Measures D08 and D09 to penalize plans with members who have discontinued diabetes medications or RAS antagonists for medically appropriate reasons. The doctors of these members or CMS's own guidance has determined that continuing statins, diabetes medications, or RAS antagonists would have been medically unnecessary and perhaps harmful for the members–not to mention unduly costly. Given the voluminous statutes, CMS regulations, and guidance on medical necessity, patient harm, and undue cost, Star Ratings measures cannot–and should not–require medically unnecessary and inappropriate treatments in order to achieve compliance under those measures.

In your April 30, 2025 response, CMS did not address–let alone dispute–the substantive merits of our challenge.[3] Instead, CMS simply says "that the current methodology does not account for medication discontinuations" and "all Patient Safety measures are adapted from measures developed and endorsed by the Pharmacy Quality Alliance."[4] CMS then directs us to the Pharmacy Quality Alliance (PQA) to address our challenges.[5]

Respectfully, CMS's reliance on the measures is arbitrary, capricious, and otherwise not in accordance with law.[6] And while CMS may consult and adopt measures developed by PQA, under the Medicare Act and the Administrative Procedure Act, CMS must ensure that any adopted measure design is

---

[1] *See* Exhibit A for members who should have been excluded. PHI has been withheld, including supporting documentation containing, among other things, patient medical information. We can make the PHI available to CMS upon request.

[2] *See* Exhibit B.

[3] *See* Exhibit C.

[4] *See* Exhibit C.

[5] *See* Exhibit C.

[6] 5 U.S.C. § 706(2)(A).

This document contains confidential, commercial proprietary information or confidential personnel or medical files exempt from disclosure under Exemptions 4 and 6 of FOIA.

methodologically sound and non-arbitrary. In short, CMS is legally responsible for Measures D08, D09, and D10 (and other Star Ratings measures). CMS cannot avoid that responsibility by pointing us to PQA.

Under CMS's Medicare 2025 Part C & D Star Ratings Technical Notes, federal law, and other applicable authorities, CMS must exclude the members identified in our prior letter as well as the additional members identified in this letter for at least four independent reasons.

*First*, as set forth in the supporting clinical documentation and our prior letter, at least 293 members were directed by their physicians *not* to take statins.[7] At least 218 members were directed by their physicians *not* to take diabetes medication.[8] And at least 222 members were directed by their physicians *not* to take RAS antagonists.[9]

CMS has repeatedly made clear that, to be included in Measures D10 (statins), D09 (RAS antagonists), and D08 (diabetes medication), the members must "[t]ak[e] ... medication *as [d]irected*."[10] Describing each of those measures,, CMS has stressed, "One of the most important ways people with [diabetes, high blood pressure, or high cholesterol] can manage their health is by taking medication *as directed*. The plan, doctor, and the member can work together to do this."[11] Here, the plan, doctor, and the member did exactly as CMS had instructed.

The supporting documentation shows that the doctors of the identified 733 members directed them not to take statins, RAS antagonists, or diabetes medication for clinical reasons, including intolerance or inadequate therapeutic response.[12] And the plan supported that treatment "as directed." Therefore, under CMS's Technical Notes, these members should have been excluded under Measures D08, D09, and D10. CMS's failure to do so is unlawful: "For an agency to say one thing[,] . . . and do another . . . is the essence of arbitrary action."[13]

*Second*, at least 393 members were *no longer* prescribed statins, diabetes medication, or RAS antagonists at a certain point during the measurement period–because their doctors determined that continuing such therapy would be medically inappropriate.[14] And CMS Technical Notes for Measure D10 "Metric" states, "This measure is defined as the percent of Medicare Part D beneficiaries 18 years and

---

[7] *See* Exhibit A.

[8] *See* Exhibit A.

[9] *See* Exhibit A.

[10] https://www.cms.gov/files/document/2025-star-ratings-technical-notes.pdf, at 92, 95, 98 (emphasis added).

[11] https://www.cms.gov/files/document/2025-star-ratings-technical-notes.pdf, at 92, 95, 98 (emphasis added).

[12] *See* Exhibit A.

[13] *Pub. Citizen v. Heckler*, 653 F. Supp. 1229, 1237 (D.D.C. 1986).

[14] *See* Exhibit A.

This document contains confidential, commercial proprietary information or confidential personnel or medical files exempt from disclosure under Exemptions 4 and 6 of FOIA.

older who adhere to their *prescribed* drug therapy for" diabetes medications, RAS antagonists, or statin cholesterol medications.[15]

Regarding the members at issue, the supporting documentation shows that their doctors ceased prescribing diabetes medications, RAS antagonists, or statins for clinical reasons. Therefore, under CMS's Technical Notes, at least 393 members should have been excluded under Measures D08, D09, and D10. CMS's failure to do so is unlawful, because "an '[u]nexplained inconsistency' in agency policy is 'a reason for holding an interpretation to be an arbitrary and capricious change from agency practice.'"[16]

*Third*, Measure D10 fails to incorporate exclusions that CMS has for Measure C16 - Statin Therapy for Patients with Cardiovascular Disease. Statin therapy for patients with cardiovascular disease (Measure C16) is a subset of statin therapy for cholesterol (Measure D10). Therefore, the exclusions that apply to the latter (Measure D10) should include, *at the very least*, the same exclusions that apply to the former (Measure C16).

Yet CMS failed to do so. For Measure C16, there are at least *eleven* exclusions, including but not limited to Cirrhosis, end stage renal disease (ESRD), Myalgia, myositis, myopathy, or rhabdomyolysis during the measurement year.[17] By contrast, measure D10 has only *two* exclusions.[18] Among other conditions, Measure D10 does not exclude Cirrhosis, ESRD, Myalgia, myositis, myopathy, or rhabdomyolysis during the measurement year.

There is no legitimate basis (clinical or otherwise) for this discrepancy. For example, a patient who has Cirrhosis generally should not be on statins regardless of whether the therapy is for cardiovascular disease or cholesterol. And such discrepancies are unlawful, because "an agency must treat similar cases in a similar manner unless it can provide a legitimate reason for failing to do so."[19] CMS has not–because it cannot–do so.

Without this unlawful discrepancy whereby Measure D10 arbitrarily and capriciously fails to include the exclusions in Measure C16, at least 666 members should be excluded.[20]

*Fourth*, under federal law and longstanding CMS regulations and guidance, Medicare beneficiaries should not receive medically unnecessary care.[21] In the case of each of the identified members, their

---

15 https://www.cms.gov/files/document/2025-star-ratings-technical-notes.pdf, at 92, 95, 98 (emphasis added).

16 *See Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016).

17 https://www.cms.gov/files/document/2025-star-ratings-technical-notes.pdf, at 56-57.

18 https://www.cms.gov/files/document/2025-star-ratings-technical-notes.pdf, at 99.

19 *See Bracco Diagnostics, Inc. v. Shalala*, 963 F. Supp. 20, 27 (D.D.C. 1997).

20 *See* Exhibit A.

21 *See, e.g.*, 18 U.S.C. section 1349; https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/Downloads/Fraud-Abuse-MLN4649244.pdf at 5 (CMS explaining that "Medicare fraud include[s] … [k[nowingly ordering medically necessary … services for patients.").

This document contains confidential, commercial proprietary information or confidential personnel or medical files exempt from disclosure under Exemptions 4 and 6 of FOIA.

doctors determined that statin therapy would be medically unnecessary, and in some cases, cause patient harm. Under well-established law, CMS Star Ratings cannot require illegal or harmful therapy (in violation of federal statute and CMS guidance) in order to satisfy a medication adherence measure.[22]

In CMS's April 30, 2025 response to our similar challenges regarding Measure D10, CMS directed us to bring such challenges to PQA. While we understand that CMS often bases its Star Rating measures on the measure steward's specifications (for example, PQA) for each measure, ultimately under both the Medicare Act and the Administrative Procedure Act, it is CMS's obligation to ensure that measure design–inlcuding D08, D09, and D10–is methodologically sound and non-arbitrary.[23]

* * *

For the above reasons, Clover Health continues to challenge CMS's use of the measure and respectfully asks that CMS rescind the measure, unless and until it is appropriately modified to exclude members who have discontinued statins for clinically supported reasons. We appreciate your consideration of this challenge and respectfully request that CMS exclude such members from Measures D08, D09, and D10. We reserve all rights.

Sincerely,

Dr. Shelly Gupta
Chief Medical Officer
Clover Health

Will Chang
Vice President and Deputy General Counsel
Clover Health

CC: Vanessa Duran, vanessa.duran@cms.hhs.gov
Elizabeth Goldstein, elizabeth.goldstein@cms.hhs.gov

---

[22] *See* SSA § 1801 (prohibiting federal interference with or control over the practice of medicine); *see also Mylan Lab'ys Ltd. v. U.S. Food & Drug Admin.*, 910 F. Supp. 2d 299, 306 (D.D.C. 2012) (agencies cannot act "inconsistent with the statutory mandate" or "frustrate[s] the policy that Congress sought to implement.").

[23] *See* Social Security Act (SSA) § 1852(e); *see also id.* §§ 1853(o), 1856(b).

**Clover Health**

**Request for Reconsideration of Measure: C28 Complaints about the Health Plan**

**Contract:**

Clover Health (contracts H5141 and H8010) respectfully requests review and removal of certain 2024 Complaints about the Health Plan (CTMs) for purposes of calculating our 2026 Star Rating for measure: C28 Complaints About the Health Plan. Clover Health is being inaccurately penalized by CMS for issues that are outside of the plan's control and which require CMS' assistance to resolve. By seeking to penalize Clover for issues that are outside of the plan's control and that require CMS intervention to address, the agency has "failed to consider an important aspect of the problem," and has thereby failed to satisfy the Administrative Procedure Act's (APA's) requirements of reasoned decision-making. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

**Data Discrepancy:**

Complaints listed in Table B, attached, should not be counted against the plan negatively. For contract year 2024, Clover respectfully requests that a total 45 CTMs (H5141= 41 CTMs, H8010=4 CTMs) be removed from the calculation of Clover Health's 2026 Star Ratings. These fall into different categories but most share a common characteristics such as:

- Loss of Medicare Entitlement (Loss of Part A and or B coverage)
- LEP (Late Enrollment Penalty)
- CMS Facilitated Enrollment/Disenrollment (Enrollments/Disenrollments effectuated by CMS)
- Duplicate Complaint (2 complaints received for the same issue)
- No prior contact to health plan prior to filing a CTM with CMS

As noted, a common element across all these CTMs is that they involve issues outside of the plan's control that would require CMS' intervention or assistance to address or resolve. CMS has previously refused to reclassify the loss of entitlement, LEP, and SSA CTMs because CMS maintains that the plan is expected to communicate with the beneficiary and assist the member *before* the member contacts 1-800-Medicare. But the model communications the beneficiary receives about loss of entitlement, LEP, and SSA come directly from CMS and clearly instruct the beneficiary to contact 1-800 Medicare with any questions. CMS states,

*"Remember, Medicare limits how and when you can make changes to your coverage. Call 1-800-MEDICARE (1-800-633-4227) anytime, 24 hours a day, 7 days a week. TTY users should call 1-877-486-2048."*

Many members, therefore, contact 1-800 Medicare before notifying the plan of the issue. Given this context, it is not possible for the plan to intervene before the beneficiary calls 1-800 Medicare - and thus, it is not possible for the plan to avoid a CTM.

**Has this Issue Previously Been Raised with CMS/NCQA This Year? If so, what was their response?**:

Clover Health has previously requested that these cases not count against the health plan following the CTM Updated Guidance on Standard Operating Procedures (SOP) for the Complaints Tracking Module. CMS original response to the Plan request that CTMs be removed is found in the table below in the column labeled, Table B, "Original CMS Response".

**Why should CMS change it and what does Clover believe our rate/score to be?:**

Overall, classifying these complaints as CTMs misrepresents the nature of these member complaints. The root cause of these complaints is not the *plan's* behavior. Rather, these complaints arise because of actions by CMS(or the Social Security Administration). As explained above, given the communications sent by CMS to members, it is also impossible for the plan to intervene prior to the complaint being filed. Incorporating these complaints into STAR ratings severely and unfairly penalizes plans for issues that are entirely outside of the plan's control and that would require CMS assistance to address. Clover ascertains that removing the below CTMs would change the final H8010 and H5141 Star Measure Rate as detailed in Table A, *"Clover Calculated CTM Rate Reflecting CTMs Removed"*.

- H5141: Removal of 41 CTMs
- H8010: Removal of 4 CTMs

**Table A: CMS Plan Preview C25 CTM Rate vs. Recalculated C25 CTM Rate**

| Contract | Total Number of Complaints | Complaint Average Enrollment | CMS Plan Preview 1 Rate | Revised Number of Complaints with CTMs removed | Complaint Average Enrollment | Clover Calculated CTM Rate Reflecting CTMs Removed |
|---|---|---|---|---|---|---|
| H5141 | 214 | 76,781 | 0.23 | 173 | 76,781 | 0.18 |
| H8010 | 16 | 3,575 | 0.37 | 12 | 3,575 | 0.28 |

File Excluded Because It Contains Protected Health Information

Table B.pdf

**Clover Health – Faulty CMS Test Calls Foreign Language Interpreter and TTY Availability Subject: Request for Recalculation of C33 and D01 Measure Score for Contracts H5141 and H8010**

---

**Executive Summary**

Clover Health respectfully requests that CMS exclude five (5) test calls–resulting in unsuccessful outcomes–conducted between April 1–3, 2025 from the calculation of Stars measure C33 ("Call Center – Foreign Language Interpreter and TTY Availability") and D01 ("Call Center – Foreign Language Interpreter and TTY Availability"). These calls were erroneously marked as plan unsuccessful despite Clover Health's compliance with applicable CMS protocols. The failures arose solely because CMS test callers prematurely disconnected before the protocol-mandated routing to a live representative could occur—a procedural error on the part of the callers, not Clover Health.

Clover Health requests that CMS exclude a total of 5 impacted calls from scoring--3 from Measure C33 and 2 from D01 for Contracts H5141 and H8010, which would result in the following changes:

- H5141
  - C33 would go from 94 percent (60/64) compliance to 98 percent compliance (60/61)
  - D01 would go from 94 percent (60/64) compliance to 97 percent compliance (60/62)
- H8010
  - C33 would go from 94 percent (60/64) compliance to 98 percent compliance (60/61)
  - D01 would go from 94 percent (60/64) compliance to 97 percent compliance (60/62)

Each of the test calls at issue was made while Clover's call center was fully operational, and live representatives were available and standing by. While a temporary Interactive Voice Response (IVR) misconfiguration resulted in the incorrect playback of an English-language message during this window, Clover's IVR system was correctly configured to default to a live customer service representative (CSR) in the absence of an IVR selection–exactly as CMS mandates for non-English language testing.

Under CMS's own guidance, when IVR options are unavailable in the caller's language, callers must remain on the line without making a selection. CMS technical notes and December 2024 memorandum confirm that only calls that remain in the queue and are not routed to a representative may be counted as "unsuccessful due to time-outs." Further, when it comes to non-English speaking callers, CMS technical notes state:

> Finally, when testing interpreter availability, our callers are simulating the experience of a non-English-speaking caller, so if IVR instructions are not available in the language we are testing, we do not make an IVR selection because a non-English-

> speaking caller *could not understand what is being said and could not make that IVR selection.* For this reason, ensure your phone systems will default to a live customer service representative if no IVR selection is made, or voice command given.

Medicare Part C & D Call Center Monitoring Accuracy and Accessibility Study Technical Notes at 19 (Emphasis added).

CMS test callers prematurely terminated all five calls at issue–contrary to CMS's testing methodology. Accordingly, Clover Health urges CMS to exclude these calls from Stars scoring. Inclusion would not only be inconsistent with CMS policy, but would also constitute an arbitrary and capricious departure from agency standards.

**Background**

From April 1st to April 3rd, 2025, CMS test callers performed 5 test calls of Clover Health's call center to determine if a non-English speaking caller would be connected to a live representative within a certain period. Throughout that time, Clover Health's call center was open and representatives were available during business hours. Further, at all times, the phone system was operable in all respects, including the feature to default to a live operator if no IVR selection was made.

Clover Health acknowledges that, during the time period in question, it experienced a temporary misconfiguration within our contact center platform, Zoom Contact Center. This misconfiguration resulted in the wrong IVR script being played, causing the system to erroneously deliver an English-only closed message during normal hours of operation. In response to the misconfiguration, CMS test callers, simulating non-English speakers, disconnected from their test calls without waiting the CMS-mandated time period for calls of this nature. Of these 5 unsuccessful calls, 3 were associated with Measure C33 and 2 were associated with Measure D01, as set forth below:

**Impacted Calls**

The following CMS test calls were received during the wrong IVR message window and were marked unsuccessful due to the interviewer disconnecting the call. Unsuccessful calls according to the CMS' HPMS raw data database:

| Measure | Contract ID | Case ID | Ts0 Date | Ts0 Time (Start Time) | Ts7 Time (When Test Caller Disconnected) | IVR Time (in seconds) |
|---|---|---|---|---|---|---|
| **C33** | H8010/H5141 | C1300429 | 4/1/2025 | 12:13:00 | 12:19:39 | 339 |
| | H8010/H5141 | C1300515 | 4/1/2025 | 17:29:43 | 17:33:56 | 83 |
| | H8010/H5141 | C1301020 | 4/3/2025 | 17:36:04 | 17:37:37 | 22 |
| | | | | | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| **D01** | H8010/H5141 | D1300838 | 4/2/2025 | 19:02:04 | 19:04:29 | 27 |
| | H8010/H5141 | D1300996 | 4/3/2025 | 14:05:10 | 14:05:49 | 17 |

The error in IVR messaging was manually updated on the morning of April 4, 2025, upon identification of the issue. Note, in three of the five calls, the test caller disconnected after less than 30 seconds. In another call, the test caller disconnected after less than a minute and a half. And the final caller disconnected after less than six minutes. So in all cases, the test caller remained on the line for significantly less than the ten minutes required by CMS's test call protocols and instructions.

**Appeal Basis Narrative**

Clover Health respectfully requests reconsideration of the 5 unsuccessful CMS test calls between April 1st - 3rd, 2025 associated with Contracts H5141 and H8010. These calls were marked as unsuccessful due to callers receiving a "closed" message and subsequently choosing to disconnect.

These test calls were not failures. The misconfigured IVR script should have had no impact on the 5 calls because they were testing access to foreign language interpretation, meaning that the purpose of the test was to determine whether Clover had required language protocols in place. Clover did.

The test callers violated CMS's own standards by discontinuing the foreign language interpretation test call based on an erroneous English-only IVR. According to CMS instructions, when a test caller simulates a non-English-speaking beneficiary and IVR instructions are not available in the language being tested, the caller **mus**t remain on the line to be routed to a live representative. That's because, according to CMS's own rules, "CMS telephone interviewers who are testing a language other than the primary language **will not make a selection** in the IVR system if the instruction is only in the primary language. **Therefore, ensure IVR systems default to a live CSR/operator if the caller does not push any buttons or make a verbal selection from an options menu**." December 5, 2024 Memorandum from Vanessa S. Duran, 2025 Part C and Part D Call Center Monitoring - Timeliness and Accuracy & Accessibility Studies, at 7 (emphasis in original). In other words, a test caller simulating a non-English speaker is prohibited from interpreting or responding to English-only IVR messages. That same caller cannot reasonably interpret a 'closed' message in English.

Had the test callers stayed on the line, the callers would have been routed to a live operator. Instead, CMS' callers disconnected manually, which is inconsistent with CMS's stated expectations for how language line testing should be conducted when the test caller simulates a non-English speaker.

In conclusion, Clover Health complied with CMS's test instructions, whereas CMS's test callers departed from the agency's instructions. Clover Health had a live representative available to be connected in the mandated timeframe, including live representatives available for non-English speakers. Zoom's incorrect English-only recording was immaterial, as it did not impact the protocols

that the testers were supposed to follow for a test of the availability of foreign language interpretation services.

Because these test results were based on incomplete test calls, and the test callers violated CMS's own instructions, the results must be excluded from Stars scoring. Any other outcome would be arbitrary and capricious. "It is settled law that an agency ordinarily must follow its own policies and procedures." *Lobsters, Inc. v. Evans*, 346 F. Supp. 2d 340, 348 (D. Mass. 2004). "[A]n irrational departure from that policy" may therefore be "overturned as 'arbitrary, capricious, [or] an abuse of discretion.'" *INS v. Yueh-Shaio Yang*, 519 U.S. 26, 32 (1996).

