**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF GEORGIA**
**BRUNSWICK DIVISION**

| | |
|---|---|
| CLOVER INSURANCE COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>DEPARTMENT OF HEALTH AND HUMAN SERVICES; CENTERS FOR MEDICARE & MEDICAID SERVICES; ROBERT F. KENNEDY, JR., in his official capacity as Secretary of the United States Department of Health and Human Services; MEHMET OZ, in his official capacity as Administrator, Centers for Medicare & Medicaid Services,<br><br>Defendants. | Civil Action No. 2:25-cv-142 |

**PLAINTIFF'S MOTION FOR EXPEDITED SUMMARY JUDGMENT**

# TABLE OF CONTENTS


INTRODUCTION ........................................................................................................3

BACKGROUND ........................................................................................................12

A. The Medicare Advantage Program ..........................................................12
B. Medicare Quality Assurance Programs (1997-2003) ................................13
C. The Medicare Modernization Act Of 2003................................................14
D. CMS's Sub-Regulatory Star Ratings System (2008-2010) .......................15
E. Statutory Star Ratings & Quality Bonus Payments (2010-Present)...........16
F. CMS's Disregard Of Congress's Express Instruction ...............................17
G. Notice And Comment On The Star Ratings Measures .............................18
H. CMS's Annual Determination And Publication Of Star Ratings ..............19
I. Clover Raises Its Concerns To CMS Over Its 2026 Star Rating ...............20
J. CMS Unlawfully Determines Clover's 2026 Star Rating .........................22
K. Clover Files Suit Challenging Its 2026 Star Rating..................................23

ARGUMENT ........................................................................................................23

I. CMS DETERMINED CLOVER'S 2026 STAR RATING BASED ON DATA THAT CONGRESS FORBADE ..............................................................23
A. CMS Determined Clover's 2026 Star Rating Based On Data *Not* Collected As Part Of Plans' Quality Improvement Programs ...................24
B. CMS Determined Clover's 2026 Star Rating Utilizing Measures Based On Types Of Data Not Collected As Of November 1, 2003 ..........31

II. CMS DETERMINED CLOVER'S 2026 STAR RATING BY APPLYING MEASURES THAT HAD NOT GONE THROUGH REQUIRED NOTICE-AND-COMMENT ......................................................................36

III. CMS DETERMINED CLOVER'S 2026 STAR RATING BY APPLYING UNAUTHORIZED, ARBITRARY MEASURES................................................40
A. CMS Unlawfully Determined Clover's 2026 Star Rating Using Medication Adherence Measures That Are Disconnected From Clover's Quality, Outcomes, And Beneficiary Satisfaction ......................41
B. CMS Unlawfully Determined Clover's 2026 Star Rating Using Call Center Measures Which Are Disconnected From Clover's Quality, Outcomes, And Beneficiary Satisfaction....................................48

IV. CMS DETERMINED CLOVER'S 2026 STAR RATING BY APPLYING THE REVIEWING APPEAL DECISIONS (C32) MEASURE IN VIOLATION OF THE PRIVATE NON-DELEGATION DOCTRINE ...............50

V. IN THE ALTERNATIVE, CMS DETERMINED CLOVER'S 2026 STAR RATING IN VIOLATION OF 42 U.S.C. § 1395HH(A)(2) ................................53

CONCLUSION........................................................................................................59

## INTRODUCTION

This case concerns the Centers for Medicare & Medicaid Service's ("CMS") unlawful determination of Clover Insurance Company's ("Clover") 2026 Star Rating in a manner that penalizes Clover, despite it delivering superior clinical quality and health outcomes to its members.

Clover is an AI-powered technology and physician-enablement company that provides Medicare Advantage plans to over 150,000 members. Its proprietary platform, Clover Assistant, analyzes data from over 100 sources (labs, health records, and so on) to deliver personalized, evidence-based recommendations to physicians at the point of care, enabling them to provide earlier diagnosis and treatment to their patients and deliver better clinical quality and outcomes.

Under the Medicare Advantage program, the government contracts with private health insurance plans like Clover to provide benefits that meet or exceed the benefits provided by traditional, government-run Medicare. By creating a system founded on the principle of private competition—both among private plans and against government-run Medicare—Congress sought to provide Medicare beneficiaries with greater choice and higher quality healthcare.

To facilitate competition among plans, Congress enacted a so-called "Star Rating" system, which synthesizes a range of quality data about each plan into a summary rating of 1 to 5, which CMS in turn publishes. 42 U.S.C. § 1395w-23(o)(4)(A). Congress specified the data to be used in calculating Star Ratings to ensure beneficiaries have ready access to meaningful information to select the plan that best meets their needs. *Id.* A plan's Star Rating is an average of its scores across various "measures," such as how often plan members obtain recommended cancer screenings, and how well their blood sugar and blood pressure are controlled. Plans are then scored relative to other plans, akin to grading on a "curve" in a college course. Congress also provides significant financial resources to plans (and, in turn, their members) that achieve 4 Stars or greater.

In calculating Clover's 2026 Star Rating, CMS has *admittedly* departed from the measures

of clinical quality and health outcomes that Congress authorized, instead relying on a host of other measures that have little or nothing to do with clinical quality and outcomes. In doing so, CMS has violated Congress's express statutory constraints. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394-95 (2024) (holding that "courts must exercise independent judgment in determining the meaning of statutory provisions" to come to the "best reading of a statute").

Since Medicare Advantage's inception, Congress has required each plan to maintain an ongoing quality assurance program. 42 U.S.C. § 1395w-22(e)(1). Initially, Congress granted CMS broad authority to require plans to collect and report under these programs any quality data that CMS determined "appropriate." *Id.* §§ 1395w-22(e)(1), (e)(2)(A)(xii) (1997). Under that authority, CMS proposed a host of quality measures and standards, which CMS indicated that it could and would modify annually in its sole discretion.[1] Medicare Advantage plans and others raised serious concerns with CMS's approach, warning that constantly changing measures and standards would result in "significant" and "excessive" administrative costs without improving healthcare for seniors. 65 Fed. Reg. at 40,220-21. Yet CMS refused to modify its approach. *Id.*

In 2003, Congress intervened to put an end to this chaos, amending the statute to essentially freeze in place CMS's existing quality measures. Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 108-173, § 722(a)(2), 117 Stat. 2066, 2347-48 (2003). Congress imposed two critical limitations on CMS's authority: (1) As part of quality improvement programs, CMS could only require plans to collect quality data that were "the types of data that were collected by the Secretary as of November 1, 2003." 42 U.S.C. § 1395w-22(e)(3)(B). And (2), CMS could only change the types of data to be collected after submitting a report to Congress on the reasons for such changes, prepared in consultation with Medicare Advantage plans and

[1] 63 Fed. Reg. 34,968, 34,993 (June 26, 1998); 65 Fed. Reg. 40,170, 40,220-21 (June 29, 2000).

private accrediting bodies. *Id*. CMS has never made such a report. *See id.* In 2004, CMS admitted that, under § 1395w-22(e), plans were limited to collecting data under CMS's preexisting, pre-2003 measurement systems of clinical quality, health outcomes, and beneficiary satisfaction, *i.e.*, the Healthcare Effectiveness Data and Information Set ("HEDIS") (concerning quality), Health Outcomes Survey ("HOS") (outcomes), and Consumer Assessment of Healthcare Providers and Systems ("CAHPS") (satisfaction) systems. 69 Fed. Reg. 46,866, 46,886 (Aug. 3, 2004).

Yet just a few years later in 2008, CMS attempted to work around Congress's express statutory limitations in § 1395w-22(e). CMS introduced annual Star Ratings, not based on any express *statutory* authority, but sub-regulatory guidance. 75 Fed. Reg. 71,190, 71,218 (Nov. 22, 2010). Those Star Ratings included data on two programs: (1) Medicare Advantage, and (2) Medicare Part D, an optional prescription drug benefit that Medicare beneficiaries may opt into. CMS *combined* in its Star Ratings (1) data collected pursuant to CMS's authority under § 1395w-22(e) as a component of plans' quality improvement programs (HEDIS, CAHPS, and HOS data), *and* (2) data collected under other statutory authorities, *e.g.*, data on telephonic customer service and Part D prescription drug benefits. 83 Fed. Reg. 16,440, 16,520 (Apr. 16, 2018).

The key point for present purposes is that, by relying on a broader set of data collected under a broader set of statutory authorities *beyond* § 1395w-22(e), CMS's sub-regulatory Star Ratings recreated the same problem that Congress had intervened to solve in 2003: Plans were subjected to ever-changing quality standards on CMS's self-selected, shifting quality measures.

In 2010, Congress had to intervene again. Congress applied much the same solution that it had adopted seven years earlier in its 2003 amendments, and expanded that solution to govern the entire Star Ratings system. Congress instructed CMS to stop morphing its quality measures from year to year, and instead base its Star Ratings on the measures of clinical quality, health

outcomes, and beneficiary satisfaction that Congress instructed in 2003. 42 U.S.C. § 1395w-23(o)(4)(A). Congressional control over, and the integrity of, the codified Star Ratings program were important to Congress for an additional reason: Congress at the same time incorporated the Star Ratings into statutory formulas that determine certain additional payments to higher-rated plans that in turn benefit plans' beneficiaries. Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, § 1102(c)-(2), 124 Stat. 1029, 1043-46 (2010).

Congress therefore codified in part, and overrode in part, CMS's sub-regulatory Star Ratings system, instructing that CMS's Star Ratings "shall be determined according to a 5-star rating system (based on the data collected *under section 1395w-22(e)* . . . .)." 42 U.S.C. § 1395w-23(o)(4)(A) (emphasis added). That is, Congress selected the *same* solution that it had adopted seven years earlier in its 2003 amendments: Congress required the Star Ratings to be based on predictable types of data collected under plans' quality improvement programs (*i.e.*, HEDIS, HOS, and CAHPS data) on quality, outcomes, and beneficiary satisfaction that plans provided under § 1395w-22(e)—not on whatever other sources of data CMS might prefer as a policy matter.

Rather than heed Congress's command, CMS forged ahead with calculating Star Ratings based on a host of other authorities and data sources that CMS *admits*—in sources no less formal than the Federal Register and the Code of Federal Regulations—are *not* collected under § 1395w-22(e) as part of plans' quality improvement programs, as Congress required:

> there are several measures in the Stars Ratings System that are based on performance that address telephone customer service, members' complaints, disenrollment rates, and appeals; however these *additional measures are not collected directly from the sponsoring organizations for the primary purpose of quality measurement so they are not information collections governed by section 1852(e)) [§ 1395w-22(e)]*. These additional measures are calculated from information that CMS has gathered *as part of the administration of the Medicare program*, such as information on appeals forwarded to the Independent Review Entity under subparts M, enrollment, and compliance and enforcement actions.

83 Fed. Reg. at 16,531-32 (emphases added). As CMS's own binding regulation acknowledges,

"CMS bases Part C Star Ratings on the type of data specified in section 1852(e) of the Act [§ 1395w-22(e)] *and on CMS administrative data*." 42 C.F.R. § 422.162(c)(1) (emphasis added). In short, CMS seems to believe it can utilize any sources of data that it wishes to determine Star Ratings, whether or not the data are "information collections governed by section 1852(e)." 83 Fed. Reg. at 16,531-32. But Congress imposed a more stringent statutory constraint than CMS accepts: The Star Ratings must be "based on the data collected under section 1395w-22(e) of this title," not under other authorities. 42 U.S.C. § 1395w-23(o)(4)(A).

It is therefore clear that CMS erred as a matter of law in determining Clover's 2026 Star Rating at 3.5 Stars. Because CMS admittedly determined Clover's 2026 Star Rating based on data and measures beyond its statutory authority under § 1395w-22(e), the Administrative Procedure Act ("APA") requires Clover's 2026 Star Rating to be set aside and then recalculated without inclusion of several such statutorily unauthorized measures. *See* 5 U.S.C. § 706(2). (To be clear, the Court need not rule upon the lawfulness of the Star Rating system as a whole; as detailed below, it is sufficient to provide Clover complete relief for the Court to conclude that CMS determined Clover's 2026 Star Rating in a manner that violates CMS's statutory authority and related requirements, and must recalculate Clover's 2026 Star Rating consistent with governing law.)

Because it exceeds Congress's carefully crafted guardrails enacted in 2003 and 2010, CMS's determination cannot be reconciled with the statutory text. The Medicare Payment Advisory Commission ("MedPAC"), a nonpartisan independent legislative branch agency, has identified that many of the novel, unauthorized measures that CMS currently applies are "flawed and inconsistent with the Commission's [MedPAC's] principles for quality measurement." Ex. 1, Decl. of Clay Thornton ("Thornton Decl.") at Ex. B, MedPAC, *Report to the Congress: Medicare and the Health Care Delivery System* 243 (June 2019). That is because CMS includes over 40

measures that are "weakly correlated with health outcomes of importance to beneficiaries and the program," *id.* at 248, and do "not provide a reliable basis for evaluating quality across MA [Medicare Advantage] plans." Ex. C, MedPAC, *Report to the Congress: Medicare and the Health Care Delivery System* 321 (June 2025). CMS itself recently concurred with MedPAC's longstanding findings that the Medicare Advantage Star Ratings measures are broken. 90 Fed. Reg. 54,894, 54,965 (Nov. 28, 2025) (CMS proposing to eliminate novel measures, as Star Ratings need to be "simplif[ied] and refocus[ed]" on clinical quality and outcomes). That is correct: Congress chose a different design under § 1395w-22(e), and it is *that* design that must control.

In addition, CMS made other mistakes that also harmed Clover's 2026 Star Rating.

*First*, even with respect to data that CMS claims *are* collected under § 1395w-22(e) as part of plans' quality improvement programs, some of those data are not in fact "the types of data that were collected by the Secretary as of November 1, 2003," as required under § 1395w-22(e)(3)(B). The "types of data" collected as of November 1, 2003 means data in common with the specific data collections, *i.e.*, the questions under the CAHPS, HEDIS, and HOS surveys that were part of plans' quality assurance programs as of November 1, 2003. *Id.* CMS nonetheless determined Clover's 2026 Star Rating based on types of data that CMS did not collect as of November 1, 2003, including, as just one illustrative example, the quality of foreign-language interpretation services when CMS contractors placed "test" calls to Clover's customer service line. That, too, was error.

*Second*, CMS determined Clover's 2026 Star Rating based on measures that had not been subjected to notice and comment in the manner required by CMS's regulations. 42 C.F.R. §§ 422.164(c)(2), (d)(2) (2024). Specifically, CMS has bound itself under its regulations that it will only adopt a new or substantially modified measure in its Star Ratings if CMS (1) publicly proposes the measure (on its website), (2) elicits public feedback prior to the measurement year

for the new measure, *then* (3) engages in notice-and-comment rulemaking. *Id.* §§ 422.164(c)(2), (d)(2). CMS unlawfully calculated Clover's 2026 Star Rating using 3 measures (known as C04, C05, C23 for the measurement year at issue)[2] that CMS did not adopt by following this process.

