# Exhibit C

JUNE 2025



*Report to the Congress*

# Medicare and the Health Care Delivery System

MEDPAC

MEDPAC | Medicare Payment Advisory Commission

The Medicare Payment Advisory Commission (MedPAC) is an independent congressional agency established by the Balanced Budget Act of 1997 (P.L. 105–33) to advise the U.S. Congress on issues affecting the Medicare program. In addition to advising the Congress on payments to health plans participating in the Medicare Advantage program and providers in Medicare's traditional fee-for-service program, MedPAC is also tasked with analyzing access to care, quality of care, and other issues affecting Medicare.

The Commission's 17 members bring diverse expertise in the financing and delivery of health care services. Commissioners are appointed to three-year terms (subject to renewal) by the Comptroller General and serve part time. Appointments are staggered; the terms of five or six Commissioners expire each year. The Commission is supported by an executive director and a staff of analysts, who typically have backgrounds in economics, health policy, and public health.

MedPAC meets publicly to discuss policy issues and formulate its recommendations to the Congress. In the course of these meetings, Commissioners consider the results of staff research, presentations by policy experts, and comments from interested parties. (Meeting transcripts are available at www.medpac.gov.) Commission members and staff also seek input on Medicare issues through frequent meetings with individuals interested in the program, including staff from congressional committees and the Centers for Medicare & Medicaid Services (CMS), health care researchers, health care providers, and beneficiary advocates.

Two reports—issued in March and June each year—are the primary outlets for Commission recommendations. In addition to annual reports and occasional reports on subjects requested by the Congress, MedPAC advises the Congress through other avenues, including comments on reports and proposed regulations issued by the Secretary of the Department of Health and Human Services, testimony, and briefings for congressional staff.

CHAPTER 2

# Supplemental benefits in Medicare Advantage

## Chapter summary

In addition to covering basic Part A and Part B services, Medicare Advantage (MA) plans may provide "supplemental" benefits to their enrollees, such as reduced cost sharing for Part A and Part B services, reduced Part B and Part D premiums, enhanced Part D benefits, and other benefits not covered under fee-for-service (FFS) Medicare such as dental, vision, or hearing services (non-Medicare services). These supplemental benefits, which are intended to provide more generous coverage and better financial protection for MA enrollees, are a defining feature of MA, but relatively little is known about the use of the benefits and the costs associated with them.

The majority of the supplemental benefits provided by MA plans are financed by the rebates that plans receive from Medicare. Medicare spending on plan rebates has increased sharply in recent years. Our analysis shows that, in 2025, Medicare will pay MA plans approximately $86 billion in rebates—or about $2,530 per enrollee (roughly 17 percent of Medicare's payments to MA plans)—to provide supplemental benefits, up from $21 billion (or about $1,160 per enrollee) in 2018.

According to their 2025 bid projections, plans expect to use about $39 billion (of the total $86 billion, equivalent to about $100 per member per month (PMPM)) to provide non-Medicare services to their enrollees and

## In this chapter


- Background
- Marked growth since 2018 in the rebates that finance MA supplemental benefits
- Conventional MA plans and SNPs report using rebates very differently
- Little is known about use of supplemental benefits
- Supplemental benefits: Cost-sharing and premium reductions
- Supplemental benefits: Non-Medicare services
- The role of vendors, community-based organizations, and vertically integrated entities
- Appendix: Additional information about supplemental benefits

about $27 billion ($64 PMPM) to reduce enrollees' cost sharing for Medicare-covered services (such as doctors' visits). Though plans' bids indicate how they intend to use rebate dollars, projections may vary from actual experience, and little is known about how MA rebate dollars are actually spent. Because Part D benefit enhancements and Part D and Part B premium reductions are adjudicated directly between CMS and MA plans, there is less uncertainty about plans' spending for these supplemental benefits. For 2025, we estimate that MA plans will use about $15 billion of the rebates they receive from Medicare to enhance Part D benefits and reduce Part D premiums (equivalent to about $37 PMPM), and they will use about $5 billion ($10 PMPM) to reduce their enrollees' Part B premiums.

Different types of MA plans tend to offer different types of supplemental benefits. Conventional MA plans (i.e., nonemployer, non-special-needs plans) typically allocate the largest share of their rebate dollars to reducing enrollee cost sharing for Part A and B services. In contrast, special-needs plans (SNPs) report allocating a small share of their rebates to reducing cost sharing because most of their enrollees are dually eligible for Medicare and Medicaid and so will have their out-of-pocket (OOP) costs covered by Medicaid and other programs. Instead, SNPs allocate most of their rebate dollars to the provision of non-Medicare services.

