# Exhibit L

March 31, 2023

**NOTE TO: Medicare Advantage Organizations, Prescription Drug Plan Sponsors, and Other Interested Parties**

**Announcement of Calendar Year (CY) 2024 Medicare Advantage (MA) Capitation Rates and Part C and Part D Payment Policies**

In accordance with section 1853(b)(1) of the Social Security Act, we are notifying you of the annual capitation rate for each Medicare Advantage (MA) payment area for CY 2024 and the risk and other factors to be used in adjusting such rates.

In response to our request for comments on the Advance Notice of Methodological Changes for CY 2024 MA Capitation Rates and Part C and Part D Payment Policies (CY 2024 Advance Notice), published on February 1, 2023, CMS received submissions from professional organizations, MA and Part D sponsors, advocacy groups, physicians, state Medicaid agencies, pharmaceutical manufacturers, pharmacy benefit managers, pharmacies, and other interested persons. The Rate Announcement describes and responds to all of the substantive comments received.

After considering all comments received, we are finalizing policies in the Announcement of CY 2024 MA Capitation Rates and Part C and Part D Payment Policies (CY 2024 Rate Announcement) that reflect CMS' commitment to ensuring that people with Medicare receive equitable, affordable, high quality, and whole-person care now and in the future, especially the most vulnerable. The policies in the CY 2024 Rate Announcement are an important step in our efforts to make sure the MA program meets the health care needs of all beneficiaries while improving the quality and long-term stability of the Medicare program. The CY 2024 Rate Announcement finalizes an important transition to an updated risk adjustment model that implements a set of commonsense, clinically-based technical updates needed to keep MA payments up-to-date and to improve payment accuracy to MA plans.

Specifically, the updated risk adjustment model is developed using ICD-10 codes to align with the rest of the health care system, which has been using ICD-10 since 2015. It also incorporates newer data – the current MA risk adjustment model is calibrated with 2014 diagnosis data and 2015 FFS expenditure data and the new model uses 2018 diagnosis data and 2019 expenditure data. Finally, the revised model includes clinically-based adjustments to ensure that conditions included in the model are stable predictors of costs. These adjustments help ensure payments accurately reflect what it costs to care for beneficiaries and make the model less susceptible to discretionary coding, which can lead to excess payments to MA plans. This is consistent with updates we have done in the past where we removed or reclassified codes disproportionately coded in MA compared to Medicare FFS to avoid wasteful spending.

Together, these updates improve the model's ability to predict the cost of care and ensure MA risk-adjusted payments are as accurate as possible, which ultimately makes sure MA plans are paid enough to deliver the benefits that their enrollees are entitled to.

The capitation rate tables for 2024 and supporting data are posted on the CMS website at https://www.cms.gov/Medicare/Health- Plans/MedicareAdvtgSpecRateStats/Ratebooks-and-Supporting-Data.html. The statutory component of the regional benchmarks, qualifying counties, and each county's applicable percentage are also posted on this section of the CMS website.

Attachment I of the Rate Announcement shows the final estimates of the National Per Capita MA Growth Percentage for 2024 and the National Medicare Fee-for-Service (FFS) Growth Percentage for 2024, used to calculate the 2024 capitation rates. As discussed in Attachment I, the final estimate of the National Per Capita MA Growth Percentage for combined aged and disabled beneficiaries is 1.60 percent, and the final estimate of the FFS Growth Percentage is 2.45 percent. Attachment II provides a set of tables that summarizes many of the key Medicare assumptions used in the calculation of the growth percentages.

Section 1853(b)(4) of the Social Security Act requires CMS to release county-specific per capita FFS expenditure information on an annual basis, beginning with March 1, 2001. In accordance with this requirement, FFS data for CY 2021 were posted on the above website with the Advance Notice.

Attachment II details the key assumptions and financial information behind the growth percentages presented in Attachment I.

Attachment III presents responses to Part C payment-related comments on the CY 2024 Advance Notice.

Attachment IV presents responses to Part D payment-related comments on the Advance Notice.

Attachment V provides the final Part D benefit parameters and details how they are updated.

Attachment VI presents responses to comments on updates for MA and Part D Star Ratings.

Attachment VII contains economic information for significant provisions in the CY 2024 Rate Announcement.

Attachment VIII contains the CMS-HCC Risk Adjustment Factor and Predictive Ratio tables.

**Key Updates from the Advance Notice**

Growth Percentages: Attachment I provides the final estimates of the National Per Capita MA Growth Percentage and the FFS Growth Percentage, also called growth rates, upon which the capitation rates are based, and information on deductibles for Medical Savings Accounts. Each year for the Rate Announcement, CMS updates the growth rates to be based on the most current

estimate of per capita costs, based on the available historical program experience and projected trend assumptions at that time. The growth rates change between proposed and final as CMS incorporates updated data and assumptions. This year, the change in growth rates from the Advance Notice to the Rate Announcement is due to several key factors, including: additional CY 2022 experience data that was lower than previously projected, updated modeling to account for the effects of COVID-19 and other programmatic and demographic changes, lower morbidity from excess COVID-related deaths, lower total spending by explicitly modeling the shift of hip and knee replacements from inpatient to outpatient setting, and updated modeling of the effect of a greater share of dual beneficiaries enrolling in MA. For more information on the overall change in growth rates, please see the Fact Sheet released in the Newsroom section of the CMS.gov website that accompanies this Rate Announcement.

> Technical Update to Medical Education Payments in the Non-ESRD USPCC Baseline: CMS is finalizing the technical update to remove MA-related indirect medical education and direct graduate medical education costs (described in the CY 2024 Advance Notice) from the historical and projected expenditures supporting the final estimates (being released in this Rate Announcement) of the non-ESRD FFS USPCCs. The Secretary has directed the CMS Office of the Actuary (OACT) to phase in this technical update to the USPCCs over a 3-year period beginning with the CY 2024 ratebook, with 33% of the medical education adjustment applied to the USPCCs in 2024. We expect 67% of the 2025 medical education adjustment to be applied in 2025 and 100% of the 2026 value to be applied in 2026.

Calculation of FFS Costs: The Secretary has directed the CMS Office of the Actuary to adjust the FFS experience for beneficiaries enrolled in Puerto Rico to reflect the propensity of "zero–dollar" beneficiaries nationwide.

CMS-Hierarchical Condition Categories (CMS-HCC) Risk Adjustment Model (Non-PACE): CMS is finalizing the updated risk adjustment model proposed in the CY 2024 Advance Notice, but will phase it in over 3 years. For CY 2024, risk scores will be calculated as a blend of 67% of the risk scores calculated with the current model (the 2020 model) and 33% of the risk scores calculated with the updated model (the 2024 model). For CY 2025, we expect risk scores to be calculated as a blend of 33% of the risk scores calculated with the 2020 model and 67% of the risk scores calculated with the 2024 model, and for CY 2026, we expect 100% of the risk scores to be calculated with the 2024 model.

Frailty Adjustment for Fully Integrated Dual Eligible Special Needs Plans (FIDE SNPs): CMS is finalizing frailty factors that do not include the Consumer Assessment of Healthcare Providers and Systems (CAHPS) survey weight, which is an adjustment that can be used to account for potential non-response bias. This weight was proposed to be included in the frailty factor calculation in the CY 2024 Advance Notice. CMS will implement FIDE SNP frailty factors consistent with the updated CMS-HCC risk adjustment model being finalized for CY 2024. Also,

consistent with CMS' proposal to blend risk scores for CY 2024 (67% current model and 33% updated model), a blended frailty score for FIDE SNPs will be compared with PACE frailty calculated in the same manner to determine whether that FIDE SNP has a similar average level of frailty as PACE. The final frailty factors for CY 2024 can be found in Section L.

**Policies Adopted as Described**

As in past years, policies in the Advance Notice that are not modified or retracted in the Rate Announcement become effective for the upcoming payment year. Clarifications in the Rate Announcement supersede information in the Advance Notice and prior Rate Announcements as they apply for payment year 2024.

MA Benchmark, Quality Bonus Payments, and Rebate: We will continue to implement the methodology, as described in the CY 2024 Advance Notice, used to derive the benchmark county rates, how the qualifying bonus counties are identified, and the applicability of the Star Ratings.

Location of Network Areas for Private Fee-for-Service (PFFS) Plans in Plan Year 2025: The list of network areas for plan year 2025 is available on the CMS website at https://www.cms.gov/Medicare/Health-Plans/PrivateFeeforServicePlans/NetworkRequirements.html.

Direct Graduate Medical Education (DGME) Carve-out Applied to Average Geographic Adjustments (AGAs): As in past years, we will continue carving out FFS DGME amounts from the MA capitation rates. (This is different than the technical update related to medical education payments on behalf of MA enrollees in the Non-ESRD USPCC baseline discussed above.)

Organ Acquisition Costs for Kidney Transplants: We will continue carving out Kidney Acquisition Costs (KAC) from the MA capitation rates.

Indirect Medical Education (IME) Phase Out Applied to AGAs: We will continue phasing out FFS IME amounts from the MA capitation rates.

MA End Stage Renal Disease (ESRD) Rates: We will continue to set MA ESRD rates on a state basis.

MA Employer Group Waiver Plans (EGWPs): We will continue to use the payment methodology as described in the Advance Notice, but with the finalized bid-to-benchmark ratios for 2024 MA EGWP Payment rates as indicated in the table below. These bid-to-benchmark ratios are weighted by February 2023 enrollment, including retroactive enrollment

adjustments made in March 2023 to the February 2023 enrollment file, due to a system processing error.[1]

| Applicable Percentage | Bid to Benchmark Ratio |
|---|---|
| 0.95 | 78.5% |
| 1 | 77.2% |
| 1.075 | 76.6% |
| 1.15 | 76.8% |

CMS-HCC Risk Adjustment Model (PACE): For CY 2024, CMS will continue to use the 2017 CMS-HCC risk adjustment model and associated frailty factors to calculate risk scores for participants in PACE organizations.

CMS-HCC ESRD Risk Adjustment Models:

- For Non-PACE Organizations: For CY 2024, CMS will continue to use the 2023 CMS-HCC ESRD risk adjustment models to calculate risk scores for beneficiaries in dialysis, transplant, and post-graft status.

- For PACE Organizations: For CY 2024, CMS will continue to use the 2019 CMS-HCC ESRD risk adjustment models to calculate risk scores for participants in PACE organizations with ESRD.

Frailty Adjustment for PACE Organizations: For CY 2024, CMS will continue to use the frailty factors associated with the 2017 CMS-HCC model (as displayed in Table II-6 of the CY 2024 Advance Notice) to calculate frailty scores for PACE organizations.

Medicare Advantage Coding Pattern Difference Adjustment: For CY 2024, CMS will continue to apply the statutory minimum MA coding pattern difference adjustment factor of 5.90 percent.

Final 2024 Normalization Factors:

CMS will finalize the 2024 Normalization Factor methodologies as proposed in the Advance Notice.

For the three CMS-HCC risk adjustment models with a 2019 or 2020 denominator listed below, CMS will calculate the normalization factors using a five-year linear slope methodology and updated average FFS risk scores for 2018 through 2022, but continuing to exclude the 2021 risk score.

- 2024 CMS-HCC model (for non-PACE organizations), for blended risk score calculations: 1.015

[1] For more information, see the HPMS memorandum dated January 31, 2023 regarding the February 2023 MARx plan payment.

- 2023 CMS-HCC ESRD dialysis model (for non-PACE organizations): 1.022
- 2023 CMS-HCC ESRD functioning graft model (for non-PACE organizations): 1.028

For the four CMS-HCC risk adjustment models with a 2015 denominator listed below and the RxHCC models, CMS will calculate the normalization factors using a five-year linear slope methodology and historical FFS risk scores (2016 through 2020), without including the 2021 and 2022 risk scores.

- 2020 CMS-HCC model (for non-PACE organizations), for blended risk score calculations: 1.146
- 2017 CMS-HCC model (for PACE organizations): 1.159
- 2019 CMS-HCC ESRD dialysis model (for PACE organizations): 1.100
- 2019 CMS-HCC ESRD functioning graft model (for PACE organizations): 1.159
- 2023 RxHCC model (for non-PACE organizations): 1.063
- 2020 RxHCC model (for PACE organizations): 1.084

<u>Sources of Diagnoses for Risk Scores calculated with CMS-HCC and CMS-HCC ESRD Risk Adjustment Models</u>:

- For Non-PACE organizations: CMS will continue the policy adopted in the CY 2023 Rate Announcement to calculate risk scores for payment to MA organizations and certain demonstrations using only risk adjustment-eligible diagnoses from encounter data and FFS claims.
- For PACE organizations: CMS will continue using the same method of calculating risk scores that we have been using since CY 2015, which is to pool risk adjustment-eligible diagnoses from the following sources to calculate a single risk score (with no weighting): (1) encounter data, (2) Risk Adjustment Processing System (RAPS) data, and (3) FFS claims.

<u>RxHCC Risk Adjustment Models</u>:

- For Non-PACE Organizations: For CY 2024, we will continue to use the 2023 RxHCC risk adjustment model to adjust direct subsidy payments for Part D benefits offered by stand-alone Prescription Drug Plans (PDPs) and Medicare Advantage-Prescription Drug Plans (MA-PDs).
- For PACE Organizations: For CY 2024, CMS will continue to use the 2020 RxHCC risk adjustment model to calculate Part D risk scores.

<u>Source of Diagnoses for Risk Scores calculated with the RxHCC Risk Adjustment Models</u>:

- For Non-PACE organizations: CMS will continue the policy adopted in the CY 2023 Rate Announcement to calculate Part D risk scores using only risk adjustment-eligible diagnoses from encounter data and FFS claims.

- For PACE organizations: CMS will continue using the same method of calculating risk scores that we have been using since CY 2015, which is to pool risk adjustment-eligible diagnoses from the following sources to calculate a single risk score (with no weighting): (1) encounter data, (2) RAPS data, and (3) FFS claims.

Inflation Reduction Act Updates: CMS will implement the changes to the Part D drug benefit made by the Inflation Reduction Act of 2022 as described in the CY 2024 Advance Notice:

- Cost sharing for covered Part D drugs will be eliminated for beneficiaries in the catastrophic phase of coverage beginning in CY 2024.
- Beginning in CY 2024, the low-income subsidy program (LIS) under Part D will increase the income limits for the full LIS benefit from 135 percent of the federal poverty limit (FPL) to 150 percent of the FPL. Medicare beneficiaries earning between 135 percent and 150 percent of the FPL in CY 2024, who meet the resources requirements under either sections 1860D-14(a)(3)(D) or (E) of the Act, and who would have been eligible for the partial low-income premium and cost-sharing subsidies and a reduced deductible under section 1860D-14(a)(2) of the Act had the IRA not been enacted, will be eligible for full low-income premium and cost-sharing subsidies and a $0 deductible.
- For CY 2024, the deductible will continue not to apply to any Part D covered insulin product. Also, in the initial coverage phase and the coverage gap phase, cost sharing must not exceed the applicable copayment amount, which for CY 2024 is $35 for a month's supply of each covered insulin product.[2]
- For CY 2024, the deductible will continue not to apply to any adult vaccine recommended by the Advisory Committee on Immunization Practices (ACIP). Also, the statute requires these vaccines to be exempt from any co-insurance or other cost sharing, including cost sharing for vaccine administration and dispensing fees for such products, when administered in accordance with ACIP's recommendation, for beneficiaries in the initial coverage and coverage gap phases.[3]
- Beginning in CY 2024, the base beneficiary premium (BBP) growth will be held to no more than 6 percent by statute. The BBP for Part D in 2024 will be the lesser of the BBP

---

[2] The elimination of the deductible for each Part D covered insulin product and implementation of cost-sharing capped at $35 for a month's supply of each Part D covered insulin product has been effective as of January 1, 2023. See HPMS Memorandum*, Contract Year 2023 Program Guidance Related to Inflation Reduction Act Changes to Part D Coverage of Vaccines and Insulin*, September 26, 2022.

[3] The elimination of the deductible and cost sharing for any adult vaccine recommended by ACIP has been effective as of January 1, 2023. See HPMS Memorandum*, Contract Year 2023 Program Guidance Related to Inflation Reduction Act Changes to Part D Coverage of Vaccines and Insulin*, September 26, 2022.

for 2023 increased by 6 percent or the amount that would otherwise apply under the original methodology if the IRA were not enacted.

Annual Adjustments to Medicare Part D Benefit Parameters in 2024: We will update the defined standard benefit deductible amount, initial coverage limit, and out-of-pocket (OOP) threshold, by multiplying the CY 2023 amounts by the CY 2024 Annual Percentage Increase (API) and rounding as specified by the statute.

Part D Calendar Year Employer Group Waiver Plans Prospective Reinsurance Amount: We are maintaining the Part D Calendar Year EGWP prospective reinsurance policy as discussed in the CY 2024 Advance Notice. The average per member per month (PMPM) actual reinsurance amount paid to Part D Calendar Year EGWPs for the most recently reconciled payment year, which for purposes of CY 2024 is CY 2021, was $71.09.

Part D Risk Sharing: We will apply no changes to the current threshold risk percentages for CY 2024.

Retiree Drug Subsidy Amounts: We will use the same methodology as in prior years to update the cost threshold and cost limit for qualified retiree prescription drug plans.

/ s /
Meena Seshamani, M.D., Ph.D.
Director, Center for Medicare

I, Jennifer Wuggazer Lazio, am a Member of the American Academy of Actuaries. I meet the Qualification Standards of the American Academy of Actuaries to render the actuarial opinion contained in this Rate Announcement. My opinion is limited to the following sections of this Rate Announcement: The growth percentages and United States per capita cost estimates provided and discussed in Attachments I, II and III; the qualifying county determination, calculations of Fee-for-Service cost, direct graduate medical education carve-out, kidney acquisition cost carve-out, IME phase out, MA benchmarks, EGWP rates, and ESRD rates discussed in Attachment III; the Medicare Part D Benefit Parameters: Annual Adjustments for Defined Standard Benefit in 2024 described in Attachments IV and V; and the economic information contained in Attachment VII. As noted in Attachment III, the Secretary has directed the CMS Office of the Actuary to phase in the MA medical education technical correction to the USPCCs that are used in determining the growth percentages.

/ s /
Jennifer Wuggazer Lazio, F.S.A., M.A.A.A.
Director
Parts C & D Actuarial Group
Office of the Actuary

Attachments

**2024 RATE ANNOUNCEMENT TABLE OF CONTENTS**

Announcement of Calendar Year (CY) 2024 Medicare Advantage (MA) Capitation Rates and Part C and Part D Payment Policies ........ 1
Key Updates from the Advance Notice ........ 2
Policies Adopted as Described ........ 4

Attachment I. Final Estimates of the National Per Capita Growth Percentage and the National Medicare Fee-for-Service Growth Percentage for Calendar Year 2024 ........ 13

Attachment II. Key Assumptions and Financial Information ........ 15

Attachment III. Responses to Public Comments on Part C Payment Policy ........ 28
Section A. General Comments ........ 28
Section B. Estimates of the MA and FFS Growth Percentages for 2024 ........ 30
Section C. MA Benchmark, Quality Bonus Payments, and Rebate ........ 44
Section D. Calculation of Fee-for-Service Costs ........ 45
Section E. Direct Graduate Medical Education ........ 55
Section F. Organ Acquisition Costs for Kidney Transplants ........ 55
Section G. IME Phase Out ........ 55
Section H. MA ESRD Rates ........ 55
Section I. MA Employer Group Waiver Plans ........ 63
Section J. CMS-HCC Risk Adjustment Model for CY 2024 ........ 65
Section K. End Stage Renal Disease (ESRD) Risk Adjustment Models for CY 2024 ........ 115
Section L. Frailty Adjustment for Fully Integrated Dual Eligible Special Needs Plans (FIDE SNPs) and PACE Organizations ........ 116
Section M. Medicare Advantage Coding Pattern Adjustment ........ 120
Section N. Normalization Factors ........ 123
Section O. Sources of Diagnoses for Risk Score Calculation for CY 2024 ........ 127

Attachment IV. Responses to Public Comments on Part D Payment Policy ........ 128
Section A. RxHCC Risk Adjustment Model ........ 128
Section B. Sources of Diagnoses for Part D Risk Score Calculation for CY 2024 ........ 130
Section C. Inflation Reduction Act of 2022 Part D Benefit Design Changes ........ 130
Section D. Medicare Part D Benefit Parameters: Annual Adjustments for Defined Standard Benefit in 2024 ........ 131
Section E. Part D Calendar Year Employer Group Waiver Plans Prospective Reinsurance Amount ........ 132
Section F. Part D Risk Sharing ........ 133

Attachment V. Final Updated Part D Benefit Parameters for Defined Standard Benefit, Low-Income Subsidy, and Retiree Drug Subsidy ........ 134
Section A. Annual Percentage Increase in Consumer Price index ........ 137
Section B. Calculation Methodology ........ 137

Section C. Annual Percentage Increase in Average Expenditures for Part D Drugs per Eligible Beneficiary (API) ....139
Section D. Estimated Total Covered Part D Spending at Out-of-Pocket Threshold for Applicable Beneficiaries ....140
Section E. Retiree Drug Subsidy Amounts ....143

Attachment VI. Updates for Part C and D Star Ratings ....144
Part C and D Star Ratings and Future Measurement Concepts ....144
Reminders for 2024 Star Ratings ....144
Measure Updates for 2024 Star Ratings ....145
Extreme and Uncontrollable Circumstances Policy for the 2024 Star Ratings ....150
Changes to Existing Star Ratings Measures for the 2023 Measurement Year and Beyond ..152
Display Measures ....162
Potential New Measure Concepts and Methodological Enhancements for Future Years ....169

Attachment VII. Economic Information for the CY 2024 Rate Announcement ....179
Section A. Changes in the Payment Methodology for Medicare Advantage and PACE for CY 2024 ....179
A1. Medicare Advantage and PACE non-ESRD Ratebook ....179
A2. Indirect Medical Education (IME) Phase Out ....179
A3. Medicare Advantage and PACE ESRD Ratebooks ....180
A4. CMS-HCC Risk Adjustment Model ....180
A5. ESRD Risk Adjustment ....181
A6. Frailty Adjustment for FIDE SNPs ....181
A7. MA Coding Pattern Adjustment ....181
A8. Normalization ....181
Section B. Changes in the Payment Methodology for Medicare Part D for CY 2024 ....181
B1. Part D Risk Adjustment Model ....181
B2. Annual Percentage Increase for Part D Parameters ....182

Attachment VIII. CMS-HCC Risk Adjustment Factors & Predictive Ratio Tables ....183
Table VIII-1. 2024 CMS-HCC Model Relative Factors for Continuing Enrollees ....183
Table VIII-2. 2024 CMS-HCC Model Relative Factors for Aged and Disabled New Enrollees ....193
Table VIII-3. 2024 CMS-HCC Model Relative Factors for New Enrollees in Chronic Condition Special Needs Plans (C-SNPs) ....194
Table VIII-4. 2024 CMS-HCC Model with Disease Hierarchies ....195
Table VIII-5. Predictive Ratios by Deciles of Predicted Risk (sorted low to high): Non-Dual, Aged (Age >=65) Continuing Enrollee ....197
Table VIII-6. Predictive Ratios by Deciles of Predicted Risk (sorted low to high): Non-Dual, Disabled (Age <65) Continuing Enrollee ....197

Table VIII-7. Predictive Ratios by Deciles of Predicted Risk (sorted low to high): Full Benefit Dual, Aged (Age >=65) Continuing Enrollee ....198
Table VIII-8. Predictive Ratios by Deciles of Predicted Risk (sorted low to high): Full Benefit Dual, Disabled (Age <65) Continuing Enrollee ....198
Table VIII-9. Predictive Ratios by Deciles of Predicted Risk (sorted low to high): Partial Benefit Dual, Aged (Age >=65) Continuing Enrollee ....199
Table VIII-10. Predictive Ratios by Deciles of Predicted Risk (sorted low to high): Partial Benefit Dual, Disabled (Age <65) Continuing Enrollee....199
Table VIII-11. Predictive Ratios by Deciles of Predicted Risk (sorted low to high): Institutional Continuing Enrollee ....200

## Attachment I. Final Estimates of the National Per Capita Growth Percentage and the National Medicare Fee-for-Service Growth Percentage for Calendar Year 2024

Table I-1 below shows the National Per Capita MA Growth Percentage (NPCMAGP) for 2024. An adjustment of -1.77 percent for the combined aged and disabled cohort is included in the NPCMAGP to account for corrections to prior years' estimates as required by section 1853(c)(6)(C). The combined aged and disabled change is used in the development of the ratebook.

**Table I-1. Increase in the National Per Capita MA Growth Percentages (NPCMAGP) for 2024**

| | Prior increases | Current increases | | | NPCMAGP for 2024 with §1853(c)(6)(C) adjustment[1] |
|---|---|---|---|---|---|
| | 2003 to 2023 | 2003 to 2023 | 2023 to 2024 | 2003 to 2024 | |
| Aged + Disabled | 109.238 % | 105.537 % | 3.432 % | 112.590% | 1.60 % |

[1] Current increases for 2003-2024 divided by the prior increases for 2003-2023.

Table I-2 below provides the change in the FFS United States Per Capita Cost (USPCC), which was used in the development of the county benchmarks. The percentage change in the FFS USPCC is shown as the current projected FFS USPCC for 2024 divided by projected FFS USPCC for 2023 as estimated in the 2023 Rate Announcement released on April 04, 2022.

**Table I-2. FFS USPCC Growth Percentage for CY 2024**

| | *Aged + Disabled* | *Dialysis–only ESRD* |
|---|---|---|
| Current projected 2024 FFS USPCC | $1,105.10 | $9,544.97 |
| Prior projected 2023 FFS USPCC | 1,078.63 | 9,332.69 |
| Percent change | 2.45 % | 2.27 % |

Table I-3 below shows the monthly actuarial value of the Medicare deductible and coinsurance for 2023 and 2024. In addition, for 2024, the actuarial value of deductibles and coinsurance is being shown for non-ESRD only, since MA plan bids for 2024 exclude costs for ESRD enrollees. These data were furnished by the Office of the Actuary.

**Table I-3. Monthly Actuarial Value of Medicare Deductible and Coinsurance for 2023 and 2024**

| | 2023 | 2024 | Change | 2024 non-ESRD |
|---|---|---|---|---|
| Part A Benefits | $38.18 | $36.62 | -4.1% | $35.36 |
| Part B Benefits[1] | 154.95 | 161.71 | 4.4 | 154.36 |
| Total Medicare | 193.13 | 198.33 | 2.7 | 189.72 |

[1] Includes the amounts for outpatient psychiatric charges.

**Medical Savings Account (MSA) Plans.** The maximum deductible for MSA plans for 2024 is $16,000.

**Attachment II. Key Assumptions and Financial Information**

The USPCCs are the basis for the National Per Capita MA Growth Percentage. Below is a table that compares last year's estimates of USPCCs with current estimates for 2003 to 2025. In addition, this table shows the current projections of the USPCCs through 2026. We are also providing a set of tables that summarize many of the key Medicare assumptions used in the calculation of the USPCCs. Most of the tables include information for the years 2003 through 2026.

Most of the tables in this attachment present combined aged and disabled non-ESRD data. The ESRD information presented is for the combined aged-ESRD, disabled-ESRD, and ESRD only.

All of the information provided in this attachment applies to the Medicare Part A and Part B programs. Caution should be employed in the use of this information. It is based upon nationwide averages, and local conditions can differ substantially from conditions nationwide.

None of the data presented here pertain to the Medicare Part D prescription drug benefit.

**Table II-1. Comparison of Current & Previous Estimates of the Total USPCC – Non-ESRD**

| | Part A | | Part B | | Part A + Part B | | |
|---|---|---|---|---|---|---|---|
| Calendar year | Current estimate | Last year's estimate | Current estimate | Last year's estimate | Current estimate | Last year's estimate | Ratio |
| 2003 | $296.18 | $296.18 | $247.66 | $247.66 | $543.84 | $543.84 | 1.000 |
| 2004 | 314.08 | 314.08 | 271.06 | 271.06 | 585.14 | 585.14 | 1.000 |
| 2005 | 334.83 | 334.83 | 292.86 | 292.86 | 627.69 | 627.69 | 1.000 |
| 2006 | 345.30 | 345.30 | 313.70 | 313.70 | 659.00 | 659.00 | 1.000 |
| 2007 | 355.44 | 355.44 | 330.68 | 330.68 | 686.12 | 686.12 | 1.000 |
| 2008 | 371.90 | 371.90 | 351.04 | 351.04 | 722.94 | 722.94 | 1.000 |
| 2009 | 383.91 | 383.91 | 367.49 | 367.35 | 751.40 | 751.26 | 1.000 |
| 2010 | 383.93 | 383.93 | 376.34 | 376.12 | 760.27 | 760.05 | 1.000 |
| 2011 | 387.73 | 387.73 | 385.30 | 385.12 | 773.03 | 772.85 | 1.000 |
| 2012 | 377.37 | 377.37 | 391.93 | 391.76 | 769.30 | 769.13 | 1.000 |
| 2013 | 380.03 | 380.03 | 398.72 | 398.54 | 778.75 | 778.57 | 1.000 |
| 2014 | 370.23 | 370.23 | 418.36 | 418.18 | 788.59 | 788.41 | 1.000 |
| 2015 | 373.86 | 373.99 | 435.00 | 434.95 | 808.86 | 808.94 | 1.000 |
| 2016 | 377.62 | 377.61 | 444.28 | 444.14 | 821.90 | 821.75 | 1.000 |
| 2017 | 383.09 | 382.91 | 459.19 | 459.08 | 842.28 | 841.99 | 1.000 |
| 2018 | 388.12 | 388.06 | 489.65 | 489.43 | 877.77 | 877.49 | 1.000 |
| 2019 | 400.79 | 400.21 | 521.89 | 521.77 | 922.68 | 921.98 | 1.001 |
| 2020 | 403.90 | 402.19 | 522.48 | 522.62 | 926.38 | 924.81 | 1.002 |

| | Part A | | Part B | | Part A + Part B | | |
|---|---|---|---|---|---|---|---|
| Calendar year | Current estimate | Last year's estimate | Current estimate | Last year's estimate | Current estimate | Last year's estimate | Ratio |
| 2021 | 409.38 | 412.79 | 569.14 | 573.53 | 978.52 | 986.32 | 0.992 |
| 2022 | 431.47 | 447.39 | 603.83 | 624.52 | 1,035.30 | 1,071.91 | 0.966 |
| 2023 | 459.23 | 469.56 | 658.56 | 668.36 | 1,117.79 | 1,137.92 | 0.982 |
| 2024 | 464.05 | 488.33 | 692.10 | 707.07 | 1,156.15 | 1,195.40 | 0.967 |
| 2025 | 480.98 | 509.50 | 729.01 | 744.57 | 1,209.99 | 1,254.07 | 0.965 |
| 2026 | 496.85 | | 772.41 | | 1,269.26 | | |

**Table II-2. Comparison of Current & Previous Estimates of the FFS USPCC – Non-ESRD**

| | Part A | | Part B | | Part A + Part B | | |
|---|---|---|---|---|---|---|---|
| Calendar year | Current estimate | Last year's estimate | Current estimate | Last year's estimate | Current estimate | Last year's estimate | Ratio |
| 2010 | $369.60 | $371.20 | $374.30 | $373.99 | $743.90 | $745.19 | 0.998 |
| 2011 | 369.45 | 371.15 | 383.17 | 382.92 | 752.62 | 754.07 | 0.998 |
| 2012 | 355.15 | 356.97 | 390.70 | 390.45 | 745.85 | 747.42 | 0.998 |
| 2013 | 361.78 | 363.75 | 394.49 | 394.24 | 756.27 | 757.99 | 0.998 |
| 2014 | 362.07 | 364.24 | 409.16 | 408.89 | 771.23 | 773.13 | 0.998 |
| 2015 | 366.98 | 369.37 | 428.06 | 427.73 | 795.04 | 797.10 | 0.997 |
| 2016 | 369.00 | 371.57 | 433.62 | 433.36 | 802.62 | 804.93 | 0.997 |
| 2017 | 370.97 | 373.64 | 448.28 | 448.06 | 819.25 | 821.70 | 0.997 |
| 2018 | 374.54 | 377.84 | 474.15 | 473.79 | 848.69 | 851.63 | 0.997 |
| 2019 | 380.01 | 383.05 | 500.82 | 500.77 | 880.83 | 883.82 | 0.997 |
| 2020 | 370.93 | 372.68 | 473.65 | 473.99 | 844.58 | 846.67 | 0.998 |
| 2021 | 384.05 | 388.34 | 550.73 | 546.76 | 934.78 | 935.10 | 1.000 |
| 2022 | 398.10 | 424.46 | 573.64 | 598.85 | 971.74 | 1,023.31 | 0.950 |
| 2023 | 428.63 | 448.03 | 629.07 | 630.60 | 1,057.70 | 1,078.63 | 0.981 |
| 2024 | 440.70 | 465.39 | 664.40 | 666.68 | 1,105.10 | 1,132.07 | 0.976 |
| 2025 | 451.09 | 484.86 | 698.89 | 701.28 | 1,149.98 | 1,186.14 | 0.970 |
| 2026 | 459.88 | | 739.42 | | 1,199.30 | | |

**Table II-3. Comparison of Current & Previous Estimates of the ESRD Dialysis-only FFS USPCC**

| | Part A | | Part B | | Part A + Part B | | |
|---|---|---|---|---|---|---|---|
| Calendar year | Current estimate | Last year's estimate | Current estimate | Last year's estimate | Current estimate | Last year's estimate | Ratio |
| 2010 | $2,952.75 | $2,952.75 | $3,881.39 | $3,881.39 | $6,834.14 | $6,834.14 | 1.000 |

| | Part A | | Part B | | Part A + Part B | | |
|---|---|---|---|---|---|---|---|
| Calendar year | Current estimate | Last year's estimate | Current estimate | Last year's estimate | Current estimate | Last year's estimate | Ratio |
| 2011 | 2,862.38 | 2,862.38 | 3,908.01 | 3,908.01 | 6,770.39 | 6,770.39 | 1.000 |
| 2012 | 2,774.49 | 2,774.49 | 3,944.59 | 3,944.59 | 6,719.08 | 6,719.08 | 1.000 |
| 2013 | 2,794.19 | 2,794.19 | 4,088.66 | 4,088.66 | 6,882.85 | 6,882.85 | 1.000 |
| 2014 | 2,784.52 | 2,784.52 | 4,115.70 | 4,115.70 | 6,900.22 | 6,900.22 | 1.000 |
| 2015 | 2,775.84 | 2,775.84 | 4,060.87 | 4,060.87 | 6,836.71 | 6,836.71 | 1.000 |
| 2016 | 2,895.91 | 2,895.91 | 4,081.27 | 4,081.27 | 6,977.18 | 6,977.18 | 1.000 |
| 2017 | 2,883.27 | 2,883.27 | 4,102.66 | 4,102.66 | 6,985.93 | 6,985.93 | 1.000 |
| 2018 | 2,952.21 | 2,952.21 | 4,526.09 | 4,526.09 | 7,478.30 | 7,478.30 | 1.000 |
| 2019 | 3,040.74 | 3,040.74 | 4,614.18 | 4,614.18 | 7,654.92 | 7,654.92 | 1.000 |
| 2020 | 3,082.55 | 3,082.55 | 4,542.51 | 4,542.51 | 7,625.06 | 7,625.06 | 1.000 |
| 2021 | 3,295.54 | 3,264.12 | 4,786.27 | 5,025.52 | 8,081.81 | 8,289.64 | 0.975 |
| 2022 | 3,395.47 | 3,646.65 | 4,863.56 | 5,279.76 | 8,259.03 | 8,926.41 | 0.925 |
| 2023 | 3,632.99 | 3,890.68 | 5,296.62 | 5,442.01 | 8,929.61 | 9,332.69 | 0.957 |
| 2024 | 3,835.56 | 4,057.82 | 5,709.41 | 5,648.71 | 9,544.97 | 9,706.53 | 0.983 |
| 2025 | 4,084.94 | 4,242.66 | 6,778.51 | 6,426.56 | 10,863.45 | 10,669.22 | 1.018 |
| 2026 | 4,347.69 | | 7,309.00 | | 11,656.69 | | |

**Table II-4. Basis for ESRD Dialysis-only FFS USPCC Trend**

| Calendar year | Part A | | | Part B | | | Part A & Part B | | |
|---|---|---|---|---|---|---|---|---|---|
| | All ESRD cumulative FFS trend | Adjustment factor for dialysis-only | Adjusted dialysis-only cumulative trend | All ESRD cumulative FFS trend | Adjustment factor for dialysis-only | Adjusted dialysis-only cumulative trend | All ESRD cumulative FFS trend | Adjustment factor for dialysis-only | Adjusted dialysis-only cumulative trend |
| 2022 | 1.02556 | 1.00465 | 1.03032 | 1.01381 | 1.00230 | 1.01615 | 1.01860 | 1.00327 | 1.02193 |
| 2023 | 1.09223 | 1.00931 | 1.10240 | 1.10155 | 1.00461 | 1.10663 | 1.09775 | 1.00652 | 1.10490 |
| 2024 | 1.14780 | 1.01400 | 1.16386 | 1.18467 | 1.00693 | 1.19287 | 1.16963 | 1.00976 | 1.18104 |
| 2025 | 1.21677 | 1.01871 | 1.23954 | 1.40326 | 1.00925 | 1.41624 | 1.32722 | 1.01278 | 1.34419 |
| 2026 | 1.28905 | 1.02344 | 1.31926 | 1.50961 | 1.01157 | 1.52708 | 1.41967 | 1.01597 | 1.44234 |

## Table II-5. Summary of Key Projections

Part A[1]

| Year | Calendar year CPI percent change | FY inpatient PPS update factor | FY Part A total reimbursement (incurred) |
|---|---|---|---|
| 2003 | 1.4% | 3.0% | 3.5% |
| 2004 | 2.1 | 3.4 | 8.4 |
| 2005 | 2.7 | 3.3 | 8.8 |
| 2006 | 4.1 | 3.7 | 5.9 |
| 2007 | 3.3 | 3.4 | 5.7 |
| 2008 | 2.3 | 2.7 | 7.6 |
| 2009 | 5.8 | 2.7 | 6.7 |
| 2010 | 0.0 | 1.9 | 3.0 |
| 2011 | 0.0 | −0.6 | 4.5 |
| 2012 | 3.6 | −0.1 | 0.4 |
| 2013 | 1.7 | 2.8 | 4.7 |
| 2014 | 1.5 | 0.9 | 0.6 |
| 2015 | 1.7 | 1.4 | 3.2 |
| 2016 | 0.0 | 0.9 | 4.3 |
| 2017 | 0.3 | 0.2 | 4.0 |
| 2018 | 2.0 | 1.8 | 4.0 |
| 2019 | 2.8 | 1.9 | 5.5 |
| 2020 | 1.6 | 3.1 | 3.2 |
| 2021 | 1.3 | 2.9 | 4.8 |
| 2022 | 5.9 | 2.5 | 4.7 |
| 2023 | 8.7 | 4.3 | 8.1 |
| 2024 | 3.3 | 2.8 | 5.3 |
| 2025 | 1.4 | 3.1 | 6.8 |
| 2026 | 2.1 | 2.9 | 7.3 |

Part B[2]

| | Physician fee schedule | | | | |
|---|---|---|---|---|---|
| Calendar year | Fees[3] | Residual[4] | Outpatient hospital | ESRD dialysis update factor[5] | Total |
| 2003 | 1.4% | 4.5% | 4.4% | | 6.8% |
| 2004 | 3.8 | 5.9 | 11.1 | | 9.8 |
| 2005 | 2.1 | 3.2 | 10.8 | | 7.0 |
| 2006 | 0.2 | 4.6 | 5.1 | | 6.1 |
| 2007 | -1.4 | 3.5 | 8.2 | | 4.3 |
| 2008 | -0.3 | 4.0 | 6.3 | | 4.8 |
| 2009 | 1.4 | 2.3 | 5.4 | | 3.9 |
| 2010 | 2.3 | 2.1 | 6.6 | | 2.4 |
| 2011 | 0.8 | 2.3 | 7.1 | 2.5% | 2.3 |
| 2012 | -1.2 | 0.8 | 7.2 | 2.1 | 1.7 |
| 2013 | -0.1 | 0.2 | 7.2 | 2.3 | 0.8 |
| 2014 | 0.4 | 0.6 | 12.6 | 2.8 | 3.4 |
| 2015 | -0.3 | -0.3 | 7.4 | 0.0 | 2.7 |
| 2016 | -0.4 | -0.3 | 5.2 | 0.15 | 1.9 |
| 2017 | 0.1 | 1.1 | 7.4 | 0.55 | 2.8 |
| 2018 | 0.5 | 1.1 | 8.4 | 0.3 | 5.7 |
| 2019 | 1.2 | 2.8 | 4.9 | 1.3 | 5.8 |
| 2020 | 0.2 | -11.5 | -6.0 | 1.7 | -1.3 |
| 2021 | 4.8 | 13.1 | 20.0 | 1.6 | 8.7 |
| 2022 | -1.1 | 4.0 | 6.5 | 1.9 | 4.9 |
| 2023 | -0.5 | 3.4 | 15.1 | 3.0 | 7.4 |
| 2024 | -1.7 | 3.5 | 9.1 | 1.6 | 4.8 |
| 2025 | -1.9 | 3.0 | 8.3 | 2.3 | 5.6 |
| 2026 | 0.4 | 2.6 | 8.3 | 2.1 | 5.8 |

[1] Percent change over prior year.

[2] Percent change in charges per aged Part B enrollee.

[3] Reflects the physician update and legislation affecting physician services—for example, the addition of new preventive services enacted in 1997, 2000, and 2010.

[4] Residual factors are factors other than price, including volume of services, intensity of services, and age/sex changes.

[5] The ESRD Prospective Payment System was implemented in 2011.

**Table II-6. Medicare Enrollment Projections (In millions)**

Non-ESRD Total

| Calendar year | Part A Aged | Part A Disabled | Part B Aged | Part B Disabled |
|---|---|---|---|---|
| 2003 | 34.437 | 5.961 | 33.038 | 5.215 |
| 2004 | 34.849 | 6.283 | 33.294 | 5.486 |
| 2005 | 35.257 | 6.610 | 33.621 | 5.776 |
| 2006 | 35.795 | 6.889 | 33.975 | 6.017 |
| 2007 | 36.447 | 7.167 | 34.465 | 6.245 |
| 2008 | 37.378 | 7.362 | 35.140 | 6.438 |
| 2009 | 38.257 | 7.574 | 35.832 | 6.664 |
| 2010 | 39.091 | 7.832 | 36.516 | 6.938 |
| 2011 | 39.950 | 8.171 | 37.247 | 7.254 |
| 2012 | 41.687 | 8.411 | 38.546 | 7.502 |
| 2013 | 43.087 | 8.629 | 39.779 | 7.732 |
| 2014 | 44.533 | 8.776 | 41.063 | 7.894 |
| 2015 | 45.911 | 8.853 | 42.311 | 7.977 |
| 2016 | 47.370 | 8.862 | 43.623 | 7.990 |
| 2017 | 48.893 | 8.940 | 44.944 | 8.007 |
| 2018 | 50.457 | 8.696 | 46.310 | 7.862 |
| 2019 | 52.110 | 8.531 | 47.765 | 7.735 |
| 2020 | 53.684 | 8.319 | 49.225 | 7.573 |
| 2021 | 55.041 | 8.054 | 50.513 | 7.359 |
| 2022 | 56.468 | 7.703 | 51.923 | 7.072 |
| 2023 | 58.030 | 7.384 | 53.481 | 6.785 |
| 2024 | 59.651 | 7.160 | 55.023 | 6.586 |
| 2025 | 61.276 | 7.093 | 56.595 | 6.532 |
| 2026 | 62.914 | 7.098 | 58.163 | 6.537 |

Non-ESRD Fee-for-Service

| Calendar year | Part A Aged | Part A Disabled | Part B Aged | Part B Disabled |
|---|---|---|---|---|
| 2003 | 29.593 | 5.628 | 28.097 | 4.875 |
| 2004 | 29.946 | 5.931 | 28.300 | 5.128 |
| 2005 | 30.014 | 6.178 | 28.287 | 5.339 |
| 2006 | 29.362 | 6.149 | 27.459 | 5.270 |
| 2007 | 28.838 | 6.225 | 26.782 | 5.297 |
| 2008 | 28.613 | 6.241 | 26.301 | 5.311 |
| 2009 | 28.563 | 6.288 | 26.071 | 5.374 |
| 2010 | 28.903 | 6.455 | 26.261 | 5.556 |
| 2011 | 29.210 | 6.659 | 26.440 | 5.736 |
| 2012 | 29.960 | 6.693 | 26.744 | 5.779 |
| 2013 | 30.330 | 6.691 | 26.948 | 5.790 |
| 2014 | 30.603 | 6.618 | 27.060 | 5.732 |
| 2015 | 30.947 | 6.488 | 27.274 | 5.609 |
| 2016 | 31.629 | 6.378 | 27.814 | 5.503 |
| 2017 | 31.916 | 6.299 | 27.882 | 5.361 |
| 2018 | 32.168 | 5.867 | 27.926 | 5.028 |
| 2019 | 32.456 | 5.467 | 28.017 | 4.666 |
| 2020 | 32.221 | 4.953 | 27.666 | 4.202 |
| 2021 | 31.438 | 4.409 | 26.816 | 3.711 |

| Calendar year | Part A | | Part B | |
|---|---|---|---|---|
| | Aged | Disabled | Aged | Disabled |
| 2022 | 30.802 | 3.856 | 26.163 | 3.224 |
| 2023 | 30.410 | 3.205 | 25.703 | 2.581 |
| 2024 | 30.504 | 2.652 | 25.739 | 2.066 |
| 2025 | 30.941 | 2.434 | 26.129 | 1.864 |
| 2026 | 31.365 | 2.252 | 26.482 | 1.681 |

ESRD

| Calendar year | ESRD - Total | | ESRD - Fee-for-Service | |
|---|---|---|---|---|
| | Total Part A | Total Part B | Total Part A | Total Part B |
| 2003 | 0.340 | 0.331 | 0.319 | 0.309 |
| 2004 | 0.353 | 0.342 | 0.332 | 0.321 |
| 2005 | 0.366 | 0.355 | 0.344 | 0.332 |
| 2006 | 0.382 | 0.370 | 0.353 | 0.340 |
| 2007 | 0.396 | 0.383 | 0.361 | 0.347 |
| 2008 | 0.411 | 0.397 | 0.367 | 0.353 |
| 2009 | 0.426 | 0.412 | 0.374 | 0.360 |
| 2010 | 0.442 | 0.428 | 0.388 | 0.373 |
| 2011 | 0.429 | 0.416 | 0.371 | 0.358 |
| 2012 | 0.441 | 0.429 | 0.379 | 0.366 |
| 2013 | 0.454 | 0.441 | 0.385 | 0.372 |
| 2014 | 0.469 | 0.456 | 0.390 | 0.377 |
| 2015 | 0.482 | 0.468 | 0.393 | 0.379 |
| 2016 | 0.496 | 0.481 | 0.400 | 0.384 |
| 2017 | 0.511 | 0.495 | 0.404 | 0.386 |
| 2018 | 0.524 | 0.507 | 0.405 | 0.387 |
| 2019 | 0.537 | 0.519 | 0.406 | 0.387 |
| 2020 | 0.540 | 0.522 | 0.396 | 0.377 |
| 2021 | 0.527 | 0.511 | 0.325 | 0.308 |
| 2022 | 0.509 | 0.495 | 0.272 | 0.258 |
| 2023 | 0.510 | 0.499 | 0.245 | 0.232 |
| 2024 | 0.520 | 0.508 | 0.236 | 0.223 |
| 2025 | 0.531 | 0.519 | 0.236 | 0.223 |
| 2026 | 0.543 | 0.531 | 0.237 | 0.223 |

**Table II-7. Part A Projections for non-ESRD (Aged+Disabled)***

| Calendar year | Inpatient hospital | SNF | Home health agency | Managed care | Hospice: Total reimbursement (in millions) |
|---|---|---|---|---|---|
| 2003 | 2,594.78 | 370.63 | 124.28 | 457.87 | 5,733 |
| 2004 | 2,714.57 | 413.44 | 133.89 | 500.73 | 6,832 |
| 2005 | 2,818.21 | 450.54 | 140.87 | 602.29 | 8,016 |
| 2006 | 2,755.32 | 475.07 | 141.30 | 766.75 | 9,368 |
| 2007 | 2,696.33 | 504.24 | 143.72 | 916.90 | 10,518 |
| 2008 | 2,682.50 | 536.68 | 151.00 | 1,088.37 | 11,404 |
| 2009 | 2,637.34 | 551.67 | 153.86 | 1,260.14 | 12,274 |
| 2010 | 2,612.51 | 571.74 | 155.18 | 1,264.21 | 13,126 |
| 2011 | 2,570.82 | 623.31 | 138.31 | 1,314.41 | 13,897 |
| 2012 | 2,473.46 | 541.69 | 130.82 | 1,376.07 | 15,068 |
| 2013 | 2,468.49 | 540.47 | 128.47 | 1,416.56 | 15,263 |
| 2014 | 2,406.24 | 534.37 | 123.89 | 1,372.06 | 15,346 |
| 2015 | 2,388.54 | 530.99 | 126.08 | 1,435.16 | 16,159 |
| 2016 | 2,405.32 | 504.84 | 121.44 | 1,495.94 | 17,128 |
| 2017 | 2,381.77 | 484.69 | 117.35 | 1,609.39 | 18,228 |
| 2018 | 2,352.67 | 465.63 | 113.87 | 1,721.35 | 19,570 |
| 2019 | 2,314.56 | 444.32 | 108.47 | 1,938.76 | 21,174 |
| 2020 | 2,137.02 | 450.75 | 95.42 | 2,160.64 | 22,319 |
| 2021 | 2,117.54 | 421.03 | 93.28 | 2,277.75 | 23,034 |
| 2022 | 2,066.30 | 440.14 | 88.44 | 2,579.80 | 24,195 |
| 2023 | 2,146.67 | 417.69 | 94.63 | 2,848.53 | 26,017 |
| 2024 | 2,141.39 | 403.73 | 95.65 | 2,924.58 | 27,867 |
| 2025 | 2,122.61 | 434.96 | 102.09 | 3,108.74 | 30,079 |
| 2026 | 2,110.05 | 449.31 | 108.55 | 3,290.82 | 32,605 |

*Average reimbursement per enrollee on an incurred basis.

**Table II-8. Part B Projections for non-ESRD (Aged+Disabled)***

| Calendar year | Physician fee schedule | Outpatient hospital | Durable medical equipment |
|---|---|---|---|
| 2003 | $1,226.51 | $364.77 | $196.96 |
| 2004 | 1,344.01 | 418.85 | 195.61 |
| 2005 | 1,397.43 | 477.65 | 196.83 |
| 2006 | 1,396.40 | 497.47 | 197.78 |
| 2007 | 1,368.35 | 526.92 | 195.68 |
| 2008 | 1,367.83 | 555.09 | 200.92 |
| 2009 | 1,386.03 | 587.61 | 183.61 |
| 2010 | 1,429.74 | 623.13 | 183.76 |
| 2011 | 1,459.64 | 662.97 | 175.84 |
| 2012 | 1,412.72 | 697.86 | 173.70 |
| 2013 | 1,369.64 | 735.35 | 152.53 |
| 2014 | 1,351.32 | 823.34 | 128.57 |
| 2015 | 1,336.26 | 876.01 | 132.77 |
| 2016 | 1,313.75 | 911.03 | 120.73 |
| 2017 | 1,293.54 | 952.81 | 112.30 |
| 2018 | 1,285.36 | 1,000.20 | 127.05 |
| 2019 | 1,300.14 | 1,018.61 | 129.06 |
| 2020 | 1,111.11 | 914.01 | 123.59 |
| 2021 | 1,251.85 | 1,031.58 | 121.33 |
| 2022 | 1,208.99 | 1,014.01 | 125.84 |
| 2023 | 1,171.90 | 1,134.23 | 131.99 |
| 2024 | 1,149.61 | 1,190.45 | 133.58 |
| 2025 | 1,139.05 | 1,266.88 | 138.33 |
| 2026 | 1,147.58 | 1,346.13 | 143.96 |

| Calendar year | Carrier lab | Physician administered drugs | Other carrier | Intermediary lab |
|---|---|---|---|---|
| 2003 | $73.73 | $182.58 | $147.21 | $75.18 |
| 2004 | 78.48 | 195.20 | 158.78 | 80.47 |
| 2005 | 82.71 | 178.77 | 184.02 | 84.16 |
| 2006 | 85.59 | 185.41 | 175.66 | 84.51 |
| 2007 | 90.65 | 186.97 | 176.55 | 84.38 |
| 2008 | 94.50 | 184.43 | 182.19 | 85.78 |
| 2009 | 101.60 | 196.19 | 178.46 | 79.19 |
| 2010 | 103.81 | 196.41 | 178.67 | 80.23 |
| 2011 | 103.85 | 209.50 | 179.44 | 83.31 |
| 2012 | 111.73 | 209.34 | 185.17 | 84.64 |
| 2013 | 111.79 | 216.91 | 177.08 | 81.74 |
| 2014 | 117.60 | 224.56 | 173.55 | 55.45 |
| 2015 | 113.99 | 252.11 | 174.94 | 55.26 |
| 2016 | 100.91 | 271.45 | 172.90 | 56.21 |
| 2017 | 100.65 | 280.51 | 177.43 | 54.99 |
| 2018 | 107.28 | 304.36 | 176.15 | 52.94 |
| 2019 | 108.73 | 329.41 | 174.14 | 50.31 |
| 2020 | 109.18 | 325.03 | 166.87 | 51.77 |
| 2021 | 122.82 | 340.52 | 165.36 | 56.25 |
| 2022 | 112.53 | 359.41 | 178.83 | 52.95 |
| 2023 | 116.31 | 368.95 | 184.37 | 52.89 |
| 2024 | 118.37 | 389.08 | 184.22 | 52.28 |
| 2025 | 128.70 | 410.19 | 187.50 | 54.52 |
| 2026 | 132.58 | 432.42 | 191.43 | 55.03 |

*Average reimbursement per enrollee on an incurred basis.

| Calendar year | Other intermediary | Home health agency | Managed care |
|---|---|---|---|
| 2003 | $113.99 | $136.75 | $421.40 |
| 2004 | 119.58 | 156.45 | 471.37 |
| 2005 | 139.78 | 179.44 | 560.31 |
| 2006 | 142.09 | 202.88 | 769.94 |
| 2007 | 151.16 | 232.33 | 931.18 |
| 2008 | 158.20 | 252.43 | 1,104.26 |
| 2009 | 187.44 | 282.09 | 1,203.79 |
| 2010 | 193.08 | 283.25 | 1,221.29 |
| 2011 | 198.15 | 254.42 | 1,276.29 |
| 2012 | 205.08 | 239.36 | 1,368.13 |
| 2013 | 194.43 | 234.07 | 1,497.49 |
| 2014 | 200.51 | 227.73 | 1,703.30 |
| 2015 | 210.37 | 224.84 | 1,829.20 |
| 2016 | 214.14 | 219.09 | 1,938.69 |
| 2017 | 220.58 | 208.93 | 2,096.95 |
| 2018 | 228.23 | 206.47 | 2,376.35 |
| 2019 | 236.12 | 201.48 | 2,704.42 |
| 2020 | 208.83 | 187.27 | 3,062.48 |
| 2021 | 219.92 | 182.59 | 3,327.89 |
| 2022 | 214.19 | 169.26 | 3,800.44 |
| 2023 | 212.86 | 177.44 | 4,341.49 |
| 2024 | 214.10 | 175.38 | 4,687.26 |
| 2025 | 221.29 | 182.19 | 5,007.97 |
| 2026 | 228.98 | 194.55 | 5,384.17 |

* Average reimbursement per enrollee on an incurred basis.

## Table II-9. 2024 Projections by Service Category for non-ESRD (Aged+Disabled)*

| Service type | Current estimate | Last year's estimate | Ratio |
|---|---|---|---|
| Part A | | | |
| Inpatient hospital | $2,141.39 | $2,303.60 | 0.930 |
| SNF | 403.73 | 447.80 | 0.902 |
| Home health agency | 95.65 | 126.49 | 0.756 |
| Managed care | 2,924.58 | 2,978.53 | 0.982 |
| Part B | | | |
| Physician fee schedule | 1,149.61 | 1,170.57 | 0.982 |
| Outpatient hospital | 1,190.45 | 1,232.65 | 0.966 |
| Durable medical equipment | 133.58 | 126.40 | 1.057 |
| Carrier lab | 118.37 | 107.45 | 1.102 |
| Physician Administered Drugs | 389.08 | 420.58 | 0.925 |
| Other carrier | 184.22 | 163.46 | 1.127 |
| Intermediary lab | 52.28 | 44.36 | 1.179 |
| Other intermediary | 214.10 | 245.56 | 0.872 |
| Home health agency | 175.38 | 245.69 | 0.714 |
| Managed care | 4,687.26 | 4,716.27 | 0.994 |

* Average reimbursement per enrollee on an incurred basis.

**Table II-10. Claims Processing Costs as a Fraction of Benefits**

| Calendar year | FFS Part A | FFS Part B | Total Part A | Total Part B |
|---|---|---|---|---|
| 2003 | 0.001849 | 0.011194 | 0.001849 | 0.011194 |
| 2004 | 0.001676 | 0.010542 | 0.001676 | 0.010542 |
| 2005 | 0.001515 | 0.009540 | 0.001515 | 0.009540 |
| 2006 | 0.001245 | 0.007126 | 0.001245 | 0.007126 |
| 2007 | 0.000968 | 0.006067 | 0.000968 | 0.006067 |
| 2008 | 0.000944 | 0.006414 | 0.000944 | 0.006414 |
| 2009 | 0.000844 | 0.005455 | 0.000844 | 0.005455 |
| 2010 | 0.000773 | 0.005055 | 0.000773 | 0.005055 |
| 2011 | 0.000749 | 0.004396 | 0.000749 | 0.004396 |
| 2012 | 0.001008 | 0.003288 | 0.001008 | 0.003288 |
| 2013 | 0.000994 | 0.002846 | 0.000994 | 0.002846 |
| 2014 | 0.001003 | 0.002884 | 0.001003 | 0.002884 |
| 2015 | 0.000952 | 0.002730 | 0.000952 | 0.002730 |
| 2016 | 0.000852 | 0.002348 | 0.000852 | 0.002348 |
| 2017 | 0.000833 | 0.002111 | 0.000833 | 0.002111 |
| 2018 | 0.000836 | 0.001953 | 0.000836 | 0.001953 |
| 2019 | 0.000699 | 0.001644 | 0.000699 | 0.001644 |
| 2020 | 0.000625 | 0.001536 | 0.000625 | 0.001536 |
| 2021 | 0.001038 | 0.002708 | 0.000600 | 0.001399 |
| 2022 | 0.001094 | 0.002801 | 0.000582 | 0.001310 |
| 2023 | 0.001094 | 0.002801 | 0.000582 | 0.001310 |
| 2024 | 0.001094 | 0.002801 | 0.000582 | 0.001310 |
| 2025 | 0.001094 | 0.002801 | 0.000582 | 0.001310 |
| 2026 | 0.001094 | 0.002801 | 0.000582 | 0.001310 |

**Approximate Calculation of the USPCC, the National MA Growth Percentage for Combined (Aged+Disabled) Beneficiaries, and the FFS USPCC (Aged+Disabled)**

The following procedure will approximate the actual calculation of the USPCCs from the underlying assumptions for the contract year for both Part A and Part B.

Part A: The Part A USPCC can be approximated by using the assumptions in the tables titled "Part A Projections for non-ESRD (Aged+Disabled)" and "Claims Processing Costs as a Fraction of Benefits." Information in the "Part A Projections" table is presented on a calendar year per capita basis. First, add the per capita amounts over all types of providers (excluding hospice). Next, multiply this amount by 1 plus the loading factor for administrative expenses from the "Claims Processing Costs" table. Then, divide by 12 to put this amount on a monthly basis.

Part B: The Part B USPCC can be approximated by using the assumptions in the tables titled "Part B Projections for non-ESRD (Aged+Disabled)" and "Claims Processing Costs as a Fraction of Benefits." Information in the "Part B Projections" table is presented on a calendar year per capita basis. First, add the per capita amounts over all types of providers. Next, multiply by 1 plus the loading factor for administrative expenses from the "Claims Processing Costs" table and then divide by 12 to put this amount on a monthly basis.

The National Per Capita MA Growth Percentage: The National Per Capita MA Growth Percentage for 2024 (before adjusting for prior years' over/under estimates) is calculated by adding the USPCCs for Part A and Part B for 2024 and then dividing by the sum of the current estimates of the USPCCs for Part A and Part B for 2023.

The FFS USPCC: The tables used to calculate the total USPCC can also be used to approximate the calculation of the FFS USPCC. The per capita data presented by type of provider in the projections tables for both Part A and Part B are based on total enrollment. To approximate the FFS USPCCs, first add the corresponding provider types under Part A and Part B separately. For the FFS calculations, do not include the managed care provider type. Next, rebase the sum of the per capita amounts for FFS enrollees, i.e., multiply the sum by total enrollees and divide by FFS enrollees. (The enrollment tables in this attachment now also include FFS enrollment.) Then, multiply by 1 plus the loading factor for administrative expenses and divide by 12. The result will only be approximate because there is an additional adjustment to the FFS data which accounts for cost plan data which comes through the FFS data system. This cost plan data is in the total per capita amounts by type of provider, but it is removed for the FFS calculations.

**Attachment III. Responses to Public Comments on Part C Payment Policy**

**Section A. General Comments**

Comment: CMS received a large number of comments in response to the CY 2024 Advance Notice, with many supporting the direction of the proposals in the Advance Notice and others expressing concerns about the impacts of the proposed updates. Commenters who supported the proposals in the Advance Notice believed that the methods taken to update factors, including the capitation rates, were sound and that the adjustments, such as those to capitation rates, were much needed to ensure payment accuracy and preserve the financial integrity of the Medicare Trust Fund. Commenters also cited overpayments to MA organizations and concerns that wasteful spending is weakening the Medicare program, placing extra pressure on the Medicare Trust Fund, and being subsidized by all Medicare beneficiaries via higher Part B premiums. A number of commenters cited MedPAC's findings that excess payments to MA organizations will exceed $27 billion in 2023 and they estimate aggregate excess payments to MA organizations have totaled nearly $124 billion from 2007 to 2023. One commenter stated that this year's projected revenue increase of 1% was an improvement in CMS' management of the MA program compared to recent years, such as the projected increase of 8.5% for payment in 2023. Commenters also emphasized that discretionary coding and perceived 'gaming' of codes is a key part of driving excess payments, and applauded efforts to make the model more accurate and less susceptible to discretionary coding. Another commenter noted that, while changes to the risk adjustment model in the proposal and previous policies impacting quality bonuses would tend to reduce payments to MA organizations, these decreases would be more than offset by an increase in MA benchmarks driven by increases in diagnostic coding by plans. It was also stated that though many MA organizations and associations state that if the MA risk score trend is excluded from the year over year revenue calculation projected payment would decrease, there is no reason to exclude the risk score growth from the estimate of the year-over-year percentage change in payment to have an accurate estimate.

The commenters who did not support the proposed changes saw the net effect of the proposals as cuts to the MA program and urged CMS to maintain stability in the program and not implement the proposed updates. Many commenters submitted a wide array of suggestions regarding proposals in the Advance Notice, including the medical education adjustment to the growth percentages and the updated risk adjustment model. Several commenters stated that the combined effect of the updates to the growth percentages and the risk adjustment model, as well as the impact of Star Ratings, would materially affect benchmarks and result in significant payment reductions. Some commenters stated that the MA risk score trend is not actually part of the MA payment methodology, and that if the risk score trend were not taken into account the year-to-year change in payment would be a negative 2.27%, and not a positive 1.03%. These commenters asserted that a variety of impacts would occur if CMS finalized the proposed changes including that these proposals would disrupt care, place the health of sicker, lower-

income enrollees at risk, and result in increased costs and reduced benefits for MA enrollees. These commenters highlighted the potential for reduced funding for supplemental benefits and claimed that these policies would result in reductions in the coverage of dental, hearing, vision, transportation, and cost sharing for drugs, as well as in hindering the development of complex, innovative solutions to providing care to Medicare beneficiaries. Further, some commenters stated that provision of care would suffer and value-based models would also suffer and result in deteriorating health outcomes.

Response: CMS thanks commenters for their thoughts and input regarding payments made under the MA program. CMS has a duty to be a steward of the Medicare program. Protecting and strengthening Medicare for the 65 million Americans who have it now, and all the beneficiaries in the future, is a key priority for CMS.

Core to this mission is to maintain stability for Medicare beneficiaries in both Medicare FFS and MA. The policies finalized for CY 2024 are projected to increase average payments to MA organizations by 3.32% in CY 2024, which will provide continued stability to the MA market and MA beneficiaries. The policies we are finalizing are commonsense, clinically-based technical updates that are crucial to ensuring that payments to MA organizations are up to date and reflect current diagnostic and expenditure trends. These updates ensure accurate payment to MA organizations and prevent wasteful Medicare spending. These policies were proposed and finalized using careful analyses, iterative clinical input, and with CMS' strategic pillars, especially our commitment to health equity, top of mind.

We respectfully disagree with some commenters' claims that this reasonable update to payments in MA is actually a payment cut that will result in increased costs or fewer benefits for beneficiaries. These comments disregard the payment impact of increases in plan risk scores, which is an essential element to understanding the full revenue picture for MA organizations. Well-established historical trend data show that MA organizations continue to increase the diagnostic codes they submit to CMS for payment, even when models are updated. We have included assumptions for a reduced MA risk score trend due to the updated model. Moreover, we note that there have been prior years when the overall expected revenue change was lower than the 3.32% change projected in this Rate Announcement, and enrollment in MA plans and the extra payments that MA plans receive from CMS, called rebates, to provide supplemental benefits that are above and beyond those available in Medicare FFS, consistently increased over the years, including the years of lower growth in payments. In fact, over the past decade MA has become a very robust market, where plans compete for enrollment in large part by offering zero premium plans and generous supplemental benefits. In fact, rebates have more than doubled in the past five years and rose 20% from 2022 to 2023. The competitiveness of the MA market has also resulted in beneficiaries having access to on average approximately 61 plans and roughly 60% of enrollees enrolled in zero premium plans.

The updates proposed by CMS in the CY 2024 Advance Notice are technical, data-driven, and clinically-based updates that improve the accuracy of payments to MA organizations, as required under the statute governing the MA program. We expect MA organizations that are committed to their MA business to have strong business plans, long term financial strength, and a business trajectory beyond a single year.

Though plans will have different impacts for the policies finalized, the robust strength and competitiveness of the market and high level of choice ensure that the 3.32% nationally averaged update will result in maintained stability.

**Section B. Estimates of the MA and FFS Growth Percentages for 2024**

***Technical Update to USPCC baseline regarding MA-related Medical Education Expenses***

Comment: In the CY 2024 Advance Notice, we proposed a technical change to remove medical education costs (IME and DGME) paid to hospitals by CMS associated with services furnished to MA enrollees from the historical and projected expenditures supporting the non-ESRD FFS USPCCs beginning with the CY 2024 ratebook. Several commenters expressed support for the technical update to remove medical education payments paid by CMS to hospitals associated with services furnished to MA enrollees from the non-ESRD FFS USPCC estimates, in order to make payments to MA organizations more appropriate and accurate.

A few commenters expressed appreciation for CMS' ongoing efforts regarding data evaluations and improvements regarding the development of per capita FFS costs, and for the transparency provided by CMS concerning these efforts. One of these commenters encouraged CMS to continue to take steps to improve the level of transparency related to the methodologies and analysis supporting the development of the USPCCs and county benchmarks, such as providing more details in the Advance Notice on how adjustment factors are calculated including data source/scope and providing further explanation of changes to methodologies.

Response: We appreciate the support and feedback provided by the commenters.

Comment: A large number of commenters expressed concern regarding the full implementation of the technical update to the USPCC baseline at one time, and recommended that the change instead be phased in gradually over multiple years to minimize disruption to premiums and benefits. Several of these commenters noted that CMS has previously phased in benchmark changes, citing as examples the statutory phase-in of the Affordable Care Act benchmark changes and the incremental IME phase-out per section 1853(k)(4)(B)(ii) of the Act.

A couple of commenters requested that the technical update be delayed and not finalized for CY 2024. An additional couple of commenters recommended that CMS not proceed with the proposed technical update to the USPCCs for CY 2024, requesting instead that CMS provide more information about the methodology for identifying medical education payments and the

adjustments to the county benchmarks and USPCCs. One of these commenters believed there was insufficient time for stakeholders to analyze the potential impacts of the technical proposal.

Response: We appreciate the commenters' suggestions to phase in or delay the technical update to the data used for the USPCC baseline. The Secretary has directed the CMS Office of the Actuary to phase in the technical update to the data used to develop the USPCCs over a 3-year period beginning with 33% of this adjustment to the medical education costs applied to the USPCCs in 2024. We expect 67% of the 2025 medical education adjustment to be applied in 2025 and 100% of the 2026 medical education adjustment to be applied in 2026.

Comment: Several commenters noted that there has already been an adjustment to remove medical education costs from the county-level benchmarks in prior years. Many commenters requested clarification regarding how the medical education costs being removed from the non-ESRD FFS growth rate for the technical change is different than the medical education costs removed from county-level benchmarks as an adjustment to the Average Geographic Adjustment (AGA). A few of these commenters inquired whether there is any overlap between the amounts being removed from the USPCC and those being removed at the county level.

Response: The adjustments to the USPCC and AGA pertain to two different groups of Medicare beneficiaries: the technical update to the non-ESRD FFS USPCC pertains to excluding IME and DGME costs *associated with MA enrollees* (paid directly by CMS to hospitals), whereas the county level adjustment to the AGA pertains to IME and DGME costs *associated with FFS beneficiaries* (paid directly by CMS to hospitals) to determine MA capitation rates as required by section 1853 of the Act. Historically, IME and DGME payments included in the non-ESRD FFS USPCCs were sourced from historical inpatient cost reports and included amounts paid on behalf of both FFS and MA enrollees. The cost reports are used as a source for the baseline projections of the USPCCs since the data contains more detail of the various components of hospital payments that are projected separately, including capital, bad debt, and ancillary pass through payments. In contrast, the IME and DGME payments used to calculate the ratebook IME and DGME carve-out factors applied to the AGAs were sourced from the FFS claims records and, as such, the adjustment in the county FFS rate calculation has always been limited to the payments for FFS admissions. The claim records, and not cost reports, are used in the ratebook medical education exclusion because the claim records include the beneficiary's county of residence. Therefore, no corresponding adjustment is required to the IME phase-out and DGME carve-out adjustments to the AGAs in the county ratebook calculation to remove costs associated with MA enrollees. As stated on page 11 of the CY 2024 Advance Notice, the technical update has no impact on the exclusion of medical education costs from the AGAs used to develop the ratebook.

Comment: A few commenters believed that the explanation of the technical change in the Advance Notice was limited and did not fully explain how the change will affect cost projections, why the technical change is being implemented at this time, how the impact was determined, and the statutory basis for the technical change.

Many commenters requested more transparency and details regarding the technical update and the derivation of the impacts. Specific requests from commenters included the following:

- Further explanation/justification of the need for such a large adjustment, such as detailed support of the magnitude of the impact of the technical update (including the underlying data and calculations), information regarding how the technical update compares to the magnitude of historical IME costs that are removed after the application of the AGA to the rebased FFS per capita costs, and how the technical update is consistent with the underlying county claim costs.
- Disclosure of whether CMS has performed a reconciliation of the two sources of IME/DGME information (IME/DGME payments sourced from historical cost reports used in the non-ESRD FFS USPCC, and IME/DGME payments sourced from the FFS claims records used to calculate the county ratebook carve-out factors), and if so, disclosure of the reconciliation results which could demonstrate whether the two sources are consistent (to ensure that the FFS IME/GME payments included in the non-ESRD FFS USPCC align with the IME/GME payments being excluded in the MA ratebook).
- Information regarding the methodology for developing the MA-related IME and DGME adjustment to the USPCC (to better understand how CMS calculated the projected estimates for medical education costs for 2022 and 2023), and the impact on the CY 2022 and CY 2023 non-ESRD FFS USPCCs.
- Additional information on the methodology for identifying IME and GME payments for exclusion.

Response: CMS Office of the Actuary believes that the technical update is consistent with projecting actuarial estimates of FFS per capita costs for the upcoming contract year, as directed by statute. Section 1853(c)(1)(D) requires an estimate of the per capita costs for services covered under Parts A and B for individuals who are not enrolled in an MA plan.

In the CY 2024 Advance Notice, we indicated that, for the CY 2024 ratebook development, the baseline development and modeling supporting the USPCCs had now been updated to separately identify the historical and projected costs of IME and DGME paid to hospitals by CMS associated with services furnished to MA enrollees. This update in the modeling stems from separate projections of IME and DGME by FFS versus MA coverages.

In this Rate Announcement, we are providing the updated impact of the technical update for IME/DGME on the final estimate of the CY 2024 non-ESRD FFS USPCC (that is being released in this Rate Announcement); the following is a demonstration of the impact.

As reflected in Table II-2 of this Rate Announcement, the CY 2024 Part B non-ESRD FFS USPCC is $664.40. This value is unaffected by the technical update for IME/DGME.

The following table illustrates the development of the CY 2024 Part A non-ESRD FFS USPCC both pre- and post-adjustment.

| Projection for Contract Year 2024 | With full (100%) implementation of technical update (*informational*) | With 33% implementation of technical update *for CY 2024 rates* |
|---|---|---|
| a. FFS Enrollment (in millions) | 33.16 | 33.16 |
| <u>Reimbursements (in millions)</u> | | |
| b. Legacy approach (i.e., including MA medical education) | $178,800.9 | $178,800.9 |
| c. MA medical education | ($11,063.6) | ($3,651.0) |
| d. Admin loading | 1.0011 | 1.0011 |
| e. 2024 Part A non-ESRD FFS USPCC (legacy)<br>*e = [(b * d) / a / 12]* | $449.89 | $449.89 |
| f. 2024 Part A non-ESRD FFS USPCC (with exclusion of MA medical education)<br>*f = [(b + c) * d) / a / 12]* | $422.05 | $440.70 |
| g. 2024 Part B non-ESRD FFS USPCC | $664.40 | $664.40 |
| h. 2024 non-ESRD FFS USPCC (legacy)<br>*h = e + g* | $1,114.29 | $1,114.29 |
| i. 2024 non-ESRD FFS USPCC (with exclusion of MA medical education)<br>*i = f + g* | $1,086.45 | $1,105.10 |
| j. 2023 non-ESRD FFS USPCC from CY 2023 Rate Announcement | $1,078.63 | $1,078.63 |
| k. CY 2024 FFS growth rate (legacy)<br>*k = h/j – 1 (rounded to hundredth of a percent)* | 3.31% | 3.31% |
| l. CY 2024 FFS growth rate (with exclusion of MA medical education)<br>*l = i/j – 1 (rounded to hundredth of a percent)* | 0.73% | 2.45% |
| m. Impact of technical update on CY 2024 FFS growth rate<br>*m = l - k* | -2.58% | -0.86% |

The resulting impact of the technical update on the MA growth rate (based on the change in the non-ESRD Total USPCC, which includes both FFS and Part C projections) is -1.27 percent for full (100%) implementation of the medical education change (provided for informational purposes) and -0.42% for 33% implementation in CY 2024.

In response to a commenter's request for a comparison of the two sources of IME/DGME information (IME/DGME payments sourced from historical cost reports used in the non-ESRD FFS USPCC, and IME/DGME payments sourced from the FFS claims records used to calculate the county ratebook carve-out factors), the following table illustrates the CY 2021 incurred IME and DGME represented in the FFS USPCC calculations and the ratebook carveouts. Note that the data in the illustrative table below include experience for both non-ESRD and ESRD FFS beneficiaries.

| Item | CY 2021 Incurred Amount (Billions) | |
|---|---|---|
| | IME | DGME |
| FFS USPCCs in 2024 Rate Announcement | $6.8 | $2.4 |
| 2024 Ratebook AGA Carveouts | $6.6 | $2.2 |
| USPCCs Minus Ratebook | $0.2 | $0.2 |

*Note: $0.2 billion impact represents 0.06 percent of 2021 non-ESRD FFS expenditures.*

The results show that the aggregate IME and DGME ratebook carveouts are similar to the corresponding values in the FFS USPCCs. The difference is largely attributed to the different data sources for the IME and DGME amounts. That is, the USPCC values for IME/DGME originate from the inpatient cost reports, whereas the ratebook IME/DGME carveouts are tabulated from the National Claim History claim records.

Comment: A few commenters expressed concern that the technical update would inappropriately reduce the non-ESRD FFS growth rate to below the expected growth in per enrollee Medicare costs.

Another commenter expressed concern that the reduction in the growth rate for the technical update will exacerbate financial challenges facing not-for-profit health plans and negatively impact value-based care providers, many of whom are paid based on the payments Medicare Advantage plans receive from CMS.

Response: We appreciate the concerns raised by the commenters. We note that the non-ESRD FFS USPCCs in prior ratebook years had included both IME and DGME costs paid to hospitals on behalf of MA enrollees. Consequently, MA benchmarks had included these admission-related costs even though CMS, and not MA organizations, had been paying these costs associated with MA enrollees directly to hospitals. That is, the non-ESRD FFS USPCCs in prior ratebook years had included amounts paid for IME and GME associated with services for MA enrollees, and those are not costs for Part A and Part B services "for individuals who are not enrolled in an MA plan" per section 1853(c)(1)(D). Under authority in sections 1853(c)(1)(D) and 1876(a)(4), the

Secretary has directed the CMS Office of the Actuary to phase in the technical update to the USPCCs over a 3-year period beginning with the CY 2024 ratebook, with 33% of this medical education adjustment applied to the USPCCs in 2024. We expect 67% of the 2025 medical education adjustment to be applied in 2025 and 100% of the 2026 value to be applied in 2026.

Comment: A commenter expressed opposition to the technical update, and seemed to suggest that the technical update could be made to the growth rates without affecting the level of MA rates, and called into question whether the technical update was an improvement to accuracy of the USPCC calculation.

Another commenter seemed to suggest that CMS could adjust previous years' USPCCs in a manner in which plans would not be "penalized" by the technical change.

Response: The technical update results in a more accurate projection of the USPCCs because the update properly excludes medical education costs associated with inpatient services furnished to MA enrollees from the costs for furnishing services to FFS beneficiaries; the non-ESRD FFS USPCC reflect FFS per capita costs and should not be based on the costs associated with services furnished to MA enrollees. The statute prescribes the general approach per section 1853(c) to updating the USPCCs and growth rates, and section 1853 of the Act requires that FFS per capita costs be used in developing MA rates. As discussed in the CY 2024 Advance Notice, the growth rates are used in the calculation of MA rates, whereby the MA growth rate is used in the calculation of the applicable amount per section 1853(k) and the non-ESRD FFS USPCC (and implicitly the corresponding non-ESRD FFS growth rate) is used in the calculation of the specified amount per section 1853(n). The CY 2024 FFS growth rate is calculated as the current projection of the 2024 non-ESRD FFS USPCC (that is being released in this Rate Announcement) divided by the prior projection of the 2023 non-ESRD FFS USPCC (that was released in the CY 2023 Rate Announcement). The 2024 non-ESRD FFS USPCC is used in the calculation formula for the CY 2024 MA county rates.

Comment: A couple of commenters noted that the technical update will affect MA benchmarks in all counties, even though specific counties may have lower levels of medical education payments.

Another commenter believed that the technical change would have a higher impact on their urban service market that has a high concentration of academic medical centers than the national impact that CMS provided in the CY 2024 Advance Notice.

Response: The technical update is a revision to the national monthly per capita cost (USPCC) that is applied to all counties as follows. The non-ESRD FFS USPCC and the corresponding non-ESRD FFS growth percentage are used uniformly in the calculation of the specified amount (in developing the county level FFS per capita cost estimates under Section 1853(n)(2)(A) of the Act) for all counties. The non-ESRD Total USPCC and the corresponding MA growth percentage are applied uniformly in the calculation of the applicable amounts (per Section

1853(k)(1)) which serve as a cap on the specified amount which affects the subset of counties where the rates are at the benchmark cap level. We provided the preliminary impacts of the technical update in the CY 2024 Advance Notice, and we now provide the final impacts of the technical update in this Rate Announcement, for the FFS growth rate and the MA growth rate so that stakeholders can understand how the technical update will impact the county rates in their plan service area.

***Consolidated Appropriations Act, 2023 (CAA, 2023)***

Comment: A couple of commenters requested confirmation regarding whether the impacts of the Consolidated Appropriations Act, 2023 (P.L. 117-328) are included or excluded from the growth rates.

Response: As indicated on page 14 of the CY 2024 Advance Notice, the USPCCs and growth rates provided in the CY 2024 Advance Notice did not reflect the impact of CAA, 2023, given the timing constraints of the recently enacted CAA, 2023, and the statutory timeframe for releasing the Advance Notice. The USPCCs and growth rates provided in the CY 2024 Rate Announcement do reflect the provisions of CAA, 2023.

***Inflation Reduction Act (IRA) Medicare Part B provisions***

Comment: A commenter noted that, under the IRA, inflation rebates paid by manufacturers are remitted to the Medicare Trust Fund for Part B drugs furnished under MA and FFS. The commenter indicated that this may create complexities in MA reimbursement assumptions. The commenter encouraged CMS to ensure that the assumptions related to the cost of Part B Rebatable Drugs in the MA rate setting model accounts for the total cost incurred by MA organizations (that is, that the MA rates should reflect the Average Sales Price of a prescription drug prior to the application of the inflationary rebate).

Also, the commenter indicated that MA plans will be required to provide beneficiaries with reductions in cost-sharing to ensure that their cost-sharing does not exceed 20% of the net price of the Part B Rebatable Drug after the application of the inflation rebate. The commenter encouraged CMS to ensure that projected MA costs for Part B Rebatable Drugs should account for these reductions in cost-sharing for beneficiaries.

Response: For 2024 MA rate development, CMS assumed that prices for Part B drugs will not materially exceed the inflation-adjusted payment amounts under section 1847A(i) of the Act. Therefore, no adjustments to projected Part B FFS expenditures to account for inflation rebates for 2024 were necessary.

Further, section 1853 of the Act sets forth how the MA capitation rates and benchmarks are set based on FFS per capita costs.

Comment: A commenter noted that the USPCCs for 2023 and thereafter reflect cost projections related to provisions of the IRA, including exclusion from the Part B deductible for insulin when it is furnished through durable medical equipment and a $35 cap on beneficiary cost sharing for insulin. The commenter noted that CMS had indicated in the CY 2024 Advance Notice that these provisions are expected to increase Part B FFS expenditures beginning with 2023, and requested more detail on the expected increase.

Response: We estimate that the reduced cost sharing for Part B insulin associated with DME would reduce FFS beneficiary cost sharing by roughly $20-30 million during CY 2024, which increases Part B FFS expenditures.

***COVID-19***

Comment: Many commenters urged additional transparency regarding actuarial assumptions used to calculate the growth rates pertaining to the COVID-19 pandemic. Specific requests from commenters included the following:

- More specificity about the extent to which coverage requirements related to the COVID-19 public health emergency are reflected in estimates of costs, utilization, and growth rates.
- Additional information on the actuarial assumptions that underlie the accounting of pandemic-related costs in the calculation of the FFS growth percentage.
- Additional information about how revised USPCC projections (for ex., the 2022 USPCC restatement) are affected by the emerging experience with COVID-19.
- Detailed information as to the complete costs related to the COVID-19 pandemic and whether these costs are included in the growth percentages, such as: the annual utilization trend during 2020-2022, long-term costs, costs for beneficiaries dually eligible for Medicare and Medicaid that were disproportionately impacted by the pandemic, and the additional hospital, testing, and vaccination costs associated with COVID-19.
- Assumptions related to future COVID-19 vaccine cost and utilization.
- Any difference in how assumptions related to the COVID-19 impact were applied to the ESRD population relative to the broader Medicare population.

Response: Several policies and legislative provisions were enacted during the public health emergency that increased spending; notably, the 3-day inpatient stay requirement to receive Skilled Nursing Facility (SNF) services was waived, payments for inpatient admission related to COVID-19 were increased by 20 percent, and the use of telehealth was greatly expanded. The public health emergency is assumed in the actuarial modeling to end in June 2023, when these effects are assumed to be eliminated. The results would not be materially affected if the actuarial modeling had instead assumed the public health emergency to end on the announced date of May 11, 2023, as is currently expected.

Actual Medicare FFS per capita spending has been consistently below the pre-pandemic projections throughout the public health emergency. The following table compares combined non-ESRD and ESRD FFS per capita spending by major provider category with what was assumed on a pre-pandemic basis for 2020 through the third quarter of 2022 for each category. The pre-pandemic baseline reflects utilization trend assumptions developed prior to the onset of the COVID-19 pandemic but has been updated to reflect certain economic factors, such as actual price updates, and certain demographic factors, such as the share of individuals enrolling in MA plans by ESRD status.

| Service Type | Per capita: actual / baseline | | |
|---|---|---|---|
| | 2020 | 2021 | 2022 |
| Inpatient | -6.6% | -7.1% | -8.7% |
| Outpatient | -16.3% | -6.5% | -8.6% |
| Skilled Nursing Facility | 2.6% | -2.3% | 3.1% |
| Home Health | -15.3% | -17.9% | -24.5% |
| Physician | -12.9% | -3.1% | -2.7% |

Note: The data for 2022 include only the first three quarters.

A number of factors have contributed to this lower spending. First, the deaths from COVID-19 have contributed to a lower average morbidity for the surviving population. Using a matched-cohort approach we studied the impact of COVID-19 deaths on historical and projected Medicare FFS morbidity. The resulting estimate of excess morbidity on aggregate per capita Medicare FFS spending is in the following table:

| 2021 | 2022 | 2023 | 2024 | 2025 | 2026 |
|---|---|---|---|---|---|
| -2.50% | -4.00% | -4.40% | -4.40% | -3.90% | -2.30% |

Over the last several years, a greater proportion of those dually eligible for Medicaid and Medicare have been enrolling in MA which has decreased the average FFS per capita cost for inpatient hospital, SNF, and home health spending. In addition, the proportion of hip and knee replacement surgeries performed in the inpatient setting has dropped dramatically during the public health emergency, causing a greater shift in spending from the inpatient to outpatient setting than implicitly assumed in prior projection assumptions. These factors account for a significant portion of the difference between actual costs and the pre-pandemic baseline.

Assumptions for COVID-19 vaccine in CY 2024 are (i) 47 percent of beneficiaries will receive a COVID shot with 43 percent represented in Medicare FFS claims; (ii) average doses per utilizer: 1.3; and (iii) average cost per dose: $105.

We studied the impact of the COVID-19 pandemic on historical experience separately for non-ESRD and ESRD FFS beneficiaries. Accordingly, separate COVID-19 related projection factors were applied to the non-ESRD and ESRD baseline projections.

***ESRD growth rate***

Comment: A commenter expressed appreciation for improved transparency regarding the development of ESRD Dialysis-only FFS USPCCs, further stating that the information provided in the CY 2024 Advance Notice Attachment I was extremely helpful.

Response: We appreciate the support.

Comment: A commenter requested that CMS provide additional detail and explanation into the significant historical restatements of the ESRD Dialysis-only FFS USPCC, in light of significant and directionally opposite revisions of some of the USPCCs. Several other commenters noted that the restated CY 2022 ESRD Dialysis-only FFS USPCC had a significant decrease, which was a larger decrease than the non-ESRD FFS USPCC, and requested additional information on the driving factors.

Response: The CY 2022 ESRD Dialysis-only FFS USPCC is lower in the CY 2024 Advance Notice and 2024 Rate Announcement than in the 2023 Rate Announcement due to reflection of actual incurred experience through 4th quarter 2022 in the CY 2024 Advance Notice and CY 2024 Rate Announcement, whereas the CY 2022 ESRD Dialysis-only FFS USPCC in the CY 2023 Rate Announcement was projected based on actual incurred experience through 4th quarter 2020.

Comment: A couple of commenters expressed concerns regarding the volatility of the ESRD growth percentage, particularly in comparison to non-ESRD growth rates, and urged CMS to provide clarifying details on the change from last year. One of these commenters expressed concern with the lack of transparency and requested more detailed information about the methodologies and assumptions used to calculate the ESRD growth percentage.

A couple of commenters requested that CMS publish expenditure trends for beneficiaries with ESRD by service category, similar to the file currently published for the non-ESRD FFS USPCCs, for CY 2022 and onward.

A commenter requested that CMS analyze and disclose the volatility in ESRD per capita costs that may be stemming from the COVID-19 public health emergency, recent inflationary trends, and the impact of the 21st Century Cures Act that opened the Medicare Advantage benefit to beneficiaries with ESRD. Another commenter requested that CMS ensure that the ESRD growth percentage adequately accounts for the increased costs of the COVID-19 pandemic on the ESRD population.

A couple of commenters believed that the use of CY 2021 as the base year for 2024 USPCC estimates results in distorted estimates of per capita cost and has a negative effect on Innovation Center models that use USPCC estimates as a benchmark for payments, and further believed that CY 2020 data would also be problematic to use due to the pandemic. One of these commenters urged CMS to review its USPCC estimates in this context and take steps to mitigate the effect of health care utilization during the pandemic on the ESRD USPCC estimates, particularly any differential impact on beneficiaries with chronic kidney disease and ESRD.

A few commenters indicated that, with ESRD enrollment increasing, and with the use of a modified version of the USPCCs serving as the basis for benchmarks under certain Innovation Center demonstration programs, it is important for stakeholders to receive information on factors that contribute to the USPCC development to prevent uncertainty and volatility. A couple of

commenters suggested that CMS develop policies that would address and limit the volatility in the ESRD USPCC and the impact of prior year adjustments, such as limiting prior year adjustments to no more than 3 percent or spreading downward adjustments greater than 3 percent over multiple years similar to policies adopted for the Medicare FFS program (e.g., SNF, ESRD PPS).

Response: The ESRD dialysis USPCCs are derived from the total ESRD USPCC baseline, but are adjusted for recent trend differences between the total ESRD and dialysis ESRD populations. Thus, the ESRD dialysis USPCCs are projected using a base year USPCC, CY 2021 for the 2024 dialysis ESRD ratebook, trended from 2021 to 2024 using total ESRD growth with an "adjustment factor for dialysis only." The utilization and intensity assumptions supporting the ESRD trends are based on multiple years of historical experience. The applicable trends are found in the Attachment II table, "Basis for ESRD Dialysis-only FFS USPCC Trend."

As discussed in past Rate Announcements, we believe it is important to update the FFS per capita cost estimates using the most current FFS data available at the time those values are announced and apply repricing adjustments to reflect changes in FFS payment rules. Similar to prior Rate Announcements, the method for calculating the county-level non-ESRD rates and the state-level ESRD rates includes AGAs based on a five-year rolling average of historical claims experience, which provides some measure of stability in the rates.

The published 2022-2024 "Medicare Unit Cost Increases" by service category (available at https://www.cms.gov/files/document/ffs-trends-2022-2024.pdf) apply to provider payments for both ESRD and non-ESRD beneficiaries. Starting with the 2024 Rate Announcement posting, we will add trends for the ESRD Prospective Payment System (ESRD PPS) base rate.

Comment: A commenter acknowledged that the ESRD PPS policies are outside the scope of the Advance Notice, but a couple of commenters requested that CMS consider the interactions and downstream effects on MA ESRD rates of payment systems when developing ESRD PPS policies and processes, including the Transitional Drug Add-on Payment Adjustment (TDAPA) and Transitional Add-On Payment Adjustment for New and Innovative Equipment and Supplies (TPNIES) under the ESRD PPS.

Response: We appreciate the feedback. CMS believes the current methodology for calculating MA ESRD rates account for products that receive the TDAPA or TPNIES under the ESRD PPS. The CY 2024 ESRD dialysis-only FFS USPCC reflects our best estimate of the national per-capita cost, including changes to the ESRD PPS bundled payments for variables such as payment adjustments to the ESRD PPS base rate, including the TDAPA for certain renal dialysis drugs and biological products and the TPNIES for certain renal dialysis equipment and supplies.

***Other Comments on USPCCs and Growth Rates***

Comment: A commenter noted that the non-ESRD FFS USPCC estimates for prior years in Table I-4 of the CY 2024 Advance Notice decreased in comparison to the estimates in the CY 2023 Rate Announcement. The commenter requested additional information about the factors contributing to the revised projections (beyond the technical update that was proposed in the Advance Notice for medical education payments), particularly for the 2022 USPCC restatement.

Response: The CY 2022 non-ESRD FFS USPCC is lower in the CY 2024 Advance Notice and CY 2024 Rate Announcement due to reflection of actual incurred experience through 3rd quarter 2022 in the CY 2024 Advance Notice and through 4th quarter 2022 in the CY 2024 Rate Announcement, whereas the CY 2022 non-ESRD FFS USPCC in the CY 2023 Rate Announcement was projected based on experience through 3rd quarter 2021. The actual experience for 2022 is lower than projected in the CY 2023 Rate Announcement.

Comment: Several commenters expressed concern regarding the level of transparency of the analysis and assumptions used to calculate the growth percentages, and urged additional transparency. Specific requests from commenters included the following:

- Detailed information about the factors and assumptions used to calculate the growth percentages, including additional details on utilization changes and unit costs by type of service.
- More clarity about the extent to which CMS accounted for finalized payment rates for Medicare FFS inpatient (IPPS) and outpatient (OPPS) systems, including details on utilization changes and unit costs by type of service; and if not, reasoning as to why these payment rates were not taken into account.
- More clarity as to the reasons why the 2024 growth rate estimates are markedly lower than in prior years, beyond the technical change to medical education costs.
- Any analysis, explanation, and methodologies that the agency utilized and relied upon.

Response: We discussed in the CY 2024 Advance Notice the methodology, sources of data, assumptions, and trends underlying the MA capitation rates at a level of detail consistent with past practice. In addition to the information provided in the CY 2024 Advance Notice, CMS also shared information about actuarial assumptions related to growth rates in its Actuarial User Group call on February 23, 2023. Participants of the call were invited to ask questions about assumptions supporting the CY 2024 Advance Notice growth rates. This call was widely attended by stakeholders, and the call's agenda and materials are available at https://www.cms.gov/files/document/february-2023-actuarial-user-group-call-agenda.pdf.

In support of the MA ratebook growth rates, CMS has, as required under section 1853(b)(3), included an explanation of the assumptions and changes in methodology used in the CY 2024 Rate Announcement; see the key economic assumptions underlying the USPCCs included in

Attachment II of this Rate Announcement. Consistent with prior years, with this Rate Announcement we have published additional information regarding trends for the prior five years and unit cost increases to the contract year at https://www.cms.gov/Medicare/Health-Plans/MedicareAdvtgSpecRateStats/FFS-Trends.html.

Additionally, the USPCC projections reflect payment levels based on the most recent Medicare final regulations for fiscal year 2023 or calendar year 2023.

Further, the 2024 growth rates are lower than in recent years primarily due to actual experience for 2022 is lower than projected in the 2023 Rate Announcement. The 2024 growth rates also reflect updated modeling to account for the effects of COVID-19 and other programmatic and demographic changes, lower morbidity from excess COVID-related deaths, lower total spending by explicitly modeling the shift of hip and knee replacements from inpatient to outpatient setting, and updated modeling of the effect of a greater share of dual beneficiaries enrolling in MA.

We believe that this information in the CY 2024 Advance Notice and now this Rate Announcement provides the necessary support for understanding USPCC levels and trends.

Comment: Several commenters expressed concern that the CY 2024 growth rate estimates were lower than estimates in the 2022 Medicare Trustees Report, while one of these commenters acknowledged that the calculations are not inherently performed in the same manner.

Many commenters noted that the proposed CY 2024 growth rates were lower than those finalized in the CY 2023 Rate Announcement. Commenters believed that the proposed 2024 growth rates did not fully account for the projected growth in costs. Several commenters encouraged CMS to finalize a strong FFS growth percentage that fully takes into account the rising cost of care due to inflation and provider reimbursements, and to appropriately reflect the expected increase in Medicare costs for 2024. Commenters cited published analyses (e.g., Congressional Budget Office, Bureau of Labor Statistics, Federal Reserve Bank of Dallas) regarding estimates of the rate of inflation in the health care sector.

A couple of commenters expressed concern that the development of the MA rates may not fully account for the range of costs that should be included (e.g. large operational costs, inflation, labor attrition) that health systems are incurring, especially given that the IME/DGME technical update reduces the non-ESRD FFS growth rate.

A commenter expressed concern that the growth rate applied to PACE rates failed to keep PACE payment on track with the rate of inflation for medical care and other associated costs, such as those related to workforce.

Response: The USPCC modeling approach reflects projected increases in Medicare payment rate update factors. The projected expenditures for some of the Medicare payment systems include the expectation of inflation including projected market basket increases for inpatient, SNF, home

health agency, and outpatient hospital projections and consumer price index (CPI) updates for durable medical equipment projections.

The growth percentages are based on CMS' best estimate of historical program experience and projected trend at the time those values are announced. We continue to consider it best practice to base the growth rates on the most recent data and assumptions available at the time those values are announced. Therefore, for each release of the growth rates, CMS updates historical enrollment and claims, as well as projection factors, based on the most recent data. For example, the projections supporting the 2024 growth rates are based on actual experience through December 31, 2022 and reflect provisions of final 2023 FFS payment regulations.

The baseline supporting the USPCCs and growth rates has been revised since the CY 2024 Advance Notice. A key change since the CY 2024 Advance Notice has been the addition of experience for 4th quarter 2022 for the non-ESRD projections. Further, the projection factors have been revised for the CY 2024 Rate Announcement to reflect lower morbidity stemming from excess-COVID deaths, explicit modeling of a shift of hip and knee replacements from inpatient to outpatient setting, and reflection of a greater share of dual eligible beneficiaries enrolling in MA.

**Section C. MA Benchmark, Quality Bonus Payments, and Rebate**

Comment: A few commenters expressed concern that the cap on benchmarks imposed by the Affordable Care Act limits health plans' ability to improve coverage for enrollees such as adding supplemental benefits and reducing cost sharing. A couple of these commenters encouraged CMS to consider the impact of the benchmark cap on the Administration goal to support health equity. A commenter stated that the benchmark cap undermines the Quality Bonus Payment (QBP), whereby high-quality MA plans rated 4-Stars or higher will not receive the full QBP due to the benchmark cap.

Several commenters suggested that we review our options for exercising discretionary authority to eliminate the cap or to remove quality bonuses from the cap calculation. A couple of these commenters referred to legal analyses provided to CMS in previous years regarding this issue that showed that they believed such changes were legally permissible. A couple of these commenters expressed concern that the cap is inconsistent with Congressional intent, is contrary to ensuring that seniors receive the highest possible quality of care, and harms beneficiaries by undermining value-based care and reducing benefits to enrollees in high quality plans.

Response: As we have stated in response to similar comments in prior Rate Announcements, while we appreciate the commenters' concerns, we have not identified discretion under Section 1853(n)(4) of the Act to eliminate application of the pre-Patient Protection and Affordable Care Act (ACA) (Pub. L. 111-148) rate cap or exclude the bonus payment from the cap calculation.

Comment: A commenter expressed support for the QBP policies. Another commenter expressed concerns regarding quality bonuses and rebates, and suggested that MA rebates be phased out. And another commenter suggested that CMS explore changes to the rebate percentage, such as reducing the rebate percentage in relation to increasing levels of a plan's coding of diagnoses for risk adjustment.

A commenter expressed concern regarding the high proportion of plans receiving quality bonus payments based on the current star rating system. Another commenter expressed concern about the proportion of Special Needs Plans (SNPs) that had reduced quality bonus payments resulting from a drop in star rating under the current star rating system.

Response: We appreciate the feedback submitted by the commenters regarding quality bonus payments and MA rebates. The statutory requirements regarding quality bonus payments and the rebates percentages are prescribed in Sections 1853(o) and 1854(b)(1)(C) of the Act, respectively.

Comment: A commenter supported CMS' interpretation of Sections 1853(o)(3)(B) and 1853(c)(1)(B) of the Act with regard to Puerto Rico counties that would have had an urban floor county rate, whereby more counties in Puerto Rico will continue to qualify for a double bonus.

Response: We appreciate the support.

Comment: A commenter suggested that, for dually eligible beneficiaries enrolled in D-SNPs in Puerto Rico, the Part B premium buy-downs should be considered part of the A/B bid and not considered a supplemental benefit, since dually eligible beneficiaries in the mainland would have the Part B premium covered by Medicaid.

Response: Section 1854 of the Act specifies the costs that may be included in the bid submitted by each MA organization. Per section 1854(a)(6)(A)(ii), the bid must separately address the costs attributable to provision of benefits under the Medicare FFS program (as defined in section 1852(a)(1)(B), which is benefits under Parts A and B, excluding hospice and the costs of acquisition of a kidney for transplant), including, for plan year 2020 and subsequent plan years, the provision of additional telehealth benefits as described in section 1852(m) (that is, the "A/B bid") from costs attributable for supplemental benefits and Part D benefits. Payment of the Part B premium is not a benefit under Medicare Part A or B. CMS does not have discretion under section 1854(a)(6)(A) to treat the payment of the Part B premium as a benefit under the Medicare FFS.

**Section D. Calculation of Fee-for-Service Costs**

Comment: A commenter expressed support for moving to alternative payment models that include comprehensive prospective payment to sufficiently and sustainably support primary care's role in addressing patient's health related social needs.

Response: We appreciate the feedback from the commenter about the scope of CMMI models.

Comment: A commenter expressed support for the repricing refinements applied to the development of FFS costs, such as reflecting changes in FFS payment rules.

Another commenter expressed support for the AGA methodology, and further suggested that the CMS-HCC risk adjustment model proposed for CY 2024 should be used for the purpose of standardizing the AGA factors regardless of the risk model finalized for CY 2024 payment.

Another commenter suggested that CMS adjust county-level benchmarks for states and regions that are disproportionately affected by risk model revisions.

Response: We appreciate the support and suggestions from the commenters. As in prior years, the benchmarks will be standardized with the risk scores calculated using the CMS-HCC risk adjustment model(s) being used for the payment year (in this case CY 2024), including any blending/phasing-in of the risk adjustment models.

Comment: A couple of commenters urged additional transparency regarding the rebasing methodology, given the regional variations in pandemic impacts and to ensure accuracy and stability. A couple of other commenters suggested that CMS release a preliminary estimate of the impact of rebasing the county rates at the time of the Advance Notice.

Response: We appreciate the request for transparency and believe that we have been responsive to stakeholders' interest in understanding and analyzing the rebasing methodology. As noted on page 25 of the CY 2024 Advance Notice, CMS released the 2021 FFS cost data by county used for rebasing county rates in the development of the 2024 ratebook. This data is available on the CMS website at https://www.cms.gov/Medicare/Health-Plans/MedicareAdvtgSpecRateStats/FFS-Data.html. Due to timing constraints, this data did not reflect adjustments for Innovation Center models and demonstrations and the Medicare Shared Savings Program and Advanced Alternative Payment Models, and do not reflect adjustments for claim repricing for the most current available Medicare FFS payment rules and parameters.

Starting with the CY 2020 Advance Notice, CMS has published with each Advance Notice the latest FFS cost data by county used in the development of the non-ESRD ratebooks. For the CY 2019 Advance Notice and prior, this FFS cost data was released at the same time as the Rate Announcement on the CMS webpage at: https://www.cms.gov/Medicare/Health-Plans/MedicareAdvtgSpecRateStats/FFS-Data. The accelerated release of the FFS experience allows stakeholders to conduct basic analyses of the impact of recent program experience on the geographic adjustments supporting the rates.

Comment: A couple of commenters expressed support for the use of five years of FFS experience to mitigate any annual fluctuations and anomalies in the data.

Several commenters expressed concerns regarding rebasing the rates for CY 2024 pertaining to the potential for instability and disparities across counties, such as in Puerto Rico and Florida. Commenters requested that CMS consider a variety of alternatives, including: an exemption from rebasing for Puerto Rico given the significant impact of natural disasters and the ongoing pressures related to COVID-19, not rebasing the MA rates for CY 2024 to improve stability in the MA program, removal of the 2020 FFS experience from the five-year period used in the AGA calculation due to the impact of the COVID-19 pandemic, and a suggestion to make an upward adjustment to the AGA methodology to account for the downward pressure of COVID-19 impacts on FFS medical costs in 2020 due to suppressed utilization and the impact of natural disasters which are occurring with greater frequency and severity in recent years.

A couple of commenters encouraged CMS to consider rebasing less frequently (e.g., AGA update every three years).

Response: We appreciate the feedback submitted by the commenters and appreciate their concerns about stability in MA county rates.

We note that the impact of rebasing and repricing the historical FFS data had a positive impact on CY 2024 MA rates in Puerto Rico.

The CY 2020 Advance Notice (page 21) and Rate Announcement (pages 27 and 28) included discussion and analysis of trends in the FFS data, and concluded that our methodology of using five years of FFS experience mitigates annual fluctuations and anomalies in the data that may occur for a variety of reasons. The CY 2023 Advance Notice (pages 24 and 25) also discussed CMS' analysis of the trends in the 2020 FFS data that were impacted by the COVID-19 pandemic and affirmed our conclusion that using five years of historical data provides for stability in the rates despite local or regional events, such as natural or weather-related disasters, and varying impacts from nationwide events, such as pandemics.

As discussed on page 18 of the CY 2024 Advance Notice, section 1853(c)(1)(D)(ii) of the Act requires CMS to rebase the county FFS per capita costs periodically, which entails updating the estimate of each county's FFS costs using more current FFS claims information. As discussed in past Rate Announcements, given that MA county rates are based on FFS costs, we believe it is important to update the FFS per capita cost estimates using the most current FFS data available and apply repricing adjustments to reflect changes in FFS payment rules. We have stated in previous Rate Announcements that we anticipate rebasing the rates each year. We have also previously discussed how the method for calculating the MA county rates includes a five-year rolling average of historical FFS claims experience, which provides a measure of stability in the rates. We are finalizing the proposal to rebase the CY 2024 rates.

Comment: A commenter indicated that they expect the impact of rebasing county FFS rates for CY 2024 to result in a much larger, negative impact in Florida than in most other states, and

requested additional detail regarding the drivers of such a negative trend in Florida and the magnitude of the drivers.

Response: As noted on page 25 of the CY 2024 Advance Notice, CMS released the 2021 FFS cost data by county used for rebasing county rates in the development of the 2024 ratebook along with the Advance Notice. This data is available on the CMS website at https://www.cms.gov/Medicare/Health-Plans/MedicareAdvtgSpecRateStats/FFS-Data.html.

With the Rate Announcement, CMS annually provides a tool and corresponding glossary, *Medicare FFS county 20YY web.xlsm,* which provides stakeholders with means to replicate the FFS rate development. This file is available on the CMS webpage at: https://www.cms.gov/Medicare/Health-Plans/MedicareAdvtgSpecRateStats/Ratebooks-and-Supporting-Data. Additionally, CMS has included in the CY 2021 and CY 2022 Rate Announcements a detailed discussion of the rebasing impacts in Florida. Using these two documents, in conjunction with the spreadsheet *Medicare FFS county 20YY web.xlsm,* stakeholders are able to analyze the drivers of changes in FFS per capita costs for specific counties from one ratebook to another.

Additionally, weighted by September 2022 MA enrollment by county, the overall AGAs supporting the 2024 non-ESRD, non-PACE rates in Florida changed by less than -0.25 percent relative to the same measure for the 2023 rates. Therefore, the impact of rebasing for 2024 has a minimal impact on Florida rates.

Comment: One commenter expressed concern with our proposal to limit our adjustment of the AGAs for Innovation Center payment and service delivery models to those listed in Table II-B3-1 of the CY 2024 Advance Notice, and with the proposed exclusion of certain payments under those models (e.g., care management fees) that are funded through the Innovation Center rather than the Medicare Part A or B Trust Funds. The commenter inquired about the statutory basis for excluding these costs from the calculation of MA benchmarks, and was concerned that as APMs expand in scope that a growing share of FFS spending may be excluded from MA benchmarks. The commenter expressed concern that the benchmarks may not reflect the cost of providing the FFS benefit, and that the current approach fails to adequately determine the cost of providing a benefit to MA enrollees that is comparable to the cost of providing the benefit under FFS.

The commenter is particularly concerned about the exclusion of advance payment of shared savings and additional reconciliation payments paid to providers under Innovation Center models. The commenter requested that CMS reconsider policies that exclude Innovation Center costs and that CMS provide stakeholders with the amounts currently being excluded from the development of FFS costs.

Response: As explained on pages 29-30 of the CY 2024 Advance Notice, we considered adjusting the FFS claims experience for care management fees, per-beneficiary-per-month fees, and/or advance payment of shared savings paid using the Innovation Center appropriation

instead of the Medicare Part A or B Trust Funds for other Innovation Center models conducted in the 2017–2021 period. However, in continuing prior policy, we will not take fees of this type into account in our adjustments to historical FFS experience when they were not funded under Medicare Part A or B Trust Funds.

As we discussed on page 20 of the CY 2018 Advance Notice, the fees paid from administrative accounts authorized by section 1115A of the Act are not from the Parts A and B Trust Funds, from which Medicare claims are disbursed, so we do not consider those payments to be part of FFS costs. Per section 1853(c)(1)(D)(i) and (n)(2)(F) of the Act, CMS uses the "adjusted average per capita cost for the year involved, determined under section 1876(a)(4) [of the Act]" as the base payment amount for setting MA rates. Section 1876(a)(4) indicates that FFS costs used for MA rates are based on the estimated amount that would be payable for services covered under Parts A and B, and types of expenses otherwise reimbursable under Parts A and B (including administrative costs incurred by organizations described in sections 1816 and 1842). As these costs described in section 1876(a)(4) of the Act are paid from the Trust Funds, excluding costs paid from another appropriation is appropriate to determine FFS costs. *See also* sections 1817 and 1841 of the Act. In addition, section 1853(f) of the Act indicates that payments to MA organizations shall be made from the Trust Funds "in such proportion as the Secretary determines reflects the relative weight that benefits under Part A and under Part B represents of the actuarial value of the total benefits under this title." Therefore, we will not make an adjustment to historical FFS claims to account for payments made from the funds appropriated under section 1115A(f).

Comment: Many commenters requested that we calculate FFS spending using only claims and utilization data for beneficiaries enrolled in both Part A and Part B (rather than based on such data for beneficiaries in Part A and/or Part B, as is the practice today), because they believed that would be a more accurate, reasonable, appropriate, and/or equitable methodology. Several of these commenters cited MedPAC's support of benchmarks calculated based on FFS data for beneficiaries with both Part A and Part B.

Several commenters pointed out that, in order to enroll in an MA plan, beneficiaries are required to be enrolled in both Part A and Part B, and believe that the benchmark calculations should align with the population of beneficiaries eligible to enroll in MA plans. One of these commenters believes the current methodology is inappropriate from an actuarial perspective, as the current methodology includes beneficiaries who are not eligible to enroll in MA, and stated that actuarial principles require that an estimate of the benchmark must represent what the MA enrollee would cost in FFS. Further, the commenter believes the Social Security Act requires that Part A-only enrollees be excluded from the calculation of county benchmarks to ensure that the estimate best represents what that enrollee would cost in FFS.

A commenter suggested that the current approach fails to adequately determine the cost of providing a benefit to MA enrollees that is comparable to the cost of providing the benefit under

FFS. Several commenters expressed concern that, as the number of Medicare beneficiaries with Part A-only grows, MA benchmarks may be distorted as artificially low and fail to reflect the FFS costs of the population eligible to enroll in Medicare Advantage, which the commenters believe results in an actuarially inaccurate and inequivalent benchmarks. One commenter noted that Part A-only enrollment varies by county, whereby certain counties are disproportionately impacted.

A commenter indicated that the risk adjustment models are calibrated with FFS beneficiaries enrolled in Part A and Part B, and recommended that risk adjustment and payment rates be based on the same population.

A few commenters noted that, in a recently released public use file containing information on geographic variation in Medicare spending, CMS Office of Enterprise Data and Analytics (OEDA) excluded beneficiaries who were Part A only or Part B only and the document stated the following regarding per-capita spending for beneficiaries enrolled in Part A only or Part B only: "Since those beneficiaries are enrolled in only one part of Medicare, per-capita spending for those beneficiaries cannot be compared directly to spending for beneficiaries that are enrolled in both Part A and Part B." A couple of these commenters interpreted this statement and the public use file methodology to be a "tacit acknowledgement" by CMS that the MA benchmark formula was incorrect.

A commenter noted that in 2021, CMS had indicated that the agency intended to issue a Request For Information (RFI) on the topic of revising MA rates to be based on data from beneficiaries with both Part A and Part B, but no such RFI has been released and the commenter encouraged CMS to issue an RFI to gather stakeholder input.

A couple of commenters stated that, similar to their belief that the adjustment made to per capita costs for Medicare beneficiaries who are dually eligible for benefits through the Department of Veterans Affairs and the Department of Defense (i.e., the VA/DoD adjustment) is needed because these beneficiaries are not enrolled in MA, a similar adjustment should be made for Part A-only and Part B-only beneficiaries who are not enrolled in MA (because they are not eligible to enroll).

Several commenters expressed support for continuing our policy of basing benchmarks in Puerto Rico on Medicare costs for beneficiaries with both Part A and Part B coverage. A few commenters requested that we apply a uniform approach in all counties to calculate benchmarks, pointing to the methodology used by CMS for Puerto Rico rates, to improve payment accuracy by addressing high MA penetration rates and low FFS Part B enrollment in other areas such as Hawaii. A couple of commenters suggested that CMS could implement a phased-in approach for counties with MA penetration over a certain percentage and gradually lower the threshold each year.

A commenter requested that CMS revise the benchmark methodology for counties in Maryland, to be based on the FFS experience for beneficiaries enrolled in both Part A and Part B similar to the rate adjustment for Puerto Rico, due to the unique impact of the Total Cost of Care (TCOC) Model in establishing benchmarks for Maryland. The commenter indicated that Medicare FFS spending under the TCOC Model is higher than it would otherwise be under typical Medicare FFS payment rates (e.g., IPPS/OPPS) which results in most Maryland rates being adjusted downward by a 95% applicable percentage. The commenter indicated that revising the benchmark methodology as they suggest would incentivize the expansion of MA offerings and supplemental benefits in Maryland, where MA penetration is currently lower than other areas, whereby MA plans could then be able to bid further below the benchmarks and offer more generous supplemental benefits. The commenter noted that CMS has explicitly determined it has authority to exercise "discretion for the data used to develop the estimate for one geographic area, based on circumstances unique to that area" for the rates in Puerto Rico and urged CMS to use this authority to address the unique circumstances present in Maryland to improve equity and access to care for Maryland beneficiaries.

Response: We refer commenters to the detailed response that we provided in the CY 2020 Rate Announcement regarding use of FFS data for costs of all Medicare beneficiaries, whereby CMS concluded that it finds the current ratebook methodology (our longstanding policy of considering costs of beneficiaries with Part A and/or Part B) to be consistent with the statute at Section 1853(c)(1)(D) of the Act. We continue to believe that it is not necessary to change the methodology at this time, nor is it required as the statutory language clearly permits CMS to include Medicare beneficiaries who have Part A only or Part B only. While we recognize that calculating rates based on data that excludes beneficiaries entitled only to Part A would yield different results than calculating rates based on our current methodology, that fact alone does not determine which methodology should be employed.

With respect to Puerto Rico, we have discussed in past Advance Notices and Rate Announcements that while most Medicare beneficiaries are automatically enrolled in Part B and must opt out to decline it, beneficiaries in Puerto Rico must take affirmative action to opt in to Part B coverage. As a result, we believe it is appropriate to adjust the FFS rate calculation for Puerto Rico used to determine MA rates so that it is based only on the Medicare costs for beneficiaries with both Part A and Part B.

Further, section 1853(c)(1)(D)(iii) of the Act explicitly requires an adjustment to the estimate of the FFS per capita cost for individuals dually eligible for benefits through the Department of Veterans Affairs and the Department of Defense. There is no statutory requirement for excluding cost data for beneficiaries with coverage for Part A only or Part B only from the information used to develop the FFS per capita cost estimate.

We appreciate the commenter's suggestion to revise MA rates in Maryland due to the impact of the TCOC Model on the FFS experience; however, the statute requires that MA capitation rates

be based on FFS per capita costs, not what FFS per capita costs would be under different (hypothetical) circumstances.

The purpose of the public use file published by OEDA was to "support further analysis" of the issue of geographic variation in the amount and quality of health care services that Medicare beneficiaries receive. The statement cited from OEDA's document (regarding comparing the per-capita spending of beneficiaries who were Part A only or Part B only with per-capita spending of beneficiaries enrolled in both Part A and Part B) was noting that beneficiaries enrolled in only one part of Medicare have different levels of per-capita spending than beneficiaries that are enrolled in both Part A and Part B. As noted above, while we recognize that calculating rates based on data that excludes beneficiaries entitled only to Part A would yield different results than calculating rates based on our current methodology, that fact alone does not determine which methodology should be employed.

We appreciate the suggestions submitted by commenters, and we will continue to analyze this issue and consider whether any adjustments to the methodology on this point may be warranted in future years. For CY 2024 we will continue to calculate FFS spending for the purpose of establishing MA benchmarks using FFS claims and utilization data for beneficiaries in Part A and/or Part B.

<u>Comment</u>: The CY 2024 Advance Notice sought public comment on the possibility of adjusting FFS experience in Puerto Rico to reflect the propensity of zero-dollar beneficiaries nationwide. Several commenters supported the use of an adjustment to the Puerto Rico MA rates to reflect the prevalence of zero-dollar beneficiaries nationwide. Commenters believed that such an adjustment is appropriate because the number of zero claimants in the Puerto Rico FFS population is a significantly greater proportion of the population relative to the rest of the United States. One of these commenters stated that the zero-claims adjustment is needed to ensure that plans in Puerto Rico can maintain benefits for the low-income populations they serve.

<u>Response</u>: The Secretary has directed OACT to adjust the FFS experience for beneficiaries in Puerto Rico to reflect the propensity of zero-dollar beneficiaries nationwide. For purposes of making this adjustment, consistent with the Secretary's instructions, OACT evaluated experience exclusively for beneficiaries that are enrolled in both Part A and Part B and are not also eligible for VA coverage.

The updated study analyzed experience for calendar years 2017 through 2021, using the cohort of FFS beneficiaries enrolled mid-year (i.e., enrolled in both Part A and Part B as of the mid-year dates used for the study) to approximate the average enrollment for the year. On average, 14.5 percent of Puerto Rico FFS beneficiaries with both Part A and Part B were found to have no Medicare claim reimbursements per year. This compares to a nationwide, non-territory proportion of 6.1 percent of FFS beneficiaries without Medicare spending. These results were applied to the Puerto Rico FFS experience by adjusting the weighting of the enrollment and risk

scores for the zero-claim cohort to reflect the nationwide proportion of zero-claim beneficiaries. The resulting impact was an average increase in the standardized FFS costs in Puerto Rico of 4.4 percent for 2017 through 2021. Accordingly, a 4.4 percent adjustment was applied to the pre-standardized Puerto Rico FFS rates supporting the CY 2024 ratebook development.

Comment: Many commenters expressed concern regarding the disparity between payment rates in Puerto Rico and payment rates in the mainland, and urged CMS to explore all potential options to increase MA benchmark rates in Puerto Rico. One of these commenters encouraged CMS to work with Congressional leaders and the White House to provide a minimum level of funding for the MA program in Puerto Rico to improve healthcare infrastructure and quality of care, and further the goals of health equity. Another commenter urged CMS to take administrative action to eliminate historic socioeconomic and legal disparities and long-standing health inequities in federal programs.

A few commenters indicated that the MA rates in Puerto Rico do not adequately cover the relatively high costs of providing care, and noted that MA plays an important role in addressing Social Determinants of Health (SDOH) and filling in gaps in the healthcare system in Puerto Rico. Commenters indicated that the MA program has effectively become a social safety net in Puerto Rico, in part due to the lack of benefits that would be covered elsewhere (e.g., Part D Low Income Subsidy).

A commenter recommended that we adjust the MA benchmarks in Puerto Rico to account for the proportion of dually eligible beneficiaries in the Puerto Rico FFS population.

A few commenters noted that the MA program is critically important in Puerto Rico as the foundation of Puerto Rico's healthcare system with high MA penetration, and detailed the socioeconomic conditions in Puerto Rico, noting the higher proportion of dually eligible beneficiaries in Puerto Rico whereby plans devote significant resources to addressing health-related social needs to meet non-clinical needs and to improve health outcomes. A couple of these commenters indicated that relatively low MA rates in Puerto Rico have contributed to provider and professional migration from the island, leading to access and quality issues.

Several commenters requested that we consider establishing a minimum AGA of 0.70 for Puerto Rico. A few commenters noted the level of the standardized benchmarks in Puerto Rico compared to the national level and other locales over time. A couple of commenters suggested that a minimum AGA be implemented in a manner that is not budget neutral. One of the commenters suggested determining a minimum AGA level similar to the geographic adjustment under the Medicare FFS program or establishing a hold harmless minimum benchmark.

A commenter indicated their belief that a minimum AGA could be implemented by administrative action and that CMS has the legal authority to establish a minimum AGA. The commenter indicated that Section 1876(a)(4) does not prescribe one method to be used in determining the adjusted average per capita cost (AAPCC) for the purposes of setting the MA

benchmark for a service area, rather the statute only directs that the Secretary estimates the AAPCC, giving broad discretion in potential actuarial methods to be used, with a few conditions. The commenter continued that estimating the AAPCC can be with "actual experience" of FFS expenditures in a service area, but such expenditure data is only specified to provide "the *basis*" of the Secretary's estimate. The commenter further continued that the Secretary may forgo "actual experience" of FFS expenditures for an alternate general method, namely an "actuarial equivalent based on an adequate sample and other information and data." The commenter indicated that this broad alternate method confirms the discretion available to the Secretary and that the AAPCC need not be merely a restatement of actual FFS expenditure experience in a particular service area. Lastly, the commenter indicated that, whether using "actual experience" or an "actuarial equivalent" as the basis of estimating AAPCC, the Secretary is not limited to using expenditure data from the service area for the particular MA benchmark. The commenter indicated that the statute expressly permits the Secretary to use data from "a geographic area served by an eligible organization or . . . *a similar area.*" The commenter indicated that CMS can select data from a similar geographic area or jurisdiction whose FFS population is expected to be useful in projecting what the amounts payable to the plan *would be* for services provided to its enrollee population in the service area. The commenter continued that it would be reasonable for the Secretary to look to a "similar area" that is likely to predict with some accuracy what the FFS expenditures in Puerto Rico would be if its broader population of MA enrollees received care through FFS. The commenter indicated that a similar jurisdiction would need to be a territory that is similarly excluded from several federal programs, such as the LIS and SSI, and depends upon annual appropriations from Congress for Medicaid funding. The commenter continued that a similar jurisdiction could be an island with the same relatively high costs for utilities and imported goods and services including national prices for prescription drugs and lab services, and that a similar jurisdiction would have a high poverty rate, high urbanization, hurricane-damaged infrastructure. The commenter concluded that the US Virgin Islands (USVI) would meet these criteria as a similar jurisdiction, such that the AAPCC for Puerto Rico could be calculated by multiplying the USPCC by the USVI AGA to determine a more accurate estimated FFS per capita spending in Puerto Rico. The commenter offered that to simplify, the Secretary could establish a national AGA floor of 0.70 to achieve a similar result. The commenter noted precedent under the Medicare FFS program for CMS to establish a minimum AGA (e.g., under the Physician Fee Schedule, ESRD PPS, IPPS).

Further, the commenter noted that, given the very high MA penetration rate in Puerto Rico, the MA rates in Puerto Rico are based on a relatively small number of FFS beneficiaries. The commenter provided their recent analysis of FFS data in Puerto Rico which indicated that the FFS data that is used as the basis for MA rates is not robust and is not representative of MA enrollees in Puerto Rico, due to the proportion of beneficiaries with zero FFS claims, the relatively small number of FFS beneficiaries, and the low proportion of dually eligible FFS beneficiaries in Puerto Rico.

Response: We appreciate the concerns and recommendations commenters have raised regarding Puerto Rico. We will continue to analyze these issues and consider whether any refinements to the methodology may be warranted in future years. As discussed in the CY 2017 Advance Notice, the law requires that MA benchmarks be based on a county's average Medicare FFS per capita costs, and there is no evidence that FFS costs in Puerto Rico are higher than the costs observed in the FFS claims data and thus no basis for overhauling Puerto Rico's MA benchmarks. Section 1853(c)(1)(D) requires an estimate of the per capita costs for services covered under Parts A and B for individuals who are not enrolled in an MA plan.
As we stated in the CYs 2017 and 2018 Rate Announcements, we believe that the FFS data in Puerto Rico is sufficient for establishing accurate MA benchmarks.

In response to a commenter's suggestion that there is precedent under the Medicare FFS program (e.g., under the Physician Fee Schedule, ESRD PPS, IPPS) for CMS to establish a minimum AGA, we note that these examples are based on statutory provisions that are neither applicable to the MA program nor provide a direct analog to the provisions in section 1853 that determine the formula for setting MA capitation rates.

**Section E. Direct Graduate Medical Education**

See Attachment III Section titled "Estimates of the MA and FFS Growth Percentages for 2024."

**Section F. Organ Acquisition Costs for Kidney Transplants**

Comment: A commenter expressed support for the continued use of the KAC carve-out calculation methodology.

Response: We appreciate the support.

Comment: A commenter urged CMS to closely monitor the impact of the KAC carve-out, and suggested that CMS take steps to limit any large decreases in county benchmarks that may result.

Response: We will continue to monitor the amount of kidney acquisition costs to determine whether refinements and improvements to the methodology for the carve-out adjustment are warranted.

**Section G. IME Phase Out**

See Attachment III Section titled "Estimates of the MA and FFS Growth Percentages for 2024".

**Section H. MA ESRD Rates**

Comment: The majority of commenters on this topic expressed concerns that ESRD state rates are not sufficient to cover the cost of care for beneficiaries with ESRD. The commenters requested that CMS re-examine the methodology to improve the adequacy, stability, and

accuracy of MA ESRD benchmarks and payment given the statutory change that allows beneficiaries with ESRD to directly enroll in MA plans.

Commenters highlighted the potential consequences of inadequate rates, including higher out-of-pocket costs, reduced benefits, or limited service areas as a result of the increasing enrollment of beneficiaries with ESRD in MA plans. A commenter stated the increased costs for beneficiaries with ESRD could increase cost sharing for all MA beneficiaries. Another commenter expressed concerns that MA plans may limit access to care or dissuade beneficiaries with ESRD from choosing an MA plan.

Another commenter suggested that the underlying ESRD PPS reduces reimbursements and leads to the development of inadequate MA ESRD rates.

Response: CMS appreciates the comments regarding MA ESRD payment adequacy given the increased enrollment into MA plans by beneficiaries with ESRD. CMS continues to analyze these issues and consider whether, consistent with the statutory requirements for setting ESRD rates in section 1853(a)(1)(H) of the Act, any refinements to the methodology may be warranted in future years to ensure appropriate ESRD payment rates.

In regard to the comment that MA plans might adopt a less attractive service area or benefit designs due to the enrollment of beneficiaries with ESRD in MA, we note that in accordance with the beneficiary protections at section 1852(b) of the Act and § 422.110, MA organizations are prohibited from denying, limiting, or conditioning the coverage or furnishing of benefits to individuals eligible to enroll in an MA plan based on health status factors. Under its own responsibilities at section 1852(b), CMS may not approve an MA plan if we determine that the plan design and its benefits are likely to substantially discourage enrollment by certain MA eligible individuals with the organization.

CMS will continue to monitor and investigate complaints related to plan coverage to determine if an MA organization has designed its plan benefits in an impermissible way. If warranted, CMS may take compliance or enforcement actions against an MA organization for failing to meet any contract requirements, such as providing adequate access to medically necessary services.

Comment: Commenters appreciated CMS' analysis to explore recommendations to develop MA ESRD rates at a smaller geographic level than the state level to address geographic differences in costs. Commenters, citing the analysis in the CY 2024 Advance Notice, questioned the potential use of the Core-Based Statistical Areas (CBSAs) in MA ESRD rate setting given the Area Deprivation Index (ADI) analysis. Specifically, they expressed concerns that reduced payments for rural and medically underserved areas, relative to urban areas, may have negative impacts on promoting health equity and supported CMS' proposal to use statewide ESRD rates for CY 2024. The commenters also requested more information on the CYs 2023 and 2024 analyses, what the change and impact was on ESRD payment rates in CBSAs with a low ADI compared to

a high ADI, and the number of MA beneficiaries with ESRD located in the CBSAs with a low ADI.

However, given payment adequacy concerns, a majority of commenters maintained that CMS should continue analyzing policy options to change how CMS calculates ESRD payment rates, and made suggestions such as: calculating ESRD rates at a smaller geographic level, with some commenters asking CMS to also consider adjustments to rural and medically underserved areas to ensure beneficiary access to high-quality MA plan options. Many of these commenters stated calculating the ESRD payment rates at a sub-state level or on a county-level basis with adjustments may lessen financial pressures associated with delivering care to beneficiaries with ESRD and reduce disparities among beneficiaries living in more rural and medically-underserved areas.

A commenter recommended improving the accuracy of state dialysis rates by reflecting the geographic distribution of MA dialysis patients. The commenter stated CMS could develop state rates by aggregating county-level per capita costs for FFS dialysis patients weighted by county-level MA dialysis patient enrollment, and not re-standardize the MA-weighted state rates to constrain them to be equal to existing state rates. According to the commenter such a method would align MA payment rates with per capita FFS costs and pay MA plans more fairly based on the geographic distribution of MA dialysis patients.

A commenter also stated that Puerto Rico would benefit from the implementation of rate changes based on the ADI analysis, given that ADIs in Puerto Rico are lower than the mainland. The commenter recommended CMS implement the ADI adjustment to MA ESRD rates.

Response: We thank the commenters for their support of our analyses of sub-state ESRD rates. Our analysis of potential changes in ESRD rates by CBSA showed that CBSAs representing the 40 percent of enrollment with the highest ADI measures (high levels of socioeconomic deprivation), were expected to receive CY 2022 ESRD rates that were an average of 2.13 percent lower under the CBSA-level approach. We believe our long-standing rate-setting approach is fair and reasonable and while we will continue our use of statewide MA ESRD rates for CY 2024, we will consider ways to conduct additional analysis into this issue.

CMS appreciates the recommendation to develop MA ESRD rates at a sub-state level. We agree with commenters that significant changes to the current methodology should be fully examined prior to implementation. Proposed changes to the MA ESRD rate methodology must be included in the Advance Notice and subject to public notice and an opportunity to comment before such changes are adopted, consistent with section 1853(b) of the Act. Consistent with our authority under section 1853(a)(1)(H) of the Act, CMS will continue taking into consideration commenters' concerns and recommendations.

Comment: Commenters provided additional suggestions for revisions to the ESRD rate setting methodology. Several commenters stated concerns that the Maximum Out-Of-Pocket (MOOP)

limit is a factor contributing to underpayment for beneficiaries with ESRD. Some commenters believe these higher plan costs resulting from the MOOP as applied to MA beneficiaries with ESRD will be shifted onto beneficiaries without ESRD through higher premiums for all enrollees and reduced supplemental benefits. Commenters suggested that CMS update the MA benchmark to incorporate the difference between FFS Medicare out-of-pocket costs and the MA MOOP to directly increase payments for beneficiaries with ESRD.

Another commenter requested that CMS examine the possibility of applying the QBP percentage to ESRD benchmarks. The commenter stated that currently, MA plans do not receive quality bonus payments for coordinating care for ESRD beneficiaries. The commenter stated that the statute provides that the quality incentive payment should be applied at the contract or plan level, indicating that MA ESRD membership should be included when increasing benchmarks for quality.

Response: While we appreciate the suggestions of commenters, we do not find the suggestions to revise the ESRD rate-setting methodology to be consistent with our interpretation of section 1853 of the Act. As explained in the CY 2012 Advance Notice and CY 2012 Rate Announcement, CMS interprets the legislative changes made by the ACA to MA payment to indicate that all MA payment rates, including the separate rates of payment for ESRD enrollees, should closely align with FFS Medicare costs.

As provided in section 1853(a)(1)(H) of the Act, CMS establishes separate rates of payment to MA organizations for ESRD beneficiaries enrolled in MA plans. *See also* §§ 422.254 and 422.304 through 422.308. The rates used for enrollees in dialysis or transplant status are based on statewide average FFS Medicare costs for ESRD beneficiaries in dialysis status. For enrollees with functioning graft status, the MA county benchmark rates are the payment rates. The rates for those in dialysis, transplant, and functioning graft status are also adjusted using a risk adjustment methodology that is specific to the health care costs for beneficiaries with ESRD in dialysis, transplant or functioning graft status.

We understand the concern about potential subsidization of ESRD costs by enrollees without diagnoses of ESRD, however the data CMS uses to calculate the CY 2024 MOOP limits includes out-of-pocket expenses from beneficiaries with and without diagnoses of ESRD because the MOOP limits will apply to enrollees with and without diagnoses of ESRD in CY 2024. This practice avoids discriminating against beneficiaries with diagnoses of ESRD — or any group of beneficiaries with a particular high-cost condition or health status — that would result if there were higher premiums, cost sharing, or MOOP amounts applicable only to those individuals with a certain chronic condition. Additional detail on how CMS finalized MOOP limits calculations, including the data used and the percentiles of FFS Medicare data projections that should be used in those calculations is available in the final rule titled “Medicare Program; Maximum Out-of-

Pocket (MOOP) Limits and Service Category Cost Sharing Standards" (CMS-4190-FC4) (87 FR 22290) published April 14, 2022.[4]

In regard to the commenter's recommendation for CMS to add a QBP percentage to MA ESRD benchmarks, section 1853(o) of the Act is clear that the QBP is applied to the applicable percentage used to calculate the applicable amount under section 1853(n) of the Act, while ESRD rates are set pursuant to section 1853(a)(1)(H) of the Act (that is, ESRD rates are not set under subsection (n)).

Comment: Commenters expressed concerns about the market concentration of dialysis providers. The small number of organizations in the dialysis market impacts MA organization's ability to negotiate reimbursement rates close to FFS Medicare rates for dialysis services. Several commenters cited a MedPAC analysis indicating that, on average, MA contracts are paying more than the FFS Medicare rate for dialysis treatments.

A commenter stated financial pressure from an inability to negotiate reasonable reimbursement rates may cause some MA plans to offset higher dialysis spending by reducing costs for other services or risk losses on beneficiaries with ESRD. The commenter stated sub-state MA ESRD rate setting could lessen this financial pressure.

Response: CMS appreciates the feedback provided by commenters regarding this issue. Please refer to the CY 2021 final rule titled, "Medicare Program; Contract Year 2021 Policy and Technical Changes to the Medicare Advantage Program, Medicare Prescription Drug Benefit Program, and Medicare Cost Plan Program" (CMS-4190-F) (85 FR 33796), which appeared in the Federal Register on June 2, 2020, which addresses concerns regarding dialysis provider concentration, network adequacy requirements, and the challenges MA organizations face in negotiating reasonable reimbursement for dialysis services.[5]

We also note that CMS is prohibited from requiring MA organizations to use particular price structures for payment to their contracted providers. (See section 1854(a)(6)(B)(iii) of the Act and § 422.256(a)(2).) In accordance with the beneficiary protections under section 1852(b) and at § 422.112(a), CMS expects that MA plans will continue to ensure that their plan designs allow for adequate access to covered services.

CMS appreciates the recommendation to develop MA ESRD rates at a sub-state level. We do not believe that adopting sub-state MA ESRD rates will fully address the commenters concerns. We believe our long-standing rate-setting approach is fair and reasonable and while we will continue

---

[4] Refer to CMS' Medicare Program; Maximum Out-of-Pocket (MOOP) Limits and Service Category Cost Sharing Standards Final Rule.

[5] Refer to CMS' Medicare Program; Contract Year 2021 Policy and Technical Changes to the Medicare Advantage Program, Medicare Prescription Drug Benefit Program, and Medicare Cost Plan Program Final Rule.

our use of statewide MA ESRD rates for CY 2024, we will consider ways to conduct additional analysis into this issue.

Comment: Several commenters encouraged CMS to leverage Innovation Center authority and value-based models to achieve greater stability in MA ESRD payments. A commenter encouraged the Innovation Center to limit the impact of the negative trend factor on the ESRD Seamless Care Organizations (ESCOs) in the Comprehensive ESRD Care model. Another commenter suggested that CMS provide MA plans with the option to participate in the Innovation Center's kidney demonstration models.

Commenters also encouraged CMS to explore ways to modernize the Medicare conditions for coverage and revise the definition of "dialysis facility" to provide beneficiaries with ESRD the choice to receive care in their preferred home or in-center dialysis setting, when clinically appropriate.

Several commenters encouraged CMS to expand the ESRD Chronic Condition-Special Needs Plans (C-SNP) to include beneficiaries with chronic kidney disease (CKD) to slow CKD progression.

Response: CMS notes that potential demonstrations and modernizing ESRD regulations are outside the scope of this document.

In the CY 2024 proposed rule titled, "Medicare Program; Contract Year 2024 Policy and Technical Changes to the Medicare Advantage Program, Medicare Prescription Drug Benefit Program, Medicare Cost Plan Program, Medicare Parts A, B, C, and D Overpayment Provisions of the Affordable Care Act and Programs of All-Inclusive Care for the Elderly; Health Information Technology Standards and Implementation Specifications" (CMS-4201-P) (87 FR 79452), CMS has proposed to revise the C-SNP category named "End Stage Renal Disease (ESRD) requiring dialysis" to be "Chronic kidney disease (CKD)" with the following conditions: CKD requiring dialysis/ESRD, and CKD not requiring dialysis.[6] CMS proposed that this particular change would not be implemented for CY 2024 in order to give CMS time to collect data and information related to the structuring of the proposed CKD C-SNP plan bid. CMS will provide additional bid pricing information to MA organizations if this proposal is finalized.

Comment: Commenters expressed concerns that the MA ESRD benchmarks underrepresent the actual costs of care for ESRD beneficiaries in Puerto Rico. A commenter stated that an insufficient number of ESRD beneficiaries remain in FFS Medicare in Puerto Rico to predict the costs of the MA ESRD population. The commenter asked CMS to verify what percentage of the Medicare ESRD population in Puerto Rico remain in FFS Medicare. The commenter also asked

---

[6] Refer to CMS' Medicare Program; Contract Year 2024 Policy and Technical Changes to the Medicare Advantage Program, Medicare Prescription Drug Benefit Program, Medicare Cost Plan Program, Medicare Parts A, B, C, and D Overpayment Provisions of the Affordable Care Act and Programs of All-Inclusive Care for the Elderly; Health Information Technology Standards and Implementation Specifications Proposed Rule.

if CMS has established a cut-off percentage, below which FFS experience could no longer accurately predict MA ESRD costs.

Response: CMS appreciates the concerns and suggestions that commenters have raised regarding ESRD rates in Puerto Rico. As CMS stated in the CY 2018 Rate Announcement, CMS believes that the FFS data in Puerto Rico is sufficient for establishing accurate MA rates and is consistent with the statutory requirements that MA capitation rates be based on FFS costs. CMS will continue to analyze these issues and consider whether, consistent with the statutory requirements for setting ESRD rates in section 1853(a)(1)(H) of the Act, any refinements to the methodology may be warranted in future years.

There is a total of 113,000 member months of Puerto Rico dialysis experience for 2017-2021 supporting the development of the 2024 dialysis ESRD rates. We believe that this level of experience is adequate for setting ESRD dialysis payment rates in Puerto Rico.

Comment: A commenter recommended CMS make changes to the BPT so that the ESRD subsidy falls under Medicare-covered benefits instead of under Mandatory Supplemental benefits. The commenter encouraged CMS to make the ESRD and non-ESRD service categories consistent, merge the ESRD and MA BPT format in the near term, and eliminate the ESRD BPT filing in the long-term.

Response: We appreciate the suggestions submitted by the commenter related to the BPT. Section 1853(a)(1)(H) of the Act authorizes CMS to establish "separate rates of payment" with respect to beneficiaries with ESRD enrolled in MA plans and does not require that a competitive bidding methodology be used for CMS capitation payments for ESRD enrollees. In setting such separate rates, CMS has established an approach for paying MA organizations for enrollees with ESRD that directly use the rates, rather than bids. As such, the ESRD rates are intended to be the base rate for enrollees with ESRD, and these costs cannot be paid under the rates used in the bids to determine payment for non-ESRD beneficiaries. Therefore, the ESRD subsidy that is permitted in plan bids for non-ESRD beneficiaries will remain as a mandatory supplemental benefit. MA plans (with the exception of ESRD C-SNPs) do not bid on ESRD beneficiaries. At this time, CMS does not find it necessary to require that MA plans submit a separate A/B bid for beneficiaries with ESRD. Regarding the commenters request that CMS eliminate the ESRD BPT filing requirement, CMS notes that MA plans are not required to submit ESRD BPTs (with the exception of ESRD C-SNPs).

Comment: A commenter suggested that the underlying ESRD PPS reduces reimbursements and leads to the development of inadequate MA ESRD rates. As noted in similar comments from prior years, the commenter reiterated the concern that MA ESRD rates are suppressed largely by policies that inappropriately reduce reimbursement under the ESRD PPS. The commenter cited examples such as the outlier payment pool and case-mix adjusters that they believe have resulted

in inadequate payments from ESRD PPS reimbursement that flow into the MA rate setting process. The commenter encouraged CMS to explore policy redesigns under the ESRD PPS.

Response: CMS appreciates the feedback provided by commenters regarding the ESRD PPS and its relationship to the development of the MA ESRD rates. Section 1853(a)(1)(H) of the Act authorizes CMS to establish "separate rates of payment" with respect to beneficiaries with ESRD enrolled in MA organizations. Under CMS' authority under section 1853(a)(1)(H), and in keeping with CMS' interpretation of the ACA to more closely align MA payment rates with FFS costs, the MA ESRD state rates are based on FFS costs. CMS encourages commenters to review and respond to ESRD PPS rulemaking for the Medicare FFS program.

Comment: Some commenters urged CMS to ensure that reimbursement for new and innovative treatments are incorporated in the MA ESRD rates in a timelier fashion. The commenters stated that because MA ESRD rates are calculated using historical cost data, the timing may not align with when new products will receive the Transitional Drug Add-on Payment Adjustment (TDAPA) and the Transitional Add-on Payment Adjustment for New and Innovative Equipment and Supplies (TPNIES) through the FFS ESRD PPS. A commenter stated MA beneficiaries have reported difficulties obtaining access to new and innovative products. The commenters recommended CMS develop an alternative payment mechanism for new innovative technologies to improve access to these treatments for MA beneficiaries with ESRD.

A commenter recommended CMS pay ESRD facilities directly for the TDAPA and TPNIES payment adjustments during the two-year payment period for MA beneficiaries, and then adjust MA rates to account for additional FFS payment amounts once products are fully bundled.

Response: CMS appreciates the commenters' feedback regarding adequately funding new and innovative products for beneficiaries with ESRD. CMS believes the current methodology for calculating MA ESRD rates accounts for payment adjustments to the ESRD PPS base rate, including the TDAPA for certain renal dialysis drugs and biological products and the TPNIES for certain renal dialysis equipment and supplies under the ESRD PPS. We also note that the TPNIES and the TDAPA for certain drugs are two-year add-on payment adjustments with no subsequent modification to the base rate. Only the TDAPA for drugs in new ESRD PPS functional categories may result in a base rate modification. The CY 2024 dialysis-only ESRD USPCC reflects our best estimate of the national per-capita cost, including changes to the ESRD PPS bundled payments for variables such as payment adjustments to the ESRD PPS base rate, including the TDAPA and TPNIES.

CMS will continue to monitor and investigate complaints related to beneficiary challenges obtaining access to new and innovative products to determine if an MA organization has designed its plan benefits in an impermissible way.

**Section I. MA Employer Group Waiver Plans**

Comment: Some commenters expressed their support for EGWPs. Commenters stated EGWPs are an important healthcare option for many Medicare beneficiaries and the employers who have chosen to support them in retirement. These commenters believe that EGWPs represent a successful public-private partnership that enables businesses to give recent retirees the option to choose a plan that provides quality care, lower premiums, and supplemental benefits. A commenter stated EGWPs act as critical partners in providing retirees with comprehensive Medicare benefits with enhanced value-based benefits at a lower premium than FFS Medicare.

Response: We appreciate the support.

Comment: Some commenters expressed appreciation for the inclusion of the preliminary bid-to-benchmark ratios for EGWPs in the Advance Notice to facilitate more accurate benefit and premium information for employers and beneficiaries.

Response: We appreciate the support.

Comment: Many commenters recommended CMS exclude negative margin plans from the calculation of estimated bid-to-benchmark ratios for EGWPs to avoid undermining the availability of supplemental benefits to improve health equity.

Response: As we noted in the CY 2023 Rate Announcement, we do not believe that there is a reasonable rationale to exclude these plans because the ratios are intended to be representative of the market. Negative margin plans are included in the non-EGWP market as well, so the bids of such plans are included when the bid-to-benchmark ratios are developed. CMS does adjust for factors which would otherwise result in significant differences between the EGWP and non-EGWP market. More specifically, while the majority of plans in the EGWP market are PPO plans, the non-EGWP market is predominantly HMO plans. EGWP individual market bid-to-benchmark ratios are calculated separately for HMO and PPO plan types by quartile. Unlike the HMO/PPO difference between EGWP and non-EGWP plans, there is no data to suggest that a similar difference exists between EGWP and non-EGWP plans regarding negative margin plans upon which CMS can judge the reasonableness of adjusting the bid-to-benchmark ratios to account for negative margin plans.

Comment: A commenter suggested that to reduce the number of PBPs submitted, CMS should establish a process using segment ID to facilitate additional flexibility with Part B buy-downs.

Response: As described in recent past Advance Notices and Rate Announcements, when an MA organization submits an individual market MA plan bid to CMS, the MA organization is permitted to use MA rebates to buy down a portion of the Part B premiums for its enrollees in each PBP by identifying the buydown amount in the BPT as its use of the beneficiary rebate. We then retain that rebate amount specified by the MA organization in each PBP and coordinate

directly with the Social Security Administration (SSA) to ensure that each beneficiary's Part B premium is appropriately calculated and takes into account the buy-down amount. Implementing the bidding waiver as described in the Advance Notice facilitates the communication of this information throughout CMS systems by maintaining an operational structure that is similar to the one that exists for individual market MA plans. For this reason, we decline to make the recommended changes, but we appreciate the commenter's thoughts on this issue and will continue to analyze and explore suggestions for refinements to this policy in the future.

Comment: Commenters expressed concerns that the published preliminary bid-to-benchmark ratios are lagging inflation and lower than expected and expressed concerns that the preliminary bid-to-benchmark ratios and risk model changes may increase costs for employers who utilize EGWPs and result in increased premiums or reduced benefits for beneficiaries. Many requested additional details about how the ratios were calculated.

Response: Please see CYs 2020, 2021, 2022, and 2023 Advance Notices for additional details on the calculation of bid-to-benchmark ratios; responses to comments on those detailed explanations are provided in the applicable Rate Announcement. CMS is publishing updated bid-to-benchmark ratios in this CY 2024 Rate Announcement, using the methodology detailed in the CY 2024 Advance Notice. CMS published preliminary bid-to-benchmark ratios for the first time in the CY 2023 Advance Notice as a result of feedback from the industry on the CY 2022 bid cycle. MA organizations indicated that having this information early provides valuable information in their negotiations with employer/union groups to create more accurate benefit and premium quotes for their employer/union groups. Commenters that requested additional details on how the bid-to-benchmark ratios were calculated did not provide further information on which details CMS could expand upon.

Comment: A commenter requested that CMS provide updated EGWP ratios based on February enrollment data before the release of the Rate Announcement.

Response: We appreciate this recommendation. For this CY 2024 Rate Announcement, MA EGWP ratios are based on February enrollment.

Comment: A commenter suggested adjusting current rate setting to capture differences in the use of HMO and PPO plans between the EGWP and non-EGWP markets. The commenter believes it would be more accurate for CMS to segment the benchmark calculation by HMO and PPO products and adjust the bid-to-benchmark ratio for the differing products accordingly.

Response: We appreciate this suggestion; however, we are continuing to apply our current methodology for paying EGWPs in CY 2024. Consistent with how we have developed EGWP payments since 2019, the CY 2024 EGWP payment methodology takes into account the prevalence of HMO and PPO enrollment in the EGWP market by calculating CY 2024 individual market bid-to-benchmark ratios separately for HMO and PPO plan types by quartile. CMS then takes into account the prevalence of HMO and PPO enrollment in the EGWP market

to combine the ratios by quartile. This methodology is more consistent with the county rates for individual market plans, which are also not calculated separately for HMO and PPO plan types.

**Section J. CMS-HCC Risk Adjustment Model for CY 2024**

Comment: Commenters stated their support for the proposed CY 2024 CMS-HCC model, stating it improves payment accuracy, program integrity and helps address excess payments to MA organizations that have negatively affected taxpayers and beneficiaries. Specific examples of support included the following comments:

- Updating the model with more recent underlying data will improve the accuracy of risk adjustment and payments to MA organizations;
- Updating the model to account for the transition from ICD-9 to ICD-10 provides more quality diagnostic information;
- Making changes to address variation in coding will decrease the impact of variability in MA coding compared to FFS.

Response: We thank the commenters for their support. We agree that moving to the 2024 CMS-HCC model will improve payment accuracy to MA plans and that updating the risk adjustment model is an essential part of CMS' duty to effectively run the MA program and be a steward of the Medicare program.

Comment: Many commenters requested CMS phase in the updated 2024 model over multiple years.

Response: CMS is finalizing the updated risk adjustment model proposed in the CY 2024 Advance Notice and will phase it in over 3 years. The 3-year phase in is consistent with how CMS has approached other years in which model updates have been phased in over time (e.g., the 2014 model was phased in over 3 years and the CMS-HCC model adopted in the CY 2019 Rate Announcement to address the 21st Century Cures requirements was phased in over 4 years, with additional revisions adopted in the CY 2020 Rate Announcement). For CY 2024, risk scores will be calculated as the sum of 33% of the risk score calculated using the updated 2024 CMS-HCC risk adjustment model with 67% of the risk score calculated using the current 2020 CMS-HCC risk adjustment model. For 2025, we expect risk scores will be calculated as the sum of 67% of the risk score calculated using updated 2024 CMS-HCC risk adjustment model with 33% of the risk score calculated using the 2020 CMS-HCC risk adjustment model. For 2026, we expect that 100% of the risk scores will be calculated using the updated model.

Comment: Commenters recommended CMS delay implementation of the CY 2024 CMS-HCC risk adjustment model, or withdraw it, so there could be more time to assess and understand it, and make modifications. Some commenters requested that CMS seek additional industry input before implementing any substantive changes to the risk adjustment model. A few commenters cited precedent such as an October 2015 memo related to the CY 2017 Advance Notice as an

example when CMS solicited early feedback from the public on substantial changes to the risk adjustment model. Commenters requested that CMS provide at least 60-day notice for changes to the risk adjustment model. Some commenters cited risk adjustment model changes related to the 21st Century Cures Act that required a 60-day comment period in statute. A few commenters recommended CMS better align the timing of the Advance Notice with the bid cycle to give MA organizations more time to analyze impacts. One of these commenters recommended CMS provide a 60- to 90-day comment period as well as release the Advance Notice between October and December to give industry more time to analyze changes. Another commenter recommended that any major risk adjustment model changes should be finalized at least one full year before plans submit bids for the relevant benefit year.

Response: CMS appreciates the concerns raised by the commenters on the timing of the implementation of the updated risk adjustment model and the process for comments.

As described in more detail later in this section and illustrated in Table III-1, it is important to maintain or improve the accuracy of the risk adjustment model by updating it to reflect more recent relative costs, treatment and utilization patterns, and coding practices. As the current model ages and is used to predict expenditures for more recent enrollees in MA plans, we identify in our analysis that predictive accuracy begins to decline. Delaying implementation of a risk adjustment model that is based on more recent underlying data will prolong the use of a risk adjustment model that, though still accurate according to CMS' measures (i.e., having a predictive ratio between 0.90 and 1.10), is waning in its ability to predict current costs. In addition, the longer CMS waits to update the risk adjustment model, the more impactful it will be on the year-over-year bottom line impacts for MA organizations.

It is vital that the CMS-HCC risk adjustment model is as up-to-date as possible and that CMS is able to implement routine updates that improve accuracy and address variation in coding that could lead to excess payments to plans. When a risk adjustment model is updated with more recent underlying data, the relative factors associated with each demographic factor and HCC reflect more recent costs, coding, and diagnostic patterns. All the updates in the 2024 CMS-HCC model are steps that CMS has taken before to update the risk adjustment model and are not novel changes to MA payment. In fact, CMS alerted plans about its commitment to move to ICD-10 in 2018 and to update the underlying data years. CMS is committed to implementing the new 2024 risk adjustment model, given that it reflects more recent data, is built using ICD-10 codes and a clinically-based review of the best diagnoses to accurately predict Medicare costs.

We acknowledge the commenters' request for an extended comment period. Per section 1853(b)(2) of the Act, the Advance Notice of proposed changes to the methodology and assumptions used to determine annual MA capitation rates and the risk and other factors used in adjusting MA capitation rates under section 1853(a)(1)(C) is required to have a minimum 30-day comment period. The Advance Notice was released on February 1, 2023 and comments were accepted through 6 PM Eastern Time on Monday March 6, 2023 (33 days). The statutory

requirement for a 60-day comment period applied only to proposals to implement certain changes to the CMS-HCC model stipulated in the 21st Century Cures Act. As added by the 21st Century Cures Act, section 1853(a)(1)(I)(iii) required that CMS provide at least 60 days for public review and comment of proposed changes to the Part C CMS-HCC risk adjustment model that were specifically based on section 1853(a)(1)(I).

Like in previous years when similar changes were proposed, CMS believes that the period provided for comments on the CY 2024 Advance Notice is sufficient. In setting these timelines, we seek to achieve multiple goals, including providing the statutory-required amount of time for public comment while also releasing the Advance Notice using more current data to calibrate the model and ensuring that the Rate Announcement is published by the statutory deadline. We provided the public with sufficient information to review the proposals since we informed the industry that the evaluation to reclassify the model was underway as far back as 2018 and we provided a number of resources to evaluate the updated model. Further, the updates proposed are in line with typical model updates for which CMS has provided a similar or shorter comment period per the existing statutory requirement at the time. Specifically–

- In the 2018 Report to Congress,[7] CMS stated that it was conducting analyses for the reclassification of the CMS-HCC risk adjustment model on ICD-10. In addition, CMS outlined key specific areas in which the reclassification was being examined (e.g., episode of care codes). The report also provided information for how CMS solicits clinical input, and how CMS would evaluate the conditions and underlying diagnoses for inclusion in the payment model.

- In the 2024 Advance Notice and associated releases, CMS provided a variety of information to support the review and evaluation of the updated risk adjustment model as well as explained the process used to develop, and the scope of changes made as part of the updated model. The Advance Notice included or provided a link to sufficient material to evaluate the updated risk adjustment model: the relative factors for each variable in the updated model, a table that detailed the differences for every HCC in the current model relative to the updated model, and the mapping of every ICD-10 diagnosis code that maps to the current 2020 model and the updated model. In addition, CMS publicly released risk adjustment model software which can be used to simulate risk scores under the updated model. We also released to each MA organization and certain demonstrations plan-segment level risk scores for their enrollees, by every model segment, for the current model, the proposed model, and for an alternative model that had a subset of the updates. The information provided enabled evaluation of the impact of various model updates, including the underlying HCC restructuring (diagnosis to HCC mappings & HCC comparison table), the relative impact of the updates (relative factor tables), the impact of the updates (plan-segment risk scores &

---

[7] Refer to Section 4. Ongoing Research in the 2018 Report to Congress.

model software), and the impact of the changes focused on Principle 10 (plan-segment risk scores under the proposed and alternative model).[8]

- CMS has updated the underlying data in the model many times since the initial implementation of the CMS-HCC risk adjustment model (see the Advance Notices and Rate Announcements for 2007, 2009, 2013, 2014, 2017, and 2019). In addition, in the 2014 Advance Notice, CMS proposed a model (the "2014 model") with similar updates to those in the 2024 (e.g., data year update, a clinical revision that resulted in newly built HCCs, and updates based on a review a diagnoses codes that showed indication of variable coding and removal of certain codes and associated HCCs).[9] For the recent years in which the comment timeline was extended compared to normal practice CMS made atypical structural updates to the CMS-HCC model. For example, the 2017 model revised the underlying segmentation structure of the model moving from a single to six community segments to improve the sensitivity of the model and add protective features to make unique adjustments for every health condition based on dual-eligibility status. This change was not phased in and the new model was implemented 100% in year 1. For the 2019 and 2020 Advance Notices, we proposed and finalized the changes to risk adjustment that were required in the 21st Century Cures Act, such as the requirement to add an additional increase to payment when an individual as multiple conditions – called count variables. The 21st Century Cures Act also mandated that we provide 60 days comment for those specific changes to MA risk adjustment, so we released a 'Part I' with the risk adjustment changes to comply but released the remainder of the Advance Notice in 'Part II' to ensure we had the most up to date data and analyses possible. The 2024 CMS-HCC model is not analogous to these situations because it maintains the same structure adopted in 2017 and 2020.

CMS engages with stakeholders on a regular basis through various lines of communication. We have regular meetings with various stakeholders – MA organizations, provider groups, beneficiary advocates, trade groups, expert clinicians, disease specific advocacy groups, academic researchers, and others – conduct user group calls with the industry, and release Requests for Information (RFIs). In July of 2022, we released a comprehensive RFI that solicited feedback for ways to improve the MA program. In response to this RFI, we received roughly 4,000 comments. We will continue to consider additional ways in which we can engage with stakeholders as we consider changes to the CMS-HCC risk adjustment model for future years, and appreciate commenter input.

Regarding the comment to align the Rate Announcement with the bid cycle, section 1853(b)(1)(B) of the Act requires the Rate Announcement to be published by the first Monday in

---

[8] Principle 10 -Discretionary diagnostic categories should be excluded from payment models. Diagnoses that are particularly subject to intentional or unintentional discretionary coding variation or inappropriate coding by health plans/providers, or that are not clinically or empirically credible as cost predictors, should not increase cost predictions. Excluding these diagnoses reduces the sensitivity of the model to coding variation and coding proliferation.

[9] Refer to Section G. of the 2014 Advance Notice

April before the contract year; this is roughly 2 months before the statutorily-set bid submission date of the first Monday in June.

Comment: Some commenters asked for more information from CMS regarding the updated model. The information requested included: underlying data used to calibrate the model, analysis supporting the predictive accuracy of the model, assessment of the model's impact on certain subgroups and plan types (e.g., individuals dually eligible for Medicare and Medicaid, all types of Special Needs Plans (SNPs), and racial and ethnic minorities), and details on the technical and clinical expert panel review. Examples of the suggestions for analysis and/or additional information CMS should release to the public included:

- The reclassification methodology including the underlying data used to calibrate the model so that stakeholders may simulate the proposed model revision and provide meaningful feedback;
- An analysis on the effect of the case-mix between MA and FFS because of concerns that sicker beneficiaries are leaving MA for FFS and healthier beneficiaries are moving from FFS to MA resulting in HCC coefficients that are too high;
- An analysis supporting the predictive accuracy of the model including providing predictive ratios and r-squared ($R^2$) values, similar to what has been provided in previous iterations;
- An analysis to support departing from a recent statement in the Report to Congress that the 2020 model was performing well;
- An analysis to determine if plan-level variations in coding of certain conditions is associated more with differences in beneficiary composition than upcoding;
- An analysis using the most recent PY 2022 data to reevaluate model estimates;
- Software, coefficients, and diagnosis mappings for an updated model with the updated data years and ICD-10 changes, but without the Principle 10-focused clinical updates related to variable coding (the V27 model); and
- Supporting data for removing diagnoses and HCCs, an analysis on diabetes, and other data justifying Principle 10 (i.e., addressing variable coding).

Response: We appreciate commenters requests. As noted in the Reports to Congress, the CMS-HCC risk adjustment models have consistently performed well, and the latest Report to Congress included analyses of the performance of the 2020 risk adjustment model.[10] CMS has updated the underlying data in the model many times since the initial implementation of the CMS-HCC risk adjustment model (see the Advance Notices and Rate Announcements for 2007, 2009, 2013, 2014, 2017, and 2019). Further, CMS has always made updates to model calibrations to account for updates and changes in International Classification of Diseases, Clinical Modification diagnosis codes. Periodically, CMS conducts a clinical revision of the CMS-HCC model and rebuilds all the HCCs from the ground up and, in the process, takes into account changes in

---

[10] 2018 and 2021 Reports to Congress: https://www.cms.gov/Medicare/Health-Plans/MedicareAdvtgSpecRateStats/Risk-Adjustors-Items/ReportToCongress

disease patterns, treatment methods and their costs, and coding practices, as well as compositional changes within the Medicare population. For example, in 2014 we implemented an updated CMS-HCC model that included a clinical revision using newly built HCCs using ICD-9 codes, for which coding patterns had changed in the 10 years since the initial CMS-HCC model. For CY 2023, CMS proposed and implemented an RxHCC model with changes similar to those made to the 2024 CMS-HCC model. The CY 2023 RxHCC model was updated based on more recent underlying data years and the model RxHCCs were reclassified based on the ICD-10 classification system.

As noted in the CY 2024 Advance Notice, the 2024 CMS-HCC model results in more appropriate relative weights for the HCCs included in the model. CMS weighs a number of considerations when updating and revising the CMS-HCC model. Since MA plans bear full financial risk for the population and services they cover, a main objective of risk adjustment is to minimize incentives for MA plans to compete for the healthiest beneficiaries. The risk adjustment model accomplishes this by accurately predicting relative risk across subgroups of beneficiaries and reimbursing plans more for populations that are expected to be sicker and have more complex health needs. This is achieved through the segmentation of the model that assigns unique risk scores for each condition based on demographic factors. A key focus of the MA risk adjustment model is to accurately predict costs that are attributable to characteristics that are present over time (e.g., chronic conditions that persist or affect longer term costs, demographics, etc.). In this sense, the model is an insurance-like model that seeks to balance the over and under prediction errors so that the average actual expenditures for a sufficiently large group of beneficiaries equals the average predicted expenditures.

Further, because we are using the CMS-HCC model for payment (as compared to an analytic exercise to predict costs), we follow our longstanding principles when updating the model in order to ensure both statistical and clinical meaningfulness.

Because of the risk adjustment model's focus on predicting foreseeable costs, a key factor in measuring the predictive accuracy of the model is measuring how well it predicts costs over subgroups of beneficiaries. Predictive accuracy in the CMS-HCC models is measured by the predictive ratio – the ratio of predicted cost to actual cost – for a group of beneficiaries. While perfect prediction is a predictive ratio of 1.0, every subgroup does not need to have a predictive ratio of 1.0 to indicate a high performing model. Rather, when comparing models for groups of beneficiaries, a predictive ratio closer to 1.0 indicates a better prediction, but a predictive ratio between 0.90 and 1.10 is generally considered accurate.[11] The predictive ratios for each group of FFS beneficiaries, when divided into 10 subgroups based on level of risk (i.e., costs predicted by the model), show that the model predicts well across the spectrum of risk, meaning that, on

[11] https://www.cms.gov/files/document/report-congress-risk-adjustment-medicare-advantage-december-2021.pdf, p. 42

average, MA plans with varying risk profiles are compensated commensurate with their expected experience.

By this measure, as explained in more detail below, the 2024 CMS-HCC model that we are finalizing improves on the predictive accuracy of the 2020 CMS-HCC model.

In addition, in prior years, we either have elected or have been directed by Congress to improve prediction for selected subgroups of beneficiaries. For example, the 2017 CMS-HCC model established separate model segments for populations dually enrolled in Medicare and Medicaid. The 2014 CMS-HCC model, which had a single-segment for all enrollees residing in the community, under predicted spending for full benefit dual eligible groups in the model sample by close to 9 percent. Based on these findings, CMS elected to develop a model that improved prediction for these beneficiaries. Predicting cost for dually eligible beneficiaries in separate segments improved their predictive ratio to 1.0 and subsequently improved the accuracy of payments to MA plans, which were increasingly specializing in dual eligible beneficiaries. Congress, through the 21st Century Cures Act, also directed CMS to make changes to the model to address concerns about the predictive accuracy of the model for beneficiaries with multiple chronic conditions and for specific behavioral health conditions. The addition of count variables and clinical revisions to HCCs improved the predictive ratios. The previous changes we made to improve the predictive accuracy of the model are maintained in the 2024 CMS-HCC model.

There are a number of reasons to update and revise the CMS-HCC model, all of which improve or maintain predictive accuracy. We improve accuracy of the model by updating the CMS-HCC model with more recent underlying data years to better reflect the more recent relative costs and more recent treatment and utilization patterns for conditions in the model, thereby avoiding any reductions in predictive accuracy that can result from using relative factors based on older data. For example, the actual expenditure per person for beneficiaries diagnosed with Multiple Sclerosis (HCC 77 in the 2020 CMS-HCC model) increased 24.2 percent from $17,966 in the 2014/2015 sample to $22,308 in the 2018/2019 sample. The prevalence of Multiple Sclerosis also increased by 11.6 percent between the 2014 and 2018. Updating the model with more recent data results in higher a relative factor for Multiple Sclerosis to better predict cost for MA beneficiaries. While maintaining or improving the model’s predictive accuracy by decile of predicted risk is necessary, keeping the model up-to-date with more recent experience is also necessary. For example, as Table III-1 shows, the current model 2020 CMS-HCC model that is calibrated using 2014 diagnoses and 2015 costs for 2019 beneficiaries, to their actual cost in 2019, by decile of predicted risk. While the current model maintains predictive accuracy, it is less accurate than models with more recent data because of inflation, changing beneficiary characteristics, and differences in diagnostic coding patterns in FFS. Models based on more recent data and coding patterns are the most accurate possible representation of what experience is expected to be in future payment years. The 2024 CMS-HCC model is more accurate than the 2020 CMS-HCC model because it reflects more recent relative cost (2019 compared to 2015)

and includes clinically meaningful conditions that predict cost developed from experience with ICD-10.

Measures of model performance that are based on individual observations such as the $R^2$, which measures how well the model explains variation in spending across individuals (rather than groups), are produced with the risk adjustment model but are not a primary factor when determining the model's specification. Given the model's goal of predicting costs over subgroups, it is not intended to predict accurately for individuals or small subgroups of beneficiaries. As such, measures of model performance for individuals are less relevant. Nevertheless, the 2024 model has an improved $R^2$ compared to the current 2020 model.

Table III-1 provides predictive ratios by decile of risk, meaning the higher the risk the higher the risk score, for the current 2020 model using both a 2014 – 2015 sample population (which is what it was calibrated on) as well as the current 2020 model using the updated 2018 – 2019 sample population (used for the updated 2024 model), and the updated 2024 model using the 2018 – 2019 sample population. The predictive ratios provided in Table III-1 are the ratio of 2019 expenditures predicted by the model for 2019 to the actual 2019 expenditures using 2018 diagnoses. We have also provided predictive ratios by demographic segments in Attachment VIII Tables VIII-5 – 11 for multiple subpopulations. As indicated in the below table, the current model for both 2014 – 2015 and 2018 – 2019 sample population continue to predict expenditures accurately, having predictive ratios between 0.90 and 1.10, but we observed that over time the accuracy begins to decline. When comparing the same 2018 – 2019 sample population, we see that for all but one decile the updated model predicts expenditures more accurately than the current 2020 model.

**Table III-1 Predictive Ratios by Decile of Predicted Risk**

| | 2014/2015 Sample | 2018/2019 Sample | | |
|---|---|---|---|---|
| **Decile** | **2020 Model** | **2020 Model** | **2024 Model** | **Improvement in Predictive Risk** |
| *Entire sample* | 1.000 | 0.974 | 1.000 | - |
| First (lowest) decile | 0.971 | 0.910 | 0.970 | ↑ |
| Second decile | 0.985 | 0.946 | 0.986 | ↑ |
| Third decile | 0.987 | 0.943 | 1.013 | ↑ |
| Fourth decile | 0.986 | 0.964 | 1.000 | ↑ |
| Fifth decile | 1.001 | 0.981 | 0.994 | ↑ |
| Sixth decile | 1.003 | 0.977 | 0.996 | ↑ |
| Seventh decile | 1.005 | 0.987 | 0.999 | ↑ |
| Eighth decile | 1.006 | 0.988 | 0.998 | ↑ |
| Ninth decile | 1.006 | 0.993 | 1.008 | ↓ |
| Tenth (highest) | 1.002 | 0.966 | 1.003 | ↑ |
| Top 5% | 0.998 | 0.948 | 0.999 | ↑ |
| Top 1% | 0.985 | 0.922 | 0.984 | ↑ |
| Top 0.1% | 0.952 | 0.885 | 0.966 | ↑ |

**NOTES**:

1. "Improvement in Predictive Risk" compares the distance the predictive ratios are from 1.0 for the 2024 model and 2020 model with a 2018 – 2019 sample.
2. A green arrow indicates that the predictive ratio for any specific decile for the 2024 model is closer to 1.0 than the predictive ratio for the 2020 model with a 2018 – 2019 sample, and vice-versa.

Table III-2 provides the $R^2$ for the CMS-HCC model segments for the current 2020 CMS-HCC model and the 2024 CMS-HCC model. As previously stated, CMS uses the predictive ratio as the primary measure of accuracy for the model and $R^2$ is less useful in assessing the predictive accuracy of the MA CMS-HCC risk model. However, we provide the $R^2$ for the model segments because it does provide information about the extent to which the model can explain variation in expenditures between individuals. Table III-2 shows there is slight improvement in all demographic segments, including Full-Benefit Duals. (Increases in $R^2$ values indicate improvement.)

**Table III-2 R-Squared by CMS-HCC Model and Demographic Segments**

| Demographic Segment | 2020 Model (14/15 Sample) | 2024 Model (18/19 Sample) |
|---|---|---|
| Non-Dual, Age≥65 | 0.1257 | 0.1355 |
| Non-Dual, Age<65 | 0.1148 | 0.1472 |
| Full-Benefit Dual, Age≥65 | 0.1214 | 0.1246 |
| Full-Benefit Dual, Age<65 | 0.1317 | 0.1889 |

| Demographic Segment | 2020 Model (14/15 Sample) | 2024 Model (18/19 Sample) |
|---|---|---|
| Partial-Benefit Dual, Age≥65 | 0.1122 | 0.1159 |
| Partial-Benefit Dual, Age<65 | 0.0987 | 0.1589 |
| Institutional | 0.1087 | 0.1200 |

CMS released a variety of information to support the review and evaluation of the updated risk adjustment model as well as explaining the process used to develop, and the scope of changes, in the updated risk model. As previously noted, the Advance Notice included or provided a link to sufficient material to evaluate the new risk model: the relative factors for each variable in the updated model, a table that detailed the differences for every HCC in the current model relative to the new model, and the mapping of every payment ICD-10 diagnosis code under the current model and the updated model. Though the information released in the Advance Notice was sufficient to analyze the model, CMS also publicly released risk adjustment model software which could be used to more quickly simulate risk scores. We also released to each MA organization and certain demonstrations plan-segment level risk scores for their enrollees, by every model segment, for both the proposed model and for an alternative model that had a subset of the updates. The information provided enabled evaluation of the impact of various model updates, including the underlying HCC restructuring (diagnosis to HCC mappings & HCC comparison table), the relative impact of the updates (relative factor tables), the impact of the updates (plan-segment risk scores & model software), and the impact of the changes focused on Principle 10 (plan-segment risk scores under the proposed and alternative model that had a subset of the updates in the new risk model we are adopting).

As with every model update, CMS noted in the CY 2024 Advance Notice that there will be variation in the impact on risk scores depending on the clinical profile of each plan's enrollees. All of the model updates (i.e., underlying data updates, denominator update, and ICD-10 reclassification) contribute to changes in the relative costs of conditions, and therefore changes to the resulting risk scores. Beneficiary risk scores or plan average risk scores may change depending on an individual beneficiary's combination of diagnoses or the clinical profile of a plan's enrollee population. Further, the risk scores of different subgroups can change differently, to reflect changes that may be particular to that subgroup or clinical profiles that are more prominent in a subgroup. These subgroups include dual status, Long Term Institutional (LTI) status, geographic location, plan type, to the extent that plans focus on enrolling beneficiaries with different characteristics.

Risk score differences between the current model and the updated model will occur for several reasons. Specifically, revisions to the models result in changes in the marginal cost attributable to each HCC, relative to the change in the average cost (i.e., denominator used to set the relative factors), and can alter the relative factor associated with each HCC, and with the relative values among HCCs. In addition, changes in the relative factors will result from changing from HCCs that were created using the ICD-9 classification system to HCCs that were created using the

ICD-10 classification system, as well as from the addition or deletion of HCCs to or from the model.

Comment: Many commenters stated that the updated model will have a significant negative effect on the availability of supplemental benefits, and specifically identified a variety of benefits that they thought would be affected. Commenters mentioned increased beneficiary cost sharing, and reduced supplemental benefits such as transportation, nutritious meals, dental coverage, hearing coverage, vision coverage, telehealth coverage, fitness and wellness benefits, decreased cost-sharing, annual vision exams and coverage for glasses or contact lenses, as the consequences of adopting the new model.

Response: We estimate that the overall impact of the CY 2024 Rate Announcement will be a net increase of payment of 3.32%. The updated risk adjustment model is one of many factors that contribute to the net payment increase, and when MA organizations prepare their bids and benefit packages, they take into account all these factors when they determine the amount of supplemental benefits they will offer. In addition, MA organizations have a variety of business decisions that they make when determining how much profit margin they include in their bids, how to allocate revenue to supplemental benefits, and the amounts that they allocate to each category of supplemental benefits. Given the competitive nature of the MA program, we anticipate that MA organizations will strive to minimize the impact of any payment-related changes on beneficiaries and the scope of benefits available to them. While impacts may vary by MA plan for a variety of reasons, given the increased revenue projected for MA organizations, we expect that the availability of supplemental benefits will be stable or grow in CY 2024, as seen previously in years with comparable updates. Following those payment updates, the MA market remained stable and enrollment in MA continued to grow.

Comment: Many commenters stated that the updated model will impact care delivery and the quality of care. Many of these commenters expressed concerns regarding the number of ICD-10 codes that no longer map to HCCs in the model, as well as some of the specific clinical areas that are not included in the new CMS-HCC risk adjustment model, and expressed concern that the changes made in the updated model will directly affect patient care. Specifically, commenters cited that there are over 2,000 net fewer ICD-10 codes mapped to the updated model compared with the current model. The commenters focused on the changes to the volume of diagnoses mappings instead of the specific clinical updates, and stated that removing these diagnosis codes may have significant health implications, and may prevent slowing disease progression from early stages. In addition, some commenters stated that the conditions removed from the proposed model are precursors to adverse medical events, and that their removal would disincentivize catching these conditions early. Some commenters stated that the recalibration of the updated model lowers HCC coefficients which will result in negative clinical outcomes particularly for vulnerable populations. A few commenters recommended CMS consult with all medical specialties prior to making any clinical changes to the HCC reclassification. Commenters expressed concern of possible unintended consequences to patient care that may occur since they

envisioned that clinician coding and documentation practices would become less precise for early or mild stage disease in response to the model update. Commenters highlighted specific conditions as areas of concern (which we address in specific responses below).

Response: Risk adjustment is intended to reduce or eliminate "the incentives to enroll only the healthiest, and thus least expensive, beneficiaries while steering clear of the sickest and costliest—thereby rewarding Medicare Advantage insurers to the extent that they achieve genuine efficiencies over traditional Medicare in addressing the same health conditions." *UnitedHealthcare Ins. Co. v. Becerra*, 16 F.4th 867, 873-74 (D.C. Cir. August 13, 2021, reissued November 1, 2021), *cert. denied*, 142 S. Ct. 2851 (U.S. June 21, 2022) (No. 21-1140). The risk adjustment model used for MA payment is not designed to drive clinical behavior to look for specific conditions or to be the sole purpose for MA organizations or health care providers to identify and treat conditions that are potential precursors to adverse medical events or complicating factors in the identification and treatment of other conditions. MA organizations are required, by their contracts with CMS and section 1852(a) of the Act, to furnish medically necessary Part A and Part B benefits to their enrollees. Because MA organizations are at financial risk for the care of their enrollees, changes in the risk adjustment model do not change the fundamental incentive in a capitated payment system to reduce morbidity and mortality by identifying and treating early stages of disease. Therefore, we respectfully disagree with commenters that the changes to the mappings of certain diagnoses or conditions to the HCCs in the model will disincentive MA organizations from identifying and treating conditions early in the disease process.

MA organizations submit bids to CMS that request the revenue needed to cover the expected per beneficiary costs of their enrollee population. Risk adjustment is used to adjust plan bids and payment based on health status and demographic characteristics such that plans are paid more for beneficiaries predicted to have higher costs. To accurately predict the likely relative cost of each beneficiary, it is important to include in the risk adjustment model those diagnoses and conditions that are reliable predictors of future costs and exclude those that are unreliable predictors of future costs. For the CY 2024 model, CMS undertook a comprehensive and thoughtful process, informed by clinical input, to determine the diagnoses and conditions for inclusion. As a result, the new model will better direct resources to plans with beneficiaries with higher health care needs.

CMS uses ten longstanding principles, originally introduced in the 1999 Report to Congress and later expanded and formally established by the 2000 Report to Congress, to group diagnosis codes into HCCs and select which HCCs are included in the model.[12,13] Regarding the specific diagnoses and conditions that were included in the updated model, CMS followed these longstanding principles to group diagnosis codes and build all new HCCs using ICD-10-CM

---

[12] 1999 Report to Congress: Proposed Method of Incorporating Health Status Risk Adjusters into Medicare+Choice Payments
[13] 2000 Report to Congress: Diagnostic Cost Group Hierarchical Condition Category Models for Medicare Risk Adjustment

diagnosis codes. ICD-10-CM diagnosis codes have been used by U.S. providers since October 2015. Moving from ICD-9-CM to ICD-10-CM was a major classification change in the U.S., both in terms of the volume of diagnosis codes and in the structure and clinical specificity of codes, as well as changes in clinical concepts for some conditions. Therefore, we conducted multi-years analyses (2016/2017, 2017/2018, and 2018/2019) to assess the stability of using ICD-10 diagnosis codes for the model calibration.[14] Because providers are no longer using ICD-9, in order to update the underlying data for the model calibration, a reclassification had to occur to develop HCCs aligned with the ICD-10 classification system. As part of this process, we determined which diagnoses were the best predictors of prospective costs based on our longstanding principles for developing risk models.[15] As a result of this reclassification, the number of HCCs in the payment model increased from 86 to 115. The updates made to the CMS-HCC model improves its accuracy by reflecting more recent cost and utilization patterns, and by including conditions that reliably predict Medicare costs, and thus help ensure that higher payments are available to plans that serve beneficiaries who are expected to have more costly health care needs.

Relative factor differences between the current model and the proposed model will occur for several reasons. Since the model update included updated data years and included an HCC reclassification, changes in the marginal cost attributable to each HCC is driven by both of these updates. In addition, the relative factors associated with each condition is relative to the change in average cost (i.e., the updated denominator). As noted above, the risk model was reclassified increasing the number of HCCs from 86 in the current model to 115 in the updated model. For this reason, generally comparing HCC coefficients across both models would not be an appropriate measurement. For those conditions in which the HCC persisted across both models, some coefficients have increased more than average and some have increased less than average. For those conditions whose dollar coefficients have increased more than average, the relative coefficients have increased (see Multiple Sclerosis example discussed earlier in this section). As noted in the CY 2024 Advance Notice, changes to the condition categories – including additions, deletions, and revisions – are based on each condition category's ability to predict costs for Medicare Parts A and B benefits. Condition categories that do not predict costs well – for example, because the coefficient is small, the t-value is low, a small number of beneficiaries have the certain condition, or the condition does not have well-specified diagnostic coding – are not included in the model. As previously stated, condition categories and the underlying ICD-10 to HCC mappings are evaluated using the longstanding risk adjustment principles. Empirical data are taken into account along with clinician information and clinician input when evaluating HCC for inclusion in the model. Empirical data analysis includes reviewing diagnosis

---

[14] In Section 4 Ongoing Research of the 2018 & 2021 Reports to Congress CMS discusses the need to evaluate ICD-10 diagnosis patterns: https://www.cms.gov/Medicare/Health-Plans/MedicareAdvtgSpecRateStats/Risk-Adjustors-Items/ReportToCongress

[15] Advance Notice of Methodological Changes for Calendar Year (CY) 2004 Medicare+Choice (M+C) Payment Rates; 2021 Report to Congress on Risk Adjustment in Medicare Advantage (section 2.3 provides further details on the Principles of Risk Adjustment). *See also* 2018 and 2021 Reports to Congress

frequencies, predictive power, expenditures associated with the condition, chronicity (duration of a condition), and prospective cost prediction (analyses of concurrent versus prospective costs implications).

To obtain clinical input throughout the model development process, CMS consulted with a panel of internal medicine and general practitioners to provide clinical expertise, as the model covers all body systems and a broad spectrum of diagnoses. The clinicians are practicing physicians, as well as professors, and health services researchers. A series of discussions with the clinicians were held over the course of a year to review and discuss the reclassification. The reclassification process, including the clinical consultation panel review, is an iterative process. The process involves empirical data investigation and analysis by healthcare economists, clinical research, and clinician input and review. Multiple iterations of the model are calibrated to evaluate diagnosis mappings, HCC reconfigurations, clinical hierarchies, and which HCCs are included in the model for payment. Clinician input was provided, where applicable, for each model iteration. Decisions regarding the model classification (e.g., how diagnoses are grouped) were made based on the level of granularity provided in the ICD-10 classification system, the risk adjustment model principles, examination of the model performance (i.e., predictive accuracy), and for the initial analysis to further assess which conditions are more discretionary, a review of HCC frequencies in MA and FFS.

The clinical panel provided insight and recommendations related to the criteria used to evaluate and treat conditions (e.g., lab findings, test results, physical exams, medications, medical interventions, etc.); specificity of diagnoses; potential for variable coding for certain diseases or disease groups; treatment practices; manifestations of conditions in different populations (e.g., aged vs. disabled; non-dual vs. full-benefit; dual vs. partial-benefit dual); disease severity and implications for medical burden; the need for additional medical specialist intervention (i.e., whether or not a condition would require evaluation by a specialty clinician); clinical face validity (i.e., whether the condition is consistent with the relative costs associated with it) and interpretation of empirical results; clinical similarities and differences between specific diseases (e.g., Crohn's disease and ulcerative colitis); relationship of acute and chronic versions of diseases (e.g., acute hepatitis C and chronic hepatitis C); and implications for predicted costs.

The HCC classification system is exhaustive (i.e., all diagnosis codes map to an HCC). While all diagnosis codes map to an HCC, only a smaller subset of HCCs are included in the payment model. When CMS refers to "payment HCC" we are referring to an HCC that is included in the model for payment, and vice versa for references to "non-payment HCCs."

Below we address the specific conditions that were re-mapped or grouped differently in the updated 2024 risk adjustment model and about which concerns were raised by commenters. There were HCC reconfigurations and underlying diagnosis changes as described in the 2024 Advance Notice. Below we review these changes:

- Vascular Disease (Diagnoses related to atherosclerosis, aortic, deep vein thrombosis, embolism, and other circulatory diseases)
  - As identified in the 2024 Advance Notice, the Vascular disease group was reconfigured from the 2020 CMS-HCC model to the 2024 CMS-HCC model. There are 365 ICD-10 payment diagnosis codes in the vascular disease group. The increased granularity under the ICD-10 classification system permitted better configuration of the vascular HCCs, and HCCs 107-108 were reconfigured into three new HCCs, 263, 264, and 267. Under the current 2020 CMS-HCC model, vascular HCC 108 contains a range of ICD-10 codes, including those describing atherosclerosis of the aorta, renal artery, and extremities, except with ulceration or gangrene; specified aneurysms; and peripheral vascular disease. ICD-10 codes atherosclerosis of arteries of extremities unspecified, with exercise or rest pain, ulceration, or gangrene are mapped to HCCs in the Vascular disease hierarchy according to their clinical severity. Based on empirical data (e.g., expenditure patterns, frequency, predictive accuracy) and clinician input, payment HCCs for atherosclerosis of arteries of extremities in the updated 2024 CMS-HCC model contain primarily codes for atherosclerosis with rest pain and with ulceration or gangrene, as they typically indicate more serious cases.
  - In consultation with clinicians, codes that indicate more serious cases of vascular disease were retained in the payment HCCs, and diagnoses for "other" and "unspecified" disease were mapped to a non-payment HCC. Diagnosis codes for atherosclerosis of arteries of the extremities with rest pain were moved to the higher-level payment HCC 264. Diagnoses "with rest pain" indicates compromised vasculature in the leg and that vascular disease is likely more widespread, so usually requires intervention. Codes for atherosclerosis of arteries of the extremities, with intermittent claudication were broken out as new nonpayment HCC 265 (refer to additional information provided in a later response). A new HCC 267 was created for *Deep Vein Thrombosis and Pulmonary Embolism* due to clinical considerations (similar indications for treatment and cost implications in a prospective model). Of the remaining codes from 2020 CMS-HCC model HCC 107, only the more severe manifestations that would consistently and reliably predict costs prospectively (e.g., aortic aneurysm, ruptured and arterial embolism and thrombosis) are mapped to payment HCC 264. Diagnosis codes (e.g., Atherosclerosis of the Aorta) for manifestations or stages of diseases that are not consistently reliably predictive of future years costs (e.g., involve lifestyle changes, or medical monitoring) were mapped to the lower level Vascular HCC. The new treatment of the vascular disorders is consistent with the treatment of coronary atherosclerosis in the CMS-HCC model, in which the diagnosis of coronary atherosclerosis is non-payment, but the more severe manifestations of unstable angina and acute myocardial infarction are payment HCCs.
- Metabolic Diseases (Endocrine related diagnoses)

  - There are three payment HCCs in the 2020 CMS-HCC model Metabolic disease group. The 2024 CMS-HCC model Metabolic disease group was expanded to four HCCs, in the payment model. HCC 23 (*Other Significant Endocrine and Metabolic Disorders*) was reconfigured to pull out select conditions with prospective cost implications. There are 59 ICD-10 payment diagnosis codes in the metabolic disease group. First, high-cost lysosomal storage disorders with expensive Part B drug treatments were split out into a new HCC 49 *Specified Lysosomal Storage Disorders*. Then metabolic disorders and endocrine disorders were separated based on cost and clinical considerations into HCC 50 *Amyloidosis, Porphyria, and Other Specified Metabolic Disorders*, and HCC 51 *Addison's and Cushing's Diseases, Acromegaly, and Other Specified Endocrine Disorders*, respectively. Other conditions (e.g., aldosteronism) from the 2020 CMS-HCC model HCC 23 that may be more indicative of lab test results and can be manifestations of other, underlying disorders (e.g., heart failure), or are primarily treated with lower-cost medications were mapped to a non-payment HCC based on empirical overprediction (i.e., overprediction of the costs for beneficiaries with these conditions) and clinical considerations. This is consistent with the treatment of hypothyroidism and hyperthyroidism, which are not in the 2020 or proposed 2024 CMS-HCC payment models.

- Heart Diseases (Cardiovascular and heart failure diagnoses)
  - There are five payment HCCs in the current 2020 CMS-HCC model Heart disease group. In the reclassified 2024 CMS-HCC model, the Heart disease group was expanded to ten payment HCCs, due to the split-out of 2020 CMS-HCC model HCC 85 *Congestive Heart Failure* into five payment heart failure HCCs (222-226) to account for clinical severity and cost differences. There is a hierarchy among heart failure HCCs, with new HCC 221 *Heart Transplant Status/Complications* added to the top of the hierarchy and new split-out HCC 227 *Cardiomyopathy/Myocarditis* at the bottom. Multiple different configurations of heart failure codes were evaluated, and the implemented hierarchy was finalized based on empirical analyses and consulting clinicians' input. The HCC structure captures differences in prospective costs among conditions and has clinical salience. Principle 10 focused changes are discussed in a later response.

- Blood Disease (Coagulation diagnoses and disorders of immunity)
  - There are three payment HCCs in the 2020 CMS-HCC model Blood disease group. In the 2024 CMS-HCC model, the Blood disease group was expanded to seven payment HCCs. There are 132 ICD-10 payment diagnosis codes in the blood disease group. Specifically, diagnoses that describe coagulation defects, hemorrhagic conditions, and purpura were mapped to payment HCC 112 *Immune Thrombocytopenia and Specified Coagulation Defects and Hemorrhagic Conditions* or non-payment HCC *Thrombocytopenia, Purpura, Thrombophilia, and Other and Unspecified Hemorrhagic Conditions* based on clinical

severity, specificity, and the reliability for predicting prospective costs. There are two payment HCCs (114-115) in the 2024 CMS-HCC model Blood disease group that describe immune conditions. HCCs 114 *Common Variable and Combined Immunodeficiencies* and 115 *Specified Immunodeficiencies and White Blood Cell Disorders* contain immune conditions from the 2020 CMS-HCC model HCC 47. This split-out allows for isolation of the costlier and clinically severe common variable and combined immunodeficiencies (in 2024 CMS-HCC model HCC 114) from other specified immunodeficiencies and white blood cell disorders (in 2024 CMS-HCC model HCC 115), while unspecified, non-specific, and lower-severity immune disorders were mapped to a non-payment HCC.

- Amputation
  - There is one payment HCC in the 2020 CMS-HCC model Amputation disease group, which was reconfigured to cover initial complications or ongoing costs of lower limb amputation in the 2024 CMS-HCC model. There are 44 ICD-10 payment diagnosis codes in the amputation disease group. Diagnosis codes for the acquired absence codes of toe and finger were mapped to the non-payment HCC *Post-Surgical States/Aftercare/Elective* to more accurately classify them based on similar implications for disease burden (e.g., similar clinical implications for care) and cost prediction. This is parallel to the RxHCC model, where these codes similarly map to nonpayment HCCs.[16]
- Neurological Diseases (Polyneuropathy diagnoses)
  - There are eight payment HCCs in the current 2020 CMS-HCC model Neurological (Neuro) disease group. In the 2024 CMS-HCC model, the Neuro disease group was expanded to twelve payment HCCs. There are 200 ICD-10 payment diagnosis codes in the neurological disease group. Codes in the current 2020 CMS-HCC payment HCC 75 *Myasthenia Gravis/Myoneural Disorders and Guillain-Barre Syndrome/Inflammatory and Toxic Neuropathy* were reconfigured into 2024 CMS-HCC model HCCs 193-196. First, the most underpredicted and chronic codes were pulled out into new payment HCC 193 *Chronic Inflammatory Demyelinating Polyneuritis and Multifocal Motor Neuropathy*. The acute Guillain-Barre Syndrome became non-payment HCC 194 in the 2024 model; costs associated with this HCC are predicted reasonably well without being in the payment model, and this diagnosis will transition to HCC 193 if it becomes long-lasting/chronic. Myasthenia gravis codes were reconfigured into two payment 2024 CMS-HCC model HCCs based on clinical severity and cost differences: HCC 195 *Myasthenia Gravis with (Acute) Exacerbation*; and HCC 196 *Myasthenia Gravis without (Acute) Exacerbation and Other Myoneural Disorders*. In the 2024 CMS-HCC model,

---

[16] The Rx Hierarchical Condition Categories (RxHCC) model is used in Medicare Part D risk adjustment. https://www.cms.gov/files/document/2023-announcement.pdf.

nonpayment HCC 203 *Polyneuropathy, Mononeuropathy, and Other Neurological Conditions/Injuries* remains parallel to the 2020 CMS-HCC model nonpayment HCC 81, with the addition of several clinically related codes determined not appropriate for the payment model on empirical, clinical, or coding specificity grounds (narcolepsy and cataplexy, drug-induced and other polyneuropathies, neuromyopathy and central nervous system atrophy).

- Diabetes
  - There are three payment HCCs in the 2020 CMS-HCC model Diabetes disease group. The 2024 CMS-HCC model HCC classification has four payment diabetes HCCs, as HCC 35 *Pancreas Transplant Status* was added to the top of the hierarchy. There continue to be three 2024 CMS-HCC model payment HCCs for diabetes with/without complication, with minor differences in code content compared to the payment HCCs in 2020 CMS-HCC model. There are 344 ICD-10 payment diagnosis codes in the diabetes disease group. In consultation with clinicians, the diagnosis codes for diabetes with unspecified complications and with complications related to glycemic (i.e., blood sugar) control were moved to the lowest payment HCC, 2024 CMS-HCC model HCC 38. This was due to empirical data regarding coding frequency, as well as clinical considerations (high blood sugar is the defining characteristic of diabetes, and thus is inherent to the disorder rather than a complication). Glycemic complications can be acute, side effects of drug therapy, and of less serious magnitude than complications related to other disease groups that remain in the 2024 CMS-HCC model HCC 37 *Diabetes with Chronic Complications*, and could also be associated with poorer quality of care (poor glycemic control). Severe acute complications related to glycemic control (e.g., E11641 *Type 2 diabetes mellitus with hypoglycemia with coma*) remain in the highest HCC, 2024 CMS-HCC 36. Some drug induced diabetes codes were re-mapped to a non-payment HCC because the conditions can be temporary/reversible, variable cost profile, and the removal allows costs to be attributed to conditions that represent the underlying health status.

- Kidney Disease
  - There are five payment HCCs in the current 2020 CMS-HCC model Kidney disease group. In the 2024 CMS-HCC model, there are four payment Kidney HCCs. There is a straight hierarchy between the payment HCCs. There are 9 ICD-10 payment diagnosis codes in the kidney disease group. The kidney hierarchy relies on the chronic kidney disease (CKD) stages to define the payment HCCs. In the 2024 CMS-HCC model, the 2020 CMS-HCC model HCC 138 was replaced with two new, more granular HCCs – 328 *Chronic Kidney Disease, Moderate (Stage 3B)* and 329 *Chronic Kidney Disease, Moderate (Stage 3, Except 3B)* – due to new FY2021 ICD-10 codes that split the broad range of Glomerular Filtration Rate (GFRs) in stage 3 into 3a, 3b, or 3 unspecified. There is a specified (a priori) constraint setting HCCs 328 and 329 coefficients equal, so stage 3

will continue to have a single payment coefficient until there is sufficient data in later years to distinguish, estimate, and evaluate separate coefficients for HCCs 328 and 329 in future model updates. The HCC-level split-out is parallel to the Part D V08 RxHCC reclassification that was implemented for CY 2023, and provides future flexibility to reconsider the constraint at the point when underlying data that includes the separate codes for CKD stages 3a and 3b is used for a recalibration. Due to clinical considerations, the 2020 CMS-HCC model HCCs 134 and 135, renumbered as HCC 324 *Dialysis Status* and HCC 325 *Acute Kidney Failure* in the 2024 CMS-HCC model, were removed from the payment model and hierarchy. HCC 324 *Dialysis Status* captures transitory dialysis, and the removal from payment allows the costs to flow through to actual conditions that created the need for dialysis, such as congestive heart failure or sepsis. If dialysis is chronic, the beneficiary will attain ESRD status and be moved to risk scores calculated using the ESRD model. HCC 325 *Acute Kidney Injury* (AKI) is also by definition transitory. Beneficiaries without transitory disease should receive a CKD diagnosis. If CKD stage 3 or above (moderate or severe) develops, it will be captured in the payment model through the CKD HCCs.

- Psychiatric Diseases (Diagnoses related to Schizophrenia, Psychosis, Personality Disorders, Bipolar Disorders and Major Depression)
  - There are four payment HCCs in the 2020 CMS-HCC model Psychiatric disease group. The 2024 CMS-HCC model Psychiatric disease group was expanded to five payment HCCs, which remain in a straight hierarchy. There are 438 ICD-10 payment diagnosis codes in the psychiatric disease group. The top HCC – renumbered from 2020 CMS-HCC model HCC 57 to 2024 CMS-HCC model HCC 151 *Schizophrenia* – remains unchanged. The 2020 CMS-HCC model HCC 58 (*Reactive and Unspecified Psychosis*) was reconfigured as 2024 CMS-HCC model HCC 152 *Psychosis, Except Schizophrenia*. Several conditions – delusional disorders, manic and depressive (bipolar) disorders, severe, with psychotic behavior, and major depressive disorder, severe, with psychotic features – were moved out of the HCC 59 in the 2020 CMS-HCC (current) model into HCC 152 in the 2024 CMS-HCC model because costs for beneficiaries with these conditions were underpredicted in the 2020 CMS-HCC model depression HCC 59 and are clinically consistent with non-schizophrenic psychosis. The 2024 CMS-HCC model HCC 153 *Personality Disorders; Anorexia/Bulimia Nervosa*, was reconfigured from 2020 CMS-HCC model HCC 60. Personality disorders were moved up above non-psychotic depression/bipolar disorders in the reclassified Psychiatric hierarchy because of their higher associated prospective costs. Consulting clinicians supported this reorganization as it is reflective of care practices associated with the conditions. Diagnosis codes for anorexia/bulimia nervosa were moved into 2024 CMS-HCC model HCC 153 (a payment HCC) based on empirical underprediction in a non-payment 2020 CMS-HCC and consulting clinicians' input that these conditions have prospective cost

implications since they require specialized treatment and frequent institutionalization. The subsequent two payment 2024 CMS-HCC model HCCs (154-155) relate to depression and bipolar disorders. The 2020 CMS-HCC model HCC 59 *Major Depressive, Bipolar, and Paranoid Disorders* was reconfigured. In addition to the codes specifying psychosis that were moved up to 2024 CMS-HCC model HCC 152, only select other codes from the 2020 CMS-HCC model HCC 59 were retained as codes used in risk adjustment payment, in the 2024 CMS-HCC model HCC 154 *Bipolar Disorders without Psychosis* and HCC 155 *Major Depression, Moderate or Severe, without Psychosis.* Bipolar disorder was split out as HCC 154 to reflect the greater clinical severity compared to depression, which it hierarchically excludes. As discussed in the "Clinical Update using ICD-10 Diagnosis Code" section of the 2024 Advance Notice, the reclassification was guided by the longstanding 10 risk adjustment principles, including that diagnoses in the payment model be clinically meaningful (well specified) and should reliably predict costs in a future year. As such, diagnoses for mild, unspecified, remission, subsequent encounter, and sequela codes were re-mapped to appropriate non-payment HCCs. For depression, the 2024 CMS-HCC payment model is limited to ICD-10 codes specifying moderate or severe major depression. Remaining diagnosis codes (includes depression codes for mild, unspecified, or in remission, as well as codes for bipolar disorders in remission) from the 2020 CMS-HCC model HCC 59 were remapped to the nonpayment depression HCC. These codes represent less-severe conditions with lower cost implications, and clinicians expected depression would be coded as moderate or severe if the condition was sufficiently serious. Similarly, codes specifying in remission were removed as beneficiaries experiencing relapse would likely be coded with a diagnosis reflecting an active disorder. Diagnosis codes from the 2020 CMS-HCC model HCC 59 that specify subsequent encounter for or sequela of attempted suicide/intentional self-harm, were removed from payment, consistent with the removal of most subsequent encounter and sequelae codes throughout the reclassified 2024 CMS-HCC model. This accounted for the majority of codes from 2020 CMS-HCC model HCC 59 that were removed from payment in the 2024 CMS-HCC model (>95%).These codes were remapped to the nonpayment External Causes of Morbidity and Injury disease groups, as subsequent encounter codes require less intensive follow-up, and sequela codes are for unspecified late effects of a condition, which are variable in clinical burden and can be acute, and do not reliably or consistently predict meaningful prospective costs. (The specific condition that is a sequela should be coded separately, and could enter the payment model on that basis.) As identified in the underlying ICD-10 diagnosis to HCC mappings CMS released with the 2024 Advance Notice, the initial encounter diagnosis codes for attempted suicide/intentional self-harm conditions that are being actively treated and predict ongoing and prospective costs still map to payment HCCs.

- Musculoskeletal Diseases (Diagnoses related to rheumatoid arthritis and connective tissues).

- There are two payment HCCs in the current 2020 CMS-HCC model Musculoskeletal (MSK) disease group. There are three payment HCCs in the 2024 CMS-HCC model MSK disease group. There are 1,187 ICD-10 payment diagnosis codes in the musculoskeletal disease group. The 2020 CMS-HCC model HCC 40 was split into 2024 CMS-HCC model HCC 93 Rheumatoid Arthritis and Other Specified Inflammatory Rheumatic Disorders and HCC 94 Systemic Lupus Erythematosus and Other Specified Systemic Connective Tissue Disorders according to the underlying expenditures associated with these conditions. In consultation with clinicians the conditions were split rather than combined as they vary in chronicity, severity, and progression. HCC 93 hierarchically excludes HCC 94 so a beneficiary may receive at most one of these two HCCs. Underpredicted codes (i.e., diagnoses where the model underpredicts costs for beneficiaries with the condition) were moved from the 2020 CMS-HCC model nonpayment Neuro (inclusion body myositis) and MSK HCCs (sarcoid arthropathy and sarcoid myositis) to the payment HCC 93 in the 2024 CMS-HCC model to improve prediction and enhance clinical coherence (i.e., grouping diagnoses that are clinically similar). Clinically relevant, cost-similar codes were moved from a payment 2020 CMS-HCC model Vascular HCC into 2024 CMS-HCC model HCC 94 (other and unspecified necrotizing vasculopathies). Conditions (e.g., polymyalgia rheumatic, sacroiliitis, and Sicca (Sjogren's) syndrome) that were overpredicted (i.e., the mode overpredicted costs for beneficiaries with these conditions) were moved to a non-payment HCC based on input from consulting clinicians. For example, Sicca syndrome and sacroiliitis are localized, whereas other conditions from the 2020 CMS-HCC model HCC 40 are systemic, and treatment for these conditions is symptom-driven (e.g., eye drops or sucking candy for Sicca) and unlikely to be associated with prospective costs. Polymyalgia rheumatica can be clinically variable, is often treated by medications, and is likely to be picked up by other diagnosis codes in severe cases.

In summary, the CMS-HCC reclassification involved revising condition categories – including adding, deleting, and reconfiguring categories and clinical hierarchies, and freshly considering which categories are included in the payment model. The goal was to improve predictive ability, to better account for current disease patterns, treatment methods and costs, and diagnosis and coding practices. The resulting model classifies the ~74,000 ICD-10-CM codes into 266 CMS-HCCs, 115 of which are included in the 2024 CMS-HCC payment model. This increase in condition categories from the current 2020 CMS-HCC model (204 CMS-HCCs; 86 in payment) is due to the greater level of detail in ICD-10-CM diagnosis codes, allowing for the development of HCCs with increased clinical specificity and validity that better capture clinical and cost differences between conditions. In aggregate, the 2024 CMS-HCC model contains approximately 20 percent fewer ICD-10-CM codes than the 2020 CMS-HCC model. This resulted from the removal of diagnoses in accordance with CMS' risk adjustment principles, evaluated based on (1) empirical data including frequency, sample size, associated expenditures (e.g., overpredicted under the current model HCC); (2) clinical specificity and salience; (3) reliability to predict

prospective costs (including conditions that represent side effects of medical or drug treatment rather than underlying health status risk); and (4) variable diagnosis or reporting (based on empirical evidence or clinical input). Table III-3 below provides additional information on the underlying diagnosis code counts for the current 2020 CMS-HCC model and the 2024 CMS-HCC model.

**Table III-3 Summary Statistics for the 2020 CMS-HCC and 2024 CMS-HCC Classifications**

| | 2020 CMS-HCC Model | 2024 CMS-HCC Model |
|---|---|---|
| **FY22/23 ICD-10 codes - total** | 73,926* | 73,926* |
| **FY22/23 ICD-10 codes mapped to payment HCCs** | 9,797 (13.3%) | 7,770 (10.5%) |
| **FY22/23 ICD-10 codes mapped to non-payment HCCs** | 64,129 (86.7%) | 66,156 (89.5%) |
| Added | | 209 |
| No longer mapped in the 2024 CMS-HCC Model | | 2,236 |
| No longer mapped – ICD-10 clinical updates | | 2,161 (96.6%) |
| No longer mapped – Principle-10 focused updates | | 75 (3.4%) |
| **HCCs - total** | 204 | 266 |
| HCCs – payment | 86 (42.2%) | 115 (43.2%) |
| HCCs – non-payment | 118 (57.8%) | 151 (56.8%) |

* The total number of ICD-10 diagnosis codes varies by fiscal year.

Comment: A few commenters stated concerns that the Fact Sheet released with the Advance Notice did not discuss the methodology, assumptions, and data used for developing the MA risk score trend. A commenter believed that not providing this additional context may lead to confusion, misinterpretation, and possibly false conclusion about the impact of the risk score trend on MA payments. Commenters requested that CMS include the methodological details behind the MA risk score trend.

Response: Each year, CMS releases an associated Fact Sheet that shows the year-to-year percentage change in payment associated with the proposed (in the Advance Notice) or finalized (in the Rate Announcement) policies. The Fact Sheet shows the overall average impact on MA revenue, as well as the average impact of each individual update or policy proposal. As part of the impacts released in the Fact Sheet, CMS also estimates the average growth of MA risk scores in the payment year, known as the MA risk score trend. The MA risk score trend is the average increase in risk scores, not accounting for normalization and the MA coding pattern adjustment (which are included separately). The MA risk score trend is included in the Fact Sheet because it has direct bearing on MA payments and the MA revenue picture would be incomplete without it.

CMS calculates the MA risk score trend by calculating MA risk scores over three prior years, then calculating the average annual change in risk scores across those three years. All three years of risk scores are calculated using the risk adjustment model(s) to be used in the upcoming

payment year. This average annual change is the MA risk score trend provided in the Advance Notice and Rate Announcement Fact Sheet. The trend is an industry average and individual plans' experience will vary.

Note that the MA risk score trend has a separate impact from the impact of the risk adjustment model, which is represented in a separate row of the Fact Sheet, and is based on risk score changes where the underlying data is held steady. Specifically, to measure the risk adjustment model impact CMS uses the same diagnostic and demographic information run through the current model and the model(s) for the upcoming payment years (e.g., 2020 diagnoses were used to calculate 2021 risk scores under each model to calculate the risk adjustment model impact in the Fact Sheet). The difference between the current model and payment year model(s) risk scores, accounting for differences in normalization, is represented in the risk adjustment model impact and normalization row.

By including both the risk adjustment model/normalization impact and the MA risk score trend in the Fact Sheet, the resulting impact is effectively estimating a year-over-year payment impact if diagnostic and demographic data are held steady, then further accounting for growth in risk scores in the payment year based on historical experience. Therefore, it is imperative to consider the MA risk score trend in concert with the impact of risk adjustment policy proposals to accurately predict payment impacts in the following year.

It is important to note that every model has its own risk score trend. The current model used for payment in CY 2023 (the 2020 risk adjustment model) has a risk score trend of 5%. Because we are blending risk scores from the updated 2024 model with risk scores from the current 2020 model, the effective MA risk score trend of 4.44% is in the Fact Sheet for the CY 2024 Rate Announcement. This means that though we anticipate an increase in risk scores based on the diagnoses submitted by plans, the impact on payment is anticipated to be less in the updated model.

Comment: Many commenters expressed concern that the updated model may have a negative impact on certain beneficiary populations, locations, and plan types. Multiple commenters believed that the diabetes changes and model changes where diagnoses are no longer included for payment will have a negative impact on dually eligible beneficiaries and vulnerable populations (e.g., minority beneficiaries and those under the federal poverty level), or beneficiaries in urban or rural areas.

Multiple commenters expressed concerns about the model's impacts on plans with high enrollment of dually eligible beneficiaries, and high-risk, chronically complex vulnerable populations (e.g., Special Needs Plans that serve dually eligible beneficiaries (D-SNPs) or beneficiaries with certain chronic diseases (C-SNPs). Multiple commenters stated that minorities and people with low incomes make up a larger share of MA enrollees than they do in FFS, and that the proposed model will more negatively affect them. Commenters expressed concern about

the implication for benefits that SNP beneficiaries have, such as greater access to supplemental benefits, and stated that, according to their research, the proposed model will have a more negative impact on D-SNPs and C-SNPs, therefore negatively impacting the beneficiaries' access to these benefits. Commenters also expressed concern that the negative impact of the proposed model may disincentivize MA plans from offering C-SNPs. A few commenters believed the updated model will also negatively impact employer-group waiver plans (EGWPs) with a commenter noting the inability for EGWPs to adjust bids in response to potentially lower risk scores.

Response: The updates improve the accuracy of the risk adjustment model and help ensure that higher payments are available to plans that serve beneficiaries with more costly health care needs (refer to the predictive accuracy information provided above). Additionally, the updates do not change features in the CMS-HCC risk adjustment model, first implemented in 2017, that ensure dually eligible beneficiaries have unique adjustments for every health condition based on their dual-eligibility status that result in higher payments for those conditions than non-duals. The updates also do not alter changes first implemented in 2020 that ensure that plans receive an additional increase in payment based on the number of conditions the beneficiary has.

As previously discussed in this Rate Announcement, conditions in the model are used as predictors of relative costs, not as direct reimbursement for the treatment of each condition. Plan bids project the average revenue needed to cover all Part A and B benefits, and the risk score is used to assess the relative cost of a plan's enrollee population. Further, it is the total risk score that predicts the relative cost of a beneficiary, and each factor predicts part of the costs; therefore, each relative factor cannot be assessed in isolation. If a specific HCC (or diagnosis code mapped to a specific HCC) is no longer included in the payment model, coefficients of other HCCs and demographic factors will be increased such that the model continues to predict the overall total expenditures (please see above for a discussion of the model's predictive accuracy over subgroups of beneficiaries by level of risk). Because the updated model improves upon the current model by incorporating recent costs and utilization patterns and is developed using ICD-10 codes, and because the model ensures that plans that enroll higher need beneficiaries receive higher payments, we do not agree that the updated model will negatively affect beneficiary costs or supplemental benefits, and care delivery (see also response to comments above).

There will be variation in the impact on risk scores depending on each beneficiary's clinical mix. All of the model updates (i.e., underlying data updates, denominator update, and ICD-10 reclassification) contribute to changes in the relative costs of conditions compared to the 2020 CMS- HCC model currently used, and therefore changes to the resulting risk scores. Beneficiary risk scores or plan average risk scores may change depending on an individual beneficiary's combination of diagnoses or the clinical profile of a plan's enrollee population. CMS has observed that, on average, predicted risk for dually-eligible populations and those in special needs plans are higher than non-dually-eligible enrolled beneficiaries. On average, under the new

CY 2024 risk adjustment model, risk scores for special needs plans (SNPs) are 50% higher than non-SNPs. More specifically, risk scores for C-SNPs and D-SNPs are, respectively, 54% and 47% higher than non-SNP beneficiaries. Risk scores, under the 2024 updated model, for dually-eligible beneficiaries in the community are on average 49% higher compared to non-dually eligible beneficiaries in the community. While risk scores change in reflection of the underlying changes in the relative factors associated with each condition, on average, the model continues to predict higher risk for dually-eligible and SNP enrolled beneficiaries.

In addition, as we did at an industry level, CMS calculated the MA risk score trend for dually-eligible beneficiaries (i.e., full-dual and partial-dual beneficiaries residing in the community) and found that the MA risk score trend for these dually eligible beneficiaries is 4.67 percentage points higher than it is for non-dually eligible beneficiaries. As explained in detail in a later response, the risk score trend represents the average growth in MA risk scores for the payment year. As discussed in more detail in a later response in this section, it is imperative to consider the MA risk score trend in concert with the impact of the updated risk adjustment model (as well as other changes to payment factors) to accurately predict payment impacts in the following year. On average, this growth in MA risk scores will more than offset the impact of the new risk adjustment model and normalization for dually-eligible beneficiaries.

Comment: Commenters stated concern with the CMS review of conditions that focused on Principle 10 – Discretionary diagnostic categories should be excluded from payment models.

Some commenters noted that removal or constraining of conditions described under Principle 10 may exacerbate health inequities, constrain investments in prevention of severe conditions, and limit the prevention of subsequent medical events.

Some commenters stated they are supportive of CMS' decision to update the risk adjustment model based on more current underlying data, updating the denominator, and some clinical revisions based on ICD-10, but were specifically opposed to the clinical revisions made under Principle 10.

Commenters believed that CMS has not released adequate data underlying its determination to constrain the coefficients for the diabetes and congestive heart failure HCCs. Multiple commenters stated that CMS does not explain why imposing constraints on these conditions helps the predictive value of the model. Some commenters believed that the constraining of the coefficients for the diabetes HCCs in the updated model would delay diagnosis for diabetics and lead to serious complications by lowering early detection.

Multiple commenters suggested that the removal of the conditions angina pectoris, protein-calorie malnutrition, and atherosclerosis with intermittent claudication will also affect the ability to conduct further clinical investigation and intervention. Some of the commenters believed that the Principle 10-based changes are not clinically appropriate and do not accurately reflect beneficiary acuity or cost of care. A commenter stated beneficiaries with angina pectoris incur

more than twice the expenditures of a typical Medicare beneficiary and four times the hospital costs. A few commenters, citing their clinical experience, oppose removing angina pectoris and atherosclerosis of lower extremities with intermittent claudication from the updated model because these conditions can help with early identification and prevention of more serious conditions such as fatal cardiovascular disease. A few commenters expressed concern that removing protein-calorie malnutrition from the model, which can indicate frailty, will also adversely affect institutional level of care of enrollees and beneficiaries with HIV/AIDS. Multiple commenters cited internal analysis stating vulnerable populations and minority communities have higher prevalence rates of conditions identified in Principle 10.

<u>Response</u>: CMS appreciates the feedback and concerns of the commenters.

As described in the 2024 Advance Notice, for conditions in the model where coding in MA was highest relative to FFS, CMS reviewed these conditions with our clinical experts for evaluation against the model principles because we believe that this coding differential indicates conditions where there may be discretionary coding variation. The review is consistent with our evaluation of condition categories, and the underlying ICD-10 diagnosis code to HCC mappings, against risk adjustment model development Principle 10. In consultation with clinician input regarding appropriate classification of identified conditions, this reclassification involved moving some discretionary diagnosis codes from condition categories included in the CMS-HCC model to condition categories not included in the model, removing from the model several condition categories that do not accurately predict the projected cost of a beneficiary, and constraining HCCs to be equal to each other so that they carry the same weight in the risk score. These updates serve to maintain the integrity of the condition categories in the model.

CMS approached the inherent tradeoffs involved in designing a classification system using empirical evidence on frequencies and predictive power, clinical input on relatedness, specificity, and severity of diagnoses, and professional judgment on incentives and diagnostic patterns relative to the classification system. Plans with an atypical distribution in their patient population may experience varying risk scores impacts; however, the actual change in risk score of any beneficiary with one or more of the conditions described below will depend on the totality of their risk profile, including their demographic factors and other diagnoses.

- *HCC constraints (i.e., hold the coefficients of the HCCs equal to each other such that each HCC carries the same weight):*
    - Constrained all Diabetes HCCs (HCC 36, 37, and 38). In the current 2020 CMS-HCC model the top two diabetes HCCs, 17 and 18, are constrained. When developing the 2024 CMS-HCC model, empirical data showed that the 2020 CMS-HCC model HCC 18 had a substantially higher prevalence in MA than FFS and HCC 19 had a lower prevalence; the shift of beneficiaries to a higher HCC in the hierarchy led to further evaluation of the HCCs. Under the clinical criteria used to code HCC 18, beneficiaries with a range of

clinical burden and medical expenditures may be captured in the diabetes with chronic complications HCC resulting in a diminished capacity for the model to differentiate between disease severity. For example, there may be instances where a beneficiary is coded with the more severe manifestation of diabetes based on a laboratory finding (e.g., automated urinalysis test that finds protein in the urine) even if the finding is not clinically significant and has no implications for medical treatment. Thus, the constraint was expanded to all three diabetes payment HCCs in the 2024 CMS-HCC model. Constraining the Diabetes HCCs allows expenditures to be attributed to well defined and significant complications of diabetes captured in other payment HCCs (e.g., chronic kidney disease and diabetic eye disease).

- Constrained Congestive Heart Failure HCCs (HCCs 224, 225, and 226). In the 2020 CMS-HCC model, all Congestive Heart Failure diagnoses are effectively constrained because they are included in a single Congestive Heart Failure HCC. In the 2024 CMS-HCC model in consultation with clinicians the single Congestive Heart Failure HCC was split into five HCCs to better capture the range of heart failure severity. The most severe manifestation is left unconstrained, while the less severe split outs of the HCC are constrained, effectively holding them together as they were under the 2020 CMS-HCC model while CMS continues to observe clinical variation, coding, and cost patterns for these HCCs. The newly split out HCC 227 *Cardiomyopathy/Myocarditis* is not constrained, but is hierarchically excluded by the heart transplant/failure HCCs 221-226.

- *HCC removals:*

  - HCC 47 *Protein-Calorie Malnutrition*. The current 2020 CMS-HCC model includes a single marker (HCC 21) for Protein-Calorie Malnutrition. Empirical data shows that MA reports severe malnutrition at a lower rate than FFS, moderate malnutrition at a slightly higher rate, and mild and unspecified malnutrition and cachexia at a much higher rate. Clinically, the more severe manifestations of protein calorie malnutrition can be useful as a risk marker for frailty, severe illness, and late- or end-stage disease, and it is likely correlated with poverty/disadvantaged populations. CMS explored creating two HCCs to distinguish between severe malnutrition and diagnosis codes for mild, unspecified malnutrition, and cachexia. However, empirical data show that coding for malnutrition is variable. Removal of the HCC allows expenditures to flow to the well-specified underlying conditions (e.g., cancer and HIV).

  - HCC 230 *Angina Pectoris*. In the 2020 CMS-HCC model, HCC 88 *Angina Pectoris* is one of five payment HCCs in the Heart disease group. It is at the bottom of a payment hierarchy with HCC 87 *Unstable Angina and Other Acute Ischemic Heart Disease* and HCC 86 *Acute Myocardial Infarction.* In the 2024 CMS-HCC model the Unstable Angina and Other Acute Ischemic Heart Disease HCC is in the payment model. Clinicians and empirical data support that unstable angina (HCC 87) has specific

diagnostic criteria, whereas angina pectoris has diagnostic criteria that can result in coding in situations with little or no significance (e.g., patients exhibiting only chest pain may receive this diagnosis) and diagnosis and coding may be variable. Therefore, unstable angina is maintained in the 2024 payment model, while the more variable manifestation is now mapped to a non-payment HCC.

- HCC 265 *Atherosclerosis of Arteries of the Extremities, with Intermittent Claudication*. The Vascular HCC group was restructured (as described above). In consultation with clinicians, payment codes are focused on peripheral arterial atherosclerosis with ulceration, gangrene, or rest pain, as these codes indicate more severe manifestations. The clinical characteristics of intermittent claudication are variable, with some patients unaware they have the condition in the absence of screening. Therefore, the variation in coding and clinical implications of this HCC suggest it is not a reliable predictor of prospective medical expenditures.

Comment: A few commenters stated that CMS is inappropriately reliant on Principle 10 in adopting changes to make the model more resistant to variable coding. The commenters requested that CMS provide more transparency on the clinically specific areas impacted by the Principle 10 updates. A few commenters stated that CMS did not indicate the extent to which the agency weighted the tenth principle against the other nine. Multiple commenters stated that CMS did not provide transparency explaining the tradeoffs and inter-relatedness between Principle 10 and other principles. Specifically:

- A few commenters stated that removing diagnosis codes from the model reduces predictive power and violates Principle 2 (Diagnostic categories should predict medical expenditures).
- One of the commenters believed CMS constraining diabetes and other conditions goes against the intent of Principle 4 (In creating an individual's clinical profile, hierarchies should be used to characterize the person's illness level within each disease process, while the effects of unrelated disease processes accumulate).
- A commenter stated CMS' updated model violates Principle 5 (The diagnostic classification should encourage specific coding) by paying unspecified diagnoses at the same rate as conditions with severe acute complications, which does not encourage specific coding.
- A commenter stated the Advance Notice does not fully articulate the various approaches considered by CMS in shifting ICD codes to different clinical categories in violation of Principle 9 (The diagnostic classification should assign all ICD-9-CM and ICD-10-CM codes (exhaustive classification)).

Response: CMS appreciates the feedback and concerns of the commenters.

In rebuilding the diagnostic classification for the 2024 CMS-HCC risk adjustment model, Principles 7 (monotonicity), 8 (transitivity), and 9 (exhaustive classification) were followed. For example, if the expenditure weights for the model did not originally satisfy monotonicity,

constraints were imposed to create a model that did. Empirical data and clinical assessment were used to make tradeoffs among other principles. For example, clinical meaningfulness (Principle 1) is often best served by creating a very large number of detailed clinical groupings. But a large number of groupings must be balanced with adequate sample sizes for each category (Principle 3). Another tradeoff is encouraging specific coding (Principle 5) versus predictive power (Principle 2). In ICD-10 there are a number of nonspecific codes. If all of the HCCs these codes are mapped to are included for payment, the relative cost associated with them would be marginal and less meaningful. The inclusion of HCCs and associated diagnoses must be balanced with maintaining or improving the predictive power of the model. CMS approached the inherent tradeoffs involved in designing a classification system using empirical evidence on the frequency of medical conditions in MA compared to FFS, predictive power, clinical assessment on relatedness, specificity, and severity of diagnoses, and professional judgment on incentives and likely provider responses to the classification system. In developing the 2024 CMS-HCC model, CMS balanced these competing goals to achieve a risk adjustment model that would result in payments to MA plans that fairly compensate for the higher costs of sicker enrollees while paying less for healthier enrollees at an aggregate level.

Comment: A commenter believed CMS may have inadvertently introduced bias in the updated model by only focusing on the coding frequency of diagnoses in MA compared to FFS for the determination to exclude or include particular diagnoses based on Principle 10. The commenter recommended CMS either also consider comorbidity in the MA population compared to FFS, not consider the relative frequency of coding in MA compared to FFS, or find ways to include incentives for providers not currently in risk arrangements to screen and treat at the same rates as seen in MA.

Response: We respectfully disagree with the commenter that Principle 10-focused clinical updates made to the updated risk adjustment model only focused on reviewing the coding frequency of diagnoses in MA compared to FFS. As explained in the 2024 Advance Notice (at 47), "[f]or conditions in the model where coding in MA was highest relative to FFS, CMS reviewed these conditions with our clinical experts for evaluation against the model principles because we believe that this coding differential indicates conditions where there may be discretionary coding variation." Also, as stated above, CMS approached the inherent tradeoffs involved in designing a classification system using empirical evidence on frequencies, predictive power, clinical input on relatedness, specificity, and severity of diagnoses, and professional judgment on incentives and diagnostic patterns relative to the classification system.

Comment: Some commenters stated their belief that CMS is incorrect in our analysis of the impact of the model and that their analysis indicates the model to have a more negative impact ranging between -3.4 to -3.7% over the whole industry.

Response: We respectfully disagree with commenters. The industry average calculated by CMS takes into account the change in risk scores compared to the current risk adjustment model and

the updated risk adjustment model, and necessarily takes into account normalization. As with every update of the risk adjustment model, the impact on each plan can vary, depending on the clinical profiles of their enrollees.

Comment: A few commenters stated their concern about the impact of the proposed model on Puerto Rico. All of these commenters stated that the proposed model will have the largest negative effect on Puerto Rico due to the territory's very high MA penetration, poverty levels, and higher than national average prevalence rates for diabetes, mental health disorders, and congestive heart failure. A commenter inquired if CMS evaluated how the impact correlates to certain metrics like geography and/or evaluate the impact based on the ADI.

Response: The CMS-HCC model is a national model, including large subgroup segments that capture national variation in costs between the segmented populations. The goal of risk adjusted payments is to pay accurately using the appropriate relative risk for a beneficiary. There will be variation in the impact on risk scores depending on each beneficiary's clinical mix. All of the model updates (i.e., underlying data updates, denominator update, and ICD-10 reclassification) contribute to changes in the relative costs of conditions, and therefore changes to the resulting risk scores. Beneficiary risk scores or plan average risk scores may change depending individual beneficiary's combination of diagnoses or the clinical profile of a plan's enrollee population.

As discussed above, the updated model improves predictive accuracy and helps ensure that higher payments are available to plans that serve beneficiaries with greater health care needs (refer to the predictive accuracy information provided above). Conditions in the model are used as predictors of relative costs, not as direct reimbursement for each condition. As intended, the model ensures that plans that enroll higher need beneficiaries receive higher payments, and, therefore, we do not agree that the updated model will disproportionately negatively affect beneficiaries depending on their region.

We understand that geographically Puerto Rico has a high percentage of beneficiaries with risk scores calculated using the full benefit dual segment. A previously stated, CMS has observed that, on average, predicted risk for dually-eligible populations are higher than non-dually-eligible enrolled beneficiaries. As discussed above, the risk score trend for dually-eligible beneficiaries is higher than the trend for non-dually eligible beneficiaries. As noted in another response, the MA risk score trend (i.e., average growth in risk scores for the payment year) for dually eligible beneficiaries is 4.67 percentage points higher than it is for non-dually eligible beneficiaries and the risk score trend difference for Puerto Rico is even greater. As discussed in more detail in a later response in this section, it is imperative to consider the MA risk score trend in concert with the impact of risk adjustment policy proposals to accurately predict payment impacts in the following year. When the risk adjustment model/normalization and the MA risk score trend are taken into account, dually-eligible risk scores are less impacted by the risk adjustment changes. When considering payment, the full scope of contributing factors must be considered. MA plans submit bids to CMS that request the total revenue needed to cover the expected per beneficiary

costs of their enrollee population. The purpose of the model is to calculate risk scores (that are used in calculating payments made to plans) to take into account differences in expected costs for their enrollees and to increase or lower payment based on the relative expected costs. Risk adjustment is used to adjust plan bids and calculate payments based on health status and demographic characteristics such that plans are paid more for beneficiaries predicted to have higher costs due to increased risk. Further, individual coefficients do not represent complete costs for expected expenditures related to a condition, but only the average increase in the overall predicted costs for a beneficiary with that condition relative to other conditions used for payment in the model. Rather, the total relative cost of a beneficiary, or a group of beneficiaries, is represented by the total risk score.

Comment: Commenters stated their concern that the proposed model will negatively impact providers engaged in value-based payment models. A commenter noted that many contracts between plans and their provider partners are based on existing risk models. The commenter noted the burden that exists by needing to revise these contracts. Some commenters believed the proposed model may result in physician organizations leaving MA for FFS. A few commenters noted that the proposed model's impact on the MA industry will negatively impact what they believe is a national provider shortage.

Response: CMS thanks the commenters for expressing their concerns. Per section 1854(a)(6)(B)(iii) of the Act, CMS is prohibited from interfering in payment arrangements between MA organizations and providers with which they contract by requiring specific price structures for payment. The purpose of the risk adjustment model is to predict the overall relative expected expenditures for beneficiaries for purposes of paying MA organizations accurately and fairly for the relative expected costs for the enrollees in their plans. MA organizations in turn develop provider networks and negotiate payment arrangements with participating providers for the delivery of covered services to enrollees.

MA organizations are contractually required to cover all Medicare Part A and Part B services (subject to limited exclusions), maintain adequate networks, and provide quality care. They are responsible for determining their own revenue needs to cover these services. An updated risk adjustment model is intended to more appropriately pay plans that are enrolling a sicker population. In paying plans a capitated payment, CMS contracts with MA organizations for them to provide coverage of – by furnishing, arranging for, or making payment for – these benefits. The nature of the MA program, by using capitated payments, allowing MA plans to use a portion of savings when they bid below the benchmark to furnish additional benefits, and transferring full financial risk to MA plans, incentivizes MA organizations to develop cost efficiencies in care provision. Reducing morbidity and mortality by catching early stages of disease in an inherent expectation of a capitated managed care system.

Section 1852 of the Act requires MA plans to cover Medicare Part A and B benefits (subject to limited exclusions) for their enrollees and that when the MA plan uses a network of providers

and limits coverage to those providers, the MA plan must ensure that covered benefits are available and accessible to enrollees. These changes in the CMS-HCC risk model used for risk adjusting payments to MA plans do not limit or change these requirements related to coverage. We expect that MA organizations will renegotiate or revise the payment arrangements they have with their contracted providers as necessary to ensure that the MA plan continues to make benefits available and accessible for enrollees.

The risk adjustment model is not intended to incentivize (or disincentivize) any particular care modality. This is illustrated by, for example, not weighting diagnoses by site of care. Another example is allowing costs to flow to demographic variables, which allows some portion of plan payments to be paid regardless of disease state and thereby provide funds for a wide range of prevention and intervention approaches, as well as to cover treatment of acute and lower-severity chronic conditions not included in the risk-adjustment model. Finally, and to reiterate, by using more recent data in calibrating the model, coefficients are recalculated, and conditions that might be relatively more costly than they were before will result in higher risk scores for beneficiaries with such conditions.

Comment: A few commenters stated their view that it is incorrect to determine that coding differences between MA and FFS are driven by inappropriate coding.

Response: Discretionary coding involves conditions that are diagnosed and coded inconsistently across providers and plans. Including conditions in the model where there is variation in their coding can lead to distortion of the marginal costs estimated by the model, reducing the ability of the HCCs in the model to predict stable costs and accurately predict those costs in alignment with the severity of the condition. Diagnosis codes that are subject to discretion are not necessarily or by definition an indication of inappropriate coding.

Comment: Some commenters recommended different methods for updating the CMS-HCC risk adjustment model, including making updates on a more regular basis, adding drug utilization to the model, using more sources of data (e.g., home health and skilled nursing facilities), using a concurrent model, and calibrating a model using MA encounter data. A number of commenters recommended social drivers be incorporated into the risk adjustment model. Some commenters offered recommendations on ways to improve the risk adjustment model by incorporating additional factors that could improve prediction of the relative costs of MA enrollees by accounting for social risks. Some commenters recommended CMS integrate all Z-codes, Z55 through Z65, into the HCC risk adjustment model. Other examples of recommendations for future risk adjustment models include:

- Aligning coding expectations between MA and FFS. This includes the FFS program rejecting claims until an appropriate diagnosis code is included;
- Adding a frailty measure to the risk adjustment model; and
- Applying a single coefficient to conditions with wide ranges of complexity.

Response: CMS thanks commenters for their suggestions and feedback on updating the CMS-HCC risk adjustment model. CMS is committed to ensuring the risk adjustment model continues to perform well in predicting relative risk.

Comment: Some commenters questioned if the updated risk adjustment model will affect lines of business outside of Medicare Advantage such as the ACO Reach and Medicare Shared Savings Program.

Response: The Medicare Shared Savings Program and certain CMMI models have incorporated the CMS-HCC risk adjustment model into their financial methodologies. CMS is considering the implications of these changes to the CMS-HCC risk adjustment model for these initiatives.

Comment: A few commenters recommended CMS consider the impact the updated model will have on one or multiple of the following areas: Health Provider Shortage Areas (HPSA), Medically Underserved Areas (MUA), high Area Deprivation Index (ADI) locations, high Social Vulnerability Index (SVI) locations, and/or Opportunity and Enterprise Zones.

Response: CMS thanks the commenters for their recommendations and feedback.

The CMS-HCC model is a national model, including large subgroup segments that capture national variation in costs between the segmented populations. The goal of risk adjusted payments is to pay accurately using the appropriate relative risk for a beneficiary. There will be variation in the impact on risk scores depending on each beneficiary's clinical mix. As previously discussed, the model is not intended for provider reimbursement at the service level. Therefore, the risk adjustment model should not have implications on provider availability. Regarding vulnerable populations, as previously stated the model is segmented by dual-eligible status and includes demographic variable to estimate relative risk. Risk scores for dual-eligible beneficiaries continue to be higher than non-duals on average.

Comment: A commenter wanted to know if the proposed model will use CY 2023 diagnosis codes.

Response: CMS will use the updated model to calculate risk scores for 2024 payment, using diagnoses codes from 2023 dates of service.

Comment: One commenter asked CMS to provide logic on the inclusion of some "P" and "Q" ICD-10 newborn codes within the proposed model.

Response: Certain P and Q codes were moved from nonpayment in the Newborn disease group to payment in condition-specific disease groups in the updated model. ICD-10 coding guidance specifies that they may be used regardless of age. P codes are for conditions that originate in the perinatal period, which may continue throughout a patient's life. Q codes are for congenital malformations, deformations, and chromosomal abnormalities, which although present at birth may not be identified until later in life. In the updated model, these codes are remapped for

clinical cohesion to the respective disease-related HCC in the body system, parallel to codes for the condition from other ICD-10 chapters (i.e., non-congenital forms, not originating in the perinatal period). Thus, these P and Q codes are added to the model if the condition warrants inclusion as payment.

Comment: A few commenters stated that CMS made a technical error in Attachment VI, Table VI-1 related to the Note on Neurology HCCs and disease interactions.

Response: These commenters are correct. The CY 2024 Advance Notice has a technical error in the table. Under footnote 2 of Attachment VI, Table VI-1, Neurological is defined as HCCs 108-192; HCCs 195-199, but it should state HCCs 180-192, 195, 196, 198, 199. This has been corrected in this document. We appreciate the commenters identifying this.

Comment: Several commenters stated either that the proposed risk adjustment model does not meet the actuarial equivalence requirement in Section 1853(a)(1)(c)(i) of the Social Security Act or were concerned that the proposed model did not meet the actuarial equivalence requirement based on the documentation provided in the Advance Notice. A commenter noted their belief that in order to fulfill its statutory mandate to ensure actuarial equivalence, CMS must only assess FFS treatment costs and associated diagnoses when updating the model used for MA payment, and that the use of other criteria, are not valid unless those changes improve the model's ability to predict FFS treatment cost. Commenters identified specific diagnoses that they stated were excluded from the proposed model, which they believe offers evidence that the proposed model violates this statutory requirement.

Response: Section 1853(a)(1)(c)(i) of the Social Security Act instructs CMS to adjust the payments made to MA organizations "for such risk factors as age, disability status, gender, institutional status, and such other factors as the Secretary determines to be appropriate, including adjustment for health status . . . so as to ensure actuarial equivalence." It also authorizes CMS to "add to, modify, or substitute for such adjustment factors [i.e., age, disability status, gender, etc.] if such changes will improve the determination of actuarial equivalence."

The 2024 CMS-HCC model satisfies the statutory requirement of actuarial equivalence because, within the limitations of such a model, it accurately predicts variations in cost, as discussed at length above. But the statute does not require CMS to show that every single change made from the previous CMS-HCC model improves its predictive accuracy. CMS retains the discretion and authority to design the 2024 CMS-HCC payment model so as to achieve actuarial equivalence, just as earlier payment models were designed to do. Those earlier payment models do not limit the scope of the Secretary's authority today.

The Balanced Budget Act of 1997, the initial statutory requirement to implement risk adjustment based on health status in the MA program, directed the Secretary to implement a risk adjustment methodology that accounts for variations in per capita costs based on health status and other demographic factors no later than January 1, 2000. As required by 1853(a)(3)(A), the risk

adjustment methodology was to be submitted to Congress in a report that included an evaluation of the method by an outside, independent actuary of the actuarial soundness of the proposal. The report that was submitted to Congress in 1999 provided a foundation for the ten principles that were expanded on in a 2000 report to Congress that CMS still uses today to guide risk adjustment model development.[17] Each iteration of the risk adjustment model, including the 2024 CMS-HCC model, has maintained or improved upon the previous payment model's ability to predict variation in per capita spending across key subgroups of beneficiaries.[18]

CMS is obligated to release a report to Congress every three years with information on how revisions to the risk adjustment model impact the predictive ratios for groups of enrollees in MA plans by predicted cost and groups defined by the number of chronic conditions of enrollees. Because CMS has not uniformly collected cost information for beneficiaries enrolled in the MA program, the report is developed with data on Medicare FFS enrollees, which are the same data used to calibrate the model. The next report will be released with findings from the 2024 CMS-HCC model in 2024. In response to comments from stakeholders, predictive ratios are provided for the 2024 CMS-HCC model overall on page 72 and by model segment in Attachment VIII Tables VIII-5 to VIII-11.

One commenter wrongly asserts that "under the policies proposed in the Advance Notice, CMS would fail to satisfy its obligation to ensure actuarial equivalence, as the proposed model does not appear to be based on an assessment of FFS costs in order to generate appropriate coefficients to support appropriate MA payments." The 2024 CMS-HCC model does account for FFS cost to generate appropriate coefficients. Per-capita payments to MA plans reflect the relative cost experience in Medicare FFS for a beneficiary population modeled by reference to demographics, diagnoses, and other factors CMS selects. As discussed above, the 2024 CMS-HCC model accurately predicts variation in FFS costs.

One commenter implies that CMS must make decisions to update the risk adjustment model based only on "analysis of whether removing these codes will mean the model more accurately predicts costs associated with treating certain conditions in FFS" and erroneously claims that "In order to fulfill its statutory mandate to ensure actuarial equivalence, CMS must assess FFS treatment costs associated with diagnoses, not use of codes." The Secretary is provided discretion in how to adjust for health status. In addition, as discussed before, the risk adjustment model accurately predicts variation in per capita cost based on health status as intended. Diagnosis codes from claims or encounter data are used as a measure of health status to predict variation in cost because those data are the most practicable for developing and implementing a payment system at the scale required by the Medicare program. An individual diagnosis code or

[17] See 1999 Report to Congress: https://www.cms.gov/medicare/health-plans/medicareadvtgspecratestats/downloads/rtc_riskadjusters1999.pdf, and 2000 Report to Congress: Diagnostic Cost Group Hierarchical Condition Category Models for Medicare Risk Adjustment

[18] For example, see the December 2021 Report to Congress

HCC is not a sufficient, nor the only, indicator of a beneficiary's health status. CMS does not believe that the reference to health status in Section 1853(a)(1)(C)(i) requires CMS to adjust payments to MA organizations for the costs they incur for specific diagnoses on submitted claims or encounter data, in relation to FFS or otherwise. The predictive accuracy for a specific condition in the model is not a valid criterion on which to assess the model's actuarial equivalence because expected relative costs based on health status is ultimately measured by all conditions and factors in the model used to calculate risk scores.

The statute provides the Secretary discretion in how to account for health status when calculating payments that reflect the risk of the enrollee, and this extends to the individual HCCs included in the model. CMS follows the ten principles laid out in the 2000 Report to Congress to group diagnosis codes into HCCs and select which HCCs are included in the model.[19] These principles balance clinical considerations, such as creating clinically meaningful groupings of diagnoses and ensuring only well-specified diagnoses are included in the model, and the predictive accuracy of the model as measured by the ability of the model to predict accurately across groups of beneficiaries. As discussed throughout the Rate Announcement, the 2024 CMS-HCC model accurately predicts variation in expenditures (per capita cost) across groups of beneficiaries. There is no meaningful difference in the accuracy of each model for groups of beneficiaries by decile of predicted risk using the beneficiary sample specifically applicable to each model, CMS' standard measure of accuracy. However, when compared using the same beneficiary sample (i.e., 2019 beneficiaries, 2018 diagnoses) for both models, the 2024 CMS-HCC is more accurate by decile of predicted risk than the 2020 CMS-HCC model. The 2024 CMS-HCC model more accurately reflects MA plan's expected experience because it was developed with more recent data. In general, the model predicts higher expenditures for people who have higher actual predicted risk and less for people who have lower actual predicted risk. The model accurately predicts total expenditures regardless of whether or not a condition is included in the model. Spending associated with conditions not included in the model is allocated to other variables in the model, such as the demographic factors, count variables and conditions in the model associated with the removed conditions. To the extent that there are changes in the predicted risk for certain subgroups of beneficiaries, or beneficiaries with certain conditions, those changes can occur for multiple reasons. The model includes updates to the underlying data years, the denominator year, and reclassification for ICD-10. As such, relative changes are driven by more recent enrollment, treatment/utilization, and cost patterns, in addition to the reclassification.

If CMS were not paying MA organizations appropriately for the health status of the beneficiaries they enroll, many MA plans would not be competitive with the FFS program and enrollment would likely stagnate. The exact opposite has occurred. Analysis of CMS program statistics shows that between 2014 (the first year of the last major clinical revision to the risk adjustment model) and 2021, enrollment in MA grew by 70 percent whereas enrollment in FFS has declined

---

[19] 2000 Report to Congress: Diagnostic Cost Group Hierarchical Condition Category Models for Medicare Risk Adjustment.

by seven percent. Enrollment growth among beneficiaries who are dually enrolled in Medicare and Medicaid, who on average have higher medical cost and greater health needs, has also been higher, increasing by more than 125 percent from 2.7 million in 2014 to 6.1 million in 2021, whereas dual enrollment in FFS has declined by 22 percent from 7.2 million to 5.6 million. Dual eligible enrollees made up more than one in five (22.1 percent) of MA enrollees in 2021, similar to the proportion in FFS (19 percent). As enrollment in the program has grown, the number of organizations offering MA plans has increased, the number of plans offering supplemental rebates has increased, and plans are profitable. Over the last ten years (2014 – 2023) the average margin included in plan bids is 4.4 percent while the ratio of the average benchmark to the average plan bid to provide standard Medicare benefits has increased. In 2014, the adjusted benchmark was on average 114 percent of the standardized bid, and in 2023 the adjusted benchmark was on average 152 percent of the standardized bid. The 2024 CMS-HCC model maintains the same risk adjustment system based on variation in health status that has supported a robust MA program. The commenters provided no specific evidence in their comments that the payments they will receive under the 2024 CMS-HCC model are not sufficient to meet their obligation to provide benefits to the beneficiaries who enroll in their plan.

Comment: One commenter suggested that the documentation standards in Medicare Advantage differ from the documentation standards in traditional Medicare (i.e., Parts A and B), and that this difference causes the CMS-HCC risk adjustment model to violate the actuarial equivalence requirement in Section 1853(a)(1)(c)(i) of the Social Security Act.

Response: The argument, that differing documentation standards between MA and FFS cause the risk adjustment model to systematically underpay MA organizations in violation of the actuarial equivalence provision of Section 1853(a)(1)(c)(i) of the Social Security Act, incorrectly presumes that there are two different standards. As we recently explained, FFS and Medicare Advantage have the same documentation standard for diagnosis coding. Policy and Technical Changes to the Medicare Advantage Program for Years 2020 and 2021, Final Rule, 88 Fed. Reg. 6643, 6652-53 n.31, 6657-59 (February 1, 2023). Both programs require all reported diagnoses to be substantiated by documentation in the beneficiary's medical records. Moreover, the commenter is wrong to suggest that MA data is "audited" while FFS data is "unaudited," or that coding errors are condoned in FFS. In each program there is i) an identical documentation standard, ii) an obligation to work in good faith towards compliance with that standard, iii) some CMS auditing of compliance, and iv) coding errors that nonetheless escape detection. *See id.* at 6658 n.40, 6659. This has been true since the beginning of the Medicare Advantage program, and remains true today. There is no reason to presume that the error rate in diagnosis coding in FFS is meaningfully higher than the error rate in Medicare Advantage.

CMS regularly informs Congress about the use of the CMS-HCC risk adjustment model, calibrated on FFS data, for calculation of MA payments. Congress has been well informed about CMS' implementation of risk adjustment since the advent of the Medicare Advantage program, often requiring reporting or amending the relevant statutory provisions, without any indication

that Congress believed CMS was falling short of the statutory requirement of actuarial equivalence in payments to MA insurers. To the contrary, Congress has made a holistic determination that payments to MA organizations based on the CMS-HCC payment model are higher than they ought to be by at least 5.9%. The statutory adjustment leaves the agency with asymmetric discretion: CMS is free to find that a larger reduction in payments should be made, but not a smaller one.

That is not to say that the risk adjustment model achieves perfect accuracy. As noted previously, the model predicts variation in expenditures for groups of enrollees based on their expected costs, not expenditures at the individual level. [20] Nevertheless, accuracy is achieved at the aggregate level, and as we recently explained, the arguments that FFS errors create systematic underpayment do not adequately account for the offsetting effects of FFS under-coding and the increased costs associated with FFS over-coding. 88 Fed. Reg. at 6659.[21]

In fact, most independent experts have found that if anything, MA organizations are significantly overpaid even after application of the minimum 5.9% coding pattern adjustment that has been in place since 2019. MedPAC, for example, estimated that MA risk scores for 2020 were 9.5% higher than FFS risk scores for similar FFS enrollees (3.6% higher after applying the 5.9% coding pattern adjustment), resulting in nearly $12 billion in excess payments to MA plans. MedPAC, Report to the Congress: Medicare Payment Policy 440 (March 2022). Other independent studies have reached similar findings. *See id.* at 440-41 (citing studies). Further, some independent experts estimate that these differentials are increasing. Very recently, MedPAC estimated that for 2021, MA risk scores were 10.8% higher than FFS risk scores for similar FFS enrollees (4.9% higher after applying the 5.9% coding pattern adjustment), resulting in nearly $17 billion in excess payments to MA plans. [22] MedPAC projects that excess payments to MA plans will reach $23 billion in 2023 if MA coding patterns remains the same as in 2021.[23]

CMS is required to operate the MA program and publish payment rates each year. The agency must therefore act on the basis of the best information available to it at the time, within the bounds of the discretion afforded to it by Congress; it cannot wait for more complete information. The history of the CMS-HCC payment model, which has relied on the same documentation standard and been calibrated on the same data for many years; the amendments to the Medicare statute indicating a congressional determination that the model was paying MA

---

[20] *See UnitedHealthcare*, 16 F.4th at 874 ("The model uses data from a large pool of beneficiaries (full sample sizes over 1 million for the CMS-HCC models) to estimate predicted costs on average for each of the component factors (e.g., age-sex, low income status, individual disease groups). Using regression analysis on such a vast data sample mutes the effect of individual errors in traditional Medicare data, so long as errors are not so widespread or systemically skewed as to raise or lower the values of particular relative factors.") (internal citations and quotation marks omitted).

[21] *See also UnitedHealthcare*, 16 F.4th at 888 (discussing the effects of underreporting and extraneous expenditures within the FFS data).

[22] MEDPAC, REPORT TO THE CONGRESS: MEDICARE PAYMENT POLICY xxiv, 324-25, 355 (March 2023); LUIS SERNA & ANDY JOHNSON, MEDPAC PRESENTATION Slides 11, 13 (Jan. 12, 2023), https://www.medpac.gov/wp-content/uploads/2023/01/MedPAC-MA-status-report-Jan-2023.pdf.

[23] *Id.*

organizations more than they ought to be paid; and the weight of expert analysis suggesting that the model continues to overcompensate those insurers despite the mandatory payment reduction, all demonstrate that CMS acts within its statutory authority in continuing to operate the risk adjustment model on FFS cost and diagnosis data while making only the statutory minimum payment reduction.

Comment: A commenter challenged CMS authority to implement changes to Medicare Advantage payment policy through the Advance Notice and Rate Announcement. Several commenters contested CMS authority to make any changes to the Part C risk adjustment model generally. The commenters argued that what CMS proposes makes fundamental changes to the MA program that are unprecedented and therefore exceeding the executive branch's authority to implement, and that the proposed changes should be implemented through notice and comment rulemaking.

Response: The commenter mischaracterizes the proposed changes to payment in the 2024 Advance Notice. The proposed changes are not unprecedented. They are ordinary and routine. The fundamental structure of the Medicare Advantage program remains intact. CMS will continue to pay MA plans a risk adjusted amount based on the MA plan's bid to provide Medicare Parts A and B benefits through adequate provider networks; in addition, for MA plans that bid under the benchmark, CMS will provide the MA plan a portion of the amount by which the benchmark exceeds the bid as the MA rebate, to be used to furnish supplemental benefits (including reductions in cost sharing) or to pay Part B or Part D premiums for their enrollees. CMS pays MA organizations rebates to cover additional benefits as an incentive for the MA organization to provide Part A and Part B services for less than the cost to the FFS program, as measured by the MA benchmark applied in each plan's bid. By statute, the plan-specific rebate amount is based on the MA contract's star rating and the MA organizations ability to cover Parts A and B benefits for less than the applicable benchmark rate. This Advance Notice and Rate Announcement does not alter the payment structure; rather it updates the benchmark rates and other aspects of MA payment calculation.

CMS expects the net impact to aggregate MA payments between 2023 and 2024 as a result of all changes finalized in this Rate Announcement to increase MA payments by 3.32 percent.[24] CMS anticipates stable premiums and benefits for beneficiaries in 2024, as seen previously in years with comparable updates.

The updates made to the CMS-HCC Part C risk adjustment model as finalized in the 2024 Rate Announcement are not unprecedented. They are similar in scope to risk adjustment model

[24] HHS and the GAO have also both identified high amounts of improper payments in the MA program. 88 Fed. Reg. at 6645, 6653. In fiscal year (FY) 2021 for example (based on calendar year 2019 payments), we calculated that CMS made over $15 billion in Part C overpayments, a figure representing nearly 7 percent of total Part C payments. *Id.* at 6645 n.7 (citing HHS, FY 2021 HHS Agency Financial Report, pg. 211. See https://www.hhs.gov/sites/default/files/fy-2021-hhs-agency-financial-report.pdf

changes proposed and finalized previously through the Advance Notice and Rate Announcement. The 2024 CMS-HCC model changes are a combination of routine data updates (e.g., updating the years of data used when calibrating the model) and clinical updates to the Hierarchical Condition Categories (HCCs) that were required to develop a model using the ICD-10 diagnosis codes implemented in 2015. For example, CMS recalibrated the MA risk adjustment model with updated data years and/or made clinical revisions to the risk adjustment model in payment years 2007, 2009, 2013, 2014, 2017, 2019, and 2020. The 2021 Report to Congress provides the history of the models and changes over the years. A major clinical revision, including the removal of HCCs for dementia based on Principle 10, was completed for the models that were implemented for the Program of All-Inclusive Care for the Elderly (PACE) starting in PY 2012 and phased in for MA starting in PY 2014. Updates to the data years–pairwise years of diagnosis and cost information–to adjust the model coefficients to account for more recent patterns of health status and cost in the FFS Medicare program are more frequent and last occurred with model update for PY 2019.

Although requested and suggested by commenters, CMS is not required to use rulemaking in the Federal Register to adopt a new risk model for MA payment. Section 1853(b)(2) directs that CMS determine and announce the annual MA capitation rate and the risk and other factors to be used in adjusting such rates under section 1853(a)(1)(C) for MA payments in each contract year. Each year, in advance of the final announcement of the rates and risk and other factors, CMS must "provide for notice to [MA] organizations of proposed changes to be made in the methodology from the methodology and assumptions used in the previous announcement and shall provide such organizations an opportunity (in 2017 and each subsequent year, of no less than 30 days) to comment on such proposed changes." CMS fully complied with that required process: the CY 2024 Advance Notice described the changes in methodology and assumptions for setting the capitation rates and described how CMS developed the risk factors and specific coefficients for adjusting those capitation rates for age, disability status, gender, institutional status, eligibility for Medicaid, and health status. This notice and comment process has been in place since 1985 when CMS first began contracting with private health plans on a capitation basis, under procedures set forth in section 1876(a)(1)(F) of the Act. All major changes in payment policy have been implemented through this process. For example, when section 1853(a)(3) was first implemented in 2000 with the initial risk adjustment methodology developed by CMS, this initial methodology was implemented through an Advance Notice and Rate Announcement. All subsequent changes to the risk adjustment methodology, including the establishment of a budget neutrality factor to make risk adjustment payments budget neutral to the prior demographic-based payments, used in the initial years of CMS-HCC model, and the subsequent decision by CMS to phase out budget neutrality (which was ratified by Congress in the DRA) have all been implemented through the section 1853(b) process. Congress has on several occasions ratified in statute methodologies that CMS established through this section 1853(b) process (e.g., the initial phase in of risk adjustment, the plan to phase out budget neutrality, providing separate adjustments in the risk adjustment model for dual eligible

individuals). Furthermore, section 1853(b)(2) requires only a 30-day comment period, which we believe is an indication that this period is sufficient for stakeholders to review the changes proposed in the Advance Notice and provide comment. Prior to the Securing Fairness in Regulatory Timing Act of 2015 (SFRTA) (Pub. L. 114-106), which amended section 1852(b) to require that the Advance Notice be issued 60 days before the issuance of the Rate Announcement, the statute did not require that the comment period be a minimum length. Although the 21st Century Cures Act required, at section1853(a)(1)(I)(iii), a 60-day comment period for changes to the risk model under section 1853(a)(1)(I), that comment period does not apply to future model updates made by the Secretary under the authority granted in Section 1853(a)(1)(C).

Comment: Several commenters stated that they are directionally aligned with CMS' decision to update the risk adjustment model based on more current underlying data, updating the denominator, and some clinical revisions based on ICD-10, but were specifically opposed to the clinical revisions to select conditions made under Principle 10.

Response: Commenters conflated changes to the model that were exclusively based on Principle 10 and changes that were based on Principle 10 in conjunction with other model principles. The transition to ICD-10 required CMS to reevaluate all conditions (those ICD-10 diagnoses that were included in the mapping to payment HCCs in the current 2020 CMS-HCC model as well as all diagnoses not mapped to payment HCCs in the 2020 CMS-HCC model) against all of the model principles. Between the 2020 CMS-HCC model and the 2024 CMS-HCC model, 2,236 ICD-10 diagnosis codes no longer map to the model for payment and 209 were added. Additional information for the 2,236 codes that newly map to non-payment HCCs in the 2024 CMS-HCC model is provided below. These diagnosis codes generally fall into one of six categories:

1. Subsequent Encounter (codes ending in D) – 6 percent of the diagnosis codes that newly map to non-payment HCCs under the 2024 CMS-HCC model. Subsequent encounter codes represent less intensive follow-up treatment. While the cost from subsequent encounters are included in the model, the diagnosis codes indicating they are from a subsequent encounter were removed because they do not reliably or consistently predict meaningful costs. The diagnosis code on the initial encounter is more reliable and predictive. Costs from these encounters will be attributed to other conditions on the encounter that are in the model, demographic factors and count variables.
2. Sequela (codes ending in S) – 40 percent of the diagnosis codes that newly map to non-payment HCCs under the 2024 CMS-HCC model. The initial encounter diagnosis codes for these conditions that are being actively treated and predict ongoing and prospective costs still map to payment HCCs. Sequela codes are for late effects of a condition and indicate variable conditions that can be acute and/or require less follow up medical care. Because ICD-10 guidelines require the actual late effect (e.g., pain) to be coded separately, the sequela codes, which are non-specific, are excluded from payment HCCs.

Costs from these encounters will be attributed to other conditions on the encounter that are in the model, demographic factors and count variables.

3. Drug-induced – 8 percent of the diagnosis codes that newly map to non-payment HCCs under the 2024 CMS-HCC model. ICD-10 codes for drug-induced conditions can be secondary to poor quality of care related to drug-induced conditions or drug-intensive styles of care. Re-mapping these conditions to a non-payment HCC focuses the costs on underlying health status risks rather than the side effects of health care, and because drug-induced conditions are often temporary/reversible and are unlikely to predict prospective costs (i.e., the condition is often resolved by stopping the drug). Beneficiaries with a persisting drug-induced condition are ultimately coded with a diagnosis describing their condition that is not labeled as "drug-induced." Thus, expenditures associated with drug-induced conditions will be reflected in costs modeled for the underlying health condition prompting drug treatment. For example, costs of chemotherapy and its complications will load onto associated cancer diagnoses. Only a few codes (16 unique codes and the drug or chemical induced diabetes E09- code set) were removed from payment primarily because they are drug-induced. Other drug-induced codes were made nonpayment both because they are drug-induced and due to another clinical/empirical consideration (for example, overprediction of the costs for beneficiaries with those conditions in the 2020 CMS-HCC model, clinical considerations based on consulting physicians' recommendation, or the non-drug-induced version of the condition was also moved to nonpayment).
4. Complication of Medical Care – 16 percent of the diagnosis codes that newly map to non-payment HCCs under the 2024 CMS-HCC model. The goal of risk adjustment is to use health status to predict the relative additional costs of treating the beneficiary, and not the side effects of medical treatment, which are not reliable predictors of future costs. For example, in the 2024 CMS-HCC model, relative costs associated with an infection as a complication of care will load onto the underlying condition prompting the medical care. Claims data do not allow for determining whether a complication is avoidable. Excluding complications, such as a surgery performed on the wrong side of the body, avoids using diagnoses that result from poor quality of care, or more aggressive, procedure-oriented care. Serious complications would be accounted for by the specified conditions that are included in the payment model, which would be coded in addition to or instead of complications codes, especially if they persist in the long-term.
5. Principle 10 only – 3 percent of the diagnosis codes that newly map to non-payment HCCs under the 2024 CMS-HCC model. These diagnosis codes were removed after clinical assessment, conducted after the codes were identified for additional clinical review. The list of HCCs identified for further review is in the subsequent comment summary and response. As noted before, the clinical panel provided insight and recommendations related to the criteria used to evaluate and treat conditions (e.g., lab findings, test results, physical exams, medications, medical interventions, etc.);

specificity of diagnoses; potential for variable coding for certain diseases or disease groups; treatment practices; manifestations of conditions in different populations (e.g., aged vs. disabled; non-dual vs. full-benefit; dual vs. partial-benefit dual); disease severity and implications for medical burden; clinical face validity (i.e., whether the condition is consistent with the relative costs associated with it) and interpretation of empirical results; clinical similarities and differences between specific diseases (e.g., Crohn's disease and ulcerative colitis); relationship of acute and chronic versions of diseases (e.g., acute hepatitis C and chronic hepatitis C); and implications for predicted costs.

6. Other – 28 percent of the diagnosis codes that newly map to non-payment HCCs under the 2024 CMS-HCC model. This category indicates decisions were made based on a combination of clinical and empirical reasons that align with model principles such as clinical meaningfulness (Principle 1), overprediction (Principle 2), diagnostic specificity (Principle 5), and concerns about coding intensity or clinical discretion (Principle 10.)

As can be determined from the distribution of the reasons for exclusion from the 2024 model, a significant majority of diagnosis codes (97 percent) were excluded for reasons other than Principle 10. As noted in the 2024 Advance Notice Fact Sheet, analysis of the most recent data suggests fully implementing the 2024 CMS-HCC model would reduce MA risk scores by 3.12 percent. A majority of the -3.12 percent impact is due to changes other than those based only on Principle 10. We calculate the marginal impact of the changes based only on Principle 10 to be -0.55 percent (e.g., Principle 10 only changes account for -0.55 of the total -3.12 percent impact).

A list of conditions that commenters were concerned about excluding diagnosis codes from and the rationale for removing those diagnosis codes is provided in response to other comments in this section.

Comment: Several commenters stated that the changes to the Part C risk adjustment model proposed in the 2024 Advance Notice based solely on Principle 10 are intended to reduce payments to MA organizations because of differences in coding patterns between Medicare Advantage and FFS and therefore are duplicative of the coding pattern adjustment. Commenters indicated those changes are not authorized by section 1853(a)(1)(C) of the Social Security Act and one commenter noted that such changes would require CMS to implement a model based on MA encounter data.

Response: We disagree. Section 1853(a)(1)(C)(ii) of the Social Security Act requires the Secretary to reduce payments to MA organizations by at least 5.9% to account for "differences in coding patterns between Medicare Advantage plans and providers under part[s] A and B." As explained above, per-capita payments to MA plans reflect the relative cost experience in Medicare FFS for a beneficiary population modeled by reference to demographics, diagnoses, and other factors CMS selects. The per-capita payments initially calculated by the CMS-HCC model are then reduced in compliance with section 1853(a)(1)(C)(ii). But the enactment of that

provision did not diminish the Secretary's discretion or authority to design the payment model. And as discussed above, the 2024 CMS-HCC model accurately predicts variation in FFS costs, just as the 2020 CMS-HCC model did when it was published.

The removal of certain codes from payment HCCs and constraints on the coefficients of certain HCCs are not the same as the coding pattern adjustment required by section 1853(a)(1)(C) and do not address the same thing. The adjustment mandated by section 1853(a)(1)(C)(ii) is applied to each beneficiary's risk score at every MA plan, which reflects that provision's focus on coding pattern differences at a general, program-wide level. Specifically, section (a)(1)(C)(ii) addresses the incentive for all MA plans to identify more valid, supported codes on all HCCs, and therefore report more diagnoses (which we do not assume to be inaccurate when evaluating coding pattern differences between FFS and MA). By reducing each individual risk score by a specified percentage, the coding pattern adjustment corrects for overall, net differences between MA and FFS coding. Our process in applying Principle 10 and looking at how often certain codes appeared within the universe of diagnosed conditions for Medicare beneficiaries in FFS and in the MA program did not look at general, program-wide differences on all HCCs, but rather at whether certain differences on particular codes warranted further review to ensure that they are credible predictors of variation in per capita costs. In circumstances where there is discretion in coding, beneficiaries with different profiles are attributed with the same HCC and the model's ability to differentiate higher-than-average relative costs accurately is diminished.

Principle 10 is well grounded and appropriate to use because it focuses on ensuring that codes used in the model are clinically and empirically credible predictors of future costs. Because the coding of additional diagnoses directly increases the payments made to MA organizations, diagnoses for which the documenting and reporting involves a substantial amount of discretion present a particular risk to the integrity of the payment model.[25] This risk is distinct from the more general incentive, which is addressed by Section 1853(a)(1)(C)(ii) of the Social Security Act, for MA organizations to increase their coding intensity (and therefore their payments) by reporting as many valid, supported diagnoses as possible.

The model relies on conditions that are well specified, and that consistently and reliably predict medical costs in a future year. Incentives for discretionary coding, while possibly stronger in MA, are not unique to MA, and we have seen increases in coding in the FFS program in recent years. There are several possible drivers. The proportion of payments in FFS tied to value-based payment models that rely on the CMS-HCC model has grown significantly between the expenditure year for the 2020 model (2015) and the expenditure year for the 2024 CMS-HCC model (2019). Further, providers who are both FFS participating providers and in MA networks may carry over incentives from the MA program into their larger practice. Including diagnosis

---

[25] MedPAC, Report to the Congress: Medicare Payment Policy xxiv, 324-25, 355 (March 2023); Luis Serna & Andy Johnson, MedPAC Presentation Slides 11, 13 (Jan. 12, 2023), https://www.medpac.gov/wp-content/uploads/2023/01/MedPAC-MA-status-report-Jan-2023.pdf

codes in the model where providers may have an incentive to report a more severe diagnosis code when clinically not well specified dilutes the cost predicted by the model for more severe conditions and potentially reduces the sample size of the less severe condition resulting in unstable predictions between calibrations. As described before, despite including fewer diagnosis codes, the reclassified payment model maintains or improves predictive accuracy compared to the model currently in use (the 2020 CMS-HCC model) predictive ratios (ratios of predicted to actual mean expenditures by predicted expenditure decile) and other measures CMS does not typically consider, such as the $R^2$ statistic.

Further, even if there was an overlap between the Principle 10-guided changes in the 2024 CMS-HCC model compared to the currently used 2020 CMS-HCC model, nothing in section 1853(a)(1)(C) prohibits how CMS has approached this issue in model development. Section 1853(a)(1)(C)(i) authorizes the addition, modification, or removal of a risk factor. The mandatory, uniform coding pattern adjustment did not (as some commenters suggested) remove the Secretary's authority to revise the model to eliminate or constrain particular codes or HCCs based on our longstanding principles for risk model development for the MA program. Here, the revisions to address the multiple conditions (as reflected in coded diagnoses) and costs used by CMS to adjust for overall health status are within the scope of that authority. We note that commenters alleging duplication with the coding pattern adjustment provided no specific evidence in their comments that they will be underpaid. There is a range of estimates for the appropriate coding pattern adjustment, and as noted before, independent experts have found that if anything, the risk adjustment model has been overpaying MA organizations significantly even after application of the minimum coding pattern adjustment.[26]

The changes finalized in the 2024 CMS-HCC model are incorrectly characterized by the commenters as a coding intensity or coding pattern adjustment. The changes based on Principle 10 are clinically informed and are intended to ensure a more accurate prediction of variation in cost based on health status. Removing HCCs for protein-calorie malnutrition, angina pectoris, and atherosclerosis of arteries of the extremities with intermittent claudication, and separately constraining the three diabetes HCCs (glycemic, unspecified, or no complications; with chronic complications; and with severe acute complications) and congestive heart failure (heart failure, except end-stage and acute; acute heart failure (excludes acute on chronic); and acute on chronic heart failure) so that each grouping has the same coefficient allocates the FFS spending associated with those conditions to demographic factors, the count variables, and other associated conditions in the model that are better specified.

As noted in the Advance Notice, CMS followed a process for identifying ICD-10 codes that may be subject to discretionary coding. Discretionary coding can occur when providers may make

[26] For a discussion of different methods for calculating a coding intensity adjustment see, "Reducing Medicare Advantage Overpayments" at https://www.crfb.org/papers/reducing-medicare-advantage-overpayments. *See also*, the 2010 Advance Notice https://www.cms.gov/medicare/health-plans/medicareadvtgspecratestats/downloads/advance2010.pdf

different decisions regarding the diagnosing and documenting of a condition given the same circumstance, or an MA organization may make a decision that is different from a provider regarding the reporting of condition for payment. This may occur because clinical indicators are broad, need significant interpretation, or because the condition is being diagnosed and documented in situations where it has no clinical significance, or where it does not require or affect patient care, treatment or management as required by the ICD-10 Coding Guidelines. The first step in our analysis was to determine whether there are differences in coding patterns between FFS and MA by condition, because a difference in the rate of diagnosis codes submitted could be indicative of differences in clinical interpretation. CMS data and independent studies generally find that the demographic and healthcare utilization patterns between FFS and MA are similar. [27,28,29] By and large, the prevalence of HCCs is also similar between MA and FFS. In the Non-Dual Aged segment, the percentage point difference in prevalence between MA and FFS was within 1 percentage point for 75 of 86 payment HCCs (87 percent). In the Full Benefit Dual Aged Segment, the percentage point difference in prevalence between MA and FFS was within 1 percent for 72 of the 86 (84 percent) payment HCCs. Therefore, the small number of outlier HCCs where the difference in prevalence in MA exceeded 1 percent warranted further analysis. CMS identified the following HCCs in the 2020 CMS-HCC model that had significant variation in coding between MA and FFS:

1. HCC 18 Diabetes with Chronic Complications
2. HCC 21 Protein-Calorie Malnutrition
3. HCC 22 Morbid Obesity
4. HCC 59 Major Depressive, Bipolar, and Paranoid Disorders
5. HCC 85 Congestive Heart Failure
6. HCC 88 Angina Pectoris
7. HCC 108 Vascular Disease
8. HCC 111 Chronic Obstructive Pulmonary Disease
9. HCC 138 Chronic Kidney Disease, Moderate (Stage 3).

Identifying HCCs with significant coding pattern differences was the first step in CMS' analysis before a more intensive clinical review to determine whether the continued reliance on these diagnosis codes in the payment model was consistent with Principle 10.

Among diagnoses in these nine HCCs that were selected for further clinical review, CMS determined that the following ICD-10 diagnoses codes are subject to sufficient clinical discretion

---

[27] https://www.commonwealthfund.org/publications/issue-briefs/2021/oct/medicare-advantage-vs-traditional-medicare-beneficiaries-differ; *see also* Paul D. Jacobs & Richard Kronick, *Getting What We Pay For: How Do Risk-Based Payments to Medicare Advantage Plans Compare with Alternative Measures of Beneficiary Health Risk*, 53 HEALTH SERVICES RESEARCH 4997, at 5012 (Dec. 2018) (increasing MA risk scores compared to FFS likely outpace relative increases in actual health risk; MA enrollees are no sicker, and may well be healthier than similar FFS beneficiaries).

[28] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC9175080/

[29] https://www.kff.org/medicare/report/beneficiary-experience-affordability-utilization-and-quality-in-medicare-advantage-and-traditional-medicare-a-review-of-the-literature/

and that removal from payment HCCs in the 2024 CMS-HCC model is appropriate: all ICD-10 diagnosis codes mapped to 2020 CMS-HCC model HCC 21 Protein-Calorie Malnutrition and HCC 88 Angina Pectoris, and 30 diagnosis codes mapped to HCC 108 Vascular Disease. CMS further assessed that the coefficients in the 2024 CMS-HCC model for the diabetes HCCs and some of the Congestive Heart Failure HCCs, which retain most of the ICD-10 codes originally mapped to the 2020 CMS-HCC model HCCs, should be constrained. Constraining the coefficients for the diabetes HCCs in the 2024 CMS-HCC model balances the need to predict cost for clinically meaningful conditions and the need to limit the incentive to report discretionary codes included in the model for payment. As a group, each set of constrained HCCs are accurately predicted, although individual HCCs within each group may be under or over predicted.

The decision to exclude diagnoses was made after careful consideration and consultation with independent clinicians. Diagnoses mapped to HCC 21 Protein-Calorie Malnutrition had been included in the 2020 CMS-HCC model because clinically, protein-calorie malnutrition can be useful as a risk marker for frailty, severe illness, and late- or end-stage disease, and it is likely correlated with poverty/disadvantaged populations. However, CMS analysis confirmed that the most commonly reported diagnosis codes mapped to HCC 21 by FFS and MA include less severe or unspecified protein-calorie malnutrition (E46, E43, E440) and Cachexia (R64). Recent analysis from the HHS Office of the Inspector General (OIG) found that hospitals correctly billed FFS Medicare for severe malnutrition diagnosis codes (E41 and E43) for 27 of the 200 claims reviewed. For 164 of the remaining claims OIG found that hospitals used severe malnutrition diagnosis codes when they should have used codes for other forms of malnutrition or no malnutrition diagnosis code at all, and for nine of these claims, the medical record documentation supported a secondary diagnosis code other than a severe malnutrition diagnosis code.[30] This finding in conjunction with clinician experts' opinion suggested that including even the more severe diagnoses mapped to HCC 21 in the 2020 model would create incentives for wide variation in coding. Because the regression model predicts all FFS costs, any spending associated with the Protein-Calorie Malnutrition HCCs will be reallocated to correlated conditions or demographic markers, such as cancer and older ages.[31] As previously stated, the risk adjustment model is intended to differentiate relative risk such that higher payments are calculated for sicker beneficiaries with higher disease burden relative to average.

Diagnoses mapped to HCC 88 Angina Pectoris in the 2020 CMS-HCC model were excluded due to Principle 10 because of a lack of clinical specificity. Decisions regarding whether to diagnose and document angina pectoris are subject to some discretion, which presents a risk that the

---

[30] https://oig.hhs.gov/oas/reports/region3/31700010.pdf.

[31] CMS has explained this type of effect before: "We do note that when specified HCCs are removed from the model, the model is recalibrated and the same costs are predicted with the new set of HCCs. The relative factors for conditions that are comorbid with the excluded HCC may increase, as may the various demographic factors." CY 2014 Rate Announcement at 30-31 (April 1, 2013), https://www.cms.gov/Medicare/Health-Plans/MedicareAdvtgSpecRateStats/Downloads/Announcement2014.pdf

diagnosis could be used in cases of chest pain that do not require further treatment, and also when the diagnosis does not affect the care, treatment or management of the beneficiary. Additionally, HCC 88 included ICD-10 codes for other or unspecified forms of angina pectoris, including with atherosclerosis. Independent studies have found that incidental detection of atherosclerosis through CT scans is "relatively prevalent and carr[ies] high risk for asymptomatic coronary disease." For example, in a study of 1,494 clinically healthy adults without a history of CVD, 68% of those who underwent abdominal CT had atherosclerotic lesions with stenosis in the aorta or its major branches. Thus, there is a likelihood that atherosclerosis is being coded based on radiology reports for cases that are asymptomatic.[32] This rationale was also applied to the ICD-10 diagnosis codes previously included for payment in HCC 108 in the 2020 CMS-HCC model. Arterial Atherosclerosis with intermittent claudication may not be a good predictor of medical expenditure because evidence suggests that patients with intermittent claudication often do not require treatment.[33]

In response to a comment suggesting that variation in coding between MA and FFS must be addressed through a model calibrated with MA encounter data, CMS agrees that an MA coding pattern difference adjustment would no longer need to be applied to the MA risk scores if the risk adjustment model were calibrated with MA data. While CMS disagrees with commenters that changes to the 2024 CMS-HCC model based on Principle 10 are duplicative of the coding intensity adjustment, and disagrees that CMS does not have the authority to make changes to the risk adjustment model to account for variability in diagnosis codes submitted, CMS agrees that the statute supports calibrating a model using MA data submitted on encounter data records. CMS will engage with stakeholders when we move forward with developing such a model.

*CMS-HCC Risk Adjustment Model for PACE organizations for CY 2024*

Comment: Several commenters opposed CMS' proposal to use the 2017 CMS-HCC risk adjustment model for payment to PACE organizations for CY 2024. These commenters urged that, for CY 2024, CMS transition PACE organizations to the CMS-HCC risk adjustment model that is currently being used for MA payment (the 2020 CMS-HCC risk adjustment model). These commenters are concerned that the 2017 CMS-HCC risk adjustment model excludes several chronic conditions, especially dementia, which is prevalent in the PACE population. Commenters also pointed to pressure ulcers (HCC 159), moderate chronic kidney disease (HCC 138), and several mental health and substance use disorder HCCs as condition categories that they believe are critically important for accurate risk adjustment for PACE organizations. Commenters believe that the frailty adjustment is inadequate to capture the risk of their

---

[32] Suh, B., Song, Y. S., Shin, D. W., Lim, J., Kim, H., Min, S. H., ... & Cho, B. (2018). Incidentally detected atherosclerosis in the abdominal aorta or its major branches on computed tomography is highly associated with coronary heart disease in asymptomatic adults. Journal of cardiovascular computed tomography, 12(4), 305-311.

[33] Cassar K. (2006). Intermittent claudication. BMJ (Clinical research ed.), 333(7576), 1002–1005. https://doi.org/10.1136/bmj.39001.562813.DE

participants in a model that excludes the aforementioned conditions, which are included for payment in the 2020 CMS-HCC risk adjustment model. Commenters asserted that PACE organizations are underpaid using the current risk adjustment methodology because they believe it fails to recognize the costs of care associated with a complex population, such as PACE participants. One commenter stated that their ability to provide integrated, quality care to PACE participants may be compromised because of systematic underpayments they believe are present for PACE organizations due to the use of the 2017 CMS-HCC risk adjustment model.

Additionally, commenters voiced concern over the misalignment of PACE and MA in regards to the risk adjustment models used for payment, stating that the misalignment is further exacerbated by CMS' proposal to move MA plans to an updated CMS-HCC risk adjustment model that is calibrated using ICD-10 diagnoses, as well as more recent diagnostic and cost data, thereby further increasing health disparities. The commenters agreed with CMS that it is important to update the diagnostic and cost data on which the risk adjustment model is based, and noted that the model proposed for organizations other than PACE has new categories that reflect more clinical specificity and validity (i.e., greater level of detail that allows more precision in the identification of specific conditions). Commenters questioned why these considerations are not being applied to the risk adjustment model being used for PACE, believing that CMS should use a payment model for PACE that accurately represents the population they serve.

Generally, commenters believed that it is possible for CMS to use the 2020 CMS-HCC risk adjustment model to pay PACE organizations, without having to change the diagnostic data sources currently being submitted by PACE organizations for risk adjustment purposes (which includes diagnoses submitted to the Risk Adjustment Processing System (RAPS) and the Encounter Data System (EDS)). Commenters believed that CMS' past justifications for being unable to move PACE to the 2020 CMS-HCC risk adjustment model were insufficient or not credible. Commenters noted that in the 2020 Rate Announcement,[34] CMS stated that they have done extensive work to improve and facilitate the submission of encounter data and will continue to do so, however, commenters were only aware of a couple of instances where CMS engaged with PACE organizations since that time (site visits with some PACE organizations and a PACE-specific webinar presentation on encounter data). Commenters argued that CMS has used the data submitted to RAPS and EDS for PACE risk adjustment for several years "without concern for accuracy or completeness," and, therefore, CMS' prior justifications for not moving PACE to the model used for MA is not a credible barrier to transitioning PACE to a more accurate risk adjustment model. They recommended that CMS transition PACE to the 2020 CMS-HCC risk adjustment model using the current method of calculating PACE risk scores (pooling RAPS, encounter data, and FFS claims), and that during the transition, CMS collaborate with PACE organizations to address encounter data submission difficulties they may be experiencing.

---

[34] CY 2020 Rate Announcement.

Response: CMS will continue the use of the 2017 CMS-HCC risk adjustment model for risk-adjusted payment to PACE organizations for CY 2024. The 2017 CMS-HCC risk adjustment model was first adopted for PACE in the 2022 Rate Announcement.[35] CMS acknowledges concerns from commenters about the inclusion of dementia and other conditions in the model, and the recommendation to move PACE to the 2020 CMS-HCC risk adjustment model that includes these conditions. CMS recognizes that using distinct HCCs to calibrate separate models for PACE and MA may result in differences in predicted risk for individual beneficiaries, however, we note that the costs associated with conditions that are not in the 2017 CMS-HCC risk adjustment model for payment, such as dementia, are predicted by comorbid conditions and demographic factors. To the extent that these costs are not predicted by the model, they are reflected in the frailty factors.

As noted in the November 1, 2013 HPMS memo titled, "Clarification to Encounter Data Submissions Memo for PACE Organizations,"[36] PACE organizations are only required to submit encounter data records for Medicare-covered items and services for which the organization collects claims. Because PACE organizations are not submitting encounters for all of their services, we do not have complete encounter data for their members and, therefore, we do not have a complete diagnostic profile for their members in the encounter data. Without a complete diagnostic profile, we cannot rely solely on encounter data to calculate PACE risk scores and, instead, use diagnoses from encounter data as a supplement to RAPS data when calculating risk scores for payment using the 2017 CMS-HCC risk adjustment model. Because the 2020 CMS-HCC risk adjustment model was calibrated using FFS diagnoses that were selected using the filtering method that is used for encounter data, this model is intended to calculate risk scores using diagnoses submitted on encounter data records and FFS claims (for beneficiaries who switch from FFS to MA) filtered in the same manner as encounter data records. Since we do not have complete encounter data from PACE organizations, we are not calculating PACE beneficiary risk scores using diagnoses solely from encounter data and FFS claims (in contrast to the long-standing approach to calculating non-PACE beneficiary risk scores), and we cannot implement the 2020 CMS-HCC risk adjustment model for PACE at this time. Using primarily RAPS-based diagnostic data (based on specialty filtering) on a model that was developed to calculate risk scores using encounter data (based on CPT/HCPCS filtering) results in inaccurate risk scores, and therefore payment.

In the summer of 2022, CMS engaged with some PACE organizations to discuss successes and challenges they have experienced with submitting encounter data. CMS will conduct analyses to ascertain the state of encounter data submissions for PACE organizations and continue to work closely with these organizations to develop further guidance and provide technical assistance with transitioning PACE organizations fully to encounter data in anticipation of future implementation of a risk adjustment model for PACE that is calibrated using encounter data

---

[35] CY 2022 Rate Announcement

[36] Clarification to Encounter Data Submissions Memo for PACE Organizations, November 1, 2013

(such as the one currently used for MA payment in 2023 or a future model). As noted in the 2022 Rate Announcement, CMS continues plans to use a more recently updated model to pay PACE organizations as soon as it is practicable.

**Section K. End Stage Renal Disease (ESRD) Risk Adjustment Models for CY 2024**

CMS did not receive comments on the CMS-HCC ESRD risk adjustment models for PACE organizations for CY 2024. CMS will continue to calculate risk scores for payment of beneficiaries with ESRD in PACE organizations using the CY 2019 CMS-HCC ESRD risk adjustment models as proposed in the CY 2024 Advance Notice.

Comment: Two commenters supported the continued use of the CY 2023 CMS-HCC ESRD Models for 2024.

Response: CMS appreciates the comments. For CY 2024, we will continue to calculate risk scores for payment of beneficiaries with ESRD in MA plans and certain demonstrations using the CY 2023 CMS-HCC ESRD risk adjustment models as proposed in the CY 2024 Advance Notice.

Comment: A couple commenters made recommendations for CMS to engage with stakeholders when updating the ESRD risk adjustment models in the future; one commenter specifically requested full transparency, collaboration with plans and providers, and a longer comment period (i.e., at least 60 days for comment on any proposed changes). A commenter urged that risk adjustment model changes be finalized at least two years in advance of the implementation date to allow sufficient time for plans and providers to make necessary operational changes.

Response: Thank you for your comment.

Comment: One commenter requested that CMS move enrollees with a reported dialysis diagnosis into the ESRD segment automatically.

Response: We believe the commenter is suggesting that CMS use ICD-10 diagnosis codes related to ESRD as an indicator to calculate risk scores using the ESRD dialysis risk adjustment model. The ESRD dialysis model is intended to calculate projected risk for beneficiaries receiving ongoing dialysis treatment. ICD-10 ESRD diagnosis codes are not always indicative of dialysis treatment. For example, ESRD ICD-10 diagnosis codes can be used in instances where a beneficiary has an early stage of ESRD that does not require dialysis, or a beneficiary is receiving acute dialysis for a limited timeframe. To consistently apply ESRD risk scores to beneficiaries receiving ongoing dialysis, CMS uses notification from a dialysis facility that the beneficiary is receiving dialysis in a Medicare certified facility. The dialysis facility submits the notification to CMS on the CMS-2728 form and the payment system uses this information to apply an ESRD dialysis risk score. This allows CMS to calculate risk scores that are appropriate for the dialysis population.

**Section L. Frailty Adjustment for Fully Integrated Dual Eligible Special Needs Plans (FIDE SNPs) and PACE Organizations**

*Frailty for FIDE SNPs*

Comment: The majority of commenters who made a remark about frailty for FIDE SNPs expressed concern about the decrease in the frailty factors and the impact on enrollee frailty scores, especially in combination with the impact of the proposed CMS-HCC risk adjustment model. Plans cited a number of reasons for their concern, including: general concerns about the decline in frailty scores and disproportionate impacts on vulnerable and high-need populations because of payment decreases; concerns that it will be harder for FIDE SNPs to qualify for frailty because, in order to qualify, the average level of frailty in the FIDE SNP has to be similar to that in the PACE program; and concerns that the decreases in frailty factors may be anomalous for full-benefit and/or partial-benefit dually eligible individuals.

Response: We appreciate commenters' concern regarding the change in the frailty factors. For CY 2024, CMS proposed to update the frailty factors used to calculate frailty scores for beneficiaries enrolled in FIDE SNPs in order to align with the 2024 CMS-HCC risk adjustment model and, in addition, applied a new technical adjustment to account for potential non-response bias. In reviewing the initial frailty factors produced by the survey results using CMS' long-standing methodology, we noticed differences in some of the underlying patterns of frailty factors relative to prior years. For example, the full-Medicaid 0 Activities of Daily Living (ADL) group that typically does not predict additional costs due to limitations of ADLs (i.e., predicted a negative factor) has a positive factor under the recalibrated frailty factors. CMS believes the differences in patterns of the factors may result from a number of drivers, including declines in response rates and the underlying FFS population changes. To address these concerns, CMS newly applied the Consumer Assessment of Healthcare Providers and Systems (CAHPS)[37] survey weight designed to adjust for the potential impact of non-response bias in the CAHPS survey. While the application of the CAHPS survey weight maintains frailty factor patterns that are largely consistent with prior years, the application of the weight puts downward pressure on a number of the frailty factors. We do not believe the frailty factors without the CAHPS survey weight applied are erroneous as they reflect the results of predicted residual costs from the model for the survey population.

In consideration of the comments received, for CY 2024, CMS is finalizing updated frailty factors that align with the 2024 CMS-HCC model, but that were not calculated using the CAHPS survey weight that was proposed in the CY 2024 Advance Notice.

The final frailty factors for CY 2024 can be found in Table III-4. While we are not applying the CAHPS survey weight for CY 2024, we will continue to evaluate the underlying patterns driving

---

[37] Consumer Assessment of Healthcare Providers and Systems (CAHPS) surveys

the changes in the CY 2024 frailty factors and the appropriateness of applying CAHPS survey weighting to the frailty factors. CMS will take our findings under consideration when making future updates to the frailty factors.

We note that we must implement frailty factors that align with the CMS-HCC risk adjustment model to be used in payment, since the frailty factors are calculated by predicting costs that are not captured by the CMS-HCC risk adjustment model used for payment. For this reason, we are unable to delay use of the recalibrated frailty factors, as some commenters requested. However, the frailty factors being finalized for CY 2024 will be phased in on the same schedule as the Part C model. Frailty scores for FIDE SNPs in CY 2024 will be calculated by blending 67% of the frailty scores calculated using the frailty factors associated with the 2020 CMS-HCC risk adjustment model (finalized in the 2022 Rate Announcement[38]) and 33% of the frailty scores calculated using the frailty factors associated with the 2024 CMS-HCC risk adjustment model. The blended frailty score will be compared to the PACE level of frailty calculated in the same manner to determine whether that FIDE SNP has a similar average level of frailty as PACE. Specifically, we note that the PACE minimum is calculated using the same frailty factors as those used to calculate the frailty scores for FIDE SNPs, so changes in FIDE SNP frailty scores will be accompanied by a change in how the PACE minimum is calculated. See the 2012 Rate Announcement for a discussion of how CMS calculates the PACE minimum.[39]

**Table III-4 Final Frailty Factors Associated with the 2024 CMS-HCC Model – FIDE SNPs**

| Number of ADLs | Non-Medicaid | Partial Medicaid | Full Medicaid |
|---|---|---|---|
| 0 | -0.066 | -0.070 | 0.158 |
| 1-2 | 0.103 | 0.203 | 0.230 |
| 3-4 | 0.201 | 0.203 | 0.230 |
| 5-6 | 0.201 | 0.217 | 0.248 |

Comment: Some commenters included a recommendation that CMS provide additional information about how the change in frailty factors was formulated through rulemaking. A few commenters recommended delaying the implementation of the CY 2024 CMS-HCC risk adjustment model with the frailty adjustment, or implementing a phased-in approach. A few commenters asked for more information or wanted CMS to be more transparent about the process. A commenter recommended that stakeholders have more time before changes are made to the frailty adjustment and recommended convening a technical expert panel.

Response: Section 1853(a)(1)(B)(iv) of the Act authorizes an additional payment adjustment that takes into account the frailty of beneficiaries enrolled in Fully Integrated Dual Eligible Special

[38] Refer to Section K. Frailty Adjustment for PACE Organizations and FIDE SNPs of the 2022 Advance Notice for the frailty factors associated with the 2020 CMS-HCC risk adjustment model.
[39] Refer to Section L. Frailty Adjustment of the 2012 Rate Announcement for information regarding the establishment of the PACE minimum.

Needs Plans (FIDE SNPs), if the average level of frailty in the FIDE SNP is similar to that in the PACE program, and CMS has chosen to apply such an adjustment. The frailty adjustment for FIDE SNPs is part of the risk adjustment methodology. Because section 1853(b) of the Act provides for the update of risk and other factors used to adjust capitation payments through the Advance Notice and Rate Announcement, frailty adjustment factors have consistently been proposed and finalized through the Advance Notice and Rate Announcement since we first started making these adjustments for frailty for qualifying FIDE SNPs in 2012. As the frailty factors must be estimated in alignment with the CMS-HCC risk adjustment model being used for the payment year, it is a component of the methodology used to adjust payments to plans and, therefore, is appropriately finalized using the process specified in section 1853(b) of the Act. As previously stated, we must implement frailty factors that align with the CMS-HCC risk adjustment model to be used in payment, since the frailty factors are calculated by predicting costs that are not captured by the CMS-HCC model. For this reason, we are unable to delay the use of the recalibrated frailty factors, as some commenters requested. As discussed previously, the Advance Notice and Rate Announcement are the appropriate means by which changes are made to MA payments. This also pertains to frailty factors for FIDE SNPs.

Comment: A few plan commenters recommended allowing additional plan types (e.g., HIDE SNPs with exclusively aligned enrollment, ESRD C-SNPs, and/or plans that serve any dually eligible beneficiaries) to be eligible for the frailty adjustment.

Response: By law, CMS must use the same payment methodology for all enrollees in MA plans, including Special Needs Plans (SNPs), except as explicitly provided for in statute. Section 1853(a)(1)(B)(iv) of the Act authorizes CMS to make frailty-adjusted payments only to certain dual SNPs – those with fully integrated, capitated contracts with states for Medicaid benefits, including long term care, and which have similar average levels of frailty as the PACE program. Thus, CMS cannot make frailty payments to any SNP that does not meet these criteria without implementing frailty payments program-wide.

CMS has explored ways of incorporating frailty into the risk adjustment model in order to account for frailty when making risk adjusted payments to all plans and found challenges with a number of approaches (see the "Evaluation of the CMS-HCC Risk Adjustment Model," published March 2011).[40] In addition, as directed by section 17006(f)(2)(b) of the 21st Century Cures Act, the Government Accountability Office issued a report on issues related to incorporating functional status into MA risk adjustment in 2018.[41] This study found a number of challenges with incorporating frailty into the model, including that "stakeholders could face substantial challenges if the risk adjustment model were revised to account for beneficiary

---

[40] Pope, Gregory C.; Kautter, John; Ingber, Melvin J.; Freeman, Sara; Sekar, Rishi; and Newhart, Cordon. (March 2011). Evaluation of the CMS-HCC Risk Adjustment Model.

[41] GAO Medicare Advantage Benefits and Challenges of Payment Adjustments Based on Beneficiaries' Ability to Perform Daily Tasks.

functional status, in part because this information is not readily available.” The CMS-HCC risk adjustment model uses demographic factors and diagnoses to predict relative costs for subpopulations, with the frailty adjustment used to predict expenditures for community beneficiaries with functional impairments that are unexplained by the risk adjustment model alone. Because the frailty factors are calculated using the residual of the CMS-HCC risk adjustment model (the difference between the predicted expenditure amounts and the actual expenditure amounts), and frailty scores have an average value of zero, the application of a frailty adjustment to all MA plans would result in many plans receiving a negative frailty adjustment.

*Frailty for PACE Organizations*

Comment: Some commenters expressed concerns with using the HOS-M survey to estimate frailty because of low response rates, and that reliance on the HOS-M for frailty adjustment does not consider the challenges faced by people with dementia in completing the survey. Most of these commenters urged that, if dementia could not be included in the risk adjustment model used to pay PACE organizations for CY 2024, that CMS modify the CY 2023 HOS-M survey administration protocol to allow PACE organizations to proactively offer completion assistance for the survey to their participants living with dementia to increase the likelihood that they are adequately represented in the survey’s results.

Response: CMS estimates frailty factors to explain additional costs not explained by diagnoses in the CMS-HCC risk adjustment model. To the extent that these costs are not predicted by the model, they are likely to be reflected in the frailty factors. CMS calibrates the frailty factors by regressing the residual, or unexplained costs, from the CMS-HCC risk adjustment model on counts of activities of daily living (ADLs). Although total costs are included in the calibration of the 2017 CMS-HCC risk adjustment model, and the associated frailty factors help predict overall costs where diagnoses are not fully predictive, results for individual organizations may differ due to differences between the sample used for model calibration and the populations enrolled in individual plans.

CMS acknowledges the concerns related to improving the response rates for the HOS-M for PACE participants generally, and among those with dementia. The responses from this survey are used to determine a beneficiary’s limitations in ADLs for the calculation of a frailty score. For the HOS-M, CMS will continue to allow a beneficiary to designate a proxy for responding to the survey, including a PACE staff member. In addition, PACE organizations are able to provide additional beneficiary contact information to support response rates. We collect survey data in this manner so that there is consistency across PACE organizations, as this helps to ensure equitable frailty results for payment.

**Section M. Medicare Advantage Coding Pattern Adjustment**

Comment: Many commenters opposed CMS' proposed 5.9 percent 2024 coding pattern adjustment and provided alternate alternative recommendations to the statutory minimum coding pattern adjustment of 5.9 percent, as summarized below:

- *Higher adjustment factor:* Several commenters recommended a higher adjustment factor than the statutory minimum, which they state is inadequate to adjust for differential patterns of coding between MA and FFS. Commenters expressed concern that the statutory minimum does not account for the full impact of coding pattern differences, and multiple commenters highlighted analyses from MedPAC that the coding adjustment factor should be several percentage points higher. These commenters stated their belief that excess spending is accelerating the depletion of the Medicare Trust Funds and the potential savings from fully accounting for the coding pattern differential would increase solvency of the Trust Funds. A few commenters that recommended a higher coding pattern adjustment expressed concern that the current application of the minimum adjustment and the risk adjustment model incentivize plan sponsors to code their enrollees with as many conditions as possible, driving up payment rates. One commenter expressed concern that CMS' current methodology does not address the underlying causes of coding intensity, thereby undermining the goal of plans competing on the basis of quality and costs. Another commenter noted their belief that increased payments to MA plans do not result in better care.

- *Lower adjustment factor:* One commenter stated that the coding pattern adjustment results in inappropriately low risk scores that negatively impacts payment for many nonprofit regional health plans.

- *Specific Methodological Recommendations:*

    - Demographic Estimate of Coding Intensity (DECI). A few commenters recommended the incorporation of the DECI method to calculate a coding pattern adjustment factor. Under the assumption that MA does not receive adverse or favorable selection relative to FFS in terms of health status, the recommended DECI method controls for demographics, estimating the coding pattern adjustment by comparing MA risk relative to FFS risk using the CMS-HCC risk adjustment model, and comparing that relationship against MA risk versus FFS risk using the Adjusted Average Per Capita Cost (AAPCC) model that is based on demographics only and was used in payment prior to 2000.

    - Targeted approaches:

        - General targeted comments. Several commenters expressed concern that coding patterns across the MA landscape are heterogeneous and that failure to recognize

> these differences across plans by applying an across-the-board coding pattern adjustment could result in an inequitable outcome. A few commenters recommended targeted approaches, because of their concern that certain MA organizations code much more aggressively than others with higher levels of coding intensity due to various structural payment incentives, including payments between MA organizations and their contracted providers. Other commenters stated their concern about the current application of the factor because it does not adequately adjust for risk score increases above the average, and disadvantages plans serving primarily low-income and historically underserved communities that have less administrative resources to focus on diagnosis coding.
>
> ▪ Segmented approach. A few commenters suggested a segmented approach to coding pattern adjustments that recognizes different levels of coding patterns among plans, such that the lowest coding factor is applied to lower coding plans while the highest factor is applied to higher coding plans.
>
> ▪ Contract-specific approach. A few commenters recommended tailoring the MA coding pattern adjustment to the relative level of coding intensity seen in individual MA contracts – rather than the across-the-board coding pattern adjustment that CMS applies today to all MA contracts. A few commenters believe that CMS should consider increasing the MA coding pattern adjustment for all contracts and consider using its statutory authority to vary the coding pattern adjustment by contract.

A few commenters had recommendations to calibrate the model using different data to address coding pattern differences between MA and FFS. One commenter recommended a multipronged approach to addressing coding pattern differences in MA and FFS. Their recommendation included three parts: 1) develop a risk adjustment model that uses two years of FFS and MA diagnostic data; 2) exclude diagnoses that are documented only on health risk assessments from either FFS or MA; and then 3) apply a coding adjustment that fully accounts for the remaining differences in coding between FFS Medicare and MA plans.

<u>Response</u>: On an annual basis, CMS analyzes coding pattern differences and determines what the coding pattern adjustment factor should be. Section 1853(a)(1)(C)(ii) of the Act establishes a minimum MA coding pattern adjustment, which was originally adopted beginning with 2014 payment. The current statutory minimum coding pattern adjustment is 5.9%. We have found that the minimum adjustment is sufficient to reflect differences in coding patterns between MA plans and providers under FFS Parts A and B. CMS continues to believe that applying a uniform adjustment is an appropriate approach. Therefore, we are finalizing our proposed MA coding pattern adjustment factor for CY 2024.

We appreciate the extensive and thoughtful comments and feedback we received on this proposal. Ensuring that the coding pattern adjustment policy appropriately addresses differences in coding patterns between the FFS program and MA is essential and we will consider these recommendations in the development of future coding pattern adjustment proposals.

Comment: A few commenters supported CMS' proposed 5.9 percent 2024 coding pattern adjustment.

Response: CMS appreciates the support of the commenters. CMS is finalizing the proposed adjustment of 5.9 percent for CY 2024.

Comment: One commenter requested sufficient time and information to comment on any potential changes to the MA coding pattern adjustment in the future.

Response: CMS appreciates the comment. Section 1853(b)(2) requires that CMS provide notice of proposed changes in the methodology and assumptions for setting MA capitation rates and risk and other factors used to adjust the capitation payments, with a comment period of at least 30 days to comment on the proposed changes. We will continue to consider additional ways in which we can engage with stakeholders should we consider changes to the MA coding pattern adjustment.

Comment: A few commenters recommended that CMS move to a risk adjustment model based on MA encounter data to improve payment accuracy, which would also eliminate the need for a coding pattern adjustment.

Response: We appreciate the recommendation to move to an encounter-data based model. CMS recognizes the benefits of moving to a payment system that is based on MA experience. As discussed above, public comment would be an essential part of developing an encounter data-based model.

Comment: A few commenters believed that it is fundamentally incorrect to assume any observed coding differentials between the FFS and MA populations are driven by inappropriate coding on the part of MA plans and requested that CMS recognize that higher coding does not necessarily equate to wrong coding. One commenter stated that CMS should consider that differences in coding stem from the fact that FFS is unmanaged and under-coded, and that the differences actually demonstrate the value of MA plans in diagnosing and appropriately managing members' conditions. One commenter stated that the MA coding pattern adjustment was redundant to the many structures in place to reduce coding intensity such as the Risk Adjustment Data Validation audit (RADV).

Response: The MA coding pattern adjustment is not intended to adjust for inaccurate coding, but it is intended to account for program-wide differences in coding patterns between MA and FFS. CMS applies the MA coding pattern adjustment to adjust for the impact on MA risk scores of

coding patterns that differ from FFS coding, which is the basis of the CMS-HCC model. More specifically, Section 1853(a)(1)(C)(ii) of the Social Security Act requires the Secretary to reduce payments to MA organizations by at least 5.9% to account for "differences in coding patterns between Medicare Advantage plans and providers under part[s] A and B." This mandatory adjustment is applied to each beneficiary's risk score at every MA plan, which reflects how section 1853(a)(1)(C)(ii) focuses on coding pattern differences at a general, program-wide level. Specifically, section (a)(1)(C)(ii) addresses the incentive for all MA plans to identify more valid, supported codes on all HCCs, and therefore report more diagnoses (which we do not assume to be inaccurate when evaluating coding pattern differences between FFS and MA). By reducing each individual risk score by a specified percentage, the coding pattern adjustment corrects for overall, net differences between MA and FFS coding.

**Section N. Normalization Factors**

CMS did not receive comments on the methodology proposed to calculate the RxHCC risk adjustment model normalization factors for CY 2024. CMS is finalizing the RxHCC normalization factor methodology as proposed.

Comment: For the CMS-HCC and CMS-HCC ESRD risk adjustment models, many commenters were in support of the continued exclusion of the CY 2021 risk score from the calculation of the normalization factors for CY 2024, consistent with the policy finalized for CY 2023. Some commenters stated their agreement with CMS' belief that the decreased 2021 risk score is driven by reduced utilization in 2020 due to the pandemic and, therefore, should be excluded from the normalization factor. Several commenters were, in general, supportive of the methodology proposed to calculate the normalization factors for CY 2024, with a couple expressing their support only for the proposed methodology for the newer models (the CMS-HCC model proposed in the 2024 Advance Notice and the CMS-HCC ESRD models finalized in CY 2023).

Response: CMS appreciates the support of the commenters. We are finalizing the normalization factor methodology for the CMS-HCC and CMS-HCC ESRD risk adjustment models as proposed.

Comment: Several commenters were generally concerned that the proposed normalization factors for the CMS-HCC and CMS-HCC ESRD risk adjustment models are overstated, with one commenter stating their belief that this will translate to fewer benefits for beneficiaries. One commenter had concerns about applying a common normalization factor across model segments because they believe that the impact of the COVID-19 pandemic was not the same across segments, potentially leading to disproportionate impacts of the normalization factor across plans depending on their beneficiary population. A couple of commenters suggested a more nuanced approach be used for the inclusion of the 2022 risk score in the normalization factors for the newer models.

A few commenters were specifically concerned about CMS' proposed methodology to exclude the 2021 risk score (based on 2020 dates of service) from the calculation of the risk adjustment model normalization factors for CY 2024. A couple of these commenters believed that excluding the 2021 risk score data continues to deviate from CMS' longstanding methodology to use risk scores based on the most recent data available so as to reflect recent FFS experience. There was concern by a couple of commenters that excluding more recent years (for the older models), or weighting post-pandemic risk scores equally with pre-pandemic risk scores (for the newer models), may not be appropriate as the risk score experience may not be the same in the two time periods. A couple of commenters also stated that removing the 2021 risk score data from the normalization methodology increases the negative normalization adjustment, resulting in further reduction to risk scores and resulting payments. One of these commenters believed CMS' proposed methodology was contrary to CMS' data that showed continued lower risk scores in FFS while another questioned the accuracy of the normalization factors when excluding the 2021 risk score. One commenter requested that CMS explain how it plans to address the anomalous 2020 utilization patterns in future years, and voiced concern that utilization in 2021 and 2022 may also be anomalous. This commenter asked that CMS be consistent with how it uses the 2021 risk score in normalization in that, if it is excluded for CY 2024, that it continues to be excluded in the future.

A couple of commenters supported CMS' proposed methodology to calculate the normalization factors for the newer models (those with a 2019 or 2020 denominator) using risk scores from 2018-2022, excluding 2021, but opposed the proposed methodology for the older models (those with a 2015 denominator) to exclude both 2021 and 2022 risk scores. These commenters believed that the CMS should be consistent with its methodology across models and that the 2022 risk score should be included for both newer and older models so as not to overstate the normalization factor for the older models, which would lead to insufficient MA payments. They believe that the pre-pandemic experience may not reflect post-pandemic experience and by excluding more recent years from the older models, CMS is further deviating from its longstanding methodology to use recent FFS experience in the calculation of the normalization factor. Alternate methodologies for including 2022 in the normalization factor for the older models were suggested by a few commenters, such as using more years in the trend, projecting the trend differently, weighting 2022 risk scores more heavily to reflect more relevant and recent FFS experience, or blending.

Several commenters also requested that CMS be more transparent in its normalization factor calculation by releasing more data, providing more methodological information, further explaining its rationale for the proposed policy, or establishing a Technical Expert Panel to discuss the calculation of the normalization factor.

Response: CMS appreciates commenters' concerns regarding the calculation of the normalization factors for CY 2024. We believe, however, the proposed methodologies – using a linear approach with the most recent five years of data, with the exclusion of 2021 (2018–2022,

excluding 2021) for newer models, and using a linear approach with the exclusion of 2021 and 2022 (2016-2020) for the older models – are better projections of the applicable average FFS risk score in 2024.

The goal of the normalization factor is to accurately predict the FFS risk score in the payment year, thereby maintaining an average FFS risk score of 1.0 across the entire FFS population. CMS believes that the inclusion of the 2021 risk score in the slope calculation will result in a projected risk score (i.e., normalization factor) that is significantly below what the actual average FFS risk score is likely to be in 2024 whether the risk score is based on the current or proposed CMS-HCC model. In other words, including the 2021 risk score in either projection results in an unrealistic estimate of the 2024 FFS risk score.

Including the 2021 risk score and applying our typical methodology for the current CMS-HCC model yields a CY 2024 normalization factor that is lower than the actual 2022 FFS risk score. For the proposed model, if the 2021 risk score were included in the calculation using our typical methodology, the CY 2024 normalization factor would be 0.8% higher than the 2022 risk score. CMS believes it is unlikely that 2024 risk scores will be lower than 2022 risk scores, or that risk scores will grow by only 0.8% over two years. In addition, in all of the years used to identify the trend in risk scores prior to 2021, risk scores progressively increased; the decreases in utilization in 2020 were irregular due to the pandemic. The objective of the normalization factor is to project the payment year risk scores as accurately as possible to maintain the 1.0, given the information known at the time the projected scores are calculated. Given this objective, CMS believes that the decreases in utilization in 2020 due to the pandemic are not reflective of future health care utilization and should not be included in the calculation of the normalization factors.

Including the 2022 risk score and applying our typical methodology for the current CMS-HCC model yields a CY 2024 normalization factor that is lower than the 2022 FFS risk score. As noted above, CMS believes it to be unlikely that 2024 risk scores will be lower than 2022 risk scores. Given the increase in the 2022 actual FFS risk score relative to 2021 and the continuous increase in the average FFS risk score prior to the pandemic, it is not reasonable to apply a normalization factor that is lower than the most recent risk score data point in the trend. While we think it is important to incorporate more recent years of data in the trend to reflect current risk, updating the data must be balanced with projecting a risk score that is reflective of what the average 2024 FFS risk score is likely to be in order to establish the appropriate normalization factor.

CMS appreciates commenters' concerns about the impact of the COVID-19 pandemic on utilization and diagnoses submission, and the potential effects on risk adjusted payments. CMS carefully considered the use of the 2021 FFS risk score in the calculation of the slope used to project the normalization factors for the CMS-HCC risk adjustment models for CY 2024. The 2021 risk score, which is based on diagnoses from 2020 dates of service, is significantly lower than the 2020 risk score, which was based on diagnoses from 2019 dates of service. Prior to

2021, risk scores progressively increased in the years used to identify the trend in risk scores. We believe that the decrease in the 2021 risk score is driven primarily by reduced utilization in 2020 due to the pandemic. While CMS understands the uncertainty surrounding the future impact of the COVID-19 pandemic and the use of the 2020 utilization data, every year CMS re-evaluates the data and bases policy decisions on the information available. We will continue to monitor and analyze underlying risk score trends and their drivers. The public will have an opportunity to comment on future proposed policies.

While there is inherent uncertainty with any prediction of future values, the proposed approaches to calculating the normalization factors for CY 2024 maintain the stability of using our longstanding five-year linear slope methodology while balancing the impact of the pandemic on the normalization factor projection and the progressive increase in risk scores evident in the historical trend prior to 2021.

Comment: A couple of commenters requested further rationale for CMS' proposal to include 2020 utilization and data for development of the MA benchmarks and growth rates but not for the CY 2024 normalization factors. A couple of commenters also questioned CMS' use of 2020 as the denominator year for the proposed CMS-HCC risk adjustment model because the 2020 denominator uses 2020 expenditures/2020 dates of service. These commenters were concerned that CMS is being inconsistent in its use of the 2020 experience across the policies proposed in the 2024 Advance Notice.

Response: We understand that commenters are concerned about the treatment of 2020 data in some of CMS' MA payment policies. CMS carefully considered the appropriateness of 2020 data and made a determination based on how the data is being used (e.g., as part of an average versus part of a trend), and the reasonableness of the impact of the data on what is being measured. As described in more detail below, the impact of an inconsistent data point differs when used to calculate an average versus a projected value. Prior to establishing MA benchmarks for CY 2024, the trends in the 2020 FFS data used to establish the benchmarks were analyzed. Some specific regions did experience decreased per-capita costs while other regions experienced increased per-capita costs when compared to the 2019 national average per-capita costs. However, because the ratebook FFS average geographic adjustments (AGAs) use data to develop a relative index that averages out to 1.0, the level of the 2020 FFS claims is not impactful for this measure. Furthermore, for ratebook development, CMS uses an average of five years of FFS experience for each county, so annual fluctuations and anomalies in the data that may occur for a variety of reasons are mitigated. Calculating and using a five-year average provides stability in the rates despite local or regional events, such as natural or weather-related disasters, and varying impacts from nationwide events, such as pandemics.

Distinct from calculating the benchmarks, normalization factors are calculated using five years of historical data to create a trend that is projected out to a future payment year. As described in the CY 2023 Advance Notice, when calculating a trend, one anomalous data point can have a

large impact on the projected value, which can pull the slope up or down significantly and lead to a projection that does not reasonably estimate a future value. This trending issue does not apply with rebasing where historical data are used to calculate a five-year rolling average in the AGA calculation for ratebook development, so the impact of any one year of anomalous utilization is moderated by four other years of data.

Prior to proposing the CY 2024 normalization factors for the CMS-HCC and CMS-HCC ESRD risk adjustment models, CMS carefully considered the impact of using the 2021 risk score (2020 dates of service) in the calculation of the slope used to project the 2024 FFS risk score (i.e., the normalization factor). CMS believes that the decrease in utilization due to the pandemic was irregular and not reflective of future health care utilization, and, if the data were used to project a future risk score, would result in an underestimate of the normalization factor. The policy of excluding the 2021 risk score (2020 dates of service) from the normalization factor calculation is consistent with the approach we used to project FFS USPCCs in the 2023 Rate Announcement in that 2020 data are excluded. Like the methodology used to calculate normalization factors, the methodology used to estimate national FFS spending projects a future value based on a trend. For both estimates, which rely on trending and projecting using historical data, CMS consistently excluded the 2020 data.

As noted by commenters, CMS used a 2020 denominator to create relative factors for the proposed CMS-HCC risk adjustment model. In order to use the risk adjustment model to calculate risk scores for payment, we create relative factors for each demographic factor and HCC in the model. The relative factors are used to calculate risk scores for individual beneficiaries. CMS creates relative factors by dividing all the model-based dollar coefficients by the average per capita predicted expenditures for a specific year (the "denominator year"). To calculate a model denominator, in this case the average per capita predicted expenditures for 2020 (i.e., the 2020 denominator), we do not use actual expenditures, but rather, we apply the proposed CMS-HCC model to 2019 diagnoses from a cohort of 2020 beneficiaries, and produce a predicted average per capita expenditure for 2020. Therefore, actual 2020 experience – utilization or expenditures – is not reflected in the 2020 denominator.

**Section O. Sources of Diagnoses for Risk Score Calculation for CY 2024**

CMS did not receive comments within the scope of the policy as to which sources of diagnoses are used for risk score calculation for CY 2024.

For non-PACE organizations, for CY 2024, CMS will continue the policy adopted in the CY 2023 Rate Announcement to calculate risk scores for payment to MA organizations and certain demonstrations using only risk adjustment-eligible diagnoses from encounter data and FFS claims.

For PACE organizations, for CY 2024, CMS will continue using the same method of calculating risk scores under the CMS-HCC and ESRD models that we have been using since CY 2015,

which is to pool risk adjustment-eligible diagnoses from the following sources to calculate a single risk score (with no weighting): (1) encounter data, (2) Risk Adjustment Processing System (RAPS) data, and (3) FFS claims.

**Attachment IV. Responses to Public Comments on Part D Payment Policy**

**Section A. RxHCC Risk Adjustment Model**

Comment: Of the commenters that commented specifically on the proposal to continue using the 2023 RxHCC model for CY 2024, most expressed concerns about the impact of using the 2023 model in CY 2024 given the plan design changes called for in the IRA. These commenters believed that changes such as the elimination of cost-sharing in the catastrophic phase of coverage and cost-sharing caps on insulin and vaccines would result in increased plan liability that would not be accounted for in the 2023 RxHCC model. Some commenters expressed additional concerns about the impact that underestimation of plan liability would have on low-income beneficiaries, beneficiaries with high-cost medications, and beneficiaries in D-SNP plans. Some commenters supported updating the RxHCC model in CY 2025 to reflect plan design changes to appropriately reflect relative risks of Part D enrollees. A couple of commenters recommended CMS take specific steps in CY 2024 to account for the proposal to use the 2023 RxHCC model in CY 2024 (e.g., providing flexibility to adjust margins during the rebate reallocation process).

Response: CMS appreciates the commenters' concerns. As noted in the CY 2024 Advance Notice, the IRA was enacted well into the timeline needed to conduct a revision to the RxHCC risk adjustment model to reflect these recent benefit changes for CY 2024. We acknowledge that these benefit changes can result in changes to plan liability for beneficiaries with conditions that result in an increased likelihood of reaching the catastrophic phase of the benefit. It requires extensive time to prepare the data to update the model, run the recalibration and calculate the relative factors, review the output, and finalize an updated model for publication in the Advance Notice. For example, for the RxHCC risk adjustment model, this work includes re-mapping all the Prescription Drug Event data to reflect the new plan liability, and re-estimating the RxHCC coefficients based on the updated plan liability. For these reasons, the insufficient time CMS had to recalibrate the RxHCC risk adjustment model to account for plan design changes called for by the IRA made an update infeasible.

We note that any changes to plan liability as a result of IRA changes to the Part D benefit are not expected to be large. Further, to the extent that any plans' resulting revenue need for the plan's liability under the CY 2024 benefit sufficiently exceeds what they projected in their bid, then the Part D sponsor would be compensated for some of their losses through the Part D risk corridors. As discussed in the Advance Notice, we will be recalibrating the model based on the updated benefit structure for CY 2025.

For CY 2024 CMS will continue to use the RxHCC Risk Adjustment Models as discussed in the 2024 Advance Notice:

- For Non-PACE Organizations: For CY 2024, we will continue to use the 2023 RxHCC risk adjustment model to adjust direct subsidy payments for Part D benefits offered by stand-alone Prescription Drug Plans (PDPs) and Medicare Advantage-Prescription Drug Plans (MA-PDs).

- For PACE Organizations: For CY 2024, CMS will continue to use the 2020 RxHCC risk adjustment model to calculate Part D risk scores.

Comment: A few commenters expressed concerns about the combined effects of changes to the CMS-HCC risk adjustment model and the RxHCC model. One commenter believed that the CMS-HCC changes could threaten the ability of MA plans to use rebate dollars to buy down the Part D premiums, while another believed that the removal of codes from the CMS-HCC model would cause discrepancies between plan coding activities for risk adjustment between the Part C and Part D programs. Another commenter suggested revising RxHCC model coefficients for any conditions, such as diabetes, which were being removed or disincentivized in the CMS-HCC model.

Response: CMS appreciates the commenters' concerns. These two models have always had key differences, among them that the CMS-HCC risk adjustment model predicts the costs of Part A and Part B benefits, while the RxHCC model predicts plan liability for prescription drugs covered under the Part D program. Because the models predict different costs, it has always been the case that they have HCCs that are formulated differently or that are in one model and not the other. The CMS-HCC risk adjustment model is being updated to improve the prediction of costs for the Part A and Part B benefits, using updated data and a reclassification of the HCCs so they are based on the ICD-10 classification system. For CY 2023, the RxHCC model was updated to improve the prediction of plan liability for Part D prescription drug costs by calibrating the model on more recent data years and using newly built HCCs reflected a reclassification using ICD-10 codes. In this way, for CY 2024, the RxHCC and CMS-HCC models will be more closely aligned. We do not anticipate that changes to the CMS-HCC model will cause discrepancies in plan coding activities between the Part C and Part D programs.

Comment: Several commenters recommended that CMS examine other methods where the underlying data and structure of the RxHCC model could be modified for CY 2025. These commenters believed that the model underpredicts plan liability for common therapeutic areas, especially for newer, high-cost treatments and for low-income beneficiaries. Some of these commenters also believed that the redesign of the Part D benefit in CY 2025 could lead to incentives for plans to select beneficiaries with more favorable risk, so the model should be updated to mitigate this potential.

Response: CMS appreciates the commenters' concerns. As discussed in the Advance Notice, we will be recalibrating the model based on the updated benefit structure for CY 2025 and will take this feedback into account as part of the development and recalibration process. We consistently look for ways to improve our models and thank the commenters for their thoughts.

Comment: A few commenters suggested steps such as including drug utilization markers similar to those in the commercial market, as well as updating the model with more recent claims data to reflect more recent drug costs and improve the predictive power of the model.

Response: CMS thanks the commenters for their suggestions. We understand that in certain programs such as the Marketplace where a combined medical and drug model is utilized, the methodological approach for predicting relative costs that are specific to that population may be different from the approach used in MA. CMS uses the RxHCC risk adjustment model to adjust the direct subsidy payments for Part D benefits offered by stand-alone prescription drug plans and MA-Part D plans. Having the RxHCC model used to predict drug costs separate from the CMS-HCC model used to predict medical costs enables a single model – the RxHCC model – to account for differences in predicted plan liability for prescription drugs among distinct subgroups of Part D eligible beneficiaries.

Comment: A majority of commenters recommended that CMS release information about the recalibration of the RxHCC model that incorporates the updated benefit structure in advance of the CY 2025 Advance Notice, with many of these commenters also recommending that CMS allow for a 60-day comment period for the RxHCC model so that plans have more time to evaluate the methodological changes.

Response: We thank the commenters for their recommendations.

**Section B. Sources of Diagnoses for Part D Risk Score Calculation for CY 2024**

Please refer to Attachment III, Section O. for comments and responses regarding sources of diagnoses.

**Section C. Inflation Reduction Act of 2022 Part D Benefit Design Changes**

Comment: Many commenters expressed support for CMS' implementation of the IRA changes in place for 2024.

Response: CMS thanks the commenters for their support.

Comment: A commenter expressed opposition to CMS' implementation of the IRA changes in place for 2024, stating that the changes will lead to reduced benefits, increased cost-sharing, and increased premiums.

Response: CMS appreciates the commenter's concerns. We note that the IRA changes in place for 2024 are mandated by statute and anticipate that these changes will increase the affordability

and accessibility of Part D drugs for Medicare beneficiaries. Furthermore, the premium stabilization requirements will prevent unaffordable increases in premiums owed by Part D beneficiaries.

Comment: A commenter requested clarification that the low-income cost sharing subsidy will continue to cover the full cost of a claim with respect to ACIP-recommended vaccines and covered insulin products for LIS beneficiaries up to the low-income patient payment in the coverage gap. Another commenter argued that the low-income cost sharing subsidy used to calculate the coverage gap discount with respect to covered insulin products for LIS beneficiaries should be calculated based on the full cost of the drug rather than the maximum LIS copayment.

Response: For LIS beneficiaries in the coverage gap in 2024, the low-income cost-sharing subsidy will continue to cover the full cost of an ACIP-recommended vaccine and a covered insulin product up to the maximum LIS copayment in accordance with section 1860D-14(a)(1)(C) of the Act. As such, the low-income cost sharing subsidy will continue to cover the full cost of ACIP-recommended vaccines and covered insulin products up to the lesser of the applicable copayment amount or nominal copayment amount. LIS-eligible beneficiaries are not applicable beneficiaries and do not receive a coverage gap discount. Additionally, we clarify that when we stated in the CY 2024 Advance Notice that no cost will be incurred by LIS and non-LIS beneficiaries for ACIP-recommended adult vaccines and, therefore, no costs will count as TrOOP toward the OOP threshold for beneficiary progression into the catastrophic phase, we were speaking only of the amount actually paid by the beneficiary and not the low-income cost sharing subsidy amount.

**Section D. Medicare Part D Benefit Parameters: Annual Adjustments for Defined Standard Benefit in 2024**

Comment: A few commenters requested that CMS consider the impact of the 2023 pharmacy price concession rule when calculating the API and CPI in the Rate Announcement. A commenter believes that the pharmacy price concession rule will reduce the negotiated price of drugs and patient drug spending, and therefore the effect of the pharmacy price concession rule should be considered when calculating the API and CPI. Some commenters also requested that CMS consider the changes to the coverage of ACIP-recommended vaccines and covered insulin products in the calculation of the API and CPI for 2024.

Response: CMS appreciates the commenters' suggestions and concerns. Under section 1860D-2(b)(6) of the Act, the API is defined as the annual percentage increase in average per capita aggregate expenditures for covered Part D drugs in the United States for Part D eligible individuals for the 12-month period ending in July 2023. The calculation does not involve a projection of the time period where the pharmacy price concession rule is effective. Additionally, changes to the coverage of ACIP-recommended vaccines and covered insulin products will not impact the calculation of the API for 2024 because the calculation is based on total drug

spending. Our estimate of API includes expected increases in the total drug spending as a result of additional coverage required for ACIP-recommended vaccines and covered insulin products during January through July 2023.

Section 1860D-14(a)(4) of the Act requires CMS to use the annual percentage increase in the CPI for the 12-month period ending in September of the previous year. The calculation also does not involve a projection of the time period where the pharmacy price concession rule is effective.

Finally, the annual percentage increase in the CPI is determined using the actual September 2022 value as calculated by the Bureau of Labor Statistics and an estimate of the September 2023 CPI based on projections from the President's FY2024 Budget.

Comment: A commenter also requested more transparency as to how the value of the 1.09 adjustment that CMS made to the calculation of total gross covered drug costs for 2024 was determined.

Response: We evaluated the impact of the change in coverage for ACIP-recommended vaccines and covered insulin products according to Part D historic claims data in 2021 by using continuance tables for the LIS and Non-LIS populations, and calculating the allowed cost corresponding to the true out-of-pocket cost (TrOOP) threshold. The adjustments to the calculation of the allowed cost at the catastrophic threshold are necessary because beneficiaries take a longer time to reach the TrOOP threshold, and, thus, the catastrophic phase when they pay less cost sharing prior to the catastrophic phase.

These adjustments have also been updated from those in the CY 2024 Advance Notice to reflect that the low-income cost sharing subsidy, when applicable, will continue to count toward TrOOP. As noted above, we clarify that when we stated in the CY 2024 Advance Notice that no cost will be incurred by LIS and non-LIS beneficiaries for ACIP-recommended adult vaccines and, therefore, no costs will count as TrOOP toward the OOP threshold for beneficiary progression into the catastrophic phase, we were speaking only of the amount actually paid by the beneficiary and not the low-income cost sharing subsidy amount.

**Section E. Part D Calendar Year Employer Group Waiver Plans Prospective Reinsurance Amount**

Comment: One commenter supported our policy of paying prospective reinsurance amounts to Part D EGWPs and recommended that CMS add a trend adjustment to the methodology so that prospective reinsurance payments take into account the amount by which reinsurance is projected to increase in the current payment year relative to the most recently reconciled payment year.

Response: CMS thanks the commenter for their support and recommendation. We do not believe it would be appropriate to adjust prospective reinsurance payments for CY 2024 by a trend factor

when we did not propose to do so in the Advance Notice. Although we decline to add a trend factor at this time, we will consider this recommendation as we continue to refine our methodology for future years

**Section F. Part D Risk Sharing**

Comment: A commenter suggested that CMS consider narrowing risk corridors to help manage premium increases on beneficiaries.

Response: We appreciate the commenter's suggestion. Under section 1860D-15(e)(3)(C) of the Act and § 423.336(a)(2)(ii), CMS may establish a risk corridor with higher threshold risk percentages for Part D risk sharing. However, the statute does not permit CMS to narrow the corridors relative to the CY 2011 thresholds.

**Attachment V. Final Updated Part D Benefit Parameters for Defined Standard Benefit, Low-Income Subsidy, and Retiree Drug Subsidy**

**Table V-1. Updated API and CPI for 2024**

| | Annual percentage trend for 2023 | Prior year revisions | API for 2024 |
|---|---|---|---|
| API | 6.42% | 1.50% | 8.01% |
| September CPI (all items, U.S. city average) | 3.81% | 3.87% | 7.83% |

**Table V-2. Updated Part D Benefit Parameters for Defined Standard Benefit, Low-Income Subsidy and Retiree Drug Subsidy**

| | 2023 | 2024[42] |
|---|---|---|
| **Standard Benefit** | | |
| Deductible | $505 | $545 |
| Initial Coverage Limit | $4,660 | $5,030 |
| Out-of-Pocket Threshold | $7,400 | $8,000 |
| Total Covered Part D Spending at Out-of-Pocket Threshold for Non-Applicable Beneficiaries (1)(6) | $10,516.25 | $11,477.39 |
| Estimated Total Covered Part D Spending for Applicable Beneficiaries (2)(6) | $11,206.28 | $12,447.11 |
| Minimum Cost Sharing in Catastrophic Coverage Portion of the Benefit | | |
| Generic/Preferred Multi-Source Drug | $4.15 | Not Applicable |
| Other | $10.35 | Not Applicable |
| **Full Subsidy-Full Benefit Dual Eligible (FBDE) Beneficiaries (3)** | | |
| Deductible | $0.00 | $0.00 |
| Copayments for Institutionalized Beneficiaries [category code 3] | $0.00 | $0.00 |
| Copayments for Beneficiaries Receiving Home and Community-Based Services] [category code 3] (4) | $0.00 | $0.00 |
| Maximum Copayments for Non-Institutionalized Beneficiaries | | |
| Up to or at 100% FPL [category code 2] | | |
| Up to Out-of-Pocket Threshold | | |
| Generic/Preferred Multi-Source Drug | $1.45 | $1.55 |
| Other | $4.30 | $4.60 |
| Above Out-of-Pocket Threshold | $0.00 | Not Applicable |
| Between 100% and 150% of FPL [category code 1] | | |
| Up to Out-of-Pocket Threshold | | |
| Generic/Preferred Multi-Source Drug | $4.15 | $4.50 |
| Other | $10.35 | $11.20 |
| Above Out-of-Pocket Threshold | $0.00 | Not Applicable |

[42] These parameters reflect additional plan coverage required for covered insulin products under section 1860D-2(b)(9) of the Act, as added by section 11406 of the IRA, and ACIP-recommended vaccines under section 1860D-2(b)(8) of the Act, as added by section 11401 of the IRA.

| | 2023 | 2024[42] |
|---|---|---|
| **Full Subsidy-Non-FBDE Beneficiaries (3)** | | |
| Applied or eligible for QMB/SLMB/QI or SSI, income at or below 135% FPL in 2023 or at or below 150 % FPL for 2024 and beyond and resources ≤ $9,090 (individuals, 2023) or ≤ $13,630 (couples, 2023) [category code 1] (5) | | |
| Deductible | $0.00 | $0.00 |
| Maximum Copayments up to Out-of-Pocket Threshold | | |
| Generic/Preferred Multi-Source Drug | $4.15 | $4.50 |
| Other | $10.35 | $11.20 |
| Maximum Copayments above Out-of-Pocket Threshold | $0.00 | Not Applicable |
| **Partial Subsidy (3) (Revised to Full Subsidy Effective 1/1/24)** | | |
| Applied and income below 150% FPL and resources below $15,160 (individual, 2023) or $30,240 (couples, 2023) [category code 4] 5 | | |
| Deductible | $104 | Not Applicable |
| Coinsurance up to Out-of-Pocket Threshold | 15% | Not Applicable |
| Maximum Copayments above Out-of-Pocket Threshold | | |
| Generic/Preferred Multi-Source Drug | $4.15 | Not Applicable |
| Other | $10.35 | Not Applicable |
| **Retiree Drug Subsidy Amounts** | | |
| Cost Threshold | $505 | $545 |
| Cost Limit | $10,350 | $11,200 |

(1) For a beneficiary who is not considered an "applicable beneficiary," as defined at section 1860D-14A(g)(1) of the Act, and is not eligible for the Medicare Coverage Gap Discount Program, this is the amount of total drug spending required to reach the OOP threshold in the defined standard benefit. There is a 1 percent adjustment for the estimated total covered Part D spending at catastrophic for non-applicable beneficiaries because beneficiaries take a longer time to reach the catastrophic phase threshold when they pay less cost sharing for insulins and vaccines (no more than a $35 copay per month's supply of each covered insulin product and a $0 copay on ACIP-recommended adult vaccines) under the 2024 defined standard benefit. This adjustment has been updated from the 7 percent adjustment in the CY 2024 Advance Notice to reflect that the low-income cost sharing subsidy, when applicable, will continue to count toward TrOOP.

(2) For a beneficiary who is an "applicable beneficiary," as defined at section 1860D-14A(g)(1) of the Act, and is eligible for the Medicare Coverage Gap Discount Program, this is the estimated average amount of total drug spending required to reach the OOP threshold in the defined standard benefit. There is a 3 percent adjustment for the estimated total covered Part D spending at catastrophic for applicable beneficiaries. This adjustment has been updated from the 9 percent adjustment in the CY 2024 Advance Notice to account for the fact that beneficiaries take a longer time to reach the catastrophic phase threshold when they pay less cost sharing for insulins and vaccines (no more than a $35 copay per month's supply of each covered insulin

product and a $0 copay on ACIP-recommended adult vaccines) under the 2024 defined standard benefit.

(3) The LIS eligibility categories and corresponding cost-sharing benefits are sometimes referred to using category codes as follows:

- Category Code 1 – Non-institutionalized FBDE beneficiaries with incomes between 100% and 150% of FPL (beginning in CY 2024) and full-subsidy-non-FBDE beneficiaries. Note that LIS beneficiaries that would previously fall into category code 4 fall into category code 1 beginning in CY 2024 – see note for category code 4 below.
- Category Code 2 – Non-institutionalized FBDE beneficiaries with incomes up to 100% of the FPL.
- Category Code 3 – FBDE beneficiaries who are institutionalized or would be institutionalized if they were not receiving home and community-based services.
- Category Code 4 – Partial subsidy beneficiaries through CY 2023. Beneficiaries with incomes between 135 percent and 150 percent of the FPL, who meet the resource standards under either of sections 1860D-14(a)(3)(D) or (E) of the Act, and who would have been eligible for the partial LIS benefit absent the enactment of the IRA, will be eligible for the full LIS benefit. These category 4 beneficiaries will now have the same Part D benefit parameters as beneficiaries in category 1 of the LIS. Category 2 and 3 of the LIS remain unchanged.

(4) Per section 1860D-14(a)(1)(D)(i) of the Act, full-benefit dually eligible beneficiaries who are receiving home and community-based services qualify for zero cost sharing if the individuals (or couple) would have been institutionalized otherwise.

(5) The resource limits for CY 2024 will be provided via the annual HPMS memo entitled "2024 Resource and Cost-Sharing Limits for Low-Income Subsidy (LIS)" that is expected to be released during the usual timeframe after the September 2023 CPI has been made available by the Bureau of Labor Statistics. Additionally, these amounts include $1,500 per person for burial expenses. Also, beneficiaries that would have been eligible for the partial LIS benefit had the IRA not been enacted will be eligible for the full LIS benefit if they meet either of the resource standard described at sections 1860D-14(a)(3)(D) or (E) of the Act.

(6) The allowed amounts for total covered Part D spending at the out-of-pocket threshold reflect the slower progression through the benefit due to the new requirements for covered insulin products and ACIP-recommended vaccines at sections 1860D-2(b)(9) and 1860D-2(b)(8) of the Act. For non-LIS beneficiaries, these amounts reflect that the manufacturer Coverage Gap Discount will be calculated similarly for covered insulin products, ACIP-recommended vaccines, and other drugs. For LIS beneficiaries, these amounts reflect that the low-income cost sharing subsidy, when applicable, will continue to count toward TrOOP.

**Section A. Annual Percentage Increase in Consumer Price index**

***Annual Percentage Increase in Consumer Price Index, September (September CPI)***

Section 1860D-14(a)(4) of the Act requires CMS to use the annual percentage increase in the CPI for the 12-month period ending in September 2023 to update the maximum copayments up to the out-of-pocket threshold for full-benefit dually eligible enrollees with incomes not exceeding 100 percent of the Federal Poverty Level. These copayments are increased from $1.45 per generic, preferred drug that is a multi-source drug, or biosimilar, and from $4.30 for all other drugs in 2023 and rounded to the nearest multiple of $0.05 and $0.10 respectively.[43]

**Section B. Calculation Methodology**

***Annual Percentage Increase in Average Expenditures for Part D Drugs per Eligible Beneficiary (API)***

For contract years 2006 and 2007, the APIs, as defined in section 1860D-2(b)(6) of the Act, were based on the National Health Expenditure (NHE) prescription drug per capita estimates because sufficient Part D program data was not available. Beginning with contract year 2008, the APIs are based on Part D program data. For the CY 2024 benefit parameters, Part D program data will be used to calculate the annual percentage trend as follows:

$$\frac{August\ 2022\text{–}July\ 2023}{August\ 2021\text{–}July\ 2022} = \$4{,}916.80/\$4{,}620.25 = 1.064$$

In the formula, the average per capita cost for August 2021 – July 2022 is calculated from actual Part D PDE data, and the average per capita cost for August 2022 – July 2023 is calculated based on actual Part D PDE data for prescription drug claims with service dates from August 2022 – December 2022 and projected through July 2023.

The 2024 benefit parameters reflect the 2023 annual percentage trend, as well as an update for revision to prior year estimates for API. Based on updated NHE prescription per capita costs and PDE data, the annual percentage increases are now calculated as summarized by Table V-3.

**Table V-3. Revised Prior Years' Annual Percentage Increases**

| Year | Prior Estimates of Annual Percentage Trend | Revised Annual Percentage Trend |
|---|---|---|
| **2006** | 7.30% | 7.30% |
| **2007** | 5.92% | 5.92% |
| **2008** | 4.69% | 4.69% |

[43] Per section 1860D-14(a)(4)(A) of the Act, the copayments are increased from the unrounded 2023 values of $4.1508 for multi-source generic or preferred drugs, and $10.3507 for all other drugs.

| Year | Prior Estimates of Annual Percentage Trend | Revised Annual Percentage Trend |
|---|---|---|
| **2009** | 3.14% | 3.14% |
| **2010** | 2.36% | 2.36% |
| **2011** | 2.15% | 2.15% |
| **2012** | 2.53% | 2.53% |
| **2013** | -3.14% | -3.14% |
| **2014** | 10.12% | 10.12% |
| **2015** | 9.89% | 9.89% |
| **2016** | 4.02% | 4.02% |
| **2017** | 1.87% | 1.87% |
| **2018** | 4.05% | 4.05% |
| **2019** | 4.92% | 4.92% |
| **2020** | 5.06% | 5.06% |
| **2021** | 4.69% | 4.69% |
| **2022** | 5.80% | 7.37% |

Accordingly, the CY 2024 benefit parameters reflects a multiplicative update of 1.50 percent for prior year revisions. In summary, the outlined in Section A are updated by 8.01 percent for, as summarized by Table V-4.

**Table V-4. Annual Percentage Increase**

| | |
|---|---|
| Annual percentage trend for July 2023 | 6.42% |
| Prior year revisions | 1.50% |
| Annual percentage increase for 2024 | 8.01% |

Note: Percentages are multiplicative, not additive. Values are carried to additional decimal places and may not agree to the rounded values presented above.

***Annual Percentage Increase for Out-of-Pocket Threshold***

In accordance with section 1860D-2(b)(4)(B), we calculated the change in the out-of-pocket threshold using the 2023 threshold value of $7,400 as our starting point. To calculate the 2024 value, we applied the 2024 API described above and rounded to the nearest $50. The resulting 2024 out-of-pocket threshold value is $8,000.

***Annual Percentage Increase in Consumer Price Index, September (September CPI)***

To ensure that plan sponsors and CMS have sufficient time to incorporate cost-sharing requirements into the development of the benefit, any marketing materials, and necessary

systems, CMS includes in its methodology to calculate the annual percentage increase in the CPI for the 12-month period ending in September 2023, an estimate of the September 2023 CPI based on projections from the President's FY2024 Budget.

The September 2022 value is from the Bureau of Labor Statistics. The annual percentage trend in the September CPI for CY 2024 is calculated as follows:

$$\frac{\text{Projected September 2023 CPI}}{\text{Actual September 2022 CPI}} \text{ or } \$308.1/\$296.8=1.038$$

(Source: President's FY2024 Budget and Bureau of Labor Statistics, Department of Labor)

The CY 2024 benefit parameters reflects the CY 2023 annual percentage trend in the September CPI of 3.81 percent, as well as a 3.87 percent multiplicative correction for the revision to last year's estimate. The CY 2023 annual percentage trend in the CPI can be found in Table V-5 below.

**Table V-5. Cumulative Annual Percentage Increase in September CPI**

| | |
|---|---|
| Annual percentage trend for September 2023 | 3.81% |
| Prior year revisions | 3.87% |
| Annual percentage increase for 2024 | 7.83% |

Note: Percentages are multiplicative, not additive. Values are carried to additional decimal places and may not agree to the rounded values presented above.

**Section C. Annual Percentage Increase in Average Expenditures for Part D Drugs per Eligible Beneficiary (API)**

Section 1860D-2(b)(6) of the Act defines the API as "the annual percentage increase in average per capita aggregate expenditures for covered Part D drugs in the United States for Part D eligible individuals, as determined by the Secretary for the 12-month period ending in July of the previous year using such methods as the Secretary shall specify." The following defined standard Part D prescription drug benefit parameters are updated using the "annual percentage increase":

**Deductible:** From $505 in 2023 and rounded to the nearest multiple of $5.

**Initial Coverage Limit:** From $4,660 in 2023 and rounded to the nearest multiple of $10.

**Out-of-Pocket Threshold:** From $7,400 in 2023 and rounded to the nearest multiple of $50.

**Maximum Copayments up to the Out-of-Pocket Threshold for Certain Low-Income Full Subsidy Eligible Beneficiaries:** From $4.15 per generic, preferred drug that is a multi-source

drug, or biosimilar and $10.35 for all other drugs in CY 2023, rounded to the nearest multiple of $0.05.

**Table V-6. Part D Benefit Parameters for Defined Standard Benefit for 2023 and 2024 for Non-LIS Beneficiaries**

| | 2023 | | 2024[44] | |
|---|---|---|---|---|
| **Deductible Phase** | Cost sharing: 100% | | Cost sharing: 100% | |
| | Deductible: $505 | | Deductible: $545 | |
| **Initial Coverage Phase** | Cost sharing: 25% | | Cost sharing: 25% | |
| | Initial Coverage Limit: $4,660 | | Initial Coverage Limit: $5,030 | |
| **Coverage Gap** | Applicable Drugs: Cost sharing: 25% (1) | Non-applicable Drugs Cost sharing: 25% | Applicable Drugs Cost sharing: 25% (1) | Non-applicable Drugs Cost sharing: 25% |
| | Out-of-Pocket Threshold: $7,400 | | Out-of-Pocket Threshold: $8,000 | |
| **Catastrophic Coverage** | Cost sharing: Greater of 5% or $4.15 (Generic/Preferred Multi-Source Drug) / $10.35 (Other) | | Cost Sharing: 0% | |

(1) The 25% coinsurance for applicable drugs for non-LIS beneficiaries during the coverage gap reflects the application of the 70% Medicare Coverage Gap Discount Program discount.

**Section D. Estimated Total Covered Part D Spending at Out-of-Pocket Threshold for Applicable Beneficiaries**

For CY 2024, the estimated total gross covered prescription drug costs at the out-of-pocket threshold for applicable beneficiaries will be calculated given the following basic assumptions:

- 100 percent beneficiary cost-sharing in the deductible phase.
- 25 percent beneficiary cost-sharing in the initial coverage phase.
- 25 percent beneficiary cost-sharing for non-applicable drugs purchased in the coverage gap phase of the benefit.

---

[44] These parameters reflect additional plan coverage required for covered insulin products under section 1860D-2(b)(9) of the Act, as added by section 11406 of the IRA, and ACIP-recommended vaccines under section 1860D-2(b)(8) of the Act, as added by section 11401 of the IRA.

- 95 percent cost-sharing for the ingredient cost and sales tax for applicable drugs purchased in the coverage gap phase of the benefit—consisting of 25 percent beneficiary coinsurance and 70 percent Medicare Coverage Gap Discount Program discount.
- 25 percent cost-sharing for the dispensing of applicable drugs and vaccine administration fees not associated with ACIP-recommended vaccines drugs purchased in the coverage gap phase of the benefit.

In this estimate, it is assumed that the dispensing and vaccine administration fees account for 0.042 percent of the gross covered brand drug costs used by non-LIS beneficiaries in the coverage gap. Therefore, a 75 percent reduction in cost-sharing for dispensing and vaccine administration fees results in an overall reduction of 0.030 percent to 94.970 percent in cost-sharing for applicable (brand) drugs in the coverage gap.

The CY 2024 calculation of the estimated total gross covered prescription drug costs at out-of-pocket (OOP) threshold for applicable beneficiaries is as follows:

$$(\text{ICL}+\frac{\text{100\% beneficiary cost sharing in the gap}}{\text{weighted gap coinsurance factor}}) * \mathit{Insulin\ and\ Vaccine\ Adjustment}$$

$$or\ (\$5{,}030+\frac{\$6{,}333.75}{89.782\%}) * 1.03 = \$12{,}447.11$$

- *ICL* is the Initial Coverage Limit equal to $5,030.

- Insulin and Vaccine Adjustment=1.03.

- *100 percent beneficiary cost sharing in the gap* is the estimated total drug spending in the gap assuming 100 percent coinsurance and is equivalent to:

  *(*OOP threshold) – (OOP costs up to the ICL) *or* $8,000 − $1,666.25 = $6,333.75

  *Weighted gap coinsurance factor* is calculated as follows:

  (Brand Gross Drug Cost Below Catastrophic [GDCB] % for non-LIS × gap cost sharing for applicable drugs) + (Generic GDCB % for non-LIS × 25% gap cost sharing for non-applicable drugs)

  *or*

  (92.59% × 94.970%) + (7.41% × 25.00%) = 89.782%

  - *Brand GDCB % for non-LIS* is the percentage of gross covered drug costs below the OOP threshold for applicable beneficiaries (i.e., non-LIS) attributable to applicable drugs, as reported on the 2022 PDEs.

- *Gap cost sharing for applicable drugs* is the coinsurance incurred by applicable beneficiaries (i.e., non-LIS) for applicable drugs in the coverage gap, where:

  - *Coinsurance for applicable drugs* is calculated as follows:

    - [(percentage of gross covered brand drug costs attributable to ingredient cost and sales tax) × (cost-sharing percentage)] + [(percentage of gross covered brand drug costs attributable to dispensing and vaccine administration fees not associated with ACIP-recommended vaccines) × (cost-sharing coinsurance percentage)]

      *or*

      94.970% = [(99.958% × 95%) + (0.042% × 25%)]

- *Generic GDCB % for non-LIS* is the percentage of gross covered drug costs below the OOP threshold for applicable beneficiaries (i.e., non-LIS) attributable to non-applicable drugs as reported on the 2022 PDEs.

  *Gap cost sharing for non-applicable drugs* is the coinsurance incurred by applicable beneficiaries (i.e., non-LIS) for non-applicable drugs in the coverage gap.

**Table V-7. Updated Total Gross Covered Drug Costs at the Out-of-Pocket Threshold for Applicable and Non-Applicable Beneficiaries in CY 2024**

| | 2023 | 2024[45] |
|---|---|---|
| Total Gross Covered Drug Costs at Out-of-Pocket Threshold for Non-Applicable Beneficiaries (1) | $10,516.25 | $11,477.39 |
| Estimated Total Gross Covered Drug Costs for Applicable Beneficiaries (2) | $11,206.28 | $12,447.11 |

(1) For a beneficiary who is not considered an "applicable beneficiary," as defined at section 1860D-14A(g)(1) of the Act, and is not eligible for the Medicare Coverage Gap Discount Program, this is the amount of total drug spending required to reach the OOP threshold in the defined standard benefit.
(2) For a beneficiary who is an "applicable beneficiary," as defined at section 1860D-14A(g)(1) of the Act, and is eligible for the Medicare Coverage Gap Discount Program, this is the estimated average amount of total drug spending required to reach the OOP threshold in the defined standard benefit.

[45] These figures have been updated from those in the CY 2024 Advance Notice to reflect the fact that beneficiaries take a longer time to reach the catastrophic phase threshold when they pay less cost sharing for insulins and vaccines (no more than $35 copay per month's supply of each insulin product and $0 copay on ACIP-recommended adult vaccines) under the 2024 defined standard benefit.

**Section E. Retiree Drug Subsidy Amounts**

Per 42 CFR 423.886(b)(3), the cost threshold and cost limit for qualified retiree prescription drug plans are updated using the API, as defined previously in this document. The updated cost threshold is rounded to the nearest multiple of $5 and the updated cost limit is rounded to the nearest multiple of $50. The cost threshold and cost limit are defined as $505 and $10,350, respectively, for plans that end in CY 2023, and as $545 and $11,200 for plans that end in CY 2024.

**Table V-8. Updated Retiree Drug Subsidy Amounts in 2024**

| | 2023 | 2024 |
|---|---|---|
| **Retiree Drug Subsidy Amounts** | | |
| Cost Threshold | $505 | $545 |
| Cost Limit | $10,350 | $11,200 |

**Attachment VI. Updates for Part C and D Star Ratings**

**Part C and D Star Ratings and Future Measurement Concepts**

The Part C and D Star Ratings measure the quality of and reflect the experiences of beneficiaries in Medicare Advantage (MA) and Prescription Drug Plans (PDPs or Part D plans), assist beneficiaries in finding the best plan for their needs, and determine eligibility for MA Quality Bonus Payments. The Star Ratings support CMS' efforts to make the patient the focus in all of our programs and to create incentives to eliminate health disparities.

The methodology for the Star Ratings system for the Part C and D programs is codified at §§ 422.160 - 422.166 and 423.180 - 423.186. In the Advance Notice, we provided information and updates as required by §§ 422.164(c)(2), (d), (e)(2) and (f)(1); 422.166(f)(2); 423.184(c)(2), (d), (e)(2), and (f)(1); and 423.186(f)(2). We appreciate the feedback we received on potential future measures and concepts for the Star Ratings. We reviewed the comments and will consider them as we identify future enhancements to the Star Ratings program. Some commenters requested additional resources to track current and future Star Ratings measures and methodological enhancements. We will consider making additional resources available to help Part C and D sponsors keep track of future changes.

**Reminders for 2024 Star Ratings**

CMS finalized the application of Tukey outlier deletion for non-CAHPS measures beginning with the 2024 Star Ratings in the CY 2021 final rule (85 FR 33832-36).[46] We also finalized the addition of the Transitions of Care and Follow-up after Emergency Department Visit for Patients with Multiple Chronic Conditions measures to be added to the 2024 Star Ratings in the CY 2022 final rule (86 FR 5921-26). Additionally, the Plan All-Cause Readmissions measure will be returned to the 2024 Star Ratings after being delayed due to the suspended collection of CAHPS and HEDIS data in 2020.[47]

We provide various datasets and reports to plan sponsors throughout the year. Part C and D sponsors should regularly review their underlying measure data that are the basis for the Star

---

[46] In the CY 2021 final rule, we finalized use of Tukey outlier deletion effective for the Star Ratings issued in October 2023 and subsequent years. (85 FR 33833-36) In the rulemakings since that time, we have not proposed to eliminate the Tukey outlier deletion aspect of the Star Ratings methodology. As we stated in May 2022 final rule (87 FR 27766), we will implement Tukey outlier deletion beginning with the 2024 Star Ratings to help improve stability of cut points and prevent cut points from being influenced by outliers. However, it appears that the sentence in §§ 422.166(a)(2)(i) and 423.186(a)(2)(i) ("Effective for the Star Ratings issued in October 2023 and subsequent years, prior to applying mean resampling with hierarchal clustering, Tukey outer fence outliers are removed.") was inadvertently removed from the codified regulation text. In the Medicare Program; Contract Year 2024 Policy and Technical Changes to the Medicare Advantage Program, Medicare Prescription Drug Benefit Program, Medicare Cost Plan Program, Medicare Parts A, B, C, and D Overpayment Provisions of the Affordable Care Act and Programs of All-Inclusive Care for the Elderly; Health Information Technology Standards and Implementation Specifications proposed rule which appeared in the Federal Register on December 27, 2022 (hereinafter referred to as the December 2022 proposed rule) (87 FR 79452), we proposed a technical amendment to fix this codification error from the May 2022 final rule.

[47] See the Announcement of Calendar Year (CY) 2022 Medicare Advantage (MA) Capitation Rates and Part C and Part D Payment Policies, page 97.

Ratings and immediately alert CMS if errors or anomalies are identified so any issues can be resolved prior to the first plan preview period.

As described at §§ 422.164(h) and 423.184(h), CMS annually sets and announces a deadline for MA and Part D organizations to request that CMS or the Independent Review Entity (IRE) review its Part C appeals data or CMS review its Complaints Tracking Module (CTM) data. CMS is announcing a deadline of June 30, 2023 for all contracts to make their requests for review of the 2022 appeals and CTM measure data for the 2024 Star Ratings. Sponsoring organizations can view and monitor their Part C appeals timeliness and effectuation compliance data on the Medical Appeal Search website. Sponsoring organizations should refer to the May 10, 2019 HPMS memorandum, "Complaints Tracking Module (CTM) File Layout Change and Updated Standard Operating Procedures," for instructions on how to request a review of CTM data.

**Measure Updates for 2024 Star Ratings**

The measures that will be used to calculate the 2024 Star Ratings are listed in Table VI-1 with information about the measure type, weight, and measurement year.

**Table VI-1: 2024 Star Ratings Measures**

| Part C or D | Measure | Measure Type | Weight | Measurement Year | Improvement Measure | Included in the 2024 CAI Values |
|---|---|---|---|---|---|---|
| C | Breast Cancer Screening | Process Measure | 1 | 1/1/2022 – 12/31/2022 | **Yes** | **Yes** |
| C | Colorectal Cancer Screening | Process Measure | 1 | 1/1/2022 – 12/31/2022 | **Yes** | **Yes** |
| C | Annual Flu Vaccine | Process Measure | 1 | 3/2023 – 6/2023 | **Yes** | **Yes** |
| C | Controlling Blood Pressure | Intermediate Outcome Measure | 3 | 1/1/2022 – 12/31/2022 | **Yes** | **Yes** |
| C | Monitoring Physical Activity | Process Measure | 1 | 7/2022 – 11/2022 | **Yes** | **Yes** |
| C | Special Needs Plan (SNP) Care Management | Process Measure | 1 | 1/1/2022 – 12/31/2022 | **Yes** | **No** |

| **Part C or D** | **Measure** | **Measure Type** | **Weight** | **Measurement Year** | **Improvement Measure** | **Included in the 2024 CAI Values** |
|---|---|---|---|---|---|---|
| C | Care for Older Adults – Medication Review | Process Measure | 1 | 1/1/2022 – 12/31/2022 | **Yes** | **No** |
| C | Care for Older Adults– Pain Assessment | Process Measure | 1 | 1/1/2022 – 12/31/2022 | **Yes** | **No** |
| C | Osteoporosis Management in Women who had a Fracture | Process Measure | 1 | 1/1/2022 – 12/31/2022 | **Yes** | **Yes** |
| C | Diabetes Care – Eye Exam | Process Measure | 1 | 1/1/2022 – 12/31/2022 | **Yes** | **Yes** |
| C | Diabetes Care – Blood Sugar Controlled | Intermediate Outcome Measure | 3 | 1/1/2022 – 12/31/2022 | **Yes** | **Yes** |
| C | Reducing the Risk of Falling | Process Measure | 1 | 7/2022 – 11/2022 | **Yes** | **Yes** |
| C | Improving Bladder Control | Process Measure | 1 | 7/2022 – 11/2022 | **Yes** | **Yes** |
| C | Medication Reconciliation Post-Discharge | Process Measure | 1 | 1/1/2022 – 12/31/2022 | **Yes** | **Yes** |
| C | Plan All-cause Readmissions | Outcome Measure | 1 | 1/1/2022 – 12/31/2022 | **No** | **No** |
| C | Transitions of Care | Process Measure | 1 | 1/1/2022 – 12/31/2022 | **No** | **No** |
| C | Follow-up after Emergency Room Visit | Process Measure | 1 | 1/1/2022 – 12/31/2022 | **No** | **No** |
| C | Getting Needed Care | Patients' Experience and Complaints Measure | 4 | 3/2023 – 6/2023 | **Yes** | **No** |

| Part C or D | Measure | Measure Type | Weight | Measurement Year | Improvement Measure | Included in the 2024 CAI Values |
|---|---|---|---|---|---|---|
| C | Getting Appointments and Care Quickly | Patients' Experience and Complaints Measure | 4 | 3/2023 – 6/2023 | **Yes** | **No** |
| C | Customer Service | Patients' Experience and Complaints Measure | 4 | 3/2023 – 6/2023 | **Yes** | **No** |
| C | Rating of Health Care Quality | Patients' Experience and Complaints Measure | 4 | 3/2023 – 6/2023 | **Yes** | **No** |
| C | Rating of Health Plan | Patients' Experience and Complaints Measure | 4 | 3/2023 – 6/2023 | **Yes** | **No** |
| C | Care Coordination | Patients' Experience and Complaints Measure | 4 | 3/2023 – 6/2023 | **Yes** | **No** |
| C | Complaints about the Health Plan | Patients' Experience and Complaints Measure | 4 | 1/1/2022 – 12/31/2022 | **Yes** | **No** |
| C | Members Choosing to Leave the Plan | Patients' Experience and Complaints Measure | 4 | 1/1/2022 – 12/31/2022 | **Yes** | **No** |
| C | Health Plan Quality Improvement | Improvement Measure | 5 | NA | **No** | **No** |
| C | Plan Makes Timely Decisions about Appeals | Measures Capturing Access | 4 | 1/1/2022 – 12/31/2022 | **Yes** | **No** |

| Part C or D | Measure | Measure Type | Weight | Measurement Year | Improvement Measure | Included in the 2024 CAI Values |
|---|---|---|---|---|---|---|
| C | Reviewing Appeals Decisions | Measures Capturing Access | 4 | 1/1/2022 – 12/31/2022 | **Yes** | **No** |
| C | Call Center – Foreign Language Interpreter and TTY Availability | Measures Capturing Access | 4 | 2/2023 – 5/2023 | **Yes** | **No** |
| C | Statin Therapy for Patients with Cardiovascular Disease | Process Measure | 1 | 1/1/2022 – 12/31/2022 | **Yes** | **Yes** |
| D | Call Center – Foreign Language Interpreter and TTY Availability | Measures Capturing Access | 4 | 2/2023 – 5/2023 | **Yes** | **No** |
| D | Complaints about the Drug Plan | Patients' Experience and Complaints Measure | 4 | 1/1/2022 – 12/31/2022 | **Yes** | **No** |
| D | Members Choosing to Leave the Plan | Patients' Experience and Complaints Measure | 4 | 1/1/2022 – 12/31/2022 | **Yes** | **No** |
| D | Drug Plan Quality Improvement | Improvement Measure | 5 | NA | **No** | **No** |
| D | Rating of Drug Plan | Patients' Experience and Complaints Measure | 4 | 3/2023 – 6/2023 | **Yes** | **No** |
| D | Getting Needed Prescription Drugs | Patients' Experience and Complaints Measure | 4 | 3/2023 – 6/2023 | **Yes** | **No** |
| D | MPF Price Accuracy | Process Measure | 1 | 1/1/2022 – 9/30/2022 | **Yes** | **No** |

| Part C or D | Measure | Measure Type | Weight | Measurement Year | Improvement Measure | Included in the 2024 CAI Values |
|---|---|---|---|---|---|---|
| D | Medication Adherence for Diabetes Medications | Intermediate Outcome Measure | 3 | 1/1/2022 – 12/31/2022 | **Yes** | **Yes** |
| D | Medication Adherence for Hypertension (RAS antagonists) | Intermediate Outcome Measure | 3 | 1/1/2022 – 12/31/2022 | **Yes** | **Yes** |
| D | Medication Adherence for Cholesterol (Statins) | Intermediate Outcome Measure | 3 | 1/1/2022 – 12/31/2022 | **Yes** | **Yes** |
| D | MTM Program Completion Rate for CMR | Process Measure | 1 | 1/1/2022 – 12/31/2022 | **Yes** | **Yes** |
| D | Statin Use in Persons with Diabetes | Process Measure | 1 | 1/1/2022 – 12/31/2022 | **Yes** | **Yes** |

**Improvement Measures (Part C & D) for the 2024 Star Ratings.** Under §§ 422.164(f) and 423.184(f), improvement measures are calculated using performance measures that meet specific conditions. Table VI-1 includes information about which measures will be used to calculate the improvement measures for the 2024 Star Ratings. As stated in §§ 422.164(f)(4)(i) and 423.184(f)(4)(i), CMS will only include measures in the improvement calculations at the contract level if numeric value scores are available for both the current and prior year.

**2024 Star Ratings Program and the Categorical Adjustment Index**

The methodology for the Categorical Adjustment Index (CAI) is described at §§ 422.166(f)(2) and 423.186(f)(2), as well as in the annual Medicare Part C & D Star Ratings Technical Notes available on CMS' Part C and D Star Ratings website. As finalized at §§ 422.166(f)(2) and 423.186(f)(2), all measures identified as candidate measures will be included in the determination of the 2024 CAI values. The measure set for the 2024 CAI (for both Part C and D) is identified in Table VI-1.

In keeping with our commitment to transparency, a summary of the analysis of the candidate measure set that includes the minimum, median, and maximum values for the within-contract variation for the low-income subsidy (LIS)/dual eligible (DE) differences are posted with the 2024 CAI values on CMS' Part C and D Star Ratings website.

Commenters supported continuing the CAI. There were suggestions for adding additional measures and identifying an alternative to the CAI. We will take these suggestions into consideration; however, Star Ratings methodological changes must be adopted through rulemaking. We also note that certain measures, such as the CAHPS measures, are excluded from the CAI pursuant to §§ 422.166(f)(2)(ii)(A) and 423.186(f)(2)(ii)(A) because they are already case-mix adjusted.

**Extreme and Uncontrollable Circumstances Policy for the 2024 Star Ratings**

Extreme and uncontrollable circumstances such as natural disasters can directly affect Medicare beneficiaries and providers, as well as the Parts C and D organizations that provide beneficiaries with important medical care and prescription drug coverage. An affected contract is identified based on these criteria:

> (1) Its service area is within an "emergency area" during an "emergency period" as defined in section 1135(g)(1) of the Act;
>
> (2) Its service area is within a geographic area designated in a major disaster declaration under the Stafford Act and the Secretary exercised authority under section 1135 of the Act based on the same triggering event(s); and
>
> (3) A certain minimum percentage (25 percent or 60 percent) of the enrollees under the contract must reside in a Federal Emergency Management Agency (FEMA)-designated Individual Assistance area at the time of the extreme and uncontrollable circumstance. (See §§ 422.166(i) and 423.186(i)).

We use the start date of the incident period to determine which year of Star Ratings could be affected, regardless of whether the incident period extends to another calendar year (§§ 422.166(i) and 423.186(i)).

Under the 25 percent rules at §§ 422.166(i)(2)–(6) and 423.186(i)(2)–(5), contracts with at least 25 percent of their service area in a FEMA-designated Individual Assistance area in 2022 will receive the higher of their measure-level rating from the current and prior Star Ratings years for purposes of calculating the 2024 Star Ratings (thus, for 2024 Star Ratings, affected contracts will receive the higher of their measure-level ratings from 2023 or 2024 for the applicable measures). *See also* 84 FR 15770–77. The numeric scores for contracts with 60 percent or more of their enrollees living in FEMA-designated Individual Assistance areas at the time of the extreme and uncontrollable circumstance are excluded from: (1) the measure-level cut point calculations for non-CAHPS measures; and (2) the performance summary and variance thresholds for the reward factor as described at §§ 422.166(i)(9)(i) and (i)(10)(i), and 423.186(i)(7)(i) and (i)(8)(i). Table VI-2 lists the emergency areas affected by emergency declarations first issued in 2022, as defined in section 1135 of the Act, and the exercise of the Secretary's authority under section 1135 of the Act.

**Table VI-2: List of Section 1135 Waivers Issued in Relation to the FEMA Major Disaster Declarations**

| Section 1135 Waiver Date Issued | Waiver or Modification of Requirements Under Section 1135 of the Social Security Act | FEMA Incident Type | Affected State | Incident Start Date |
|---|---|---|---|---|
| 5/9/2022 | New Mexico Wildfires and Straight-line Winds | Wildfires | New Mexico | 4/5/2022 |
| 8/2/2022 | Kentucky Severe Storms, Flooding, Landslides, and Mudslides | Severe Storms, Flooding, Landslides, and Mudslides | Kentucky | 7/26/2022 |
| 9/20/2022 | Tropical Storm/Hurricane Fiona | Hurricane | Puerto Rico | 9/17/2022 |
| 9/26/2022 | Hurricane Ian | Hurricane | Florida | 9/23/2022 |
| 9/30/2022 | Hurricane Ian | Hurricane | South Carolina | 9/25/2022 |

Table VI-3 lists the states and territories with Individual Assistance designations from the FEMA major disaster declarations.

**Table VI-3: Individual Assistance Counties and County-Equivalents in FEMA Major Disaster Declared States/Territories**

| FEMA Declaration | State | FEMA Individual Assistance Counties or County-Equivalents |
|---|---|---|
| DR-4652-NM | New Mexico | Colfax, Lincoln, Mora, San Miguel, Valencia |
| DR-4663-KY | Kentucky | Breathitt, Clay, Floyd, Knott, Lee, Leslie, Letcher, Magoffin, Martin, Owsley, Perry, Pike, Whitley |
| DR-4671-PR | Puerto Rico | Adjuntas, Aguada, Aguadilla, Aguas Buenas, Aibonito, Anasco, Arecibo, Arroyo, Barceloneta, Barranquitas, Bayamon, Cabo Rojo, Caguas, Camuy, Canovanas, Carolina, Catano, Cayey, Ceiba, Ciales, Cidra, Coamo, Comerio, Corozal, Culebra, Dorado, Fajardo, Florida, Guanica, Guayama, Guayanilla, Guaynabo, Gurabo, Hatillo, Hormigueros, Humacao, Isabela, Jayuya, Juana Diaz, Juncos, Lajas, Lares, Las Marias, Las Piedras, Loiza, Luquillo, Manati, Maricao, Maunabo, Mayaguez, Moca, Morovis, Naguabo, Naranjito, Orocovis, Patillas, Penuelas, Ponce, Quebradillas, Rincon, Rio Grande, Sabana Grande, Salinas, San German, San Juan, San Lorenzo, San Sebastian, Santa Isabel, Toa Alta, Toa Baja, Trujillo Alto, Utuado, Vega Alta, Vega Baja, Vieques, Villalba, Yabucoa, Yauco |
| DR-4673-FL | Florida | Brevard, Charlotte, Collier, DeSoto, Flagler, Glades, Hardee, Hendry, Highlands, Hillsborough, Lake, Lee, Manatee, Monroe, Okeechobee, Orange, Osceola, Palm Beach, Pasco, Pinellas, Polk, Putnam, Sarasota, Seminole, St. Johns, Volusia |
| DR-4677-SC | South Carolina | Charleston, Georgetown, Horry |

**Changes to Existing Star Ratings Measures for the 2023 Measurement Year and Beyond**

CMS solicits feedback on new measure concepts as well as measure updates through the annual Advance Notice and Rate Announcement process. We also provide advance notice regarding measures considered for implementation as future Star Ratings measures. As codified at §§ 422.164(c)(2)–(4), 423.184(c)(2)–(4), 422.164(d)(2), and 423.184(d)(2), new measures and measures with substantive specification changes must be added or updated through rulemaking, and must remain on the display page for at least two years prior to becoming a Star Ratings measure. In addition, CMS uses the Advance Notice and Rate Announcement process to announce non-substantive specification changes as described at §§ 422.164(d)(1) and 423.184(d)(1) and to remove measures as described at §§ 422.164(e) and 423.184(e). We described a number of measure concepts and changes in the Advance Notice and summarize

significant comments on those issues here. We encourage interested parties to provide comments directly to measure developers during their public comment periods. For example, the National Committee for Quality Assurance (NCQA) and the Pharmacy Quality Alliance (PQA) regularly solicit public comments on new measures, changes to existing measures, and measure retirements.

As part of the CMS National Quality Strategy and Medicare Value-Based Care Strategy, CMS is committed to aligning a subset of measures across all our programs and ensuring we measure quality across the entire care continuum in a way that promotes the best, safest, and most equitable care for all individuals. Improving alignment of measures across federal programs and with private payers will reduce provider burden while also improving the effectiveness and comparability of measures across quality programs. Across our CMS quality rating and value-based care programs, where applicable, we are considering including what CMS is calling a "Universal Foundation"[48] of quality measures which is a subset of measures that are aligned across programs. This "Universal Foundation" is a building block to which programs will add additional aligned or program-specific measures. As a start, each program is considering which measures included in the "Universal Foundation" are not currently in their programs and the steps to add them over time if appropriate.

Having this "Universal Foundation" will support efforts to ensure high quality care for the more than 150 million Americans covered by our programs and serve as an alignment standard for the rest of the health care system. The "Universal Foundation" will 1) focus provider attention, 2) reduce provider burden, 3) allow for consistent stratification of measures to identify disparities in care, 4) accelerate the transition to interoperable, digital quality measures, and 5) allow for cross-comparisons across quality and value-based care programs, to better understand what drives quality and equity improvement and what does not. The preliminary set of measures included in the Adult "Universal Foundation" are listed in Table VI-4 with information about whether the measures are currently in the Star Ratings program. The set of measures will evolve over time to meet the needs of individuals served across CMS program.

**Table VI-4: Preliminary Adult Universal Foundation Measures**

| Meaningful Measure 2.0 Domain | Measure | Part C and D Star Ratings |
|---|---|---|
| Wellness and Prevention | Colorectal Cancer Screening (HEDIS) | Currently in Star Ratings |
| | Breast Cancer Screening (HEDIS) | Currently in Star Ratings |

[48] https://www.nejm.org/doi/full/10.1056/NEJMp2215539?query=featured_homeye

| Meaningful Measure 2.0 Domain | Measure | Part C and D Star Ratings |
|---|---|---|
| | Adult Immunization Status (HEDIS) | Solicited feedback on this measure in the Advance Notice |
| Chronic Conditions | Controlling High Blood Pressure (HEDIS) | Currently in Star Ratings |
| | Diabetes: Hemoglobin A1c Poor Control (>9%) (HEDIS) | Currently in Star Ratings (reversed score so higher scores are better) |
| Behavioral Health | Screening for Depression and Follow-Up Plan (HEDIS) | Solicited feedback on this measure in the Advance Notice |
| | Initiation and Engagement of Substance Use Disorder Treatment (HEDIS) | Currently on display page |
| Seamless care coordination | Plan all-cause readmissions or Hospital all-cause readmissions (HEDIS) | Currently in Star Ratings |
| Person-centered care | Consumer Assessment of Healthcare Providers and Systems (CAHPS): Overall Rating Measures (CAHPS) | Currently in Star Ratings |
| Equity | Screening for Social Drivers of Health/ Social Need Screening and Intervention (HEDIS) | Solicited feedback in the 2023 Advance Notice/Rate Announcement about the NCQA measure focused on Screening and Referral to Services for Social Needs |

There was overwhelming support from commenters regarding CMS' goal of aligning measures across federal and private payers, and many of the commenters applauded CMS for its leadership and efforts to streamline quality and performance measures across its many programs. Many commenters agreed that aligning health plans and providers on a streamlined set of quality measures could reduce administrative burden and ensure everyone is working toward the same patient goals and outcomes. A small number of commenters suggested a variety of different measures to add to the Universal Foundation, including measures related to women's health issues, tobacco use screening and intervention, patient safety, Part D medication adherence, rare diseases, and patient activation. A commenter recommended measures that support primary care providers, such as measures focused on relationships, access to care, comprehensiveness of care, trust in physicians, and person-centeredness. Other commenters suggested a focus on outcome measures rather than process measures. A handful of commenters raised issues related to the newer measures under the Universal Foundation and whether electronic health records and the electronic clinical data systems (ECDS) were available and ready to support accurate data collection for these measures. Other commenters wanted more information about what programs

would be included in the Universal Foundation, timelines for implementing new measures in each program included in the Universal Foundation, and how measures will be added to or removed from the Universal Foundation over time as the focus evolves.

There was mixed reaction to some of the measures in the Universal Foundation. For Social Need Screening and Intervention, some commenters strongly supported including this measure, but others were concerned about data collection issues with this measure and challenges of having clinicians screen for issues that they are not adequately able to address. We also received feedback on the Adult Immunization Status, Initiation and Engagement of Substance Use Disorder (SUD) Treatment, and Depression Screening and Follow-up measures; this feedback is described below under the Display Measures section. We will take these comments into consideration as we move forward. Any additional measures added to the Star Ratings would need to go through rulemaking.

**Optional Exclusions for HEDIS Measures (Part C).** For selected HEDIS measures, plans may choose whether or not they applied optional exclusions. NCQA reviewed all applicable HEDIS measures to determine whether the optional exclusions could be required. NCQA is making updates to the following Star Ratings and display measures for measurement year 2023 (2025 Star Ratings):

- Controlling Blood Pressure: The optional exclusions for pregnancy, end-stage renal disease/dialysis/nephrectomy/kidney transplant, and non-acute inpatient admissions are now required.
- Colorectal Cancer Screening: The optional exclusions for colorectal cancer and total colectomy are now required.
- Kidney Health Evaluation for Patients with Diabetes: The optional exclusions for polycystic ovary syndrome, gestational diabetes, and steroid-induced diabetes are now required.

For all HEDIS measures that are part of the Star Ratings and display page, the optional exclusion for enrollees who died during the measurement year became a required exclusion for measurement year 2023. These updates would be non-substantive under § 422.164(d)(1)(i) since they narrow the population covered under the measures. Most commenters supported making the optional exclusions required. We have shared feedback received with NCQA.

**Care for Older Adults (COA) – Pain Assessment (Part C)**. NCQA is considering retiring the COA Pain Assessment indicator from the HEDIS measurement set for the following reasons: 1) pain assessments should be multidimensional, and the current indicator cannot ensure this; 2) the current indicator does not differentiate between acute and chronic pain; and 3) the measure also does not assess follow up, and evidence suggests that pain assessment alone does not improve quality of care. Additionally, the current measure is only reported for SNPs; however, a wider population of MA enrollees would benefit from a pain assessment and follow-up measure. Therefore, NCQA is conceptualizing a new Chronic Pain Assessment and Follow-up measure

described below in the section on Potential New Measure Concepts and Methodological Enhancements for Future Years. NCQA obtained feedback from their Committee for Performance Measurement (CPM) in September 2022 and solicited public comment on the proposed retirement of this measure as part of the HEDIS public comment period in February 2023. Pending results of public comment, NCQA would seek approval from the CPM in May 2023 for retirement of this measure in measurement year 2025. As a reminder, in the December 2022 proposed rule, CMS proposed adding a rule at §§ 422.164(e)(1)(iii) and 423.184(e)(1)(iii) to allow removal of a Star Ratings measure, without separate rulemaking, when a measure steward other than CMS retires a measure.

Most commenters opposed the retirement of the COA – Pain Assessment measure until a replacement measure has been introduced and carefully evaluated given that pain is a frequent symptom of illness and disease in the older beneficiaries. We have shared this feedback with NCQA for their consideration.

**COA – Functional Status Assessment and Medication Review (Part C).** NCQA is also exploring the development of new measures for Functional Status Assessment and Medication Review that may eventually replace these indicators of the COA measure and be reported for a wider population than only enrollees of SNPs. Any potential new measures are currently planned for development for measurement year 2025 and beyond. If new measures are developed and implemented, NCQA would propose retirement of the existing COA measures. If NCQA retires the existing measures, CMS would consider replacing the retired measures in the Star Ratings with the new ones consistent with the process specified in § 422.164(c).

We received mixed reaction to the development of new measures for a wider population than only enrollees in SNPs. Some commenters did not want the current COA measures retired until new measures are available. Other commenters wanted more information on the value of broadening the population for these measures, as well as more information about the specifics of these potential new measures. We have shared this feedback with NCQA for their consideration.

**Diabetes Care – Eye Exam and Diabetes Care – Blood Sugar Controlled (Part C).** NCQA is reviewing these two measures for potential updates to the existing specifications and updates that leverage standardized electronic clinical data. NCQA is re-evaluating the approach to identify whether an enrollee has diabetes and would be included in the denominator to reflect the evolution of claims data coding practices, pharmacy practices, and the use of electronic clinical data. The current method identifies enrollees if they have at least two outpatient encounters with a diagnosis of diabetes on different dates of service *or* at least one inpatient encounter with a diagnosis of diabetes *or* a prescription for a diabetes medication. Potential updates include 1) simplifying the current claims-based denominator approach to identify enrollees if they have at least two encounters (in any setting except lab) on different dates of service with a diagnosis of diabetes; and 2) revising the current pharmacy-based denominator approach to require a diabetes diagnosis for those enrollees identified through a dispensed diabetes medication alone (this

would obviate the need for the existing exclusions of polycystic ovary syndrome, gestational diabetes, or steroid-induced diabetes). These potential clarifications for measurement year 2024 would be non-substantive under § 422.164(d)(iv) by adding clarifications for the documentation requirements to identify enrollees with diabetes. As such, if NCQA proceeds, CMS will apply the update to the measures beginning with the 2024 measurement year (2026 Star Ratings). These changes would also apply to the Kidney Health Evaluation for Patients with Diabetes (Part C) measure currently on the display page and being proposed for the 2026 Star Ratings in the Medicare Program; Contract Year 2024 Policy and Technical Changes to the Medicare Advantage Program, Medicare Prescription Drug Benefit Program, Medicare Cost Plan Program, Medicare Parts A, B, C, and D Overpayment Provisions of the Affordable Care Act (ACA) and Programs of All-Inclusive Care for the Elderly; Health Information Technology Standards and Implementation Specifications proposed rule which appeared in the Federal Register on December 27, 2022 (87 FR 79452, 2024 Part C and D proposed rule).

In the Advance Notice, we stated that NCQA is also evaluating the potential removal of the hybrid reporting method for the Diabetes Care - Eye Exam and Diabetes Care - Blood Sugar Controlled measures for measurement year 2024 and beyond. The measures would then be specified for the Administrative or ECDS reporting methods. Currently, NCQA is not considering removal of the hybrid method for Diabetes Care - Blood Sugar Controlled. They are continuing to consider for the Diabetes Care–Eye Exam measure to remove hybrid reporting and transition to administrative-only reporting. The administrative reporting method utilizes claims data and supplemental data. The hybrid reporting method utilizes claims data, supplemental data, and sampling to include medical record review. The removal of hybrid reporting from the Diabetes Care–Eye Exam measure will remove the sampling component and transition the measure to administrative-only reporting in measurement year 2024. Removing hybrid reporting will not change the data sources that health plans can use; the change is to the reporting method only. Health plans will no longer be able to assess performance based on a sample of members when the hybrid method is removed, but they can perform year-round chart review and have it audited as non-standard supplemental data to report for the measure.

NCQA is also considering excluding enrollees with bilateral eye enucleation from the Diabetes Care – Eye Exam measure starting with measurement year 2024. This change would be non-substantive as described at § 422.164(d)(1)(i) since it narrows the population covered by the measure. Another potential update that NCQA is considering is the incorporation of a Glucose Management Indicator (GMI) as an additional method to assess numerator compliance in the existing Diabetes Care – Blood Sugar Controlled measure for measurement year 2024 or beyond. GMI is a calculation derived from continuous glucose monitoring devices that assesses average blood sugar values and can provide information directly to patients and physicians at more frequent intervals. Based on guidelines from the American Diabetes Association, GMI can serve

as an alternative method for HbA1c for use in clinical management.[49] NCQA is evaluating the inclusion of GMI alongside HbA1c as two methods to assess the numerator. In cases where enrollees have results available for both methods in the measurement year, the most recent result should be used (regardless of whether it is a GMI or HbA1c result). In cases where enrollees have results available for both methods on the same day, the HbA1c result should be used. If NCQA decides to add additional tests that meet the numerator requirements, it would be a non-substantive update as described at § 422.164(d)(1)(iv)(A). If this update is made, NCQA is considering renaming the measure *Glycemic Status Assessment for Patients With Diabetes*.

Commenters generally supported revising the specifications for identifying enrollees with diabetes. Most of the commenters were opposed to the removal of the hybrid reporting method for the Diabetes Care – Eye Exam measure. Some commenters noted that GMI was problematic as it is not as precise as HbA1c. Other commenters noted that GMI is self-administered and not all patients can afford continuous glucose monitoring devices. GMI would be an alternative to HbA1c so would not be required. We have shared this feedback with NCQA for their consideration as they continue to explore updates to these measures.

**Breast Cancer Screening (Part C).** For measurement year 2024, NCQA is considering revising the eligible population for this measure to be more inclusive of individuals who should be screened for breast cancer. The revised eligible population would include members 52-74 years of age who are recommended for routine breast cancer screening, including transgender and gender-diverse members. For example, this would include transgender men with sex assigned at birth as female, and transgender women with sex assigned at birth as male but who have undergone estrogen hormone therapy. The intent of this change is to ensure that all members in need of breast cancer screening are included in the eligible population, meaningfully improving quality of care for a population that currently experiences disparities as it relates to preventive screenings. However, given the relatively small size of the additional population to include transgender and non-binary individuals, this change will not meaningfully impact either the numerator or denominator of the measure. If NCQA decides to expand the population included in the denominator, it would be a non-substantive update as described at § 422.164(d)(1)(ii) given less than 0.3% of adults 50 years old and older identify as transgender or nonbinary.[50] Most commenters supported revising the eligible population for this measure. We have shared the feedback received with NCQA as they continue to explore updates to this measure.

**Statin Use in Persons with Diabetes (SUPD) (Part D).** CMS will make the following non-substantive updates to the SUPD measure beginning with the 2024 measurement year and 2026 Star Ratings: 1) to use continuous enrollment (CE) to fully align with the PQA specifications and to no longer adjust for member-years (MYs), and 2) to align with the PQA age criteria

---

[49] American Diabetes Association Professional Practice Committee. 6. Glycemic targets: Standards of Medical Care in Diabetes—2022. Diabetes Care 2022; 45 (Suppl. 1); S83–S96.
[50] https://www.pewresearch.org/fact-tank/2022/06/07/about-5-of-young-adults-in-the-u-s-say-their-gender-is-different-from-their-sex-assigned-at-birth/.

specifications. CMS previously solicited feedback on using the CE specifications instead of MYs in the 2023 Advance Notice. These two changes (using CE and eligibility for the SUPD measure by the PQA's age criteria at the start of the measurement year) are non-substantive updates under § 423.184(d)(1) because they are updates with no change to the intent of the measure or the target population.

The SUPD measure analyzes the percent of Part D beneficiaries, ages 40 to 75 years, who were dispensed at least two diabetes medication fills that received a statin medication fill during the measurement period. As a reminder, a higher rate for the SUPD measure indicates better performance. CMS adapted the SUPD measure from the PQA specifications, and CMS currently adjusts Part D enrollment based on MYs to account for beneficiaries who are enrolled for only part of the contract year. For example, if a beneficiary is enrolled for 6 out of 12 months of the year, they will count as only 0.5 MYs in the rate calculation. However, the current PQA specifications use CE instead of MYs. As stated in the 2022 PQA measure manual, the beneficiary's index prescription start date (IPSD) begins on the earliest date of service for a diabetes medication during the measurement year. Beneficiaries are continuously enrolled during the measurement year with one allowable gap in enrollment which may be up to 31 days during the measurement year.

Beginning with measurement year 2024, CMS will use CE to fully align with the PQA specifications and to no longer adjust for MYs; this update would be non-substantive. This update is consistent with the update to use CE for the Part D medication adherence measures as described immediately below. In applying CE, CMS will also align with the PQA age criteria specifications for the SUPD measure; a beneficiary will be eligible for the measure based on their age at the start of the measurement year regardless of whether the beneficiary ages in or out during the measurement year. This will be a non-substantive change from CMS' current specifications with the MY adjustment in which a beneficiary is eligible for inclusion in the SUPD measure from the month the beneficiary meets the minimum age restriction and ending with the month before they exceed the maximum age restriction.

We analyzed year of service (YOS) 2021 data as of January 2022 limited to contracts with a denominator greater than 30 members and compared rates using MYs and CE. We found that 88 percent of beneficiaries included in the measure using MYs were also in the denominator using CE. Overall, the mean SUPD rates using CE were slightly higher than rates using MYs by around 0.3 percentage points. For MA-PDs (non-MMPs), the mean rates increased from 85.08 percent to 85.51 percent with CE. About 45 percent of MA-PD contracts' rates stayed relatively the same, 43 percent increased, and 12 percent decreased. For PDPs, the mean rates increased from 82.00 percent to 82.38 percent. We found 55 percent of PDP contracts' rates stayed relatively the same, 43 percent increased, and 2 percent decreased. Finally, we found that there was a slight increase in SUPD rates across MA-PDs and PDPs for both female and male beneficiaries, as well as individuals with LIS, dual eligibility, disability, and by race (Black, Hispanic, American Indian/Alaska Native, and Multiracial).

Commenters in response to the CY 2024 Advance Notice were supportive of these non-substantive measure updates to the SUPD measure, and we will apply starting with the 2024 measurement year for the 2026 Star Ratings.

**Medication Adherence for Diabetes Medication/Medication Adherence for Hypertension (RAS Antagonists)/Medication Adherence for Cholesterol (Statins) (Part D).** In the 2023 Rate Announcement, CMS solicited initial feedback on implementing risk adjustment of the medication adherence measures based on sociodemographic (SDS) characteristics (age, gender, dual eligibility/ LIS status, and disability status) according to the PQA specifications and endorsed by the National Quality Forum (NQF).

Implementing SDS risk adjustment is a substantive change according to § 423.184(d)(2). CMS proposed this change for the 2026 measurement year and 2028 Star Ratings in the 2024 Part C and D proposed rule published on December 27, 2022 (87 FR 79616-79617). CMS also included data analysis and additional information in the 2024 Part C and D proposed rule (87 FR 79617-79618) to provide a more complete picture of the potential updates to the measures. The proposed substantive change will be addressed through the rulemaking process.

We signaled that there may be a few non-substantive changes made to the adherence measures in the Announcement of Calendar Year (CY) 2023 Medicare Advantage (MA) Capitation Rates and Part C and Part D Payment Policies.[51] In addition, CMS will make the following non-substantive changes to the three adherence measures to fully align with the current PQA measure specifications which are endorsed by the NQF: 1) no longer adjust for MYs; instead apply the PQA's measure specifications to use CE as defined by the treatment period and exclude beneficiaries with more than 1-day gap in enrollment during the treatment period and 2) no longer adjust for inpatient (IP) or SNF stays as the PQA specifications do not include these adjustments. As a reminder, in accordance with § 423.184(d)(1), non-substantive changes may be adopted during or in advance of the measurement period through the Advance Notice/Rate Announcement process. We plan to implement CE starting with the 2024 measurement year for the 2026 Star Ratings. We plan to remove the IP/SNF stay adjustment from the adherence measures starting with the 2026 measurement year for the 2028 Star Ratings, which is the same time we proposed to implement the SDS risk adjustment change, but is not dependent on finalizing the SDS risk adjustment proposal.

Commenters were supportive of the non-substantive update to the medication adherence measures to apply CE instead of MYs to align with the PQA. CMS will implement the CE to the medication adherence measures starting with the 2024 measurement year (2026 Star Ratings). We received a comment requesting clarification on whether a beneficiary who has a gap in enrollment would be excluded from the entire measurement period when applying CE. CMS will no longer account for beneficiaries who are enrolled for only part of the measurement year in the

---

[51] Please refer to the Announcement of Calendar Year (CY) 2023 Medicare Advantage (MA) Capitation Rates and Part C and Part D Payment Policies at the following website: https://www.cms.gov/files/document/2023-announcement.pdf.

contract. Based on the PQA measure specifications, the treatment period for the adherence measures begins on the index prescription start date (IPSD) and extends through whichever comes first: the last of day of enrollment during the measurement year, death, or the end of the measurement year. For example, a beneficiary who is CE in one contract for 6 months and then disenrolls from that contract in July of the same measurement year would be included in the measure calculation for that contract if they meet all of the other measure criteria, even though the beneficiary was CE for only 6 months of the measurement year. Beneficiaries are CE during the measurement year with an allowable one 1-day gap in enrollment during the treatment period.

Several commenters were not supportive of the removal of the IP/SNF stay adjustment from the medication adherence measures. Some commenters expressed concern that removal of the IP/SNF stay adjustment would disproportionately impact plans with a higher proportion of beneficiary stays or institutional special needs plans (I-SNPs). As a reminder, the IP/SNF stay adjustment is not included in the PQA measure specifications. We performed contract-level analysis of the SDS risk adjustment with and without IP/SNF stay adjustment as discussed in the 2024 Part C and D proposed rule. The majority of contracts did not have a change in their medication adherence rates. These findings were also consistent for contracts with SNPs. We found that more contracts with SNPs (including I-SNPs) increased in their rates or stayed the same than decreased. CMS will move forward with this measure specification update in order to align with the measure steward, and remove the IP/SNF stay adjustment starting with the 2026 measurement year (2028 Star Ratings).

A few commenters suggested additional medication adherence measure specification changes, such as excluding beneficiaries in I-SNPs or residing in long-term care (LTC) facilities who are receiving palliative care or excluding certain GLP-1 agonists which may be used for weight loss. As a reminder, Part D does not cover medications for weight loss based on section 1927(d)(2) of the Social Security Act. PQA is the measure steward for the adherence measures, and CMS has shared specification comments received with the PQA.

**MTM Program Completion Rate MTM Program Completion Rate for Comprehensive Medication Review (CMR) (Part D).** The data for this measure are reported by contracts to CMS in the Health Plan Management System (HPMS) per the Part D Reporting Requirements (OMB control number 0938-0992). Independent validation of these data is performed in accordance with § 423.514(j) (OMB control number 0938-1115), and the results are due in HPMS by June 30 of the year following the reporting period. Beneficiaries who are in hospice at any point during the reporting period are excluded from this measure. The Medicare Enrollment Database (EDB) is used to exclude beneficiaries in hospice. Starting with the 2023 reporting period for the 2025 Star Ratings, CMS will use the EDB data to identify beneficiaries in hospice in June after the reporting period, which aligns with when the Part D Reporting Requirements data are pulled from HPMS. The data validation results are pulled in July of the year following the reporting period. Commenters supported this change. This is a non-substantive change as

described at § 423.184(d)(1) since this change does not meaningfully impact the numerator or denominator of the measure. In addition, the prevalence of beneficiaries in hospice is low (less than 4% of MTM program enrollees).

**Display Measures**

Display measures on CMS.gov are published separately from the Star Ratings and include measures that are transitioned from inclusion in the Star Ratings, new or updated measures before inclusion into the Star Ratings, and informational-only measures. Organizations and sponsors have the opportunity to preview the data for their display measures prior to release on CMS.gov. We anticipate all 2023 display measures will continue to be shown on CMS.gov in 2024 unless noted below.

**Depression Screening and Follow-Up (Part C).** We solicited feedback regarding whether to add the HEDIS Depression Screening and Follow-up for Adolescents and Adults measure to the 2026 Star Ratings display page (using data from the 2024 measurement year). As CMS' Behavioral Health Strategy includes using quality measures to "drive health systems, providers, practices and clinicians, and community-based providers toward delivery of high value care" (CMS Behavioral Health Strategy | CMS), we are considering behavioral health measures that could potentially be added to the Star Ratings program in the future through rulemaking. The HEDIS measure, "Depression Screening and Follow-up," measures the percentage of members who were screened for clinical depression using a standardized instrument and, if screened positive, received follow-up care. This aligns with the U.S. Preventive Services Task Force recommendations regarding screening and follow-up for depression (Depression in Adults: Screening - Healthy People 2030 | health.gov) and supports CMS' efforts to implement the Universal Foundation set of measures across quality programs.

Most commenters supported adding the Depression Screening and Follow-up measure to the display page and eventually the Star Ratings. However, some commenters raised concerns about the availability of data needed for this measure and recommended allowing time for clinical data systems to capture this type of information. A few commenters also raised concerns about the impact of state laws and regulations on the ability to share mental health information with primary care providers without patient consent and the impact this may have on providing follow-up care. CMS will take this feedback into consideration and we have also shared this feedback with NCQA for their consideration. We plan to add this measure to the 2026 Star Ratings display page (using data from the 2024 measurement year). For this measure to be added to the Star Ratings, it would need to be adopted through rulemaking.

**Initiation and Engagement of Substance Use Disorder (SUD) Treatment (Part C).** Prior to measurement year 2022, this measure was called Initiation and Engagement for Alcohol and Other Drug Abuse or Dependence Treatment. This HEDIS measure is currently on our display page. For measurement year 2022, NCQA updated the measure to change it from "member-

based" to "episode-based"; lengthened the negative substance use disorder (SUD) history period from 60 days to 194 days to limit the number of members receiving ongoing treatment who inadvertently fall into the denominator; removed emergency department visits and medically managed withdrawal services from the negative SUD history period; removed the requirement that a psychosocial treatment encounter accompany pharmacotherapy; and split the adult age stratification between 18-64 years and 65+ years to better highlight any gaps in care between different age groups. Since many individuals with SUD attempt treatment multiple times before they are able to successfully engage, the revision of the measure to an "episode-based" framework allows for each recovery attempt to count independently, which should result in a more valid representation of engagement with SUD treatment for health plan populations. Additionally, emergency department visits and withdrawal services alone are not suggestive of ongoing or planned treatment for individuals with SUD and thus do not signal that a member is already engaged in comprehensive care so these were removed from the measure's negative SUD history period. The requirement that psychosocial treatment accompany pharmacotherapy was also removed to align with the most current clinical practice guidelines (e.g., allowing for patients who may not accept concomitant psychosocial treatment).

We are considering potentially adding this measure to the Star Ratings in the future pending rulemaking. This would support CMS' efforts to implement the Universal Foundation set of measures across quality programs. Commenters did not support adding this measure to the Star Ratings and raised concerns about confidentiality, state and federal regulations regarding disclosure of alcohol and SUD information without written authorization, and individuals refusing to admit an SUD problem. We have shared this feedback with NCQA for their consideration. We will take the comments into consideration as we consider adding this measure to the Star Ratings. For this measure to be added to the Star Ratings, it would need to be adopted through rulemaking.

**Timely Follow-up After Acute Exacerbations of Chronic Conditions (Part C).** This clinical quality measure assesses the percentage of acute events requiring an emergency department visit or hospitalization for one of six chronic conditions, where outpatient, non-emergent follow-up is received within a guideline-recommended timeframe after discharge to the community for each chronic condition:

1. Hypertension: Within 7 days
2. Asthma: Within 14 days
3. Congestive Heart Failure (CHF): Within 14 days
4. Coronary Artery Disease (CAD): Within 14 days
5. Chronic Obstructive Pulmonary Disease (COPD): Within 30 days
6. Diabetes: Within 30 days.

Follow-up care is a critical aspect of care coordination, ensuring patients understand and are adhering to their medication regimen, providers are monitoring patients for adverse events, and

providers are educating patients to recognize warning signs. This measure was originally developed using MA encounter data submitted by MA contracts reflecting care received 2014-2016. The measure is constructed at the contract level. Details regarding measure specifications and validation are available from NQF (NQF 34455) and the measure steward, IMPAQ International.[52]

The measure calculation was subsequently replicated using encounter data from 2016 to 2020. Contract-level measure performance rates were found to be roughly stable over time with mean and median performance rates varying from 69-70% and 71-73%, respectively, between 2016 and 2019, before declining in 2020.

CMS solicited comments on adding this measure to the display page starting with the 2024 Star Ratings and potential future inclusion of this measure in the Part C Star Ratings pending rulemaking. We received mixed support for this measure. While a few supported the measure due to the importance of follow-up care, others suggested the measure is duplicative of existing Star Ratings measures. We appreciate all comments received and will not proceed with adding the measure to the display page at this time.

**Adult Immunization Status (Part C and D)**. We appreciate the feedback we received from last year's Advance Notice on replacing the current CAHPS influenza vaccination measure with the HEDIS influenza indicator from the Adult Immunization Status measure. Some commenters suggested that it would be more reliable than self-reported CAHPS data, while other commenters noted that the electronic data sources would have incomplete vaccination status data since patients can receive vaccines in community settings with or without an insurance claim. Many commenters cited discrepancies between HEDIS immunization data with self-reported CAHPS data. Some commenters suggested supplementing electronic data sources with other data sources to have more complete information. CMS will continue to take this feedback into consideration. Any changes to the current influenza measure in Star Ratings would need to be proposed through rulemaking.

CMS plans to add NCQA's Adult Immunization Status measure to the 2026 display page starting with data from the 2024 measurement year. This measure assesses the receipt of influenza, Td/Tdap, zoster, and pneumococcal vaccines. This measure is specified for the HEDIS ECDS Reporting Standard and captures receipt of vaccinations using data from a variety of electronic sources such as administrative claims, immunization registries, and EHRs, among others. For HEDIS measurement year 2023, NCQA has made a series of updates to the measure, including updating the pneumococcal indicator to assess adults 66 and older who received any of the following vaccines between age 19 and the end of the measurement period: pneumococcal conjugate vaccine (PCV) 20, PCV15, PCV13, or pneumococcal polysaccharide vaccine (PPSV) 23; removing the exclusions for chemotherapy, bone marrow transplant, and

---

[52] See https://www.qualityforum.org/QPS/3455.

immunocompromising conditions; and expanding the age range for influenza and Td/Tdap vaccination status to Medicare enrollees age 19 and older and zoster for age 50 and older. We also continue to consider this measure as a potential future Star Ratings measure pending rulemaking. This measure is also part of the Universal Foundation set of measures that CMS is considering proposing across quality programs. Commenters expressed mixed support for this measure. Some commenters supported it and highlighted the benefits of it being a comprehensive measure of vaccinations. Other commenters were opposed to it, expressing concerns about obtaining complete vaccination data, inaccurate or incomplete information in immunization registries, and enrollee resistance to vaccines given the increasingly politicized nature of vaccinations. We have shared this feedback with NCQA. We will take these comments into consideration as we consider adding this measure to the Star Ratings in the future through rulemaking.

**Concurrent Use of Opioids and Benzodiazepines (COB), Polypharmacy Use of Multiple Anticholinergic Medications in Older Adults (Poly-ACH), and Polypharmacy Use of Multiple Central Nervous System Active Medications in Older Adults (Poly-CNS) (Part D).** We announced in the 2020 Rate Announcement that these measures would be on the display page for 2021 and 2022, and that CMS would consider adding them to the Star Ratings in the future. In the 2024 Part C and D proposed rule (87 FR 79619-79620), CMS proposed to move the COB, Poly-ACH, and Poly-CNS measures from the display page to the 2026 Star Ratings (2024 measurement year). See the proposed rule for further information, and these proposals will be addressed through the rulemaking process.

Additionally, CMS will make a non-substantive update for the 2024 measurement year to align with the PQA measure specifications to use CE and no longer adjust for MYs. We did not receive much feedback regarding the non-substantive update to use CE instead of MYs. One commenter requested clarification on whether a member who has a gap in enrollment would be excluded from the entire measurement period when applying CE. According to the PQA measure specifications for CE for the COB and the two Polypharmacy measures, there is one allowable gap in enrollment of up to 31 days during the measurement year. Therefore, when the enrollment is verified monthly, the beneficiary may not have more than a one-month gap in coverage for CE. We will implement this non-substantive update to align with the PQA measure specifications for the 2024 measurement year.

We received measure specification comments to exclude LTC residents and add risk adjustment to these measures. We have shared these specification-related comments with the measure steward, PQA.

**Antipsychotic Use in Persons with Dementia, Overall (APD)/Antipsychotic Use in Persons with Dementia, in Long-Term Nursing Home Residents (APD-LTNH) (Part D)**. These measures currently reported on the display page are adapted from the APD measure developed by the PQA. The PQA recently made the following measure specification updates in their 2023

measure manual to the APD measure: 1) slight modification in the APD measure description; 2) updated definition to reflect appropriate indication for antipsychotic use; 3) added major depression diagnosis as an exclusion to the numerator; and 4) removed the ">60 cumulative days supply" language from the denominator. In the 2023 measure manual, PQA slightly modified the APD description from "the percentage of individuals at least 65 years of age with dementia who received an antipsychotic medication without evidence of a psychotic disorder" to "the percentage of individuals at least 65 years of age with dementia who received an antipsychotic medication without evidence of an appropriate indication for an antipsychotic use." Additionally, the PQA updated the definition to reflect appropriate indication for antipsychotic use to align with FDA approved uses as individuals having one or more claims with schizophrenia, bipolar disorder, Huntington's disease, or Tourette's syndrome in the primary diagnosis or any other diagnosis fields during the measurement year. Furthermore, beneficiaries taking an antipsychotic with an FDA approved indication for treatment of major depression diagnosis (i.e., depression resistant to treatment) is a new exclusion added to the numerator. However, the PQA developed the following process to exclude beneficiaries with major depression diagnosis. The update to remove beneficiaries with major depression diagnosis was approved by the PQA's Quality Measure Expert Panel:

1) one or more prescription claim for an antipsychotic indicated for major depression during the measurement year. The antipsychotic medications would be based on the PQA's NDC lists; and

2) one or more prescription claim for an antidepressant during the measurement year. The antidepressant medications would be based on the PQA's NDC lists; and

3) major depression at any time during the measurement year based on the diagnosis codes provided by the PQA.

Currently, we identify beneficiaries for the denominator who have either a dementia diagnosis and/or two or more prescription claims with unique dates of service (DOS) and a total days' supply greater than 60 cumulative days for a cholinesterase inhibitor or N-methyl-D-aspartate (NMDA) receptor antagonist during the measurement year. However, in PQA's 2023 measure manual, PQA updates the APD measure specifications by removing the requirement for "greater than 60 cumulative days' supply" in the denominator since there is no known rationale for including this requirement in addition to the 2 or more prescription claims on different dates of service since beneficiaries can be eligible for the denominator with either prescription claims or diagnosis. Furthermore, the removal of > 60 days' cumulative supply would more accurately align the APD measure with the other PQA measures.

We tested the updated PQA measure specifications for both APD measures using 2021 PDE data with contracts with greater than 30 member-years. A total of 809 Part D contracts were included in the APD measure analysis and 418 Part D contracts for the APD-LTNH measure. With the

added major depression exclusion, the numerator decreased for both APD measures. We found that 6.0% of beneficiaries in the APD denominator population were diagnosed with major depression and 10.1% of beneficiaries from the APD-LTNH denominator. For the APD measure, the mean rate for all contracts improved from 8.57% to 7.10% with the updated measure specifications. Similarly, for the APD-LTNH measure, the mean rate overall improved from 7.99% to 5.96%. As a reminder, a lower rate indicates better performance for both APD measures. The tables below provide more information on the change in rates after applying the updated specifications.

**Table VI-5. APD Rate Distribution for Contracts with > 30 Denominator Member-Years**

| | Contract Type | Percentile Distributions | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Number of contracts | Mean | Min | p25 | p50 | p75 | p90 | Max |
| YOS 2021 PDE with Current Measure Specifications | All Contracts | 809 | 8.57% | 0.00% | 6.09% | 7.85% | 10.09% | 13.05% | 30.75% |
| | MAPDs | 749 | 8.52% | 0.00% | 5.93% | 7.67% | 10.10% | 13.62% | 30.75% |
| | MAPDs (non-MMP) | 711 | 8.62% | 0.00% | 5.97% | 7.72% | 10.22% | 13.76% | 30.75% |
| | PDPs | 60 | 9.19% | 5.24% | 8.46% | 9.04% | 9.93% | 11.53% | 12.44% |
| YOS 2021 PDE with Updated Measure Specifications | All Contracts | 809 | 7.10% | 0.00% | 4.75% | 6.22% | 8.13% | 11.66% | 34.06% |
| | MAPDs | 749 | 7.08% | 0.00% | 4.62% | 6.05% | 8.13% | 11.95% | 34.06% |
| | MAPDs (non-MMP) | 711 | 7.15% | 0.00% | 4.64% | 6.12% | 8.17% | 12.00% | 34.06% |
| | PDPs | 60 | 7.32% | 2.33% | 6.48% | 7.30% | 8.11% | 9.15% | 10.06% |

**Table VI-6: APD-LTNH Rate Distribution for Contracts with >30 Denominator Member-Years**

| | Contract Type | Percentile Distributions | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Number of contracts | Mean | Min | p25 | p50 | p75 | p90 | Max |
| YOS 2021 PDE with Current Measure Specifications | All Contracts | 418 | 7.99% | 0.00% | 4.95% | 7.50% | 10.37% | 13.49% | 20.67% |
| | MAPDs | 373 | 7.92% | 0.00% | 4.69% | 7.41% | 10.37% | 13.49% | 20.67% |
| | MAPDs (non-MMP) | 338 | 8.27% | 0.00% | 5.18% | 7.87% | 10.67% | 14.15% | 20.67% |
| | PDPs | 45 | 8.57% | 2.93% | 6.66% | 7.58% | 9.70% | 13.05% | 17.51% |
| | | | | | | | | | |
| YOS 2021 PDE with Updated Measure Specifications | All Contracts | 418 | 5.96% | 0.00% | 3.67% | 5.44% | 7.81% | 10.46% | 27.18% |
| | MAPDs | 373 | 5.86% | 0.00% | 3.54% | 5.30% | 7.71% | 10.27% | 27.18% |
| | MAPDs (non-MMP) | 338 | 6.09% | 0.00% | 3.74% | 5.53% | 7.95% | 10.88% | 27.18% |
| | PDPs | 45 | 6.77% | 3.03% | 5.05% | 5.99% | 8.78% | 10.65% | 11.79% |

Based on the results of the analysis, CMS plans to implement the updated measure specifications on the display page for the 2023 measurement year.

One commenter requested that APD and APD-LTNH measures consider permitting the use of low-dose, short-term use of antipsychotics in certain situations. Another commenter was concerned with the impact and appropriateness of the APD and APD-LTNH measures in medically complex individuals with dementia. We have shared these comments with the PQA.

The majority of commenters were supportive of the measure specification updates to the APD and APD-LTNH measures to align with the PQA. We will implement the measure specification updates to the APD and APD-LTNH measures for the 2023 measurement year.

**Initial Opioid Prescribing - Long Duration (IOP-LD) (Part D).** We began reporting the IOP-LD measure in the 2023 display page (2021 measurement year). Currently, beneficiaries enrolled in hospice, with a cancer diagnosis, with a sickle cell disease diagnosis, or receiving palliative care during the measurement year or the 90 days prior to the measurement period are excluded from the measure. However, CMS will align with current PQA measure specifications, and therefore, these beneficiaries will be excluded from the measure during the measurement year or 90 days prior to the index prescription start date (IPSD), the earliest date of service for an opioid medication during the measurement year. CMS plans to update the IOP-LD measure on the display page for the 2023 measurement year.

The majority of commenters supported this measure specification update to the IOP-LD measure. CMS will continue to exclude beneficiaries with an exclusion diagnosis during the measurement year. However, with this measure specification update beginning in the 2023 measurement year, only beneficiaries with an exclusion diagnosis 90 days prior to the IPSD will be excluded rather than excluding all beneficiaries who have an exclusion diagnosis 90 days prior to the measurement year.

We also received one measure specification comment to exclude LTC residents from the IOP-LD measure. We have shared this specification-related feedback with the PQA.

**Medication Adherence for HIV/AIDs (Antiretrovirals) (ADH-ARV)/Antipsychotic Use in Persons with Dementia, Overall (APD)/Antipsychotic Use in Persons with Dementia, in Long-Term Nursing Home Residents (APD-LTNH)/Use of Opioids at High Dosage in Persons without Cancer (OHD)/Use of Opioids from Multiple Providers in Persons without Cancer (OMP)/Initial Opioid Prescribing -Long Duration (IOP-LD) (Part D).** Similar to the other Part D Patient Safety measures discussed above, CMS will align with the PQA measure specifications to use CE and no longer adjust for MYs. Currently, we do not have an exact timeline to update these display page and Patient Safety measures, but we will announce it in advance to sponsors.

Commenters were supportive of this specification change to align with the PQA by updating the measures from MYs to CE. We will provide more information when the timeline for these measure changes is finalized.

**Potential New Measure Concepts and Methodological Enhancements for Future Years**

**Health Equity (Part C and D)**. CMS continues to consider additional ways to advance health equity in the Part C and D programs. CMS released confidential stratified reports to Part C and D sponsors in HPMS in Spring 2022 to help contracts identify disparities in care by LIS/DE and disability status for most Part C and D Star Ratings measures. Commenters were supportive of providing confidential stratified reports to Part C and D sponsors and a few recommended releasing the stratified reports publicly. CMS will consider releasing the stratified reports publicly in the future. A variety of stratified reports are currently available through the CMS Office of Minority Health website at https://www.cms.gov/about-cms/agency-information/omh/research-and-data/stratified-reporting.

**Chronic Pain Assessment and Follow-up (Part C).** NCQA is exploring a new measure for measurement year 2025 that would assess chronic pain and follow-up in Medicare enrollees age 65 and older. They are currently proposing two indicators for this measure. The first indicator would assess if enrollees with chronic pain received a multidimensional pain assessment, and the second indicator would assess if some type of follow-up was received among enrollees who tested positive for pain on the multidimensional assessment. Most commenters supported this

measure concept but some requested more information about measure specifications. We shared feedback received with NCQA for their consideration as they continue to develop this measure.

**Cross-Cutting: Sexual Orientation and Gender Identity for HEDIS Measures (Part C).** NCQA is evaluating approaches to update applicable HEDIS measure specifications where eligible populations are currently defined with gendered language to ensure inclusive and gender-affirming approaches aligned with measure intent. Any potential changes to HEDIS measures, such as Breast Cancer Screening, would be considered for measurement year 2024 or beyond. These potential updates for measurement year 2024 or beyond would be non-substantive under § 422.164(d)(1)(ii) because the changes are not expected to meaningfully impact the numerator or denominator of the affected measures. Most commenters supported these updates although some requested a longer timeframe before implementation. We shared feedback received with NCQA.

**Cross-Cutting: Identifying Chronic Conditions in HEDIS Measures (Part C).** NCQA is reevaluating how to identify those with chronic conditions (e.g., diabetes, bipolar disorder, advanced illness) with the goal of updating the claims-based approach that is currently used across HEDIS measures to identify conditions by incorporating clinical data. The potential revised claims method would identify members with a condition if they have at least two encounters with the diagnosis (in any setting except lab) on different dates of service. This would be in place of the current method which has unneeded complexity by looking for at least two visits (e.g., outpatient, observation, telephone, emergency department, non-acute inpatient encounters) on different dates of service or at least one inpatient encounter or discharge with a diagnosis. These potential updates would simplify the way conditions are identified and would impact the following Star Ratings and display measures: Diabetes Care – Eye Exam, Diabetes Care - Blood Sugar Controlled, Follow-up After Emergency Department Visit for Patients with Multiple Chronic Conditions, and Kidney Health Evaluation for Patients with Diabetes. Potential updates would also apply to how advanced illness diagnoses are identified as part of the cross-cutting advanced illness and frailty exclusion. This exclusion is implemented in the following Star Ratings measures: Breast Cancer Screening, Colorectal Cancer Screening, Controlling High Blood Pressure, Diabetes Care - Eye Exam, Diabetes Care – Blood Sugar Controlled, Kidney Health Evaluation for Patients with Diabetes, Osteoporosis Management in Women Who Had a Fracture, Statin Therapy for Patients With Cardiovascular Disease. These potential updates for measurement year 2024 would be non-substantive under § 422.164(d)(1)(iv) by adding clarifications for the documentation requirements to identify enrollees with chronic conditions. Most commenters supported these updates. We shared feedback received with NCQA for their consideration as they make measure updates.

**Blood Pressure Control Measures (Part C)**. NCQA is exploring the development of new blood pressure control measures that utilize the capabilities of digital quality measures and leverage standardized electronic clinical data. The current Controlling Blood Pressure measure included in Part C Star Ratings assesses the percentage of members 18-85 years of age with hypertension

whose blood pressure was adequately controlled (<140/90 mmHg). The numerator currently assesses if control was reached by using only the most recent blood pressure reading available. NCQA is planning to test a new approach which takes an average of blood pressure readings over time and will also explore alternative evidence-based blood pressure control thresholds (<130/80 mmHg). Their testing efforts will also inform the development of an accompanying HEDIS blood pressure control measure for patients with diabetes. The new measures are being explored for measurement year 2025 and beyond, and if implemented, would eventually replace the current HEDIS measures related to blood pressure. If new measures are introduced, NCQA would propose retirement of the existing blood pressure measures.

Most commenters supported NCQA's work to develop a new blood pressure control measure. Some commenters requested additional clarification about the number of readings that would be counted in the measure, whether blood pressure outliers would be removed, whether blood pressure readings from remote patient monitoring would be included in the average, and whether patients with only one screening in a year would be excluded from the measure. Other commenters raised questions about alternative blood pressure thresholds under consideration. We have shared this feedback with NCQA for their consideration as they continue to explore the development of a new blood pressure control measure.

**Kidney Health (Part C).** NCQA is exploring potential measure concepts for kidney health management related to person-centered outcomes, shared decision making, and preparedness for kidney failure for the future. Commenters expressed strong support for these measure concepts. We have shared this feedback with NCQA for their consideration as they continue to explore measures related to kidney health management.

**Social Connection Screening and Intervention (Part C).** NCQA is continuing to work on developing a potential new measure that assesses the percentage of members age 65 and older who were screened using pre-specified instruments at least once during the measurement period for social isolation, loneliness, or inadequate social support and received a corresponding intervention if they screened positive. NCQA has begun measure development work in this area focused on members 65 and older, because much of the evidence for screening and interventions is focused on this age group; however, NCQA plans to explore including those under 65 in the future. The proposed measure will have two indicators, one for social connection screening and one for social connection intervention. This measure would be reported using electronic clinical data, including data from electronic health records, registries, case management systems, and administrative claims. NCQA is considering stratifying the potential measure by age (65-74, 75-84, and 85+) and race/ethnicity. Most commenters supported these updates although some wanted clarification about the measure and possible interventions as well as more time to implement any changes. We have shared feedback received with NCQA.

**Broadening the Mental Health Conditions Assessed by Health Outcomes Survey (HOS) (Part C).** CMS continues to explore ways to enhance the HOS to provide MA contracts with

useful and actionable feedback about their enrollee populations. For example, we are exploring whether to broaden the mental health items in the survey to ensure we have the data to assess whether enrollees with social risk factors such as low-income status are experiencing more issues with poor mental health. This effort supports CMS' focus on health equity.

The existing HOS mental health measures focus broadly on emotional problems with an emphasis on depression. While depression is a significant health problem in the Medicare population that has been linked to poor health outcomes, many older adults live with mental health conditions beyond depression. For example, 1.2% to 15% of community samples of persons over 60 years of age show anxiety symptoms.[53] We are exploring ways to measure a broader array of mental health conditions and provide more actionable feedback and data to health plans for quality improvement. The 2-item measure of Generalized Anxiety Disorder (GAD-2) is used clinically as a way to screen anxiety disorders generally and Generalized Anxiety Disorder more specifically.[54] In combination with the Patient Health Questionnaire-2 (PHQ-2) that is currently on the HOS and is used as a screening tool for depression, the combined questions (GAD-2 and PHQ-2) make up the PHQ-4, which functions well as a general mental health screening tool. Adding the GAD-2, therefore, could widen the scope of measurement of HOS to anxiety disorders and enhance the survey's ability to screen for mental health needs.

CMS received mixed feedback about broadening the mental health conditions assessed by HOS. Although over half of commenters were generally supportive, some commenters made a variety of different suggestions such as rewording the GAD-2, considering whether there are similar questions on the HOS, and evaluating whether the HOS is the best vehicle to assess anxiety disorders. The remaining commenters did not support adding the GAD-2 measure to HOS, citing reasons such as low prevalence of anxiety in older adults, limitations of HOS such as small sample sizes, and issues with patient-reported outcome measures.

We will take this feedback into consideration as we continue to explore enhancements to HOS. There is growing concern that anxiety disorders, similar to depression, are underrecognized and undertreated in older adults.[55] Recent data from the Medicare Current Beneficiary Survey (MCBS) and other sources suggest that the prevalence of anxiety disorders and depression spiked during the COVID-19 pandemic. For example, one analysis of MCBS data found 24% of adults ages 65 and older with Medicare reported anxiety or depression in August 2020, a rate that is substantially higher than the 11% of older adults with Medicare who reported depression or

---

[53] Bryant, C., Jackson, H., & Ames, D. (2008). The prevalence of anxiety in older adults: methodological issues and a review of the literature. *Journal of Affective Disorders, 109*(3): 233-250.

[54] Kroenke, K.; Spitzer, R.L.; Williams, J.B.; Monahan, P.O.; Löwe B. (2007). Anxiety disorders in primary care: prevalence, impairment, comorbidity, and detection. *Ann Intern Med*, 146:317-325.

[55] Seniors With Anxiety Frequently Don't Get Help. Here's Why. | Kaiser Health News (khn.org).

anxiety in 2018.[56] Rates are even higher among younger beneficiaries. An analysis of United States Census Bureau *COVID-19 Household Pulse Survey* data collected between April 23, 2020 and March 1, 2021 found 43% of Medicare beneficiaries with disabilities (i.e., under age 65) had symptoms of generalized anxiety disorder and 37% had symptoms of major depressive disorder.[57] Given the impact of anxiety disorders on health, we will continue to consider how best to measure.

**Measuring Access to Mental Health Care on HOS (Part C).** Since 2006, the HOS has used seven items from the Veterans RAND 12-Item Health Survey (VR-12) to calculate mental health summary scores. In addition, one HOS question from the VR-12 assesses change in emotional health compared with one year ago but is not used in the calculation of the summary scores. Two additional mental health items measure mild, moderate, or severe depression. One item assesses memory problems.

These mental health-related questions do not address access to care, but access to mental health care could be useful to measure for quality improvement. There are existing surveys that include questions to assess need for and access to mental health services.[58, 59] These questions include whether an appointment was made (or attempted) during the last 6 or 12 months, how difficult it was to make appointments, whether psychiatric medications were prescribed or other treatment conducted as soon as needed, or whether there were challenges in filling psychiatric prescriptions. These types of measures could help plans assess variation in access to mental health care.

Commenters expressed support for measuring mental health care access. However, most commenters suggested that HOS may not be the right vehicle for this type of measure. They believe HOS is already too long, that it has declining response rates and small sample sizes, and that plans cannot act on the findings or track outcomes. A couple of commenters questioned whether a self-reported measure is appropriate for tracking access to mental health care. CMS will take this feedback into consideration as we continue to explore how best to capture challenges Medicare beneficiaries face in accessing mental health care.

**Addressing Unmet Health-Related Social Needs on HOS (Part C).** In the 2023 Advance Notice and Rate Announcement we described a new HEDIS measure focused on screening and referral to services for social needs that NCQA refers to as the Social Need Screening and

---

[56] Koma, W; True, S.; Biniek, J.F.; Cubanski, J.; Orgera, K.; Garfield, R. One in four older adults report anxiety or depression amid the COVID-19 Pandemic. *KFF,* 2020, Oct 9. Accessed March 9, 2023: https://www.kff.org/medicare/issue-brief/one-in-four-older-adults-report-anxiety-or-depression-amid-the-covid-19-pandemic/

[57] Friedman C. (2022). The mental health of Medicare beneficiaries with disabilities during the COVID-19 pandemic. *Rehabil Psychol, 67*(1):20-27.

[58] Agency for Healthcare Research and Quality (AHRQ). (2021, May). *Supplemental items for CAHPS Clinician & Group Adult Survey 3.0/3.1: Access to Mental Health Services*. https://www.ahrq.gov/cahps/surveys-guidance/item-sets/cg/suppl-mentalhealth-cg30-adult.html.

[59] Kyanko KA, Curry LA, Keene DE, et al. Does primary care fill the gap in access to specialty mental health care? A mixed methods study. *J Gen Intern Med.* 2022:1-7.

Intervention (SNS-E) measure. This measure focuses on whether members were screened at least once during the measurement year. Commenters to the Advance Notice generally supported its use, but some requested CMS eventually go beyond this measure to include not just screening and referrals but also access to appropriate services.

CMS is working on developing an additional measure that would complement the SNS-E measure as we expand our work related to health equity. This new measure would be a survey-based assessment of enrollee health-related social needs, specifically housing instability, food insecurity, and transportation availability. Each question set would begin with an initial screening item. The subsequent items would assess whether the respondent has received assistance and whether a need currently exists. While the SNS-E measure aims to capture screening and assessment by the plan and its providers, we are considering potential HOS questions that would focus on enrollees' perceptions of unmet needs and of the plans' assessment and intervention. The HOS questions would also provide additional information about ongoing unmet needs even if the plan intervened. The HOS measure will provide important patient-reported data that will complement the HEDIS SNS-E measure. Unlike the SNS-E, the HOS measure will ask respondents whether they received assistance from their plan or provider and whether they are currently struggling with unmet needs.

While most commenters see the value of addressing unmet health-related social needs and its role in health equity, CMS received mixed feedback about adding questions regarding screening and assistance with unmet social needs to HOS. Although more than half of commenters supported adding related questions to HOS, other commenters raised the following concerns: plans and providers do not have full control over which services are sought and provided; geographic differences in the availability of community resources and interventions; adding these items to HOS could duplicate the data from NCQA's Social Need Screening and Intervention (SNS-E) measure; and HOS may not be the appropriate vehicle for collecting this information. CMS will take this feedback into consideration as we continue to explore how best we can capture ongoing unmet needs to ensure beneficiaries are getting the support they need.

**CAHPS (Part C and D).**

*Web Mode of Data Collection*

As noted in the 2023 Advance Notice and Rate Announcement, in an effort to increase response rates for the MA and PDP CAHPS surveys, CMS tested the effects on response rates and survey scores of a web-based mode, as an addition to the current mixed mode protocol. The testing also allowed for assessment of the impact of the web mode on the current MA and PDP CAHPS survey instruments with the Agency for Healthcare Research and Quality's (AHRQ) 5.1 Health Plan Survey wording clarifications for explicit references to care received via telehealth (phone or video). Commenters to the 2023 Advance Notice overwhelmingly supported the addition of a

web mode for the MA and PDP CAHPS survey as part of the mixed mode data collection protocol.

In the CAHPS field test we found that for enrollees with email addresses, the web-mail-phone protocol increased MA response rates by 4 percentage points; we found little change to response rates for PDPs. We believe that the availability of better email addresses across all contracts will help improve response rates overall and may help contribute to cost savings for plans in the long run, as web responses should be less costly.

Nearly all commenters supported the addition of a web-based mode but a few were concerned the web option would introduce bias. Based on testing and evaluation, CMS believes that there is little to no risk of bias based on the addition of a web-based mode. The use of a three-phase sequential multimode approach, web followed by mail followed by telephone, allows MA enrollees choices about how to respond. It maintains or increases response rates for all groups of Medicare enrollees and is available to those with or without broadband or telephone access. While the increases in response rates vary slightly by enrollee characteristics, this does not create bias, as scores from those randomized for the web-mail-phone protocol were similar to those randomized for the mail-phone protocol in our field test. Of 39 items compared between the web-mail-phone and mail-phone protocols, none differed in case-mix adjusted mean score at $p<0.01$ and only two differed at $p<0.05$, a pattern consistent with chance. Thus, there is no evidence of a mode effect on scores from the web-mail-phone protocol relative to the mail-phone protocol.

In our testing we saw different rates of email availability by plan and, while this may influence response rate gains, it would not bias plan scores because response by web results in scores similar to those obtained under the mail-phone protocol. Similarly, no effect on scores over time is anticipated. To increase the likelihood of responses, health and drug plans should maintain accurate contact information, including email addresses when available, for their enrollees. In the field test a majority of respondents in the web-mail-phone protocol still chose to respond by mail or phone. Among respondents with an available email address, 79% chose to respond by mail or phone. Further, the composition of respondents is similar in the web-mail-phone and mail-phone protocols. We compared respondents to the web-mail-phone and mail-phone protocols by age, sex, LIS/DE status, race/ethnicity, education, and health status, and respondents were quite similar; the overall pattern of differences was consistent with chance.

A few commenters felt that the addition of web mode should be considered a substantive change, suggesting it would change the denominator of the CAHPS measures. CMS disagrees that this is a substantive change because the denominator remains enrollees with at least 6 months of continuous enrollment at the time of sampling. With this change, the same people with Medicare are included. The addition of web to the mail-phone survey protocol does not change the specification for the numerator or denominator. Further, the focus of the survey questions that

make up the CAHPS survey has not changed, so Part C and D sponsors would be implementing the same efforts to improve patient experiences of care.

A few commenters asked for additional information about how the web mode will be implemented. CMS tested and will add the web mode to the existing method of administration by using a pre-notification letter, an email with reminder (beginning in 2024) or letter survey invitation with personalized URL to complete the survey online, up to two mailings of the questionnaire for non-respondents, and telephone follow-up of non-respondents. This is a multi-pronged, comprehensive survey administration protocol that avoids the weaknesses of reliance upon mail or telephone administration alone. Additional details about the protocols can be found in the MA and PDP CAHPS survey OMB package at https://www.cms.gov/Regulations-and-Guidance/Legislation/PaperworkReductionActof1995/PRA-Listing-Items/CMS-R-246. Similar to mail and phone administration, the web survey will be conducted in accordance with CMS protocols and technical specifications. The MA and PDP CAHPS survey can only be administered by CMS-approved vendors who have met CMS requirements for systems security and procedures to safeguard data in a manner compliant with the Health Insurance Portability and Accountability Act (HIPAA) as described at 45 CFR Part 160 and Part 164.

CMS also sought comment on the AHRQ's 5.1 clarifications that explicitly added references to in-person, phone, or video appointments to a few of the CAHPS survey items asking about health care experiences. The survey instructions already ask the respondent to think about the times they got health care in person, by phone, or by video call when completing the survey, so the modified question wording just reminds the respondent of the instructions. In the field test we did not find evidence that the 5.1 changes affect scores on the CAHPS Star Ratings measures. Commenters generally supported the 5.1 wording changes that are inclusive of telehealth.

As discussed in the Advance Notice, we are planning to implement the web-based mode (as an addition to the current mixed mode protocol) as well as the 5.1 wording clarifications (to explicitly include telehealth or use terms appropriate to both telehealth and in-person visits) in the 2024 CAHPS survey implementation used for the 2025 Star Ratings. These changes were included in an OMB Paperwork Reduction Act package referenced above for the MA and PDP CAHPS surveys. We note that while the 2024 Part C and D proposed rule did propose to amend §§ 422.164(d)(1) and 423.184(d)(1) described at 87 FR 79622 to add collection of survey data through another mode of survey administration to the non-exhaustive list of non-substantive measure updates that can be made without rulemaking, that proposal is only a clarification. The current regulations permit non-substantive changes like those described in this section to be done through the Advance Notice/Rate Announcement process. As we stated in the 2024 Part C and D proposed rule, the expansion of how data are collected is non-substantive because there is no change to the information that is being collected; the only change is the way in which it is collected. The CAHPS 5.1 wording changes are also non-substantive as specified at §§ 422.164(d)(1)(iv)(C) and 423.184(d)(1)(iv)(C) because they reiterate the existing instructions when answering the questions.

*Updates to Survey Questions*

Also, as noted in the 2023 Advance Notice and Rate Announcement, we tested some additional questions for potential implementation as part of the MA and PDP CAHPS survey. The new survey items capture more detail or test new approaches to topics covered in the current MA and PDP CAHPS surveys (e.g., patient-provider communication, getting test results, communication between providers), and also new topics (e.g., perceived unfair or insensitive treatment). Commenters to the 2023 Advance Notice supported adding questions on unfair or insensitive treatment to the survey, as long as consideration is given to survey length.

The question on unfair treatment asked whether in the last 6 months anyone from a clinic, emergency room, or doctor's office treated the enrollee in an unfair or insensitive way because of their disability, age, culture or religion, language or accent, race or ethnicity, sex (female or male), sexual orientation, gender or gender identity, or income. While few enrollees reported experiencing unfair treatment overall, unfair treatment by health condition was most common, followed by unfair treatment by disability and age. Across MA contracts in the field test, 9.4 percent of respondents endorsed one or more reasons for being treated in an unfair or insensitive way.

Nearly all commenters on the CY 2024 Advance Notice supported the intent of the question on unfair treatment, although some shared concerns about the question being added to the MA CAHPS Survey; for example, some commenters recommended that CMS control for factors that might affect responses. CMS is considering using the same case-mix adjustors for unfair treatment as for other CAHPS measures. We will consider this item as a display page measure for 2025 Star Ratings. If it were to be considered as a future Star Ratings measure, once CMS has more experience with the measure, we would put the potential measure through the Measures Under Consideration process, with future rulemaking used to adopt the measure for the Star Ratings program.

We also tested modifications to the Getting Appointments and Care Quickly measure. For example, we tested a question that would replace the current question "In the last 6 months, how often did you see the person you came to see within 15 minutes of your appointment time?" in the existing three-item composite measure. The replacement question that did not focus on the exact amount of time waiting did not test well. As an alternative, we considered removing the question related to waiting more than 15 minutes, since telehealth and type of provider may influence how enrollees respond to this item. This would reduce the Getting Appointments and Care Quickly measure to the existing two items:

- In the last 6 months, when you needed care right away, how often did you get care as soon as you needed?
- In the last 6 months, how often did you get an appointment for a check-up or routine care as soon as you needed?

Although this change would reduce the reliability of the measure somewhat, a two-item Getting Appointments and Care Quickly measure would still have high reliability with a mean reliability of 0.75.[60] We solicited stakeholder feedback on removing this question from the Getting Appointments and Care Quickly measure starting with the 2024 survey administered for the 2025 Star Ratings. This change would be considered non-substantive as described at § 422.164(d)(1) since it would not change the population covered by this measure, the two existing questions that would continue to be included in the measure, and the intent of the measure that focuses on the individual's experience of getting care as soon as needed. CMS received overwhelming support for removing the 15-minute wait time question from the Getting Appointments and Care Quickly measure. We will remove this question from Getting Appointments and Care Quickly for the 2025 Star Ratings.

We also tested some potential alternative questions for the current questions included in the Care Coordination measure focused on how often doctors, nurses, or health care providers explain the results of tests, how often the explanations were easy to understand, and how often the information was as much as was needed. We are conducting ongoing analysis of these questions to see whether they would fit into an updated Care Coordination measure. CMS will take this feedback into consideration as we continue to explore alternative questions.

---

[60] See https://www.rand.org/pubs/technical_reports/TR653.html for a description of reliability and what is considered sufficient reliability to discern differences among groups.

## Attachment VII. Economic Information for the CY 2024 Rate Announcement

Below, we provide the economic information for significant provisions in the Rate Announcement. Provisions not specifically addressed below are intended to represent a continuation of the policies established for CY 2023 and, as a result, do not have an impact associated with them.

## Section A. Changes in the Payment Methodology for Medicare Advantage and PACE for CY 2024

### *A1. Medicare Advantage and PACE non-ESRD Ratebook*

The FFS growth percentage for the 2024 MA non-ESRD rates is estimated to be 2.45 percent, and the MA growth percentage for the 2024 MA non-ESRD rates is estimated to be 1.60 percent. The MA non-ESRD ratebook impact summarized here is calculated by comparing 2024 Part C expenditures reflecting these growth rate assumptions to the expected 2024 Part C expenditures assuming the MA non-ESRD ratebook remains unchanged from that finalized for 2023. The net impact on the Medicare Trust Funds for CY 2024 is expected to be $8.1 billion. This figure accounts for the impact of the benchmark rate cap, MA rebate, and MA EGWP policies, as well as the portion of the difference between benchmarks and bids that the government retains and the portion of the program costs covered by Part B premiums.

The MA growth percentage, used to calculate the 2024 PACE non-ESRD rates as well as in development of the applicable amount used in setting MA non-ESRD rates, is estimated to be 1.60 percent. The PACE non-ESRD ratebook impact is calculated by comparing the 2024 PACE expenditures reflecting this growth rate assumption to the expected 2024 PACE expenditures assuming that the PACE non-ESRD ratebook remains unchanged from the CY 2023 PACE non-ESRD ratebook. The net impact on the Medicare Trust Funds for CY 2024 for the PACE ratebook change is expected to be $30 million. This figure accounts for the portion of the program costs covered by Part B premiums.

The net impact on the Medicare Trust Funds for CY 2024 of implementing the zero-claims adjustment in Puerto Rico is expected to be $260 million.

### *A2. Indirect Medical Education (IME) Phase Out*

Section 161 of the Medicare Improvements for Patients and Providers Act of 2008 (MIPPA) (Pub. L. 110-275) amended section 1853(k)(4) of the Act to require CMS to phase out indirect medical education (IME) amounts from pre-ACA MA capitation rates, which are used to set the cap on MA benchmarks and are used as the basis for PACE non-ESRD capitation rates. Note that section 1894(d)(3) of the Act provides that the IME payment phase-out does not apply to PACE capitation rates. Section 1853(n)(2)(A)(i) and (n)(2)(F) of the Act provides that the IME phase-out is applied in developing the post-ACA MA benchmarks. Per statute,

the maximum incremental IME phase-out is 0.60 percent of the FFS rate per year. We estimated the impact of the IME phase-out change between 2023 and 2024. Since the maximum IME reduction is 8.4 percent in 2023 and 9.0 percent in 2024, we calculate the impact as the difference for those counties with IME percentages of at least 8.4 percent, with the maximum impact of 0.6 percent (i.e., the difference between 8.4 and 9.0 percent). Also, since the IME reduction to MA benchmarks is increasing, the impact is considered to be a net savings to the Medicare Trust Funds.

In payment year 2024, there are no counties that have IME amounts greater than 8.4 percent of the FFS rate. Since all counties have IME amounts less than 8.4 percent of their respective FFS rates, there is no impact by the change in the IME phase-out percentage in 2024. For the ESRD ratebook, all IME amounts used for MA ESRD rates are less than 8.4 percent of the FFS rate, so there is no impact from the IME phase-out change on the ESRD ratebook for 2024.

Note that the statutorily prescribed methodology for calculating the IME phase-out in 2024 is the same as that provided by statute for CY 2023; we are providing this impact assessment for informational purposes.

***A3. Medicare Advantage and PACE ESRD Ratebooks***

The FFS growth percentage for the 2024 MA ESRD rates is estimated to be 2.27 percent. The impact on the MA and PACE ESRD ratebooks is calculated by comparing projected 2024 Part C expenditures with this growth rate assumption to the expected 2024 Part C expenditures with the assumption that the MA and PACE ESRD ratebooks would have been unchanged from those finalized for 2023. The net impact on the Medicare Trust Funds for CY 2024 is expected to be $440 million. This figure accounts for the portion of the program costs covered by Part B premiums.

***A4. CMS-HCC Risk Adjustment Model***

For CY 2024, CMS is finalizing an updated CMS-HCC risk adjustment model for organizations other than PACE, with a 3-year phase in beginning in CY 2024 when the risk scores will be calculated as the sum of 33% of the risk score calculated with the updated model (the 2024 model) and 67% of the risk score calculated with the current model (the 2020 model). The CY 2024 impact on MA risk scores of the finalized CMS-HCC risk adjustment model with a 3-year phase in starting at 33% is projected to be -2.16%, which represents a $7.6 billion net savings to the Medicare Trust Fund in 2024.When estimating the impact of the proposed model, the impact takes into account the portion of the difference between benchmarks and bids that the government retains and the portion of the program costs covered by Part B premiums.

***A5. ESRD Risk Adjustment***

For CY 2024, CMS is continuing the use of the ESRD risk adjustment models implemented in CY 2023. Therefore, no economic impact is applicable.

***A6. Frailty Adjustment for FIDE SNPs***

For CY 2024, CMS is calculating frailty scores for FIDE SNPs by blending 67% of the frailty scores calculated with the frailty factors used for CY 2023 (associated with the 2020 CMS-HCC model) and 33% of the frailty scores calculated with the updated frailty factors being finalized for CY 2024 that do not include the CAHPS survey weight (associated with the finalized 2024 CMS-HCC risk adjustment model). To calculate impacts, CMS utilized the survey results from the 2021 HOS / HOS-M to estimate frailty scores based on the frailty factors used for CY 2023 (the current model) and the frailty factors being finalized for CY 2024 (the updated model), and blended them as is being finalized. The CY 2024 impact of transitioning to frailty scores calculated using the updated frailty factors, relative to CY 2023, is a change in frailty scores of -0.58%, which represents a net savings of less than $10 million dollars to the Medicare Trust Funds in 2024.

***A7. MA Coding Pattern Adjustment***

For CY 2024, we will continue to apply the statutory minimum coding pattern difference adjustment (5.90%). There is no change in policy from CY 2023, and we applied the same factor for CY 2023, therefore the year-over-year impact is zero.

***A8. Normalization***

The normalization factors serve to offset the trend in risk scores and maintain a 1.0 average FFS risk score. For CY 2024, for the CMS-HCC risk adjustment models with a 2019 or 2020 denominator, CMS will calculate the normalization factors using a five-year linear slope methodology and updated average FFS risk scores for 2018 through 2022, but continuing to exclude the 2021 risk score as was done for the CY 2023 normalization factor. For the CMSHCC risk adjustment models with a 2015 denominator and the RxHCC models, CMS will calculate the normalization factors using a five-year linear slope methodology and historical FFS risk scores (2016 through 2020). Since normalization is applied to risk scores to maintain the same average risk scores in each program year-over-year, the impact of normalization is zero.

**Section B. Changes in the Payment Methodology for Medicare Part D for CY 2024**

***B1. Part D Risk Adjustment Model***

For CY 2024, we are continuing the use of the RxHCC risk adjustment model that was implemented in CY 2023. Therefore, no economic impact is applicable.

***B2. Annual Percentage Increase for Part D Parameters***

The methodology for updating other Part D parameters for CY 2024 remains unchanged from that used for CY 2023. As a result, updating the other Part D parameters does not have an impact on the Medicare Trust Fund alone; the impact of such parameter updates is dependent on the behavior and bid assumptions of Part D plan sponsors.

## Attachment VIII. CMS-HCC Risk Adjustment Factors & Predictive Ratio Tables

### Table VIII-1. 2024 CMS-HCC Model Relative Factors for Continuing Enrollees

| Variable | Description Label | Community, NonDual, Aged | Community, NonDual, Disabled | Community, FBDual, Aged | Community, FBDual, Disabled | Community, PBDual, Aged | Community, PBDual, Disabled | Institutional |
|---|---|---|---|---|---|---|---|---|
| **Female** | | | | | | | | |
| 0-34 Years | | - | 0.238 | - | 0.346 | - | 0.454 | 0.948 |
| 35-44 Years | | - | 0.288 | - | 0.332 | - | 0.420 | 0.810 |
| 45-54 Years | | - | 0.340 | - | 0.384 | - | 0.404 | 1.031 |
| 55-59 Years | | - | 0.385 | - | 0.421 | - | 0.424 | 0.949 |
| 60-64 Years | | - | 0.436 | - | 0.502 | - | 0.414 | 0.881 |
| 65-69 Years | | 0.330 | - | 0.435 | - | 0.365 | - | 1.188 |
| 70-74 Years | | 0.395 | - | 0.506 | - | 0.423 | - | 1.119 |
| 75-79 Years | | 0.465 | - | 0.596 | - | 0.485 | - | 0.965 |
| 80-84 Years | | 0.524 | - | 0.665 | - | 0.544 | - | 0.862 |
| 85-89 Years | | 0.624 | - | 0.775 | - | 0.618 | - | 0.750 |
| 90-94 Years | | 0.737 | - | 0.869 | - | 0.738 | - | 0.627 |
| 95 Years or Over | | 0.742 | - | 0.877 | - | 0.835 | - | 0.481 |
| **Male** | | | | | | | | |
| 0-34 Years | | - | 0.106 | - | 0.191 | - | 0.306 | 0.826 |
| 35-44 Years | | - | 0.154 | - | 0.204 | - | 0.261 | 0.719 |
| 45-54 Years | | - | 0.215 | - | 0.293 | - | 0.300 | 0.991 |
| 55-59 Years | | - | 0.283 | - | 0.410 | - | 0.353 | 0.989 |
| 60-64 Years | | - | 0.345 | - | 0.504 | - | 0.374 | 0.917 |
| 65-69 Years | | 0.332 | - | 0.531 | - | 0.375 | - | 1.275 |
| 70-74 Years | | 0.396 | - | 0.626 | - | 0.417 | - | 1.224 |
| 75-79 Years | | 0.502 | - | 0.714 | - | 0.498 | - | 1.319 |
| 80-84 Years | | 0.571 | - | 0.789 | - | 0.565 | - | 1.238 |
| 85-89 Years | | 0.664 | - | 0.907 | - | 0.615 | - | 1.135 |
| 90-94 Years | | 0.800 | - | 0.993 | - | 0.712 | - | 0.946 |
| 95 Years or Over | | 0.896 | - | 1.058 | - | 0.904 | - | 0.825 |
| **Medicaid and Originally Disabled Interactions** | | | | | | | | |
| Originally Disabled, Female | | 0.228 | - | 0.160 | - | 0.103 | - | - |
| Originally Disabled, Male | | 0.135 | - | 0.158 | - | 0.075 | - | - |
| Medicaid | | - | - | - | - | - | - | 0.130 |

| Variable | Description Label | Community, NonDual, Aged | Community, NonDual, Disabled | Community, FBDual, Aged | Community, FBDual, Disabled | Community, PBDual, Aged | Community, PBDual, Disabled | Institutional |
|---|---|---|---|---|---|---|---|---|
| **Disease Coefficients** | | | | | | | | |
| HCC1 | HIV/AIDS | 0.301 | 0.213 | 0.397 | 0.237 | 0.196 | 0.109 | 1.322 |
| HCC2 | Septicemia, Sepsis, Systemic Inflammatory Response Syndrome/Shock | 0.500 | 0.598 | 0.649 | 0.780 | 0.447 | 0.591 | 0.605 |
| HCC6 | Opportunistic Infections | 0.381 | 0.763 | 0.588 | 0.833 | 0.518 | 0.685 | 0.728 |
| HCC17 | Cancer Metastatic to Lung, Liver, Brain, and Other Organs; Acute Myeloid Leukemia Except Promyelocytic | 4.209 | 3.995 | 3.896 | 4.235 | 3.946 | 4.103 | 1.952 |
| HCC18 | Cancer Metastatic to Bone, Other and Unspecified Metastatic Cancer; Acute Leukemia Except Myeloid | 2.341 | 2.486 | 2.277 | 2.537 | 2.166 | 2.403 | 1.110 |
| HCC19 | Myelodysplastic Syndromes, Multiple Myeloma, and Other Cancers | 1.798 | 1.989 | 1.563 | 1.661 | 1.520 | 1.554 | 0.957 |
| HCC20 | Lung and Other Severe Cancers | 1.136 | 0.978 | 1.166 | 1.173 | 1.214 | 1.067 | 0.672 |
| HCC21 | Lymphoma and Other Cancers | 0.671 | 0.540 | 0.654 | 0.739 | 0.627 | 0.618 | 0.493 |
| HCC22 | Bladder, Colorectal, and Other Cancers | 0.363 | 0.366 | 0.382 | 0.409 | 0.410 | 0.351 | 0.314 |
| HCC23 | Prostate, Breast, and Other Cancers and Tumors | 0.186 | 0.233 | 0.196 | 0.218 | 0.203 | 0.237 | 0.197 |
| HCC35 | Pancreas Transplant Status | 0.949 | 1.393 | 1.117 | 0.573 | 1.117 | 2.740 | 1.106 |
| HCC36 | Diabetes with Severe Acute Complications | 0.166 | 0.191 | 0.186 | 0.235 | 0.166 | 0.210 | 0.280 |
| HCC37 | Diabetes with Chronic Complications | 0.166 | 0.191 | 0.186 | 0.235 | 0.166 | 0.210 | 0.280 |
| HCC38 | Diabetes with Glycemic, Unspecified, or No Complications | 0.166 | 0.191 | 0.186 | 0.235 | 0.166 | 0.210 | 0.280 |
| HCC48 | Morbid Obesity | 0.186 | 0.144 | 0.300 | 0.178 | 0.164 | 0.118 | 0.442 |
| HCC49 | Specified Lysosomal Storage Disorders | 9.256 | 13.778 | 2.833 | 6.399 | 3.269 | 7.771 | 1.528 |

| Variable | Description Label | Community, NonDual, Aged | Community, NonDual, Disabled | Community, FBDual, Aged | Community, FBDual, Disabled | Community, PBDual, Aged | Community, PBDual, Disabled | Institutional |
|---|---|---|---|---|---|---|---|---|
| HCC50 | Amyloidosis, Porphyria, and Other Specified Metabolic Disorders | 0.648 | 0.883 | 0.555 | 0.789 | 0.435 | 0.529 | 0.362 |
| HCC51 | Addison's and Cushing's Diseases, Acromegaly, and Other Specified Endocrine Disorders | 0.510 | 0.606 | 0.634 | 0.654 | 0.313 | 0.393 | 0.620 |
| HCC62 | Liver Transplant Status/Complications | 0.376 | 0.184 | 0.261 | 0.409 | 0.571 | 0.271 | 0.593 |
| HCC63 | Chronic Liver Failure/End-Stage Liver Disorders | 0.962 | 1.032 | 1.102 | 1.209 | 0.861 | 1.101 | 0.894 |
| HCC64 | Cirrhosis of Liver | 0.447 | 0.383 | 0.475 | 0.414 | 0.391 | 0.270 | 0.378 |
| HCC65 | Chronic Hepatitis | 0.185 | 0.248 | 0.101 | 0.220 | 0.156 | 0.189 | 0.378 |
| HCC68 | Cholangitis and Obstruction of Bile Duct Without Gallstones | 0.388 | 0.383 | 0.085 | 0.354 | 0.391 | 0.270 | 0.090 |
| HCC77 | Intestine Transplant Status/Complications | 1.172 | 6.301 | 5.039 | 6.161 | 5.039 | 5.039 | 5.089 |
| HCC78 | Intestinal Obstruction/Perforation | 0.326 | 0.534 | 0.382 | 0.548 | 0.478 | 0.688 | 0.380 |
| HCC79 | Chronic Pancreatitis | 0.357 | 0.574 | 0.525 | 0.799 | 0.444 | 0.709 | 0.218 |
| HCC80 | Crohn's Disease (Regional Enteritis) | 0.550 | 0.635 | 0.490 | 0.651 | 0.479 | 0.603 | 0.374 |
| HCC81 | Ulcerative Colitis | 0.244 | 0.285 | 0.201 | 0.286 | 0.205 | 0.237 | 0.258 |
| HCC92 | Bone/Joint/Muscle/Severe Soft Tissue Infections/Necrosis | 0.479 | 0.529 | 0.611 | 0.632 | 0.471 | 0.539 | 0.556 |
| HCC93 | Rheumatoid Arthritis and Other Specified Inflammatory Rheumatic Disorders | 0.617 | 0.470 | 0.439 | 0.384 | 0.405 | 0.288 | 0.297 |
| HCC94 | Systemic Lupus Erythematosus and Other Specified Systemic Connective Tissue Disorders | 0.268 | 0.239 | 0.237 | 0.250 | 0.224 | 0.196 | 0.297 |
| HCC107 | Sickle Cell Anemia (Hb-SS) and Thalassemia Beta Zero | 0.457 | 1.449 | 0.610 | 1.939 | 0.303 | 1.569 | 0.692 |

| Variable | Description Label | Community, NonDual, Aged | Community, NonDual, Disabled | Community, FBDual, Aged | Community, FBDual, Disabled | Community, PBDual, Aged | Community, PBDual, Disabled | Institutional |
|---|---|---|---|---|---|---|---|---|
| HCC108 | Sickle Cell Disorders, Except Sickle Cell Anemia (Hb-SS) and Thalassemia Beta Zero; Beta Thalassemia Major | 0.146 | 0.386 | 0.103 | 0.408 | 0.303 | 0.416 | 0.098 |
| HCC109 | Acquired Hemolytic, Aplastic, and Sideroblastic Anemias | 1.144 | 1.815 | 1.048 | 1.541 | 1.009 | 1.514 | 0.529 |
| HCC111 | Hemophilia, Male | 4.639 | 30.706 | 15.539 | 31.424 | 11.201 | 32.199 | 6.310 |
| HCC112 | Immune Thrombocytopenia and Specified Coagulation Defects and Hemorrhagic Conditions | 0.450 | 0.640 | 0.460 | 0.634 | 0.574 | 0.708 | 0.516 |
| HCC114 | Common Variable and Combined Immunodeficiencies | 2.262 | 2.598 | 2.016 | 2.670 | 2.137 | 2.789 | 0.691 |
| HCC115 | Specified Immunodeficiencies and White Blood Cell Disorders | 0.565 | 0.692 | 0.438 | 0.498 | 0.302 | 0.613 | 0.691 |
| HCC125 | Dementia, Severe | 0.341 | 0.296 | 0.438 | 0.367 | 0.401 | 0.345 | - |
| HCC126 | Dementia, Moderate | 0.341 | 0.296 | 0.438 | 0.367 | 0.401 | 0.345 | - |
| HCC127 | Dementia, Mild or Unspecified | 0.341 | 0.296 | 0.438 | 0.367 | 0.401 | 0.345 | - |
| HCC135 | Drug Use with Psychotic Complications | 0.424 | 0.637 | 0.702 | 1.181 | 0.522 | 0.922 | 0.297 |
| HCC136 | Alcohol Use with Psychotic Complications | 0.424 | 0.637 | 0.502 | 1.181 | 0.522 | 0.922 | 0.297 |
| HCC137 | Drug Use Disorder, Moderate/Severe, or Drug Use with Non-Psychotic Complications | 0.424 | 0.365 | 0.502 | 0.471 | 0.394 | 0.348 | 0.297 |
| HCC138 | Drug Use Disorder, Mild, Uncomplicated, Except Cannabis | 0.423 | 0.264 | 0.502 | 0.384 | 0.355 | 0.348 | 0.297 |
| HCC139 | Alcohol Use Disorder, Moderate/Severe, or Alcohol Use with Specified Non-Psychotic Complications | 0.242 | 0.207 | 0.478 | 0.250 | 0.308 | 0.159 | - |

| Variable | Description Label | Community, NonDual, Aged | Community, NonDual, Disabled | Community, FBDual, Aged | Community, FBDual, Disabled | Community, PBDual, Aged | Community, PBDual, Disabled | Institutional |
|---|---|---|---|---|---|---|---|---|
| HCC151 | Schizophrenia | 0.511 | 0.380 | 0.591 | 0.414 | 0.501 | 0.304 | 0.449 |
| HCC152 | Psychosis, Except Schizophrenia | 0.484 | 0.290 | 0.579 | 0.255 | 0.501 | 0.247 | 0.208 |
| HCC153 | Personality Disorders; Anorexia/Bulimia Nervosa | 0.396 | 0.290 | 0.420 | 0.255 | 0.464 | 0.232 | 0.199 |
| HCC154 | Bipolar Disorders without Psychosis | 0.351 | 0.166 | 0.349 | 0.126 | 0.314 | 0.108 | 0.199 |
| HCC155 | Major Depression, Moderate or Severe, without Psychosis | 0.299 | 0.166 | 0.316 | 0.126 | 0.269 | 0.108 | 0.199 |
| HCC180 | Quadriplegia | 1.125 | 0.986 | 1.068 | 1.095 | 1.311 | 1.399 | 0.735 |
| HCC181 | Paraplegia | 0.942 | 0.648 | 0.859 | 0.832 | 0.883 | 0.852 | 0.563 |
| HCC182 | Spinal Cord Disorders/Injuries | 0.478 | 0.368 | 0.402 | 0.308 | 0.401 | 0.316 | 0.270 |
| HCC190 | Amyotrophic Lateral Sclerosis and Other Motor Neuron Disease, Spinal Muscular Atrophy | 1.175 | 1.792 | 1.427 | 3.642 | 0.640 | 1.243 | 0.628 |
| HCC191 | Quadriplegic Cerebral Palsy | 0.855 | 0.743 | 0.393 | 0.466 | 0.840 | 0.104 | - |
| HCC192 | Cerebral Palsy, Except Quadriplegic | 0.314 | 0.129 | - | 0.067 | 0.220 | 0.104 | - |
| HCC193 | Chronic Inflammatory Demyelinating Polyneuritis and Multifocal Motor Neuropathy | 1.692 | 1.427 | 0.957 | 0.939 | 1.149 | 0.850 | 0.913 |
| HCC195 | Myasthenia Gravis with (Acute) Exacerbation | 2.909 | 3.633 | 2.153 | 3.323 | 2.690 | 1.779 | 1.837 |
| HCC196 | Myasthenia Gravis without (Acute) Exacerbation and Other Myoneural Disorders | 0.516 | 0.642 | 0.503 | 0.507 | 0.427 | 0.248 | 0.486 |
| HCC197 | Muscular Dystrophy | 0.426 | 0.632 | 0.369 | 0.681 | 0.162 | 0.145 | 0.292 |
| HCC198 | Multiple Sclerosis | 0.647 | 0.908 | 0.791 | 1.143 | 0.569 | 0.770 | 0.226 |
| HCC199 | Parkinson and Other Degenerative Disease of Basal Ganglia | 0.615 | 0.517 | 0.634 | 0.504 | 0.474 | 0.354 | 0.219 |

| Variable | Description Label | Community, NonDual, Aged | Community, NonDual, Disabled | Community, FBDual, Aged | Community, FBDual, Disabled | Community, PBDual, Aged | Community, PBDual, Disabled | Institutional |
|---|---|---|---|---|---|---|---|---|
| HCC200 | Friedreich and Other Hereditary Ataxias; Huntington Disease | 0.279 | 0.208 | 0.165 | 0.281 | 0.050 | 0.428 | - |
| HCC201 | Seizure Disorders and Convulsions | 0.245 | 0.196 | 0.233 | 0.170 | 0.245 | 0.202 | 0.131 |
| HCC202 | Coma, Brain Compression/Anoxic Damage | 0.543 | 0.238 | 0.721 | 0.279 | 0.549 | 0.309 | 0.097 |
| HCC211 | Respirator Dependence/Tracheostomy Status/Complications | 0.879 | 0.878 | 1.981 | 1.418 | 1.022 | 0.590 | 1.570 |
| HCC212 | Respiratory Arrest | 0.370 | 0.510 | 0.573 | 0.662 | 0.409 | 0.493 | 0.258 |
| HCC213 | Cardio-Respiratory Failure and Shock | 0.370 | 0.510 | 0.573 | 0.662 | 0.409 | 0.493 | 0.258 |
| HCC221 | Heart Transplant Status/Complications | 1.053 | 0.999 | 1.412 | 1.781 | 0.880 | 1.371 | 0.840 |
| HCC222 | End-Stage Heart Failure | 2.505 | 5.770 | 2.927 | 6.612 | 3.009 | 6.106 | 0.826 |
| HCC223 | Heart Failure with Heart Assist Device/Artificial Heart | 2.505 | 5.770 | 2.927 | 6.612 | 3.009 | 6.106 | 0.826 |
| HCC224 | Acute on Chronic Heart Failure | 0.360 | 0.442 | 0.406 | 0.537 | 0.311 | 0.411 | 0.217 |
| HCC225 | Acute Heart Failure (Excludes Acute on Chronic) | 0.360 | 0.442 | 0.406 | 0.537 | 0.311 | 0.411 | 0.217 |
| HCC226 | Heart Failure, Except End-Stage and Acute | 0.360 | 0.442 | 0.406 | 0.537 | 0.311 | 0.411 | 0.217 |
| HCC227 | Cardiomyopathy/Myocarditis | 0.189 | 0.200 | 0.173 | 0.198 | 0.145 | 0.186 | 0.189 |
| HCC228 | Acute Myocardial Infarction | 0.252 | 0.254 | 0.493 | 0.517 | 0.324 | 0.407 | 0.310 |
| HCC229 | Unstable Angina and Other Acute Ischemic Heart Disease | 0.240 | 0.254 | 0.325 | 0.458 | 0.278 | 0.315 | 0.310 |
| HCC238 | Specified Heart Arrhythmias | 0.299 | 0.296 | 0.407 | 0.304 | 0.293 | 0.261 | 0.245 |
| HCC248 | Intracranial Hemorrhage | 0.239 | 0.180 | 0.377 | 0.332 | 0.313 | 0.183 | 0.081 |
| HCC249 | Ischemic or Unspecified Stroke | 0.239 | 0.180 | 0.377 | 0.277 | 0.299 | 0.172 | 0.081 |
| HCC253 | Hemiplegia/Hemiparesis | 0.387 | 0.320 | 0.437 | 0.390 | 0.437 | 0.403 | - |
| HCC254 | Monoplegia, Other Paralytic Syndromes | 0.321 | 0.172 | 0.292 | 0.365 | 0.290 | 0.335 | - |

| Variable | Description Label | Community, NonDual, Aged | Community, NonDual, Disabled | Community, FBDual, Aged | Community, FBDual, Disabled | Community, PBDual, Aged | Community, PBDual, Disabled | Institutional |
|---|---|---|---|---|---|---|---|---|
| HCC263 | Atherosclerosis of Arteries of the Extremities with Ulceration or Gangrene | 1.118 | 1.066 | 1.432 | 1.276 | 1.007 | 1.056 | 0.696 |
| HCC264 | Vascular Disease with Complications | 0.455 | 0.520 | 0.498 | 0.461 | 0.513 | 0.622 | 0.338 |
| HCC267 | Deep Vein Thrombosis and Pulmonary Embolism | 0.294 | 0.431 | 0.445 | 0.568 | 0.338 | 0.498 | 0.245 |
| HCC276 | Lung Transplant Status/Complications | 2.531 | 1.583 | 2.210 | 2.292 | 2.961 | 1.277 | 3.085 |
| HCC277 | Cystic Fibrosis | 0.998 | 2.818 | 1.340 | 3.760 | 0.650 | 3.829 | 0.873 |
| HCC278 | Idiopathic Pulmonary Fibrosis and Lung Involvement in Systemic Sclerosis | 0.818 | 1.209 | 0.791 | 1.640 | 0.650 | 0.937 | 0.873 |
| HCC279 | Severe Persistent Asthma | 0.818 | 0.842 | 0.594 | 0.808 | 0.650 | 0.804 | 0.873 |
| HCC280 | Chronic Obstructive Pulmonary Disease, Interstitial Lung Disorders, and Other Chronic Lung Disorders | 0.319 | 0.209 | 0.390 | 0.281 | 0.321 | 0.234 | 0.312 |
| HCC282 | Aspiration and Specified Bacterial Pneumonias | 0.440 | 0.362 | 0.538 | 0.269 | 0.409 | 0.173 | 0.353 |
| HCC283 | Empyema, Lung Abscess | 0.204 | - | 0.131 | 0.074 | - | - | - |
| HCC298 | Severe Diabetic Eye Disease, Retinal Vein Occlusion, and Vitreous Hemorrhage | 0.336 | 0.364 | 0.323 | 0.319 | 0.327 | 0.301 | 0.545 |
| HCC300 | Exudative Macular Degeneration | 0.596 | 0.366 | 0.370 | 0.255 | 0.459 | 0.380 | 0.196 |
| HCC326 | Chronic Kidney Disease, Stage 5 | 0.815 | 0.927 | 0.985 | 0.946 | 0.965 | 1.050 | 0.958 |
| HCC327 | Chronic Kidney Disease, Severe (Stage 4) | 0.514 | 0.523 | 0.565 | 0.661 | 0.484 | 0.447 | 0.462 |
| HCC328 | Chronic Kidney Disease, Moderate (Stage 3B) | 0.127 | 0.179 | 0.116 | 0.181 | 0.140 | 0.178 | 0.145 |
| HCC329 | Chronic Kidney Disease, Moderate (Stage 3, Except 3B) | 0.127 | 0.179 | 0.116 | 0.181 | 0.140 | 0.178 | 0.145 |

| Variable | Description Label | Community, NonDual, Aged | Community, NonDual, Disabled | Community, FBDual, Aged | Community, FBDual, Disabled | Community, PBDual, Aged | Community, PBDual, Disabled | Institutional |
|---|---|---|---|---|---|---|---|---|
| HCC379 | Pressure Ulcer of Skin with Necrosis Through to Muscle, Tendon, or Bone | 1.965 | 2.140 | 2.580 | 2.570 | 2.349 | 2.349 | 1.420 |
| HCC380 | Chronic Ulcer of Skin, Except Pressure, Through to Bone or Muscle | 1.078 | 1.091 | 1.422 | 1.285 | 1.268 | 1.378 | 0.839 |
| HCC381 | Pressure Ulcer of Skin with Full Thickness Skin Loss | 1.075 | 1.091 | 1.379 | 1.192 | 1.136 | 1.089 | 0.423 |
| HCC382 | Pressure Ulcer of Skin with Partial Thickness Skin Loss | 0.838 | 0.994 | 1.029 | 0.935 | 0.845 | 0.937 | 0.343 |
| HCC383 | Chronic Ulcer of Skin, Except Pressure, Not Specified as Through to Bone or Muscle | 0.646 | 0.707 | 0.890 | 0.707 | 0.660 | 0.654 | 0.343 |
| HCC385 | Severe Skin Burn | 1.291 | 0.234 | 2.362 | 0.857 | - | 0.204 | - |
| HCC387 | Pemphigus, Pemphigoid, and Other Specified Autoimmune Skin Disorders | 0.406 | 0.302 | 0.658 | 0.622 | 0.477 | 0.498 | 0.125 |
| HCC397 | Major Head Injury with Loss of Consciousness > 1 Hour | 0.199 | 0.150 | 0.349 | 0.190 | 0.128 | 0.052 | 0.085 |
| HCC398 | Major Head Injury with Loss of Consciousness < 1 Hour or Unspecified | 0.199 | 0.150 | 0.349 | 0.190 | 0.128 | 0.052 | 0.085 |
| HCC399 | Major Head Injury without Loss of Consciousness | 0.199 | 0.150 | 0.349 | 0.190 | 0.128 | 0.052 | 0.085 |
| HCC401 | Vertebral Fractures without Spinal Cord Injury | 0.522 | 0.605 | 0.622 | 0.559 | 0.538 | 0.412 | 0.231 |
| HCC402 | Hip Fracture/Dislocation | 0.467 | 0.561 | 0.561 | 0.570 | 0.499 | 0.527 | 0.089 |
| HCC405 | Traumatic Amputations and Complications | 0.598 | 0.577 | 0.799 | 0.844 | 0.639 | 0.698 | 0.284 |
| HCC409 | Amputation Status, Lower Limb/Amputation Complications | 0.598 | 0.562 | 0.799 | 0.844 | 0.604 | 0.623 | 0.284 |

| Variable | Description Label | Community, NonDual, Aged | Community, NonDual, Disabled | Community, FBDual, Aged | Community, FBDual, Disabled | Community, PBDual, Aged | Community, PBDual, Disabled | Institutional |
|---|---|---|---|---|---|---|---|---|
| HCC454 | Stem Cell, Including Bone Marrow, Transplant Status/Complications | 1.068 | 0.452 | 1.326 | 0.608 | 1.338 | 0.416 | 1.596 |
| HCC463 | Artificial Openings for Feeding or Elimination | 0.673 | 0.914 | 0.891 | 0.947 | 0.526 | 0.853 | 0.634 |
| **Disease Interactions** | | | | | | | | |
| DIABETES_HF | Diabetes*Heart Failure | 0.112 | 0.023 | 0.183 | 0.041 | 0.164 | 0.053 | 0.209 |
| HF_CHR_ LUNG | Heart Failure*Chronic Lung Disorder | 0.078 | 0.062 | 0.109 | 0.097 | 0.140 | 0.108 | 0.145 |
| HF_KIDNEY | Heart Failure*Kidney | 0.176 | 0.314 | 0.194 | 0.420 | 0.140 | 0.328 | - |
| CHR_LUNG_CARD _RESP_FAIL | Chronic Lung Disorder*Cardiorespiratory Failure | 0.254 | 0.242 | 0.340 | 0.275 | 0.329 | 0.270 | 0.331 |
| HF_HCC238 | Heart Failure*Specified Heart Arrhythmias | 0.077 | 0.257 | 0.140 | 0.372 | 0.135 | 0.314 | - |
| gSubUseDisorder_ gPsych_ | Substance Use Disorder*Psychiatric | - | 0.087 | - | 0.152 | - | 0.149 | - |
| **Disabled/Disease Interactions** | | | | | | | | |
| DISABLED_ HF | Disabled, Heart Failure | - | - | - | - | - | - | 0.488 |
| DISABLED_ ULCER_ | Disabled, Skin Ulcer | - | - | - | - | - | - | 0.537 |
| DISABLED_ CANCER | Disabled, Cancer | - | - | - | - | - | - | 0.367 |
| DISABLED_ NEURO_ | Disabled, Neurological | - | - | - | - | - | - | 0.154 |
| DISABLED_ CHR_LUNG | Disabled, Chronic Lung Disorder | - | - | - | - | - | - | 0.278 |
| **Payment HCC Counts** | | | | | | | | |
| D1 | 1 payment HCCs | - | - | - | - | - | - | - |
| D2 | 2 payment HCCs | - | - | - | - | - | - | - |
| D3 | 3 payment HCCs | - | - | - | - | - | - | - |
| D4 | 4 payment HCCs | - | - | - | - | - | - | - |
| D5 | 5 payment HCCs | 0.050 | 0.088 | 0.049 | 0.095 | 0.016 | 0.105 | - |

| Variable | Description Label | Community, NonDual, Aged | Community, NonDual, Disabled | Community, FBDual, Aged | Community, FBDual, Disabled | Community, PBDual, Aged | Community, PBDual, Disabled | Institutional |
|---|---|---|---|---|---|---|---|---|
| D6 | 6 payment HCCs | 0.102 | 0.223 | 0.071 | 0.245 | 0.096 | 0.191 | - |
| D7 | 7 payment HCCs | 0.188 | 0.380 | 0.160 | 0.472 | 0.207 | 0.435 | - |
| D8 | 8 payment HCCs | 0.316 | 0.440 | 0.267 | 0.607 | 0.345 | 0.581 | - |
| D9 | 9 payment HCCs | 0.444 | 0.750 | 0.353 | 0.841 | 0.345 | 0.823 | - |
| D10P | 10 or more payment HCCs | 0.728 | 1.431 | 0.746 | 1.471 | 0.901 | 1.268 | 0.373 |

**NOTES**:

1. The denominator used is $10,402.34.
2. In the "disease interactions" and "disabled interactions," the variables are defined as follows:
   Cancer = HCCs 17-23
   Cardiorespiratory Failure = HCCs 211-213
   Chronic Lung Disorder = HCCs 276-280
   Diabetes = HCCs 35-38
   Heart Failure = HCCs 221-226
   Kidney = HCCs 326-329
   Neurological = HCCs 180-192, 195, 196, 198, 199
   Psychiatric = HCCs 151-155
   Skin Ulcer = HCCs 379-382
   Specified Heart Arrhythmias = HCC 238
   Substance Use = HCCs 135-139

**SOURCE:** 2018-2019 100% Medicare data.

**Table VIII-2. 2024 CMS-HCC Model Relative Factors for Aged and Disabled New Enrollees**

| | Non-Medicaid & Non-Originally Disabled | Medicaid & Non-Originally Disabled | Non-Medicaid & Originally Disabled | Medicaid & Originally Disabled |
|---|---|---|---|---|
| **Female** | | | | |
| 0-34 Years | 0.711 | 1.025 | - | - |
| 35-44 Years | 0.950 | 1.303 | - | - |
| 45-54 Years | 1.155 | 1.415 | - | - |
| 55-59 Years | 1.152 | 1.289 | - | - |
| 60-64 Years | 1.212 | 1.396 | - | - |
| 65 Years | 0.532 | 0.986 | 1.212 | 1.599 |
| 66 Years | 0.532 | 0.990 | 1.276 | 1.599 |
| 67 Years | 0.557 | 1.004 | 1.276 | 1.599 |
| 68 Years | 0.584 | 1.004 | 1.276 | 2.021 |
| 69 Years | 0.625 | 1.004 | 1.276 | 2.021 |
| 70-74 Years | 0.694 | 1.043 | 1.276 | 2.021 |
| 75-79 Years | 0.901 | 1.128 | 1.276 | 2.021 |
| 80-84 Years | 0.988 | 1.342 | 1.276 | 2.021 |
| 85-89 Years | 1.287 | 1.563 | 1.287 | 2.021 |
| 90-94 Years | 1.287 | 1.712 | 1.287 | 2.021 |
| 95 Years or Over | 1.287 | 1.712 | 1.287 | 2.021 |
| **Male** | | | | |
| 0-34 Years | 0.409 | 0.738 | - | - |
| 35-44 Years | 0.669 | 1.264 | - | - |
| 45-54 Years | 0.906 | 1.420 | - | - |
| 55-59 Years | 0.984 | 1.477 | - | - |
| 60-64 Years | 1.057 | 1.542 | - | - |
| 65 Years | 0.567 | 1.182 | 1.057 | 1.727 |
| 66 Years | 0.576 | 1.234 | 1.155 | 1.959 |
| 67 Years | 0.617 | 1.319 | 1.155 | 1.959 |
| 68 Years | 0.678 | 1.367 | 1.155 | 1.959 |
| 69 Years | 0.684 | 1.455 | 1.297 | 1.959 |
| 70-74 Years | 0.808 | 1.455 | 1.297 | 1.959 |
| 75-79 Years | 1.049 | 1.455 | 1.297 | 2.813 |
| 80-84 Years | 1.245 | 1.503 | 1.297 | 2.813 |
| 85-89 Years | 1.516 | 1.682 | 1.516 | 2.813 |
| 90-94 Years | 1.516 | 1.981 | 1.516 | 2.813 |
| 95 Years or Over | 1.516 | 1.981 | 1.516 | 2.813 |

**NOTES**:

3. The denominator used is $10,402.34.
4. For payment purposes, a new enrollee is a beneficiary who did not have 12 months of Part B eligibility in the data collection year. CMS-HCC new enrollee models are not based on diagnoses, but include factors for different age and sex combinations by Medicaid and the original reason for Medicare entitlement.

**SOURCE**: 2018-2019 100% Medicare data.

**Table VIII-3. 2024 CMS-HCC Model Relative Factors for New Enrollees in Chronic Condition Special Needs Plans (C-SNPs)**

| | Non-Medicaid & Non-Originally Disabled | Medicaid & Non-Originally Disabled | Non-Medicaid & Originally Disabled | Medicaid & Originally Disabled |
|---|---|---|---|---|
| **Female** | | | | |
| 0-34 Years | 1.332 | 1.655 | - | - |
| 35-44 Years | 1.332 | 1.655 | - | - |
| 45-54 Years | 1.536 | 1.965 | - | - |
| 55-59 Years | 1.536 | 1.989 | - | - |
| 60-64 Years | 1.628 | 2.030 | - | - |
| 65 Years | 0.900 | 1.285 | 1.708 | 2.085 |
| 66 Years | 0.900 | 1.285 | 1.708 | 2.085 |
| 67 Years | 0.940 | 1.351 | 1.719 | 2.148 |
| 68 Years | 1.004 | 1.351 | 1.745 | 2.148 |
| 69 Years | 1.020 | 1.467 | 1.755 | 2.233 |
| 70-74 Years | 1.195 | 1.634 | 1.929 | 2.295 |
| 75-79 Years | 1.419 | 1.885 | 2.032 | 2.484 |
| 80-84 Years | 1.612 | 2.061 | 2.239 | 2.735 |
| 85-89 Years | 1.833 | 2.250 | 2.239 | 2.735 |
| 90-94 Years | 2.016 | 2.400 | 2.239 | 2.735 |
| 95 Years or Over | 2.016 | 2.400 | 2.239 | 2.735 |
| **Male** | | | | |
| 0-34 Years | 1.206 | 1.485 | - | - |
| 35-44 Years | 1.206 | 1.485 | - | - |
| 45-54 Years | 1.472 | 1.845 | - | - |
| 55-59 Years | 1.552 | 1.994 | - | - |
| 60-64 Years | 1.642 | 2.035 | - | - |
| 65 Years | 0.944 | 1.422 | 1.642 | 2.035 |
| 66 Years | 0.944 | 1.422 | 1.659 | 2.150 |
| 67 Years | 0.985 | 1.477 | 1.659 | 2.195 |
| 68 Years | 1.005 | 1.477 | 1.659 | 2.195 |
| 69 Years | 1.065 | 1.477 | 1.677 | 2.246 |
| 70-74 Years | 1.216 | 1.735 | 1.807 | 2.316 |
| 75-79 Years | 1.496 | 1.952 | 2.039 | 2.487 |
| 80-84 Years | 1.704 | 2.194 | 2.155 | 2.573 |
| 85-89 Years | 1.924 | 2.403 | 2.346 | 2.573 |
| 90-94 Years | 2.142 | 2.403 | 2.346 | 2.573 |
| 95 Years or Over | 2.142 | 2.403 | 2.346 | 2.573 |

**NOTES**:

1. The denominator used is $10,402.34.
2. For payment purposes, a new enrollee is a beneficiary who did not have 12 months of Part B eligibility in the data collection year. CMS-HCC new enrollee models are not based on diagnoses, but include factors for different age and sex combinations by Medicaid and the original reason for Medicare entitlement.

**SOURCE**: 2018-2019 100% Medicare data.

**Table VIII-4. 2024 CMS-HCC Model with Disease Hierarchies**

| CMS-HCC | If the Disease Group is listed in this column… | …Then drop the CMS-HCC listed in this column |
|---|---|---|
| | **CMS-HCC Hierarchical Condition Category Label** | |
| 17 | Cancer Metastatic to Lung, Liver, Brain, and Other Organs; Acute Myeloid Leukemia Except Promyelocytic | 18, 19, 20, 21, 22, 23 |
| 18 | Cancer Metastatic to Bone, Other and Unspecified Metastatic Cancer; Acute Leukemia Except Myeloid | 19, 20, 21, 22, 23 |
| 19 | Myelodysplastic Syndromes, Multiple Myeloma, and Other Cancers | 20, 21, 22, 23 |
| 20 | Lung and Other Severe Cancers | 21, 22, 23 |
| 21 | Lymphoma and Other Cancers | 22, 23 |
| 22 | Bladder, Colorectal, and Other Cancers | 23 |
| 35 | Pancreas Transplant Status | 36, 37, 38 |
| 36 | Diabetes with Severe Acute Complications | 37, 38 |
| 37 | Diabetes with Chronic Complications | 38 |
| 62 | Liver Transplant Status/Complications | 63, 64, 65, 68 |
| 63 | Chronic Liver Failure/End-Stage Liver Disorders | 64, 65, 68, 202 |
| 64 | Cirrhosis of Liver | 65, 68 |
| 77 | Intestine Transplant Status/Complications | 78, 80, 81 |
| 80 | Crohn's Disease (Regional Enteritis) | 81 |
| 93 | Rheumatoid Arthritis and Other Specified Inflammatory Rheumatic Disorders | 94 |
| 107 | Sickle Cell Anemia (Hb-SS) and Thalassemia Beta Zero | 108 |
| 111 | Hemophilia, Male | 112 |
| 114 | Common Variable and Combined Immunodeficiencies | 115 |
| 125 | Dementia, Severe | 126, 127 |
| 126 | Dementia, Moderate | 127 |
| 135 | Drug Use with Psychotic Complications | 136, 137, 138, 139 |
| 136 | Alcohol Use with Psychotic Complications | 137, 138, 139 |
| 137 | Drug Use Disorder, Moderate/Severe, or Drug Use with Non-Psychotic Complications | 138, 139 |
| 138 | Drug Use Disorder, Mild, Uncomplicated, Except Cannabis | 139 |
| 151 | Schizophrenia | 152, 153, 154, 155 |
| 152 | Psychosis, Except Schizophrenia | 153, 154, 155 |
| 153 | Personality Disorders; Anorexia/Bulimia Nervosa | 154, 155 |
| 154 | Bipolar Disorders without Psychosis | 155 |
| 180 | Quadriplegia | 181, 182, 253, 254 |
| 181 | Paraplegia | 182, 254 |
| 191 | Quadriplegic Cerebral Palsy | 180, 181, 182, 192, 253, 254 |
| 192 | Cerebral Palsy, Except Quadriplegic | 180, 181, 182, 253, 254 |
| 195 | Myasthenia Gravis with (Acute) Exacerbation | 196 |
| 211 | Respirator Dependence/Tracheostomy Status/Complications | 212, 213 |
| 212 | Respiratory Arrest | 213 |

| CMS-HCC | If the Disease Group is listed in this column… | …Then drop the CMS-HCC listed in this column |
|---|---|---|
| | **CMS-HCC Hierarchical Condition Category Label** | |
| 221 | Heart Transplant Status/Complications | 222, 223, 224, 225, 226, 227 |
| 222 | End-Stage Heart Failure | 223, 224, 225, 226, 227 |
| 223 | Heart Failure with Heart Assist Device/Artificial Heart | 224, 225, 226, 227 |
| 224 | Acute on Chronic Heart Failure | 225, 226, 227 |
| 225 | Acute Heart Failure (Excludes Acute on Chronic) | 226, 227 |
| 226 | Heart Failure, Except End-Stage and Acute | 227 |
| 228 | Acute Myocardial Infarction | 229 |
| 248 | Intracranial Hemorrhage | 249 |
| 253 | Hemiplegia/Hemiparesis | 254 |
| 263 | Atherosclerosis of Arteries of the Extremities with Ulceration or Gangrene | 264, 383, 409 |
| 276 | Lung Transplant Status/Complications | 277, 278, 279, 280 |
| 277 | Cystic Fibrosis | 278, 279, 280 |
| 278 | Idiopathic Pulmonary Fibrosis and Lung Involvement in Systemic Sclerosis | 279, 280 |
| 279 | Severe Persistent Asthma | 280 |
| 282 | Aspiration and Specified Bacterial Pneumonias | 283 |
| 326 | Chronic Kidney Disease, Stage 5 | 327, 328, 329 |
| 327 | Chronic Kidney Disease, Severe (Stage 4) | 328, 329 |
| 328 | Chronic Kidney Disease, Moderate (Stage 3B) | 329 |
| 379 | Pressure Ulcer of Skin with Necrosis Through to Muscle, Tendon, or Bone | 380, 381, 382, 383 |
| 380 | Chronic Ulcer of Skin, Except Pressure, Through to Bone or Muscle | 381, 382, 383 |
| 381 | Pressure Ulcer of Skin with Full Thickness Skin Loss | 382, 383 |
| 382 | Pressure Ulcer of Skin with Partial Thickness Skin Loss | 383 |
| 397 | Major Head Injury with Loss of Consciousness > 1 Hour | 202, 398, 399 |
| 398 | Major Head Injury with Loss of Consciousness < 1 Hour or Unspecified | 202, 399 |
| 405 | Traumatic Amputations and Complications | 409 |

**How Payments are Made with a Disease Hierarchy**
**EXAMPLE:** If a beneficiary triggers HCCs 195 (Myasthenia Gravis with (Acute) Exacerbation) and 196 (Myasthenia Gravis without (Acute) Exacerbation and Other Myoneural Disorders), then HCC 196 will be dropped. In other words, payment will always be associated with the HCC in column 1 if an HCC in column 3 also occurs during the same collection period. Therefore, the organization's payment will be based on HCC 195 rather than HCC 196.

**Table VIII-5. Predictive Ratios by Deciles of Predicted Risk (sorted low to high): Non-Dual, Aged (Age >=65) Continuing Enrollee**

| | 2014/2015 Sample | 2018/2019 Sample | | |
|---|---|---|---|---|
| **Deciles** | **2020 Model** | **2020 Model** | **2024 Model** | **Improvement in Predictive Risk** |
| Entire sample | 1.000 | 0.968 | 1.000 | - |
| First (lowest) decile | 0.968 | 0.902 | 0.977 | ↑ |
| Second decile | 0.983 | 0.938 | 0.981 | ↑ |
| Third decile | 0.996 | 0.940 | 1.026 | ↑ |
| Fourth decile | 0.989 | 0.958 | 1.003 | ↑ |
| Fifth decile | 1.003 | 0.977 | 0.995 | ↑ |
| Sixth decile | 1.002 | 0.970 | 0.993 | ↑ |
| Seventh decile | 1.005 | 0.983 | 0.996 | ↑ |
| Eighth decile | 1.003 | 0.982 | 0.996 | ↑ |
| Ninth decile | 1.003 | 0.987 | 1.006 | ↑ |
| Tenth (highest) | 1.003 | 0.963 | 1.003 | ↑ |
| Top 5% | 1.000 | 0.942 | 1.000 | ↑ |
| Top 1% | 0.984 | 0.917 | 0.987 | ↑ |
| Top 0.1% | 0.959 | 0.879 | 0.967 | ↑ |

**Table VIII-6. Predictive Ratios by Deciles of Predicted Risk (sorted low to high): Non-Dual, Disabled (Age <65) Continuing Enrollee**

| | 2014/2015 Sample | 2018/2019 Sample | | |
|---|---|---|---|---|
| **Deciles** | **2020 Model** | **2020 Model** | **2024 Model** | **Improvement in Predictive Risk** |
| Entire sample | 1.000 | 0.979 | 1.000 | - |
| First (lowest) decile | 1.090 | 1.100 | 0.932 | ↑ |
| Second decile | 0.959 | 0.975 | 0.990 | ↑ |
| Third decile | 0.982 | 0.964 | 0.983 | ↑ |
| Fourth decile | 0.982 | 0.977 | 1.011 | ↑ |
| Fifth decile | 0.952 | 0.968 | 0.955 | ↓ |
| Sixth decile | 0.997 | 0.965 | 0.997 | ↑ |
| Seventh decile | 0.983 | 0.972 | 0.997 | ↑ |
| Eighth decile | 1.008 | 1.004 | 1.002 | ↑ |
| Ninth decile | 1.028 | 1.013 | 1.022 | ↓ |
| Tenth (highest) | 1.001 | 0.959 | 1.004 | ↑ |
| Top 5% | 0.991 | 0.935 | 0.998 | ↑ |
| Top 1% | 0.999 | 0.922 | 0.981 | ↑ |
| Top 0.1% | 0.979 | 0.874 | 0.960 | ↑ |

**Table VIII-7. Predictive Ratios by Deciles of Predicted Risk (sorted low to high): Full Benefit Dual, Aged (Age >=65) Continuing Enrollee**

| | 2014/2015 Sample | 2018/2019 Sample | | |
|---|---|---|---|---|
| **Deciles** | **2020 Model** | **2020 Model** | **2024 Model** | **Improvement in Predictive Risk** |
| Entire sample | 1.000 | 1.002 | 1.000 | - |
| First (lowest) decile | 0.969 | 0.949 | 0.996 | ↑ |
| Second decile | 1.006 | 0.980 | 1.029 | ↓ |
| Third decile | 0.988 | 1.012 | 1.015 | ↓ |
| Fourth decile | 0.994 | 0.996 | 0.983 | ↓ |
| Fifth decile | 1.006 | 1.017 | 0.986 | ↑ |
| Sixth decile | 1.000 | 1.006 | 0.997 | ↑ |
| Seventh decile | 1.004 | 1.012 | 0.992 | ↑ |
| Eighth decile | 1.003 | 1.014 | 1.002 | ↑ |
| Ninth decile | 1.002 | 1.009 | 1.002 | ↑ |
| Tenth (highest) | 1.001 | 0.991 | 1.003 | ↑ |
| Top 5% | 1.004 | 0.983 | 1.002 | ↑ |
| Top 1% | 0.978 | 0.938 | 0.979 | ↑ |
| Top 0.1% | 0.915 | 0.844 | 0.919 | ↑ |

**Table VIII-8. Predictive Ratios by Deciles of Predicted Risk (sorted low to high): Full Benefit Dual, Disabled (Age <65) Continuing Enrollee**

| | 2014/2015 Sample | 2018/2019 Sample | | |
|---|---|---|---|---|
| **Deciles** | **2020 Model** | **2020 Model** | **2024 Model** | **Improvement in Predictive Risk** |
| Entire sample | 1.000 | 0.988 | 1.000 | - |
| First (lowest) decile | 1.076 | 1.008 | 0.967 | ↓ |
| Second decile | 1.016 | 1.004 | 1.053 | ↓ |
| Third decile | 0.893 | 0.869 | 0.904 | ↑ |
| Fourth decile | 0.940 | 0.957 | 0.970 | ↑ |
| Fifth decile | 0.992 | 0.985 | 1.005 | ↑ |
| Sixth decile | 0.999 | 1.010 | 1.005 | ↑ |
| Seventh decile | 1.020 | 0.995 | 1.013 | ↓ |
| Eighth decile | 1.019 | 0.999 | 0.996 | ↓ |
| Ninth decile | 1.008 | 1.014 | 1.016 | ↓ |
| Tenth (highest) | 1.002 | 0.983 | 1.002 | ↑ |
| Top 5% | 0.996 | 0.974 | 0.995 | ↑ |
| Top 1% | 0.984 | 0.954 | 0.983 | ↑ |
| Top 0.1% | 0.873 | 0.986 | 1.007 | ↑ |

**Table VIII-9. Predictive Ratios by Deciles of Predicted Risk (sorted low to high): Partial Benefit Dual, Aged (Age >=65) Continuing Enrollee**

| | 2014/2015 Sample | 2018/2019 Sample | | |
|---|---|---|---|---|
| Deciles | 2020 Model | 2020 Model | 2024 Model | Improvement in Predictive Risk |
| Entire sample | 1.000 | 0.992 | 1.000 | - |
| First (lowest) decile | 0.998 | 0.942 | 1.000 | ↑ |
| Second decile | 0.998 | 0.987 | 1.023 | ↓ |
| Third decile | 0.977 | 0.933 | 0.999 | ↑ |
| Fourth decile | 0.987 | 0.992 | 1.001 | ↑ |
| Fifth decile | 0.999 | 0.989 | 0.976 | ↓ |
| Sixth decile | 1.004 | 1.016 | 0.983 | ↓ |
| Seventh decile | 1.003 | 1.013 | 1.006 | ↑ |
| Eighth decile | 1.006 | 1.017 | 1.000 | ↑ |
| Ninth decile | 1.006 | 1.021 | 1.009 | ↑ |
| Tenth (highest) | 0.999 | 0.968 | 1.000 | ↑ |
| Top 5% | 0.994 | 0.951 | 1.000 | ↑ |
| Top 1% | 0.999 | 0.931 | 0.985 | ↑ |
| Top 0.1% | 0.981 | 0.870 | 0.981 | ↑ |

**Table VIII-10. Predictive Ratios by Deciles of Predicted Risk (sorted low to high): Partial Benefit Dual, Disabled (Age <65) Continuing Enrollee**

| | 2014/2015 Sample | 2018/2019 Sample | | |
|---|---|---|---|---|
| Deciles | 2020 Model | 2020 Model | 2024 Model | Improvement in Predictive Risk |
| Entire sample | 1.000 | 0.988 | 1.000 | - |
| First (lowest) decile | 0.935 | 0.878 | 0.989 | ↑ |
| Second decile | 1.020 | 1.023 | 0.896 | ↓ |
| Third decile | 0.988 | 0.955 | 1.045 | → |
| Fourth decile | 0.979 | 0.991 | 1.002 | ↑ |
| Fifth decile | 0.982 | 0.979 | 0.996 | ↑ |
| Sixth decile | 0.999 | 0.988 | 1.003 | ↑ |
| Seventh decile | 1.011 | 1.012 | 0.999 | ↑ |
| Eighth decile | 1.025 | 1.032 | 0.996 | ↑ |
| Ninth decile | 1.010 | 1.019 | 1.022 | ↓ |
| Tenth (highest) | 0.996 | 0.963 | 1.000 | ↑ |
| Top 5% | 0.989 | 0.944 | 0.997 | ↑ |
| Top 1% | 1.002 | 0.939 | 0.981 | ↑ |
| Top 0.1% | 1.076 | 0.932 | 0.968 | ↑ |

**Table VIII-11. Predictive Ratios by Deciles of Predicted Risk (sorted low to high): Institutional Continuing Enrollee**

| | 2014/2015 Sample | 2018/2019 Sample | | |
|---|---|---|---|---|
| **Deciles** | **2020 Model** | **2020 Model** | **2024 Model** | **Improvement in Predictive Risk** |
| Entire sample | 1.000 | 0.951 | 1.000 | - |
| First (lowest) decile | 0.858 | 0.788 | 0.824 | ↑ |
| Second decile | 0.959 | 0.877 | 0.932 | ↑ |
| Third decile | 0.995 | 0.928 | 0.977 | ↑ |
| Fourth decile | 1.000 | 0.949 | 1.011 | ↑ |
| Fifth decile | 1.022 | 0.968 | 1.029 | ↑ |
| Sixth decile | 1.023 | 0.976 | 1.035 | ↓ |
| Seventh decile | 1.026 | 0.982 | 1.028 | ↓ |
| Eighth decile | 1.020 | 0.975 | 1.028 | ↓ |
| Ninth decile | 1.015 | 0.970 | 1.014 | ↑ |
| Tenth (highest) | 0.989 | 0.952 | 0.992 | ↑ |
| Top 5% | 0.984 | 0.939 | 0.978 | ↑ |
| Top 1% | 0.967 | 0.900 | 0.918 | ↑ |
| Top 0.1% | 0.954 | 0.865 | 0.859 | ↓ |

**NOTES**:

1. "Improvement in Predictive Risk" compares the distance the predictive ratios are from 1.0 for the 2024 model and 2020 model with a 2018 – 2019 sample.
2. For example, a green arrow indicates that the predictive ratio for any specific decile for the 2024 model is closer to 1.0 than the predictive ratio for the 2020 model with a 2018 – 2019 sample, and vice-versa.