# In the United States District Court for the Southern District of Georgia Brunswick Division

| | |
|---|---|
| CLOVER INSURANCE COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al.,<br><br>Defendants. | 2:25-CV-142 |

## ORDER

This action is before the Court on Defendants' motion to dismiss or transfer venue. Dkt. No. 21. The motion has been fully briefed, dkt. nos. 21, 22, 25, and is ripe for review. For the reasons given below, Defendants' motion to dismiss or transfer, dkt. no. 21, is **DENIED**.

## BACKGROUND

In the complaint,[1] Plaintiff Clover Insurance Company ("Clover") challenges the 2026 "Star Rating" it received in

---

[1] When considering a motion filed pursuant to Rule 12(b)(3), a court accepts the facts in the plaintiff's complaint as true. Drake v. JWN Inc., No. CV218-026, 2018 WL 9415068, at *2 (S.D. Ga. July 30, 2018) (citing Simbaqueba v. U.S. Dep't of Def., No. CV309-066, 2010 WL 2990042, at *2 (S.D. Ga. May 28, 2010), report and recommendation adopted, 2010 WL 2990041 (July 29, 2010)). Should there exist any inconsistencies between the complaint and extrinsic evidence which the Court finds to be properly considered, the Court "must draw all reasonable inferences and resolve all

connection with the federal government's Medicare Advantage Program. Dkt. No. 1 ¶¶ 1, 4. First, though the Court need not wade too deeply into the complex statutory scheme governing Medicare to rule on the pending motion to dismiss or transfer venue, it is nonetheless necessary to review generally the statutory and regulatory scheme underlying Clover's claims before reaching the complaint's factual allegations. Accordingly, the Court begins by addressing the federal government's Star Rating system and its statutory and regulatory backdrop. The Court will then address how Clover's allegations fit within that structure.

## I. Statutory and Regulatory Backdrop

The Medicare program was enacted to provide healthcare assistance for the elderly and individuals laboring under certain disabilities. See generally 42 U.S.C. § 1395 et seq.; see also Elevance Health, Inc. v. Becerra, 736 F. Supp. 3d 1, 4 (D.D.C. 2024); MSP Recovery Claims, Series LLC v. QBE Holdings, Inc., 965 F.3d 1210, 1214 (11th Cir. 2020) (citing MSPA Claims 1, LLC v. Kingsway Amigo Ins. Co., 950 F.3d 764, 767 (11th Cir. 2020)). This case concerns a statutory sub-scheme under the umbrella of Medicare: the Medicare Advantage Program.

Under traditional Medicare, as contemplated by Parts A and B of the Medicare Act, beneficiaries are entitled to have the federal

---

factual conflicts in favor of the plaintiff." Id. (quoting Wai v. Rainbow Holdings, 315 F. Supp. 2d 1261, 1268 (S.D. Fla. 2004)).

Centers of Medicare & Medicaid Services (Defendant "CMS") pay medical providers directly for medical care. MSP Recovery Claims, Series LLC v. Metro. Gen. Ins. Co., 40 F.4th 1295, 1298 (11th Cir. 2022) (citing 42 U.S.C. §§ 1395c to 1395i-6, 1395j to 1395w-6). However, under Parts C and D of the Medicare program, individuals may receive Medicare benefits through private insurers. Becerra, 736 F. Supp. 3d at 4. More specifically, the Medicare Advantage Program, otherwise known as Part C of the Medicare Act, allows eligible individuals to instead "elect to have a private insurer of the individual's choice provide Medicare benefits." Metro. Gen. Ins. Co., 40 F.4th at 1298 (citing 42 U.S.C. §§ 1395w-21 to 1395w-28). Pursuant to the Medicare Advantage program, private Medicare Advantage Organizations ("MAOs") are the entities which provide these Medicare benefits. Id. (citing 42 U.S.C. § 1395w-28). Part D of the Medicare Program then contemplates "subsidized prescription drug insurance coverage" for beneficiaries who enroll in traditional or Part C plans. Becerra, 736 F. Supp. 3d at 4.

Congress's goal in creating the Medicare Advantage program, in short, was to "harness the power of private sector competition to stimulate experimentation and innovation that would ultimately create a more efficient and less expensive Medicare system." Humana Med. Plan, Inc. v. W. Heritage Ins. Co., 832 F.3d 1229, 1235 (11th Cir. 2016) (quoting In re Avandia Mktg., Sales Pracs. & Prods. Liab. Litig., 685 F.3d 353, 363 (3d Cir. 2012)); see also H.R.

Rep. No. 105-217, at 585 (1997), 1997 U.S.C.C.A.N. 176, 205-06 (Conf. Rep.). To carry out this purpose, CMS contracts with MAOs to provide Medicare-covered benefits to enrollees through Medicare Advantage Plans ("MA Plans"). Humana Med. Plan, 832 F.3d at 1235; see also HMO La., Inc. v. Dep't of Health & Human Servs., 793 F. Supp. 3d 150, 153 (D.D.C. 2025). In effect, the Medicare Advantage program "aims to reduce Medicare costs through semi-privatization; it permits Medicare to effectively sub-contract its duties to private insurers." MSPA Claims 1, LLC v. Tenet Fla., Inc., 918 F.3d 1312, 1316 (11th Cir. 2019) (citing Parra v. PacifiCare of Ariz., Inc., 715 F.3d 1146, 1152–53 (9th Cir. 2013)).

In the fall of each year, CMS rates Medicare Advantage plans on a one-to-five-star scale, known as the "Star Ratings" system. See Becerra, 736 F. Supp. 3d at 4 (citing 42 U.S.C. § 1395w–23(o)); Blue Cross & Blue Shield of Mass., Inc. v. Kennedy, 808 F. Supp. 3d 139, 141 (D.D.C. 2025) (citing Policy and Technical Changes to Medicare Programs, 83 Fed. Reg. 16,440, 16,520 (Apr. 16, 2018) (codified in scattered sections of 42 C.F.R.)). These "Star Ratings" are intended to communicate the quality of each plan, where a one-star rating is the lowest-quality rating and a five-star rating reflects the highest quality. Id.; 42 C.F.R. § 422.166(a)(4); see also HMO La., 793 F. Supp. 3d at 153 ("The ratings are intended to be 'a true reflection of plan quality and

enrollee experience' based on 'complete, accurate, and reliable' data." (quoting 83 Fed. Reg. 16,440, 16,520–21 (Apr. 16, 2018))).

The Star Ratings affect both federal funding allocation and plan enrollment. Blue Cross, 808 F. Supp. 3d at 141–43. First, while the complex web of Medicare laws explains in great detail how this occurs, Star Ratings impact the payments that plans receive from CMS: Medicare Advantage plans with higher star ratings are generally eligible to receive more annual federal funds from CMS than lower-rated plans. Id. at 141–42; see also Becerra, 736 F. Supp. 3d at 5 (describing this system in greater detail). Second, regarding plan enrollment, "higher scoring plans are likely to attract additional customers, while lower scoring plans may lose customers." Becerra, 736 F. Supp. 3d at 6. This market impact stems from public reporting of Star Ratings, as "CMS displays the star ratings in its online and print resources available to Medicare beneficiaries." HMO La., 793 F. Supp. 3d at 153 (citing (42 C.F.R. § 422.166(h)).