**Supporting Documentation**

- 2025 Part C and Part D Call Center Monitoring
- 508_Technical_Notes_2025_07_03_Final

**Citations:**

Medicare Part C & D Call Center Monitoring Accuracy and Accessibility Study Technical Notes

*"For non-TTY calls, callers will wait in the plan IVR or hold queues for up to 10 minutes each until a live person is available." The Hold queue is defined as the time spent on hold by the CMS caller following the interactive voice response (IVR) system, touch-tone response system, or recorded greeting and before reaching a live person. After 10 minutes has expired, the system closes out the case and the CMS caller assigns a status code shown in the raw data."*

*"Interpreter availability: Defined as the ability of a caller to communicate with a person at the plan's call center and receive answers to questions in the caller's language. This must happen within eight minutes of reaching a live person. This occurs at the end of phase 3.*

*TTY functionality: Defined as the ability of a hearing and/or speech impaired caller using TTY being able to communicate with a live person and receive answers to questions at the plan's call center directly or via a relay operator within seven minutes. This occurs at the end of phase 3."*

*"Finally, when testing interpreter availability, our callers are simulating the experience of a non-English-speaking caller, so if IVR instructions are not available in the language we are testing, we do not make an IVR selection because a non-English-speaking caller could not understand what is being said and could not make that IVR selection. For this reason, ensure your phone systems will default to a live customer service representative if no IVR selection is made, or voice command given."*

2025 Part C and Part D Call Center Monitoring - Timeliness and Accuracy & Accessibility Studies - 2025 Part C and Part D Call Center Monitoring

*Ensure IVR systems default to a live CSR/operator if the caller does not push any buttons or make a verbal selection from an options menu. Every year CMS encounters plans that offer limited IVR options without a clear way to select the option to speak with a current member representative or a prospective beneficiary representative, and the IVR message cycles over and over without a live representative answering the telephone. This results in unsuccessful calls due to time-outs. Test your systems. When planning the IVR choices, ask yourself, "If I am calling to get information so I can decide if I want to enroll in this plan, is there an IVR option for me on this prospective beneficiary telephone number, even if I do not speak English (or other than the primary language in the area)?"*

*"In order to replicate a beneficiary's actual experience,* ***CMS telephone interviewers who are testing a language other than the primary language will not make a selection in the IVR system if the instruction is only in the primary language. Therefore, ensure IVR systems default to a live CSR/operator if the caller does not push any buttons or make a verbal selection from an options menu.*** *If the IVR instruction is available in the language being tested, the test callers will make an*

*appropriate IVR selection. For example, if the language being tested is French, and instruction is available in French in the IVR to select an option for French, the test caller will make that selection. (Please note that the primary language in Puerto Rico is Spanish and English elsewhere. When testing calls in Puerto Rico, English is considered a foreign language.)"*

CENTERS FOR MEDICARE & MEDICAID SERVICES
CENTER FOR MEDICARE

# Medicare Part C & D Call Center Monitoring Accuracy and Accessibility Study Technical Notes

# Table of Contents

DOCUMENT CHANGE LOG .......... 2
PURPOSE .......... 2
BACKGROUND .......... 3
CONTACT INFORMATION .......... 4
PERFORMANCE METRICS AVAILABILITY IN HPMS .......... 4
UNDERSTANDING THE DATA: CALL OUTCOMES COMPARED TO MEASURE OUTCOMES .......... 5
PERFORMANCE METRICS AS DISPLAYED IN HPMS .......... 6
CALL CENTER MONITORING DEFINITIONS .......... 9
RAW DATA .......... 11
DATA DICTIONARY .......... 11
FREQUENTLY ASKED QUESTIONS .......... 12

## Document Change Log

| Previous Version | Description of Change | Revision Date |
|---|---|---|
| **2008** | Added purpose section, contact information, and expanded/clarified definitions | **5/15/2016** |
| **2017** | Revised call and measure outcomes and provided additional detail for performance metrics shown in HPMS for 2017, including unsuccessful calls. | **3/23/2017** |
| **2019** | Expanded sections for Purpose, Contact Information, and Understanding the Data. Added FAQs. | **6/30/2019** |
| **2021** | Revised language to match the Call Center Monitoring Memo, and expanded /clarified definitions | **7/20/2021** |
| **2022** | Revised based on 42 CFR 422.111(h) and 423.128(d) | **6/30/2022** |
| **2024** | Revised language around where calls originate. Minor format updates. | **6/05/2024** |
| **2025** | Edited for clarity, removed language that was duplicative, ambiguous, or superfluous | **6/18/2025** |

### Purpose

This document describes the Medicare Part C and Part D Call Center Monitoring metrics for the yearly Accuracy and Accessibility Study. All results are reported at the contract level.

**Background**

Each year, CMS issues an annual Call Center Monitoring Memo to all Medicare Advantage Organizations (MAOs), Prescription Drug Plans (PDPs), Medicare Advantage-Prescription Drug Plans (MA-PDs), and Medicare-Medicaid Plans (MMPs) affected by the Call Center Monitoring studies it performs. The memo explains that the studies are for the purpose of monitoring the performance of plan sponsors' call centers with respect to the standards adopted to implement 42 C.F.R. §§ 422.111(h)(1) and 423.128(d)(1). The annual memo describes the study and offers tips to help your organization be successful. The annual memo supersedes any definitions contained in this document.

In an effort to reduce the burden on plans by reducing the number of phone calls necessary for the Accuracy and Accessibility Study, CMS selects samples across *call centers* rather than basing this study on the phone number itself. In order to select these samples, we review the toll-free prospective beneficiary customer service phone numbers listed in HPMS for your Part C and Part D prospective customer service centers. CMS' monitoring contractor, then asks the compliance officer on record in HPMS to indicate if the customer service phone numbers route into the same or different call centers. The monitoring contractor then determines the number of distinct call centers indicated by the compliance officer and notes which phone numbers route to each unique call center. The contractor assigns a unique call center indicator to identify each call center for use in the study.

This study is conducted at the call center level by calling all toll-free prospective phone numbers for the Part C call center or the Part D call center. A simple random sample method is adopted for the Accuracy and Accessibility Study with eight different survey modes: English, Spanish, French, Vietnamese, Mandarin, Cantonese, Tagalog, and TTY. (These modes are announced each year inthe annual call center monitoring memo.) English is considered the native language we are testing for all states/territories except Puerto Rico, where Spanish is tested as the native language.

Although TTY services utilize a separate set of phone numbers, TTY is defined as one of the survey modes and it is treated like one of the languages from the sample design perspective. Therefore, TTY calls are a subset of the total sample. Since there is no TTY call center information, TTY sample size is first built at the unique TTY phone number level. For state relayphone numbers and other TTY lines that cover a large number of contracts, the sample is selected at the TTY/ LEP call center level to get sufficient sampling of these phone numbers and lines.

The metrics and compliance outcomes are posted in the HPMS at the conclusion of the study.The raw data, which is available by download from HPMS, show which accuracy questions were "assigned" to plans for each case/call. The call center indicator is also shown in the raw data. All plan-level results are "rolled up"and reported out to you in HPMS by contract ID.

Results are displayed for all MAOs, MA-PDs, PDPs, and MMPs. Data were collected from contracts that cover U.S. territories but were not collected from the following organization types: 1876 Cost, Employer/Union Only Direct Contract PDP, Employer/Union Only direct Contract PFFS, National PACE (Programs for the All-Inclusive Care of the Elderly), MSA, employer contracts, and organizations that did not have a phone number accessible to survey callers. Contracts with *only* SNPs are excluded from the accuracy measure of the Accuracy and Accessibility Study. Any plan under marketing and enrollment sanction is excluded from the

Accuracy and Accessibility Study until such sanction is released.

The following categories are reported within the HPMS Call Center Monitoring Part C and Part D Prospective Beneficiary Customer Support Performance Metrics sections: TTY functionality, interpreter availability/LEP, accuracy measures, results by language tested, unsuccessfulcalls, and Star Ratings. The TTY functionality and interpreter availability/LEP scores are combined for Star Ratings purposes but are shown in the Call Center Monitoring data only as they relate to the Accuracy and Accessibility Study. Inquiries about Star Ratings should be referred to the Part C & D Star Ratings Team.

**Contact Information**

The Call Center Monitoring resource mailbox can assist you with all aspects of Call Center Monitoring. Prior to results being posted CMS can assist with questions or concerns related to systems connectivity and urgent issues. After results are posted, CMS can assist with questions about individual calls. **Please include the following information along with your question/concern:**

- Contract ID
- Phone number on which the call was received
- Unique case ID found in the raw data or the date and time of the call including time zone
- If questioning a disconnected call, a full call log (screen shots alone are not sufficient), that confirms the disconnect did not occur on the plan side. Information should be provided to help CMS interpret any information that is provided. Audio files alone are not sufficient to determine a call disconnect

**Please do not use secure email to communicate with us.** This project never shares personally identifiable information. If you must send something in a secure fashion, please contact us at the email below first. Send your concerns to CallCenterMonitoring@cms.hhs.gov.

If you have questions or require information about other subject areas that overlap with Call Center Monitoring, please write to those contacts directly and cc the Call Center Monitoring mailbox.

- CMS Medicare Learning Network Team: MLNMattersTeam@cms.hhs.gov
- Part C & D Star Ratings: PartCandDStarRatings@cms.hhs.gov

**Performance Metrics Availability in HPMS**

Detailed results (e.g., number of calls by language, number of questions answered correctly,number of completed calls by mode, etc.) will be available in the HPMS at the following paths: (https://hpms.cms.gov):

1. For Part C results, from the HPMS home page (https://hpms.cms.gov): Quality and Performance > Performance Metrics > Call Center Monitoring > Part C Prospective Beneficiary Customer Service > [choose date range for current study] > [enter the contract number].

2. For Part D results, from the HPMS home page (https://hpms.cms.gov): Quality and Performance > Performance Metrics > Call Center Monitoring > Part D Prospective Beneficiary Customer Service > [choose date range for current study] > [enter the contract

number].

**Understanding the Data: Call Outcomes Compared to Measure Outcomes**

Call outcomes and measure outcomes may differ, meaning you may have a call listed in the rawdata that reached a CSR, but none of the measures included in that call was successful. To help you understand your raw data and your results, please think about the separate phases of each call as shown below:

- Phase 1: Dial
- Phase 2: Connect
- Phase 3: Complete
- Phase 4: Ask

In phase 1 *(dial)*, the plan's toll-free or alternate toll-free (TTY) calling information, downloaded from HPMS, is dialed.

Phase 2 (*connect*) is when the caller reaches a live person. Reasons for unanswered calls may include (1) wrong number listed in HPMS; (2) prolonged wait times for a live person due to high call volumes at the plan; (3) center is closed at an inappropriate time; or (4) other reasons caused by the plan or the plan's phone carrier.

Regardless of mode of call scheduled (TTY, interpreter availability/LEP, or native language call) it will be scored as unsuccessful if we are not able to reach a live person. (CMS provides you with a data dictionary in HPMS. The data dictionary provides definitions for our numerical codes in the raw data. These codes explain the outcome for you.)

For non-TTY calls, callers will wait in the plan IVR or hold queues for up to 10 minutes each until a live person is available. If either timer expires before we reach a live person, the call is unsuccessful. This does not apply to TTY calls because the caller does not encounter an IVR or HOLD before reaching a live person.

If we reach a live person within the given time parameters, the call moves into phase 3 (*complete*) to ensure we are speaking with a customer service representative who can answer questions about the plan's benefits. If yes, the call is moved into phase 4 (*ask*) to ask the three accuracy questions.

At the conclusion of the study, CMS may take compliance action when a contract fails to meet any of the following requirements:

Interpreter availability: Defined as the ability of a caller to communicate with a person at the plan's call center and receive answers to questions in the caller's language. This must happen within eight minutes of reaching a live person. This occurs at the end of phase 3.

TTY functionality: Defined as the ability of a hearing and/or speech impaired caller using TTY being able to communicate with a live person and receive answers to questions at the plan's call center directly or via a relay operator within seven minutes. This occurs at the end of phase 3.

Accuracy: Accuracy of answers to questions about plan benefits allows for a maximum of seven

minutes for each of three questions. Contracts with *only* Special Needs Plans (SNPs) are excluded from the accuracy measure.

The raw data will show outcomes for each test call placed. The raw data will include a numerical code for the call that also explains the call outcome. Refer to the data dictionary to help you decipher the numerical call outcome codes. The data dictionary is available for download in HPMS next to the link for the Raw Data at the bottom of the performance metrics pages. In addition to the raw data, HPMS will list the unsuccessful call in the performance metrics section as well as the reason why the call was unsuccessful.

Please be aware that certain outcome codes in the raw data imply **a call is completed.**

- **Code 295** indicates that the caller asked and received answers to all three accuracy questions.
- **Code 295.2** indicates a SNP call with phase 3 fulfilled and phase 4 excluded.
- **Code 290.x** *(where x is filled in with a number)* indicates that phase 4 began but for several reasons, one or more of the three accuracy questions were not answered. This most often occurs when the seven-minute timer expires during a question, or the call disconnects. This code indicates a positive outcome for the interpreter availability/LEP or TTY measure (phase 3), with the accuracy measure (phase 4) *partially* met. You can review the raw data for the individual call to determine if each question was answered and, if so, whether it answered accurately or inaccurately. The raw data also shows you if and when a timer expired for an accuracy question, meaning on the first, second, or third accuracy question. Recall that any unanswered question has a neutral impact on the plan's performance and is not cause for concern.

**Performance Metrics**

The performance metrics listed below correspond with column letters in the Call Center Performance Metrics tables in HPMS.

**Total Number of all Monitoring Calls** – This metric is the number of all monitoring calls, including interpreter availability/LEP, TTY, and native language calls.

**Total Number of Completed Monitoring Calls** - This metric includes the total number of completed LEP calls, completed TTY calls, and completed native language calls (codes 295,295.2, 290.x).

**All Calls - Percentage of Completed Calls out of All Calls** – This metric shows thepercentage of completed monitoring calls out of the total number of monitoring calls. This is not your Star Rating measure.

**Unsuccessful Calls** – This section shows the call weeks, which are the calendar weeks of theyear when the study was active. For example, week 1 is the first week in January. This study is normally active from approximately February through June. The chart includes a count of unsuccessful calls, the total number of unsuccessful calls during the study, and a call outcome description. For example, the reader may see an outcome description that states, "TTY seven-minute HOLD." This would imply that the CMS caller was on hold for longer than seven minutes when testing TTY

functionality, and therefore the call was unsuccessful, and thus the TTY measure was unsuccessful.

A call is classified as unsuccessful for any of the following reasons:

- Phone number was called but did not get answered after six rings.
- Survey could not continue; Call Center disconnected call (including hanging up).
- Survey could not continue; Call Center responded in Spanish only.
- Survey could not continue; call dropped before it rang six times.
- Survey could not continue; line did not accept incoming calls.
- Survey could not continue; message stated that the target number cannot be dialed from CMS caller area code.
- Survey could not continue; phone line problems.
- Survey could not continue; reached a number that was NOT the targeted call center (dueto incorrect phone number listed in HPMS).
- Survey could not continue; reached a system filtering inbound calls.
- Survey could not continue; reached Call Center voicemail.
- Survey could not continue; received a busy signal.
- Survey could not continue; technology barrier (e.g., received a computer modem/fax machine signal, beeper/pager number, etc.)
- Survey could not continue; received a message that an identification number was neededto continue.
- Survey could not continue; received a TYY device for the hearing impaired when callingvia telephone.
- Survey could not continue; received message that the Call Center was closed.
- Survey could not continue; CSR refused to answer question.
- Survey could not continue; CSR insists on member name, SSN, ID etc. to continue.
- Survey could not continue; CSR tells our caller to call back.
- Survey could not continue: CSR unable to answer questions about Medicare/Medicaid.
- Surveyor navigated the IVR for 10 minutes and call reached time limit.
- Surveyor was in the HOLD queue for 10 minutes and then call reached limit.
- Surveyor cannot connect to TTY operator.
- Surveyor can connect to TTY operator but cannot connect to the plan.
- Survey could not continue for other reasons*.

*When the classification "*Survey could not continue for other reasons*" is used, the CMS caller includes the reason in a descriptor field. Most commonly recorded reasons include:

- Disconnected number
- CSR Offers New Number to Call

**Connected and Completed Calls by Language** – This section shows the results by individual language. The languages tested were English, Spanish, French, Vietnamese, Mandarin, Cantonese, and Tagalog. HPMS displays the total number of monitoring calls, total number of connected calls,

total number of completed calls,and percentage of completed calls out of all calls.

**Total Number of All Interpreter Availability/LEP Monitoring Calls** – The metric shows the total number of monitoring calls placed to test interpreter availability.

**Total Number of Completed Interpreter Availability/LEP Calls Out of All LEP Calls** – This metric shows the total number of times that an attempt to confirm interpreter availabilitywas completed**.**

**Percentage of Completed Interpreter Availability/LEP Calls Out of All LEP Calls** – This metric shows the percentage of completed LEP calls out of the total number of all LEPmonitoring calls.

**Total Number of TTY Monitoring Calls** - This metric shows the total number ofmonitoring calls placed to test TTY functionality.

**Total Number of Completed Calls to the organization TTY number** - This metric showsthe total number of times that an attempt to confirm TTY functionality was completed.

**Percentage of Completed Calls to the organization TTY number** – This metric shows the percentage of completed TTY calls out of the total number of TTY monitoring calls.

**Star Ratings Calculation -** The calculation of this measure is the number of completed contacts with the interpreter and TTY divided by the number of attempted contacts. Completed contact with an interpreter is defined as establishing contact with an interpreter and confirming that the customer service representative can answer questions about the plan's Medicare Part C benefit within eight minutes. Completed TTY contact is defined as establishing contact with and confirming that the customer service representative can answer questions about the plan's Medicare Part C benefit within seven minutes. The formula is as shown below.

$$\frac{\text{\# Completed TTY calls + \# Completed LEP calls}}{\text{\# TTY calls + \# LEP calls}}$$

For more info on Star Ratings: https://www.cms.gov/Medicare/Prescription-Drug-Coverage/PrescriptionDrugCovGenIn/PerformanceData.html

**Accuracy - Total Number of Medicare Questions Answered** – This metric shows the total number of times the Medicare accuracy questions were *answered* within seven minutes. If ananswer was not provided before the seven-minute timer expired during the monitoring call, it was not counted in this metric.

**Accuracy - Total Number of Accurate Answers to all Medicare Questions** – This metric shows the total number of times a CSR provided an accurate response to the accuracy question.

**Accuracy - Percentage of Accurate Answers to all Medicare Questions** – This metric is the percentage of times that a Medicare question was answered accurately out of the total number of Medicare questions answered.

**Foreign Language Accuracy Result** – This metric is the percentage of times that a Medicare question was answered accurately out of the total number of Medicare questions answered, when those questions were asked in a foreign language.

**TTY Accuracy Result** – This metric is the percentage of times that a Medicare question was answered accurately out of the total number of Medicare questions answered, when those questions were asked via TTY device.

**Call Center Monitoring Definitions**
Accuracy Questions – During the Accuracy and Accessibility Study, CMS callers will ask up to three accuracy questions per monitoring call placed. Each question is allotted seven minutes to determine if the CSR provides an accurate and timely response to questions based upon the approved bid submission submitted into HPMS by the plan, or to a general Medicare accuracy question. The percentage of accurate responses is calculated as the number of questions answered accurately divided by the total number of *answered* questions multiplied by 100. Note: If a CSR is unable to answer the question before the timer expires, the call ends without progressing to the next accuracy question (e.g., question number 2 or 3). The effect of atimed-out call during the accuracy measure is neutral to the plan, meaning the question was not answered accurately or inaccurately and therefore is not counted in the accuracy measure performance metric.

Connected Calls – Generally speaking, a call is considered "connected" when the CMS caller reaches a live person (or connects to the plan for TTY calls) in a timely manner. The measure is considered completed when that person confirms that they are able to assist the CMS caller with questions about Medicare Part C or Part D benefits in a timely manner.

Hold Time
During the Accuracy and Accessibility Study, the maximum hold time for waiting in an IVR orin the Hold queue is 10 minutes for non-TTY calls.

The Hold queue is defined as the time spent on hold by the CMS caller following the interactive voice response (IVR) system, touch-tone response system, or recorded greeting and before reaching a live person. After 10 minutes has expired, the system closes out the case and the CMS caller assigns a status code shown in the raw data.

Interpreter Availability is defined as establishing contact with an interpreter and confirming that the customer service representative can answer questions about the plan's Medicare Part D benefit within eight minutes. Interpreters must be able to communicate responses to the call surveyor in the call center's non-primary language about the plan sponsor's Medicare or Medicare-Medicaid benefits. (The primary language is Spanish in Puerto Rico and English elsewhere.) A call is considered **connected** when the CMS caller confirms that the call connects to the CSR. The measure is considered **completed** when contact has been established with an interpreter and the introductory question has been correctly answered within eight minutes of reaching a CSR. The CMS caller may also have moved on to asking the first of three general Medicare or plan- specific accuracy questions, but this is not required for consideration as a completed interpreter availability measure. The number of completed calls out of all foreign language calls is used for compliance as well as star ratings measures.

Limited English Proficiency (LEP) – The acronym LEP is used in the performance metricssection

of HPMS to indicate a call made to determine interpreter availability as part of the Accuracy and Accessibility Study.

LEP Hold Time is a code used to capture the time waiting for the interpreter. Each call is allotted eight minutes for this timer.

LEP Hold time begins after reaching a live customer service representative and ends after the CMS caller has confirmed that the CSR is available and able to assist in answering questions about Medicare Part C or Part D benefits.

Missing Data **-** When call data are not available for a contract, HPMS will display "N/A." Reasons for missing data include technical issues and other reasons for which calls cannot be made/connected.

Phone Numbers **-** *Prospective beneficiary customer service lines* are called for the Accuracy and Accessibility Study. Phone numbers used in the study were extracted from data provided by MAOs, MA-PDs, PDPs, and MMPs in HPMS for prospective Part C and Part D customer service lines. Customer service numbers were extracted at the plan level (i.e., HXXXX-001 or SXXXX-001). Extracts from HPMS are performed to update phone numbers on a weekly basis throughout this study.