*Third*, CMS calculated Clover's Star Rating using measures, namely the Medication Adherence and Call Center measures, that are so divorced from clinical quality, outcomes, and beneficiary satisfaction that they are arbitrary and capricious and contrary to law. For example, under its measures known as Medication Adherence for Diabetes, Hypertension, and Cholesterol Medications (D08, D09, D10), CMS repeatedly penalized Clover's Star Ratings in hundreds of cases because patients discontinued medications *as directed by their doctors*. *See* AR22-23. Each time, the doctor determined that treatment discontinuation was medically *appropriate or necessary*—which CMS did not and cannot now dispute. Yet, CMS *penalized* Clover when a patient was not dispensed drugs for periods after the drugs were deemed *no longer medically appropriate or necessary*—and in some cases, potentially harmful. *Id.* That is not just wholly arbitrary and capricious, it is also far afield from Congress's grant of authority to CMS.

*Finally*, CMS improperly delegated the determination of the measure "Reviewing Appeal Decision" (C32) (*i.e.*, whether Clover's coverage decision was correct) to a private contractor known as the "Independent Review Entity" ("IRE"), in violation of the private nondelegation doctrine. *FCC v. Consumers' Rsch*, 606 U.S. 656, 690-91 (2025) ("*Consumers' Rsch. II*").

Granting summary judgment on the foregoing bases would be sufficient to resolve this case in Clover's favor. But, if the Court disagrees with Clover on the foregoing grounds for summary judgment, in the alternative, CMS erred in an additional way: In determining Clover's 2026 Star

[2] The numerical labels associated with the Star Ratings measures vary from year to year. The numerical labels for measures used throughout this brief are those associated with the 2026 Star Ratings year. *See* AR149-215 (2026 Tech. Notes).

Rating, CMS utilized a series of measures without adopting those measures' specifications as regulations through required notice-and-comment rulemaking under 42 U.S.C. § 1395hh(a)(2).

In summary, the following classes of errors impacted the following measures that CMS erroneously applied in determining Clover's 2026 Star Ratings:

| | Data Not Collected under 1395w-22(e) | Post-2003 Data | Measures Without Notice and Comment | Arbitrary and Capricious Measures | Private Non-Delegation Doctrine |
|---|---|---|---|---|---|
| Medication Adherence, Diabetes (D08) | ✓ | ✓ | ✓ | ✓ | |
| Medication Adherence, Hypertension (D09) | ✓ | ✓ | ✓ | ✓ | |
| Medication Adherence, Cholesterol (D10) | ✓ | ✓ | ✓ | ✓ | |
| Phone Call Center (C33) | ✓ | ✓ | ✓ | ✓ | |
| Phone Call Center (D01) | ✓ | ✓ | ✓ | ✓ | |
| Appeal Decisions (C32) | ✓ | ✓ | ✓ | | ✓ |
| Rating of Drug Plan (D05) | ✓ | ✓ | ✓ | | |
| Getting Needed Drugs (D06) | ✓ | ✓ | ✓ | | |
| Medication Therapy Management Completion (D11) | ✓ | ✓ | ✓ | | |
| Pharmacy Statin Use (D12) | ✓ | ✓ | ✓ | | |
| Improving Mental Health (C05) | | ✓ | ✓ | | |
| Reducing Falling (C15) | | ✓ | ✓ | | |
| Getting Needed Care (C22) | | ✓ | ✓ | | |
| Rating of Health Care Quality (C25) | | ✓ | ✓ | | |
| Care Coordination (C27) | | ✓ | ✓ | | |
| Improving Bladder Control (C16) | | | ✓ | | |
| Annual Flu Vaccine (C03) | | | ✓ | | |
| Improving Physical Health (C04) | | | ✓ | | |
| Getting Care Quickly (C23) | | | ✓ | | |
| Customer Service (C24) | | | ✓ | | |

These errors have seriously harmed Clover. Clover overperformed on the traditional

measures of clinical quality and healthcare outcomes that Congress authorized CMS to rely upon. For example, Clover obtained 5-Star ratings on rates of breast cancer screening, colorectal cancer screening, management of osteoporosis, blood sugar control, and control of high blood pressure, among many others. Yet CMS discounted that performance by relying on other, novel, unlawful measures, erroneously reducing Clover's Star Rating from 4.0 to 3.5 Stars.

As a result of CMS's unlawful determination of Clover's Star Rating as 3.5 Stars, Clover will lose approximately $120 million in quality bonus payments and rebates to which Clover would otherwise be entitled had CMS correctly determined its Star Rating as at least 4 Stars as required by law. Clover will also suffer serious reputational and competitive harms. To prevent Clover from suffering this harm and to facilitate CMS's timely implementation of any remedy awarded by the Court, Clover respectfully requests that the Court expedite summary judgment, vacate Clover's 2026 Star Rating—including its challenged measures—and order CMS to recalculate that Rating without reliance on the unlawful measures identified herein **by May 29, 2026, the period that CMS has previously identified it may readily update a plan's Star Ratings in response to judicial decision-making** and make resulting changes to quality bonus and related payments.[3]

[3] *See Elevance Health, Inc. v. Becerra*, 736 F. Supp. 3d 1, 13 (D.D.C. 2024) ("Both parties have requested expedited consideration of . . . summary judgment in light of Plaintiffs' impending deadline to submit their bids to CMS for the upcoming contract year."); Joint Motion for Briefing Schedule at 1, *SCAN Health Plan v. Dep't of Health & Human Servs*., No. 1:23-cv-03910-CJN (D.D.C. Feb. 23, 2024), ECF No. 19 ("The parties have developed this scheduling proposal to allow for expedited summary judgment briefing in advance of the June 3, 2024 deadline for Medicare Advantage bids . . . ."); Notice of Joint Proposed Briefing Schedule at 4, *Clover Ins. Co. v. Becerra*, 1:24-cv-01385-BAH (D.D.C. June 7, 2024), ECF No. 12 (similar). In CMS's January 28, 2026 reply brief on a discovery stay (Dkt. 31), CMS represented that it may be able to afford relief at a later time. And in a January 30, 2026 email, CMS, through counsel, represented that it "will of course comply with any court order, regardless of what month it may be issued." Clover attempted to meet and confer on these new representations (which are potentially in tension with CMS's representations in *Elevance*, *SCAN*, and *Clover*), until *what date* CMS's systems could process a change in Clover's Star Rating (resulting in increased payments to Clover), and the scheduling of summary judgment. CMS declined Plaintiff's request for a telephonic conference.

## BACKGROUND

### A. The Medicare Advantage Program

The Medicare program provides government-funded health insurance to seniors and the disabled. *See* 42 U.S.C. § 1395, *et seq*. Under the Act, beneficiaries enrolled under "Original Medicare" (Medicare Parts A and B) receive benefits for covered medical services directly from the federal government. *See* 42 U.S.C. §§ 1395c to 1395i-6, 1395j to 1395w-6.

Alternatively, beneficiaries may elect coverage under the Medicare Advantage program, Medicare Part C, which Congress created in 1997 (then known as Medicare+Choice). *Id*. § 1395w-21; Balanced Budget Act of 1997, Pub. L. No. 105-33, § 4001, 111 Stat. 251, 275-327 (1997). CMS contracts with private plans to provide Original Medicare benefits and other benefits.

In 2003, Congress also established Medicare Part D, effective in 2006. § 101, 117 Stat. at 2071-72. Enrollees in Original Medicare or Medicare Advantage may choose whether to enroll in optional Part D prescription drug benefits. *See generally* 42 U.S.C. §§ 1395w-101 to 1395w-104.

Medicare Advantage plans must include the same level of benefits offered by Original Medicare (Medicare Parts A and B)—although Medicare Advantage plans may also offer supplemental benefits, like optical or dental. *See generally id.* § 1395w-22. Medicare Advantage plans compete to encourage beneficiaries to select their plans (over other plans and Original Medicare) by offering high-quality care, supplemental benefits, and lower premiums. *See id.*

To fund Medicare Advantage benefits, the government pays plans a monthly sum for each plan enrollee, determined through a bidding system. *See id.* § 1395w-23. Each year, CMS establishes "benchmark" rates that are meant to represent what it would cost CMS to provide Medicare benefits to an average enrollee in each county. *See id.* § 1395w-23(b)(1)(B). Plans then submit bids for the estimated cost for covering Medicare-defined standard benefits to an average enrollee for the upcoming year. *See id.* § 1395w-23(a)(1)(B). If a plan bids below the benchmark,

CMS returns a portion of the difference to the plan as a "rebate," which plans can use, among other things, to reduce member cost sharing, lower Part D premiums, and offer supplemental benefits not included in traditional Medicare. *See, e.g.*, *id.* §§ 1395w-23(a)(1)(E), 1395w-24(a)(6)(A).

**B. Medicare Quality Assurance Programs (1997-2003)**

Under the Balanced Budget Act of 1997, each Medicare Advantage plan was required to "have arrangements . . . for an ongoing quality assurance program." § 4001, 111 Stat. at 291, codified at 42 U.S.C. § 1395w-22(e)(1) (1997). Specifically, the statute provided for collection, analysis, and reporting of data by plans to allow CMS to monitor plans and provide beneficiaries information on plan quality. *Id.* § 1395w-22(e)(2)(A)(i), (vi), (xii) (1997).

Prior to 2003, CMS possessed express authority to choose the "quality and outcomes measures" that the Secretary "determine[d] to be appropriate" as part of plans' quality assurance programs. *Id*. § 1395w-22(e)(1), (e)(2)(A)(xii) (1997). CMS's implementing regulations required each insurer to "[m]easure performance . . . using standard measures required by [CMS]," which "may be specified in uniform data collection and reporting instruments required by [CMS]." 42 C.F.R. § 422.152(c)(1) (1998). At that time, CMS had "already begun requiring reporting of standardized quality measurement data through instruments such as [HEDIS], as well as reporting of standardized consumer satisfaction data through [CAHPS]." 63 Fed. Reg. at 34,993.

Because CMS wanted "flexibility for the specific reporting and performance requirements to progress" so it could "respond rapidly to new developments," CMS's regulations did not "specify[] the particular measures for which reporting [would] be required." *Id.* CMS admitted that it did not know what measures of quality it would ultimately deem appropriate to evaluate plans: Instead, CMS committed to inform plans of its chosen measures each year, "through the [annual] contracting process." *Id.* Adding to the uncertainty, CMS believed that it would take "several years" for CMS to determine which "minimum performance levels" would be required of

plans. 63 Fed. Reg. at 34,994. Each year, as CMS determined what measures and performance levels were required, plans would have just *one year* to meet those new requirements, at which point CMS could "decline to renew" a noncompliant plan as a Medicare Advantage insurer. *Id*.

Plans warned CMS that its constantly changing data collections and standards would impose "significant" and "excessive" administrative costs, without "address[ing] the health issues" of beneficiaries, and ultimately drive high-quality plans out of the market. 65 Fed. Reg. at 40,220-21. Rather than addressing the natural consequences of its approach, CMS reiterated its authority to "impos[e] further requirements" on insurers each year in its discretion. *Id.*

### C. The Medicare Modernization Act Of 2003

The Medicare Modernization Act amended the provisions discussed above. § 722(a)(2), 117 Stat. 2066, 2347-48. Similar to the prior statute, Congress provided that each plan "shall have an ongoing quality improvement program for the purpose of improving the quality of care provided to enrollees in each MA [Medicare Advantage] plan." 42 U.S.C. § 1395w-22(e)(1).

The amendments added a new § 1395w-22(e)(3), entitled "Data," which remains effective today. Subparagraph (A)(i) requires that, "as part of the quality improvement program under paragraph (1), each MA [Medicare Advantage] organization shall provide for the collection, analysis, and reporting of data that permits the measurement of health outcomes and other indices of quality." *Id.* § 1395w-22(e)(3)(A)(i). Subparagraph (B) further restricts the types of data that CMS can collect from plans as part of their quality improvement programs, providing:

> (B) Limitations.
>
> (i) Types of data.—The Secretary *shall not collect under subparagraph (A)* data on quality, outcomes, and beneficiary satisfaction to facilitate consumer choice and program administration *other than the types of data that were collected by the Secretary as of November 1, 2003*.
>
> (ii) Changes in types of data.—Subject to subclause (iii), the Secretary may only change the types of data that are required to be submitted under subparagraph (A)

> after *submitting to Congress a report on the reasons for such changes that was prepared in consultation with MA [Medicare Advantage] organizations and private accrediting bodies*.

*Id.* § 1395w-22(e)(3)(B)(i)–(ii) (emphases added).

In its subsequent rulemaking, CMS interpreted the amendments to mean that the agency could continue to collect data from preexisting measurement systems that formed part of plans' longstanding quality assurance programs, including the HEDIS (clinical quality), HOS (outcomes), and CAHPS (beneficiary satisfaction) systems. *See* 69 Fed. Reg. at 46,886. CMS conceded that requiring data from "new measurement system[s]" to assess plans' performance, beyond those preexisting systems, would require CMS to submit a report to Congress prepared in consultation with plans and private accrediting organizations under § 1395w-22(e). *Id.*

**D. CMS's Sub-Regulatory Star Ratings System (2008-2010)**

CMS has published raw data about Medicare Advantage plan quality and performance since 1998. 83 Fed. Reg. at 16,520. But in 2008, CMS began publishing annual Star Ratings. *Id.*

In 2008, Congress did not expressly authorize Star Ratings. Instead, they were purely a creature of sub-regulatory guidance. *See id.* These Star Ratings served two purposes: (1) to provide beneficiaries information on plan performance to consider when choosing a plan; and (2) to assist CMS in identifying low performing plans for compliance actions. 75 Fed. Reg. at 71,219.

CMS's sub-regulatory Star Ratings depended in significant part on data collected under § 1395w-22(e), *i.e.*, HEDIS, HOS, and CAHPS data. But critically, much of CMS's chosen data concerning Part C coverage, and *all* of CMS's chosen data concerning Part D, were *not* collected under CMS's authority under § 1395w-22(e) governing plans' quality improvement programs, *i.e.*, the HEDIS, HOS, and CAHPS measurement systems, but rather, drawn from other aspects of CMS's program administration. *See* 83 Fed. Reg. at 16,520 (citing other authorities to collect and disseminate data under 42 U.S.C. §§ 1395w-21(d)(1), 1395w-101(c)(1), 1395w-104(d)).

More specifically, CMS asserted that it had separate, broad authorities to collect data *itself*, and, furthermore, to disseminate data concerning plan quality *itself* to beneficiaries, separate from CMS's § 1395w-22(e) authority to collect data from plans as part of their quality improvement programs. *Id.* For example, CMS relied upon 42 U.S.C. § 1395w-21(d)(1), which authorizes *CMS itself to* "provide for activities . . . [to] disseminate information . . . on the coverage options . . . ." 42 U.S.C. § 1395w-21(d)(1); *see also id.* § 1395w-101(c)(1) (similar for Part D).