In recent years, CMS and the Congress have gradually increased plans' flexibility in the types of supplemental benefits that can be offered, and plans can now target supplemental benefits to enrollees with a particular health status or disease state. Plans also can provide supplemental benefits that are not primarily health related to chronically ill enrollees; these benefits—which include services like meals, nonmedical transportation, and pest-control services—are known as special supplemental benefits for the chronically ill (SSBCI).

These new flexibilities, combined with the growth in rebate dollars, have allowed MA plans to significantly expand the number of supplemental benefits they offer. Across almost every type of supplemental benefit, our analysis of benefits offered by plans finds that the share of MA enrollees in plans offering these benefits has increased since 2018. Many plans offer supplemental benefits as "combination benefits," in which enrollees are provided with a "flex card" that can be used to pay for a number of different services. Growth in the share of SNP enrollees in plans offering the newer forms of benefits has been particularly dramatic. According to plans' bid data, SNPs now intend to devote

more rebate dollars to other non-Medicare services than to dental, vision, hearing, and transportation benefits combined.

As Medicare spending for MA supplemental benefits grows, it becomes increasingly valuable for policymakers to fully understand their use. CMS requires MA organizations to submit encounter records for all health care items and services, including supplemental benefits, provided to their enrollees. Accordingly, MA encounter data should be the most detailed source of information for assessing MA enrollees' use of services. However, the Commission has found that encounter data for some MA plans and for some services (including inpatient, home health, and skilled nursing facility services) are incomplete. And to the best of our knowledge, no studies have used encounter data to assess MA enrollees' use of supplemental benefits—likely because the reliability of the data has been unclear.

Indeed, until 2024, the system that CMS used to collect encounter records was not configured to accept records for dental services. For this report, we used data from the Medicare Current Beneficiary Survey (MCBS) to assess how enrollees use and pay for dental care. We found that between 2017 and 2022, just over half of non–dually eligible MA enrollees who had dental coverage through their MA plan visited the dentist during the year. These enrollees paid for a considerable portion of their dental expenses OOP, but the percentage decreased over time, falling from 61 percent in 2017 to 35 percent in 2022. In both 2017 and 2022, a small share of non–dually eligible MA enrollees reported difficulty accessing dental care due to cost. For most of the outcomes we assessed, trends for FFS beneficiaries without a form of dental coverage followed a directional trend similar to that of MA enrollees with dental coverage. However, FFS beneficiaries without a form of dental coverage paid for a significantly larger share of their dental care OOP. The similar trends in dental utilization for MA and FFS beneficiaries suggest that the recent decline in OOP costs for non-dually eligible MA enrollees cannot be attributed entirely to growth in MA supplemental benefits. Other underlying factors may also have played a role. Without further analysis, it is difficult to assess the extent to which the changes observed for MA enrollees are due to changes in MA supplemental benefits, to broader changes affecting the Medicare population as a whole, or to other changes such as the composition of the MA population. Survey data, however, offer limited insight into how MA enrollees use and pay for dental care, underscoring the need for better encounter data pertaining to the services.

We analyzed encounter data for 2021 to assess whether plans are submitting records for other supplemental benefits and whether the submission rates are suggestive of problems with the reliability of the data. Our analysis is a preliminary and exploratory first step toward using encounter data to assess the use of supplemental benefits. As such, we did not attempt—at this stage—to measure utilization rates or draw conclusions about access or value based on our findings. Instead, we focused on assessing whether plans are submitting records and characterizing the potential uses or limitations of the data.

We identified significant limitations to using the encounter data to assess supplemental benefits. First, as noted above, few encounter records have been collected for dental services, which is one of the largest categories of supplemental benefits. Second, MA plans have reported that the supplemental-benefit encounter records that they do submit are incomplete because of confusion about reporting requirements and how to populate the records for services that do not have well-established procedure codes. Third, the encounter data system does not contain a way to distinguish which records are for basic or supplemental services or for optional or mandatory supplemental benefits.