One such online resource is the Medicare "Plan Finder" tool, a web service maintained by CMS. Becerra, 736 F. Supp. 3d at 5 (citing 42 C.F.R. § 422.166(h) (governing posting and display of ratings)). At a high level, beneficiaries use this tool to "shop" for plans, meaning the Plan Finder displays information about available plans in a member's jurisdiction, including plans' star ratings, to allow beneficiaries to compare plans and find the best

fit for them. Id.; Blue Cross, 808 F. Supp. 3d at 142. As a result, "contracts with higher Star Ratings prove more attractive to beneficiaries." Blue Cross, 808 F. Supp. 3d at 142.

Federal Regulations promulgated by CMS provide great detail about how Star Ratings are calculated. See 42 C.F.R. §§ 422.166, 422.162(a). CMS also publishes Technical Notes, providing granular detail about how ratings are calculated each year. See Medicare 2026 Part C & D Star Ratings Technical Notes (updated Sept. 25, 2025), cms.gov/files/document/2026-star-ratings-technical-notes.pdf. In sum, the Technical Notes describing 2026 Star Rating calculations identify meaningful "measures" to be used in such calculations, and the authorized measures fall into five broad categories:

> (1) Outcomes: Outcome measures reflect improvements in a beneficiary's health and are central to assessing quality of care.
>
> (2) Intermediate outcomes: Intermediate outcome measures reflect actions taken which can assist in improving a beneficiary's health status. Diabetes Care – Blood Sugar Controlled is an example of an intermediate outcome measure where the related outcome of interest would be better health status for beneficiaries with diabetes.
>
> (3) Patient experience: Patient experience measures reflect beneficiaries' perspectives of the care they received.
>
> (4) Access: Access measures reflect processes and issues that could create barriers to receiving needed care. Plan Makes Timely Decisions about Appeals is an example of an access measure.

> (5) Process: Process measures capture the health care services provided to beneficiaries which can assist in maintaining, monitoring, or improving their health status.

Id. at 1. The data input into the Star Ratings calculation come from four main categories of data sources: (1) health and drug plans, (2) surveys of enrollees, (3) data collected by CMS contractors, and (4) CMS administrative data. Id. at 5.

## II. The Present Action

With this backdrop in mind, Clover brings the present action to challenge its 2026 Star Rating. See generally Dkt. No. 1. According to the complaint, Clover is an artificial intelligence-powered "technology and physician-enablement company" providing Medicare Advantage plans to over 100,000 beneficiaries across multiple states—including Georgia. Id. ¶¶ 2–3. On October 9, 2025, CMS published Clover's final 2026 Star Rating as 3.5 Stars, though Clover contends that it should have been awarded a "Four Star" rating. Id. ¶¶ 8, 43. This reduced rating, according to the complaint, harms Clover's reputation and deprives both the company and its members of "approximately $120 million in statutorily mandated quality bonus and related payments." Id. ¶ 8.

In challenging its 2026 Star Rating, Clover contends that CMS erred in its calculations by considering data points beyond those measures identified by Congress without following applicable procedures to do so. Id. ¶¶ 8, 51. In other words, Clover argues

that "CMS has admittedly departed from the measures of clinical quality and health outcomes that Congress authorized, instead relying on a host of other measures that have little or nothing to do with quality"—causing harm to Clover and, allegedly, undermining the goals of the Medicare system. Id. ¶¶ 8-9.

Clover filed suit in this Court on November 7, 2025, naming as Defendants the Department of Health and Human Services ("HHS"); Robert F. Kennedy, Jr., in his official capacity as Secretary of HHS; CMS; and Mehmet Oz, in his official capacity as Administrator of CMS. See generally id. The six-count complaint seeks declaratory and injunctive relief, alleging multiple violations of the Administrative Procedure Act ("APA") (Counts I-V) and a private non-delegation violation stemming from both Article II, § 1 of the United States Constitution and the Fifth Amendment. Id. ¶¶ 232-73. Defendants now move to dismiss or transfer the case under Federal Rule of Civil Procedure 12(b)(3), arguing that venue is improper in the Southern District of Georgia. Dkt. No. 21. Separately, Clover moves to expedite resolution of this motion so as to leave sufficient time for Defendants to "make necessary changes to increase Clover's funding for the next year" within the proper timeframe. Dkt. No. 23 at 2.

**LEGAL STANDARD**

Pursuant to Federal Rule of Civil Procedure 12(b)(3), a party may move to dismiss a claim for improper venue. Fed. R. Civ. P.

12(b)(3); Simbaqueba, 2010 WL 2990042, at *2. When a defendant moves to dismiss or transfer based on improper venue, "[t]he plaintiff has the burden of showing that venue in the forum is proper." Pinson v. Rumsfield, 192 F. App'x 811, 817 (11th Cir. 2006). When analyzing a motion to dismiss or transfer under Rule 12(b)(3), a district court "must accept the facts in the plaintiff's complaint as true." Simbaqueba, 2010 WL 2990042, at *2.

When a Rule 12(b)(3) motion is "predicated upon key issues of fact, the court may consider matters outside the pleadings." Id. (citing Curry v. Gonzales, No. 105-2710, 2006 WL 3191178, at *2 (N.D. Ga. Oct. 31, 2006)).[2] Where conflicts exist between the allegations in the complaint and the evidence outside of the pleadings, the court "must draw all reasonable inferences and resolve all factual conflicts in favor of the plaintiff." Bell v. Rosen, No. CV214-127, 2015 WL 5595806, at *2 (S.D. Ga. Sept. 22, 2015) (citing Wai, 315 F. Supp. 2d at 1268); see also Simbaqueba, 2010 WL 2990042, at *2.

If a district court finds venue to be improper, it "shall

[2] Attached to Clover's response to Defendants' motion to dismiss or transfer venue is a declaration from Clay Thornton, the Chief Financial Officer of Clover. Dkt. No. 22-1 ¶ 3. This declaration outlines Mr. Thornton's experience and responsibilities in his role at Clover, alongside various reasons why Mr. Thornton believes the present matter is sufficiently connected to the Southern District of Georgia. See generally id.

dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." 28 U.S.C. § 1406(a); see also C.M. v. Noem, 796 F. Supp. 3d 1198, 1218 (S.D. Fla. 2025).

## DISCUSSION

Resolution of the present motion to dismiss or transfer boils down to two primary inquiries: (1) whether venue is proper in the Southern District of Georgia; and (2) whether, based in part on the venue analysis, this case should be adjudicated in this District, transferred to another district, or dismissed wholesale. The Court finds that venue is proper in the Southern District of Georgia but defers its decision on whether transfer would be proper under 28 U.S.C. § 1404 until it receives additional briefing from the parties on this issue.