Calls are made to a number during the time it is supposed to be operable, which is at least 8:00 a.m. to 8:00 p.m. (according to the time zones for the regions in which they operate) for *prospective beneficiary* customer service lines. For example, if the same phone number serves plans in both New York and California, that number receives calls from 8:00 a.m. in New York until 8:00 p.m. in California. The calls made are distributed throughout the period of time the call center is required to be open. Statisticsfor any given contract typically include all calls made to phone numbers associated with the contract.

If any *beneficiary* customer service calls were made before the hour of 8:00 a.m. in the time zone of the contract's eastern-most service area or after 8:00 p.m. in the time zone of the western-most service area, they will be excluded from the analysis for that specific contract since the contractor is not expected to maintain call center operations at those times.

Time Data **-** All time data are provided in minutes and seconds in the format of MM:SS and are recorded in the Eastern Time Zone.

**When reviewing the raw data, please remember to calculate the time difference between the East Coast and your plan's region(s).**

TTY functionality is defined as establishing contact with and confirming that the customer service representative can answer questions about the plan's Medicare Part D benefit within seven minutes. The calculation of this measure is the number of completed contacts with the CSR divided by the number of attempted contacts.

TTY Hold Time is a code used to capture the time waiting for the TTY operator. The TTY hold time is the time between reaching the plan, either via 711/state relay operator or connecting directly to a live CSR, and the time when a live CSR confirms he or she can assist with questions about

Medicare Part C or Part D benefits, and the confirmation was received on the tester's TTY device. The maximum allowable time for waiting for the TTY operator (TTY_HOLD) is seven minutes.

**Raw Data**
The raw data that supports these performance metrics is also available in HPMS in the Part C and Part D prospective beneficiary customer service performance metrics sections. Links to the raw data are displayed immediately below the performance metrics display. MAOs, MA-PDs, PDPs, and MMPs may download the data either in an Excel document for a single contract, or asa text-delimited file for all contracts under the parent organization ID.

**Data Dictionary**
A data dictionary is available for you to download via link in HPMS adjacent to the link for the raw data. The data dictionary provides an explanation for numerical codes shown in the raw data.

## Frequently Asked Questions

### Accuracy and Accessibility Study

**Question:** During what time of day do you place outbound monitoring calls for the Accuracy and Accessibility Study?

**Answer:** Calls are made to a number during the time it is supposed to be operable, which is at least 8:00 a.m. to 8:00 p.m. (according to the local time zones for the regions in which they operate) for beneficiary customer service lines. For example, if the same phone number serves plans in both New York and California, the number receives test calls from CMS from 8:00 a.m. in New York until 8:00 p.m. in California.

Where multiple time zones are served by a single call center servicing multiple contract IDs, if any beneficiary customer service calls were made before the hour of 8:00 a.m. in the time zone of the contract's eastern-most service area or after 8:00 p.m. in the time zone of the western-most service area, the call will be *excluded* from the analyses for that specific contract since the contractor is not expected to maintain call center operations at those times.

**Question:** How are call center indicators assigned?

**Answer:** CMS' contractor emails the compliance officer and asks them to assign a letter (A, B,C for example) for each call center it operates. We do this late in the year prior to the study beginning the following year. The CMS contractor then further breaks down the sample by phone numbers, plan types, etc. and assigns indicators as necessary for call completion.

This process can become quite involved for large contracts that cover SNPs, non-SNPs, MMPs,and non-MMPs. If you are confused by the raw data for a large organization that covers many plan types, it may be best to send specific questions to CallCenterMonitoring@cms.hhs.gov and we will assist you.

Below are some generalities about our contractor's process:

- Calls made to phone numbers assigned to call center indicators dedicated to SNP plans may be handled differently. If an assigned call center indicator only includes phone numbers that are dedicated to SNP plans, there is no change. If a call center indicator includes phone numbers that are dedicated to SNP plans along with phone numbers that serve both SNP and non-SNP, at least one LEP or English call is made to the SNP-dedicated phone number. Please note that a contract with ONLY SNPs is exempt from the accuracy measure and CMS callers will not ask any accuracy questions on calls under these SNP-only contracts. Contracts with both SNP and non-SNP plans will be asked accuracy questions for the non-SNP plans and no accuracy questions are asked for the SNP plans. The results are rolled up to the contract level.
- Regarding how calls are applied, our contractor reviews the counties served by each plan type and the time zones served in those local service areas. (For example, some contracts will occasionally have counties that are split into two time zones. If two time zones are served, the call center is required to be open from 8 am to 8 pm in EACH local service area/time zone.) Calls are scheduled to be placed at appropriate times. The results of the calls are applied to every contract ID *assigned to the call center indicator* that is appropriate based upon the time

the call was actually placed.

To handle a call center which normally covers all SNPs, non-SNPs, MMPs, and non-MMP plans, our contractor needs extra steps and assumptions to make sure that it can minimize the number of calls to the plans. These assumptions are made, for example, for contracts with

1. Some phone numbers covering both SNPs and non-SNPs.
2. Some phone numbers covering either MMPs or non-MMPs.
3. Some phone numbers covering both MMPs and non-MMPs.

When a compliance office has indicated a call center is shared by SNP-only and non-SNP phone numbers, calls are distributed so that the SNP-only number receives at least one call a week. In this case, TTY calls are only made to non-SNP phone numbers. When a call center only uses SNP-only phone numbers, the call center can expect six calls per week, including TTY calls.

We will not ask any accuracy questions for SNP plans, so the call is considered complete when an interpreter is available and answers "Yes" to our introductory question. In contrast, for non- SNP plans we will also ask accuracy questions. Consequently, SNPs which share phone numberswith non-SNPs can also share interpreter availability/LEP performance metrics with the non- SNP plan (but NOT vice versa.)

As stated previously, this can be confusing for large organizations, so let us know if you needhelp by sending your contract ID and your question to CallCenterMonitoring@cms.hhs.gov.

**Question:** How many calls will we receive during the Accuracy and Accessibility Study?

**Answer:** Each year, CMS' contractor re-evaluates the number of calls needed for statistical significance in keeping with the margin of error for this study, so the examples below should only be used as an estimate of the volume of calls that could be received in any given year.

In 2025, you could expect to receive, on average, 96 calls ***per call center indicator***. This total comes from an average of 6 calls each week. Those 6 calls were comprised of one TTY test call, two native language calls, and three foreign language calls. In 2025, we placed *approximately* 96 calls per Part C call center indicator, and approximately 96 calls per Part D call center indicator, if you were a sponsor offering Part D services.

Recall that the Accuracy and Accessibility Study is conducted at the *call center* level, not the phone number level like the Timeliness Study. Our monitoring calls include the native language (Spanish in Puerto Rico; English elsewhere), TTY, and each of the six foreign languages that wetest. Note that a call center indicator could have many phone lines (e.g., 35 phone lines in 2025) associated with it and each call will be to a different phone number when there is more than one number for a call center indicator. Another thing to note is that one phone line can be associated with multiple plans.

## Interpreter Availability Measure

**Question:** When do you release the languages for testing?

**Answer:** We announce the languages in our annual call center monitoring memo. We typically release this in December of the year prior to the study. The memo is announced via HPMS and is emailed to compliance officers listed in HPMS for the organizations we monitor.

**Question:** During the Accuracy and Accessibility Study, when testing interpreter availability, if the CMS caller remains on the line for more than the eight minutes allowed, before having an ability to ask for an interpreter, would this be considered an unsuccessful – or failed – call result?

**Answer:** If a CMS caller waits for a live person to answer for 10 minutes in the IVR or on hold but no live person picked up the call, the call will time out and it will be counted as *an unsuccessful call.* If a live person answers, this is a *connected call outcome*. If the CSR cannot get the interpreter on the line and have the interpreter help to answer the introductory question before the 8-minute LEP Hold timer goes off, the call is ended, and the interpreter availability measure does not have a complete result.

**Question:** Regarding the rule about connecting an interpreter within eight minutes, does this apply to each call or is this an average?

**Answer:** It applies to each call. If it takes longer than eight minutes for the CSR to bring the interpreter onto the call to answer our introductory question, the timer will expire, and the call will end. This results in an unsuccessful outcome. For the interpreter availability measure to be complete, the CSR, with the interpreter's help, must be ableto respond "yes" to the introductory question before the 8-minute timer expires.

**Question:** During the interpreter availability test, is there actually a Limited English Proficient (LEP) person on the line, or do you use bilingual agents?

**Answer:** We use bilingual interviewers. They are fluent in the language being tested.

**TTY Functionality**

**Question:** Do plans have to use teletypewriters for TTY functionality?

**Answer:** For the purpose of this study TTY can refer to either a machine (device) or IP software, including real time text (RTT). If using RTT, plans must ensure that it is backwards compatible with TTY.

**Question:** Are we able to use alternate technologies to TTY, like real-time text (RTT)?

**Answer:** Any alternative technology must be backwards compatible with TTY.

**Question:** Do you ask questions in foreign languages when testing TTY functionality?

**Answer:** The TTY measure is conducted in English only. For plans with service areas exclusively in Puerto Rico, please be aware that we do test TTY only in English for your plans as well.

**Question:** How should we decide if we want to use an in-house TTY device or software or a relay service?

**Plan:** This is a business decision for the plan to make, and CMS cannot offer an opinion. Plans should weigh the pros and cons of using an in-house TTY system versus the national 711relay service or their state relay number. Note that any in-house technology, such as RTT, must be backward compatible with TTY.

**Question:** Should we list 711 or the state relay operator's number in HPMS?

**Answer:** You may list either number in HPMS. When 711 is dialed, the call will route to the locality of where the call originates from. Please understand that you can dial 711 to connect to certain forms of telecommunications relay services in the United States *instead of* having to remember a ten-digit telephone number for the state relay service. Dialing 711 makes it easier for travelers to use the relay service because they do not have to remember telecommunications relay service numbers in every state.

**Question:** Is there anything we should do to test our in-house TTY devices or software?

**Answer:** CMS makes the following suggestions for testing in-house TTY devices or software:

- Regularly test your device or software to ensure that it is working properly.
- Have outside callers call in and test the system. (If in Puerto Rico, Guam, or island off the mainland, have someone on the mainland call into the TTY system to test.)
- Have two callers from outside the system call at the same time to make sure there is no disruption on either call, calls don't get disconnected, or garbling does not occur.
- When testing, check for garbled language on both sides of the call.
- Whenever you make a telephone system change, retest all TTY systems.
- If you have an outgoing message on your in-house TTY system that states to callers that if they called this number by accident, they should call the main number instead at xxx- xxx-xxxx, confirm that a TTY-recognized call will roll over to a TTY operator. This should be tested by calling from a phone line *and* a TTY line.
- Verify with your telecom provider that TTY calling is supported, in case there are any settings on the carrier side that need to be adjusted.
- If using TTY Voice over Internet Protocol (VOIP), analyze network bandwidth utilization to confirm no packet loss. If there is a packet loss, internet speed will need to beincreased.
- Ensure your technology, if not TTY, is backward compatible to TTY.

**<u>Accuracy Measure</u>**

**Question:** If the timer expired during our accuracy question and we were not able to answer it, is the result counted against the contract's performance?

**Answer:** No, the effect is neutral to the contract. During the Accuracy and Accessibility Study, CMS callers will ask up to three accuracy questions per monitoring call placed. Each question is allotted seven minutes to determine if the CSR can provide an accurate and timely response to questions based upon the approved bid submission submitted into HPMS by the plan, or to general Medicare accuracy questions. The percentage of accurate responses is calculated as the number of *questions answered accurately* divided by *the total number of answered questions* x 100. ***Note: If a***

***CSR is unable to answer the question before the timer expires, the call ends. The effect of a timed-out call is neutral to the contract, meaning the question was not answered accurately or inaccurately and therefore is not counted in the equation since a response was not received in the allotted time.***

**Question:** Are we permitted to answer the three accuracy questions within 21 minutes?

**Answer:** No. Each accuracy question has a seven-minute timer. If the first accuracy question is not answered before the seven-minute timer expires, the call ends. The second accuracy question will not be asked.

**Question:** Why is accuracy not included in the Star Ratings?

**Answer:** The accuracy measure results were previously part of the Star Ratings. In the past, the majority of plans scored high ranks and that clustered the majority of plans together with similar results, so the measure itself was deemed to be not particularly helpful in differentiating one plan from another.

**Question:** Is the accuracy test on the actual answer provided by the plan's CSR or on the quality of the interpreter to relay the answer in the foreign language?

**Answer:** Two of the goals of the Accuracy and Accessibility Study, which is performed by testing interpreter availability, TTY functionality, and accuracy of the questions asked, is to determine if interpreters are available, and to determine the accuracy of responses given to prospective members. An interpreter must be able to accurately relay the CSR's answer to the caller, so if the interpreter fails to do so, this must be attributed to the plan's performance.

**Question:** Please provide further clarity as to the timeliness metric utilized. For example, if a CSR begins providing the answer at six and a half minutes and finishes after the seven-minutelimit. Does this count as untimely?

**Answer:** If the answer is not finished before the seven-minute mark, it would be considered to have "timed out".

**Question:** Are the accuracy questions that were used in prior years published and available? I would like to pass them along to the Member Services staff to be used in training.

**Answer:** No, they are not published or available. At the conclusion of this study, you will receive the questions, the expected responses, and your actualstudy results. These results are stored in HPMS for you to download.

**Question:** We are a plan with both SNPs and non-SNPs. Our SNPs receive calls that ask only your introductory question and nothing more. Why do you do this?

**Answer:** SNPs are exempt from the accuracy measure, so we do not ask accuracy questions. The reason for this is that SNPs may have Medicaid or other benefits beyond the standard Medicare benefits offered because of state-specific contracts, for example.

**Accuracy and Accessibility Study Raw Data**

**Question:** Where do I find raw data for the Accuracy and Accessibility Study?

**Answer:** The raw data is available to you in HPMS under the performance metrics sections. For the Accuracy and Accessibility Study, you can find detailed results for your contract in HPMS by following the paths below:

1. For Part C results, from the HPMS home page (https://hpms.cms.gov): Quality and Performance > Performance Metrics > Call Center Monitoring > Part C Prospective Beneficiary Customer Service > [choose date of study] > [enter the contract number].

2. For Part D results, from the HPMS home page (https://hpms.cms.gov): Quality and Performance > Performance Metrics > Call Center Monitoring > Part D Prospective Beneficiary Customer Service > [choose date of study] > [enter the contract number].

Raw Data supporting the Part C and Part D performance metrics are available to you in HPMS in a link immediately below the performance metrics for the selected contract under Part C and Part D. Please access the link entitled "Raw Data for Xxxxx," with the variable being the contract ID you selected. This is available to you for a single contract as an Excel download. Also available for your convenience is a link entitled "Raw Data for All Contracts." This link will provide a download of all raw data to which you are entitled under your parent organization identification code. The multiple-contract data are available to you in a text-delimited file format. You may usethis file to import into Excel, Access, or some other database product.

You will also find a link to an Excel document entitled, "Data Dictionary for Raw Data." This is a data dictionary that explains the numerical codes used within the raw data. The data dictionary also contains all the questions asked during the Accuracy and Accessibility Study and the numerical coding that explains the answer received by our callers.

In addition to the above resources, CMS provided a link for you to Technical Notes for the Accuracy and Accessibility Study.

**Question:** How are completed and unsuccessful calls identified in the call level data? When reviewing the raw data, we are unclear on how a completed TTY or interpreter availability call is identified in the call level data. We had assumed that ERC=295 (Reached CSR/TTY/Interviewer - completed questions) identified the completed calls. However, one call has an ERC code = 290.7 (Partial interview - CSR could not answer question in seven minutes) so we interpreted that as an unsuccessful call. Is that correct?

**Answer:** When downloading your raw data from HPMS, you should also see a link to a data dictionary for each study just to the left of the raw data link. Please be aware that the Timeliness Study (current enrollees) uses one dictionary, while the Accuracy and Accessibility Study (prospective enrollees) uses a different dictionary. If you ever need these, simply download from HPMS at the same time you download the raw data.

In the raw data, look for the "ERC Code" and use the dictionary to decipher the numerical codes. Both ERC = 290.X and 295 would be counted as completed calls, because the first purpose of this study is that the contracts can provide interpreters and TTY functionality – and the second purpose

is to test accuracy. Both 290 and 295 codes represent the situation that our caller has already talked to interpreters and received the answer to the introductory question. As a result, the difference between codes 290 and 295 is just that when we ask accuracy questions, some unexpected situations can occur (such as the timer expiring before the accuracy question is answered, which is neutral to the plan). If all three accuracy questions are asked, the call will be coded as 295 (smooth completion of all parts of the call.) If something happened such as timeout or a disconnection, we will code the call as 290.X (dot X would tell us in detail what happened when asking those accuracy questions.) However, these 290 codes will not hurt the plan in regard to LEP and TTY functionality scores. In addition, if something happens when asking an accuracy question (an example would be the question is not actually answered), the question will not be counted in either the accuracy, so the effect is neutral to the plan: the CSR neither answered correctly nor incorrectly.

Because the main purpose of this study is the availability of interpreters and functionality of TTY, any situations that happened after a plan already completed the availability/functionality will not hurt the plan from those perspectives. Subsequently, code 290 is a code for a completed call with some problems that would benefit the plans to know how to improve when answering questions in the future. On the other hand, the code also tells us that at least the planalready fulfilled the minimum requirement of interpreter availability and TTY functionality.

**Question:** In reviewing the raw data for a prior Accuracy and Accessibly Study result, we are noticing that there is variation within the Part C rates for three of our plans, for which calls are serviced at the same call center. Because the Accuracy and Accessibility Survey is measured atthe call center level, doesn't that indicate that plans with calls serviced at the same call center would receive the same rate? Would you be able to explain the variation in the rates?

| Contract ID | Plan Name | Part C Rate |
|---|---|---|
| HXX A | Example Plan 1 | 94% |
| HXX B | Example Plan 2 | 94% |
| HXX C | Example Plan 3 | 92% |

**Answer:** Yes, this study is conducted at the call center level, so plans that do not share a call center may have different results. There are other considerations that will result in a variation of results when applied at the contract level. For example, SNPs are not asked the accuracy questions. Non-SNPs *are* asked accuracy questions. Results are rolled up to the contract level. So, if you have a contract with ONLY SNPs, the contract will not have accuracy results. If you have multiple contracts using the samecall center indicator where some contracts are SNP-only and some are a mixture of SNP and non-SNP, you will not see uniform results for the accuracy measure.

Other considerations are the counties served by the plans and those time zones they serve. CMS schedules outgoing test calls at appropriate times based upon the time zones served by those plans. To minimize burden on the call centers, we attribute the resultsof those calls to contracts within the call center indicator, but the results are only rolled up to the contract level *when appropriate to do so*, meaning one should not expect to see uniform rates simply because the same call center is used. Let's say your call center covers 3 time zones, and you have 1 contract with plans under it that serve all 3 time zones. In that case, all call results would be attributed to that one contract. If you have a separate contract that only covers the Eastern Time Zone, then the results from calls made from 8:00 am to 8:00 pm in Eastern Time ***only*** would be included in that contract's performance.

**Please be aware that once assigned, call center indicators remain with the associated plan benefit packages and while phone numbers must be kept current in HPMS, the Accuracy and Accessibility study indicators will not be updated after the Call Center Indicator collection activity is completed.**

## General Questions

**Question:** Who do I contact if I have questions?

**Answer:** If your questions are related to our call center monitoring studies, send an email with your contract ID, date of call, time of call, and include the phone number on which the call wasreceived, if possible, to CallCenterMonitoring@cms.hhs.gov. Please **do NOT** send your questions via secure email. We never share personally identifiable information on this project.CMS monitors thousands of plans and hundreds of contracts and does not have the resources to maintain separate registrations for all these contracts.

If your questions are related specifically to your Star Rating, send your question to PartCandDStarRatings@cms.hhs.gov.

If your question is related to call center performance metrics that fed into your Star Rating, and you are not sure which team to consult, send an email to both resource mailboxes and we will work together to answer your question.

**Question:** Please confirm how IVR menu choices are handled when monitoring calls are made. When the menu includes an option for member services, is this the option that will be chosen forthe monitoring? In other words, they won't select options such as Behavioral Health crisis lines, provider lines or nurse lines. Is that correct?

**Answer:** For the Accuracy and Accessibility Study, our callers will make an IVR/menu selection for prospective members whenever that is an available option in your IVR, *and it is an appropriate choice for the type of call we are placing*. For example, if we are placinga native language call, we call your prospective phone number and listen to the options. As long as you include a choice for prospective members, sales, or for more information about the plan inyour IVR call tree, we'll make that selection. We would not make selections for behavioral health lines, nurse lines, crisis lines, or other such choices.

If the correct IVR option is not immediately obvious to our callers, no IVR selection will be made. For this reason, ensure your phone systems will default to a live person if no IVR option is selected, or no voice command is given.

Finally, when testing interpreter availability, our callers are simulating the experience of anon-English-speaking caller, so if IVR instructions are not available in the language we are testing, we do not make an IVR selection because a non-English-speaking caller could not understand what is being said and could not make that IVR selection. For this reason, ensure your phone systems will default to a live customer service representative if no IVR selection is made, or voice command given.