But the *way* CMS applied these separate authorities in creating the sub-regulatory Star Ratings created a serious problem: CMS now asserted that, if CMS possessed data drawn from *any source* as part of Medicare, CMS could disseminate that information to beneficiaries through Star Ratings. 83 Fed. Reg. at 16,520. That was essentially the same position CMS had asserted prior to Congress's 2003 amendments: CMS could unilaterally determine the relevant standards of quality, and change them annually at will. *See id*. In doing so, CMS continued to saddle plans with significant administrative costs and unpredictable quality standards unrelated to health quality and outcomes, without improving healthcare for seniors. *See id.*; 65 Fed. Reg. at 40,220-21.

**E. Statutory Star Ratings & Quality Bonus Payments (2010-Present)**

In 2010, Congress codified in part, and overrode in part, CMS's Star Ratings system.

The Affordable Care Act—as amended by the Healthcare and Education Reconciliation Act—introduced the Quality Bonus Payment program, which incorporated Star Ratings into two formulas that determine certain payments to plans. *See* § 1102(c)-(d), 124 Stat. at 1043-46.

The first formula, codified at 42 U.S.C. § 1395w-23(o) and known as the quality bonus payment, rewards Medicare Advantage plans rated 4 Stars or higher with an increased 5 percent benchmark against which to bid. That effectively either increases the total amount of money the plan is eligible to receive, including in the form of a rebate (if its bid is below the benchmark), or reduces the premium the plan must charge its members (if its bid is above the benchmark).

The second formula, codified at § 1395w-24(b)(1)(C), gives higher-rated plans a larger portion of the difference between their bid and their benchmark back as a rebate. Rebates are used to lower patient cost-sharing and premiums and fund supplemental benefits not offered by Original Medicare, such as dental and vision benefits. 85 Fed. Reg. 33,796, 33,885-56 (June 2, 2020).

Critically, Congress needed to decide *which* data sources CMS could utilize for these revamped Star Ratings. Rather than deferring to CMS to select "appropriate" data as it had prior to 2003, or adopting CMS's existing sub-regulatory Star Ratings, Congress provided that the "quality rating for a plan shall be determined according to a 5-star rating system (based on the data collected under section 1395w-22(e) of this title)." *Id.* § 1395w-23(o)(4)(A). That is, Congress applied much the same solution that it had adopted seven years earlier in its 2003 amendments, and expanded that solution to the entire Star Ratings system: Congress required the Star Ratings to be based upon the data collected under plans' quality assurance programs as of November 1, 2003 under § 1395w-22(e). *Id.* § 1395w-22(e)(3)(B)(i). Congress thus required CMS to focus on established data concerning clinical quality, health outcomes, and beneficiary satisfaction. *See id.*

**F. CMS's Disregard Of Congress's Express Instruction**

Rather than honor Congress's explicit instruction that the Star Ratings used to determine payments to plans must be "based on the data collected under section 1395w-22(e) of this title," *id.*, CMS has firmly maintained its position that it may continue to rely on any sources of data it wishes to determine its Star Ratings, whether or not those data are collected under § 1395w-22(e):

> there are several measures in the Stars Ratings System that are based on performance that address telephone customer service, members' complaints, disenrollment rates, and appeals; however these *additional measures are not collected directly from the sponsoring organizations for the primary purpose of quality measurement so they are not information collections governed by section 1852(e)) [§ 1395w-22(e)].* These additional measures are calculated from information that CMS has gathered *as part of the administration of the Medicare program*, such as information on appeals forwarded to the Independent Review Entity under subparts M, enrollment, and compliance and enforcement actions.

83 Fed. Reg. at 16,531-32 (emphases added); *see also* 82 Fed. Reg. at 56,382, 56,497 (similar). CMS's binding regulation concedes that the Star Ratings are based on data collections authorized outside of § 1395w-22(e), *i.e.*, as part of the HEDIS, HOS, and CAHPS systems, as "CMS bases Part C Star Ratings on the type of data specified in section 1852(e) of the Act [§ 1395w-22(e)] *and on CMS administrative data*." 42 C.F.R. § 422.162(c)(1) (2024) (emphasis added). Indeed, CMS's own Technical Notes (CMS's central compendium of its Star Ratings guidance) identify the specific Star Ratings data sources that are *not* collected under CMS's § 1395w-22(e) authority as part of the HEDIS, HOS, and CAHPS systems. AR296-300 (listing data sources).

**G. Notice And Comment On The Star Ratings Measures**

CMS changes the Star Ratings measures each and every year. *Id.* Due to these "regular updates and revisions," CMS does not codify its Star Ratings measures in the Code of Federal Regulations, but lists each year's measures in its annual Technical Notes. 83 Fed. Reg. at 16,537.

To offer some measure of predictability and accountability to plans and the public, CMS has committed that, before adding a "new" measure, or making substantial changes to a measure's specifications, CMS must engage in a multi-step notice and comment process, dictated by its regulations. This allows interested parties to offer feedback twice, both at the initial design stage for a new or revised measure, and again after data is actually collected concerning that measure.

*First*, before adding a "new" measure, or making substantial changes to a measure's specifications, CMS must first publicly propose the measure on its website, to obtain informal feedback by the public, *in advance* of the measurement period to collect data for the revised measure. *See* 42 C.F.R. § 422.164(c)(2) ("In advance of the measurement period, CMS will announce potential new measures and solicit feedback . . . ."); *id.* § 423.184(c)(2) (same for part D); *id.* §§ 422.164(d)(2), 423.184(d)(2) (same procedure for substantial changes to measures).

*Second*, after CMS makes that announcement on its website, solicits feedback, and engages

in the new data collection, CMS *then* engages in formal notice-and-comment rulemaking in the Federal Register. 42 C.F.R. § 422.164(c)(2) (After soliciting feedback, CMS "subsequently will propose and finalize new measures through rulemaking."); *id.* § 423.184(c)(2) (same for part D); *id.* §§ 422.164(d)(2), 423.184(d)(2) (same procedure for substantial changes to measures).

**H. CMS's Annual Determination And Publication Of Star Ratings**

Utilizing the measures described above, CMS determines Star Ratings annually, through a three-step process that is broadly analogous to grading a student's overall grade in a college course.

*First,* CMS calculates a "measure score" on dozens of "measures." AR157-58 (2026 Tech. Notes). A "measure score" is the plan's raw score on each measure, usually expressed as a percentage. 42 C.F.R. §§ 422.162(a), 422.166(a)(1), (a)(4), 423.182(a), 423.186(a)(1), (a)(4). A plan will receive over 40 of these measure scores each year. *See, e.g.*, 83 Fed. Reg. at 16,537-46. This is akin to a student receiving numerical scores on over 40 assignments.

*Second,* akin to grading on a "curve" in a college course, CMS sets "cut points" between Star Rating levels for *each measure*, and converts *each* raw measure score, for each measure, into a measure-specific Star Rating between 1 and 5. 42 C.F.R. §§ 422.166(a)(1), (a)(4), (a)(2), 423.186(a)(1), (a)(2), (a)(4). For example, 90% of beneficiaries receiving recommended cancer screenings may merit a "4 Star" Star Rating for that specific measure. This is akin to converting an 85% on a homework assignment to a "B" grade.

*Third*, CMS takes a weighted average of all the plan's measure-specific Star Ratings. *Id.* §§ 422.166(c)(1), (d)(1), 423.186(c)(1), (d)(1). This average determines the plan's overall Star Rating—similar to the average of all course assignments determining the final course grade.

Star Ratings are released each October, prior to the annual open enrollment period for Medicare Advantage. For example, the Star Ratings released on October 9, 2025 are known as the "2026 Star Ratings" because they are published prior to the 2026 open enrollment period,

which occurs in late 2025. AR157. Meanwhile, the *data* underlying the 2026 Star Ratings were collected in 2024, and the 2026 Star Ratings impact payments to plans in 2027. *See e.g.*, AR210.

CMS displays Star Ratings as part of its online "Plan Finder" tool, which beneficiaries use to research, compare, and sign up for Medicare Advantage plans. Thornton Decl. ¶ 17. Higher-rated plans are displayed higher than lower-rated plans, thus helping them attract a disproportionate share of enrollment. *Id.* In addition, CMS publishes plans' measures scores for each measure. *See* Ex. D, CMS, *Part C & D Performance Data*, https://tinyurl.com/yc2b9k95.

### I. Clover Raises Its Concerns To CMS Over Its 2026 Star Rating

Throughout 2025, Clover attempted to engage with CMS to ensure that the calculation of its 2026 Star Rating would be in the manner required by CMS's governing statute and regulation.

To begin, Clover made submissions to CMS dated April 30, 2025, May 21, 2025, June 13, 2025, August 12, 2025, and August 16, 2025, concerning CMS's so-called "medication adherence" measures. *See* AR10-13 (April 30), 18-21 (May 21), 14-16 (June 13), 32-43 (August 12), 131-32 (August 16). Clover explained that, under CMS's measures known as Medication Adherence for Diabetes, Hypertension, and Cholesterol Medications (D08, D09, D10), CMS reduced Clover's Star Rating by counting against Clover hundreds of cases where patients discontinued taking medications even though patients were *directed by their doctors to stop taking the medications*. *See* AR10-13, 18-21, 14-16, 32-43, 131-32. Yet CMS *penalized* Clover for this medically recommended treatment discontinuation. *E.g.*, AR18-21. Clover requested that CMS exclude these medication adherence measures from its Star Rating, or at least exclude the challenged members who discontinued treatment *as directed*. *Id*. CMS declined to do so. *E.g.*, AR22-23.

As a part of CMS's "Second Plan Preview" on September 9, 2025, CMS released Clover's preliminary Star Rating for each measure, along with its projected overall Star Rating. *See* AR137-143. After reviewing this data, Clover determined that it was unexpectedly underperforming on a

number of other measures that either relied upon unauthorized data or failed to adhere to CMS's required procedures. Whereas Clover had expected its overall 2026 Star Rating to be at or at least close to 4 Stars, CMS's application of these unlawful measures reduced Clover's Star Rating to 3.5 Stars, while promoting other, inferior plans to 4 Stars. *Id.* So, on September 16, 2025, Clover wrote again to CMS, requesting that it exclude several measures from its Star Rating and re-calculate Clover's Star Rating at 4 Stars. AR137-43. Clover identified six types of errors.

*First*, Clover reminded CMS that Congress has limited the data on which Star Ratings may be based to the "data collected under section 1395w-22(e) of this title." 42 U.S.C. § 1395w-23(o)(4)(A); AR140. But CMS indicated its intent to determine Clover's Star Rating based on other sources of data as well. *Id*. Clover explained that CMS lacks authority to do so. *Id.*

*Second*, Clover explained that Congress has limited the data on which Star Ratings may be based to the "types of data that were collected by the Secretary as of November 1, 2003." AR139 (citing 42 U.S.C. § 1395w-22(e)(3)(B)(i)); *see also id.* § 1395w-23(o)(4)(A)). Clover explained that CMS lacks authority to determine Clover's 2026 Star Ratings using its measures based on types of data post-dating November 1, 2003, absent specific reporting to Congress in consultation with private accrediting bodies, which CMS had not done. *Id.*

*Third*, Clover explained that CMS intended to determine Clover's 2026 Star Rating based on multiple measures that had not been subjected to required notice and comment. AR141.

*Fourth*, Clover explained that several of CMS's measures are arbitrary and unauthorized, including CMS's Medication Adherence and Call Center measures. AR142.

*Fifth*, Clover explained that CMS improperly calculated Clover's Star Rating by delegating the determination of the Reviewing Appeal Decision measure (C32), regarding the correctness of Clover's coverage decisions, to a private contractor, the IRE, in violation of the private

nondelegation doctrine. AR140-41; *see also Consumers' Rsch. II*, 606 U.S. at 690-91.

*Finally*, Clover explained that CMS determined its 2026 Star Rating using measures that had not been promulgated "by regulation," as required by 42 U.S.C. § 1395hh(a)(2). AR141-42.

CMS takes the position that administrative review is wholly unavailable for plans' objections to the measures that CMS uses to determine a plan's Star Ratings. *See* 42 C.F.R. § 422.260(c)(3)(ii) (CMS review "cannot be requested for . . . the methodology for calculating the star ratings"); *Scan Health Plan v. Dep't of Health & Human Servs.*, No. 1:23-cv-03910, 2024 WL 2815789, at *4 n.3 (D.D.C. June 3, 2024) (similar). Consistent with CMS's longstanding position, on September 18, 2025, CMS responded, rejecting Clover's request and stating that Clover's objections involved issues "outside of the scope of the plan preview" process. AR137.

### J. CMS Unlawfully Determines Clover's 2026 Star Rating

On October 9, 2025, CMS published Clover's 2026 Star Rating as 3.5 Stars. *See* Ex. E, CMS, 2026 Star Ratings Data Table. Despite Clover's objections, CMS unlawfully determined Clover's Star Rating using the measures identified in Clover's prior submissions. *See* Ex. A, CMS, 2026 Star View: Medicare Report Card Master Table (listing Clover at line 392). CMS thus erroneously reduced Clover's Star Rating (Contract Number H5141) from 4.0 to 3.5 Stars. *Id.*; Thornton Decl. ¶ 33. Had CMS not included the measures Clover challenged in determining its 2026 Star Rating, Clover would have achieved at least 4.0 Stars. Thornton Decl. ¶¶ 31-32.

CMS's unlawful determination of Clover's Star Rating at 3.5 Stars has harmed and will continue to harm Clover and its members. As explained, Clover's Star Rating is a critical factor in determining CMS's payments to Clover. *Supra* at 16-17. A Star Rating of 3.5 Stars leaves Clover ineligible for a quality bonus payment. 42 U.S.C. § 1395w-23(o)(3)(A)(i) (defining a "qualifying plan" for a bonus payment as a plan with a Star Rating as "4 stars or higher"). Clover will also receive a smaller rebate than it would otherwise receive. *See, e.g.*, *id.* §§ 1395w-

23(a)(1)(E), 1395w-24(a)(6)(A). This will result in a loss of at least approximately $120 million in 2027, that Clover would have been entitled to with a 4 Star Rating. Thornton Decl. ¶ 33. This determination has also caused serious harm to Clover's reputation and goodwill, given Star Ratings and individual measure scores are publicized on CMS's website during the annual enrollment period with the explicit goal of steering beneficiaries to higher-rated plans. *Id.* ¶¶ 25, 34.