Nevertheless, for some services—particularly vision and hearing services—plans experience fewer technical limitations to submitting the data. We found that for these services, MA plans are submitting records and that the submission rates follow patterns in line with what can reasonably be expected based on survey data about MA enrollees' use of vision and hearing services. This is an encouraging sign that indicates that it may be feasible to use encounter data to explore MA enrollees' use of supplemental vision and hearing benefits. For other types of supplemental benefits, however, we found few encounter records, and the submission rates were well below the utilization rates suggested by survey data. Considering the well-documented data limitations and the discrepancies between encounter data and other sources, we can conclude that—for most supplemental benefits other than vision and hearing services—the encounter data are insufficient for characterizing enrollees' use of the benefits.

In 2024, CMS began implementing a series of actions to improve and increase the amount of data that plans report regarding utilization of and spending for supplemental benefits. The new data-reporting requirements will address some, but not all, of the data limitations that hinder our ability to assess how MA enrollees use supplemental benefits and how much plans spend on the

benefits, and it will be several more years before the full range of data are available for analysis.

In addition to assessing the data pertaining to MA enrollees' use of supplemental benefits, we provide information about how MA plans administer supplemental benefits. Because many supplemental benefits are nonmedical, MA organizations (MAOs) often contract with third parties such as businesses or community-based organizations to provide or administer the benefits. Medicare does not collect information about the entities with which MAOs contract. To better understand how supplemental benefits are administered, we reviewed the websites of MAOs and entities that administer MA supplemental benefits. Several themes emerged from our review. First, we found that many MAOs contract with dental and/or vision insurers that manage the supplemental dental and vision benefits on behalf of the MA plan, although some insurers manage the benefits themselves or have acquired organizations that manage the benefits on their behalf. Second, we found that MAOs often contract with for-profit vendors to provide nonmedical supplemental benefits. Plans may also contract with community-based organizations, though information about these arrangements was harder to find. Third, we found that MAOs frequently administer supplemental benefits through entities with which the insurer is vertically integrated and that several of the large MAOs have acquired or developed subsidiary businesses that specialize in providing services that can be offered as supplemental benefits. We also found several instances in which MAOs structure their supplemental benefits to be provided exclusively by providers owned by the plan's parent organization.

Altogether, our review of numerous data sources pertaining to MA supplemental benefits reveals a fundamental lack of transparency about how often enrollees use the benefits and plans' spending for the benefits. The data that Medicare collects are currently insufficient for examining the use of most of these benefits. The lack of reliable data makes it difficult to answer many important questions about how the rebates Medicare pays to MA plans are used. For example, we do not know how much plans spend on each type of benefit, which enrollees use each benefit (and how frequently), or whether service use differs by such factors as age, sex, race, disability status, and geographic area. The Medicare program currently relies on competition between insurers to incentivize plans to offer benefits that enrollees will value and use. But, because of different challenges in the program, including the complexity of the choice environment and the absence of reliable data,

it is unclear to what extent supplemental benefits address enrollees' needs or affect outcomes. Without reliable information about how the benefits are used or administered, it is difficult for policymakers to assess the adequacy of the access provided or to know whether the spending provides good value to enrollees and the taxpayers who fund the program. Better information could be used to help beneficiaries navigate the options available to them and could help policymakers identify ways of making the program work more efficiently. ■

The Medicare Advantage (MA) program gives Medicare beneficiaries the option of receiving benefits from private plans rather than from the traditional fee-for-service (FFS) Medicare program. MA plans are required, with few exceptions, to cover all Part A and Part B services to which Medicare beneficiaries are entitled.[1] MA plans may also provide their enrollees with "supplemental" benefits such as reduced cost sharing for Part A and Part B services, reduced Part B and Part D premiums, enhanced Part D benefits, and coverage of non-Medicare services (services not covered under FFS Medicare, such as dental, vision, and hearing services). For beneficiaries, a primary trade-off in choosing between MA and FFS is access to the supplemental benefits that plans provide versus a broader choice of providers and minimal utilization management in FFS.

The Commission has noted that supplemental benefits are intended to provide more generous coverage and better financial protection for MA enrollees. Supplemental benefits may provide MA enrollees with access to important services not covered by Medicare or address health-related challenges beneficiaries face, but little is known about enrollees' use of the benefits. The Medicare program currently relies on competition between insurers to incentivize plans to offer benefits that enrollees will value and use, but evidence regarding the extent to which supplemental benefits address enrollees' needs or affect outcomes is lacking and the reliability of the data Medicare collects about the benefits has not been well explored. Without reliable information about how the benefits are used or administered, it is difficult for policymakers to assess the adequacy of the access provided or to know whether the spending provides good value to enrollees and the taxpayers who fund the program. Better information could be used to help beneficiaries navigate the options available to them and could help policymakers identify ways of making the program work more efficiently.