### I. Venue is proper in the Southern District of Georgia.

Both Defendants HHS and CMS are federal entities. See 42 U.S.C. § 202; Alabama v. Ctrs. for Medicare & Medicaid Servs., 674 F.3d 1241, 1243 (11th Cir. 2012); Andujar v. Agency for Health Care Admin., No. 6:20-CV-1804-RBD-EJK, 2021 WL 11645444, at *2 (M.D. Fla. Apr. 7, 2021) (characterizing HHS and CMS as federal entities), report and recommendation adopted, 2021 WL 11645443 (Apr. 26, 2021). 28 U.S.C. § 1391(e) instructs plaintiffs where to file civil actions when, like Defendants Kennedy and Oz in this case, "a defendant is an officer or employee of the United States

or any agency thereof acting in his official capacity or under color of legal authority, or an agency of the United States." Under this provision, venue is proper in the judicial district where:

> (A) a defendant in the action resides,
>
> (B) a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or
>
> (C) the plaintiff resides if no real property is involved in the action.

28 U.S.C. § 1391(e)(1); see also Green v. Kendall, No. 1:23-CV-03024-ELR, 2024 WL 6874234, at *3 (N.D. Ga. July 2, 2024) (same).

Here, Clover—the party carrying the burden to show venue is proper when faced with Defendants' challenge—does not attempt to rely upon subsections (A) or (C) of 28 U.S.C. § 1391(e)(1) to argue that venue lies in the Southern District of Georgia. Dkt. No. 22 at 5–16; Pinson, 192 F. App'x at 817. Instead, the parties exclusively dispute whether "a substantial part of the events or omissions giving rise to the claim" occurred in the Southern District of Georgia within the meaning of 28 U.S.C. § 1391(e)(1)(B). Dkt. Nos. 21, 22, 25. Because whether this "substantial part" requirement is satisfied depends on "key issues of fact," the Court may properly consider matters outside the pleadings when deciding the 12(b)(3) motion, including the declaration of Clay Thornton filed as an attachment to Clover's response to the instant motion. Dkt. No. 22-1; Simbaqueba, 2010 WL

2990042, at *2 (citing Curry, 2006 WL 3191178, at *2).

To determine where "a substantial part of the events or omissions giving rise to the claim occurred," "[o]nly the events that directly give rise to a claim are relevant." Jenkins Brick Co. v. Bremer, 321 F.3d 1366, 1371 (11th Cir. 2003);[3] see also Eakin v. Rosen, No. CV215-42, 2015 WL 8757062, at *4 (S.D. Ga. Dec. 11, 2015) (quoting Jenkins Brick, 321 F.3d at 1371). Accordingly, the Court must "focus on relevant activities of the defendant[s], not of the plaintiff[s]," and the Court may consider "only those acts and omissions that have a close nexus to the wrong." Jenkins Brick, 321 F.3d at 1371–72. "[O]f the places where the events have taken place, only those locations hosting a

[3] While the Eleventh Circuit in Jenkins Brick interpreted a previous iteration of the general venue provision rather than Section 1391(e)(1)(B), the statutory language interpreted in that case is identical to the instructive language in this one. 321 F.3d at 1371. Compare 28 U.S.C. § 1391(b)(2) ("A civil action may be brought in a judicial district *in which a substantial part of the events or omissions giving rise to the claim occurred*." (emphasis added)), with id. § 1391(e)(1)(B) (providing for civil actions "brought in any judicial district in which *a substantial part of the events or omissions giving rise to the claim occurred*" (emphasis added)). Accordingly, multiple district courts in this Circuit have relied upon the principles identified in Jenkins Brick to determine whether venue is proper under Section 1391(e)(1). See, e.g., Doe 1 v. Bondi, 785 F. Supp. 3d 1268, 1279 n.7 (N.D. Ga. 2025); Russo v. Raimondo, No. 24-0186-WS-M, 2024 WL 4571431, at *2 (S.D. Ala. Oct. 24, 2024) ("[Section 1391(e)(1)(B)'s] language parallels that of Section 1391(b)(2), the general venue provision, and the parties agree that [Jenkins Brick], which construed the identical language under a previous iteration of that provision, governs the construction of Section 1391(e)(1)(B).").

'substantial part' of the events are to be considered." Id. at 1371.

This "substantial part" language "contemplates some cases in which venue will be proper in two or more districts." Id. In fact, Congress passed this provision "to broaden the venue of civil actions which could previously have been brought only in the District of Columbia." Schlanger v. Seamans, 401 U.S. 487, 490 n.4 (1971). As such, Clover is "not required to select the venue with the *most* substantial nexus to the dispute; rather, [Clover] must simply choose a venue where a substantial part of the events occurred, even if a greater part of the events occurred elsewhere." Eakin, 2015 WL 8757062, at *4 (emphasis in original) (quoting Morgan v. N. MS Med. Ctr., Inc., 403 F. Supp. 2d 1115, 1122 (S.D. Ala. 2005)); see also TruServ Corp. v. Neff, 6 F. Supp. 2d 790, 792 (N.D. Ill. 1998) ("The test is not whether a majority of the activities pertaining to the case were performed in a particular district, but whether a substantial portion of the activities giving rise to the claim occurred in the particular district." (citing Pfeiffer v. Insty Prints, No. 93 C 2937, 1993 WL 443403, at *2 (N.D. Ill. Oct. 29, 1993))). For venue purposes, the Eleventh Circuit interprets this "substantial part" language to require *more* relevant conduct than the minimum contacts inquiry embedded in the personal jurisdiction analysis. Eakin, 2015 WL 8757062, at *4 (citing Jenkins Brick, 321 F.3d at 1372 (disapproving of line

of cases from other jurisdictions because "its flavor was that of a 'minimum contacts' personal jurisdiction analysis rather than a proper venue analysis" and mere contact was not enough to make venue proper)).

Based on the applicable venue statute and authority interpreting the controlling language, Defendants argue that "a substantial part of the events or omissions giving rise to the claim" did not occur in the Southern District of Georgia. Dkt. Nos. 21, 25. In doing so, Defendants contend that Clover's core allegation is that Defendants "made decisions" which harmed Clover—decisions which were made in Maryland or the District of Columbia. Dkt. No. 21 at 4–5. In response, Clover contends that the Southern District of Georgia is a proper forum because of "Defendants' collection of and reliance upon unauthorized data from Clover's Medicare Advantage beneficiaries in this District" and subsequent publication of "an erroneous and derogatory Star Rating" to beneficiaries within this District. Dkt. No. 22 at 7, 10.

Upon due consideration of the parties' arguments, applicable venue principles, and relevant statutory, regulatory, and judicial authority, the Court holds that Clover has met its burden to show that venue is proper in the present forum. Pinson, 192 F. App'x at 817; see generally Dkt. No. 22. This is because (A) it is proper to consider in the venue analysis both the location from which

data was collected and the location of the alleged harm, and (B) when these categories of allegations are considered, a "substantial part" of the events giving rise to Clover's claims occurred in the Southern District of Georgia. See 28 U.S.C. § 1391(e)(1)(B).