**Question:** We found a call coded as 297.12 in our raw data. This disposition code says, "Neither Call Center Contact nor Ring/No Answer." Why are you counting this call against our plan's performance if you didn't contact us?

**Answer:** CMS's raw data lists the disposition codes from the calls we make in our call center monitoring studies (see data dictionaries that explain those codes for each study). Code 297.12 is one of the codes we use when we are unable to connect to a plan. This code is used for situations like receiving a message of "all circuits are busy" or a fast-busy signal. Our contractorhas a system in place that requires their survey callers to make a second attempt *for any disposition where we cannot connect to the plan*, such as 297.12. The system will not allow the caller to record the information of "Neither Call Center Contact nor Ring/No Answer" unless a second attempt has been made to connect to the plan. Only one outcome is counted "against" the plan, but two attempts are made for every call in this scenario.

CMS's contractor has investigated to rule out any phone equipment failures, caller errors, or an issue on the part of its phone carrier before the results are issued to you. CMS is not able to offer an opinion about a call disposition of no plan contact other than it could have been a phone carrier's inability to transfer the call to the call center. The plan may check with their phone carrier to determine if there were any outages during the date and time in question. If a phone carrier caused the call not to transfer to the plan, the same outcome would happen to a real prospective beneficiary attempting to call the plan, so the disposition is included, and the information is reported out with the contract's performance metrics and duplicated raw data. This is longstanding practice that meets the expectations of the study's design.

**Question:** Our contracts under our parent organization share a phone number. Why are the results different for one or more of our contracts?

**Answer:** In a situation like the one above, it is best for you to send the specific details of your question to CallCenterMonitoring@cms.hhs.gov. We will research the issue with our contractor. Things to consider are: (1) the Accuracy and Accessibility Study is conducted at the *call center level.* All share results *at the contract level* but one or more contracts might have been under sanction during the Accuracy and Accessibility Study and therefore would have been excluded. (2) The plan sponsor might have changed the phone number in HPMS at some point during the study. Our contractor tracks this and can tell us when the change was made. (3) Some functions of studies do not apply to all situations. For example, contracts with *only* SNPs are excluded from the accuracy measure in theAccuracy and Accessibility Study. (4) Contracts under one parent organization may vary, especially based upon their service areas. For example, one contract may serve only the Eastern Time Zone while another contract may serve Eastern and Central Time Zones. This would mean that each could be called the same number of hours (from 8:00 am to 8:00 pm in their local service areas), but those times would be different and thus the results applicable to a certain contract may be different. (5) The compliance officer may have told us that the phone numbers route to separate and distinct call centers for the Accuracy and Accessibility Study.

**Question:** Our compliance officer sees a compliance action in the Compliance Activity Module in HPMS, but she never received the letter herself. Is this letter valid?

**Answer:** Yes. Compliance actions are sent to the compliance officer on record and stored in

HPMS, with your organization having access to all compliance actions. CMS suggests:

- Confirming a correct email address in HPMS. (The CAM auto populates letters with whatever email address is available in HPMS, so make sure HPMS is accurate.)
- Add HPMS@cms.hhs.gov to your contacts list so the emails do not go to the junkfolder; and
- Make certain the IT system he or she uses isn't blocking the email address HPMS@cms.hhs.gov.

**Question:** I'm having a hard time downloading the raw data from HPMS. Can you send it tome?

**Answer:** Please contact the HPMS help desk at 1-800-220-2028 or hpms@cms.hhs.gov. The HPMS Team at CMS has asked that we refer folks to the HPMS help desk whenever problems occur so that they can learn what is causing the problem and what they need to do to fix it. If this does not resolve the problem, please write to us at CallCenterMonitoring@cms.hhs.gov and tell us the contract ID, and the time period for that study.

**Question:** Our call center received a CMS test call after our center closed. We serve only the Eastern Time Zone, and we are open from 8:00 a.m. to 8:00 p.m. Your test call came in at 8:15 Why did this happen, and will the result be counted against us?

**Answer:** First, be sure to adjust the timing of the call in the raw data to your time zone. You'll need to adjust the time accordingly if your call center is located in another time zone. If the time zone is not a factor and the call was truly placed outside of 8:00 a.m. to 8:00 p.m. in your service area, CMS can invalidate the call and the call's outcome will NOT be counted against your organization.

**Question:** The upcoming Christmas and New Year's Day holiday falls on a Sunday. One of my plans will observe the holidays on the Mondays after (12/26 and 1/2). Are they permitted to use alternative technologies on these two days?

**Answer:** They are permitted to use alternative technologies on Thanksgiving Day and Christmas Day only, per 42 CFR §§ 422.111(h)(1)(i), 423.128(d)(1)(i). This means they will have to support their call centers on December 26 and January 2.

**Note**: MMPs negotiate their holiday call center coverage. MMPs holiday coverage is dictated by their state-specific marketing guidance.

**Question:** How long must we retain the recordings of call center calls?

**Answer:** Though it is not a requirement of CMS to record a phone call, if an organization chooses to record calls, then those recordings would be considered a record and would be required to comply with 42 CFR 422.504.

**Question:** I'd like to send you a recording of a call. How can I do that?

**Answer:** If you can, please convert the software to .mp3 or .wav format and put it in a compressed zip file format to email to CMS. To compress the file, highlight the file, right click with your mouse, and choose "send to a compressed file." Once compressed, please email it to CallCenterMonitoring@cms.hhs.gov along with the contract ID, the phone number on which the

call was received, the date and time of the call, and the details of your request. CMS uses VLC software for recording playback. This software can read several formats including 3GP, ASF, AVI, DVR-MS, FLV, Matroska (MKV), MIDI, QuickTime File Format, MP4, Ogg, OGM, WAV, MPEG-2 (ES, PS, TS, PVA, MP3), AIFF, Raw audio, Raw DV, MXF, VOB, RM, DVD-Video, VCD, SVCD, CD Audio, DVB.

Please remember to send this via regular email and not secure email. This project never shares personally identifiable information, so secure email for a CMS test call should not be necessary.

**Question:** We created a contingency plan in the unlikely event all systems or phones go down.We know ideally when it comes to the test calls and member experience, we never want this to happen, but we want to be prepared for all circumstances. Does CMS have guidance or best practices if an outage like this occurs? We can play a cloud message letting callers know they can call back and would accordingly self-report it to CMS, but what happens if a test call comesin? Would we fail it if we had a cloud message and self-reported it to CMS?

**Answer:** Regarding contingency plans and guidance, Part D sponsors and MAOs are required to have operational continuity plans in place. These requirements are described at 42 C.F.R §422.504(o) and 42 C.F.R §423.505(p). The plans for continuity of operations must include the operation of call center customer services. Therefore, if call center operations cease temporarilydue to an emergency situation or disaster declaration (or as stated above due to phone outages), the MAO or Part D sponsor should implement their continuity plan. MAO/sponsor continuity plans should include contingency plans to maintain operations or if unable, to restore call center operation within 72 hours.

**Question:** How was compliance determined for the 2025 Accuracy and Accessibility Study?

**Answer:** Interpreter Availability was tested to determine if the services were compliant with 42 C.F.R. §§ 422.111(h)(1)(iii) and 423.128(d)(1)(iii), which require interpreters to be available for 80 percent of incoming calls requiring an interpreter within 8 minutes. TTY functionality was tested to determine if services were complaint with 42 C.F.R. §§ 422.111(h)(1)(iv) and 423.128(d)(1)(iv), which require 80 percent of incoming calls requiring TTY services to be connected to a TTY operator within 7 minutes. Accuracy was tested to determine if the services were compliant with 42 C.F.R. §§ 422.2262(a)(1)(i) and 423.2262(a)(1)(i), which requires MA organizations and Part D sponsors not to provide information that is inaccurate or misleading. For 2025, we determined the accuracy compliance threshold to be 90 percent. MA organizations and Part D sponsors with accuracy results below 90 percent are outliers and per 42 C.F.R. §§ 422.504(m)(2) and 423.505(n)(2), CMS may determine that an MA Organization or Part D sponsor is out of compliance when its performance in fulfilling requirements represents an outlier relative to the performance of other organizations.

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard, Mail Stop 00-00-00
Baltimore, Maryland 21244-1850

CENTER FOR MEDICARE

**DATE:** December 5, 2024

**TO:** All Medicare Advantage Organizations (MAOs), Prescription Drug Plan Sponsors and Medicare-Medicaid Plans (MMPs) (excluding PACE contracts, cost contracts, MSA contracts, and employer-only plans)

**FROM:** Vanessa S. Duran, Director
Medicare Drug Benefit and C & D Data Group

**SUBJECT:** 2025 Part C and Part D Call Center Monitoring - Timeliness and Accuracy & Accessibility Studies

The Centers for Medicare & Medicaid Services (CMS) will continue monitoring Part C and Part D call centers in 2025. This memo describes the elements CMS will monitor and explains how to prepare for the monitoring studies, including updating the Health Plan Management System (HPMS) with critical 2025 call center information **no later than December 20, 2024**.

For 2025, CMS has contracted with Hendall Inc., and its subcontractor American Institutes for Research (AIR), to monitor the performance of plan sponsors' call centers with respect to the standards at 42 C.F.R. §§ 422.111(h)(1) and 423.128(d)(1).

The **Timeliness Study** measures Part C and Part D *current enrollee* call center telephone lines and pharmacy technical help desk telephone lines to determine **average hold times** and **disconnect rates**. This study is conducted over four consecutive weeks each quarter, during which an organization is expected to maintain an average hold time of 2 minutes or less and maintain an average disconnect rate of 5 percent or less. Please note that the Timeliness Study results are not part of the Star Rating measures.

Important definitions for the Timeliness Study:

1. The percentage of calls disconnected is defined as the number of calls unexpectedly dropped by the plan, not due to CMS, divided by the total number of calls made to the telephone number associated with the contract.

2. The average hold time is defined as the average time spent on hold by the caller following the interactive voice response (IVR) system, touch-tone response system, or recorded greeting and before reaching a live person.

The **Accuracy & Accessibility Study** measures Part C and Part D *prospective beneficiary* call center telephone lines to determine (1) the **availability of interpreters** for individuals, (2)

teletypewriter (**TTY) functionality,** and (3) the **accuracy of plan information provided by customer service representatives** (CSRs) in all languages. The availability of interpreters and TTY functionality are used for star ratings measures. Languages tested in 2025 are unchanged from 2024 and will include English, Spanish, Cantonese, Mandarin, Vietnamese, French, and Tagalog. English will be tested as a foreign language for organizations with a service area exclusively in Puerto Rico. This study will be conducted from approximately February through June 2025.

Important definitions and exclusions for the Accuracy & Accessibility Study:

1. Interpreter availability is defined as the ability of a caller to communicate with someone and receive answers to questions in the caller's language.

2. TTY functionality is defined as the ability of a hearing and/or speech impaired caller using TTY to communicate with a CSR and receive answers to questions at the plan's call center directly or via a relay operator.

3. Contracts with *only* Special Needs Plans (SNPs) are excluded from the accuracy measure.

4. Contracts or plan benefit packages (PBPs) under marketing and enrollment sanction are excluded from the study.

In the event that an organization believes that CMS may have miscalculated its call center results based on data posted in HPMS, it may bring the relevant information to CMS's attention and ask for a review of the results. **We advise organizations that they ask for this review within 2 weeks of results being posted in HPMS.** CMS may not be able to make adjustments to the Timeliness Study if issues aren't brought to its attention within 2 weeks. Although organizations may request CMS review of Interpreter Availability and TTY functionality results through the end of the Stars plan preview 2 window, we urge organizations to submit requests for review prior to the Stars plan preview periods. **CMS will not revise results without evidence which shows the call was erroneously marked as unsuccessful, nor based on challenges to the methodology, which has been applied to all subjects of the study.**

**IMPORTANT ACTION: Verify 2025 Call Center Information**

Compliance Officers should prepare for this monitoring effort by ensuring the accuracy of 2025 Part C and/or Part D call center telephone numbers in HPMS by **December 20, 2024**. This includes current and prospective enrollee **toll-free** beneficiary call center telephone numbers**, toll-free** pharmacy help desk numbers, and current and prospective enrollee **toll-free** TTY numbers. Telephone numbers are extracted from HPMS on a weekly basis beginning in December of the year prior to the study year and updated in the monitoring contractor's automated dialing software. If any of the telephone numbers change during the year, sponsors must update their telephone numbers in HPMS immediately, pursuant to 42 C.F.R. §§ 422.504(f)(2)(vii) and 423.505(f)(2)(vii). **If an organization achieves poor results on the measures due to calls to an inaccurate telephone number, the calls will not be invalidated and the results will not be negated. It is very important that accurate information is**

**available in HPMS prior to the launch of the studies.** Use the paths outlined below to verify and/or update the telephone numbers.

Verify your pharmacy technical help desk number, which is a contract-level contact and not a bid-level contact, using the following path: HPMS home page: > Contract Management > Basic Contract Management > [enter contract number]or [enter the contract name] > Contact Data > Pharmacy Technical Help Desk Contact. There are primary and secondary contacts collected in this section. The primary contact is mandatory, and the secondary contact is optional. Please note that for call center monitoring purposes, we call only the primary contact. For any additional questions on updating your contact information, please contact the HPMS Help Desk.

Verify current and prospective enrollee numbers and TTY numbers through the following path: HPMS home page: > Plan Bids > Bid Submission > CY 2025 – Manage Plans > Edit Contact Data.

Follow these steps when editing contact information in the HPMS:

1. On the Select a Contract screen, enter a contract number into the field provided (Option 1) or select a contract number (Option 2). Click Next to advance to the Update and Save Data screen.

2. On the Update and Save Data screen, select a plan, and select a contact tab.

3. Edit the mailing address, telephone numbers, and e-mail address for applicable contracts.

4. After entering data for the first contact type, the user can complete data entry for other contact types under the same plan.

Notes:

- The above process to verify the accuracy of call center telephone numbers is separate from the Call Center Indicator activity that has already begun. You should have received communication from **CallCenterIndicators@hendall.com** in November 2024. The Call Center Indicators identify PBP phone numbers that are served by the same physical call center. This information is important as the Accuracy and Accessibility study is conducted at the call center level, with legal entities sharing results of calls placed to a shared call center, with limited exceptions. The Timeliness study is conducted at the phone number level. Results of calls placed to a shared phone number are shared by all legal entities utilizing that phone number, with limited exceptions. The Accuracy and Accessibility study indicators do not impact the Timeliness study. **Please be aware that while phone numbers must be kept current in HPMS, the Accuracy and Accessibility study indicators cannot be updated after the Call Center Indicator collection activity is completed.**

- Our regulations at 42 C.F.R. §§ 422.111(h)(1) and 423.128(d)(1) require the operation of a toll-free customer call center; MMPs also have state-specific marketing guidance that requires the toll-free number. ***Even if HPMS does not denote this as a required field in your view, having toll-free numbers available is required.*** Contact the HPMS Help Desk

at hpms@cms.hhs.gov or 1-800-220-2028 if you require assistance.

- **All TTY numbers must be either three numeric characters or ten numeric characters and entered into HPMS.**

  Please make certain you have entered into HPMS the **TTY local telephone number** and the **TTY toll-free telephone number.** If your plan does not use a dedicated, in-house TTY service, you may enter 711 in both fields, or you may enter the toll-free ten-digit number for a specific state relay service. The toll-free TTY telephone number must be populated, as this is the telephone number we pull for the Accuracy & Accessibility Study.

  This information can be found in Chapter 1 of the CY2025 Bid User Manual (*HPMS home page > Plan Bids > Bid Submission > CY2025 > View Documentation (under "Documentation" Section) > Bid Submission User Manual for Contract Year 2025)*.

**VOLUNTEERS FOR CMS INTERVIEWER TRAINING SESSIONS**

CMS solicits volunteers for abbreviated training periods prior to the beginning of a study launch. This is done by randomly selecting organizations to ask if they wish to volunteer. Contact CallCenterMonitoring@cms.hhs.gov to discuss your desire to participate in the next interviewer training session. These sessions are to train the CMS interviewers on how to properly place a call and how to navigate plan IVR systems. Your participation in a training period should not be used as a replacement for your own testing to verify that your call center is compliant with regulatory requirements.

**Tips for Success/Best Practices**

Based on several years of study results, CMS provides the following tips to help improve results.

*General:*

- Review call center requirements under 42 CFR §§ 422.111 and 423.128.

- Provide basic services and information to individuals with disabilities, upon request or when otherwise learning of the enrollee's primary language or need for an accessible format.

- Make available all plan materials and information, including those produced or distributed by contracted providers, in alternate formats (e.g., braille, large print, audio and data CDs, and in requested alternate languages) to individuals with disabilities upon request or when otherwise learning of the enrollee's primary language or need for an accessible format.

We monitor thousands of plans whose IVR options are all unique. This means it is not practical or possible to train our interviewers to always make the same selection in an IVR, and we cannot

program what options they should select for each plan. We train them to listen for options such as "current members," "pharmacy," or an option for those "interested in learning more about enrolling" for prospective calls, for example. When you are setting up your IVR options, please keep this in mind. IVR options should be intuitive for enrollees/perspective enrollees. We suggest that you train your representatives to offer a warm transfer to the correct department if a caller is misdirected. You may experience more successful call outcomes if the representative offers a warm transfer, allowing us to reach a representative who can answer our question. Simply saying, "You need to call another number" or answering "no" to the introductory question, "Are you the right person to answer questions about…." will result in an unsuccessful call outcome. We call the telephone number listed in the HPMS as provided by the plan and make a reasonable selection in the IVR, so we expect to reach a CSR who can answer questions about the plan, or at least transfer us to the correct party who can answer those questions.

*Ability to Accept Calls:*

- Callers to current enrollee and prospective enrollee customer service call centers need to be able to communicate with a live person when they call from 8:00 a.m. to 8:00 p.m. Messages that ask a caller to leave their telephone number, or automatic callbacks, are not appropriate and will not be counted as a successful call.

- CMS's monitoring reveals that our callers experience longer-than-normal hold times at the beginning of the year. Call centers should evaluate their own needs and consider increased staffing during busier times.

- If your organization intends to implement any new technology affecting telephone systems, ensure it will not interfere with the organization's ability to accept calls, including TTY communications.

- CMS makes the following suggestions for self-monitoring your call centers on a regular basis:
  - Test every telephone number supported by the call center.
  - Review and test the telephone numbers in HPMS and ensure they ring to the intended location.
  - Test by making calls from outside the organization's telephone systems. If the plan is located off the mainland, have someone place test calls from the mainland to the plan.
  - Test with more than one caller at the same time.
  - See TTY section below for specific TTY testing suggestions.

- **Ensure that your organization does not employ IVR logic or other functions that will block calls at certain times based solely upon the area code of the caller.** We call regions spanning from the Atlantic time zone to as far west as Guam. We will call you during the business standard hours of operation (8:00 a.m. to 8:00 p.m. in the time zone(s) the plan serves). If our caller cannot reach a live representative due to programming on your end, or we hear messages stating the office is closed during the required hours of operation, the call will be counted as unsuccessful.

- Carefully review your service areas to ensure the call center is open and provides services at least in accordance with standard business practices. This means that the current and prospective enrollee call centers are open minimally from **8:00 a.m. to 8:00 p.m. for <u>all</u> of your plans' local service areas.** Check carefully to verify your coverage for any counties that are split into two time zones or to confirm observance of daylight savings time. For example, some contracts will occasionally serve counties that are split into two time zones. Also, most of Arizona is exempt from daylight savings time. However, the Navajo Nation lands, which extend to the states of Arizona, New Mexico, and Utah, observe daylight savings time. Regardless of whether two time zones are served, or daylight savings time is or is not observed, call centers are required to be open minimally from 8:00 a.m.to 8:00 p.m. in **<u>all</u>** local service areas for all current and potential enrollees.

- **Ensure IVR systems default to a live CSR/operator if the caller does not push any buttons or make a verbal selection from an options menu.** Every year CMS encounters plans that offer limited IVR options without a clear way to select the option to speak with a current member representative or a prospective beneficiary representative, and the IVR message cycles over and over without a live representative answering the telephone. This results in unsuccessful calls due to time-outs. Test your systems. When planning the IVR choices, ask yourself, "If I am calling to get information so I can decide if I want to enroll in this plan, is there an IVR option for me on this prospective beneficiary telephone number, even if I do not speak English (or other than the primary language in the area)?"

- Ensure callers with private or masked numbers are able to connect to your plan's customer service telephone numbers.

- When we call customer service lines, we ask a question intended to determine if we have reached a person who has authority to answer questions about the Medicare plan we are calling. **If the CSR insists on first knowing the caller's name, date of birth, membership ID number, or Social Security Number, or refuses to answer the question by stating "no," the call will be counted as an unsuccessful call unless the party transfers the call to a person who can answer "yes" in a timely manner. The CSR should refrain from requesting additional identifying information until at a minimum the caller is able to confirm that they have reached the correct person.**

*Interpreter Availability:*

- Utilize an interpretation service to identify the beneficiary's language.

- Use interpreter services personnel who are familiar with healthcare terms and Medicare benefit concepts.

- Interpreters should:
  - Adhere to generally accepted interpreter ethics principles, including confidentiality.
  - Demonstrate proficiency in speaking and understanding at least spoken English

and the spoken language in need of interpretation.
    - Interpret effectively, accurately, and impartially, both receptively and expressively, to and from such language(s) and English, using any necessary specialized vocabulary, terminology, and phraseology.