### K. Clover Files Suit Challenging Its 2026 Star Rating

On November 7, 2025, Clover filed suit against Defendants, re-raising the objections that it had previously raised to its 2026 Star Rating. Dkt. 1. Clover requested that the Court vacate Clover's 2026 Star Rating and order CMS to re-determine that Star Rating in compliance with CMS's governing statute and regulations. *Id.* Clover requested relief by May 29, 2026, the period during which CMS has previously identified that it may readily update a plan's Star Ratings in response to judicial decision-making and make resulting changes to payments to plans. *Id.* ¶ 43.

## ARGUMENT

A court "shall . . . hold unlawful and set aside agency action" that is "arbitrary, capricious, . . . otherwise not in accordance with law . . . in excess of statutory jurisdiction, authority, or limitations . . . [or] without observance of procedure required by law." 5 U.S.C. §§ 706(2)(A), (C); *see also id.* § 702. The Court applies "the best reading of the statute" in its "independent judgment." *Loper Bright Enters.*, 603 U.S. at 394-95. CMS's determination of Clover's 2026 Star Rating is contrary to law, arbitrary and capricious, and otherwise not accordance with required procedure, and Clover is therefore entitled to summary judgment in its favor vacating its 2026 Star Rating and requiring CMS to redetermine that Star Rating in accordance with the law.

## I. CMS DETERMINED CLOVER'S 2026 STAR RATING BASED ON DATA THAT CONGRESS FORBADE

Although Congress has limited by statute the data upon which Star Ratings may be based,

CMS disregarded those statutory limitations in determining Clover's 2026 Star Rating. First, CMS unlawfully determined Clover's 2026 Star Rating based on data that were not collected as part of Clover's quality improvement program under 42 U.S.C. § 1395w-22(e), as required by § 1395w-23(o)(4)(A). Second, CMS unlawfully determined Clover's 2026 Star Rating based on data concerning quality, outcomes, and satisfaction that are not the "types of data that were collected by the Secretary as of November 1, 2003." 42 U.S.C. § 1395w-22(e)(3)(B)(i).

**A. CMS Determined Clover's 2026 Star Rating Based On Data *Not* Collected As Part Of Plans' Quality Improvement Programs**

CMS determined Clover's 2026 Star Rating based on data that plans did *not* provide for the collection, analysis, or reporting of as part of their quality improvement programs under § 1395w-22(e). CMS's determination of Clover's 2026 Star Rating is therefore contrary to law.

As explained, Congress provided an overarching restriction that the "quality rating for a plan shall be determined according to a 5-star rating system (*based on the data collected under section 1395w-22(e) of this title*)." *Id.* § 1395w-23(o)(4)(A) (emphasis added). And those data "collected under section 1395w-22(e) of this title" are data that plans provide for collection, analysis, and reporting of "as part of the quality improvement program." *Id.* § 1395w-22(e)(3).

Specifically, § 1395w-22(e)(3), entitled "Data," provides that "as part of the quality improvement program . . . each MA organization shall provide for the collection, analysis, and reporting of data that permits the measurement of health outcomes and other indices of quality." *Id.* § 1395w-22(e)(3). That is, these data are those that plans must arrange to collect, analyze, and report as part of their quality improvement programs. *Provide*, The American Heritage Dictionary (4th ed. 2003) ("To make available" or "[t]o take measures in preparation.").

CMS has further elaborated on *which* data are those that plans must "provide for the collection, analysis, and reporting of" as part of "the quality improvement program under

paragraph (1)," 42 U.S.C. § 1395w-22(e)(3): CMS requires plans to collect and report this data under the HEDIS, HOS, and CAHPS data collection systems. Prior to 2003, as part of plans' quality assurance programs, CMS required plans to "[m]easure performance . . . using standard measures required by [CMS]," which "may be specified in uniform data collection and reporting instruments required by [CMS]." 42 C.F.R. § 422.152(c)(1) (1998). At that time, CMS had "already begun requiring reporting of standardized quality measurement data through instruments such as [HEDIS], as well as . . . standardized consumer satisfaction data through [CAHPS]." 63 Fed. Reg. at 34,993; *see also* 69 Fed. Reg. at 46,886 (describing that quality assurance programs prior to 2003 included HEDIS, HOS, and CAHPS surveys). With the 2003 amendments, CMS found that it could continue to collect data under § 1395w-22(e)(3) from these preexisting measurement systems. *See* 69 Fed. Reg. at 46,886 ("[W]e can continue to require MA coordinated care plans to collect, analyze, and report their performance by using the measurement systems that are currently required, such as HEDIS, Health Outcomes of Seniors (HOS), and CAHPS.").

Essentially the same requirements remain in place today: CMS's regulation provides that as part of its quality improvement plan, each Medicare Advantage organization must "[m]easure performance under the plan, using the measurement tools required by CMS, and report its performance to CMS," and must "[c]ollect, analyze, and report quality performance data identified by CMS that are of the same type as those under paragraph (b)(3)(i) of this section." 42 C.F.R. § 422.152(b)(3). And CMS has, through sub-regulatory guidance, specified which "measurement tools" and "data" must be collected, analyzed, and reported by the plan: HEDIS, HOS, and CAHPS, just as CMS has required since 1998. *See generally* Ex. F, *Medicare Managed Care Manual Chapter 5 - Quality Improvement Program* § 30 (2014) (discussing "Standard . . . Reporting Requirements for HEDIS, HOS, and CAHPS" and describing reporting requirements).

Notwithstanding the limitation in § 1395w-22(e), CMS has chosen to apply to Clover numerous measures based on data *not* collected as part of plans' quality improvement programs under § 1395w-22(e), *i.e.*, as part of HEDIS, HOS, and CAHPS. Indeed, CMS's regulation expressly admits that "CMS bases Part C Star Ratings on the type of data specified in section 1852(e) of the Act [§ 1395w-22(e)] *and on CMS administrative data*" outside of § 1395w-22(e). 42 C.F.R. § 422.162(c)(1) (emphasis added); *see also AvMed, Inc. v. Becerra*, No. 20-3385, 2021 WL 2209406, at *2 (D.D.C. June 1, 2021) ("Star Ratings are based 'on the type of data specified in section 1852(e) . . . and on CMS administrative data.'") (citing 42 C.F.R. § 422.162(c)(1)).

CMS's decision *not* to base Clover's Star Rating on data collected under § 1395w-22(e) is particularly clear with respect to CMS's utilization of Medicare Part D (prescription drug benefit) data. For CMS's Part D measures, CMS's regulation does not even pretend that they are *in any way* derived from data collected under § 1395w-22(e). 42 C.F.R. § 422.162(c)(1) (making no reference to § 1395w-22(e)). That makes sense: Medicare Part D is an entirely separate Part of the Medicare Act, and has nothing to do with CMS's Part C authority to collect data under § 1395w-22(e). Indeed, the baseline constraint that Congress imposed was that CMS must determine the "quality rating for a plan," *i.e.*, a Medicare Advantage plan under Part C. 42 U.S.C. § 1395w-23(o)(4)(A). Part D data is entirely unrelated to the quality of a *Part C* plan. *See id.*

In short, Congress made intentional choices as to which data sources CMS could rely upon, to retain a measure of control over the Star Ratings program, and to ensure that its quality bonus payments would go to plans that satisfied Congress's vision of quality. *Id.* CMS has intentionally disregarded Congress's limitations. The upshot of CMS's choices is that today, the *majority* of a plan's Star Rating is determined based on data *other than* data authorized under § 1395w-22(e).[4]

[4] CMS assigns "weights" to each measure between 1 and 5 used in generating the overall Star

This has had severe ramifications for Clover. On many measures, CMS scored Clover with a measure-specific Star Rating of 3 or lower, lowering Clover's 2026 Star Rating, despite those measures *not* being based on data collected, analyzed, or reported under § 1395w-22(e):

**Part C and Part D Call Center – Foreign Language Interpreter and TTY Availability measures (C33 and D01):** These measures are based on data concerning how frequently TTY (teletypewriter) services and foreign language interpretation were *timely* made available each time a CMS contractor (a "test" caller) called Clover's customer service line. AR238, 240 (2026 Tech. Notes). These data are not collected by plans as part of their quality improvement programs, *i.e.*, under the HEDIS, HOS, and CAHPS systems, but are collected by private contractors on "test" calls they place unrelated to those systems. *Id.*; Ex. F, *Medicare Managed Care Manual Chapter 5 - Quality Improvement Program* § 30 (2014) (making no mention of any requirement for plans to report data on telephonic customer service as part of quality improvement programs); 42 C.F.R. § 422.152(b)(3) (limiting plans' obligations to "[c]ollect, analyze, and report quality performance data" via "measurement tools required by CMS"). CMS has *specifically* conceded that its "measures. . . [on] telephone customer service. . . are not collected directly from the sponsoring organizations for the primary purpose of quality measurement so they are not information collections governed by section 1852(e) [§ 1395w-22(e)]." 83 Fed. Reg. at 16,531-32.

**Part C Reviewing Appeals Decisions measure (C32):** This measure is based on data collected from a CMS contractor (the IRE), concerning how often Clover's coverage decisions are

---

Rating, which is a weighted average. AR166-82; 42 C.F.R. § 422.166(e)(1); 42 C.F.R. § 423.186. These weights sum to a total of 81 points. Today at least 43 points (53%), *i.e.*, the majority of the weighted average, are determined by administrative and other data drawn from outside of the Part C HEDIS, HOS, and CAHPS systems. *Infra* at 27-30; *see also* AR194, 230-38, 240-63 (explaining that measures C07, C28 to C33, and D01 to D12 are based on data drawn from outside of the Part C HEDIS, HOS, and CAHPS systems).

upheld on review by the IRE. AR235-38 (2026 Tech. Notes). These data are not collected by plans as part of their quality improvement programs, but are collected from the IRE as part of its separate function to affirm or overturn plans' coverage decisions. *Id.*; Ex. F, *Medicare Managed Care Manual Chapter 5 - Quality Improvement Program* § 30 (2014) (making no mention of any requirement for plans to report data from IRE); 42 C.F.R. § 422.152(b)(3) (limiting plans' quality improvement programs to "measurement tools required by CMS"). Again, CMS has *specifically* conceded that data concerning "appeals" "are not information collections governed by section 1852(e) [§ 1395w-22(e)]." 83 Fed. Reg. at 16,531-32.

**Medication Adherence for Diabetes Medication, Hypertension, and Cholesterol measures (D08, D09, and D10) and Pharmacy Statin Use with Diabetes measure (D12):** These measures are based on CMS-generated data, known as "Prescription Drug Event" or "PDE" data concerning drug dispensing (name of drug, dispense date, etc.), obtained from pharmacies and transmitted to CMS, via Part D plans, each time a pharmacy fills a prescription for a drug covered by Part D.[5] CMS generates PDE data as part of its administration of Part D prescription drug benefits, not under Part C. *Id.* In measures D08, D09, and D10, CMS-generated PDE data are used to determine "[t]he percentage of plan members with a prescription for [applicable] medication[s] who fill their prescription often enough to cover 80% or more of the time they are taking the medication." AR252-60 (2026 Tech. Notes). Under measure D12, these PDE data are used to determine the rate of diabetes patients that *also* fill prescriptions for statins. AR263-65.

PDE data are not collected by plans as part of their quality improvement programs, but are generated pursuant to CMS's, pharmacies', and Part D prescription drug plans' separate

---

[5] *See* AR253, 255, 258, 263 (describing that PDE data stems from the "annual Part D payment reconciliation"); Ex. G, CMS, *Questions and Answers on Obtaining Prescription Drug Event (PDE) Data*, https://tinyurl.com/43atrzcs (last visited Jan. 28, 2026).

obligations to facilitate reimbursement of Part D drug dispenses. *Supra* n.5; Ex. F, *Medicare Managed Care Manual Chapter 5 - Quality Improvement Program* § 30 (2014) (making no mention of any requirement for Medicare Advantage plans to report PDE data as part of their ongoing quality improvement programs); 42 U.S.C. § 1395w-115(c)(1)(C), 42 C.F.R. § 423.322 (CMS's asserted authority to require reporting of dispensing records into PDE system as part of Part D). Indeed, CMS has explained that § 1395w-22(e) "does not apply to our collection of Part D quality data from Part D sponsors" and does not define "applicable Part D sources of data" like PDE data. 83 Fed. Reg. at 16,531-32 (explaining that where data are "not collected directly from the sponsoring organizations for the primary purpose of quality measurement . . . they are not information collections governed by section 1852(e) [§ 1395w-22(e)]").

**Pharmacy Medication Therapy Management Program Completion Rate measure (D11):** This measure is based on "Plan D Reporting" data, which are data reported by Part D drug plans to CMS to meet the requirements of 42 C.F.R. § 423.514 under Medicare Part D to report a plan's costs of operations and other Part D data. *E.g.*, AR261 ("The data for this measure were reported by contracts to CMS per the 2024 Part D Reporting Requirements . . . ."); 42 C.F.R. § 423.514(a) ("Each Part D plan sponsor must have an effective procedure to . . . report to CMS . . . information indicating . . . utilization of its services . . . [and] Pharmacy performance. . . ."). Part D data are not data provided for by Medicare Advantage plans under their quality improvement programs, but are collected under unrelated Part D authorities. *Id.*; Ex. F, *Medicare Managed Care Manual Chapter 5 - Quality Improvement Program* § 30 (2014) (making no mention of obligation under § 1395w-22(e) to report this data); 42 C.F.R. § 422.152(b)(3) (same).

**Part D Rating of Drug Plan measure (D05) and Getting Needed Prescription Drugs measure (D06):** These two measures are differently situated from the rest. They are based on

data collected as part of the CAHPS survey, but critically, they are *not* based on data collected under CMS's authority in § 1395w-22(e) to require plans to "provide for the collection, analysis, and reporting of" as part of their "quality improvement program[s]." 42 U.S.C. § 1395w-22(e)(3).

These two measures concern (1) how beneficiaries rate their Medicare Part D prescription drug plan, from best to worst ("Part D Rating of Drug Plan"), and (2) how easily beneficiaries believe they can obtain prescription drugs using their Part D plan ("Getting Needed Prescription Drugs"). AR247-49. Recall that beneficiaries may opt into Medicare Part D, *irrespective* of whether they elect Original Medicare (Parts A and B) or Medicare Advantage (Part C). Thus, CMS has explained that "CAHPS survey data" concerning "beneficiaries' experiences with prescription drug plans," are collected under "Section 1860D-4(d) of the Act," *i.e.*, under Medicare Part D, which "specifically directs the administration and collection of data from consumer surveys in a manner similar to those conducted in the MA program." 83 Fed. Reg. at 16,531-32; *see also* 42 U.S.C. § 1395w-104(d) ("[T]he Secretary shall conduct consumer satisfaction surveys with respect to PDP [prescription drug plan] sponsors and prescription drug plans in a manner similar to the manner such surveys are conducted for MA organizations and MA plans under part C."). It is *that* authority under Part D, *not* the § 1395w-22(e)(3) authority in Part C, under which CMS collects data on beneficiaries' satisfaction with prescription drug plans through CAHPS. *Id.* These data, too, are not collected under § 1395w-22(e)(3) of Medicare Part C, but under Part D.