CMS requires MA organizations (MAOs) to submit encounter records for all health care items and services, including supplemental benefits, provided to their enrollees. Accordingly, MA encounter data should be the most detailed source of information for assessing MA enrollees' use of services. However, the Commission has found that encounter data for some MA plans and for some services (including inpatient, home health, and skilled nursing facility services) are incomplete. The Commission has not previously assessed encounter data for MA supplemental benefits.

In this chapter, we explore trends in the rebates paid to MA plans to finance the provision of supplemental benefits, measure the premium and cost-sharing reductions provided as supplemental benefits, chart changes in the types of benefits plans offer enrollees, and analyze MA encounter data to better understand the data and their potential utility for measuring enrollees' use of supplemental benefits. Because encounter data for dental services are unavailable, we also use data from the Medicare Current Beneficiary Survey (MCBS) to assess how enrollees use and pay for dental care. For assessing vision and hearing benefits, we use encounter data because there are well-defined procedure codes that should make it possible for plans to submit encounter records related to the services. For other non-Medicare services that are commonly offered as supplemental benefits, we analyze the encounter data and outline the data limitations that hinder our ability to reliably assess enrollees' use of the services. Last, we provide information about how MA plans are administering supplemental benefits and the entities with which plans are partnering to provide the services.

## Background

MA supplemental benefits can be organized into four broad categories: reduced cost sharing for Part A and Part B services, reduced Part B premiums, enhanced Part D benefits (including reduced Part D premiums), and coverage of non-Medicare services (services not covered under FFS Medicare, such as dental, vision, and hearing services). Plans have flexibility regarding which supplemental benefits they offer and the generosity of the coverage. The Congress and CMS have gradually expanded the types of supplemental benefits that MA plans can offer and how the benefits can be offered.

### Supplemental benefits in MA are financed primarily by rebates

MA plans primarily finance the provision of supplemental benefits using "rebates" that are added to the capitated payments they receive to cover basic

Medicare benefits. The rebate amount a plan receives is determined by Medicare's payment formula for MA plans and depends on how the plan's bid compares with a county-specific payment benchmark, as well as on a plan's star rating.

Organizations seeking to offer MA plans submit bids representing the dollar amount that the plan estimates will cover the Part A and Part B benefit package for a beneficiary of average spending risk.[2] Plans' bids are compared with a benchmark amount that is based on the projected costs of providing Part A and Part B services to FFS beneficiaries in the county; the benchmark is the maximum amount Medicare will pay for an MA plan to provide Part A and Part B benefits.[3] If a plan's bid is below the benchmark, its payment rate is its bid plus a share of the difference between the plan's bid and the benchmark (as low as 50 percent but typically either 65 percent or 70 percent, depending on a plan's quality ratings). The added payment to the plan, based on the difference between the bid and the benchmark, is referred to as the "rebate." Plans are required to use the rebate to provide supplemental benefits. For 2025, almost 100 percent of plans bid below their benchmarks and received rebates to offer supplemental benefits.[4]

Plans have the option of offering more supplemental benefits than what can be covered by the rebate they receive from Medicare. In such cases, plans typically charge enrollees additional premiums to cover the costs of providing the benefits. This arrangement rarely takes place: In an analysis of plans' bid data for 2022, the Government Accountability Office (GAO) found that 83 percent of MA plans, enrolling 86 percent of MA enrollees, expected to finance supplemental benefits solely with rebates; for special-needs plans (SNPs), the share was even higher, at 96 percent (Government Accountability Office 2023).[5] In other words, the supplemental benefits offered by MA plans are primarily financed by the rebates the plans receive from Medicare.

## Medicare has gradually expanded the types of supplemental benefits that MA plans can offer

MA plans' supplemental benefits are intended to provide more generous coverage and better financial protection for MA enrollees (Medicare Payment Advisory Commission 2024b). The supplemental benefits that MA plans may offer fall into four broad categories: reduced cost sharing for Part A and Part B services, reduced Part B premiums, enhanced Part D benefits (including lower premiums), and coverage of non-Medicare services (services not covered under FFS Medicare, such as dental, vision, and hearing services). Plans have flexibility regarding which supplemental benefits they offer and the generosity of the additional coverage. Each category is subject to some limitations, but—over time—CMS and the Congress have gradually increased plan flexibility and expanded the types of supplemental benefits that MA plans can offer and how the benefits can be offered.