### A. The Court may consider the data collection and harm from Star Rating publication as events "giving rise" to Clover's claims.

Preliminarily, relevant to the question of venue under Section 1391(e)(1)(B)'s "substantial part" provision is the nature of the six claims pursued by Clover, as this weighs on what "events or omissions" gave rise to them. See Eakin, 2015 WL 8757062, at *4 (describing the general nature of plaintiffs' libel and slander per se claims before ascertaining whether a substantial part of the events giving rise to the claims occurred in the Southern District of Georgia). Here, Counts I through V involve alleged violations of the APA. Dkt. No. 1 ¶¶ 232-65. The APA requires federal courts to hold unlawful and set aside federal agency actions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege, or immunity; in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; or without observance of procedure required by law. 5 U.S.C. § 706(2); see also Florida v. United States, 660 F. Supp. 3d 1239, 1272-78 (N.D. Fla. 2023); Kansas v. U.S. Dep't of Lab., 749 F.

Supp. 3d 1363, 1376 (S.D. Ga. 2024), reconsideration denied, No. 2:24-CV-76, 2024 WL 5697302 (S.D. Ga. Aug. 29, 2024). "'Law,' in this context, 'means, of course, any law, and not merely those laws that the agency itself is charged with administering.'" Kansas, 749 F. Supp. 3d at 1376 (quoting FCC v. Nextwave Pers. Communs. Inc., 537 U.S. 293, 300 (2003)). And courts may set aside agency actions under APA Section 706(2) if the actions violate an agency's own regulations, as "an agency is bound by its own regulations." Blue Cross, 808 F. Supp. 3d at 144-45 (first citing Nat'l Env't Dev. Ass'n's Clean Air Project v. EPA, 752 F.3d 999, 1008-09 (D.C. Cir. 2014); then citing Erie Blvd. Hydropower, LP v. FERC, 878 F.3d 258, 269 (D.C. Cir. 2017)).

Counts I and II, alleging agency action "not in accordance with law, in violation of statutory right, [and] in excess of statutory authority," challenge the Star Rating calculation because CMS allegedly collected and utilized data not contemplated by federal statute or its own agency regulations. Dkt. No. 1 ¶¶ 232-45. Counts III and IV, alleging agency action "without observance of procedure required by law or not in accordance with law," involve the proper procedure required when CMS makes changes to "measures" used in the Star Ratings calculation. Id. ¶¶ 246-57; 42 C.F.R. § 422.164. Count V charges CMS with "arbitrary and capricious" action for its alleged "failure to rely upon congressionally authorized data and follow required notice-and-

comment procedures," leading CMS to apply purportedly inappropriate measures in the Star Ratings calculation. Dkt. No. 1 ¶ 258-65. Finally, Count VI involves CMS's alleged outsourcing of "its decision-making function" in violation of the private non-delegation doctrine, which Clover, again, ties to the unauthorized use of certain measures in the Star Rating calculation—this time, the "Reviewing Appeal Decision" measure, which is tied to decisions of the IRE, a CMS contractor. Id. ¶¶ 266-73; see also FCC v. Consumers' Rsch., 606 U.S. 656, 696-97 (2025) (defining the private non-delegation doctrine). At bottom, all of Clover's claims against Defendants boil down to the following sequence of alleged events: (1) Defendants collected certain data measures and relied upon these measures when it calculated 2026 Star Ratings; (2) some of these measures were not the kinds of measures which were authorized by Congress or the Agency's own regulations at the time the data was collected and used, and use of one such measure violates the non-delegation doctrine; (3) Defendants did not take the proper steps to approve these new measures before they relied on them; and (4) these improper calculations led to Clover receiving a lower Star Rating than it should have received, causing harm.[4] See generally Dkt. No. 1.

[4] While this summary of the events precipitating Clover's claims is at a high level of generality, it functions only to narrow down what events are relevant to the venue analysis. The Court does not seek to opine on whether Clover plausibly alleges the elements of

### 1. Data Collection from this District

When the nature of Clover's claims is made apparent, so too are the ties between the present action and this District. See Eakin, 2015 WL 8757062, at *5. First, it is proper to consider in the venue analysis that healthcare data, some of which factored into the unauthorized measures, was collected from beneficiaries in the Southern District of Georgia. See, e.g., Dkt. No. 1 ¶¶ 51, 211–19. To support the contention that data was collected from beneficiaries in this District, the complaint and the additional declaration filed by Clover provide:

- Clover provides its Medicare Advantage plans to thousands of members in the Southern District of Georgia, including members residing "within Glynn, Camden, McIntosh, Long, Wayne, Appling, and Jeff Davis counties, along with practically every other county within this District";

- CMS utilized "unauthorized forms of data concerning Clover's members located within this District" in its 2026 Star Rating calculation;

- In May 2025, Clover provided data to CMS to "show that CMS's Medication Adherence measures . . . were arbitrary and capricious," identifying erroneous Medication Adherence data from 733 members, including members in this District, but CMS did not remedy this issue despite repeated attempts by Clover to challenge the "unlawful measures";

- Georgia is Clover's second-largest market by total membership;

- The unauthorized data use challenged by Clover includes data regarding its members, "including

its claims, but rather includes this summary in the interest of clarity.

thousands of members within this District," such as Clover's members' drug prescribing histories, outcomes of members' coverage appeals, members' evaluation of their healthcare quality, their healthcare outcomes, and their satisfaction; and

- Because thousands of Clover members reside in this District, "a substantial proportion of the foregoing data collected and utilized to determine Clover's Star Rating originates in this District."

Dkt. No. 1 ¶¶ 3, 51, 211-19; Dkt. No. 22-1 ¶¶ 6, 11. In light of the fact that all factual allegations should be taken as true and reasonable inferences should be drawn in Clover's favor, these allegations give rise to a reasonable inference that, in calculating Clover's 2026 Star Rating, (1) Defendants collected a substantial amount of member information from beneficiaries within the Southern District of Georgia, (2) data from this District factored into the unauthorized "measures" in the Star Rating calculation, and (3) CMS failed to remedy errors in data entries regarding members in this District. Dkt. No. 1 ¶¶ 3, 51, 211; Dkt. No. 22-1 ¶¶ 6, 11; see also Simbaqueba, 2010 WL 2990042, at *2; Bell, 2015 WL 5595806, at *2 (citing Wai, 315 F. Supp. 2d at 1268).

In the pending motion to dismiss or transfer venue, Defendants urge this Court to disregard the data collection from members in this District when conducting the venue analysis, claiming that "[t]he *collection* of data about members in this District has no connection to Clover's allegation that Defendants' *calculation* of its 2026 Star Rating was illegal." Dkt. No. 25 at 4-5. Based on

this contention, Defendants state that "[t]he gathering of data within this District" is not relevant to the venue analysis because such collection is only "tangentially" connected to the dispute in litigation and is not an event that "directly gives rise to a claim." Dkt. No. 21 at 5 (citing Rogers v. Civ. Air Patrol, 129 F. Supp. 2d 1334, 1339 (M.D. Ala. 2001)). However, this is an unduly narrow characterization of the events relevant to the venue analysis. Even though Defendants' "decision" to rely upon certain measures in the Star Rating calculation is one of the factual events which Clover seeks to challenge directly in all six claims, the Eleventh Circuit's analysis in Jenkins Brick does not support "confin[ing] the universe of relevant events" to only that one factual predicate. Russo, 2024 WL 4571431, at *3 (citing Jenkins Brick, 321 F.3d at 1372).