- Train CSRs to connect foreign-language callers with an interpreter.

- Ensure CSRs stay on the telephone when a foreign-language interpreter joins the call.

- In order to replicate a beneficiary's actual experience, CMS telephone interviewers who are testing a language other than the primary language will not make a selection in the IVR system if the instruction is only in the primary language. **Therefore, ensure IVR systems default to a live CSR/operator if the caller does not push any buttons or make a verbal selection from an options menu.** If the IVR instruction is available in the language being tested, the test callers will make an appropriate IVR selection. For example, if the language being tested is French, *and instruction is available in French in the IVR* to select an option for French, the test caller will make that selection. (Please note that the primary language in Puerto Rico is Spanish and English elsewhere. When testing calls in Puerto Rico, English is considered a foreign language.)

*TTY Functionality:*

- Ensure that TTY services are available in languages other than English.

- CMS makes the following suggestions for testing in-house TTY devices:
    - Regularly test your service to ensure that it is working properly.
    - Have outside callers call in and test the system. (If in Puerto Rico, Guam, or island off the mainland, have someone on the mainland call into your TTY system to test.)
    - Have two callers from outside the system call at the same time to make sure there is no disruption on either call, calls don't get disconnected, or garbling does not occur.
    - When testing, check for garbled language on both sides of the call.
    - Whenever you make a telephone system change, retest all TTY systems.
    - If you have an outgoing message on your in-house TTY system that states to callers that if they called this number by accident, they should call the main number instead at xxx-xxx-xxxx, confirm that a TTY-recognized call will roll over to a TTY operator. This should be tested by calling from a telephone line *and* a TTY line.
    - Verify with your telecom provider that TTY calling is supported, in case there are any settings on the carrier side that need to be adjusted.
    - If using TTY Voice over Internet Protocol (VOIP), analyze network bandwidth utilization to confirm no packet loss. If there is packet loss, internet speed will need to be increased.

- If using an in-house TTY device, have a staffing plan that includes coverage for the TTY device during the hours your call center is required to operate with live CSRs.

- If using an in-house TTY device, ensure CSRs always use “GA” for “Go Ahead” after they have communicated their opening remark or other response via TTY device, so the other party knows it can now safely transmit its next thought. Failure to use “GA” may confuse beneficiaries who are familiar with TTY systems and could result in a plan hanging up on a TTY caller who has not responded, because the caller is waiting for the “GA” as clearance to respond.

- When using a relay service:

- Ensure that beneficiaries using relay services can reach a CSR who has been trained on how to best communicate through a relay operator.

- Ensure that CSRs communicating to beneficiaries through relay operators are able to respond promptly to questions.

- **The decision to use 711 for the national relay operator or a different 10-digit number for a state relay operator is a business decision made by the plan.** If you use a state relay operator, be certain that all callers can successfully connect on that number, regardless of the caller’s area code. It is the plan’s responsibility to ensure that calls from any area code can be received via their state relay operator.

*Information Accuracy:*

- Ensure that CSRs are trained on requirements of 42 C.F.R. §§ 422.111(h)(1) and 423.128(d)(1). Review the 2025 edition of *Medicare & You* to ensure your CSRs are trained on new Part C and Part D benefit information for 2025. Consider sharing the most recent *Medicare & You* with your translator service provider.

- CSRs should have specific PBP level benefit and formulary data easily available.

- Because the time is limited to 7 minutes for each of the general accuracy questions, a best practice for CSRs is to speak at a high level first and offer more detail if asked.

**Guidance for Providing Services to Limited English Proficient Beneficiaries**

CMS reminds organizations of the HHS Office of Minority Health’s (HHS OMH) *National Standards for Culturally and Linguistically Appropriate Services in Health and Health Care* (*National CLAS Standards*). Originally published in 2000, an enhanced version of the *National CLAS Standards* was most recently updated by HHS OMH in 2013. The *National CLAS Standards* offer health and health care organizations 15 action steps for providing culturally and linguistically appropriate services (CLAS). The *National CLAS Standards* are intended to advance health equity, improve quality, and help eliminate health care disparities. The essential goal of the National CLAS Standards is framed in its Principal Standard (standard 1): “Provide effective, equitable, understandable, and respectful quality care and services that are responsive to diverse cultural health beliefs and practices, preferred languages, health literacy, and other communication needs.” The remaining 14 standards span three themes, including: 1) governance,

leadership, and workforce; 2) communication and language assistance; and 3) engagement, continuous improvement, and accountability. The second theme, Communication and Language Assistance, encompasses standards 5 - 8: offering language assistance to individuals who have limited English proficiency and/or other communication needs, at no cost to them, to facilitate timely access to all health care and services (standard 5); informing all individuals of the availability of language assistance services clearly and in their preferred language, verbally and in writing (standard 6); ensuring the competence of individuals providing language assistance, recognizing that the use of untrained individuals and/or minors as interpreters should be avoided (standard 7); and providing easy-to-understand print and multimedia materials and signage in the languages commonly used by the populations in the service area (standard 8).

The *National CLAS Standards* are available at ThinkCulturalHealth.hhs.gov/clas. CMS strongly encourages sponsors to review and adopt the *National CLAS Standards* and their implementation document, *The Blueprint to Advancing and Sustaining CLAS Policy and Practice*. To learn how to communicate in a way that considers the cultural, health literacy, and language needs of individuals, please visit OMH's free e-learning program, *The Guide to Providing Effective Communication and Language Assistance Services*. If you have any questions about the *National CLAS Standards*, please contact AdvancingCLAS@ThinkCulturalHealth.hhs.gov.

**Call Center Monitoring Reference Materials**

Technical Notes (including Frequently Asked Questions) and Data Dictionaries for each study are stored in HPMS via the Download drop down when you pull your plan results from the Performance Metrics page. Results can be found through the following path: HPMS homepage > Quality and Performance > Performance Metrics > Reports > Call Center Monitoring.

If you have any questions about the 2025 call center monitoring effort, please contact the Call Center Monitoring mailbox at CallCenterMonitoring@cms.hhs.gov. Do not use secure email when communicating with this resource. **CMS will not open a secure email message.** CMS monitors thousands of plans and cannot register for secure email with each entity. We never share personally identifiable information on this project. If you need to send something securely, send an email first so we can arrange a call to discuss a mutually agreeable password for the document you wish to send.

**Clover Health**

**Request for Recalculation of C32 Measure Score for Contract H5141**

---

**Executive Summary**

For 2024, Clover Health (contract H5141) respectfully requests removal of nine 2024 level 2 appeals that were incorrectly included in the calculations of Measure C32–Reviewing Appeals Decisions. Without these errors, Clover Health would have earned a compliance rate of 98% instead of 94% for this measure–thus materially impacting Clover Health's overall Star Rating. These appeals should be removed from C32 calculations for at least the following three reasons.

*First*, with respect to one appeal, the Independent Review Entity (IRE) made a clear-cut clerical reporting error (Case 1-14595402316, described below). Specifically, the IRE dismissed the case. But instead of reporting that case as dismissed, the IRE incorrectly reported it as "favorable" (*i.e.*, resolved in the patient's favor). This is a black-and-white reporting error.

*Second*, with respect to one appeal, the IRE ruled against Clover Health, claiming that Clover Health "had failed to supply *any* medical records at all with this appeal request" (Case 1-14385393292, described below). (Emphasis added). The IRE was flat-out wrong. Clover Health had provided the medical records for this case not once, but twice.

*Third,* with respect to six appeals, the IRE failed to remove six improperly submitted cases from review. (Cases 1-13664105851, 1-13814982651, 1-13976245156, 1-14005223730, 1-14173810816, and 1-14196773261, described below). The IRE's decision rests entirely on a misapplication of the 180-day timeliness standard set forth in 80.3.1 of CMS's Parts C & D Enrollee Grievances, Organization/Coverage Determinations, and Appeals Guidance. But that standard is inapplicable here—for not one, but two compelling and independently sufficient reasons.

(i) The record is unequivocal: Clover Health initiated the reopening of these cases. Clover Health identified that the original determinations were incorrect and took corrective action by covering the treatments or procedures at issue. CMS guidance at Section 80.3.1 could not be clearer: when a plan

initiates a reopening, it has up to one year to do so. Clover Health acted well within that one-year window. There is no dispute on this point. The IRE's reliance on a 180-day limit in this context is plainly wrong and directly contradicts CMS's own rules. This alone is sufficient grounds to overturn the IRE's decision.

(ii) Even if CMS were to question whether the reopenings were plan-initiated—an unlikely and unfounded position—the IRE's justification still does not hold. The 180-day limit applies only to the types of "reopenings" defined by CMS and described in Section 80.3 of the Parts C & D Enrollee Grievances, Organization/Coverage Determinations, and Appeals Guidance—*i.e.*, those involving the reconsideration of evidence, such as new or material information, or obvious factual errors.

That is not what happened here. Clover Health's request had nothing to do with new evidence or re-litigation of past decisions. Clover Health approved coverage. Labeling this plan-initiated action (for the benefit of the member) as a "reopening" subject to an IRE-initiated action, subject to a 180-day limit is a mischaracterization of CMS's policy and the facts.

1. **The IRE made a clear-cut reporting error–reporting the case as "favorable" after dismissing the case**

- **Measure:** C32 - Reviewing Appeals Decisions
- **Contract:** H5141
- **Data Discrepancy:** On April 17, 2025, the IRE notified the parties to the appeal that the IRE had identified this case as an invalid appeal. As a result of this finding, the IRE confirmed they had changed their decision and were dismissing the case; however, the IRE made an administrative error when documenting the decision in their records. While the IRE informed the parties that the case was dismissed, the data from the IRE incorrectly reported the decision as favorable. The text of the IRE decision has been provided below:

April 17, 2025

**The Reopening Number is:**
**1-14595402316R1**
**For Appeal Number**
**1-14595402316**

[redacted]

**We have reopened your case because the Plan thought we made a mistake when we made our first decision.** This letter is about our new decision in your appeal to CLOVER INSURANCE COMPANY (the Plan) for procedure code 64491 billed for May 15, 2024.

**Our decision**

We had previously decided that the Plan was right. **We have changed our decision. We are now dismissing your case.** After looking at all of the information in this case, we found that your complaint is not a valid appeal for medical coverage. The Plan sent this case to us in error.

We have jurisdiction to review only those cases where a plan has issued an organization reconsideration decision or dismissal, which at this time, the Plan has not yet issued. This means that we do not have jurisdiction to review your request at this time.

You may contact the Plan with any questions about requesting an organization reconsideration.

Please remember that you signed a Waiver of Liability in which you agreed not to bill the enrollee for these services. This Waiver does not, however, deny your right to seek further appeal from an Administrative Law Judge (ALJ).

cc: H5141: CLOVER INSURANCE COMPANY, c/o Marlene H.
New York CMS Regional Office

- **Case with this Data Discrepancy:**
  - 1-14595402316

As described above, the IRE made an administrative error when logging their April 17, 2025, dismissal decision and incorrectly logged the decision as favorable. This error resulted in the plan being incorrectly penalized on the C32 measure because the actual decision of the IRE was dismissal. This case should be removed from consideration in the measure C32 for this reason.

2. **The IRE repeatedly and erroneously claimed that Clover Health failed to provide "any medical records." Clover Health *had* provided medical records – at least twice.**

- **Measure:** C32 - Reviewing Appeals Decisions
- **Contract:** H5141
- **Data Discrepancy:** On August 12, 2024, the plan upheld the initial decision to deny the claim, and submitted this case to the IRE for a level 2 review. On October 4, 2024, the IRE notified the parties of their favorable decision, and that the decision was based on the plan supposedly "ha[ving] failed to supply *any medical records at all* with this appeal request" with the original submission to the IRE. (Emphasis added).

The plan then confirmed that its original submission on August 12, 2024, did in fact contain 4 separate medical record documents, the EOC, and the case narrative. The plan then submitted a reopening request to the IRE on November 14, 2024. The reopening request explained that the medical records had been submitted and that a second copy of those medical records in addition to all the other documents previously submitted were being resubmitted with the reopening request. The below medical records were submitted with both the original submission and the reopening request:

- File name: 2022 Medical Records.pdf
    - Records from St. Mary's General Hospital for the member's inpatient stay on 01/16/2022
- File name: Medical Records 1.pdf
    - Statements from St. Mary's General Hospital regarding the member's inpatient stay on 01/16/2022
- File name: Medical Records 2.pdf
    - Statements from St. Mary's General Hospital regarding the member's inpatient stay on 01/16/2022
    - Largely duplication of Medical Records 1.pdf
- File name: Medical Records 3.pdf

- Statements from St. Mary's General Hospital regarding the member's inpatient stay on 01/16/2022
- Largely duplication of Medical Records 1.pdf

On December 11, 2024, the IRE notified the parties of their decision to dismiss the reopening request. The IRE stated again that they failed to receive medical records, and the IRE used this as the basis for the dismissal decision. Given that the plan supplied the medical records and other documents as part of both the original submission and the reopening submission, this decision was erroneous.

- **Cases with this Data Discrepancy:**
  - 1-14385393292

As described above, the IRE's decisions were based on its incorrect finding that the plan supposedly "had failed to supply *any* medical records at all with this appeal request." (Emphasis added). That was clearly not the case. This error results in the plan being incorrectly penalized on the C32 measure because neither the original submission nor the reopening submission received the appropriate review on the merits. This case should be removed from consideration for measure C32 based on this error.

**3. The IRE incorrectly applied the 180-day deadline for requests for "reopenings" to Clover Health's requests to remove erroneously submitted cases.**

- **Measure:** C32 - Reviewing Appeals Decisions
- **Contract:** H5141
- **Data Discrepancy:** The IRE's rejection of Clover Health's removal request was based solely on the claim that the request was submitted outside the 180-day time frame, outlined in Section 80.3.1 of CMS's Parts C & D Enrollee Grievances, Organization/Coverage Determinations, and Appeals Guidance. But the IRE's rationale failsthe 180-day time limit does not apply to these cases for multipleat least two independent and alternative reasons.

*First*, even assuming a 180-day time frame applies, the plan satisfied this reopening period. For each of the six cases at issue, the evidence is unambiguous that Clover Health initiated a

reopening and revised the initial determination (i.e., the underlying claim denial) in well under 180 days. We summarize the initial determinations and Clover Health reopenings as follows:

- **1-13664105851** - Initial Determination denial on January 18, 2024 (Attachment O); reopening by Clover to approve coverage on January 22, 2024 (Attachment A; *see also* Attachment T).
- **1-13814982651** - Initial determination denial on February 21, 2024 (Attachment P); reopening by Clover to approve coverage on March 25, 2024 (Attachment D; *see also* Attachment U).
- **1-13976245156** - Initial determination denial on April 18, 2024 (Attachment Q); reopening by Clover to approve coverage on April 22, 2024 (Attachment E; *see also* Attachment V).
- **1-14005223730** - Initial determination denial on April 29, 2024 (Attachment R); reopening by Clover to approve coverage on May 1, 2024 (Attachment F; *see also* Attachment W).
- **1-14173810816** - Initial determination denial on June 5, 2024 (Attachment S); reopening by Clover to approve coverage on August 13, 2024 (Attachment J; *see also* Attachment X).
- **1-14196773261** - Initial determination denial on June 16, 2024 (Attachment N); reopening by Clover to approve coverage on July 7, 2024 (Attachment L; *see also* Attachment Y).

Thus, the IRE's argument fails on its face as unsupported by CMS rules and the available evidence. As a plan, Clover Health has a right to reopen initial determinations. *See generally* Parts C & D Enrollee Grievances, Organization/Coverage Determinations, and Appeals Guidance § 80.1 (plans may revise initial determinations via re-openings, and CMS looks to the fee-for-service reopening regulations in 42 C.F.R. pt. 405 to supply additional standards); 42 C.F.R. §§ 405.980 (reopenings include changing binding "initial determinations"), 405.924 ("initial determinations" include coverage decisions). Here, Clover Health exercised that right and indisputably reopened and revised the initial determinations within weeks (or sometimes days) of each initial determination. In each case, the reopening was well within 180 days, and the IRE's finding to the contrary is arbitrary and capricious.

Formatted: Font: Bold
Formatted: Font: Italic
Formatted: Font: 11 pt
Formatted: Font: 11 pt
Formatted: Font: Bold
Formatted: Font: Italic
Formatted: Font: 11 pt
Formatted: Font: 11 pt
Formatted: Font: Bold
Formatted: Font: Italic
Formatted: Font: 11 pt
Formatted: Font: 11 pt
Formatted: Font: Bold
Formatted: Font: Italic
Formatted: Font: 11 pt
Formatted: Font: 11 pt
Formatted: Font: Bold
Formatted: Font: Bold
Formatted: Font: Italic
Formatted: Font: 11 pt
Formatted: Font: 11 pt
Formatted: Font: Bold
Formatted: Font: Italic
Formatted: Font: 11 pt
Formatted: Font: 11 pt
Formatted: Font: Italic

*Second*, the IRE has also applied the wrong time-frame in determining if reopening was timely. It appears the IRE has applied a 180-day timeframe and then counted from the date of the underlying claim denial *to the date that Clover Health contacted the IRE to notify it that Clover Health had re-approved the claim on reopening*–rather than the date when Clover Health actually reopened the underlying claim by re-approving coverage. But even assuming the IRE's end date is appropriate (which it is not), the IRE still applied the wrong time-frame: As noted, the reopening ~~request~~ was *plan-initiated*, and a 365-day time frame therefore applies.

**Formatted:** Font: Italic

**Formatted:** Font: Italic

**Formatted:** Font: Italic

As evidenced in the documentation submitted to the IRE, and in alignment with the CMS Guidelines for reopening in Section 80.1 ("A plan to revise the initial determination or level 1 appeal decision"), Clover Health proactively reviewed the cases, determined that they were handled incorrectly, and subsequently approved coverage for the treatment or procedure in question. Thus, any reopening was necessarily "plan-initiated," and, under CMS guidance at Section 80.3.1, plan-initiated reopenings must be requested "within one year" of the initial determination—not within 180 days. Clover complied within this one year (365 day) time frame, and the IRE misapplied CMS criteria in finding the time period for any reconsideration to have passed.

*Third*~~*Second*~~, and alternatively, if CMS does not consider the cases to have been resolved through a plan-initiated reopening, a 180-day limitation still would not apply. This is because the adjustment still would not meet CMS's definition of a "reopening" subject to a 180-day time limit.

**Formatted:** Font: Italic

As described in CMS's guidance (at 107), the 180-day limit is applicable only to "reopenings" that involve substantive review of new or material evidence or correction of an obvious error. The cited examples include requests for the IRE to reconsider evidence or correct a prior determination based on that evidence.

Clover Health's request did not involve any such evidentiary reconsideration. Instead, it was a corrective action by the plan to retroactively approve coverage for cases that were erroneously

sent to the IRE. This distinction is critical: because if these actions did not constitute "reopenings" under CMS's definition, the 180-day limit does not apply.

Because the only basis for the IRE's rejection was a 180-day limitation–and because that limitation was not violated or does not apply for multipleat least two independent and alternative reasons–Clover Health respectfully requests that CMS direct the removal of these cases from the C32 calculation. *See generally Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 US 29, 43 (1983) (decisions must be upheld on the basis relied upon by the agency).

Reopening Guidance: Section 80 of the Parts C & D Enrollee Grievances, Organization/Coverage Determinations, and Appeals Guidance

- **Cases with this Data Discrepancy:**
  - 1-13664105851
    - *See* Attachment O 1-13664105851 at PDF page 3 (showing initial determination date of January 18, 2024).
    - *See* Attachment A 1-13664105851 at PDF page 1 (on January 22, 2024, approving coverage); *see also* Attachment T at PDF page 1 (on January 24, 2024 approving coverage).
    - *See* Attachment B Request to Reopen and Remove Case Submitted in Error (explaining to IRE, "This case should have followed a different process).
    - *See* Attachment C 1-13664105851 March 20, 2025 Receipt for Removal Request (IRE acknowledging receipt of Request to Reopen and Remove Case Submitted in Error).
  - 1-13814982651
    - *See* Attachment P 1-13814982651 at PDF page 3 (showing initial determination date of February 21, 2024).
    - *See* Attachment D 1-13814982651 at PDF page 1 (on March 25, 2024 approving coverage); *see also* Attachment U at PDF page 1 (on March 25, 2024 approving coverage).

- *See* Attachment B Request to ~~Reopen and~~ Remove Case Submitted in Error (explaining to IRE, "This case should have followed a different process).
- *See* Attachment E 1-13814982651 March 20, 2025 Receipt for Removal Request (IRE acknowledging receipt of Request to ~~Reopen and~~ Remove Case Submitted in Error).