As the discussion above demonstrates, CMS did not determine Clover's 2026 Star Rating "based on the data collected under section 1395w-22(e) of this title." 42 U.S.C. § 1395w-23(o)(4)(A). Rather, CMS determined Clover's 2026 Star Rating based on data other than the data specified in § 1395w-22(e)(3), including with respect to the foregoing 10 measures, *supra* at 24-30. Because CMS determined Clover's 2026 Star Rating based on data other than "data collected

under section 1395w-22(e) of this title," CMS should be required to re-determine Clover's 2026 Star Rating without the inclusion of those 10, unauthorized measures.

### B. CMS Determined Clover's 2026 Star Rating Utilizing Measures Based On Types Of Data Not Collected As Of November 1, 2003

CMS committed another, independent error: CMS determined Clover's 2026 Star Rating based on data that are not the "types of data that were collected by the Secretary [of HHS] as of November 1, 2003" under plans' quality assurance programs. 42 U.S.C. § 1395w-22(e)(3)(B)(i).

It is not entirely controversial what these permissible "types of data" are. Congress required the Star Ratings to be based upon the data collected under plans' quality assurance programs as of November 1, 2003, as CMS acknowledges. According to CMS, the "types of data" that CMS may rely on under § 1395w-22(e)(3)(B) that were collected as of November 1, 2003 are (1) any data concerning plan quality, broadly construed, that (2) are collected within CMS's "measurement systems" used to collect data as part of plans' quality assurance programs as of 2003, *i.e.*, HEDIS, HOS, and CAHPS. 69 Fed. Reg. at 46,886; 83 Fed. Reg. at 16,531-32. More particularly, CMS explained that "[w]e interpret section 1852(e)(3)(B)(i) of the Act [§ 1395w-22(e)(3)(B)(i)] to mean that we can continue to require MA [Medicare Advantage] coordinated care plans to collect, analyze, and report their performance by using the measurement systems that are currently required, such as HEDIS, Health Outcomes of Seniors (HOS), and CAHPS, as appropriate for the type of plan." 69 Fed. Reg. at 46,886. Clover agrees that those are relevant constraints on CMS's authority. But CMS asserts broad flexibility to add and subtract data collections *within* the HEDIS, HOS, and CAHPS systems, stating that, "consistent with private sector practices, we would be allowed to add, delete, or modify measures within these systems." *Id.*; *see also* 83 Fed. Reg. at 16,531-32. According to CMS, as long as data are collected through these measurement systems, they can be included in the Star Ratings. *See* 69 Fed. Reg. at 46,886.

Contrary to CMS's assertions, CMS cannot base its Star Ratings upon whatever data collections it wishes, simply by jamming those data into the HEDIS, HOS, and CAHPS systems. If, for example, CMS wished to begin measuring Clover based on gun ownership in members' homes, it would not be enough to simply shove those data into the HEDIS, HOS, and CAHPS systems. Instead, the "types of data" collected as of November 1, 2003 means data in common with the specific data collections, *i.e.*, the specific survey questions, administered as of November 1, 2003 as part of the HEDIS, HOS, and CAHPS systems under § 1395w-22(e). *Id.*

The statute's text, structure, and history all make this clear. Determining these "types" of data requires a comparative exercise, identifying whether CMS's current data share the relevant "common traits or characteristics" of the data CMS collected in 2003. *Type*, The American Heritage Dictionary of the English Language (4th ed. 2003). The statute elucidates the proper level of generality for this comparative exercise of "types" of data. *See United States v. Rigel Ships Agencies, Inc.*, 432 F.3d 1282, 1288 (11th Cir. 2005) ("In any question of statutory interpretation, we do not look at one word or term in isolation, but instead we look to the entire statutory context."). Congress provided that CMS "shall not collect . . . data on quality, outcomes, and beneficiary satisfaction to facilitate consumer choice and program administration *other than the types of data that were collected by the Secretary as of November 1, 2003*." 42 U.S.C. § 1395w-22(e)(3)(B)(i) (emphasis added). The baseline restriction is that *all* data must concern "quality, outcomes, and beneficiary satisfaction." *Id.* And *that set* of data cannot consist of data "other than the types of data that were collected by the Secretary as of November 1, 2003." *Id.* That is a *further restriction*, on top of the baseline restriction in that the data must always concern "quality, outcomes, and beneficiary satisfaction." *Id.* CMS must provide meaning to Congress's *additional* instruction to limit the data to the "types of data" collected as of November 1, 2003.

If the permissible "types of data" from 2003 were the equivalent of the broad "quality, outcomes, and beneficiary satisfaction" categories of data collected through HEDIS, HOS, and CAHPS systems, as CMS has asserted, the limiting phrase "types of data" would be rendered entirely superfluous, because, by definition, all of the data at issue must concern "quality, outcomes, and beneficiary satisfaction." *Id.* "[A] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." *Rubin v. Islamic Republic of Iran*, 583 U.S. 202, 213 (2018); *see also TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (same). Therefore, the "types of data" clause must refer to a narrower set of specific types of information than just quality, outcomes, and satisfaction, as CMS has asserted.

This interpretation is confirmed by the adjacent requirement that Medicare Advantage organizations must already collect, analyze, and report data that permits the measurement of "health outcomes and other indices of quality." 42 U.S.C. § 1395w-22(e)(3)(A)(i)). If the limitation in (B)(i) were read broadly to include any measure of quality or outcomes, the entirety of the restriction in (B)(i) would be surplusage, as the data collection under Medicare Advantage quality improvement programs must inherently relate to outcomes and other indices of quality. *Id.*

Indeed, recall that the reason Congress enacted this "types of data" limitation in the first place was that CMS had previously overreached in exercising its historical authority by requiring new data collections and setting new minimum performance standards each year as it found "appropriate." *See AvMed*, 2021 WL 2209406, at *10; *supra* at 11-20 (explaining that Congress intervened to end CMS's adoption of shifting minimum performance levels and measures that imposed "significant" and "excessive" administrative costs). In 2003, and 2010, Congress sought to end these moving goalposts and stop CMS from imposing different reporting and performance requirements on plans. *See* 42 U.S.C. § 1395w-22(e)(3)(A)(i). The "types of data" collected as

of November 1, 2003 must mean data in common with the specific survey questions then part of the HEDIS, HOS, and CAHPS systems under § 1395w-22(e). *Id.* Otherwise, CMS could entirely evade Congress's chosen restrictions on its authority, rendering those limitations without force. *See AFL-CIO v. Chao*, 409 F.3d 377, 384 (D.C. Cir. 2005) (explaining that that agency "cannot render nugatory restrictions that Congress has imposed"); *see also Maislin Indus., U.S. v. Primary Steel, Inc.*, 497 U.S. 116, 134-35 (1990) (similar). Congress directly forbade this.

Despite these limitations, CMS determined Clover's 2026 Star Rating based on types of data concerning quality, outcomes, and beneficiary satisfaction that CMS did not collect as of November 1, 2003. Again, the overwhelming majority of CMS's Star Ratings system is based on such impermissible measures,[6] including the following that reduced Clover's overall Star Rating:

**Part C and Part D Call Center – Foreign Language Interpreter and TTY Availability (C33 and D01):** These measures are defined as the percent of time that foreign language interpretation and TTY services were available for CMS "test" callers who called a plan's customer service line. AR238, 241. CMS did not collect this type of data on call center interpretation and TTY quality as part of plans' quality assurance programs prior to November 1, 2003.[7]

**Reviewing Appeals Decisions (C32):** This measure is defined as the percent of a plan's coverage decisions upheld by the IRE. AR236-37. CMS did not collect this type of data on appeals

---

[6] As explained above, *supra* n.4, CMS assigns "weights" to each measure between 1 and 5 used in generating the overall Star Rating, which is a weighted average. AR166-82; 42 C.F.R. § 422.166(e)(1); 42 C.F.R. § 423.186. These weights sum to a total of 81 points. Today, at least 60 points (74%) of the weighted average are determined by data *not* collected as part of plans' quality assurance programs as of November 1, 2003. *Infra* at 34-36; *see also* AR191, 194-200, 209-10, 212-22, 225, 227-63 (denoting that measures C05, C07 to C10, C15, C17 to C22, C25, C27 to C33, and D01 to D12 are based on data not collected prior to November 1, 2003).

[7] *See* Exs. H, I, J (reflecting HEDIS, HOS, and CAHPS surveys as of 2003); 69 Fed. Reg. at 46,886 (describing that quality assurance programs prior to 2003 included HEDIS, HOS, and CAHPS surveys); 83 Fed. Reg. at 16,531-32 (same).

to the IRE as part of plans' quality assurance programs prior to November 1, 2003. *Supra* n.7.

**Care Coordination (C27):** Defined as how well the plan coordinates members' care among various providers. AR227. CMS did not collect this type of data concerning care coordination as part of plans' quality assurance programs prior to November 1, 2003. *Supra* n.7.

**Reducing the Risk of Falling (C15):** Defined as rates of beneficiaries discussing falls and fall prevention with providers. AR209. CMS did not collect this type of data concerning the risk of falling as part of plans' quality assurance programs prior to November 1, 2003. *Supra* n.7.

**Rating of Healthcare Quality (C25):** Defined as how members rate their health care. AR225. CMS did not collect this type of data concerning members' subjective rating of their healthcare as part of plans' quality assurance programs prior to November 1, 2003. *Supra* n.7.

**Improving or Maintaining Mental Health (C05):** Defined as the percent of plan members who feel their mental health was the same or better than expected after two years. AR191. CMS did not collect this type of data concerning members' view of changes in mental health as part of plans' quality assurance programs prior to November 1, 2003. *Supra* n.7.

**Getting Needed Care (C22):** Defined as how members rate their ease of getting care, including by obtaining appointments quickly with specialists. AR221. CMS did not collect this type of data concerning the time to obtain appointments, including with specialists, as part of plans' quality assurance programs prior to November 1, 2003. *Supra* n.7.

**Rating of Drug Plan (D05):** Defined as how members rate their Part D prescription drug plan. AR248. CMS did not collect this type of data concerning Part D prescription drug benefits as part of plans' quality assurance programs prior to November 1, 2003. *Supra* n.7. Part D drug benefits did not exist then. Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 108-173, § 101(2), 117 Stat. 2066, 2072 (2003) (creating Medicare Part D).

This same problem, namely, that CMS did not collect *any* type of data concerning Part D prescription drug benefits as part of plans' quality assurance programs prior to November 1, 2003, impacts other Part D measures that CMS applied to reduce Clover's 2026 Star Rating, namely, Getting Needed Prescription Drugs (D06), AR249, Medication Adherence for Diabetes, Hypertension, and Cholesterol Medications (D08, D09, D10), AR252-60, Pharmacy Medication Therapy Management Program Completion Rate (D11), AR260-62, and Pharmacy Statin Use with Diabetes (D12), AR263; *see also supra* at 28-29 (describing these measures). In each case, CMS did not collect data concerning *any* of these aspects of Medicare Part D prior to November 1, 2003.

As the discussion above demonstrates, CMS did not determine Clover's 2026 Star Rating based on the "types of data that were collected by the Secretary [of HHS] as of November 1, 2003." 42 U.S.C. § 1395w-22(e)(3)(B)(i). Rather, CMS determined Clover's 2026 Star Rating based on data other than the data specified in § 1395w-22(e)(3)(B)(i), with respect to at least the 15 measures discussed above. *See supra* at 31-36. CMS should be required to re-determine Clover's 2026 Star Rating without inclusion of those measures, which exceed CMS's statutory authority.

## II. CMS DETERMINED CLOVER'S 2026 STAR RATING BY APPLYING MEASURES THAT HAD NOT GONE THROUGH REQUIRED NOTICE-AND-COMMENT

Not only did CMS exceed the bounds of its statutory authority, but CMS also determined Clover's 2026 Star Rating based on measures that had not gone through notice and comment in the manner required by CMS's regulations, 42 C.F.R. §§ 422.164(c)(2), (d)(2).

CMS bound itself by regulation to a mandatory, two-step procedure for adopting new and/or modified measures, but failed to follow that procedure in adopting three measures that it applied to Clover as part of its 2026 Star Rating: Improving or Maintaining Physical Health (C04); Improving or Maintaining Mental Health (C05); and Getting Appointments and Care Quickly (C23). That, too, is unlawful. *See Simmons v. Block*, 782 F.2d 1545, 1550 (11th Cir. 1986) (an

agency must "scrupulously follow the regulations and procedures promulgated by the agency").

Specifically, CMS's regulations provide that, before adding a "new" measure, or substantively updating a measure, CMS must first "announce potential new measures and solicit feedback" through the "annual call" process to obtain informal feedback from the public, which CMS carries out by posting a notice of its proposal on its website. 42 C.F.R. § 422.164(c)(2) (new part C measures); *id.* § 423.184(c)(2) (same for part D); *id* § 422.164(d)(2) (substantive updates for part C measures); *id.* § 423.184(d)(2) (same for part D). This "annual call" process must occur in "advance" of the measurement period for the new or substantively updated measure. *Id.* § 422.164(c)(2) (new part C measures); *id.* § 423.184(c)(2) (same for part D); *id.* § 422.164(d)(2) (substantive updates for part C measures); *id.* § 423.184(d)(2) (same for part D).

At the second step, after the foregoing is complete, CMS "*then subsequently* . . . propose[s] and finalize[s] new measures" or substantively updated measures, through rulemaking in the Federal Register. *Id.* § 422.164(c)(2) (new part C measures); *id.* § 423.184(c)(2) (same for part D); *see also id.* § 422.164(d)(2) (substantive updates for part C); *id.* § 423.184(d)(2) (part D).

Despite these requirements, CMS failed to follow this required two-step procedure in adopting three measures that it applied to Clover in determining its 2026 Star Rating.

**Improving or Maintaining Physical Health measure (C04); Improving or Maintaining Mental Health measure (C05):** For these two measures, CMS violated its regulations by failing to timely conduct the "annual call" process in advance of the relevant measurement year (here, 2024). Variations on these measures, Improving or Maintaining Physical Health (C04), and Improving or Maintaining Mental Health (C05), using different measurement designs, were used in prior Star Ratings years. *See* 85 Fed. Reg. 9,002, 9,045 (Feb. 18, 2020). Then, on February 18, 2020, through formal rulemaking, CMS proposed major (substantive)

changes to these two measures in the Federal Register. *Id.* (proposing to "change the case-mix adjustment for the[se] measures" and to "increase the minimum required denominator"). In response to public comments, CMS took the position that, rather than making these proposed changes immediately, these measures would be removed from the Star Ratings for several years, until being added back in future years as new measures. 86 Fed. Reg. 5,864, 5,919 (Jan. 19, 2021) (stating that these measures would be withdrawn "for at least 2 years prior to" being reintroduced as "new measure[s]"). CMS reintroduced the Improving or Maintaining Physical Health and Improving or Maintaining Mental Health measures (C04-C05) as "new" measures for the 2026 Star Ratings. AR158, 286, 316 (2026 Tech. Notes deeming these measures "new").