### Cost-sharing reductions

MA plans have the flexibility to develop their own cost-sharing rules instead of using those applied under FFS Medicare. However, plans are subject to limitations intended to guard against the use of benefit designs that might discriminate against beneficiaries who are sicker by charging high cost sharing for the services those enrollees are likely to use. Plans must abide by these rules but may charge cost sharing below the minimum required levels. Some of the limitations apply to overall cost sharing, while others apply to cost sharing for particular services.[6]

The level of overall cost sharing that plans can impose is constrained in two ways. First, plans must ensure that their cost sharing for all Part A and Part B services is, in aggregate, at least actuarially equivalent to FFS cost sharing. To maintain actuarial equivalence, any increase in cost sharing for some services must be offset by lower cost sharing for other services. Second, MA plans must provide an annual cap on enrollees' out-of-pocket (OOP) spending for in-network services, known as a maximum out-of-pocket (MOOP) limit.[7]

In addition to the limits on aggregate cost sharing, plans must also comply with a complex set of limits on the cost sharing they can charge for certain service categories (Medicare Payment Advisory Commission 2023). Conceptually, there are three major types of service-specific limits:

- Services for which plans cannot charge more in cost sharing than FFS Medicare does. This limit applies to such major categories as inpatient care, skilled nursing facility (SNF) care, dialysis, and Part B drugs.

- Services for which plans can charge more than FFS does but are subject to some specified limit. This limit applies to categories such as physician services.
- Services for which plans cannot charge more than 50 percent in coinsurance or an actuarially equivalent copayment. This general limit applies to any categories, such as outpatient hospital services, for which CMS does not have any specific limits on cost sharing.

Some of these limits—such as the prohibition on charging higher cost sharing than FFS for dialysis, SNF care, or Part B drugs—are specified in law. CMS also has the authority to put cost-sharing limits on other services to prevent plans from using benefit designs that the agency considers discriminatory. For example, CMS added cost-sharing limits for rehabilitation services, starting with the 2020 plan year, and has indicated that it may add a limit for ambulance services in the future (Centers for Medicare & Medicaid Services 2022b). MA enrollees may also pay cost sharing for non-Medicare services that their plan offers as supplemental benefits; CMS does not set limits on the cost sharing that can be charged for these services, and the cost sharing enrollees pay for them does not count toward the MOOP limit.[8]

Altogether, plans can charge less in overall cost sharing than would be charged under FFS as long as their benefit design complies with the limitations described above. For plans providing more generous coverage than would be provided under FFS, the difference between the two amounts is treated as a supplemental benefit.

#### Enhanced Part D benefits and Part B premium reductions

All beneficiaries enrolling in Medicare Part B, regardless of their decision to receive benefits through FFS Medicare or MA, are required to pay the Medicare Part B premium.[9] However, MA plans may pay a portion of their members' Part B premium as a supplemental MA benefit. Beneficiaries may face an additional premium to enroll in Part D; MA prescription drug plans (MA–PDs), which provide integrated Part C and Part D coverage under the same plan, can also reduce or eliminate the Part D premium as a supplemental MA benefit. Further, MA–PDs may provide additional Part D benefit enhancements as a supplemental benefit, such as reduced cost sharing or coverage of additional drugs.

For plans reducing their enrollees' Part B premium, CMS limits the amount by which the premium can be reduced; the maximum reduction is generally equal to the Part B premium for the year preceding the contract year (although this rule is typically not binding since very few plans offer full Part B–premium reductions).[10] For plans reducing or eliminating the Part D premium for their enrollees, the maximum reduction is based on the Part D premium for that plan, and the plan cannot reduce the total Part D premium below zero.

#### Coverage of non-Medicare services

MA plans may offer coverage of non-Medicare services (those not covered under FFS Medicare) as a supplemental benefit. Plans' ability to offer these benefits has always been subject to limitations that specify the types of benefits that can be offered and the types of enrollees who can receive them. For many years, two key requirements were that the benefits had to be (1) "primarily health related," meaning that their main purpose was "to prevent, cure, or diminish an illness or injury," and (2) "offered uniformly to all enrollees" (Centers for Medicare & Medicaid Services 2016). These requirements had prevented plans from providing benefits that were not directly health related but that could address other enrollee needs (such as in-home supports for people with functional limitations) and from targeting benefits to specific types of enrollees (such as those with a particular health condition).