Rather, in Jenkins Brick, the panel identified three relevant events which had a sufficiently "close nexus" to plaintiffs' claim for breach of employee's non-compete clause such that the events could be considered in the venue analysis: (1) the negotiation of the underlying contract, (2) the execution or signing of the contract, and (3) the alleged breach. 321 F.3d at 1372-73. In other words, though the only factual event directly challenged was the purported breach of the non-compete itself, the court considered in the venue analysis the location(s) directly related to the formation and execution of the agreement, rather than looking only

at the location of the actions allegedly constituting breach. Id.

The same analysis may be conducted in the present action. See generally Dkt. No. 1. The single fact that an ultimate calculation is challenged as unauthorized and unconstitutional does not mean that another occurrence (such as the collection of the very data underlying the challenged calculation) cannot be an event that gives rise to the claim. See Russo, 2024 WL 4571431, at *4. In other words, the record does not lend support to Defendants' contention that there is "no connection" between the allegedly unauthorized data collection and the Star Rating calculation when the precise reason Clover challenges the Star Rating calculation is for Defendants' use of the unauthorized data they allegedly collected. Id.; Dkt. No. 25 at 4–5. Not only are the data collection and ultimate calculation "connected"—they are practically interwoven into one sequence of allegedly unlawful activity leading directly to the claims pursued in this action.

Defendants also contend that it is a mistake to consider the data collection in the venue analysis because data collection is "not itself wrongful." Dkt. No. 25 at 3 (citing Woodke v. Dahm, 70 F.3d 983, 985-86 (8th Cir. 1995); Jenkins Brick, 321 F.3d at 1372). Specifically, Defendants argue that data collection in this District is not a "legal predicate" to Clover's challenge that is "necessary to support" such a claim. Id. at 3–4. To support this, Defendants state that the wrong alleged by Clover, the calculation

of the Star Rating using unauthorized data, "would still exist if CMS had, for example, used publicly available data that it was statutorily forbidden from using." Id. at 4.

It is true, as noted by Defendants, that the Eleventh Circuit in Jenkins Brick approved of the analytical framework employed in Woodke, wherein the Eighth Circuit declined to consider an event in the venue analysis because that event was "not itself wrongful." Jenkins Brick, 321 F.3d at 1372. However, while the Eleventh Circuit approved of the "analytical framework" used in Woodke because it "considered as relevant only those acts or omissions that have a close nexus to the wrong," nowhere in the Jenkins Brick opinion does the court adopt an explicit rule stating that only acts which are, standing alone, wrongful may be considered in the venue inquiry. Id. In fact, the Eleventh Circuit in the same opinion considered in its venue analysis both the location of contract negotiation, which is "not itself wrongful," and the location of contract execution, which is "not itself wrongful," either. Id. at 1372-73. This, at the very least, cautions the Court against inferring a categorical bar against considering actions which are not themselves wrongful in the venue inquiry, despite Defendants' arguments otherwise. Dkt. Nos. 21, 25.[5]

[5] Even if it were proper to interpret Jenkins Brick as establishing a requirement that an event be "in itself unlawful" for it to be relevant to venue, Clover's allegations would likely suffice under that standard. While data collection in a general sense is not

Likewise, Defendants' arguments regarding a "legal" versus "factual" predicate do not foreclose consideration of the data collection in the venue analysis. Dkt. No. 25 at 3-4. In formulating this argument, Defendants point to a sister court's analysis in Russo v. Raimondo, where the court drew distinctions between the factual and legal predicates at play in Woodke. 2024 WL 4571431, at *3; Dkt. No. 25 at 3-4. By way of background, Woodke was a trademark violation case where plaintiff's only federal claim was under the Lanham Act. 70 F.3d at 983-85. There, the defendant manufactured trailers in the Northern District of Iowa, then circulated an advertisement displaying said trailer which, allegedly, violated plaintiff's rights under the federal Lanham Act. Id. Importantly, the claimed trademark violation was tied to the advertisement rather than the manufacturing itself, and the plaintiff provided "no evidence of any advertising or sales of the infringing advertisement in the Northern District of Iowa." Id. at 985. Accordingly, the Eighth Circuit held that, though the manufacturing of the trailer featured in the challenged

unlawful, Clover instead alleges that Defendants engaged in unauthorized data collection which extended beyond its statutory authority. See, e.g., Dkt. No. 1 ¶¶ 133-46 (emphasizing the limits Congress placed on the types of data to be collected by Defendants pursuant to the Medicare Advantage program and indicating that Defendants collected and utilized a broader range of data than was authorized); see also Dkt. No. 22 at 10. Clover also alleges that member data specifically pulled from this District was part of that erroneous or unauthorized collection. Dkt. No. 1 ¶ 211.

advertisement was a factual predicate, meaning "a necessary event, in a causal sense," to the alleged wrong, the manufacturing of the trailer in the Northern District of Iowa, standing alone, did not render that district a proper venue for the trademark suit because the manufacturing was not a *legal* predicate to the claim. Id. at 985-86.

Even applying Woodke's analytical framework—the framework later approved by the Eleventh Circuit in Jenkins Brick, 321 F.3d at 1372—there are distinctions between Woodke and the present matter which warrant a different result. The scope of actions which gave rise to Woodke's only federal claim, a trademark claim challenging only the *advertisements*, was limited by the nature of the claim itself, as the key venue-impacting actions were those related to the dissemination of the challenged advertisement itself in various districts, not the manufacturing of the trailer featured within them. 70 F.3d at 983-85. But what Clover challenges in the present matter, as explained supra, is the entire sequence of data collection by Defendants and subsequent use of allegedly unauthorized data in the Star Rating calculation in a manner that exceeded statutory, regulatory, and constitutional limits imposed on Defendants. Id.; Dkt. No. 1. In other words, while the manufacturing of the trailer in Woodke was not challenged in the trademark claim, the data collection here is an integral part of the challenged agency activity. 70 F.3d at 983-85; Dkt. No. 1

¶¶ 125 (arguing that certain collections of data under Medicare Part B exceeded Defendants' statutory authority), 234-37 (noting that Congress placed limitations on the collection, analysis or reporting of data and arguing that Defendants acted in a manner which exceeded those limits in collecting and using unauthorized data).