- 1-13976245156
  - *See* Attachment Q 1-13976245156 at PDF page 3 (showing initial determination date of April 18, 2024).
  - *See* Attachment F 1-13976245156 (on April 22, 2024 approving coverage); *see also* Attachment V at PDF page 1 (on April 22, 2024 approving coverage).
  - *See* Attachment B Request to ~~Reopen and~~ Remove Case Submitted in Error (explaining to IRE, "This case should have followed a different process).
  - *See* Attachment G 1-13976245156 November 14, 2024 Receipt for Removal Request (IRE acknowledging receipt of Request to ~~Reopen and~~ Remove Case Submitted in Error).
- 1-14005223730
  - *See* Attachment R 1-14005223730 at PDF page 3 (showing initial determination date of April 29, 2024).
  - *See* Attachment H 1-14005223730 (on May 1, 2024 approving coverage); *see also* Attachment W at PDF page 1 (on May 1, 2024 approving coverage).
  - *See* Attachment B Request to ~~Reopen and~~ Remove Case Submitted in Error (explaining to IRE, "This case should have followed a different process).
  - *See* Attachment I 1-14005223730 March 20, 2025 Receipt for Removal Request (IRE acknowledging receipt of Request to ~~Reopen and~~ Remove Case Submitted in Error).
- 1-14173810816
  - *See* Attachment S 1-14173810816 at PDF page 3 (showing initial determination date of June 5, 2024).
  - *See* Attachment J 1-14173810816 (on August 13, 2024 approving coverage); *see also* Attachment X at PDF page 1 (on August 13, 2024 approving coverage).
  - *See* Attachment B Request to ~~Reopen and~~ Remove Case Submitted in Error (explaining to IRE, "This case should have followed a different process).

- *See* Attachment K 1-14173810816 March 20, 2025 Receipt for Removal Request (IRE acknowledging receipt of Request to ~~Reopen and~~ Remove Case Submitted in Error).

- 1-14196773261
  - *See* Attachment N 1-14196773261 at PDF pages 3 (showing initial determination date of June 16, 2024).
  - *See* Attachment L 1-14196773261 (at PDF page 2 on July 7, 2024 approving coverage); *see also* Attachment Y at PDF page 1 (on July 7, 2024 approving coverage).
  - *See* Attachment B Request to ~~Reopen and~~ Remove Case Submitted in Error (explaining to IRE, "This case should have followed a different process).
  - *See* Attachment M 1-14196773261 March 20, 2025 Receipt for Removal Request (IRE acknowledging receipt of Request to ~~Reopen and~~ Remove Case Submitted in Error).

**Commented [1]:** "Date of plan's reconsideration denial"

# Files Excluded Because They Contain Protected Health Information

## Attachment A – Attachment Y

**Clover Health**

**Request for Recalculation of C31 Measure Score for Contract H5141 - IRE Errors**

---

**Executive Summary**

Clover Health (Contract H5141) respectfully requests that CMS review and recalculate its C31 measure score—Plan Makes Timely Decisions about Appeals—due to errors in the classification of five Level 2 appeals. These errors have resulted in Clover Health receiving a compliance rate of 97% instead of 99% for C31, thereby materially impacting Clover Health's overall Star Rating.

Specifically, CMS has incorrectly categorized these five cases as untimely submissions to the Independent Review Entity (IRE). In three cases, the IRE used an incorrect date for the appeal, and in another case, the IRE counted a duplicate submission as a separate appeal. In a fifth case, a reconsideration appeal was submitted within the relevant timeframe.

We request that CMS correct the handling of these cases by either excluding them from the untimely count or eliminating any duplicative entries, and subsequently update Clover Health's C31 measure score to reflect the correction.

In each of these five instances, Clover Health's actions have been mischaracterized, resulting in an inaccurate representation of our timeliness. This misclassification contradicts the underlying appeals data and/or CMS's own guidance, and unfairly reduces our Star Rating score for this measure.

We appreciate your attention to this matter and look forward to your timely review and resolution.

**Discussion**

The 5 appeals fall into the following three scenarios:

- Cases 1-13931154263, 1-14156837886, and 1-14575068066: the date used by the IRE to calculate the reconsideration receipt date is inaccurate.

- Case 1-14506371416: the IRE counted a duplicate submission as a separate Level 2 appeal.
- Case 1-13926566786: the IRE applied an incorrect IRE Appeal Priority.

Below, Clover Health explains why CMS's actions under each of these scenarios must be corrected to appropriately calculate our C31 measure score.

**1. The date used by the IRE to calculate the reconsideration receipt date is inaccurate**

- **Measure:** C31: Plan Makes Timely Decisions about Appeals
- **Contract:** H5141
- **Data Discrepancy:** The date used by the IRE to calculate the reconsideration receipt date is inaccurate for three cases. The measure is intended to report timeliness of plan appeal decisions; however, by using the incorrect start date for the timeliness calculations the plan is penalized inappropriately. In each of these cases (as shown below), Clover Health submitted the corrected/valid Waiver of Liability (WOL) to the IRE. Nevertheless, the IRE used the invalid WOL, with the incorrect date.
- **Cases with this Data Discrepancy and Evidence of Data Discrepancy**
  - **1-13931154263** - The IRE incorrectly used the date 02/01/2024, as the day the plan received the provider's first attempt to submit a WOL; however, the first WOL received was invalid due to containing an erroneous signature date. *See* Attachment A, 1-13931154263 First WOL Attempt (at PDF page 6 showing an incorrect signature date of 02/01/*2023* (Emphasis added to show that the *correct* date should have been 02/01/2024)).

    After the plan confirmed with the provider via phone call on 03/28/2024 that the signature date was a provider office error, the plan requested and received a corrected/valid WOL later that same day, 03/28/2024. *See* Attachment B, 1-13931154263 corrected-valid WOL (at PDF page 5 showing a corrected signature date of 02/01/2024). Maximus, CMS' contractor, received notice "03/28/2024 - WOL Received." *See* Attachment C, 1-13931154263 Case Narrative. This is the date the IRE should have used for the calculation of plan submission timeliness per section 50.1.1, paragraph 3 of the Parts C & D Enrollee Grievances, Organization/Coverage

Determinations, and Appeals Guidance ("The plan is not required to undertake a review of the appeal until or unless the [WOL] form is obtained"). Using the correct date of 03/28/2024 with the date the plan submitted the appeal to the IRE, 04/08/2024, shows the plan submission was timely within the 60 day timeframe.

- **1-14156837886** - The IRE incorrectly used the date 02/01/2024, as the date the plan received the provider's first attempt to submit a WOL; however, the first WOL received was invalid due to containing an erroneous signature date. *See* Attachment D 1-14156837886 first WOL attempt (at PDF page 5). After the plan confirmed with the provider via phone call on 04/01/2024 that the signature date was a provider office error, the plan requested and received a corrected/valid WOL later that same day, 04/01/2024. *See* Attachment E 1-14156837886 corrected-valid WOL (At PDF page 1). Maximus, CMS's contractor, received notification, "04/01/2024 - Valid WOL received at 04:08:00 PM." *See* Attachment F 1-14156837886 Case Narrative (at PDF page 1). This is the date the IRE should use for the calculation of plan submission timeliness per section 50.1.1, paragraph 3 of the Parts C & D Enrollee Grievances, Organization/Coverage Determinations, and Appeals Guidance ("The plan is not required to undertake a review of the appeal until or unless the [WOL] form is obtained"). Using the correct date of 04/01/2024 with the date the plan submitted the appeal to the IRE, 05/31/2024, shows the plan submission was timely within the 60-day timeframe.
- **1-14575068066** - The IRE incorrectly used the date 08/01/2024, as the day the plan received the provider's first attempt to submit an appeal request; however, this first request lacked a WOL. *See* Attachment G 1-14575068066 first request lacking WOL (lacking a WOL). Upon receipt of the provider's incomplete appeal request the plan successfully made outreach to the provider and was able to obtain a valid WOL on 08/22/2024. *See* Attachment H 1-14575068066 valid WOL provided (at PDF page 3). Maximus, CMS's contractor, received notification, "08/22/2024 - Waiver of Liability Form received from provider Doam Kim." *See* Attachment I 1-14575068066 Case Narrative (at PDF page 1). This is the date the IRE should use for the calculation of plan submission timeliness per section 50.1.1, paragraph 3 of the Parts C & D Enrollee Grievances, Organization/Coverage Determinations, and Appeals Guidance ("The plan is not required to undertake a review of the appeal until or unless the

[WOL] form is obtained"). Using the correct date of 08/22/2024 with the date the plan submitted the appeal to the IRE, 10/07/2024, shows the plan submission was submitted timely within the 60 day timeframe.

Classifying these Level 2 appeals as untimely submissions is inconsistent with CMS guidance, mischaracterizes the number of untimely Level 2 submissions made by the plan, and penalizes the plan based on inaccurate information. These data for these cases should be updated to correctly reflect the timely submission of these cases.

**2. The IRE counting a duplicate submission as a separate Level 2 appeal**

- **Measure:** C31: Plan Makes Timely Decisions about Appeals
- **Contract:** H5141
- **Data Discrepancy:** On August 16, 2024, Clover Health received an expedited pre-service appeal. The plan upheld the original denial and submitted the appeal to the Independent Review Entity (IRE) for Level 2 review in a timely manner on August 18, 2024. The IRE assigned case ID **1-14405396635** and issued an unfavorable decision on August 21, 2024.

  On September 17, 2024, a clerical error by a plan processor resulted in the same case being inadvertently reforwarded to the IRE. This duplicate submission—assigned IRE case ID **1-14506371416**—was incorrectly treated as a separate, untimely appeal. However, the case had already been properly submitted, adjudicated, and closed. The duplicate submission served no functional purpose in the appeals process, and it should have been dismissed by the IRE.

  We acknowledge the error and have taken swift corrective action. Specifically, the plan has strengthened its internal Quality Assurance process to include an additional review of all appeal submissions prior to forwarding to the IRE. This enhancement ensures that duplicate or erroneous submissions are caught before transmission, preventing recurrence of this issue.

  Given the facts of the case and the prompt corrective measures implemented, we respectfully urge CMS to exclude this duplicate submission from the C31 measure calculations. Counting this case as a valid Level 2 appeal—especially one marked as untimely—artificially and unfairly distorts the plan's performance, and penalizes us for a one-time clerical oversight that has since been resolved. Including this error contradicts the intent of the C31 measure, which is

to assess a plan's true responsiveness to member appeals. This case should be removed from consideration in the C31 Star rating calculation.

- **Case with this Data Discrepancy:**
  - **1-14506371416**

### 3. The IRE claim reconsideration appeal (retrospective) submission timeframe was met

- **Measure:** C31: Plan Makes Timely Decisions about Appeals
- **Contract:** H5141
- **Data Discrepancy:**

On February 26, 2024, Clover Health received an appeal of a claim denial from a non-contracted provider. After conducting a thorough review, the plan upheld the original denial and, on April 5, 2024, appropriately submitted the case to the Independent Review Entity (IRE) for Level 2 appeal.

This appeal pertains to a retrospective claim reconsideration, for which CMS clearly establishes a 60-day timeframe for submission to the IRE, as outlined in Section 50.7.1 of the *Parts C & D Enrollee Grievances, Organization/Coverage Determinations, and Appeals Guidance.* Clover Health submitted the case on Day 59—clearly within the allowable timeframe.

While a vendor error led to the incorrect designation of the IRE Appeal Priority, this clerical misstep does not alter the fundamental nature of the case. It remains a retrospective review, and the applicable standard is the 60-day submission window. Therefore, the plan's actions were fully compliant with CMS guidance, and the case should be evaluated according to the correct timeliness metric.

Clover Health respectfully requests that CMS acknowledge the timely submission under the appropriate regulatory framework and disregard the inadvertent priority classification error made during transmission.

- **Cases with this Data Discrepancy:**
  - 1-13926566786

Classifying this Level 2 appeal as an untimely submission mischaracterizes the number of untimely Level 2 submissions made by the plan. Using this case in the C31 measure calculations is inaccurate. This case priority should be updated to retrospective and the Plan Timely data column updated to Yes for an accurate result.

# Files Excluded Because They Contain Protected Health Information

## Attachment A – Attachment I

| | |
|---|---|
| **From:** | CMS PartC&DStarRatings |
| **To:** | Cheree Pasalakis |
| **Cc:** | Cameron Pringle; Robert Davis; Will Chang; Duran, Vanessa (CMS/CM); Goldstein, Elizabeth (CMS/CM); Shelly Gupta; CMS PartC&DStarRatings |
| **Subject:** | RE: Patient Safety Measures- D10, D08, and D09 |
| **Date:** | Tuesday, August 5, 2025 11:23:12 AM |
| **Attachments:** | CMS Response to Clover.pdf |

Hello,

Please review the attached response from CMS Part C & D Star Ratings.

Thank you
Part C & D Star Ratings

**From:** Cheree Pasalakis <cheree.pasalakis@cloverhealth.com>
**Sent:** Friday, June 13, 2025 9:37 AM
**To:** CMS PartC&DStarRatings <PartCandDStarRatings@cms.hhs.gov>; PatientSafety <PatientSafety@acumenllc.com>
**Cc:** Cameron Pringle <cameron.pringle@cloverhealth.com>; Robert Davis <robert.davis@cloverhealth.com>; Will Chang <william.chang@cloverhealth.com>; Duran, Vanessa (CMS/CM) <Vanessa.Duran@cms.hhs.gov>; Goldstein, Elizabeth (CMS/CM) <Elizabeth.Goldstein@cms.hhs.gov>; Shelly Gupta <shelly.gupta@cloverhealth.com>
**Subject:** Patient Safety Measures- D10, D08, and D09

This message was sent securely using Zix®

Good morning,

We are requesting your review of the below and attached information. Thank you.

- **Contract Number**: H5141
- **Patient Safety Report:** May Patient Safety Report
- **Year of Service:** 2024
- **Patient Safety Measure:** D10 - Medication **Adherence** for Cholesterol (**Statins**), D08 **-** Medication Adherence for diabetes medications, D09 Medication Adherence for Hypertension (RAS antagonists)
- **Description of the Inquiry**:

On behalf of Clover Health, we respectfully reiterate our ongoing challenge to CMS's decision to include certain members in the latest 2024 patient safety report (published on April 1st)--within Measure D10, Medication Adherence for Cholesterol (Statins). In addition, we respectfully challenge CMS's decision to include certain members within Measure D08, Medication Adherence for Diabetes Medication and Measure D09, Medication Adherence for Hypertension (RAS antagonists).

As explained in Clover Health's April 30, 2025 letter, it is inappropriate for Measure D10 to penalize plans with members who have discontinued statins for medically

appropriate reasons. It is also inappropriate for Measures D08 and D09 to penalize plans with members who have discontinued diabetes medications or RAS antagonists for medically appropriate reasons. The doctors of these members or CMS's own guidance has determined that continuing statins, diabetes medications, or RAS antagonists would have been medically unnecessary and perhaps harmful for the members–not to mention unduly costly. Given the voluminous statutes, CMS regulations, and guidance on medical necessity, patient harm, and undue cost, Star Ratings measures cannot–and should not–require medically unnecessary and inappropriate treatments in order to achieve compliance under those measures.

In your April 30, 2025 response, CMS did not address–let alone dispute–the substantive merits of our challenge. Instead, CMS simply says "that the current methodology does not account for medication discontinuations" and "all Patient Safety measures are adapted from measures developed and endorsed by the Pharmacy Quality Alliance." CMS then directs us to the Pharmacy Quality Alliance (PQA) to address our challenges.

Respectfully, CMS's reliance on the measures is arbitrary, capricious, and otherwise not in accordance with law. And while CMS may consult and adopt measures developed by PQA, under the Medicare Act and the Administrative Procedure Act, CMS must ensure that any adopted measure design is methodologically sound and non-arbitrary. In short, CMS is legally responsible for Measures D08, D09, and D10 (and other Star Ratings measures). CMS cannot avoid that responsibility by pointing us to PQA.

Under CMS's Medicare 2025 Part C & D Star Ratings Technical Notes, federal law, and other applicable authorities, CMS must exclude the members identified in our prior letter as well as the additional members identified in this letter for at least four independent reasons.

This message was secured by **Zix**®.

| | |
|---|---|
| **From:** | CMS PartC&DStarRatings |
| **To:** | Cheree Pasalakis |
| **Cc:** | Jaye Johnston; Will Chang; Wendy Richey; Jamie Reynoso; Kim Williams; CMS PartC&DStarRatings; CMS PartC&DStarRatings |
| **Bcc:** | Hawkins, Kaitlin (CMS/CM); Cho, Taemi (CMS/CM); Lee-Martin, Alice (CMS/CM); Bhandari, Rajesh (CMS/CM); Al-Showk, Shafa (CMS/CM) |
| **Subject:** | RE: Secure - Plan Preview #1 - Appeal Documentation for H5141 and H8010 |
| **Date:** | Thursday, August 14, 2025 8:23:00 AM |
| **Attachments:** | RE Patient Safety Measures- D10 D08 and D09.msg |

Good morning Cheree,

Thank you for your inquiry. Please refer to the attached prior response dated 8/5/2025 addressing Clover's concerns regarding the Part D Star Rating Medication Adherence measures methodology. CMS will not be making changes to Clover's Medication Adherence measure results.

In addition, please refer to prior Plan Request responses regarding complaints data. CMS will not be making changes to the complaint measure rates.

Thank you.
Part C and D Star Ratings Team

**From:** Cheree Pasalakis <cheree.pasalakis@cloverhealth.com>
**Sent:** Tuesday, August 12, 2025 7:15 PM
**To:** CMS PartC&DStarRatings <PartCandDStarRatings@cms.hhs.gov>; CMS CallCenterMonitoring <CallCenterMonitoring@cms.hhs.gov>
**Cc:** Jaye Johnston <jaye.johnston@cloverhealth.com>; Will Chang <william.chang@cloverhealth.com>; Wendy Richey <wendy.richey@cloverhealth.com>; Jamie Reynoso <jamie.reynoso@cloverhealth.com>; Kim Williams <kim.williams@cloverhealth.com>
**Subject:** Secure - Plan Preview #1 - Appeal Documentation for H5141 and H8010

This message was sent securely using Zix®

Good afternoon,
Attached is our appeal documentation for plan preview #1. Thank you in advance for your review and consideration.

Cheree Pasalakis
Manager, Compliance
615.426.5531

CONFIDENTIALITY NOTICE: This e-mail message and all attachments accompanying it may contain confidential information intended solely for the use of the addressee. If the reader of this message is not the intended recipient or has received this in error, be notified that any reading, dissemination, distribution,

copying or other use of this message or its attachments, as well as the asking of any action in reliance on the contents of this information, is strictly prohibited. Any unauthorized interception of this transmission is illegal under the law. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY ME IMMEDIATELY BY A REPLY E-MAIL OR PHONE AND PERMANENTLY DELETE THE ORIGINAL E-MAIL AND ANY ATTACHMENTS FROM ALL STORAGE DEVICES WITHOUT RETAINING A COPY. THANK YOU.

This message was secured by **Zix**®.

**From:** Cheree Pasalakis
**To:** CMS PartC&DStarRatings
**Cc:** CMS CallCenterMonitoring; Will Chang; Maggie Meixell
**Subject:** Re: Secure - Plan Preview #1 - Appeal Documentation for H5141 and H8010
**Date:** Friday, August 15, 2025 3:36:12 PM
**Attachments:** image001.png

This message was sent securely using Zix®

Thank you! The new files have been uploaded.

On Fri, Aug 15, 2025 at 2:03 PM CMS PartC&DStarRatings <PartCandDStarRatings@cms.hhs.gov> wrote:

> Hello,
>
> Both files have been deleted. Please confirm once you've uploaded replacement documents.
>
> Sincerely,
>
> **Part C & D Star Ratings Team**
>
> Medicare Drug Benefit and C&D Data Group (MDBG)
>
> PartCandDStarRatings@cms.hhs.gov
>
> CMS
> CENTERS FOR MEDICARE & MEDICAID SERVICES
>
> ***Confidentiality and Restricted Disclosure Notice:*** This e-mail is intended only for the use of the named addressee(s) and may contain information that is confidential, privileged or regulated under federal and/or state law, including The Privacy Act and HIPAA. If you are not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this e-mail is strictly prohibited. If you have received this e-mail in error, please notify the sender immediately by replying to the e-mail and destroy all copies of the original message. If you are the intended recipient, you are notified that you have the obligation to ensure that any

further dissemination, distribution or copying is consistent with applicable law.

---

**From:** Cheree Pasalakis <cheree.pasalakis@cloverhealth.com>
**Sent:** Friday, August 15, 2025 2:57 PM
**To:** CMS PartC&DStarRatings <PartCandDStarRatings@cms.hhs.gov>; CMS CallCenterMonitoring <CallCenterMonitoring@cms.hhs.gov>
**Cc:** Will Chang <william.chang@cloverhealth.com>; Maggie Meixell <maggie.meixell@cloverhealth.com>
**Subject:** Re: Secure - Plan Preview #1 - Appeal Documentation for H5141 and H8010

This message was sent securely using Zix®

Good afternoon,

It is come to our attention that the following two documents submitted with our Plan Preview #1 appeal:

- The 2025 08 09 Drug Adherence Measures - Privileged and Confidential and
- SUBMISSION ERRORS_A&G Decisions - 2026 Plan Preview Appeals

Inadvertently included material that is privileged under the attorney-client privilege and attorney-work product doctrine. Would it be possible for us to upload replacement documents that remove the privileged content via the secure portal. We respectfully ask you to confirm deletion of the other documents.

Thank you!