Although CMS proposed changes to these measures through formal rulemaking in 2020-2021, it faltered by failing to follow the first step required by its procedure: CMS failed to "announce [the] potential new measures and solicit feedback" through the "annual call" process (posting on CMS's website and eliciting feedback) ***prior to*** its 2020-2021 formal rulemaking adopting these "new" measures. *Id.* § 422.164(c)(2), (d)(2). As the text of CMS's regulations makes explicit, CMS was required to complete this "annual call" first, prior to the relevant measurement year, "then subsequently" move onto formal rulemaking for new measures. 42 C.F.R. § 422.164(c)(2); *see* § 422.164(d)(2) (similar). CMS failed to do so, skipping the annual call process and proceeding straight to formal rulemaking. That renders the application of the new Improving or Maintaining Physical Health and Improving or Maintaining Mental Health measures (C04-C05) to Clover in determining its 2026 Star Rating unlawful. *See Simmons*, 782 F.2d at 1550; *Cahaba Riverkeeper v. EPA*, 938 F.3d 1157, 1164 (11th Cir. 2019) (similar).

**Getting Appointments and Care Quickly measure (C23):** CMS violated its regulations by failing to conduct notice-and-comment rulemaking despite making a substantive update to this

measure. CMS's regulations provide that CMS must "propose and finalize" substantive updates to existing Star Ratings measures "through rulemaking similar to the process for adding new measures," namely, by "solicit[ing] feedback on whether to make substantive measure updates" through the "annual call," and then later engaging in formal rulemaking. 42 C.F.R. § 422.164(d)(2).

Prior to the 2026 Star Ratings, CMS re-specified the measure Getting Appointments and Care Quickly (C23) to cut down the specified questions from 3 to 2, removing the following question: "[i]n the last 6 months, how often did you see the person you came to see within 15 minutes of your appointment time." *Compare* Ex. K, *Medicare 2024 Pt. C & D Star Ratings Tech. Notes*, at 68 *with* AR222 (2026 Tech. Notes). That left in place just two questions, concerning how quickly beneficiaries can *get on the calendar/schedule* to see a provider. AR222.

In removing this required question from measure C23 in 2024, CMS deemed this change "non-substantive," and therefore did not subject the change to notice and comment rulemaking. Ex. L, CMS, *Announcement of Calendar Year (CY) 2024 Medicare Advantage (MA) Capitation Rates & Pt. C and Pt. D Payment Policies* 178 (Mar. 31, 2023). Although CMS's regulation does not prescribe notice-and-comment rulemaking for *non*-substantive updates, *see* 42 C.F.R. § 422.164(d)(2), such non-substantive updates are limited by regulation to updates that (1) "[n]arrow the denominator or population" of the measure, (2) "[d]o not meaningfully impact the numerator or denominator of the measure," (3) "[u]pdate the clinical codes with no change in the target population or the intent of the measure," (4) provide "clarifications" (such as by "[a]dding additional instructions" or "[c]larifying documentation requirements"), or (5) "[a]dd alternative data sources or expand modes of data collection." *Id.* § 422.164(d)(1). Updates that do not fall into one of these five categories are deemed "substantive." *Id.* § 422.164(d)(2).

Critically, reducing the data upon which this measure is based to exclude a question that was previously measured does not fall within the five categories of non-substantive updates. *See id.* § 422.164(d)(1). CMS's change to C23 is thus a substantive update as a matter of law, and required notice and comment rulemaking. *Id.*; *Wooten v. Quicken Loans, Inc.*, 626 F.3d 1187, 1193 (11th Cir. 2010) (highlighting that a duly promulgated "regulatory definition" controls a term's meaning); *see also Substantive*, The American Heritage Dictionary of the English Language (4th ed. 2003) ("[s]ubstantial" or "considerable"). Beneficiaries care whether they are seen within 15 minutes, or an hour-and-15-minutes, which is why CMS deemed such changes to *eliminate* such data from measures substantive. *See* 42 C.F.R. § 422.164(d)(1). And by removing one-third of questions for this measure, the change will necessarily impact the numerator and denominator of the measure. *See id.* Indeed, CMS conceded that this change would "reduce the reliability of the measure." Ex. L, CMS, *Announcement of Calendar Year (CY) 2024 MA Capitation Rates & Pt. C & Pt. D Payment Policies* 178 (Mar. 31, 2023). That is clearly a "substantive" change.

Accordingly, CMS determined Clover's 2026 Star Rating based on three measures, Improving or Maintaining Physical Health (C04), Improving or Maintaining Mental Health (C05), and Getting Appointments and Care Quickly (C23), that had not gone through the required notice and comment. These three measures must be excluded from Clover's 2026 Star Rating.

## III. CMS DETERMINED CLOVER'S 2026 STAR RATING BY APPLYING UNAUTHORIZED, ARBITRARY MEASURES

Apart from applying measures to Clover that directly exceeded Congress's authorization and violated CMS's regulations, Defendants also applied several measures to determine Clover's 2026 Star Rating that are disconnected from quality of care, outcomes, or satisfaction as required by 42 U.S.C. § 1395w-22(e)(3)(B)(i), and are thus arbitrary and capricious and contrary to law.

### A. CMS Unlawfully Determined Clover's 2026 Star Rating Using Medication Adherence Measures That Are Disconnected From Clover's Quality, Outcomes, And Beneficiary Satisfaction

CMS's application of the Medication Adherence measures (D08, D09, and D10) to determine Clover's 2026 Star Ratings is both arbitrary and capricious and contrary to law.

"Medication adherence" is a medical term of art that refers, as the name suggests, to whether a patient adheres to (takes) the medications prescribed by his or her physician. *See, e.g.*, Ex. M, *2025 Medicare Pt. C & D Star Ratings Tech. Notes*, at 92, 95, 98 (2024) (defining "Medication Adherence" as "Taking . . . Medication as Directed," and noting that "[o]ne of the most important ways people with [a given disease] can manage their health is by taking their medication as directed."). If a patient is prescribed a medication but never picks it up from the pharmacy, or loses it in the medicine cabinet and does not take it, she is non-adherent. *Id.*; *Adhere*, Merriam-Webster's Collegiate Dictionary (11th ed. 2003) ("to bind oneself to observance," *e.g.*, of a dosage schedule). By contrast, if a physician *discontinues* prescribing a medication, for example, due to an allergy or a lack of benefit, the *failure* to continue taking the medication would be considered *adherent*. Ex. M, *2025 Medicare Pt. C & D Star Ratings Tech. Notes*, at 92, 95, 98 (2024) (explaining that adherence means taking medication "as directed"). Adherence is important to patient health outcomes and safety. *See id.*; *accord* 89 Fed. Reg. 30,448, 30,643 (Apr. 23, 2024).

The relevant problem with Clover's 2026 Star Rating is that CMS has chosen to apply to Clover "Medication Adherence" measures that, by CMS's own admission, do not measure whether a patient adheres to taking *prescribed* medications *as directed by his or her physician*. Instead, CMS's view is that once a medication is prescribed, it *must remain prescribed* to the patient *for the remainder of his or her life* (or until he or she terminates participation in the Part D plan), or the patient will generally be coded as "non-adherent" during the year of treatment discontinuation. Thus, to obtain a higher Star Rating, a plan should endeavor to keep all of its members on their

existing prescriptions, *irrespective of* their medical needs or physicians' judgment. That makes no sense. Making matters worse, CMS weights these measures 3 times heavier than many other measures, compounding the error's impact. AR254, 257, 259 (setting "[w]eighting [v]alue" at 3).

CMS arrives at this bizarre result by determining the Medication Adherence measures (D08, D09, and D10) as follows. First, CMS determines *whether* a patient was prescribed a drug to treat diabetes (D08), hypertension (D09), or cholesterol (D10) and fills that prescription at least twice within a minimum 91-day treatment period. *See* AR252-53, 255-56, 257-58 (2026 Tech. Notes). If a patient so-qualifies, that patient must fill her prescriptions often enough to cover "80% or more" of the days in the year after the prescription is first filled. AR252-60. So, for example, if a patient is prescribed a statin (for cholesterol) on January 15, 2024, and fills the prescription throughout 2024, she is "adherent." *See id.* If the same patient's doctor stops prescribing statins as of May 15, 2024 due to a contraindication or lack of benefit, CMS codes the patient *non*-adherent, and the plan's Medicare Adherence measure is reduced. *Id.* More generally, medically recommended treatment discontinuation throughout the year is classified as non-adherence. *Id.* This is not a theoretical problem: Clover identified to CMS 733 members who were directed by doctors to stop taking certain prescribed medications covered by measures D08, D09, and D10, and 393 members who were no longer prescribed the relevant drugs during treatment because their doctors determined the therapy was medically inappropriate, but were nevertheless coded *non*-adherent under CMS's measures D08, D09, and D10 in Clover's 2026 Star Ratings. AR18-21.

This way of determining "medication adherence" was arbitrary, capricious, and contrary to law. Multiple interrelated doctrines bar CMS from applying a purported measure of medication "adherence" that fails to measure actual patient adherence *at all*, and instead requires plans to keep members on their medications despite their doctor's instructions (*i.e*, non-adherence), to avoid a

reduction to the Medication Adherence measure scores in the year treatment is discontinued.

*First*, an agency's action is arbitrary and capricious when the agency relies "on factors which Congress has not intended it to consider." *Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 43 (1983); *Georgia v. Brooks-LaSure*, Case No. 2:22-cv-6, 2022 WL 3581859, at *16-17 (S.D. Ga. Aug. 19, 2022) (Wood, J.) (same) (citing *Alabama-Tombigbee Rivers Coal. v. Kempthorne*, 477 F.3d 1250, 1254 (11th Cir. 2007)). Congress limited CMS to evaluating Medicare Advantage plans based on "quality, outcomes, and beneficiary satisfaction." 42 U.S.C. § 1395w-22(e)(3)(B)(i). A measure of actual, clinically defined medication adherence might fit that bill. But CMS's measures are not of medication adherence, but of whether *prescriptions are refilled* regardless of medical necessity or physician judgment. AR252-60. Thus, a plan could have a near-100% rate of *actual* patient adherence, but end up with a 1-Star rating on this measure based *solely* on instances of physician-recommended treatment discontinuation. *See id.* That is because CMS does *nothing* to distinguish between non-adherence and discontinuation, or identify *actual* non-adherence. *Id.* CMS has never provided any explanation of how punishing plans for medically indicated treatment discontinuation measures "quality, outcomes, and beneficiary satisfaction." 42 U.S.C. § 1395w-22(e)(3)(B)(i). Congress did not authorize such a measure. *Id.*

Importantly, CMS itself has recognized this problem with these measures. CMS elicited public comments on these measures, requesting that CMS should "identify prescriptions for removal that are documented as 'discontinued' or prescriptions with therapy changes," which would "avoid the appearance that beneficiaries with discontinued medications are non-adherent." 83 Fed. Reg. at 16,533 (warning that "changes in therapy due to clinical indicators" would result in non-adherence). CMS did not dispute, either then or in the record in this case, that it would code medically prescribed discontinuation as non-adherence, but justified that approach as

follows: The "80 percent compliance threshold incorporates these circumstances as the ideal compliance expectation is 100 percent." *See id*. That is, CMS reasons that it is providing "wiggle room" for plans by allowing patients not to fill their prescriptions approximately 20% of the year, and still be categorized as "adherent" based on the remaining 80% of the year. *See id.*; AR22.

But that makes no difference: Whether CMS provides "wiggle room" at a threshold of 20%, 30%, 50%, or some other arbitrary value, it does not alter the fundamental flaw that it is *still* doing *nothing* to measure medication non-adherence as opposed to legitimate treatment discontinuation as determined by a physician. 83 Fed. Reg. at 16,533. All CMS is doing is arbitrarily changing the numerical line where it will categorize *all* patients as adherent, and *all* patients as non-adherent (*i.e.*, at an 80% threshold), *regardless* of their actual adherence status. If a patient is prescribed a medication January, then the physician discontinues treatment November, she will be classified as adherent; if the physician discontinues treatment in early October, she will be classified as non-adherent. AR252-60. All that has changed is the date, not the adherence status. And conversely, if that same patient remains prescribed the medication throughout the entire year, but is *truly* non-adherent in months 11 or 12, *i.e.*, the patient stops picking up her medications at the pharmacy, she will be coded as *adherent*, because she falls within CMS's 80-percent "wiggle room." *Id*.

So CMS's 80-percent threshold does nothing to distinguish between *actual* adherence (*i.e.*, treatment discontinuation) and non-adherence. Instead, this arbitrary 80% threshold simply encourages plans "gaming" the system to hit CMS's arbitrary 80% threshold each year, including by mass-enrolling members in automatic or long-term (90 day) refills of unnecessary, unrecommended medications over more days. *See* AR22; Ex. N, Joel F. Farley & Benjamin Y. Urick, *Is it Time to Replace the Star Ratings Adherence Measures?* 27 J. MANAG. CARE SPEC.

PHARM. 399, 402 (2021). The upshot is that rather than determine adherence, these measures penalize plans (and in turn, their members) that responsibly support physician-directed treatment and reduce medication and taxpayer waste, both by treating responsible, non-wasteful dispensing practices as "non-adherent," and then grading these plans on a curve (and negatively) against plans that push more drugs than medically necessary (often through mass-enrolled, 90-day automatic refills). *See id.* All of this is far afield from the factors that Congress authorized CMS to consider.

*Second*, and relatedly, in applying these Medicare Adherence measures to Clover, CMS also "entirely failed to consider an important aspect of the problem." *Georgia*, 2022 WL 3581859, at *11 (citing *Ala.-Tombigbee Rivers Coalition*, 477 F.3d at 1254). CMS has acknowledged its Medication Adherence measures are broken insofar as they *do not* distinguish between treatment discontinuation and non-adherence, but CMS has chosen just to blow past the problem without actually remediating it. 83 Fed. Reg. at 16,553; AR22. That is impermissible. *See Skipper v. U.S. Fish & Wildlife Serv.*, 796 F. Supp. 3d 996, 1009-10 (S.D. Ala. 2025) (agency ignored an "important aspect of the problem" where it "threw up its hands" after identifying "data limitations" and failed "to quantify or even qualitatively analyze" a required factor); *Goodson Drug Co., Inc. v. Bondi*, No. 25-cv-257, 2025 WL3405237, at *6-8 (N.D. Ga. Oct. 15, 2025) (agency decision was likely arbitrary and capricious because agency missed "important aspects of the problem" where the agency relied upon incomplete data). It is not enough for an agency to identify a problem, and fail to fix it; that is consummately arbitrary. *Skipper*, 796 F. Supp. 3d at 1009-10.