Policymakers have taken several steps in recent years to loosen those requirements:

- In 2018, CMS broadened its definition of "primarily health related" to include services that address physical impairments, lessen the functional or psychological impact of injuries, or reduce avoidable health care utilization (Centers for Medicare & Medicaid Services 2018c). Under this new definition, plans can provide services such as in-home support services and home modifications. This change took effect in 2019.
- At the same time, CMS modified the uniformity requirement to let plans target supplemental benefits to enrollees with a particular "health

not capture quality results for beneficiaries residing in rural areas who are assigned to ACOs because of the sampling approach to measurement.

### Medicare's quality measurement for Medicare Advantage and Part D plans

As of 2024, more than half of eligible Medicare beneficiaries nationwide were enrolled in MA plans (Medicare Payment Advisory Commission 2025). MA enrollment patterns differ in urban and rural areas. In 2024, the majority (56 percent) of eligible urban beneficiaries were enrolled in MA compared with 47 percent of eligible beneficiaries residing in rural counties.[16] However, the growth of MA enrollment in rural areas has been faster in recent years. In 2024, MA enrollment in rural areas grew by 8 percent, compared with 6 percent growth in urban areas. The predominant plan type often differs between urban and rural areas as well. In 2024, 39 percent of rural MA enrollees were in HMO plans compared with about 59 percent of urban enrollees. By contrast, 58 percent of rural enrollees were in local preferred provider organizations compared with 40 percent of urban enrollees.

In 2006, CMS introduced the MA star-rating system to give beneficiaries information about the clinical quality, administrative capability, and patient experience that an enrollee can expect from a given MA plan. Medicare currently collects over 100 MA quality measures, 42 of which are used to determine a star rating from 1 to 5 for each MA contract (Centers for Medicare & Medicaid Services 2023c). These ratings are available on the medicare.gov Plan Finder website so that beneficiaries can compare plans. Twelve of these 42 measures are also used to calculate Part D star ratings that are displayed on the Plan Finder website for each Part D organization.

However, the Commission has determined that the current system for MA quality measurement and reporting is flawed and does not provide a reliable basis for evaluating quality across MA plans (Medicare Payment Advisory Commission 2020, Medicare Payment Advisory Commission 2019). Nonetheless, these measures are the basis for the MA quality-bonus program, which increases MA payments (and program spending) by about $15 billion annually.

A primary flaw of current MA quality reporting is that quality results for MA are reported on a contract-wide basis, and those results are used to determine the star ratings for all plans offered under the contract.[17] MA contracts often cover wide geographic areas that include multiple diverse health care markets. In January 2024, over half of MA enrollees were in contracts that spanned two or more states. A third of MA enrollees were in multistate MA contracts that spanned noncontiguous states. The largest MA contract, with 2.6 million enrollees, had over 1,000 MA enrollees in each of 46 states and over 20,000 enrollees in each of 30 states. Another multistate contract had about 200,000 enrollees in Florida; 100,000 enrollees in Indiana; 70,000 enrollees in Arizona; and 40,000 enrollees in Oregon. The star ratings for such contracts reflect performance averaged across different service areas and thus are unlikely to accurately reflect plan quality in any one of those areas.

Plan sponsors rely exclusively on administrative data (such as encounter data) as the source for many measures, but there are some "hybrid" measures for which MA organizations can or must use both administrative data and data collected from a sample of enrollee medical records (e.g., data on breast cancer screening or diabetic A1c control). To report data for hybrid measures, MA organizations collect data for a random sample of 411 enrollees, chosen at the contract level.[18] Like many of the ACO measures previously described, MA plans work with providers (including those that furnish care in rural areas) to gather the information on this sample of enrollees to report the measure. However, because of the sampling approach at the contract level, MA quality measures may or may not capture quality results for beneficiaries residing in rural areas who are enrolled in MA plans.

## Initiatives to improve measurement of rural providers' quality of care

While acknowledging the limitations in measuring quality of care for many small providers, including those in rural areas, we have identified several federal and multistakeholder initiatives to improve quality measurement, including identifying and developing metrics most relevant for rural providers and furnishing technical assistance to rural providers. The Commission will continue to monitor the implementation and effectiveness of these initiatives.