Finally, Defendants contend that it is a mistake to consider the "mere collection of data about members in this District" as an "event giving rise to its claim[s]" because "Clover would have no cause of action if Defendants had collected the same data but taken no action with it." Dkt. No. 25 at 2. In other words, Defendants contend in their reply brief that it is a mistake to consider the data collection in the venue analysis because, if *only* the data collection from this District were considered, without considering subsequent utilization of that data in other districts, Clover would not have a cause of action. Id. This view, however, falls out of line with the venue inquiry contemplated by both the applicable venue statute and Eleventh Circuit caselaw. To explain, the relevant venue provision states that a suit may be brought in the judicial district where "a *substantial part* of the events or omissions giving rise to the claim occurred." 28 U.S.C. § 1391(e)(1)(B) (emphasis added). Nowhere in this provision did Congress state that, for the "substantial part" test to be met, a defendant's actions in the relevant District must establish *every*

*single element required to state a claim.* Id. To impose such a requirement in the present case is to increase the burden on Clover to establish venue well beyond what Congress requires. Id.

If Defendants' perspective were correct—that it is a mistake to consider events occurring in a particular district under Section 1391(e)(1)(B) unless a party would be able to state a claim based on the events in that district *alone*—this would lead to monumental changes in the venue inquiry. Dkt. No. 25 at 2. This Court has explicitly stated that "[i]n applying the amended version of [the venue statute] in Jenkins Brick,[6] the Eleventh Circuit determined that the new language contemplates venue not only in 'the place where the wrong has been committed' but also in 'those locations hosting a "substantial part" of the events' giving rise to the claim." Bell, 2015 WL 5595806, at *5 (citing Jenkins Brick Co., 321 F.3d at 1371). Consider, to cite an example given in Jenkins Brick, a breach of contract action where "the agreement is executed in Oregon; the defendant fails to deliver goods to New York and California; and the defendant makes an anticipatory repudiation of the rest of the contract from its home office in Utah." 321 F.3d at 1371. The "substantial part" inquiry functions to allow a court to look at each of these underlying events to discern whether a

[6] The "substantial part" language was added to the venue inquiry in 1990. Jenkins Brick, 321 F.3d at 1371. Before then, the general venue provision "provided for venue only in the single district 'in which the claim arose.'" Id.

"substantial part" of the events occurred in the relevant forum—even if each underlying event occurred in a different place. Id. And the inquiry would necessarily function the same way in an action challenging federal agency actions where Defendants collected data from, among other places, the Southern District of Georgia; Defendants incorporated that data into an allegedly erroneous calculation formulated in Washington, D.C. and Maryland; and Defendants published that erroneous calculation on a web service available nationwide, including in the Southern District of Georgia. See generally Dkt. No. 1. In short, based on Jenkins Brick, the Court is not "mistaken" if it considers data collection that occurred in this District, even if it, viewed alone, is not the entire basis for Clover's causes of action. 321 F.3d at 1371; Dkt. No. 25 at 2.

**2. Publication of Clover's Star Rating within this District and Resulting Reputational and Business Harm**

Second, the parties dispute whether the Court may consider in the venue analysis Clover's alleged reputational damage from the publication of the decreased 2026 Star Rating to beneficiaries in this District. Dkt. Nos. 1, 21, 22, 25. To this end, Clover contends, by virtue of the complaint and Mr. Thornton's declaration, that:

- Defendants "unlawfully decreas[ed] Clover's 2026 Star Rating from 4 to 3.5 Stars and broadly publish[ed] that determination within this

District;"

- One such publication occurred via the "Plan Finder" tool in October 2025, where beneficiaries input their zip code to find plans available to them;
- Inputting a Brunswick, Georgia zip code produces a list beginning with multiple "4.5-Star" plans, and Clover is listed ninth on that list at 3.5 Stars;
- CMS "harmed Clover's reputation and ability to attract and retain members in this District;"
- CMS harmed Clover's ability to continue to expand in this District; and
- Defendants' publication of Clover's 3.5 Star Rating will likely force Clover to "reduce or cease its operations within counties in the Southern District of Georgia, including Glynn, Camden, McIntosh, Long, Wayne, Appling, and Jeff Davis counties."

Dkt. No. 1 ¶ 51; Dkt. No. 22-1 ¶¶ 9-11. When taken as true with reasonable inferences drawn in Clover's favor, these allegations provide that (1) Defendants allegedly engaged in unlawful calculation of Clover's 2026 Star Rating; (2) Defendants published that Star Rating in this District; (3) this Star Rating made Clover appear lower on the list of available plans published by Defendants' web services to individuals in this District; and (4) this harmed Clover's business in this District and will make it difficult for Clover to continue to operate in its current state within this District. Dkt. No. 1 ¶ 51; Dkt. No. 22-1 ¶¶ 9-11; see also Simbaqueba, 2010 WL 2990042, at *2; Bell, 2015 WL 5595806, at *2 (citing Wai, 315 F. Supp. 2d at 1268).

Defendants first argue that Clover's alleged reputational

injury in this District is not relevant to the venue inquiry because the venue analysis "focus[es] on relevant activities of the defendant, not of the plaintiff." Dkt. No. 25 at 6 (quoting Jenkins Brick, 321 F.3d at 1371–72 (citations omitted)). While this is a correct statement of law in generality, the fact that the venue issue is defendant-focused does not render inapposite the location of Clover's harm. This Court in Bell v. Rosen addressed a similar argument in a case involving purported defamatory statements which were posted online. 2015 WL 5595806, at *5. There, to support venue, plaintiffs claimed that the defendants' allegedly defamatory statements harmed their reputations in the Southern District of Georgia. Id. There, the Court reasoned that "[t]he harm to Plaintiffs' reputations in this District, by itself, would likely not be a sufficiently substantial event to establish venue" because, as noted by Defendants in the instant matter, "the inquiry into relevant events focuses on the actions of Defendants." Id. But that reputational harm, when "coupled with Defendants' *publication* in this District," rendered venue proper. Id. (citing Kravitz v. Niezgoda, No. CIV.A. 12-487, 2012 WL 4321985, at *4 (S.D. Pa. Sept. 21, 2012) ("In defamation cases, it is not enough that the plaintiff may have suffered harm in a particular district . . . . 'Injury in conjunction with another event, however, may make a district a proper venue.'")). The same can be said of the present matter, as Clover does not

allege current and future reputational harm in the Southern District of Georgia in *isolation*, but rather states that Clover "broadly publiciz[ed]" the Star Rating determination within this District, which is, according to the complaint, home to thousands of Medicare Advantage beneficiaries. Dkt. No. 1 ¶ 51.

Defendants nonetheless declare that there is a "dispositive difference" between Bell's defamation analysis and the present case: the defendant's action of "publication" in Bell was part of the plaintiff's theory of recovery, as publication of a libelous or slanderous statement was essential to recovery under the applicable defamation statute. Dkt. No. 25 at 6 (citing Bell, 2015 WL 5595806, at *4). On the other hand, according to Defendants, Clover's alleged reputational harm does not impact the venue inquiry in this case because the "APA bars actions 'seeking monetary compensation for an injury to . . . reputation,'"[7] making such reputational harm irrelevant to the venue inquiry. Dkt. No. 25 at 7.