On Wed, Aug 13, 2025 at 4:30 PM CMS PartC&DStarRatings <PartCandDStarRatings@cms.hhs.gov> wrote:

> Thank you!
>
> ---
>
> **From:** Cheree Pasalakis <cheree.pasalakis@cloverhealth.com>
> **Sent:** Wednesday, August 13, 2025 5:28 PM
> **To:** CMS PartC&DStarRatings <PartCandDStarRatings@cms.hhs.gov>
> **Cc:** Wendy Richey <wendy.richey@cloverhealth.com>; CMS CallCenterMonitoring <CallCenterMonitoring@cms.hhs.gov>; Jaye Johnston <jaye.johnston@cloverhealth.com>; Jamie Reynoso <jamie.reynoso@cloverhealth.com>; Kim Williams <kim.williams@cloverhealth.com>; Will Chang <william.chang@cloverhealth.com>
> **Subject:** Re: Secure - Plan Preview #1 - Appeal Documentation for H5141 and H8010

This message was sent securely using Zix®

Thank you! I received the invitation to the Box and I have shared our files.

On Wed, Aug 13, 2025 at 4:14 PM CMS PartC&DStarRatings <PartCandDStarRatings@cms.hhs.gov> wrote:

Hello,

Please share these files via a box folder. You should be receiving an invitation link shortly. Kindly confirm once you've successfully uploaded the files in that folder.

Sincerely,

**Part C & D Star Ratings Team**

Medicare Drug Benefit and C&D Data Group (MDBG)

PartCandDStarRatings@cms.hhs.gov

CMS
CENTERS FOR MEDICARE & MEDICAID SERVICES

***Confidentiality and Restricted Disclosure Notice*:** This e-mail is intended only for the use of the named addressee(s) and may contain information that is confidential, privileged or regulated under federal and/or state law, including The Privacy Act and HIPAA. If you are not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this e-mail is strictly prohibited. If you have received this e-mail in error, please notify the sender immediately by replying to the e-mail and destroy all copies of the original message. If you are the intended recipient, you are notified that you have the obligation to ensure that any further dissemination, distribution or copying is consistent with applicable law.

**From:** Wendy Richey <wendy.richey@cloverhealth.com>
**Sent:** Wednesday, August 13, 2025 5:08 PM
**To:** Cheree Pasalakis <cheree.pasalakis@cloverhealth.com>
**Cc:** CMS PartC&DStarRatings <PartCandDStarRatings@cms.hhs.gov>; CMS CallCenterMonitoring <CallCenterMonitoring@cms.hhs.gov>; Jaye Johnston <jaye.johnston@cloverhealth.com>; Jamie Reynoso <jamie.reynoso@cloverhealth.com>; Kim Williams <kim.williams@cloverhealth.com>; Will Chang <william.chang@cloverhealth.com>
**Subject:** Re: Secure - Plan Preview #1 - Appeal Documentation for H5141 and H8010

This message was sent securely using Zix®

Please also be advised. We submitted through secure platform but if you have another means please advise.

On Wed, Aug 13, 2025 at 4:06 PM Cheree Pasalakis <cheree.pasalakis@cloverhealth.com> wrote:

> Thank you. In our original email, sent last night, our zip file also included appeal documentation for the following:
>
> - 2025 Measures D08, D09 Drug Adherence Appeals
> - TTY Admin Plan Preview Appeals
> - CTM Plan Preview Appeals
>
> All of which include PHI; we are requesting a secure means for transferring this information to you. Please advise how we can submit.
>
> Thank you!
>
> On Wed, Aug 13, 2025 at 2:29 PM CMS PartC&DStarRatings <PartCandDStarRatings@cms.hhs.gov> wrote:
>
>> We noticed in your attachments that you provided enrollee names. As is stated in our Plan Preview memo, no PHI should be sent through email. Please delete these files from your system. If you need to provide PHI, as stated you need to request a secure means for transferring the information.
>>
>> Below we provide feedback about each of the case numbers in your email regarding the Part C appeals measures.

Case 1-13931154263- When your plan submitted the case file to Maximus, there was not sufficient information about the WOL date issue. Thank you for providing additional information and Maximus will change the appeal request date to 3/28/24. In the future, please try to make these requests earlier if your plan incorrectly entered the appeal receipt date.

Case 1-14156837886- No changes will be made. There is no evidence of an issue with the signature date in the case file sent to Maximus. The WOL has a date stamp of when the plan received this via fax that explicitly states 2/1/24 at 16:20:11. This was a valid WOL as per the documentation sent to Maximus so we see no issues to correct.

1-14575068066- It looks like your plan entered the wrong date when the case was submitted to Maximus. We are having Maximus update the date to 8/22/2024.

1-14506371416- This case was submitted nearly a month after the first one that you claim is a duplicate. This is an expedited appeal, and it is very common for a patient to request multiple appeals for the same item/service if their clinical circumstances change. It also does not look like you requested a reopening of this case. No changes are being made to this case.

1-14506371416- Your plan submitted this case as an expedited appeal and no changes can be made to change the appeal priority. For this appeal your plan notes that this is an expedited request in multiple places in the file submitted to maximus.

1-14595402316- Reopening decisions do not impact the timeliness measure. Reopenings are not related to the timeliness calculations. Reopenings only affect Reviewing Appeals Decisions measure, not the Plan Makes Timely Decisions measure.

1-14385393292- Maximus does not have medical records related to this case so no updates can be made.

For all of the cases related to re-openings, Clover did not request a reopening

within 180 days of the Maximus decision. It appears that Clover is saying on their own initiative that they reopened the cases while the appeals were being processed. Clover is not able to reopen a decision after they receive an appeal request. Please see the below citation.

**42 CFR § 405.980(a)(4)** – When a party has filed a valid request for an appeal of an initial determination, redetermination, reconsideration, ALJ or attorney adjudicator decision, or Council review, no adjudicator has jurisdiction to reopen an issue on a claim that is under appeal until all appeal rights for that issue are exhausted. Once the appeal rights for the issue have been exhausted, the contractor, QIC, ALJ or attorney adjudicator, or Council may reopen as set forth in this section.

We also checked the dates related to the below cases and corrections are in red.

- **1-13664105851** - Initial Determination denial on January 18, 2024 (Attachment O); reopening by Clover to approve coverage on January 22, 2024 (Attachment A; *see also* Attachment T).
  - Initial denial on December 26, 2023; Plan received appeal request on January 17, 2024; plan forwarded to Maximus on January 19, 2024
- **1-13814982651** - Initial determination denial on February 21, 2024 (Attachment P); reopening by Clover to approve coverage on March 25, 2024 (Attachment D; *see also* Attachment U).
  - Initial determination denied on January 25, 2024; plan received appeal request on February 14, 2024; plan forwarded to Maximus on March 4, 2024
- **1-13976245156** - Initial determination denial on April 18, 2024 (Attachment Q); reopening by Clover to approve coverage on April 22, 2024 (Attachment F; *see also* Attachment V).
  - Initial determination denied on April 12, 2024; plan received appeal request on April 17, 2024; plan forwarded to Maximus on April 19, 2024
- **1-14005223730** - Initial determination denial on April 29, 2024 (Attachment R); reopening by Clover to approve coverage on May 1, 2024 (Attachment F; *see also* Attachment W).
  - Initial determination denied on April 26, 2024; plan received appeal request on April 26, 2024; plan forwarded to Maximus on April 29, 2024
- **1-14173810816** - Initial determination denial on June 5, 2024 (Attachment S); reopening by Clover to approve coverage on August 13, 2024 (Attachment J; *see also* Attachment X).

        - Initial determination denied on February 16, 2024; plan received appeal request on April 13, 2024; plan forwarded to Maximus on June 09, 2024

    - **1-14196773261** - Initial determination denial on June 16, 2024 (Attachment N); reopening by Clover to approve coverage on July 7, 2024 (Attachment L; *see also* Attachment Y).

        - Initial determination denied on June 4, 2024; plan received appeal request on June 13, 2024; plan forwarded to Maximus on June 16, 2024

Part C and D Star Ratings Team

---

**From:** Cheree Pasalakis <cheree.pasalakis@cloverhealth.com>
**Sent:** Tuesday, August 12, 2025 7:15 PM
**To:** CMS PartC&DStarRatings <PartCandDStarRatings@cms.hhs.gov>; CMS CallCenterMonitoring <CallCenterMonitoring@cms.hhs.gov>
**Cc:** Jaye Johnston <jaye.johnston@cloverhealth.com>; Will Chang <william.chang@cloverhealth.com>; Wendy Richey <wendy.richey@cloverhealth.com>; Jamie Reynoso <jamie.reynoso@cloverhealth.com>; Kim Williams <kim.williams@cloverhealth.com>
**Subject:** Secure - Plan Preview #1 - Appeal Documentation for H5141 and H8010

This message was sent securely using Zix®

Good afternoon,

Attached is our appeal documentation for plan preview #1. Thank you in advance for your review and consideration.

Cheree Pasalakis

Manager, Compliance

615.426.5531

CONFIDENTIALITY NOTICE: This e-mail message and all attachments accompanying it may contain confidential information intended solely for the use of the addressee. If the reader of this message is not the intended recipient or has received this in error, be notified that any reading, dissemination, distribution, copying or other use of this message or its attachments, as well as the asking of any action in reliance on the contents of this information, is strictly prohibited. Any unauthorized interception of this transmission is illegal under the law. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY ME IMMEDIATELY BY A REPLY E-MAIL OR PHONE AND PERMANENTLY DELETE THE ORIGINAL E-MAIL AND ANY ATTACHMENTS FROM ALL STORAGE DEVICES WITHOUT RETAINING A COPY. THANK YOU.

This message was secured by Zix®.

--

Wendy Richey

Medicare Compliance Officer

Clover Health

551-225-2014

CONFIDENTIALITY NOTICE: This e-mail message and all attachments accompanying it may contain confidential information intended solely for the use of the addressee. If the reader of this message is not the intended recipient or has received this in error, be notified that any reading, dissemination, distribution, copying or other use of this message or its attachments, as well as the asking of any action in reliance on the contents of this information, is strictly prohibited. Any unauthorized interception of this transmission is illegal under the law. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY ME IMMEDIATELY BY A REPLY E-MAIL OR PHONE AND PERMANENTLY DELETE THE ORIGINAL E-MAIL AND ANY ATTACHMENTS FROM ALL STORAGE DEVICES WITHOUT RETAINING A COPY. THANK YOU

This message was secured by Zix®.

> > This message was secured by **Zix®**.
>
> This message was secured by **Zix®**.

This message was secured by **Zix®**.

**From:** CMS PartC&DStarRatings
**To:** Cheree Pasalakis; CMS CallCenterMonitoring
**Cc:** Wendy Richey; Jamie Reynoso; Kim Williams; Karen Soares; Will Chang; Shelly Gupta; CMS PartC&DStarRatings
**Subject:** RE: Clover Health Reply to CMS Response Regarding 2026 Star Rating Plan Preview Measure Appeals
**Date:** Tuesday, August 26, 2025 4:51:55 PM
**Attachments:** Clover Response August 26 2025.docx

In the attached we have addressed each of your concerns.

Sincerely,

Part C and D Star Ratings Team

**From:** Cheree Pasalakis <cheree.pasalakis@cloverhealth.com>
**Sent:** Saturday, August 16, 2025 12:56 PM
**To:** CMS PartC&DStarRatings <PartCandDStarRatings@cms.hhs.gov>; CMS CallCenterMonitoring <CallCenterMonitoring@cms.hhs.gov>
**Cc:** Wendy Richey <wendy.richey@cloverhealth.com>; Jamie Reynoso <jamie.reynoso@cloverhealth.com>; Kim Williams <kim.williams@cloverhealth.com>; Karen Soares <karen.soares@cloverhealth.com>; Will Chang <william.chang@cloverhealth.com>; Shelly Gupta <shelly.gupta@cloverhealth.com>
**Subject:** Clover Health Reply to CMS Response Regarding 2026 Star Rating Plan Preview Measure Appeals

Dear Centers for Medicare & Medicaid Services (CMS) Representative:

Clover Health (Contract Nos. H5141 and H8010) acknowledges CMS's responses to the plan preview #1 appeals submitted by Clover Health on the following measures:

(1) Plan Makes Timely Decisions about Appeals (C31);
(2) Reviewing Appeal Decisions (C32);
(3) Foreign Language Interpreter and TTY Availability (C33, D01);
(4) Medication Adherence Measures (D08, D09, D10), and
(5) Complaints About the Health Plan (C28).

We very much appreciate CMS's consideration of the issues raised in our plan preview appeals. But we continue to disagree with the agency on several issues. We have uploaded, via the Box portal, information in reply to the agency's responses to document our concerns with the agency's responses.

Titles of documents uploaded via the box: 2025 Omnibus Response, Exhibit A, Exhibit B, Exhibit C, and Exhibit D.

Thank you.

**Response to Clover's Email Sent August 16, 2025**

Below we summarize our feedback to your questions outlined in your email from August 16, 2025. Any measure-level updates will be made following the second plan preview.

**Part C Appeals measures**

**1-14156837886**:

Please send Maximus documentation such as Appendix E through fax or the Maxmus portal. Without documentation, Maximus cannot make any changes in their system. The documentation needs to come directly from Clover to them. Any updates from changes in this case would be made following the second plan preview.

**1-14506371416**:

In the future, Clover needs to be careful not to submit two separate reviews to Maximus for the same issue. If this happens in the future, Clover should request a reopening to fix the error. We will delete case 1-14506371416 following the second plan preview.

**1-14595402316**:

In Clover's reopening request to Maximus, Clover confirmed that they should have never sent the case to Maximus. Maximus appropriately issued a dismissal on the reopening decision, stating that it was sent to us in error. However, Maximus does see a data entry error in the Medicare Appeals System related to this case. They will correct the data entry issue and this will remove the case from the 'Reviewing Appeals Decisions' measure following the second plan preview.

**1-13926566786**:

Clover submitted that this case as an expedited one to Maximus. Based on what has been submitted to Maximus, we would update this case to a pre-service one. This update would occur following the second plan preview.

**1-14385393292**:

Maximus does not have any medical records. In its portal submission, Clover did indicate that they had provided records, but the actual documents submitted by Clover included no such records. The portal submission for the original case included a total of 50 pages (none of which were medical records), and a copy of Clover's 2024 Evidence of Coverage. That's the totality of what was submitted. For the reopening, the Plan submitted a 4-page reopening request. With its reopening request, Clover states that it included medical records in its original submission. Below is a complete listing of what Clover provided to Maximus:

1. Data entry printout from the Plan's portal submission (pages 1-3)

2. Appeal letter from the provider hospital (pages 4-7)
3. Clover Health Payment Dispute Uphold letter (pages 8-10)
4. A copy of SSA 1862 (pages 11-28)
5. A fax cover sheet from the provider hospital (page 29)
6. A cover letter from the provider hospital (pages 30-31)
7. USPS tracking document (pages 32-33)
8. Waiver of Liability (page 34)
9. Clover Claims Payment dispute form (page 35)
10. Redetermination request letter from provider hospital (pages 36-39)
11. Another copy of the Clover Health Payment Dispute Uphold Letter (pages 40-42)
12. Case Narrative (pages 43-44)
13. A letter from the provider hospital dated 5/29/24 (pages 45-46)
14. Another USPS tracking document (pages 47-48)
15. Another copy of the Waiver of Liability (page 49)
16. Another copy of the Clover Claims Payment Dispute Form (page 50)

Please let us know which pages are missing.

**Reopening Issue**:

**Cases 1-13664105851, 1-13814982651, 1-13976245156, 1-14005223730, 1-14173810816, and 1-14196773261:**

Below is information about (1) the applicability of the regulation restricting plans from reopening decisions that are on appeal and (2) the confusion related to the dates we provided in the last response.

The regulation at 42 CFR § 405.980(a)(4) is an Original Medicare regulation (which is why it does not use the term "plan") that is incorporated into the MA program through §§ 422.562(d) and 422.616. Below is an excerpt from CMS-4208-F (April 15, 2025) that discusses this longstanding policy in greater detail.

*Under the regulations at § 422.576, an organization determination is binding on all parties unless it is reconsidered under the rules at §§ 422.578 through 422.596 or is reopened and revised under § 422.616. The reopening rules at § 422.616 permit an organization or*

*reconsidered determination made by an MA organization that is otherwise final and binding to be reopened and revised by the MA organization under the applicable rules in part 405, subpart I, at §§ 405.980 through 405.986. The reopening rules in part 405, subpart I, are implementing section 1869(b)(1)(G) of the Act, which states that the Secretary may reopen or revise any initial determination or reconsidered determination described in this subsection under guidelines established in regulations. While the reopening rules in §§ 405.980 through 405.986 are applicable to the Traditional Medicare program, the regulatory provisions at 42 CFR part 405 historically have been cross-referenced in the managed care regulations and have been applied to the MA program consistent with the provisions at §§ 422.562(d) and 422.616 since the inception of the MA program (and to MA's predecessor, the Medicare+Choice program). Thus, the ability of an MA organization to reopen and revise an organization determination for the reasons set forth in regulation is well established in the MA program. For purposes of this provision, the discussion is specific to the application of the reopening rules to organization determinations made by an MA organization that involve inpatient hospital admission decisions.*

CMS explains the restriction on plans reopening determinations that are on appeal in Section 80.2 of the Parts C & D Enrollee Grievances, Organization/Coverage Determinations, and Appeals Guidance (the same manual and section Clover cites in its response).

*The reopening process is separate and distinct from the appeals process. When a party has filed a valid request for a level 1 appeal, level 2 appeal, ALJ or attorney adjudicator decision, or Council review, no adjudicator has jurisdiction to reopen a case that is under appeal until all appeal rights for that case are exhausted or a subsequent request by the appellant to withdraw the appeal has been granted. For example, if a party requests a level 2 appeal and a reopening of an initial determination simultaneously, the level 2 appeal would be the only action processed. As a result, a party cannot have an appeal and a reopening occurring simultaneously with respect to the same case.*

*An MA plan cannot reopen and modify its reconsideration decision after the case file for the adverse decision has been forwarded to the IRE, as CMS considers this an issue still under appeal.*

Regarding the dates in red from CMS's prior response, despite Clover's declaration otherwise, the dates we provided contradict information supplied in the previous response (i.e., the date of the initial determination) and we wanted to correct any inaccurate information). In addition, we provided the dates Clover received the appellants' reconsideration requests and, therefore, no longer had jurisdiction to reopen the initial determinations. We also supplied the dates Clover forwarded the case files to the IRE to further emphasize that Clover lacked jurisdiction to reopen the previous decisions.

**Foreign Language Interpreter and TTY Availability Measures**

An IVR is interactive with options from which to choose, and a message stating that the call center is closed does not provide the types of instructions nor options menu addressed in the memo - those that would take the caller to the appropriate customer service representative. CMS callers are necessarily bilingual for the purpose of placing test calls and are expected to end a call upon hearing a message, in any language, that the call center is closed, because we trust that what Clover represents in the message is accurate. Here, the callers ended the calls upon hearing the call center is closed message, consistent with both CMS's published guidance and testing protocol.

**Medication Adherence and Complaints About the Plan (CTM) Measures**

The three Part D Medication Adherence measures calculate the percent of Medicare Part D beneficiaries 18 years and older who adhere to their prescribed drug therapy across classes of target medication. Adherence is calculated based on a proportion of days covered (PDC) at 80 percent or higher. The 80 percent threshold is based on an industry standard that is supported by a large body of studies and clinical evidence.

Also, the three Part D Medication Adherence measures are included in the Categorical Adjustment Index (CAI), which is a factor that is added to or subtracted from a contract's Overall and/or Summary Star Ratings to adjust for the average within-contract disparity in performance for Low Income Subsidy/Dual Eligible (LIS/DE) beneficiaries and disabled beneficiaries. The CAI value (factor) depends on the contract's percentage of beneficiaries with LIS/DE and the contract's percentage of beneficiaries with disabled status. These adjustments are included in the calculations both with and without the improvement measures included. The value of the CAI varies by the contract's percentage of beneficiaries with LIS/DE and disability status. See the draft 2026 Medicare Part C & D Star Ratings Technical Notes in HPMS for information on the CAI.

CMS will implement risk adjustment for the three Medication Adherence measures based on age, gender, LIS/DE status, and disability status, as finalized in the April 2023 final rule (88 FR 22265 through 22270), beginning with the 2026 measurement year (2028 Star Ratings), and then the measures will no longer be included in the CAI. CMS will first display the updated risk adjusted Medication Adherence measures for the 2024 measurement year (2026 display page).

Please refer to prior Plan Request responses regarding complaints data. CMS will not be making changes to the complaint measure rates.

**From:** CMS PartC&DStarRatings
**To:** Cheree Pasalakis
**Cc:** Duran, Vanessa (CMS/CM); Goldstein, Elizabeth (CMS/CM); Wendy Richey; Will Chang; Jaye Johnston; CMS PartC&DStarRatings
**Subject:** RE: 2026 Plan Preview #2 Appeal Request - Clover Health: H5141 & H8010
**Date:** Thursday, September 18, 2025 2:13:00 PM

---

Good afternoon,

Unlike Clover's prior communications to which CMS responded substantively during the plan preview period, this request is limited to issues that are outside the scope of the plan preview. The plan preview periods before each Star Ratings release are for MA and Part D organizations to preview their Star Ratings data in HPMS prior to display on the Medicare Plan Finder. During the preview periods contracts are validating their own data before the data are public, and CMS is focused on investigating and processing any necessary data corrections.