CMS also ignored another important aspect of the problem: Its own guidance is internally inconsistent in treating the *same* patient's *same* behavior as *both* adherent *and* non-adherent. As CMS admitted in its August 5, 2025 response to Clover, if a member discontinues a medication due to intolerance or adverse effects, he or she could be coded as non-adherent in the Star Ratings

measures for *that* measurement year, because he or she may fill prescriptions for less than 80% for that year. AR22. But in subsequent years, that same member will be "excluded" from the medication adherence measures so as to "no longer impact the measure[s]," because that individual would not fill any prescriptions for that medication during that year. *Id.* Because CMS concedes the patient was *not* non-adherent in those later years, it makes no sense to then turn around and code that same patient as non-adherent for the first year in which he or she discontinued treatment. CMS has provided no explanation for why the same patient's same behavior would be "non-adherent" as of December 31, but *no longer* "non-adherent" as of January 1, when nothing has changed in her behavior. *Nat'l Ass'n of State Util. Consumer Advocates v. FCC*, 457 F.3d 1238, 1253 (11th Cir. 2006) (explaining that "unexplained inconsistency" is arbitrary and capricious).

*Third*, CMS faltered by choosing to entirely ignore Clover's record evidence bearing on this issue, which consisted of evidence of *hundreds* of members of Clover's plan that discontinued treatment at physician direction, but that CMS erroneously coded as "non-adherent." *See* AR54 (providing CMS with clinical summaries of why members were directed by their physicians to discontinue treatment for the D08, D09, and D10 measures). It is not enough for an agency to simply establish by practice, or by guidance, that it will ignore evidence bearing on an issue: An agency is required to "base its decisions on the entire record" and "may not ignore some evidence before it." *Purepac Pharm. Co. v. Thompson*, 354 F.3d 877, 885 (D.C. Cir. 2004). CMS had before it evidence that what CMS coded "non-adherence" was valid treatment discontinuation. *E.g.*, AR54. CMS did not dispute that these records in fact showed hundreds of instances of treatment discontinuation. CMS cannot simply ignore evidence that runs contrary to its judgment. *Purepac,* 354 F.3d at 885; *Bidi Vapor LLC v. FDA*, 47 F.4th 1191, 1204 (11th Cir. 2022).

*Fourth*, CMS may not act contrary to its guidance, without acknowledging the departure

and providing good reasons for the change. *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221-22 (2016) (before changing its position, an agency must "display awareness that it is changing position" and provide "good reasons for the new policy"); *UnitedHealthcare Benefits of Tex., Inc. v. CMS*, No. 24-cv-357, 2024 WL 4870771, at *4 (E.D. Tex. Nov. 22, 2024) (concluding that CMS erroneously determined Star Ratings measure contrary to its guidance). CMS's Technical Notes acknowledge that the Medication Adherence measures are to determine the percentage of patients "who adhere" to a "prescribed" drug therapy, *i.e.*, members "with a prescription" who are adherent. AR252-53, 255-56, 257-58. Yet CMS refuses to consider, in determining that measure, whether a patient *actually remains prescribed a medication*, or has had the prescription discontinued. *Id.* CMS cannot simply disregard its own guidance in this manner: Because CMS requires consideration of adherence of "prescribed" medications, it cannot turn around and take the position that whether a patient continues to be "prescribed" a drug is irrelevant, as it did in this case. *Encino Motorcars*, 579 U.S. at 221-22; *Nat'l Ass'n of State Util. Consumer Advocates*, 457 F.3d at 1253.

*Finally*, CMS has attempted to overcome these limitations in its own guidance by silently overruling that guidance, thus pulling an impermissible "surprise switcheroo" on regulated parties. *Allina*, 587 U.S. at 571. For many years, the Star Ratings Technical Notes expressly stated that the Medication Adherence measures considered whether beneficiaries were taking medication "as directed" by their prescribers. *See, e.g.*, Ex. K, *2024 Medicare Pt. C & D Star Ratings Tech. Notes*, at 97, 100, 103 (2023); Ex. M, *2025 Medicare Pt. C & D Star Ratings Tech. Notes*, at 92, 95, 98 (2024). Indeed, CMS labeled each of these measures "Taking [the Specified] Medication *as Directed*." *Id.* (emphasis added). In May 2025, Clover wrote to CMS, pointing out this inconsistency between its guidance concerning taking medication "as directed," and CMS's treatment of medically directed treatment discontinuation as non-adherence. AR18-19. After

Clover raised this inconsistency, CMS "solved" the problem by simply deleting all 9 of its references to patients taking medication "as directed" from the 2026 Star Ratings Technical Notes. *See* AR252-60. But scrubbing the language "as directed" from CMS's guidance does not actually solve the problem. Before changing its position to *disregard* whether a patient takes medications "as directed," CMS was required to "display awareness that it [was] changing position" and offer "good reasons for the new policy." *Encino Motorcars*, 579 U.S. at 221-22; *see also Georgia*, 2022 WL 3581859, at *19-20. CMS did *none* of that, and its silent reversal is arbitrary and capricious.

For any and all of these reasons, CMS cannot lawfully apply its Medication Adherence measures (D08, D09, and D10) to Clover in its 2026 Star Ratings. At a minimum, CMS cannot do so without accounting for the record evidence that CMS erroneously classified hundreds of Clover members as non-adherent who had treatment discontinued by their prescribers, and re-determining that those patients are adherent, rather than non-adherent, as CMS found here.

### B. CMS Unlawfully Determined Clover's 2026 Star Rating Using Call Center Measures Which Are Disconnected From Clover's Quality, Outcomes, And Beneficiary Satisfaction

CMS's application of its Call Center measures—Foreign Language Interpreter / TTY (C33) and (D01)—in determining Clover's 2026 Star Rating was also arbitrary and contrary to law.

CMS's Call Center – Foreign Language Interpreter / TTY measures purport to evaluate the percentage of time that interpretation and teletypewriter (TTY) services were timely available (within 8 minutes) for individuals who called a plan's customer service line. AR238, 240. To do so, CMS selects a vendor to conduct "test" calls, as if the caller were a (sole) foreign language speaker or deaf. AR238-41; *UnitedHealthcare Benefits of Tex., Inc.*, 2024 WL 4870771, at *2.

These test calls are critical to a plan's overall Star Rating: To obtain five stars on these measures, a plan must generally obtain a perfect score. *UnitedHealthcare Benefits of Tex., Inc.*, 2024 WL 4870771, at *2 ("[A] single unsuccessful test call prevents a call center from receiving

a five-star rating for this metric."). Just one or a handful of calls can result in a multi-star drop, even when it is caused by minor technical issues unrelated to plan quality. *See, e.g.*, *id.* (noting that the entire case came "down to a single disputed foreign-language test call" which reduced the plan's overall Star Rating by one-half star); AR63 (Clover raising similar issues). This is because CMS contractors conduct only a limited number of test calls to each Medicare Advantage plan. 90 Fed. Reg. at 54,966. So, when CMS calculates measure Star Ratings, the small denominator (reflecting the limited total number of calls) "lead[s] to shifts in ratings as a result of small changes in the numerator" (reflecting the number of unsuccessful calls). *Id.*

Despite the extreme sensitivity of these measures, which routinely make a *single test call* worth more than $100 million, they are wholly disconnected from plan quality, outcomes, and beneficiary satisfaction. *See* 42 U.S.C. § 1395w-22(e)(3)(B)(i). Instead, these measures simply capture the happenstance of the quality of communication and connectivity between *CMS vendors*, on the one hand, and plans, on the other. *E.g.*, *UnitedHealthcare Benefits of Tex., Inc.*, 2024 WL 4870771, at *2-4 (concluding that plan's overall Star Rating was erroneously reduced by a half-star because CMS's test caller failed to ask the requisite introductory questions yet marked the call as unsuccessful). This gives rise to an annual process in which plans appeal to CMS, and then courts, to adjudicate technical and communication issues, like phone line transmission quality/clarity and the *test callers'* language proficiency, that are unrelated to plan quality, on a *single* test-call basis. *See id.* at *8-9. And again, these calls are *not* with beneficiaries, but with CMS vendors. Evaluating these irrelevant factors on calls with vendors is arbitrary and violates CMS's statutory directive to evaluate clinical quality, outcomes, and *beneficiary* satisfaction.

CMS is well aware that just a single call or handful of calls impacted by the foregoing issues (*e.g.*, a phone call that drops, connectivity issues, or a *caller's* difficulty in communication

in a foreign language) will cause major shifts in a plan's overall performance without any regard to actual plan quality. *See* Ex. O, CMS, *Announcement of Calendar Year (CY) 2026 Medicare Advantage (MA) Capitation Rates & Pt. C and Pt. D Payment Policies* 107-09 (Apr. 7, 2025) (acknowledging that "a small number of calls [is] causing significant shifts in performance"). In fact, CMS has proposed removing these measures from the Star Ratings, because "these measures are sensitive to small changes in performance." *Id.* at 107-08; 90 Fed. Reg. at 54,966 (proposing to remove these measures because they are sensitive to "small changes"). CMS has provided zero explanation for its adoption of such extremely sensitive measures, *i.e.*, how the outcome of a *single* "test" call (or a handful of them) bears any relationship to quality. CMS's use of these measures, without *any* explanation for how they actually capture *beneficiary satisfaction*, and given their *known defects*, renders their application to Clover unlawful. *State Farm*, 463 U.S. at 43 (agency cannot fail to consider "important aspect of the problem"); *Skipper*, 796 F. Supp. 3d at 1009-10.

## IV. CMS DETERMINED CLOVER'S 2026 STAR RATING BY APPLYING THE REVIEWING APPEAL DECISIONS (C32) MEASURE IN VIOLATION OF THE PRIVATE NON-DELEGATION DOCTRINE

Because the IRE, a private entity, unilaterally determined Clover's score on the Reviewing Appeal Decisions measure (C32) based solely on its views of Clover's coverage decisions, CMS's determination of Clover's 2026 Star Rating also violated the private non-delegation doctrine.

The private non-delegation doctrine prohibits the government from outsourcing the federal government's decisionmaking functions to non-governmental entities. *Consumers' Rsch. II*, 606 U.S. at 690-91. Article II of the Constitution vests "the executive Power" with the President and is "essentially a grant of the power to execute the laws." U.S. Const. art. II, § 1; *Myers v. United States*, 272 U.S. 52, 117 (1926). The private non-delegation doctrine ensures that this executive power is not delegated to unaccountable private persons. *Consumers' Rsch. II*, 606 U.S. at 692-93. A violation of this doctrine occurs when an agency outsources to private persons governmental

decision-making functions without sufficient oversight. *Id.* at 696-97; *Consumers' Rsch v. FCC* ("*Consumers' Rsch. I*"), 88 F.4th 917, 926 (11th Cir. 2023) (finding that an agency does not violate the private non-delegation doctrine where (1) "the entity function[s] subordinately to the agency," by performing a "ministerial task" and (2) "the agency retains authority and surveillance").

In applying the Reviewing Appeals Decision (C32) measure to calculate Clover's 2026 Star Rating, CMS unlawfully delegated its decision-making authority to a private entity. When a Medicare Advantage plan makes a final adverse coverage decision, the plan must automatically submit its decision for review by the IRE. 42 C.F.R. §§ 422.590, 422.592. The IRE, a private entity, then has the power to affirm or overturn the plan's coverage decision. AR236-37. The IRE is where the buck stops for the purposes of determinations of plans' Star Ratings: The Reviewing Appeals Decision measure (C32) simply reflects the percentage of Clover's coverage determinations that are upheld by the IRE, *without any review from CMS itself*. *Id.*

This is a quintessential private non-delegation doctrine violation. *See Consumers' Rsch. II*, 606 U.S. at 693-95. The IRE is not performing a simple ministerial task, like compiling medical case files for CMS's review. *Consumers' Rsch I*, 88 F.4th at 926-97 (finding no violations where the private entity's function was a ministerial one of gathering facts and making a recommendation). A ministerial task is one that "require[s] no discretion or judgment." *UnitedHealthcare Benefits*, 2024 WL 4870771, at *7; *cf. United States v. Gaubert*, 499 U.S. 315, 325 (1991) (noting a "discretionary act is one that involves choice or judgment"). But here, the IRE is independently determining whether Clover made a "reasonable" coverage determination. AR236. This requires the IRE adjudicator and its contracted private physicians to apply thousands of pages of rules, guidance, plan documentation, medical records, and medical literature, as well as physicians' own judgment of medical necessity, concerning hundreds of specific medical

conditions and their impact on specific patients. Ex. P, Maximus IRE, *Medicare Health Plan Reconsideration Process Manual* at 39-43 (2022) (evidence that IRE takes into account in conducting a review, including issuing requests for additional information in its discretion, and requiring over 800 contracted physicians to make medical necessity determinations); Ex. Q, Maximus IRE, *Medicare Appeals and Your Rights* (similar). The IRE's determination of whether Clover's actions were "reasonable" under the law and medical practice requires "making choices—and the power to make a choice is a discretionary one." *UnitedHealthcare Benefits*, 2024 WL 4870771, at *8 (concluding that CMS Star Ratings contractor's role in evaluating call center performance violated the private nondelegation doctrine); *Oklahoma v. United States*, 163 F.4th 294, 306-07 (6th Cir. 2025) (recognizing private non-delegation doctrine claim may succeed if entity goes beyond "ministerial function" and becomes "principal decisionmaker").

Confirming the non-ministerial nature of the IRE's technical legal and medical determinations, in the ordinary course, the IRE is *typically* subject to multiple levels of highly discretionary administrative and judicial review, up to and including federal district courts. AR237; 42 U.S.C. § 1395w-28(f)(8)(B); 42 C.F.R. §§ 422.602-612. But the Star Ratings are a different matter: In *this context*, CMS fails to retain "authority and surveillance" over the IRE's activities. *Consumers' Rsch. I*, 88 F.4th at 926. Again, this measure reflects *the IRE's* determination, alone, of whether a plan's "decision" to deny coverage was "reasonable." AR236. CMS provides no input into, or oversight over, this decision. *Id.* (noting that the rating was solely a reflection of the "independent reviewer['s]" judgment); *Consumers' Rsch. II*, 606 U.S. at 695 (reaffirming that a private party's recommendations violate the private non-delegation doctrine when they "go into effect without an agency's say-so"). Thus, the IRE's determination alone determines measure C32. AR237 ("The results of appeals that occur beyond [the IRE] . . . are not

included in the data" for determining the Reviewing Appeals Decisions measure).

Because CMS allows the IRE to exercise its own independent judgment to determine Clover's performance under the Star Ratings, *i.e.*, whether coverage was appropriately denied, without *any* oversight from CMS or possibility of CMS's reversal of the IRE's decision, it has violated the private non-delegation doctrine. CMS's application of the Reviewing Appeals Decision (C32) measure to Clover as part of its 2026 Star Rating should be set aside and vacated.