While Defendants claim that it is "unclear why Clover believes that a non-redressable alleged harm should be relevant to this Court's venue analysis," Clover's response brief and APA caselaw solve that mystery. Id. at 7 n.4. Defendants' action of

[7] Clover does not seek monetary relief in this case, nor do Defendants claim otherwise. Dkt. No. 25 at 7 & n.7. Defendants simply point to this principle within the APA to argue that reputational harm is not relevant. Id.

"publication" of the Star Ratings in the Southern District of Georgia, allegedly leading to reputational harm and market loss, is part of Clover's theory of recovery under the APA because, according to the United States Supreme Court, "whether one calls injury a restriction on who may sue or an element of the cause of action, the relevant, undisputed point is that a plaintiff cannot sue under the APA unless she is '*injured in fact by agency action*.'" Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys., 603 U.S. 799, 808 (2024) (emphasis added) (quoting Dir., Off. of Workers' Compen. Programs, Dep't of Lab. v. Newport News Shipbldg. & Dry Dock Co., 514 U.S. 122, 127 (1995)).

While Clover does not seek monetary damages for harm it allegedly suffered due to the publication of its Star Rating in this District, the cited reputational harm "gives rise" to Clover's APA claims because it is that very harm which brings Clover within the class of entities eligible to bring an APA claim. Id.; Dkt. No. 1 at 66 (prayer for relief seeking only declaratory judgment and injunctive relief). In short, the harm is not only relevant to Clover's APA claims, it is *required* to bring them. Id.; see also 5 U.S.C. § 702 ("A person *suffering legal wrong because of agency action*, *or adversely affected or aggrieved* by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." (emphasis added)). As a result, like the collection of data from this District, the publication of Star Ratings and

subsequent harm to Clover's business opportunities and reputation in this District may also be properly considered as events giving rise to Clover's claims within the meaning of 28 U.S.C. § 1391(e)(1)(B).

### B. A substantial part of the events giving rise to Clover's claims occurred in the Southern District of Georgia.

Based on the events properly considered in the venue inquiry, the Court holds that the events which occurred in this District are sufficiently substantial so as to support venue in this forum. Pinson, 192 F. App'x at 817. "Substantiality is a qualitative inquiry, and is 'determined by assessing the overall nature of the plaintiff's claims and the nature of the specific events or omissions in the forum.'" TrakSouth Civ. Contractors, LLC v. Branch Banking & Tr. Co., No. CV 113-197, 2014 WL 12936989, at *2 (S.D. Ga. Aug. 4, 2014) (quoting Daniel v. Am. Bd. of Emergency Med., 428 F.3d 408, 432-33 (2d Cir. 2005)).

As noted by Clover, the fact that "significant acts giving rise to Clover's claim occurred in Washington, D.C." does not undercut the appropriateness of the present forum. Dkt. No. 22 at 10. This Court in Bell discussed the difficulty of assessing venue where the "'wrong' does not center on physical acts or omissions," such as online defamation actions. 2015 WL 5595806, at *6 (quoting Cap. Corp. Merch. Banking, Inc. v. Corp. Colocation, Inc., No. 6:07-cv-1626-Orl-19KRS, 2008 WL 4058014, at *3 (M.D. Fla. Aug. 27,

2008)). In the online defamation context, "because the harm from an online defamatory statement can occur in any place where the website or forum is viewed, no one forum should be expected to stand out as a particularly strong candidate for venue." Id. (citing Cap. Corp., 2008 WL 4058014, at *3). The present case, involving allegedly unauthorized agency calculations and negative market and reputational impact stemming from online publication, presents similar difficulties because the harm from the online Star Rating publication could be viewed by beneficiaries in any of the states where Clover does business, such as "Georgia, South Carolina, New Jersey, Pennsylvania, and Texas." Dkt. No. 1 ¶ 3.

With these potential difficulties in mind, the Court need not decide today whether transactional venue would be proper in every single district where Clover does business. Id. (listing states where Clover plans are offered). Instead, the Court need only discuss the sufficiency of events hosted by the Southern District of Georgia, a district within a state which is of great importance in Clover's Medicare Advantage dealings. Dkt. No. 22-1 ¶ 6; Dkt. No. 1 ¶ 51. The record outlines the pivotal role played by the State of Georgia in Clover's business operations, as "Georgia is Clover's second-largest market after New Jersey by total membership." Dkt. No. 22-1 ¶ 6. And Clover is particularly involved in the provision of Medicare Advantage plans in the Southern District of Georgia, "provid[ing] Medicare Advantage plans to

thousands of seniors located across the Southern District of Georgia, including within Glynn, Camden, McIntosh, Long, Wayne, Appling, and Jeff Davis counties, along with practically every other county within this District." Dkt. No. 1 ¶ 51.

Based on these allegations, not only do the data collection from this District, publication in this District, and resulting injury to Clover in this District qualify as "events giving rise" to Clover's claims, but the prevalence of the South Georgia market in Clover's business dealings supports the notion that the contacts underlying Clover's claims weigh heavily in the Southern District of Georgia. Bell, 2015 WL 5595806, at *6 (noting that it is proper to consider as instructive the relative "weight of the contacts" in the venue inquiry, though this test is not dispositive on the venue issue (citing Buckley v. Robertson, No. CIV.A. 1:96-CV-996-V, 1997 WL 33642373, at *3 (S.D. Ala. Apr. 18, 1997) (finding that pre-amendment decisions applying the "weight of the contacts" test "remain important sources of guidance"); Turner v. Sedgwick Claims Mgmt. Servs., Inc., No. 7:14-CV-1244-LSC, 2015 WL 225495, at *11 (N.D. Ala. Jan. 16, 2015))). The substantiality of these events is bolstered by the Court's statement in Bell, where it held that "[reputational] harm, coupled with Defendants' publication, ma[d]e this District a proper venue for Plaintiffs' claims." 2015 WL 5595806, at *5 (citations omitted). In contrast, Clover sets forth not only the publication and reputational harm which were

sufficient in Bell, but also the role data collection from South Georgia played in the very formation of the challenged Star Rating. Id.; Dkt. No. 1 ¶¶ 3, 211; Dkt. No. 22-1 ¶¶ 6, 11.

At bottom, while Defendants' motion may demonstrate why Clover could have filed this action elsewhere, this is insufficient to overcome Clover's showing that a substantial part of the events occurred in the Southern District of Georgia. See Dkt. No. 21 at 6 (listing other locations where suit could have been filed); see also Bell, 2015 WL 5595806, at *5. As a result, Defendants' motion to dismiss or transfer is **DENIED**, because both the request for dismissal and alternative request for transfer are premised on Defendants' argument that venue is improper in the Southern District of Georgia. Dkt. No. 21 (discussing the issue of dismissal or transfer for "improper venue" pursuant to Federal Rule of Civil Procedure 12(b)(3) and 28 U.S.C. § 1406(a) but failing to make any additional request for relief should the Court find venue is proper).