Part C and D Star Ratings Team

---

**From:** CMS PartC&DStarRatings <PartCandDStarRatings@cms.hhs.gov>
**Sent:** Tuesday, September 16, 2025 2:49 PM
**To:** Cheree Pasalakis <cheree.pasalakis@cloverhealth.com>
**Cc:** Duran, Vanessa (CMS/CM) <Vanessa.Duran@cms.hhs.gov>; Goldstein, Elizabeth (CMS/CM) <Elizabeth.Goldstein@cms.hhs.gov>; Wendy Richey <wendy.richey@cloverhealth.com>; Will Chang <william.chang@cloverhealth.com>; Jaye Johnston <jaye.johnston@cloverhealth.com>; CMS PartC&DStarRatings <PartCandDStarRatings@cms.hhs.gov>
**Subject:** RE: 2026 Plan Preview #2 Appeal Request - Clover Health: H5141 & H8010

Confirming receipt.

---

**From:** Cheree Pasalakis <cheree.pasalakis@cloverhealth.com>
**Sent:** Tuesday, September 16, 2025 2:28 PM
**To:** CMS PartC&DStarRatings <PartCandDStarRatings@cms.hhs.gov>
**Cc:** Duran, Vanessa (CMS/CM) <Vanessa.Duran@cms.hhs.gov>; Goldstein, Elizabeth (CMS/CM) <Elizabeth.Goldstein@cms.hhs.gov>; Wendy Richey <wendy.richey@cloverhealth.com>; Will Chang <william.chang@cloverhealth.com>; Jaye Johnston <jaye.johnston@cloverhealth.com>
**Subject:** 2026 Plan Preview #2 Appeal Request - Clover Health: H5141 & H8010

Good afternoon,

Clover Health objects to CMS's inclusion of certain measures in the calculation of our 2026 Star Ratings; details are outlined in the attached appeal request. We are requesting that CMS exclude the identified measures from its 2026 Star Ratings and recalculate our 2026 Star Ratings. Thank you in advance for your review and consideration of our appeal request.

**HPMS Appeal – 2026 Plan Preview 2: Removal of Star Ratings Measures**

**Contract No.(s):** H5141 and H8010

September 16, 2025

---

Clover Health (Contract No.(s): H5141, H8010) ("Clover") objects to CMS's inclusion of certain measures in the calculation of Clover's 2026 Star Ratings. Inclusion of these measures in Clover's 2026 Star Ratings exceeds CMS's statutory authority and is otherwise unlawful. Clover requests that CMS exclude the measures identified below from its 2026 Star Ratings, and recalculate Clover's 2026 Star Ratings excluding these measures.

**Post-2003 Data Sources Concerning Clover:** Congress has limited the data on which Star Ratings may be based to the "types of data that were collected by the Secretary as of November 1, 2003." 42 U.S.C. § 1395w-22(e)(3)(B)(i); *see also id.* § 1395w-23(o)(4)(A) (Star Ratings must be "based on the data collected under section 1395w–22(e)"). CMS has limited authority to change the types of data collected in certain circumstances following submission of a report to Congress, but has not historically made any such report to Congress. *Id.* § 1395w-22(e)(3)(B)(ii). CMS has indicated its intent to calculate Clover's 2026 Star Ratings based on the following measures, which utilize data that is not the type of data collected by the Secretary as of November 1, 2003:

(1) Part C: Call Center – Foreign Language Interpreter / TTY (C33) and Part D: Call Center – Foreign Language Interpreter / TTY (D01);
(2) Reducing the Risk of Falling (C15), Improving Bladder Control (C16), and Care Coordination (C27);
(3) Medication Adherence for Diabetes Medication, Hypertension, And Cholesterol (D08, D09, and D10);
(4) Pharmacy Medication Therapy Management Program Completion Rate (D11);
(5) Pharmacy Statin Use with Diabetes (D12); and
(6) Rating of Drug Plan (D05) and Getting Needed Prescription Drugs (D06).

None of these measures are based on types of data that were collected by the Secretary as of November 1, 2003. Therefore, CMS does not have the statutory authority to use these measures to calculate Clover's 2026 Star Ratings. CMS must exclude these measures from Clover's 2026 Star Ratings.

**Data Concerning Clover Not Collected Under Section 1395w-22(e):** Congress has also limited the data on which Star Ratings may be based to the "data collected under section 1395w-22(e) of this title." 42 U.S.C. § 1395w-23(o)(4)(A). Section 1395w-22(e) provides that "each [Medicare Advantage] organization shall provide for the collection, analysis, and reporting of data that permits the measurement of health outcomes and other indices of quality." *Id.* § 1395w-22(e).

But CMS has indicated its intent to calculate Clover's 2026 Star Ratings based on the following measures, which utilize data drawn from other sources that are not collected under section 1395w-22(e):

(1) Part C: Call Center – Foreign Language Interpreter / TTY (C33) and Part D: Call Center – Foreign Language Interpreter / TTY (D01);
(2) Reducing the Risk of Falling (C15), Improving Bladder Control (C16), Care Coordination (C27), Improving and Maintaining Mental Health (C05), and Improving and Maintaining Physical Health (C04);
(3) Medication Adherence for Diabetes Medication, Hypertension, And Cholesterol (D08, D09, and D10);
(4) Pharmacy Medication Therapy Management Program Completion Rate (D11);
(5) Pharmacy Statin Use with Diabetes (D12);
(6) Rating of Drug Plan (D05) and Getting Needed Prescription Drugs (D06); and
(7) Plan Makes Timely Decisions on Appeals (C31) and Reviewing Appeals Decisions (C32).

As CMS itself acknowledges, these measures are not based on "data collected under section 1395w-22(e) of this title." *See* 83 Fed. Reg. 16440, 16531-16532 (2018) (CMS conceding this issue). Therefore, CMS does not have the statutory authority to use these measures to calculate Clover's 2026 Star Ratings. CMS must exclude these measures from Clover's 2026 Star Ratings.

**Evaluations of Clover By Private Third Party Contractors:** CMS has unlawfully delegated authority to rate Clover's performance to private contractors. An agency cannot outsource to private parties governmental decision-making functions, including the evaluation of the quality of Medicare Advantage plans. *See FCC v. Consumers' Rsch.*, 145 S. Ct. 2482, 2507-11 (2025) (detailing this limitation). But CMS has unlawfully delegated its functions for several measures to private contractors. These contractors purport to evaluate the quality of plans, rather than CMS doing so itself. *See UnitedHealthcare Benefits of Texas, Inc. v. CMS*, 2024 WL 4870771, at *7-9 (E.D. Tex. Nov. 22, 2024) (explaining why CMS's delegation to private contractors of call center measures violates federal law).

These measures include the following:

(1) Call Center—Foreign Language Interpreter/TTY measures (C33 and D01) and
(2) Reviewing Appeals Decisions measure (C32).

These measures are based entirely on evaluations of Clover's performance by CMS's private contractors rather than by the government itself. Therefore, CMS must exclude these measures from Clover's 2026 Star Ratings.

**Measures Adopted Without Required Rulemaking**: The Supreme Court has explained that CMS must engage in notice-and-comment rulemaking before it adopts any "rule, requirement, or other statement of policy" that "establishes or changes a substantive legal standard governing the scope of benefits, the payment for services, or the eligibility of individuals, entities, or organizations to furnish or receive services or benefits under this subchapter." *Azar v. Allina Health Servs.*, 587 U.S. 566, 572 (2019) (quoting 42 U.S.C. § 1395hh(a)(2)); *see also Office of the United States Attorney General* (February 5, 2025) (acknowledging, "Guidance documents violate the law when they are issued without undergoing the rulemaking process established by law yet purport to have a direct effect on the rights and obligations of private parties governed by the agency or otherwise act as a substitute for rulemaking"). That, of course, includes the Star Ratings measures applied to Clover, which in turn determine CMS payments to Clover, Clover's benefits offered to beneficiaries, and Clover's eligibility to participate in the Medicare Advantage program. Yet, CMS has adopted all of the foregoing measures identified throughout this entire document without engaging in the required notice-and-comment rulemaking under § 1395hh(a)(2).

The same problem also impacts the following measures:

(1) Annual Flu Vaccine (C03),
(2) Improving and Maintaining Mental Health (C05),
(3) Improving and Maintaining Physical Health (C04),
(4) Getting Needed Care (C22),
(5) Getting Appointments and Care Quickly (C23),
(6) Customer Service (C24), and
(7) Rating of Health Care Quality (C25).

These measures were all adopted without notice-and-comment rulemaking required by 42 U.S.C. § 1395hh(a)(2). Therefore, they must be excluded from Clover's 2026 Star Ratings.

**Further Measures Adopted Without Required Rulemaking:** Even if CMS were to disagree with Clover's view of *Allina*, CMS has unlawfully chosen to evaluate Clover using

measures that CMS did not adopt through the required notice-and-comment rulemaking as required under CMS's own regulations. Under 42 C.F.R. § 422.164(c)(2), CMS must adopt new measures through rulemaking. For the 2026 Star Ratings, CMS has adopted the new measures Improving and Maintaining Mental Health (C05), and Improving and Maintaining Physical Health (C04). As CMS makes clear in its 2026 Star Ratings Technical Notes, these are "new measures." 2026 Technical Notes at 131 ("*Improving or Maintaining Physical Health and Improving or Maintaining Mental Health measures have a weight of 1 for the 2026 Star Ratings because they are considered new measures."); *see also id.* at 2, 162 (similar concessions). Also impacted by the same problem is Pharmacy Statin Use with Diabetes (D12), which was previously adopted by CMS as a new measure without required notice-and-comment-rulemaking prior to its adoption. Because CMS adopted these new measures without required notice-and-comment rulemaking, CMS must exclude these measures from Clover's Star Rating.

**Arbitrary and Capricious Measures:** Several of CMS's unauthorized measures are also arbitrary and capricious. For example, Clover has identified the numerous flaws in Medication Adherence measures (D08, D09, and D10) in its prior submissions dated May 21, 2025 and August 15, 2025, and incorporates those arguments here by reference.

Similarly, Part C: Call Center – Foreign Language Interpreter / TTY (C33) and Part D: Call Center – Foreign Language Interpreter / TTY (D01) are arbitrary and capricious, because rather than measuring plan quality, they instead measure the happenstance of the quality of communication and connectivity between a CMS-selected vendor, on the one hand, and plans, on the other. A "perfect" score is generally required to obtain five stars, and just one or a handful of calls can result in a multi-star drop, even when it is caused by minor technical issues not attributable to the plan. This gives rise to an annual process in which plans appeal to CMS, and then courts, to adjudicate individualized technical and communication issues, like phone line quality and callers' foreign language proficiency, that are entirely unrelated to plan quality. And notably, CMS has made no effort to determine which foreign languages should properly be tested, and whether there is any need for these services in selected languages, much less the over 100 languages CMS requires (or TTY services). These flaws have previously been detailed in the summary judgment filings by SCAN Health Plan (No. 1:23-cv-03910 (D.D.C.)) and UnitedHealthcare (No. 6:24-cv-00357 (E.D. Tex.)), and are incorporated here by reference.

Another such arbitrary measure is Improving Bladder Control (C16). This measure evaluates whether a patient decided to discuss incontinence with a provider. Unlike other measures, which evaluate quality of services provided by plans and providers, evaluating Clover on whether a patient volunteers information is entirely unrelated to measuring plan quality. *See* 42 U.S.C. § 1395w-22(e)(3)(B)(i).

The foregoing measures should be excluded from Clover's 2026 Star Ratings.

* * *

For the above reasons, Clover requests that CMS exclude these measures from Clover's final 2026 Star Ratings, and calculate Clover's final 2026 Star Ratings without application of the above-identified measures. Clover also reiterates and incorporates by reference all previously raised objections, and reserves all rights.

Sincerely,

William Chang

Will Chang
Vice President and Deputy General Counsel

CC: Vanessa Duran, vanessa.duran@cms.hhs.gov
Elizabeth Goldstein, elizabeth.goldstein@cms.hhs.gov

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard
Baltimore, Maryland 21244-1850

CENTERS for MEDICARE & MEDICAID SERVICES

**CENTER FOR MEDICARE**

TO: All Part D Sponsors

FROM: Cynthia G. Tudor, Ph.D., Director, Medicare Drug Benefit and C & D Data Group
Cheri Rice, Director, Medicare Plan Payment Group

SUBJECT: Prohibition on Submitting PDEs for non-Part D prescriptions

DATE: May 11, 2012

The purpose of the memorandum is to address questions we have received on whether Part D sponsors may report prescription drug events (PDEs) based on data collected through other means than claims submitted by network pharmacies or requests for reimbursement from beneficiaries. More specifically, we have been asked if Part D sponsors can submit PDEs if they obtain, either directly or through a vendor, claims-level information from pharmacies and/or prescriber offices for prescriptions or physician samples that were dispensed to their enrollees outside of their Part D benefit. We surmise that Part D sponsors may be looking to obtain the additional drug history in order to improve care coordination, medication therapy management and point-of-sale edits that identify duplicate therapies and drug interactions that would otherwise go undetected. Reporting of these dispensing events as PDEs potentially could provide CMS with more accurate data on which to evaluate plan performance and base patient safety measures used to establish star ratings and quality bonus payment.

While we understand the good intent behind efforts to obtain such missing claims data, we have not yet been able to determine that we are authorized to accept such data or understand its impact on payment operations. We also have serious concerns about how to ensure beneficiary privacy protections and data validation. It is unclear to us how Part D sponsors could implement sufficient internal controls to meet audit standards necessary to ensure the quality of the data, especially in the case of physician samples. Until such time as we can resolve these questions and concerns, we must prohibit the reporting of any PDE data that has not been submitted directly by network pharmacies or beneficiaries, consistent with our existing guidance.

In the meantime, we encourage Part D sponsors to develop incentives for network pharmacies to submit claims under the plan unless beneficiaries have explicitly requested otherwise. Such incentives could include nominal amounts paid by the Part D sponsors--for example, CMS has accepted PDEs for one cent claims. Additionally, we urge Part D sponsors to work with the National Council for Prescription Drug Programs (NCPDP) to develop coding to permit zero

dollar claims transmission so that zero dollar promotional drugs, such as antibiotics, can be submitted under the plan.

We are open to having future discussions with industry about this practice and our data quality and beneficiary privacy concerns, but at this time CMS will not accept PDEs for claims that were not submitted for processing and/or reimbursement under the plan by either a network pharmacy or enrollee. Although CMS is not aware of any applicable PDEs having been submitted to date, Part D plans must delete any such previously reported PDEs.

If you have questions about the guidance in this memorandum, please contact Craig Miner at craig.miner@cms.hhs.gov or (410) 786-7937.

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard
Baltimore, Maryland 21244-1850

**MEDICARE PLAN PAYMENT GROUP**

TO: All Part D Plan Sponsors

FROM: Cheri Rice, Director
Medicare Plan Payment Group

SUBJECT: May 2013 Updates to the Drug Data Processing System

DATE: April 23, 2013

The Centers for Medicare & Medicaid Services (CMS) is announcing upcoming changes to the Drug Data Processing System (DDPS) that will take place in the month of May. An updated edit spreadsheet will be posted to the Customer Service and Support Center (CSSC) Operations website. Please submit questions regarding these changes to PDEJan2011@cms.hhs.gov.

Allowing $0 PDEs

Beginning on May 12, 2013, CMS will allow Prescription Drug Event (PDE) records where the sum of the cost fields (*i.e.*, Ingredient Cost Paid+ Dispensing Fee Paid + Vaccine Administration Fee + Total Amount Attributed to Sales Tax) equals zero on all PDEs regardless of date of service (DOS).

Currently, there are two situations in which sponsors may have PDEs with $0.00 in drug costs. First, certain pharmacies (e.g., Wegmans for antibiotics and Atorvastatin) are known to be marketing certain generic prescription drugs for free to their customers. In this case, if beneficiaries fill these free prescriptions using their Part D benefit the plan sponsor should submit a $0.00 PDE. For this particular scenario we expect sponsors to implement for dispensing events with a 2013 date of service. Thus, if a sponsor has already submitted zero dollar event as a $0.01 PDE to get around our previous editing, CMS expects the sponsor to submit an adjustment PDE at $0.00 in cost. We will not require adjustment of PDEs that fit this first scenario for years prior to 2013. Second, as stated in the Calendar Year 2014 Medicare Advantage Capitation Rates and Medicare Advantage and Part D Payment Policies and Final Call Letter, if a sponsor recoups the full claims payment from a pharmacy, then the PDE should reflect that recoupment and should indicate $0.00 in drug cost. This policy will impact the payment reconciliation conducted in 2013 for the 2012 coverage year. Thus, any 2012 PDEs with a full recoupment should be adjusted to $0.00 no later than the June 2013 cutoff for the reconciliation of the 2012 coverage year.

All of the edits listed below, with the exception of edit code 694, will be bypassed to allow PDEs with the sum of the cost fields = zero. Edit 694 will be modified to allow the cost fields to equal zero.

Edit 670: For PDEs with a DOS prior to 1/1/2011, if the Catastrophic Coverage Code = 'blank', GDCB must be greater than zero. For DOS 1/1/2011 and forward, if True Out-of-Pocket Accumulator < OOP Threshold, GDCB must be greater than zero. This edit applies to Covered Drugs only. The edit is bypassed if the sum of the cost fields = zero.

Edit 672: For DOS prior to 1/1/2011, if the Catastrophic Coverage Code is 'A', GDCB must be greater than zero. This edit applies to Covered Drugs only. The edit is bypassed if the sum of the cost fields = zero.

Edit 673: For DOS prior to 1/1/2011, if the Catastrophic Coverage Code is 'C', GDCA must be greater than zero. For DOS 1/1/2011 and forward, if True Out-of-Pocket Accumulator = OOP Threshold, GDCA must be greater than zero. This edit applies to Covered Drugs only. The edit is bypassed if the sum of the cost fields = zero.

Edit 694: The sum of Ingredient Cost, Dispensing Fee, and Vaccine Administration Fee must be >= zero. This requirement also applies to OTC drugs funded by administrative costs.

Edit 699: The true out of pocket cost is greater than the out of pocket threshold, the entire PDE falls within the catastrophic coverage phase and submitted GDCA is not greater than 0. This edit applies to Covered drugs with DOS on or after 1/1/2011. The edit is bypassed if the sum of the cost fields = zero.

Modify the “current” System Timestamp to Greenwich Mean Time (GMT)

CMS has been made aware of an issue where any time a PDE is processed by DDPS within 7 hours of the listed Claim Adjudication Timestamp, the DDPS Eastern Time (ET) timestamp appears to be before the submitted Greenwich Mean Time (GMT) timestamp, and the PDE will reject with edit 651. This anomaly occurs because DDPS uses an ET timestamp to compare to a GMT timestamp. Edit 651 will be modified to convert the “current” system timestamp to GMT when comparing the current system timestamp to the submitted Claim Adjudication Timestamp. Sponsors receiving edit 651 as a result of this issue can resubmit the PDEs after May 12, 2013.

Edit 651: The Claim Adjudication Began Timestamp is missing or invalid. For DOS 1/1/2011 and forward, must be a valid timestamp in the CCYY-MM-DD- HH.MM.SS.MMMMMM format. The field cannot contain a future date or < DOS. For DOS prior to 1/1/2011, the field must be zeros or spaces. This edit assumes time is formatted as Greenwich Mean Time (GMT).

Modify the Prescriber ID Edits

Beginning on May 6, 2013, The Prescriber ID and Prescriber ID Qualifier edits will be modified to reflect the regulatory changes that go into effect beginning in 2013. CMS requires PDEs to be submitted with an NPI in the Prescriber ID field as of January 1, 2013. CMS will reject PDEs with a DOS between January 1, 2013 and May 5, 2013 if submitted without a valid Type 1 (individual) or Type 2 (organization) NPI code value. CMS will reject PDEs with a DOS on or after May 6, 2013 if submitted without a valid individual Type 1 NPI code. In addition, CMS will reject PDEs with a DOS of January 1, 2012 or later if submitted with a valid NPI code value that has been deactivated for over one year. The following edits have been modified to reflect these changes.

Edit 622: Prescriber ID Qualifier is missing. This edit applies to all standard format claims, regardless of DOS, and applies to all non-standard format claims with DOS on or after 1/1/2012.

Edit 623: Prescriber ID Qualifier is invalid. Prior to DOS 1/1/2013, the Prescriber ID Qualifier must be equal to '01'-NPI, or '06'-UPIN, or '08 -State License, or '12'-DEA. On or after 1/1/2013, the Prescriber ID Qualifier must be equal to '01'. This edit applies to standard and non-standard format PDEs.

Edit 624: The Prescriber ID is missing. The field must not be blank. This edit applies to all standard format claims, regardless of DOS, and applies to all non-standard format claims with DOS on or after 1/1/2012.

Edit 832: NPI number not found on CMS NPI table; however it contains a valid check digit. This edit applies to Covered Drugs with DOS on or after 1/1/2012. This edit is discontinued beginning 5/6/2013.

Edit 833: NPI number not found on CMS NPI table. This edit applies to Covered Drugs with DOS on or after 1/1/2012. Effective 5/6/2013, the Prescriber ID must be a Type 1 (individual) NPI.

Edit 834: NPI is not active for the Date of Service. This edit applies to Covered Drugs with DOS on or after 1/1/2012. The DOS must be within one year of the NPPES deactivation date.