## V. IN THE ALTERNATIVE, CMS DETERMINED CLOVER'S 2026 STAR RATING IN VIOLATION OF 42 U.S.C. § 1395HH(A)(2)

Granting summary judgment on the foregoing bases is sufficient to raise Clover's overall Star Rating from 3.5 to 4 Stars, and eliminate the overwhelming majority of derogatory measure scores. If, however, the Court disagrees with Clover on the above and finds CMS may properly apply the foregoing measures to Clover, CMS erred in an additional way: In determining Clover's 2026 Star Rating, it utilized a series of measures[8] to lower Clover's Star Rating from 4 Stars to 3.5 Stars without adopting those measures' specifications as regulations in the Code of Federal Regulations through required notice-and-comment rulemaking under 42 U.S.C. § 1395hh(a)(2). Those measures therefore cannot be lawfully applied to determine Clover's 2026 Star Rating.

Under § 1395hh(a)(2) of the Medicare Act, "no rule, requirement, or other statement of policy . . . that establishes or changes a substantive legal standard governing the scope of benefits, the payment for services, or the eligibility of individuals, entities, or organizations to furnish or

[8] Namely, Annual Flu Vaccine (C03), Improving or Maintaining Physical Health (C04), Improving or Maintaining Mental Health (C05), Reducing the Risk of Falling (C15), Improving Bladder Control (C16), Getting Needed Care (C22), Getting Appointments and Care Quickly (C23), Customer Service (C24), Rating of Health Care Quality (C25), Care Coordination (C27), Reviewing Appeals Decisions (C32), Call Center – Foreign Language Interpreter / TTY (C33) and (D01), Rating of Drug Plan (D05), Getting Prescription Drugs (D06), Medication Adherence for Diabetes Medication, Hypertension, and Cholesterol (D08, D09, and D10), Medication Therapy Management Program Completion (D11), and Statin Use with Diabetes (D12).

receive services or benefits under this subchapter shall take effect unless it is promulgated by the Secretary by regulation." 42 U.S.C. § 1395hh(a)(2). As the Supreme Court has explained, this provision means that CMS must elicit notice and comment and codify "by regulation" more than just legislative rules (binding rules with force and effect of law), as is normally the rule under the APA, but also interpretative rules (non-binding rules without force and effect of law), including statements of agency policy, that fall within the statute's ambit. *See Allina*, 587 U.S. at 581-82.

Here, CMS has promulgated such "rule[s], requirement[s], or other statement[s] of policy," namely, CMS's foregoing Star Rating measures and their specifications (*supra* n.8), without doing so "by regulation," *i.e.*, without notice and comment and codification in the Code of Federal Regulations. There is no real question that CMS's specifications for the determination of the foregoing Star Ratings measures, including in its annual Technical Notes, amount to a "rule, requirement, or other statement of policy," because that phrase encompasses both binding legislative rules (contained in the Code of Federal Regulations), and non-binding, unilateral agency guidance like CMS's Technical Notes. *Allina*, 587 U.S. at 572 (A "statement of policy" provides the agency's current "adjudicatory approach." (quoting *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 94 (D.C. Cir. 1997)); *Texas v. Becerra*, 89 F.4th 529, 545 (5th Cir. 2024) (similar). CMS has clearly set forth by guidance the rules and requirements to determine plans' Star Ratings.

The harder question, and the one that has detained the Supreme Court, is whether the rule, requirement, or statement of policy provides a "substantive legal standard." *Allina*, 587 U.S. at 572. The Supreme Court has made clear that a "substantive legal standard" is more capacious than binding legislative rules that have the "force and effect of law," but has not determined how much more broadly the term extends. *Id.* However, the term has a plain and well-worn meaning: It distinguishes between procedural legal standards, and substantive (non-procedural) legal

standards. *See, e.g.*, *Keith v. Dekalb County*, 749 F.3d 1034, 1047 (11th Cir. 2014); *Burgess v. Comm'r*, 723 F.3d 1308, 1318 (11th Cir. 2013); *see also Allina*, 587 U.S. at 573 (contrasting "procedural" standard that defines *how* "duties, rights, and obligations should be enforced" with the "substantive" standard that "creates duties, rights and obligations").

Although the scope of a "substantive legal standard" may be unclear in the abstract, the boundary between a substantive legal standard and a procedural is clearly delineated here. For example, CMS's *procedures* for considering *post-hoc* administrative *challenges* to its determination of a given measure may constitute a procedural, not "substantive" legal standard. *See, e.g.*, 42 C.F.R. § 422.260. On the other hand, CMS's actual rules for how to determine a measure score are substantive. Each Star Rating measure is accompanied by specifications, both in the annual, general Technical Notes, and within more detailed *measure-specific* Technical Notes and guidance, which specify in detail the rules that CMS shall apply to determine that measure. *See, e.g.*, AR149-371 (2026 Star Ratings Technical Notes). For example, the Medication Adherence measures' specifications in the Technical Notes define *which* data CMS must analyze (about prescriptions), and what calculations CMS must run on those data to determine the Star Rating (*e.g.*, how many members met CMS's "80% threshold" for collecting dispenses of that prescription throughout the year). *Supra* at 28-29, 41-42 (citing AR252-60). As another example, the Call Center measures' specifications likewise define *which* data CMS's contractors must collect (concerning whether TTY and interpretation services are available on "test" calls), and what calculations CMS must run on those data to determine the Star Rating (*e.g.*, what percentage of calls are coded "completed" or successful within 8 minutes of the call being connected), in addition to additional, more-specific guidance documents. AR238-41; Ex. R, CMS, *Medicare Pt. C & D Call Center Monitoring Accuracy & Accessibility Study Tech. Notes* (2021) (further

specifying calculation of C33 and D01 measures); *see also* AR189-92, 209-12, 221-29, 236-37, 247-49, 252-65 (2026 Tech. Notes specifications for each of the remaining challenged measures, *see supra* n.8). These rules not only impose duties on CMS in terms of *what* they must base a plan's Star Rating on, but convey important rights on plans to have their Star Ratings determined based on the measures provided in CMS's specifications. *See, e.g.*, *UnitedHealthcare Benefits*, 2024 WL 4870771, at *1-2, 4-5 (vacating CMS's determination that CMS contractor's "test" call was "unsuccessful" because decision departed from CMS's Star Ratings measure specifications).

Finally, the Star Ratings measure specifications set standards "governing [1] the scope of benefits, [2] the payment for services, or [3] the eligibility of . . . entities, or organizations to furnish . . . services or benefits," 42 U.S.C. § 1395hh(a)(2), any one of which suffices and requires CMS to promulgate its Star Ratings measures and their specifications "by regulation."

**(1) Payment for Services**: The Star Rating measure specifications "govern[] . . . the payment for services." 42 U.S.C. § 1395hh(a)(2). Medicare Advantage plans, including coordinated care plans like Clover, must "provide health care services" to patients in exchange for fixed per-beneficiary payments from CMS—and *plans bear the financial risk* to provide those services if patient costs exceed CMS's fixed payments. 42 U.S.C. § 1395w-21(a)(2)(A)(i) ("Coordinated care plans [are those] which provide health care services . . . ."); *see also* 42 U.S.C. § 1395w-25(k) (plans must "assume full financial risk on a prospective basis for the provision of the health care services"). Determining CMS's fixed per-beneficiary payments to plans under the statute is complex (to put it mildly), but the bottom line is that "only the Medicare+Choice organization [Medicare Advantage plan] shall be entitled to receive payments from the Secretary under this subchapter [42 USCS § 1395 *et seq.*] for services furnished to the individual" electing Medicare Advantage. *Id.* § 1395w-21(i). CMS pays *only* the plan, not the provider, for provision

of services. *Id.*; 42 U.S.C. § 1395w-24(c) (plan must provide CMS monthly "bid amount for the provision of all . . . services under the plan" to determine this payment). And plans are responsible for providing healthcare services, including paying providers. *Id.*; 42 C.F.R. § 422.504(d) (CMS's contract with plan shall provide for audit of plan's "services performed under the contract").

As explained, Clover's Star Rating determines the *amount* of payments Clover is entitled to, on a beneficiary-by-beneficiary basis, for providing services to each beneficiary, including both all necessary clinical care services, as well as Clover's healthcare administration services. 42 U.S.C. § 1395w-23(o) (providing quality bonus payment for plans rated 4 Stars or higher); *id.* § 1395w-24(b)(1)(C)(iv) (providing that rebates increase at 3.5 and 4.5 Star Ratings). And the Star Rating measures, and their specifications, are *the* central component that determines Star Ratings, both *which* dimensions of quality plans are rated on, and *how* they are rated. AR149-215.

Separately, the increased funding determined by Star Ratings *also* determines enhanced payments *from plans to providers of services*. CMS requires plans to spend a fixed percentage of revenue (85%) toward patient care, known as the "medical loss ratio" ("MLR"). 42 U.S.C. § 1395w-27(e)(4); 42 C.F.R. § 422.2420(b)(2). As plan revenues increase through Star-Rating-driven payments, more funds must be spent on healthcare services to meet the MLR. *Id.*

Thus, viewed from either perspective, *i.e.*, (i) payments from CMS to plans for providing services to members, or (ii) payments from plans to providers, the Star Rating measure specifications "govern[] . . . the payment for services." 42 U.S.C. § 1395hh(a)(2).

**(2) Eligibility to Furnish Services and Benefits**: The Star Rating measure specifications also "govern[] . . . the eligibility of . . . entities, or organizations to furnish . . . services or benefits under this subchapter." 42 U.S.C. § 1395hh(a)(2). CMS may terminate plans from the Medicare Advantage program if they commit fraud, fail to comply with program rules, or, as relevant here,

fail to achieve an overall Star Rating of at least 3 Stars over three years. 42 C.F.R. § 422.510(a)(4)(xi). CMS has repeatedly terminated plans from Medicare Advantage on these grounds. Accordingly, the Star Ratings measures and their specifications govern a plan's "eligibility" to "furnish services and benefits" as well. 42 U.S.C. § 1395hh(a)(2).

**(3) Scope of Benefits:** The Star Rating measure specifications also "govern[] the scope of benefits." 42 U.S.C. § 1395hh(a)(2). That is because a plan's Star Rating impacts CMS's per-beneficiary payments to plans, which in turn determines the scope of benefits the plan may offer.

As explained, *supra* at 16-17, CMS is "obligated" to "offer additional funding to plans with better Star Ratings." *Scan Health Plan*, 2024 WL 2815789, at *1. Plans with higher Star Ratings "can then use those extra funds to lower costs for their beneficiaries or to provide them with additional benefits" not offered by Original Medicare, *id.*, such as dental and vision benefits, 85 Fed. Reg. 33,796, 33,885-56 (June 2, 2020), as well as benefits targeting a "particular health status or disease state," Ex. C, MedPAC, *Report to the Congress: Medicare and the Health Care Delivery System* 57-58 (June 2025); *see also* Bipartisan Budget Act of 2018, Pub. Law 115-123, 132 Stat. 64, 201 (Feb. 9, 2018) (expanding the scope of benefits that a plans may offer). The "majority of the supplemental benefits provided by [Medicare Advantage] plans are financed by the rebates that plans receive from Medicare," including through annual Star Ratings. *See* Ex. C, MedPAC, *Report to the Congress: Medicare and the Health Care Delivery System* 57-58, 64 (June 2025). Star Ratings measures thus govern Clover's ability to receive bonus payments and rebates, and, in turn, the "scope of benefits" that Clover may offer. 42 U.S.C. § 1395w-23(o)(1).

For the foregoing reasons, CMS's specification of the foregoing Star Rating measures must be promulgated "by regulation," *i.e.*, subjected to notice and comment and codified in the Code of Federal Regulations. *See, e.g.*, *Wilderness Soc'y v. Norton*, 434 F.3d 584, 596 (D.C. Cir. 2006);

*Brock v. Cathedral Bluffs Shale Oil Co.*, 796 F.2d 533, 538-39 (D.C. Cir. 1986). Unsurprisingly, CMS has chosen to codify in the Code of Federal Regulations practically every other aspect of its Star Rating system, including how CMS will translate measure scores on individual measures into an overall Star Rating, *apart from* its measures. *See* 42 C.F.R. pt. 422; 42 C.F.R. § 423 *et seq.*

By contrast, CMS chose not to codify in the Code of Federal Regulations the foregoing measure specifications in an effort to maintain maximum flexibility to morph its measures of quality from year to year. 83 Fed. Reg. at 16,537 (CMS chose not to codify due to measures' "regular updates and revisions"); 84 Fed. Reg. 15,680, 15,761 (Apr. 16, 2019) (similar). Instead, CMS simply published its specifications used to calculate these Star Rating measures unilaterally in its annual Technical Notes, plus the reems of internal guidance documents and measure-specific technical notes. *See, e.g.*, AR149-215 (2026 Tech. Notes); Ex. R, CMS, *Medicare Pt. C & D Call Center Monitoring Accuracy & Accessibility Study Tech. Notes* (2021) (further specifying calculation of C33 and D01 measures). But that flexibility of proceeding by uncodified, unilateral guidance, rather than notice-and-comment regulation, came at a cost: CMS cannot apply these measures to determine Clover's 2026 Star Rating. 42 U.S.C. § 1395hh(a)(2).

Accordingly, CMS cannot apply the measures identified above to Clover, *see supra* n.8, because they were not promulgated "by regulation" as required by 42 U.S.C. § 1395hh(a)(2).

## CONCLUSION

For the foregoing reasons, this Court should grant Clover's motion for summary judgment, set aside CMS's determination of Clover's 3.5-star Star Rating, and order CMS to redetermine Clover's Star Rating as at least 4 Stars.

Dated: February 2, 2026

Respectfully submitted,

/s/ *James B. Durham*
James B. Durham, Bar No. 235526
Hall Booth Smith, P.C.
3528 Darien Highway
Suite 300
Brunswick, GA 31525
Tel: (912) 554-0093
Email: JDurham@hallboothsmith.com

Andrew D. Prins*
Rachael L. Westmoreland*
LATHAM & WATKINS LLP
555 Eleventh Street NW, Suite 1000
Washington, DC 20004
Tel: (202) 637-2200
Fax: (202) 637-2201
Email: andrew.prins@lw.com
rachael.westmoreland@lw.com

Nicholas L. Schlossman*
LATHAM & WATKINS LLP
300 Colorado Street, Suite 2400
Austin, TX 78701
Tel: (737) 910-7300
Fax: (737) 910-7301
Email: nicholas.schlossman@lw.com

* *pro hac vice*

*Attorneys for Plaintiff Clover Insurance Company*

**CERTIFICATE OF SERVICE**

On February 2, 2026, I caused a copy of the foregoing document to be electronically filed with the Clerk of Court using the CM/ECF filing system, which will send notification of such filing to all registered participants.

/s/ *James B. Durham*
James B. Durham