**II. This Court's ruling that venue lies in the Southern District of Georgia does not rule out the potential for transfer under 28 U.S.C. § 1404.**

Though venue lies in the Southern District of Georgia, there is an additional avenue through which transfer may occur: 28 U.S.C. § 1404(a), the statute governing transfer from a proper venue to another proper venue. Defendants' Rule 12(b)(3) motion to dismiss or transfer discusses the potential for transfer as an alternative

to wholesale dismissal, but it does so within the context of 28 U.S.C. § 1406(a), the statute contemplating transfers from an *improper* venue to a proper venue. Dkt. No. 21 at 6; Dkt. No. 25 at 10. Clover, too, addresses the potential for transfer but cabins this discussion to Section 1406(a) and its preference for transfer to the District of Columbia should the "Court find[] venue is lacking." Dkt. No. 22 at 16. As such, neither party has expressly addressed the potential for Section 1404(a) transfer. Dkt. Nos. 21, 22, 25.

However, even if Section 1404(a) transfer is not specifically sought by a party, it is not outside of this Court's discretion to consider *sua sponte* whether transfer under Section 1404(a) should occur. Hisey v. Qualtek USA, LLC, 753 F. App'x 698, 704 n.5 (11th Cir. 2018) ("Indeed, we have a 'long-approved practice of permitting a court to transfer a case *sua sponte* [under § 1404(a)][.]'"(quoting Tazoe v. Airbus S.A.S., 631 F.3d 1321, 1336 (11th Cir. 2011) (alterations adopted))). But such *sua sponte* transfers under Section 1404(a) are authorized only when "the parties are first given the opportunity to present their views on the issue." Tazoe, 631 F.3d at 1336 (quoting Costlow v. Weeks, 790 F.2d 1486, 1488 (9th Cir. 1986)). "Before transferring *sua sponte* under section 1404(a), 'the judge should, at minimum, issue an order to show cause why the case should not be transferred, and

thereby afford the parties an opportunity to state their reasons.'" Id. (quoting Starnes v. Small, 512 F.2d 918, 934 (D.C. Cir. 1974)).

While the parties' briefing, at first glance, may seem like both sides already had an opportunity to be heard on the issue of transfer, this was in the context of only a Section 1406(a) transfer, not a Section 1404(a) transfer. Dkt. Nos. 21, 22, 25. And this is not a distinction without a difference, as a transferor court's status as an improper versus proper venue impacts what considerations govern the transfer inquiry. Compare Atl. Marine Const. Co., Inc. v. U.S. Dist. Ct. for W. Dist. of Tex., 571 U.S. 49, 62 (2013) ("[A] district court considering a § 1404(a) motion . . . must evaluate both the convenience of the parties and various public-interest considerations."); id. at 62 n.6 (listing the public and private factors considered in Section 1404(a) analysis and providing that "some weight" must be given to plaintiff's choice of forum in this analysis (first citing Piper Aircraft Co. v. Reyno, 454 U.S. 235, 241 n.6 (1981); then citing Norwood v. Kirkpatrick, 349 U.S. 29, 32 (1955))); with Isaac v. Liberty Corr. Inst., No. 20-CV-23645, 2020 WL 5752243, at *1–2 (S.D. Fla. Sept. 4, 2020) (describing factors which impact whether Section 1406 transfer, rather than dismissal, would be "in the interest of justice," including the potential for an action to be timed-barred with dismissal, whether plaintiff filed in the improper forum in good faith, and other potential prejudice on either party), report

and recommendation adopted sub nom. Isaac v. Fla. Dep't of Corr., 2020 WL 5750097 (Sept. 25, 2020); see also Ellis v. Great S.W. Corp., 646 F.2d 1099, 1105 n.7 (5th Cir. 1981) (suggesting there exist certain situations where litigants would care whether a transfer was effectuated under Section 1404(a) versus 1406(a)).

The Court notes, however, that, even if Section 1404(a) transfer has not specifically been briefed, the parties' arguments do allude to various reasons why this case would be better suited for adjudication elsewhere—specifically, the District for the District of Columbia. See Dkt. No. 21 at 5–6; Dkt. No. 22 at 14–15; Dkt. No. 25 at 10. Alongside giving some weight to a plaintiff's choice of forum, courts considering Section 1404 transfer look to factors relating to the parties' private interests, including "relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive." Atl. Marine, 571 U.S. at 62 n.6 (citing Piper Aircraft, 454 U.S. at 241 n.6). Courts also consider public-interest factors such as "the administrative difficulties flowing from court congestion; the local interest in having localized controversies decided at home; [and] the interest in having the trial of a diversity case in a forum that is at home

with the law." Id. (citing Norwood, 349 U.S. at 32). In its response to the motion to dismiss or transfer, Clover contends that Washington, D.C. is where Defendant HHS resides and where its Secretary, Defendant Kennedy, performs his official duties, favoring the convenience-focused private interest factors such as ease of access to sources of proof, cost of attendance for witnesses, and any other practical considerations. Dkt. No. 22 at 17; Atl. Marine, 571 U.S. at 62 n.6. Clover also indicates that the principal location of its own counsel is in Washington, D.C. Dkt. No. 22 at 17.

Finally, and perhaps most importantly, Clover alleges in its separate motion to expedite that the parties are operating on an expedited schedule due to the timeframe for Defendants to make changes to bonus payments to plans pursuant to judicial decision-making and the deadline for Clover to submit its annual "bid" to participate in the Medicare Advantage Program. Dkt. No. 23 ¶ 2; see also id. ¶¶ 2, 6 (requesting expedited judgment on the motion to transfer or dismiss such that the court would have sufficient time to review and decide a motion for summary judgment by May 29, 2026). To this end, Clover indicates that the District Court for the District of Columbia "has the fewest pending cases per judgeship of any of the districts that Defendants identify." Dkt. No. 22 at 15 & n.3 (citing U.S. Courts, U.S. District Court Caseloads, https://www.uscourts.gov/sites/default/files/document

/fcms_na_distprofile0630.2025.pdf). Defendants also indicate that they have no objection to transfer to the District of Columbia should this Court decide to not dismiss the present action under 28 U.S.C. § 1406. Dkt. No. 25 at 10. As such, in the interest of fairness and completeness, alongside the parties' briefing suggesting adjudication in another district may be more convenient and conducive to their expedited schedule, the Court **ORDERS** the parties, within **seven days** of the date of this Order, to show cause as to why this case should not be transferred to the United States District Court for the District of Columbia under 28 U.S.C. § 1404(a).

## CONCLUSION

Defendants' motion to dismiss or, in the alternative, motion to transfer under 28 U.S.C. 1406, dkt. no. 21, is **DENIED.**[8] With respect to the lingering potential for transfer from a proper venue to another proper venue, the parties are **ORDERED**, within **seven days** of the date of this Order, to show cause as to why this case should not be transferred to the United States District Court for the District of Columbia under 28 U.S.C. § 1404(a).

[8] Plaintiff's motion to expedite a ruling on Defendants' motion to dismiss or transfer, dkt. no. 23, is **DENIED as moot.**

**SO ORDERED** this 18th day of March, 2026.

HON. LISA GODBEY WOOD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA