**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF GEORGIA**
**BRUNSWICK DIVISION**

| | | |
|---|---|---|
| CLOVER INSURANCE COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, ET AL.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 2:25-cv-142 |

**DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

## INTRODUCTION

On October 10, 2024, Plaintiff Clover Insurance Company issued a press release, announcing that the Centers for Medicare & Medicaid Services ("CMS") had "increased the Star rating of its PPO Medicare Advantage ('MA') plans to 4 Stars for 2025."[1] In particular, Clover noted its "exceptional performance on healthcare quality measures, Medication Adherence, and Member Experience." *Id.*

Clover's performance declined relative to its peers the following year, and it received 3.5 stars for 2026. In response, Clover brought a lawsuit against CMS and related federal defendants alleging twenty of the forty-five measures comprising the 2026 Star Ratings are illegal for one reason or another. These allegedly illegal measures include the very same ones on which Clover, a scant year ago, trumpeted

[1] https://investors.cloverhealth.com/news-releases/news-release-details/clover-health-ppo-medicare-advantage-plans-earn-4-star-rating/ (Last accessed April 8, 2026).

its "exceptional performance." The measures have barely changed[2]—the only meaningful difference between the 2025 and 2026 Star Ratings is Clover's performance. Casting about for someone else to blame for its own deficiencies, Clover asks this Court to adopt multiple novel legal theories that would make the Medicare Advantage Star Ratings unworkable. CMS has used the Star Ratings system for years to assess plan performance, provide information to beneficiaries, and distribute billions of dollars annually to Medicare Advantage plans that can use the funds to lower premiums for their members and offer supplemental benefits beyond what Medicare typically provides. Under Clover's theories, the Star Ratings system would become impossible for CMS to administer.

Litigation challenges to Star Ratings are nothing new. Particularly in recent years, plans have sought to raise their scores via lawsuit. But Clover's lawsuit is different. It does not allege that CMS misjudged its performance on any measure. Instead, Clover has identified the individual Star Ratings measures on which it performed poorly in 2025 and challenged only those measures as illegal—despite virtually all of them being identical to the previous year's measures. To summarize: Clover challenges *every* measure on which it received one, two, or three stars for 2026 and *none* of the measures on which it received four or five stars. *See* Exhibit 1, Goldstein Declaration ("Goldstein Dec."), Exhibit A. Their challenge includes the three medication adherence measures that only a year earlier it highlighted

[2] There are three measures in the 2026 Star Ratings that were not part of the 2025 Star Ratings; Clover challenges two of them (Improving or Maintaining Mental Health & Improving or Maintaining Physical Health).

specifically in a press release because of its "exceptional performance." Clover's approach is transparently results-driven: it has chosen the measures to challenge based on its performance, even when applying its arguments to those measures but not others would be incoherent and arbitrary.

This Court should conclude that Clover's claims are meritless. Its arguments that CMS has violated the Medicare statute in adopting certain Star Ratings measures ignore congressional text that undermines its claims. Its single constitutional claim fares no better; it misapplies a recent Supreme Court decision and ignores the record in this case. The rest of its claims involve allegations that CMS has acted arbitrarily and capriciously in adopting certain Star Ratings measures. Clover would have this Court second-guess the agency's decision-making, but under the Administrative Procedure Act's ("APA") deferential arbitrary-and-capricious standard, such second-guessing is inappropriate and unwarranted.

If Clover wants to improve its Star Rating, it may devote resources to bettering its plan's quality, performance, and outcomes. It has chosen another path: an attempt to undermine the Star Ratings system entirely because it found its grade this year disappointing. This Court should not countenance Clover's transparent effort to change its score not by improving its performance but by belatedly insisting that the measures themselves are invalid. CMS has for years implemented the Medicare Advantage and Medicare Part D Star Ratings program in a manner that is consistent with the Medicare statute and is neither arbitrary nor capricious.

## BACKGROUND[3]

### I. Statutory and Regulatory Background

#### A. The Medicare Advantage Program

Medicare is a federally funded and administered health insurance program for eligible elderly and disabled persons and certain individuals with end-stage renal disease. CMS administers the Medicare program.

The Medicare program is divided into four major components. Parts A and B (sometimes known as "traditional" Medicare) generally provide insurance coverage for things like hospital stays and physician services, directly paid for by the government. Under Part C, also known as Medicare Advantage, Medicare beneficiaries can elect to receive their Medicare benefits through a private insurance plan. And Part D is a similar voluntary program that allows participating beneficiaries to receive prescription drug coverage through a private plan.

This case concerns Parts C and D, which are two programs under which the government pays health-insurance companies to provide coverage to participating Medicare beneficiaries. Under Part C, private insurers provide coverage that beneficiaries would otherwise receive through traditional Medicare. These insurers, known as Medicare Advantage Organizations (MAOs), contract with the government

[3] Defendants have not submitted a statement of material fact or responded to Clover's statement. Such statements are not required in actions arising under the APA, in which "judicial review generally involves only the agency's administrative record." *See Altamaha Riverkeeper v. United States Army Corps of Eng'rs*, No. 4:18-cv-251, 2020 WL 5837650, at *3 (S.D. Ga. Sept. 30, 2020) (Hall, J.); *see also Philip Morris USA Inc. v. United States Food & Drug Admin.*, 801 F. Supp. 3d 1353, 1363 (S.D. Ga. 2025) (Wood, J.) (setting forth the standard for APA review and noting that Rule 56(a)'s material fact standard does not apply). Clover does not appear to disagree that a statement of undisputed fact is unnecessary. *See* Doc. 35 at 1-2.

to provide coverage in a particular geographic area. Beneficiaries can then choose among the plans available where they reside. *See* 42 U.S.C. § 1395w-21(b). The government pays MAOs a predetermined sum for providing coverage to each beneficiary, based in part on the demographic and health characteristics of that beneficiary. *Id.* § 1395w-23(a)(1)(A), (C). Under Part D, the government contracts with insurance companies that provide subsidized prescription drug coverage to beneficiaries. *See id.* § 1395w-101. Many insurers (including Clover) operate plans that provide coverage under both Parts C and D.[4] This brief therefore refers generically to insurers that provide Medicare coverage under Parts C and D as MAOs.

To calculate payments to MAOs, CMS first determines a "benchmark," based on the per capita cost of covering Medicare beneficiaries under Parts A and B in the relevant geographic area. *Id.* § 1395w-23(n); 42 C.F.R. § 422.258. Each MAO then submits a "bid," telling CMS what payment the MAO will accept to cover a beneficiary with an average risk profile in that area. 42 C.F.R. § 422.254. If the insurer's bid is less than the benchmark, the bid becomes the insurer's "base payment"—the amount it is paid for covering a beneficiary of average risk—and the insurer also receives a portion of the amount by which its bid is lower than the benchmark as a "rebate" that the MAO can use to fund supplemental benefits for beneficiaries or reduce plan premiums. 42 U.S.C. § 1395w-24(b)(1)(C); 42 C.F.R. § 422.260. If the MAO's bid is greater than the benchmark, then the benchmark becomes the insurer's base payment, and the insurer must charge beneficiaries a premium to make up the

[4] In many situations, regulations for Part C and Part D are substantively identical. *See, e.g.*, 42 C.F.R. §§ 422.164, 423.184. In those circumstances, the brief generally cites the Part C regulations.

difference. *See* 42 U.S.C. §§ 1395w-23(a)(1)(B)(ii), 1395w-24(b)(2)(A).

### B. Medicare Advantage Quality Improvement Programs

The Medicare Advantage statute includes a provision requiring plans to have an ongoing "quality improvement program." 42 U.S.C. §§ 1395w-22(e). These programs require "each MA organization [to] provide for the collection, analysis, and reporting of data that permits the measurement of health outcomes and other indices of quality." 42 U.S.C. § 1395w-22(e)(3)(A)(i). "The Secretary shall not collect under subparagraph (A) data on quality, outcomes, and beneficiary satisfaction to facilitate consumer choice and program administration other than the types of data that were collected by the Secretary as of November 1, 2003." 42 U.S.C. § 1395w-22(e)(3)(B)(i). Before "changing the types of data that are required to be submitted under subparagraph (A)," CMS is required to first submit a report to Congress. 42 U.S.C. § 1395w-23(e)(3)(b)(ii). Congress added this limitation and the requirement of a report before changing data types in 2003 as part of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 108-173, § 722(a)(2), 117 Stat. 2066, 2347-48 (2003). In the same bill, Congress added 42 U.S.C. § 1395w-22(e)(3)(B)(iii), which provides that "nothing in [this] subsection shall be construed as restricting the ability of the Secretary to carry out the duties under section 1395w–21(d)(4)(D) of this title." *See id.*, *see also* H.R. Conf. Rep. 108-391, at 729-32 (2003), reprinted in 2003 U.S.C.C.A.N. 1808, 2086-89.

On November 1, 2003, the Secretary used three systems to gather the data underlying plans' quality improvement programs. First, the Healthcare Effectiveness

Data and Information Set ("HEDIS"), which is administered by the National Committee for Quality Assurance ("NCQA"), "is one of health care's most widely used performance improvement tools," with "90 measures across 6 domains of care."[5] HEDIS gathers data from plans inside and outside of the Medicare Advantage program: "More than 235 million people are enrolled in health plans that report HEDIS results." *Id.* Second, NCQA also administers the Health Outcomes Survey ("HOS"), which has as its goal "to gather valid, reliable, clinically meaningful about the Medicare Advantage (MA) program."[6] Third, the Agency for Healthcare Research and Quality, a component of HHS, administers the Consumer Assessment of Healthcare Providers and Systems ("CAHPS") program, which "support[s] investigator-led research to better understand patient experience with healthcare and develop scientifically valid and feasible strategies and tools to [a]ssess patient experience[,] [r]eport survey results, [and h]elp organizations use the results to improve the quality of care."[7]

In its first rulemaking implementing the Part C provisions of the Medicare Modernization Act, CMS explained in a proposed rule that "we interpret [42 U.S.C. § 1395w-23(e)(3)(B)(i)] to mean that we can continue to require MA coordinated care plans to collect, analyze, and report their performance by using the measurement systems that are currently required, such as HEDIS, Health Outcomes of Seniors (HOS), and CAHPS." 69 Fed. Reg. 46866, 46866 (Aug. 3, 2004). CMS further

---

[5] https://www.ncqa.org/hedis/ (Last accessed April 8, 2026).
[6] https://www.ncqa.org/hedis/measures/hos/ (Last accessed April 8, 2026).
[7] https://www.ahrq.gov/cahps/about-cahps/cahps-program/index.html. (Last accessed April 8, 2026).

explained its view that "consistent with private sector practices, we would be allowed to add, delete, or modify measures within these systems." *Id.* It explained that changes to measures within the systems would be "generally reviewed and approved by a committee with representatives from managed care plans, beneficiary advocacy groups, private and public health care purchasers." *Id.*

In response to this proposed rule, "some commenters expressed concern that CMS could not add measures without issuing a Report to the Congress as required under [42 U.S.C. § 1395w-23(e)(3)(A)]." 70 Fed. Reg. 4588, 4635 (Jan. 28, 2005). CMS reiterated its conclusion that the statute did not require a report before making changes "within each of the existing measurement systems, such as HEDIS." *Id.*

### C. Medicare Advantage Star Ratings

Multiple statutory provisions in both Part C and Part D of the Medicare statute authorize the Secretary to collect and disseminate information, including comparative information, about plans offering insurance under Parts C and D. *See* 42 U.S.C. §§ 1395w-21(d)(1); 1395w-21(d)(4)(D); 1395w-101(c)(1). The information gathered and distributed under these statutes is meant to provide Medicare beneficiaries with information to support informed choice about plan options. These provisions are in addition to and separate from the Medicare Part C provision, discussed above, describing quality improvement programs, which are focused on "improving the quality of care provided to enrollees." 42 U.S.C. § 1395w-22(e)(1).

In 2007, CMS began publishing "annual performance ratings for stand-alone Medicare" prescription drug plans. 83 Fed. Reg. 16440, 16520 (Apr. 16, 2018). A year

later, CMS began publishing the Star Ratings for Medicare Advantage contracts and combined Medicare Advantage-Prescription Drug Contracts. *Id.* In 2011, CMS introduced an overall rating "combining health and drug plan measures." *Id.* When CMS first began publishing the Star Ratings, it "acted upon [its] authority to disseminate information to beneficiaries as the basis." *Id.* (citing 42 U.S.C. §§ 1395w-21 & 1395w-22); *see also id.* at 16524 (purposes of quality rating system are to "provide comparative information to Medicare beneficiaries pursuant to [42 U.S.C. §§ 1395w-21(d) & 1395w-101(c)], identify and apply the payment consequences for MA plans under [42 U.S.C. §§ 1395w-22(o) & 1395w-23(b)(1)(C)], and evaluate and oversee overall and specific performance by MA and Part D plans"). "The Part D statute (at [42 U.S.C. § 1395w-101(c)]) imposes a parallel information dissemination requirement with respect to Part D plans, and refers specifically to comparative information on consumer satisfaction survey results as well as quality and plan performance indicators." *Id* at 16520.

CMS has consistently explained that Medicare Advantage Star Ratings serve more than one purpose. In 2010, CMS explained that they "provide beneficiaries information on organization performance that they may consider (in addition to cost and benefit information) when choosing a plan." 75 Fed. Reg. 71190, 71219 (Nov. 22, 2010). They also help CMS to identify "poor performing organizations for compliance actions." *Id.* In 2018, CMS explained further:

> The MA and Part D Star Ratings system is designed to provide information to the beneficiary that is a true reflection of the plan's quality and encompasses multiple dimensions of high quality care. The information included in the ratings is selected based on its relevance

> and importance such that the ratings can meet the needs of beneficiaries using them to inform plan choice. While encouraging improved health outcomes of beneficiaries in an efficient, person centered, equitable, and high quality manner is one of the primary goals of the ratings, they also provide feedback on specific aspects of care and performance that directly impact outcomes, such as process measures and the beneficiary's perspective. The ratings focus on aspects of care and performance that are within the control of the health plan and can spur quality improvement. The data used in the ratings must be complete, accurate, reliable, and valid. A delicate balance exists between measuring numerous aspects of quality and the need for a small data set that minimizes reporting burden for the industry. Also, the beneficiary (or his or her representative) must have enough information to make an informed decision without feeling overwhelmed by the volume of data.

83 Fed. Reg. at 16520.

In 2010, Congress required CMS to begin using the Star Ratings for another purpose: providing additional payments to plans. The Patient Protection and Affordable Care Act, as amended by the Healthcare and Education Reconciliation Act, added 42 U.S.C. §§ 1395w-23(o) and 1395w-24(b)(1)(C), which describe two ways that higher Star Ratings can provide plans with additional funds that they may use to offer supplemental benefits to enrollees or reduce premiums. *See* 83 Fed. Reg. at 16,520. First, plans that earn an overall rating of 4 stars or higher qualify for Medicare Advantage "quality bonus payments" in the form of an increased benchmark for the contract year following the ratings year (*e.g.*, the 2025 Star Ratings can increase the Medicare Advantage bidding benchmarks for contract year 2026). *See* 42 U.S.C. § 1395w-23(o)(1), (o)(3)(A)(i). This increased benchmark in turn can allow a Medicare Advantage plan to increase its bid, receive higher rebates, or lower premiums. *See id.* § 1395w-24(b)(1)(C); 42 C.F.R. § 422.260.

Second, Star Ratings affect the level of rebate received by plans that bid below

their benchmarks for the contract year following the ratings year. Plans that earn an overall rating of 4.5 stars or higher receive a rebate of 70% of the amount by which their bid is lower than the benchmark, while plans that earn 3.5 or 4 stars receive a rebate of 65% of that amount, and plans that earn less than 3.5 stars are eligible for a rebate of 50% of that amount. 42 U.S.C. § 1395w-24(b)(1)(C)(v); 42 C.F.R. § 422.266(a)(2)(ii).

The 2010 statutory provision requiring CMS to connect bonus payments to plan quality instructs the agency to use "a 5-star rating system (based on the data collected under section 1395w-22(e) of this title)." 42 U.S.C. § 1395w-23(o)(4)(A). Consistent with this statute, CMS began using its existing Star Ratings system to fulfill the statutory requirement. Since the inception of the Star Ratings system, the vast majority of measures underlying the Part C Star Ratings have been drawn from the CAHPS, HEDIS, and HOS systems, which CMS explained in 2004 were the "types of data" referred to in 42 U.S.C. § 1395w-22(e). *See* 69 Fed. Reg. at 46,866; *see also* AR 185-239. The CMS Star Ratings system that rates each plan on a scale from 1 to 5 "stars" based on multiple quality measures, depending on whether the plan is Medicare Advantage-only (33 measures in 2026) or also includes Part D coverage (45 measures in 2026). *See* AR 153. These quality measures assess different aspects of health outcomes, patient experience, and care quality. AR 157. To calculate these ratings measures, CMS uses a variety of different data sources, including administrative and medical record review data, survey data, and CMS performance measures. *See* 83 Fed. Reg. 16440, 16520, 16525 (Apr. 16, 2018). CMS determines

each plan's overall rating by calculating a weighted average of the plan's Star Ratings on each of the different individual measures. AR 165-69. CMS publishes the Star Ratings each October for the upcoming year at the contract level, with each plan offered under that contract assigned the contract's rating. *See* 42 C.F.R. §§ 422.162(b), 422.166, 423.182(b), and 423.186. This case concerns the 2026 Star Ratings issued in October 2025.

Each year, CMS circulates to plans (and displays on its website) a Technical Notes document that provides details about the current year's Star Ratings. AR 149-371. These Technical Notes include details about the measures that comprise the Star Ratings, how those measures are weighted, what the cut points used to determine stars for each measure are, and how CMS assesses each measure. *Id.*

In a 2018 notice-and-comment rulemaking, CMS added regulation text that "identifies the statutory authority, purpose, and applicability of the Star Ratings system regulations" CMS codified in the same rulemaking. 83 Fed. Reg. at 16524. "[B]roadly stated," the purpose of the 2018 rulemaking was to "codify the current quality Star Ratings system uses, methodology, measures, and data collection beginning with the measurement periods in calendar year 2019" with some changes. *Id.* To that end, CMS codified in regulation at 42 C.F.R. § 422.164(c) and (d) its historical practice of using the notice-and-comment process at 42 U.S.C. § 1395w-23(b)(2) to permit stakeholders to "request changes to and raise concerns about the Star Ratings methodology and measures." 83 Fed. Reg. at 16524. This notice-and-comment process, called the "Advance Notice" process, provides MAOs the

opportunity to comment on CMS proposals but does not require rulemaking under the Administrative Procedure Act. *See* 42 U.S.C. § 1395w-23(b). CMS also established regulations describing how it would use either the Advance Notice process or formal rulemaking to add, remove, or modify Star Ratings measures going forward. 83 Fed. Reg. 16532-37; *see also* 42 C.F.R. § 422.164(c), (d). In light of the establishment of a process via formal rulemaking, CMS announced that it would not "codify a list of measures and specifications in regulation text in light of the regular updates and revisions contemplated by the rules we have finalized." 83 Fed. Reg. 16537. CMS nonetheless included in the Federal Register a list of all measures it would include in the 2019 Star Ratings, 83 Fed. Reg. 16538-46, and it responded to comments on Star Ratings measures, 83 Fed. Reg. at 16547-62.

### D. The plan preview period and quality bonus payment appeals

CMS provides for two plan preview periods before the annual release of each Star Ratings in October. *See* 42 C.F.R. § 422.166(h)(2). During the first plan preview in August, CMS asks MAOs to closely review the Star Ratings methodology and their posted numeric data for each measure. The second plan preview in September includes any revisions made as a result of the first plan preview and provides a preview of the preliminary Star Ratings for each measure, domain, summary rating, and overall rating. During the second plan preview, CMS asks MAOs again to closely review the methodology and their posted data for each measure, as well as their preliminary Star Ratings assignments. This is an informal administrative process in which MAOs send any comments or questions to CMS by email, and CMS responds

in kind.

CMS regulations also provide for a quality bonus payment appeals process, a formal administrative appeal process after the Star Ratings have been published that allows MAOs to "appeal quality bonus payment status determinations." 42 C.F.R. § 422.260(a). The "burden of proof is on the MA organization to prove an error was made in the calculation of the [quality bonus payment] status." *Id.* § 422.260(c)(2)(v).

## II. Factual Background

### A. Clover's communications with CMS during the 2025 plan year

During 2025, Clover made several submissions to CMS expressing its objections to the medication adherence measures (D08, D09, and D10) that have been part of the Part D Star Ratings since 2012. AR 1-21; *see* AR 252-60. In response to these submissions, CMS explained that it could not modify the inputs to the Star Ratings during a measurement year because CMS regulations require that changes to Star Ratings measures occur via an annual notice-and-comment process and, for substantive changes, subsequent notice-and-comment rulemaking. *See, e.g.,* AR 9, AR 22 (citing 42 C.F.R. § 422.164(d)).

### B. Clover's communications with CMS during the 2026 plan preview period

During the first plan preview for the 2026 Star Ratings, Clover contacted CMS regarding its performance on the medication adherence measures (AR34-43) and other measures, including the Part C appeals measures (AR100-117), the Parts C and D call center measures (AR63-66), and the complaints about the health plan measure (AR59-61).

CMS responded substantively to Clover's concerns. The Part C appeals measures (C31 and C32, *see* AR 235-38) are based on data from the Independent Review Entity ("IRE"), a statutorily required organization that provides an independent, third-party review of coverage denials by plans offering coverage under Medicare Parts C and D. *See* 42 U.S.C. § 1395w-22(g)(4); *see also* 42 C.F.R. §§ 422.592–596. CMS reviewed the IRE data underlying the appeals measures and, where appropriate in response to Clover's submission, informed Clover that it would either allow Clover to submit additional information to the IRE or instruct the IRE to modify the data. AR 26-27, AR 131-36. CMS also responded substantively to the remainder of Clover's requests for review, explaining why it would not modify the data underlying the Star Ratings. AR 30, AR 52-53, AR 133-36.

During the second plan preview period, after it learned that its 2026 Star Rating would be 3.5 Stars, Clover abruptly shifted course. It abandoned its arguments about the complaints measure, abandoned its specific challenges related to its call center performance, and alleged for the first time its view that nearly half the Star Ratings measures were illegal via a memo it sent to CMS on September 16, 2025. AR 139-43. The measures it challenged in this memo are identical to the measures it challenges in this lawsuit, except that the letter also included a challenge to measure C31, Plan Makes Timely Decisions on Appeals. AR 140. (Because CMS agreed with some of the data changes Clover requested during the first plan preview, Clover ultimately received four stars on measure C31). CMS responded to Clover's memo two days later, explaining that Clover's request was outside the scope of the

plan preview. AR 137. Clover did not ultimately pursue any quality bonus payment appeals with the agency.

### C. Clover's 2026 Star Rating and this lawsuit

Clover's 2026 Star Rating was 3.5 stars. Following publication of the 2026 Star Ratings, Clover brought this lawsuit, challenging virtually all the measures that it had alleged were unlawful in its September 16, 2025 memo.

Clover argues that twenty of the forty-two Star Ratings measure specifications applied to it[8] for the 2026 Star Ratings are illegal, on a variety of overlapping theories. *See* Doc. 34 (hereinafter, "Br.") at 10. It argues that all twenty measures it challenges were adopted without rulemaking in violation of 42 U.S.C. § 1395hh(a)(2). It argues that ten measures also violate a separate statutory requirement describing what data the Star Ratings may be "based on," *see* 42 U.S.C. § 1395w-22(e), and that fifteen challenged measures incorporate data different from the "types of data" CMS gathered in 2003 in violation of a different statutory provision, *see* 42 U.S.C. § 1395w-23(b)(3)(B)(i). Clover also alleges that CMS adopted three measures without following its regulatory process, Br. at 36-40, challenges one measure as inconsistent with the constitutional private non-delegation doctrine, and argues that five measures are substantively arbitrary and capricious in violation of the APA, Br. at 10.

## STANDARD OF REVIEW

In an APA case, the Court's role is to ensure that the agency came to a rational decision, "not to conduct its own investigation and substitute its own judgment for

[8] There are 33 Part C measures in the 2026 Star Ratings, but three of them (C07, C08, and C09) are "Special Needs Plan" only measures that do not apply to Clover because it is not a Special Needs Plan.

the administrative agency's decision." *Pres. Endangered Areas of Cobb's History, Inc. v. U.S. Army Corps of Eng'rs*, 87 F.3d 1242, 1246 (11th Cir. 1996) ("*PEACH*"); *Philip Morris*, 801 F. Supp. 3d at 1364 ("[T]he Court cannot substitute its judgment for the agency's if the agency's conclusions are rational."). The party challenging the agency action must set forth specific facts to show that it is entitled to relief. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 884-85 (1990). With respect to statutory interpretation, this Court's role is to "apply[] all relevant interpretive tools" to determine the "best reading" of a statute. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024).

## ARGUMENT

### I. The Medicare Advantage Star Ratings do not violate the Medicare statute's rulemaking provision.

Clover promotes a novel theory that CMS's method of determining the amount of quality bonus payments to MAOs—including to Clover itself—violates the Medicare statute. There is no basis in law or precedent for this claim, which (if this Court adopts it) would undermine all of the existing Star Ratings technical specifications that underly all quality bonus payments *to all MAOs*. It would require CMS to undertake a notice-and-comment rulemaking process to codify every nuance of the Star Ratings technical specifications in the Code of Federal Regulations, including those that depend on facts that are unknown and unknowable in advance, such as the case-mix adjustment coefficients that are an integral part of calculating Star Ratings.

#### A. The Medicare statute does not require notice and comment rulemaking for Star Ratings measures.

The Medicare statute requires that CMS effectuate certain agency actions "by

regulation." 42 U.S.C. § 1395hh(a)(2). This requirement does not apply to Star Ratings measure specifications. The Medicare rulemaking provision states:

> No rule, requirement, or other statement of policy . . . that establishes or changes a substantive legal standard governing the scope of benefits, the payment for services, or the eligibility of individuals, entities, or organizations to furnish or receive services or benefits under this subchapter shall take effect unless it is promulgated by the Secretary by regulation.

42 U.S.C. § 1395hh(a)(2).

As one district court has already held when addressing whether § 1395hh(a)(2) requires notice and comment on Star Ratings measure specifications, the statute applies to rules, regulations, or statements of policy that "govern[]." *Humana Inc. v. U.S. Dep't of Health & Hum. Servs.*, 806 F. Supp. 3d 642, 648 (N.D. Tex. 2025), *appeal docketed,* No. 25-11302 (5th Cir.). And to "'govern' means 'to prevail or have decisive influence; control.'" *Id.* (citing Merriam Webster); *see also* Black's Law Dictionary (12th ed. 2024) (defining "govern" as "to control a point in issue"). But the Star Ratings measure specifications do not "have decisive influence" or "control" over the payment for services or eligibility to furnish or receive services and they do not "govern" eligibility because the regulation that permits CMS to exclude consistently low-performing plans is discretionary. *Humana*, 806 F. Supp. 3d at 647-48.

Clover, without acknowledging this decision, presses three theories for why CMS was required to promulgate the Star Ratings measure specifications by regulation, arguing in turn that they govern "the payment for services," "eligibility to furnish services or benefits," and "the scope of benefits." Br. at 56-58. None has merit.

### 1. Star Ratings measure specifications do not govern the payment for services.

Star Ratings measure specifications do not govern the payment for services because a plan's obligation to provide insurance (*i.e.*, pay for services on behalf of Medicare beneficiaries) is wholly independent of its Star Rating. Some plans do not receive quality bonus payments at all, but they have the same statutory obligation as all other MAOs to pay for "benefits under the original medicare fee-for-service program option." 42 U.S.C. § 1395w-22(a)(1)(A); *see also* 42 U.S.C. § 1395w-22(a)(1)(B). The "monthly payments" that CMS pays to "*each* [Medicare Advantage] organization," 42 U.S.C. § 1395w-23(a)(1)(A) (emphasis added), have nothing to do with Star Ratings, as evidenced by the fact that all participating MAOs receive it, and not all participating MAOs receive quality bonus payments linked to Star Ratings. This monthly payment is based on the capitation rate, which is established each year under the notice-and-comment process described in 42 U.S.C. § 1395w-23(b)(2). The capitation rate is meant to reflect what the government would expect to pay to providers for the services they furnish to a Medicare beneficiary. It is in no way linked to Star Ratings—and Clover does not allege otherwise—and therefore offers no evidence that the Star Ratings measure specifications even affect, much less "govern," the "payment for services."

Quality bonus payments, it is true, are linked to Star Ratings. But they are not and do not govern "payments for services" because a plan's obligation to pay for services on behalf of beneficiaries exists whether or not it receives quality bonus payments, and the Medicare statute and regulations *forbid* MAOs from using quality

bonus payments to pay for services. Plans may use quality bonus payments to pay for supplemental benefits or reduce beneficiary premiums. 42 C.F.R. § 422.266(b). Those supplemental benefits may not be "benefits under original Medicare." 42 C.F.R. § 422.266(b)(1). The "scope of benefits" under Parts A and B, in turn, refers to "entitlement to have payment made" for specified "services." *See* 42 U.S.C. §§ 1395d, 1395k. "[P]ayments for services refers to the amounts Medicare must pay providers for furnishing covered services." *Humana*, 806 F. Supp. 3d at 648 (citing 42 U.S.C. §§ 1395w-22(a)[(1)](B)(iv) & 1395u). A quality bonus payment is not a payment from Medicare to any plan "for services," nor may it be used by the plan to pay for "services" as Medicare defines the term. *See* 42 U.S.C. § 1395x (Medicare statute definition of various types of "services"); *see also* 42 U.S.C. §§ 1395d, 1395k ("scope of benefits" under Parts A and B referring to "entitlement to have payment made" for specified "services").

It is of no import that plans bear financial risks if their payments to providers exceed CMS's payments. Br. at 56. A plan must describe in its bid how it will use whatever quality bonus payment it receives, and its use is then reflected in marketing materials for beneficiaries describing a supplemental benefit like dental coverage or lowered premiums. If a plan spends more on services than it expected to, it could not attempt to recoup that difference mid-year by redirecting its quality bonus payment, cancelling the dental benefits of enrollees on the grounds that the plan needed that money to stay profitable. A plan that receives quality bonus payments commits, before the relevant plan year even starts, to how it will use the extra payments.

Similarly, the Medical Loss Ratio is irrelevant. A plan that fails to meet the statutory minimum loss ratio of .85 does not make extra payments to providers; it must "remit to the Secretary" a sum of money equal to its total revenue and the difference between .85 and its medical loss ratio. 42 U.S.C. § 1395w-27(e)(4). Clover presents no evidence that any Medicare Advantage plan increases payments to providers if it believes it may be below the .85 Medical Loss Ratio threshold for a plan year, and even if one did, such a policy would be a decision by the plan and not evidence that its Star Rating somehow "governs" the "payment for services."

As the district court in *Humana* correctly held, "quality bonus payments and rebates are not 'payments for services'" and "the Star Ratings do not affect 'payment for services.'" *Humana*, 806 F. Supp. 3d at 648. Clover's arguments to the contrary are meritless.

**2. Star Ratings measure specifications do not govern eligibility to furnish services or benefits.**

The *Humana* court also held, correctly, that Star Ratings do not "govern eligibility under § 1395hh." *Humana*, 806 F. Supp. 3d at 648. That court rejected the same argument Clover makes here: that the Star Ratings govern eligibility because "CMS *may* terminate plans from the Medicare Advantage program if they . . . fail to achieve an overall Star Rating of at least 3 Stars over three years." Br. at 57-58 (emphasis added). As Clover acknowledges, the regulation *allows*, but does not *require*, CMS to terminate persistently low-performing plans. *See* 42 C.F.R. § 422.510(a)(4)(xi). It thus does not "govern" eligibility because its influence is not "decisive." *See Humana*, 806 F. Supp. 3d at 648. That CMS continues to have

discretion as to whether to terminate a plan that achieves persistently low Star Ratings shows that the Star Ratings do not "govern" eligibility.

### 3. Star Ratings measure specifications do not govern the scope of benefits.

MAOs may choose to offer supplemental benefits to beneficiaries regardless of their Star Ratings. The Star Ratings therefore do not "govern" the scope of benefits. Plans are statutorily obligated to provide the same benefits as original Medicare, 42 U.S.C. § 1395w-22(a)(1)(A), and each plan "may provide to individuals enrolled under this part . . . supplemental health care benefits that the Secretary may approve," 42 U.S.C. § 1395w-22(a)(3). These provisions do not depend at all on the Star Ratings.

Clover's position appears to be that if it received more quality bonus payments, it would choose to offer more supplemental benefits. *See* Br. at 58. But that does not mean that the Star Ratings "govern" the "scope of benefits that Clover may offer"—Clover can offer whatever supplemental benefits it wants, regardless of its Star Rating, as long as the Secretary has approved them (which he "shall" unless he determines that approving them would "substantially discourage enrollment," 42 U.S.C. § 1395w-22(a)(3)(A)). Clover's claim that it is less economical for it to offer these benefits because its Star Rating means lower quality bonus payments hardly satisfies the required showing that Star Ratings "govern" the "scope of benefits."

Clover's theory fails for a second, independent reason. In the statute discussed above, Congress instructed the Secretary to "approve any such supplemental benefits" that do not "substantially discourage enrollment." 42 U.S.C. § 1395w-22(a)(3). Clover presents no evidence that the Secretary's approval of supplemental

benefits must be "by regulation" under Section 1395hh(a)(2); if the Secretary *were* required to act by regulation in approving supplemental benefits, the process would be significantly lengthier than it is now. But the fact that Congress instructed the Secretary to approve supplemental benefits without needing to act "by regulation" is a strong indication that Congress did not consider the provision of supplemental benefits by MAOs to be among the "scope of benefits" described in § 1395hh(a)(2).

#### 4. Clover's interpretation of § 1395hh(a)(2) creates an unnecessary conflict with another Medicare provision, § 1395w-23(b).

Clover's expansive reading of § 1395hh(a)(2) also creates an avoidable conflict with 42 U.S.C. § 1395w-23(b). If Clover's argument that quality bonus payments are payments for services were accepted, it would necessarily follow that the risk-adjusted Medicare Advantage capitation rate—the amount the government pays each Medicare Advantage plan for each enrollee—could also be said to govern the "payment for services" and therefore be subject to § 1395hh(a)(2). After all, that capitated payment is meant to reflect what the government would expect to pay to providers for the services they furnish to the Medicare beneficiary.

But the annual capitation rate is not subject to the requirement in § 1395hh(a)(2) that the Secretary act "by regulation." Instead, Congress established a separate notice-and-comment provision specific to the Medicare Advantage "annual announcement of payment rates." 42 U.S.C. § 1395w-23(b), (b)(2). When setting capitation rates, the agency is required to notify MAOs and give them an opportunity to comment, but the statute does not require action "by regulation" the way § 1395hh(a)(2) does. 42 U.S.C. § 1395w-23(b). Under Clover's sweeping interpretation

of § 1395hh(a)(2), it is difficult to see how capitation rates would not also be required to be set "by regulation" under 1395hh(a)(2), which would render the specific notice-and-comment provision of 1395w-23(b) meaningless. "If a provision is susceptible of (1) a meaning . . . that deprives another provision of all independent effect, and (2) another meaning that leaves both provisions with some independent operation, the latter should be preferred." A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 176 (2012); *see also Corley v. United States*, 556 U.S. 303, 314 (2009) (describing the canon that statutes should be construed to give effect to all their provisions, so that no part is inoperative or superfluous). Had Congress thought the capitation rate was subject to the regulation requirements of § 1395hh(a)(2), it would not have needed to add § 1395w-23(b). Clover's reading of § 1395hh(a)(2) thus creates an avoidable conflict between two sections of the Medicare statute. The government's reading properly avoids any such conflict.

**5. Clover's position would make the Star Ratings unworkable**

Clover's position would also make a key part of calculating each plan's Star Rating unworkable. Each year, the Star Ratings specifications include case-mix adjustments. *See* AR 266-276. CMS presents these case-mix adjustments via tables in the annual Star Ratings Technical Notes, and it bases the coefficients on statistical analysis of *that year's data*. *See id.* Without coefficients, it would be impossible to apply a case-mix adjustment to the measures that require it—but there is no way for CMS to calculate these coefficients in advance, as would be required if the detailed specifications for Star Ratings measures had to be codified in regulation. A

requirement that CMS codify in the Code of Federal Regulations every detail of the measure specifications, such as the details of the case-mix adjustment, would make calculating a plan's Star Rating unworkable.[9]

**B. Clover's argument is not limited to the measures it identifies.**

For the reasons already described, Clover cannot show that the Star Ratings measure specifications fall within the ambit of § 1395hh(a)(2). If this Court disagrees with the government's arguments, however, there is no principled basis on which to limit Clover's arguments to only the measures it identifies.

In a footnote, Clover claims that the "series of measures" allegedly adopted in violation of 42 U.S.C. § 1395hh(a)(2) consists of 20 identified measures. Br. at 53 n.8. These 20 are out of a total of 42 measures applicable to Clover for 2026 even though, as CMS clarified in 2018, *none* of the Star Ratings measure specifications are codified in the Code of Federal Regulations. See 83 Fed. Reg. at 16537. Clover offers no explanation for why the measures it challenges—and only those measures—were adopted in violation of the statute. As already described, the measures identified by Clover in this lawsuit happen to be only those on which it scored 1, 2, or 3 stars for 2026. Clover's lack of challenge to the measures on which it scored 4 or 5 stars implies that it believes CMS made no error in promulgating those measures. Clover expects this Court to take it at its word that only the measures on which it performed poorly

[9] To be sure, CMS does provide a process for stakeholder input. It conducted notice-and-comment rulemaking on the then-existing measures in 2018. *See* 83 Fed. Reg. at 16547-62. Through that rulemaking, it implemented the process described in regulation at 42 C.F.R. § 422.164, which allows MAOs to participate in the ongoing development of the Star Ratings system and modify the measure specifications through notice and comment processes.

are flawed, but it provides no principled basis for distinguishing between the measures. Clover cannot cherry-pick measures to challenge based on its performance. If the Court does adopt Clover's argument, its remand should include the basis for distinguishing between the measures that Clover fails to supply.

## II. CMS did not violate congressional directives in its selection of Star Ratings measure specifications.

Clover asserts that CMS has been quietly violating for more than a decade two provisions governing the collection and use of data for the Medicare Advantage Star Ratings. Clover first argues that a statute saying the Star Ratings should be "based on" certain data collected from MAOs as part of their quality improvement programs forbids CMS from considering *any other data* in assessing plan quality. This argument fails principally because "based on" does not mean "based only on," as circuit precedent and other statutory text make clear. Clover also argues that a provision limiting the "types of data" CMS may collect from MAOs' Part C quality improvement programs renders fifteen Star Ratings measures, including a host of Part D measures, illegal. But the "types of data" provision applies only to Part C, and the best reading of that provision does not forbid CMS's systems from gathering similar data using different survey questions.

The data underlying Part C quality improvement programs is only a portion of the data Congress has specifically authorized CMS to collect and use for various purposes. Clover wrongly assumes that CMS lacks data collection authority outside the Part C quality improvement provision. In fact, Congress authorized or required CMS to collect and disseminate data throughout Medicare Parts C and D. *See, e.g.*,

42 U.S.C. §§ 1395w-21(d)(1); 1395w-21(d)(4)(D); 1395w-101(c)(1). Consistent with these authorities, CMS began publishing Medicare Advantage Star Ratings in 2008. Two years later, Congress amended the statute to instruct plans to make quality bonus payments to plans according to a quality rating "determined according to a 5-star rating system (based on the data collected under [42 U.S.C. § 1395w-22(e)])." 42 U.S.C. § 1395w-23(o)(4)(A). The existing Medicare Part C Star Ratings used as the data source for nearly all measures data collected under § 1395w-22(e), and CMS accordingly used its existing Star Ratings to determine plans' bonus payments. This system continues to this day and is consistent with all the relevant statutory provisions.

### A. Congress did not forbid CMS from incorporating data outside the quality improvement program into the Medicare Advantage Star Ratings.

Clover's argument that this Court should find ten Star Ratings measure specifications unlawful hinges on two words found in a parenthetical in the Medicare statute: "based on." *See* 42 U.S.C. § 1395w-22(o)(4)(A). Clover offers no analysis at all of what this phrase means, but its argument (that the inclusion of *any* measure using data collected outside of HEDIS, HOS, and CAHPS violates the statute) implies a belief that "based on" means "consisting exclusively of." Under binding circuit precedent, however, "based on" does not imply exhaustiveness. That alone is enough for this Court to reject Clover's argument, but Clover also omits any discussion of surrounding provisions showing that Congress did not forbid CMS from incorporating other data into the Medicare Advantage Star Ratings system.

#### 1. "Based on" does not mean "consisting exclusively of."

Clover's argument (Br. at 24-31) that the Star Ratings must incorporate *only* the data gathered from plan's quality improvement programs rests on the assumption that inclusion of any data other than that "collected under [42 U.S.C. §] 1395w-22(e)" renders the whole 5-star rating system *not* "based on" that data. Or, to put it another way, Clover's argument assumes that "based on" means "based solely" on. This argument is squarely foreclosed by Eleventh Circuit precedent and inconsistent with the Medicare statute.

"'Nothing about the plan and ordinary meaning of the phrase 'based on' connotes exclusivity,' and 'nothing about it implies the list that follows is exhaustive." *Advance Trust & Life Escrow Services v. Protective Life Ins. Co.*, 93 F.4th 1315, 1326 (11th Cir. 2024) (discussing life insurance policy) (quoting *Slam Dunk v. Conn. Gen. Life Ins. Co.*, 853 F. App'x 451, 455 (11th Cir. 2021)). "'[B]ased on' does not mean 'exclusively on' or 'solely on.'" *Id.* at 1333. This follows from dictionary definitions of the word "base." *Id.*

CMS does not violate the statute by incorporating other data sources into the Star Ratings, because it has abided by Congress's requirement that the "five-star rating system" be "based on the data collected under [42 U.S.C. §] 1395w-22(e)." 42 U.S.C. § 1395w-23(o)(4)(A). Those data sources are the HEDIS, HOS, and CAHPS systems. 69 Fed. Reg. at 46,866; 70 Fed. Reg. at 4635. Virtually all of the measures in the Part C Star Ratings use data collected under HEDIS, HOS, or CAHPS. *See* AR 185-239 (of the twenty-nine Part C measures (excluding the improvement measure, C30, which compares data from year to year) applicable to plans that are not Special

Needs Plans (Clover's plan is not), all but five (C28, C29, C31, C32, and C33) have as their "primary data source" HEDIS, HOS, or CAHPS). Clover thus cannot deny that the Part C Star Ratings rely principally on data collected under the HEDIS, HOS, and CAHPS systems. Its claim that the Star Ratings are not "based on" data collected under the system rests entirely on its misapprehension about the meaning of the statutory phrase "based on." Depending on whether the Part C improvement measure is included, 78% or 80% by measure weight of the Part C Star Ratings draw data from HEDIS, HOS, and CAHPS.[10]

Congress provided further evidence in the Medicare Advantage statute itself that "based on" does not mean "based solely on." In the portion of the statute describing how to calculate annual capitation rates, Congress instructed the Secretary to determine a "budget neutrality adjustment factor so that the aggregate of payments under this part [with some exceptions] shall equal the aggregate payments that would have been made under this part if payment *were based entirely on* area-specific capitation rates." 42 U.S.C. § 1395w-23(c)(5) (emphasis added); *see also* 42 U.S.C. § 1395w-23(c)(4)(C)(v) ("index values shall be computed *based only on* the beneficiary population who are 65 years of age or older and who are not determined to have end stage renal disease") (emphasis added). If "based on" meant "based entirely on" or "based only on," Congress would have not needed to include the adverbs elsewhere in the Part C statute. *See Marx v. Gen. Revenue Corp.*, 568 U.S.

[10] Clover's claim that 53% of the Star Ratings by measurement weight is drawn from outside the "Part C HEDIS, HOS, and CAHPS systems," Br. at 27 n.4, erroneously treats the Part D Star Ratings as an element of the Part C Star Ratings. *See infra* Section II.A.3. Section 1395w-22(e) does not apply to Part D. Clover also includes Special Needs Plan measures that do not apply to it.

371, 386 (2013) ("[T]he canon against surplusage is strongest when an interpretation would render superfluous another part of the same statutory scheme."). That Congress twice added words to clarify when it was instructing the agency to rely *exclusively* on the listed factors is further evidence that the phrase "based on" does not connote exclusivity.

Because both circuit precedent and statutory context foreclose Clover's assumption that "based on" must mean "based exclusively on," this Court should reject Clover's argument. As described above, the Part C Star Ratings overwhelmingly draw from the HEDIS, HOS, and CAHPS systems for their underlying data and are thus "based on the data collected under" 42 U.S.C. § 1395w-22(e).

**2. Congress explicitly authorized CMS's collection and use of other data in the Part C Star Ratings.**

Clover commits a further, independent error in ignoring another relevant provision of the statute, which authorizes CMS to collect and use other data for Star Ratings purposes. Clover focuses exclusively on 42 U.S.C. § 1395w-23(o)(4)(A) and its cross-referenced § 1395w-22(e), but those are not the only relevant provisions.

Clover nowhere acknowledges that § 1395w-22(e) includes its own cross-reference, which reads: "Nothing in [this] subsection shall be construed as restricting the ability of the Secretary to carry out the duties under [42 U.S.C. § 1395w-21(d)(4)(D)]." 42 U.S.C. § 1395w-22(e)(3)(B)(iii). Those "duties" are to "provide for activities under this subsection to broadly disseminate information to medicare beneficiaries (and prospective medicare beneficiaries)," 42 U.S.C. § 1395w-21(d)(1),

including "information comparing plan options," § 1395w-21(d)(4), on the basis of a number of "quality and performance indicators," § 1395w-21(d)(4)(D). It is no accident that "broadly disseminat[ing] to" current and prospective beneficiaries "information comparing plan options" on "quality and performance indicators" bears a strong resemblance to one of the "goals of the Star Ratings": helping "beneficiaries . . . make informed choices by being able to consider a plan's quality, cost, and coverage." 83 Fed. Reg. at 16519. Indeed, the agency originally developed Star Ratings under its authority to implement the statutory requirement that "information about plan quality and performance indicators be provided to beneficiaries to help them make informed plan choices." *Id.* at 16520.

When Congress enacted § 1395w-22(e) in 2003, CMS had not started publishing Star Ratings. Congress's enactment of the provision in 2003 thus imposed "limitations" on the "types of data" underlying Medicare Advantage plans' required quality improvement programs, but Congress could not have also intended to circumscribe the data reported in the Star Ratings in 2003 *because Star Ratings did not exist yet*. Congress nevertheless emphasized that its limitation on data collection connected to plans' quality improvement programs did not restrict the Secretary's authority to engage in other data collection and dissemination activities. Clover does not acknowledge this provision, which is further evidence that § 1395w-22(e) cannot mean what Clover says it does. It cannot be the case that the "best reading" of a statute, *Loper Bright*, 603 U.S. at 373, disregards an adjacent provision. But that is precisely what Clover asks this Court to do with 42 U.S.C. § 1395w-22(e)(3)(B)(iii).

The Secretary's reading, by contrast, harmonizes both that provision and § 1395w-22(e)(3)(B)(i) by acknowledging that Congress imposed certain limitations on data collection related to quality improvement programs but explicitly preserved the Secretary's authority to collect other data, including data on plan quality.

**3. Clover wrongly assumes that the Part C statute authorizes data collection for the Part D star ratings, but Part D has its own data collection provisions that Clover ignores.**

With respect to its assertion that CMS ran afoul 42 U.S.C. § 1395w-22(e) when including certain Part D data in the Star Ratings, *see* Br. at 27-29 (challenging measures D01, D05, D06, D08, D09, D10, D11, and D12), Clover commits an even more fundamental error: it ignores a Part D provision authorizing data gathering and dissemination. Clover offers no analysis of the Part D statute in arguing that CMS has violated 42 U.S.C. § 1395w-22(e) (which is in Part C), but Part D has its own provisions requiring the Secretary to "conduct activities that are designed to broadly disseminate information to Part D eligible individuals." 42 U.S.C. § 1395w-101(c)(1). These activities must "be similar to the activities performed by the Secretary under [42 U.S.C. § 1395w-21(d)," which governs provision of information to promote informed choice under Medicare Part C. 42 U.S.C. § 1395w-101(c)(2)(A). The "comparative information referred to in paragraph (2)(A) shall include a comparison of the following with respect to qualified prescription drug coverage: (i) Benefits . . . (ii) Monthly beneficiary premium . . . (iii) Quality and performance (iv) Beneficiary cost-sharing . . . [and] (v) Consumer satisfaction surveys." 42 U.S.C. § 1395w-101(c)(3)(A). The provision describing consumer satisfaction surveys refers

specifically to "consumer satisfaction surveys regarding the plan conducted pursuant to [42 U.S.C. § 1395w-104(d)]." 42 U.S.C. § 1395w-101(c)(3)(A)(v). That provision, in turn, requires the Secretary to "conduct consumer satisfaction surveys with respect to [prescription drug plan] sponsors and prescription drug plans in a manner similar to the manner such surveys are conducted for MA organizations and MA plans under Part C." 42 U.S.C. § 1395w-104(d).

Taken together, these provisions require CMS to collect and disseminate to beneficiaries specific comparative information about prescription drug plan quality. Its activities under Part D must be similar to those under Part C, but the "based on the data collected under [42 U.S.C. § 1395w-22(e)]" provision in Part C does not apply to Part D. Instead, 42 U.S.C. § 1395w-101(c)(3)(A) applies, and it requires "a comparison . . . with respect to qualified prescription drug coverage" of five listed elements. Two of those elements—"quality and performance" and "consumer satisfaction surveys"—require the Secretary to gather data, and there are no statutory limitations on data collection in Part D analogous to Part C's § 1395w-22(e).

CMS's Part D Star Ratings comply with the statute. Its use of a five-star ratings system for Part D plans is "similar to the activities" it performs under Part C, which uses the same five-star ratings system. 42 U.S.C. § 1395w-101(c)(2)(A). And the Part D Star Ratings reflect a "comparison . . . with respect to qualified prescription drug coverage" of both "quality and performance" and "consumer

satisfaction surveys."[11] 42 U.S.C. § 1395w-101(c)(2)(A)(iii), (v). For example, Measures D05 and D06 use the CAHPS survey, a "consumer satisfaction survey," as their "primary data source." AR 247-249; 42 U.S.C. § 1395w-101(c)(2)(A)(v).[12] The remaining Part D Star Ratings measures reflect plans' "[q]uality and performance" across domains including customer service, complaints, and drug safety and accuracy of price reporting. *See* AR 240-285.

In light of the Part D statutory provisions—which Clover does not even acknowledge—its position is borderline incoherent. Clover accuses CMS of "not even pretend[ing] that [data underlying Part D measures] are in *any way* derived from data collected under § 1395w-22(e)." Br. at 26. Fair enough—but why would CMS "pretend" that its activities rely on data collected under a provision of the Part C statute, when Congress explicitly authorized broader data collection in the Part D statute? Clover provides no answer. Its argument rests on the mistaken premise that 42 U.S.C. § 1395w-22(e) is the *only* provision on which CMS could conceivably rely to collect *any* data across Medicare Parts C and D, completely disregarding the statutory authorization found in Medicare Part D. Clover goes on to say that "Part D data is entirely unrelated to the quality of a *Part C* plan." Br. at 26 (emphasis added). But Clover does not dispute that its plan offers benefits under Part C *and* Part D. And

[11] CMS also ensures that beneficiaries have access to comparative information about benefits, premiums, and cost-sharing, although those factors are not reflected in the Star Ratings. 42 U.S.C. § 1395w-101(c)(2)(A)(i), (ii), & (iv). The Medicare Plan Finder tool at CMS.gov, which also displays each plan's star rating, allows beneficiaries to compare benefits, premiums, and cost-sharing.

[12] After CMS implemented the Medicare Part D statute beginning in 2006, CAHPS began surveying beneficiaries with Medicare Part D plans about their consumer satisfaction. Beneficiaries in a plan, like Clover's, that provide coverage under Parts C and D receive a CAHPS survey with questions about their Medicare Advantage plan and their Prescription Drug Plan.

Clover further does not challenge measures D02, D03, D04, and D07, meaning it does not actually object to the use of *all* data collected under the Part D statute—only the data on which it performed poorly. *See* Goldstein Dec., Exhibit A.

Clover's position—driven by its desire to preserve the metrics on which it scored well and eliminate the ones on which it scores poorly—lacks coherence. CMS has different statutory authorities to collect data under Part C and Part D. Its collection and dissemination of Part D data through the Part D Star Ratings is not authorized by § 1395w-22(e), which is a Part C provision; it is authorized by 42 U.S.C. § 1395-101(c), which is a Part D provision. But that fact does not render the Star Ratings suspect. Clover's claim to the contrary is based on its misunderstanding of § 1395-22(e) and a failure to grapple with all of the relevant provisions.

### B. CMS's measures use the "types of data" collected as of November 1, 2003.

Clover separately alleges that CMS has failed to use the "types of data collected by the Secretary as of November 1, 2003" for 15 Star Ratings measures. Br. at 31-36; *see also* Br. at 10. There are two overlapping problems with Clover's claim. First, its interpretation of the phrase "types of data" is too narrow. Second, Clover utterly fails to apply its preferred interpretation to the facts at hand.

#### 1. CMS's interpretation of the statute is the "best reading," and Clover's is not.

The plain text of 42 U.S.C. § 1395w-22(e)(3)(B)(i) makes clear that its reach is far narrower than Clover claims. Only when the Secretary is collecting data associated with Part C plans' quality improvement programs "on quality, outcomes, and beneficiary satisfaction to facilitate consumer choice and program

administration," does the limitation on "types of data" in § 1395w-22(e)(3)(B)(i) apply. The statute is framed as a prohibition: "The Secretary shall not collect *under subparagraph (A)* data on quality, outcomes, and beneficiary satisfaction to facilitate consumer choice and program administration other than the types of data that were collected by the Secretary as of November 1, 2003." 42 U.S.C. § 1395w-22(e)(3)(B)(i) (emphasis added).[13] By its plain terms, then, the statute applies *only* to data collected under § 1395w-22(e)(3)(A), which (as relevant here) says that "each MA organization shall provide for the collection, analysis, and reporting of data that permits the measurement of health outcomes and other indices of quality." Moreover, the data described in subparagraph (A) must relate to a plan's "quality improvement program," because subparagraph (A) is part of subsection (e), which requires each MAO to "have an ongoing quality improvement program for the purpose of improving the quality of care provided to enrollees in each MA plan offered" by the MAO. 42 U.S.C. § 1395w-22(e)(1). As already discussed, the Medicare statute (in both Part C and Part D) contains multiple other provisions authorizing or requiring the Secretary to collect data about Medicare Advantage and Medicare Part D; § 1395w-22(e) places no limitations on that data collection. *See supra*, Section II.A; *see also* 42 U.S.C. § 1395w-22(e)(3)(B)(iii).

In its first interpretation of the statute via notice-and-comment rulemaking, CMS articulated its interpretation. CMS stated "[w]e interpret [42 U.S.C. § 1395w-22(e)(3)(B)(i)] to mean that we can continue to require MA coordinated care plans to

---

[13] Clover uses ellipses to omit the mention of subparagraph A. *See* Br. at 32. This is further evidence that Clover's preferred reading disregards key statutory text.

collect, analyze and report their performance by using the measurement systems that are currently required," specifically identifying HEDIS, HOS, and CAHPS. 69 Fed. Reg. at 46866. CMS determined that it could "add, delete or modify measures within these systems," but noted that any changes are "generally reviewed and approved by a committee with representatives from managed care plans, beneficiary advocacy groups, [and] private and public health care purchasers." *Id.*

The "best reading of the statute," *Loper Bright*, 603 U.S. at 373, acknowledges that "statutory construction . . . is a holistic endeavor," *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988). Clover's interpretation singles out a portion of one provision and excludes its statutory context and cross references. Properly understood, the limitation in § 1395w-22(e)(3)(B) is clear: when the Secretary is collecting data associated with Part C plans' quality improvement programs "on quality, outcomes, and beneficiary satisfaction to facilitate consumer choice and program administration" under § 1395w-22(e)(3)(A), he may not collect data "other than the types of data" that the Secretary collected on November 1, 2003. But when the Secretary is collecting data for other purposes, particularly data for Star Ratings measures consistent with his obligation to "broadly disseminate information . . . in order to promote an active, informed selection," the "types of data" restriction does not apply. That restriction refers to data gathered as part of MAOs' required quality improvement programs. Some of that data informs the Star Ratings, but CMS has other authorities (in Parts C and D) authorizing data collection for the purposes of providing beneficiaries comparative information about

plan quality more generally.

Despite asserting that "it is not entirely controversial what these 'types of data' are," Br. at 31, Clover never provides a clear answer. Clover asserts that "types of data" cannot include information on "gun ownership in members' homes," Br. at 32, and it says that the clause "must refer to a narrower set of specific types of information than just quality, outcomes, and satisfaction," Br. at 33, but it does not describe what that narrowing principle is. Finally, Clover asserts that "types of data . . . must mean data in common with the specific survey questions then [i.e., on November 1, 2003] part of the HEDIS, HOS, and CAHPS systems." Br. at 33-34. Again, though, Clover does not say what it means by "data in common."

Whatever Clover thinks the statute means, it insists that CMS's interpretation cannot be right. But under *Loper Bright*, the best reading of a statute may be informed by "interpretations issued contemporaneously with the statute at issue, and which have remained consistent over time." 603 U.S. at 394. Indeed, these initial interpretations "may be especially useful in determining a statute's meaning." *Id.* And Clover in any event mischaracterizes CMS's interpretation made contemporaneously with the statute's adoption, asserting that "as long as data are collected through [HEDIS, HOS, and CAHPS], they can be included in the Star Ratings." Br. at 31 (citing 69 Fed. Reg. at 46886).

That is not what CMS said. CMS articulated its position that "types of data" referred to the existing systems: HEDIS, HOS, and CAHPS. 69 Fed. Reg. at 46866. It noted that it could "add, delete, or modify" measures within the systems, but also

described a constraint: changes to those systems are generally reviewed by stakeholders. CMS thus cannot "jam" "whatever data collections it wishes" into the existing measurement systems. *See* Br. at 34. CMS does not exert exclusive control over the systems; NCQA manages HEDIS and HOS and the Administration for Health Research and Quality administers CAHPS.

It is notable that no commenter claimed that CMS was asserting authority that Congress had taken away. Quite the opposite. Commenters "expressed concern that CMS could not add measures without issuing a Report to the Congress." 70 Fed. Reg. at 4635; *see also* 42 U.S.C. § 1395w-22(e)(3)(B)(ii). CMS explained that it did not need to issue such a report before "making changes within each of the existing measurement systems." 70 Fed. Reg. at 4635. CMS's initial interpretation of the phrase "types of data" is consistent with the statute's best reading. If Congress had meant to lock the survey questions in place forever, it would have said so. Moreover, there is no evidence that anyone—until Clover, here in this lawsuit—has asserted that CMS misinterpreted the phrase "types of data" to give itself too much authority. Consistent with *Loper Bright*, this Court should hold that CMS's longstanding interpretation of the phrase constitutes "the best reading" of the statute.

**2. Even if Clover is right about the meaning of "types of data," its challenges to specific measures fail.**

The above discussion of "the best reading" of the statute is ultimately academic, because Clover's argument suffers from much more serious flaws. Three of the measures that Clover says violate the "types of data" limitation do not involve HEDIS, HOS, or CAHPS data at all. For the remainder of the measures, Clover's

arguments do not satisfy the requirements of Local Rule 7.1(b).

**a. The Call Center and Reviewing Appeals Decisions (C32, C33, D01) measures and all the other Part D measures are not based on HEDIS, HOS, or CAHPS data and therefore cannot violate § 1395w-22(e).**

Clover asserts that CMS has violated § 1395w-22(e) with respect to the Call Center and Reviewing Appeals Decisions measures, as well as every other Part D measure it challenges. Br. at 34-36. The data underlying the Call Center and Reviewing Appeals Decisions measures are not collected from plans at all and are certainly not among the data collected as part of MAO's quality improvement programs. *See AvMed, Inc. v. Becerra*, No. CV 20-3385, 2021 WL 2209406, at *11 (D.D.C. June 1, 2021) ("measures related to telephone customer service, members' complaints, disenrollment rates, and appeals" are not collected directly from plans and are not governed by § 1395w-22(e)) (internal quotation marks omitted). These measures do not use the HEDIS, HOS, or CAHPS systems for underlying data. *See* AR 237-240. Similarly, § 1395w-22(e) does not apply to Part D measures. Clover has already objected—without merit—that the Star Ratings should not include call center measures, the C32 appeals measure, or certain Part D measures, but they cannot show that data collected outside of the § 1395w-22(e) process should somehow be subject to the limitations in that section. Clover's incorrect argument that § 1395w-22(e) applies to all data underlying the Star Ratings is addressed above in Section II.

**b. Clover's claims that specific measures were based on data collected in violation of § 1395w-22(e) are unsupported.**

With respect to the remaining measures it challenges, Clover in each case cites a footnote referring to three exhibits for the claim that "CMS did not collect this type

of data" as of November 1, 2003. Br. at 35. This is insufficient. Clover does not describe how CMS collects this data in 2026, how it collected the data in 2003, and how CMS's current collection activities allegedly violate the statute. It should not be incumbent on Defendants and the Court to comb through about 60 pages of surveys to rebut vague and novel allegations that CMS has violated a 23-year-old statutory requirement regarding "types of data." This alone is sufficient for this Court to reject Clover's claims. Under Local Rule 7.1(b), "[e]very factual assertion in a motion, response, or brief shall be supported by a citation to the pertinent page in the existing record or in any affidavit, discovery material, or other evidence filed with the motion." *See also Chavez v. Sec'y Fla. Dep't of Corr.*, 647 F.3d 1057, 1061 (11th Cir. 2011) ("[D]istrict court judges are not required to ferret out delectable facts buried in a massive record"); *Hamilton v. CareCore Nat'l, LLC*, No. 4:09-cv-116, 2011 WL 13199214, at *5 (S.D. Ga. Mar. 30, 2011) (Moore, J.) ("The Court's task is not to delve through a voluminous record to find support for a party's claims—that task is instead one for a litigant's counsel."). Clover's failure to identify with any specificity the bases for its challenges under the "types of data" provision is fatal to its claims. As shown below, for many of the measures that Clover challenges, the relevant 2003 survey included a *nearly identical* question as the current survey.[14] The record reveals that the remainder of Clover's allegations are unsupported.

[14] Defendants provide the 2003 CAHPS survey to the Court as an exhibit. *See* Goldstein Dec., Exhibit B. Clover's exhibit is the 1998 survey, which it claims "CMS has identified as remaining in use in 2003." Declaration of Clay Thornton, Doc. 34-1, ¶ 41. The surveys are similar, but the question numbers do not match precisely and does not identify where CMS asserted that the 1998 survey was used in 2003.

**Care Coordination (C27):** For the 2026 Star Ratings, this measure is based on six questions from the 2025 CAHPS survey. AR 227-28. These questions are related to seven questions from the 2003 survey. Goldstein Dec., Exhibit B (questions 8, 10, 33, 34, 36, 45, 46). The 2003 and 2026 surveys both solicit information about how familiar a physician was with important information about the patient, how difficult it was for the patient to obtain necessary care, and how helpful patients found their discussions with a personal physician. Clover does not claim Congress forbade changes to the wording of survey questions, and the questions underlying the Care Coordination measure are consistent with the types of data collected in 2003.

**Reducing the Risk of Falling (C15):** Much like the care coordination measure above, the Reducing the Risk of Falling measure reflects a wording change between 2003 and 2024 on the HOS survey, but the "types of data" underlying the measure have not changed. In 2003, HOS gathered data regarding patients' issues with walking and issues with legs and feet. These health concerns, unsurprisingly, are strongly correlated with fall risk. In 2006, HOS began asking specifically about fall risk, Goldstein Dec., Exhibit 3; that question now underlies the relevant Star Ratings measure. But the survey in 2003 included questions eliciting similar information. Once again, Clover does not allege that the "types of data" limitation requires the survey questions to be identical from 2003 onward, and its failure to explain *how* CMS has violated the statutory limitation (or to even identify the relevant questions) is insufficient to make out any claim.

**Rating of Health Care Quality (C25):** For the 2026 Star Ratings, this

measure is based on a single question from the CAHPS survey: "Using any number from 0 to 10, where 0 is the worst health care possible and 10 is the best health care possible, what number would you use to rate all your health care in the last 6 months?" Clover alleges that "CMS did not collect this type of data concerning members' subjective rating of their healthcare as part of plans' quality assurance programs prior to November 1, 2003." Br. at 35. This is just not true. Question 37 of the 2003 CAHPS survey is essentially identical. Goldstein Dec., Exhibit B at 8, q. 37 ("Using any number from 0 to 10 where 0 is the worst health care possible, and 10 is the best health care possible, what number would you use to rate all your health care in the last 6 months?").[15]

**Improving or Maintaining Mental Health (C05):** For the 2026 Star Ratings, this measure is based on the HOS survey—and specifically a comparison between 2022 answers and 2024 answers. AR 191. Clover wrongly alleges that the relevant question is whether CMS collected data "concerning members' view of changes in mental health." Br. at 35. But that is not how the measure works: CMS compares answers about current mental health across two survey years. The relevant question is whether CMS has historically gathered data about mental health, which it has. The 2003 HOS survey includes questions about mental health, as well as emotional health. Doc. 34-10 at 5-7.

**Getting Needed Care (C22):** For the 2026 Star Ratings, this measure is

[15] In 1998, the CAHPS survey that Clover provides, question 36 read: "Use any number from 0 to 10 where 0 is the worst health care possible, and 10 is the best health care possible. How would you rate all your health care?". Doc. 34-9 at 16.

based on two questions from the CAHPS survey: "In the last 6 months, how often did you get an appointment to see a specialist as soon as you needed?" and "In the last 6 months, how often was it easy to get the care, tests, or treatment that you needed." [tech notes 59]. These questions are similar to numerous questions from the 1998 and 2003 surveys. In 2003, CAHPS asked "In the last 6 months, how much of a problem, if any, was it to see a specialist that you needed to see?" Goldstein Dec., Exhibit B at 5, q. 14. "In the last six months, how much of a problem, if any, was it to get the care tests or treatment you or a doctor believed necessary?" *Id.* at 7, q. 27. CAHPS asked the same questions in 1998. Doc. 34-9 at 9 (q. 15), 12 (q. 27). The CAHPS survey has asked beneficiaries about obtaining care from specialists and needed care or treatment more generally since 2003. To the extent Clover argues that the historical questions are not soliciting the same "types of data"—which is unclear because Clover never explains its reasoning – that claim is not supported by the record.

* * *

Clover's allegation that CMS has violated the "types of data" limitation in 42 U.S.C. § 1395w-22(e)(3)(B)(i) does not withstand scrutiny. Its proposed reading of the statute—to the extent it offers one—is not "the best reading" as required under *Loper Bright*. Worse, even if Clover were correct about how to best interpret the statute, it has utterly failed to offer factual support for its position.

**III. CMS did not violate its regulatory notice and comment obligations (42 C.F.R. § 422.164) with respect to any measure.**

Clover asserts, with respect to three measures in the 2026 Star Ratings, that CMS failed to comply with regulatory notice-and-comments requirements when

promulgating those measures. Br. at 36-40. Clover is incorrect. With respect to the physical and mental health measures (C04 and C05), CMS followed the regulatory procedure. With respect to the Getting Appointments Quickly Measure (C23), CMS acted consistently with its regulation in deeming the update "non-substantive" and Clover, despite an opportunity to do so, made no objection to CMS's approach.

CMS regulations divide changes to the Star Ratings into two categories: "substantive" and "non-substantive." For substantive changes, CMS will "initially solicit feedback *on whether to make substantive measure updates* through the process described" in 42 U.S.C. § 1395w-23(b) (*i.e.*, the Advance Notice and Rate Announcement process). 42 U.S.C. § 422.164(d)(2) (emphasis added). It may then "propose and finalize these measures through rulemaking." *Id.* For non-substantive changes, which are described in a list preceded by the non-exhaustive word "includes," CMS will announce changes "through the process described . . . in [42 U.S.C. § 1395w-23(b)." 42 C.F.R. § 422.164(c).

### A. CMS used the advance notice process to solicit feedback on the mental and physical health measures before initiating formal rulemaking.

The HOS system includes Patient-Reported Outcomes measures, which underlie the Star Ratings measure specifications for "Improving or Maintaining Physical Health (C04)" and "Improving or Maintaining Mental Health (C05)." AR 190-91. On January 30, 2019, CMS issued its Advance Notice soliciting feedback on

these measures.[16] It stated that it was "considering using new and more targeted PRO measures to hold contracts accountable for the outcomes of care for their members." *Id.* at 140. And it explained that it currently "assesses two global [Patient-Reported Outcomes] measures—improving or maintaining physical health and improving or maintaining mental health." *Id.* CMS requested "suggestions for future measure development related to [Patient Reported Outcomes]." *Id.* Then, in the rate announcement issued on April 1, 2019, CMS summarized the comments it had received and announced that it was "planning to continue work on developing new PROs and to enhance the measures used from the Health Outcomes Survey."[17]

The next year, CMS acted on this plan via notice-and-comment. It proposed two modifications to the HOS Patient-Reported Outcomes measures: adjusting the case-mix and increasing the minimum required denominator. 85 Fed. Reg. 9002, 9045 (Feb. 18, 2020). Upon receiving comments, CMS finalized its proposed specification changes but announced that it would treat the modified measures as "new measures," meaning that they would be display measures only for two years and would return for the 2026 Star Ratings. 86 Fed. Reg. 5864, 5921 (Jan. 19, 2021).

This process is fully consistent with the regulation, which requires that CMS "initially solicit feedback *on whether to make substantive measure updates*" via the Advance Notice and Rate Announcement Process. *See* 42 U.S.C. § 422.164(d)(2)

---

[16] https://www.cms.gov/medicare/health-plans/medicareadvtgspecratestats/downloads/advance2020part2.pdf at 139-140 (Last accessed April 8, 2026).

[17] https://www.cms.gov/medicare/health-plans/medicareadvtgspecratestats/downloads/announcement2020.pdf, 160. (Last accessed April 8, 2026).

(emphasis added). It did so in 2019, asking commenters for suggestions on future measure development for Patient-Reported Outcome measures. In the next rulemaking cycle, it proposed a change to the Patient-Reported Outcomes measure, and in finalizing the rule decided to implement the change by treating the measure as modified as a "new measure."

Clover does not acknowledge the 2020 Advance Notice and Rate Announcement. But this document shows that CMS complied with its regulations by soliciting feedback on whether to modify the Patient-Reported Outcomes measures before proposing changes through rulemaking.

**B. The change to Getting Appointments and Care Quickly (C25) was non-substantive.**

Clover alleges that CMS made a substantive change to measure C23 without notice and comment rulemaking. Br. at 38-40. Because the change was not substantive, CMS was not required to undergo rulemaking, and it satisfied its regulatory obligations.

On February 1, 2023, CMS issued its 2024 Advance Notice.[18] It announced a proposal to modify Getting Appointments and Care Quickly measure to remove a question, and requested "stakeholder feedback on removing this question." *Id.* at 121. It further announced that the change would be non-substantive because it "would not change the population covered by this measure, the two existing questions [] would continue to be included in the measure, and the intent of the measure [] focuses on getting care as soon as needed." *Id.* CMS received "overwhelming support" for its

[18] https://www.cms.gov/files/document/2024-advance-notice-pdf.pdf (Last accessed April 8, 2026).

proposed change and finalized the modification.[19] Clover, which did not submit a comment letter, Goldstein Dec., ¶ 5, now objects.

The main problem with Clover's argument is that it reads the key word "including" out of the regulation. Clover insists that non-substantive changes "*are limited by regulation* to" five categories. Br. at 39. That is not what the regulation says. "Non-substantive measure updates *include* measures that" fall into five categories. The verb "include" introduces a non-exhaustive list. *See, e.g.*, *Glover v. Ocwen Loan Servicing, LLC*, 127 F.4th 1278, 1289 (11th Cir. 2025). CMS explained why it deemed the measure update non-substantive, and Clover does not address that explanation at all in its brief.

Clover is also incorrect that the removal of a question "necessarily impact[s] the numerator and denominator of the measure." Br. at 40. A plan's score on C23 is described as "the percent of the best possible score the plan earned on how quickly members get appointment and care," AR 222. The numerator is the plan's score on the measure. The denominator is the best possible score. That is true whether the measure reflects a plan's score on three questions or two.

Clover baldly asserts that a change that would slightly reduce a measure's reliability "is clearly a substantive change." Br. at 40. It offers no citation for this proposition, which is far from clear based on the regulation. If CMS proposed a policy change that systematically violated its own regulations, it is reasonable to expect that a MAO would have said something about that in response to the proposal. If *Clover*

---

[19] https://www.cms.gov/files/document/2024-announcement-pdf.pdf, at 178. (Last accessed April 8, 2026).

*itself* believed at the time that the change was illegal, it could have said something. Like many of its other challenges, Clover's challenge to measure C23 reflects a belated effort to eliminate metrics on which it performed poorly.

**IV. The Independent Review Entity's role does not amount to an unconstitutional delegation.**

If this Court agrees with Defendants that CMS did not violate the Medicare statute rulemaking provision, the provisions governing types of data, and its own procedural regulations, it does not need to go further. Clover challenges six additional measures on two grounds: it raises a constitutional challenge to Measure C32 and APA arbitrary-and-capricious challenges to Measures C33, D01, and D08-10. But eliminating these six measures from the calculation of Clover's 2026 Star Rating would not improve its score, and thus Clover has suffered no injury from the inclusion of the remaining six measures. *See* Goldstein Dec., ¶ 4. Clover's challenges are nonetheless meritless.

Clover argues that CMS has violated the private non-delegation doctrine by including a Star Ratings measure that compares the number of Clover's decisions submitted to a statutorily mandated "Independent Review Entity" (IRE) with the number of decisions upheld by that entity. But Clover asserts that CMS has failed to exercise any supervision over the IRE despite benefitting, during the plan preview period, from CMS's review of data underlying several IRE determinations.

An agency violates the private nondelegation doctrine when it "allows non-governmental entities to govern." *FCC v. Consumers' Research*, 606 U.S. 656, 697 (2025). But agencies are permitted to "rely on advice and assistance from private

actors" if those actors "function[] subordinately to the agency and [are] subject to its authority and surveillance." *Id.* at 692 (cleaned up).

The Medicare Advantage statute requires the Secretary to "contract with an independent, outside entity to review and resolve in a timely manner reconsiderations that affirm denial of coverage." *See* 42 U.S.C. § 1395w-22(g)(4); *see also* 42 C.F.R. §§ 422.592–596. The purpose of IRE review is to ensure that a MAO's decision to deny coverage to a beneficiary is automatically subject to independent, third-party review—thereby encouraging plans to refrain from excessive denials of coverage. And the inclusion in the Star Ratings of a metric showing how often the IRE reverses each plan benefits consumers: Medicare beneficiaries reasonably want to know how often a plan makes adverse coverage decisions that do not withstand independent scrutiny. To that end, a plan must submit every adverse coverage determination for automatic review by the IRE, which may either affirm or reverse the plan's coverage determination. 42 C.F.R. §§ 422.590-596. Clover wrongly asserts that "[t]he IRE is where the buck stops for the purposes of determinations' of plans Star Ratings." Br. at 51. This is wrong, as evidenced by the Administrative Record in this very case. During the plan preview period, plans may request CMS review of IRE decisions. Clover did so during the 2025 plan preview, AR 100-109, and CMS (after reviewing the issue) made changes to the underlying data to Clover's benefit, AR 126, resulting in Clover's Star Rating on the C31 measure (Plan Makes Timely Decisions About Appeals, AR 235-36) increasing from three to four stars. This amply demonstrates that, for the purposes of Star Ratings, CMS exercises "authority and

surveillance" over the IRE.

Clover's insistence otherwise ignores its own conduct during the plan preview period and CMS's exercise of "authority and surveillance" to Clover's benefit. Another district court held recently in addressing a non-delegation challenge to the inclusion of IRE dispositions in the Star Ratings that it did not need to address the private non-delegation doctrine after disposing of the specific matters challenged by the plaintiff. *Alignment Healthcare, Inc. v. U.S. Dep't of Health & Human Servs.*, No. 25-cv-74, 2025 WL 1635371, at *4 (D.D.C. June 9, 2025). In that case, the district court disagreed with CMS's treatment of the IRE matters during the plan preview period. *See id.* But it correctly avoided the constitutional issue because it could address the plaintiff's challenge by addressing the specific matters on which it sought judicial review. The same is true here: the only difference is that Clover has not asked this Court to reverse CMS's decision, after review, to affirm the IRE's disposition of certain matters. Under these facts, Clover cannot make out a private non-delegation claim. The record—the relevant sections of which Clover simply ignores—amply demonstrates that CMS reviewed the relevant IRE dispositions, modified some, and affirmed others. If Clover disagreed with CMS's affirmances, it could have sought further review. There has thus been no violation of the private non-delegation doctrine.

## V. CMS did not act arbitrarily and capriciously in including call center (C33 and D01) and medication adherence (D08, D09, and D10) measures in the Star Ratings.

Clover alleges that five total measures in two categories are "disconnected from

quality of care, outcomes, or satisfaction" and are thus "arbitrary and capricious and contrary to law." Br. at 40. Clover is incorrect.

Clover does not acknowledge the applicable standard of review, but in determining whether agency action is "arbitrary and capricious" under the APA, the court applies a "highly deferential" standard of review that "presumes the validity of agency action." *National Mining Ass'n v. United Steel Workers*, 985 F.3d 1309, 1321 (11th Cir. 2021). ""The scope of review is narrow and a court is not to substitute its judgment for that of the agency." *Id.* (cleaned up).

**A. The Call Center measures are not arbitrary and capricious.**

There can be little doubt that a call center's ability to field incoming calls and provide assistance is important to consumers. If, for example, a person dials a MAO's call center during business hours on a weekday and hears an automated message saying that the call center is closed, AR 64, he or she may understandably choose to switch to a different plan that provides a higher level of customer service. Moreover, the Medicare Advantage statute and regulations require that plans be able to provide information to beneficiaries via a toll-free number. 42 C.F.R. § 422.111(h)(1). Plans' comparative performance on this metric is relevant to their quality.

Clover's arbitrary-and-capricious claim can be resolved on the basis that it wrongfully asserts that "CMS has provided zero explanation for its adoption of such extremely sensitive measures." Br. at 50. The Call Center measures have been part of the Star Ratings continuously since 2016, and between 2016 and now CMS has responded to comments and explained its position on the Call Center measures. For example, CMS has explained that "access to health services is a critical issue in the

healthcare sector and to Medicare beneficiaries." 83 Fed. Reg. 16576. Lack of access can cause harms, both physical and financial, to Medicare beneficiaries. *Id.* "For these reasons, access measures, such as appeals measures and call center measures, are crucial in the Star Ratings system." *Id.* CMS has also explained that "[i]nternal analysis across all plans shows that the methodology is sound and CMS has confidence in the data." *Id.* at 16550.

Clover apparently believes that the APA requires that the government newly justify a policy each time a litigant asserts that it is unfair. But this is not the law: Arbitrary and capricious review "presumes the validity of agency action" and the Court's goal is to "ensure that [the agency] engaged in reasoned decisionmaking." *Nat'l Mining Ass'n*, 985 F.3d at 1321.

That standard is met here. The inclusion of call center metrics furthers the purposes of the Star Ratings; Clover cannot assert that a plan that provides inconsistent customer service over the phone is superior in quality to one that reliably fields incoming calls and provides timely information to beneficiaries. The inclusion of call center metrics thus furthers the purpose of providing information that is a "true reflection of the plan's quality and encompasses multiple dimensions of high quality care." 83 Fed. Reg. at 16520. Nor is it arbitrary and capricious to assess plans' call centers via test calls. Clover asserts that the test calls "simply capture the happenstance of the quality of communication and connectivity between CMS vendors, on the one hand, and plans, on another." Br. at 49. There is no record support for this assertion, and in fact Clover's own performance on the most recent call center

study indicates that is incorrect. When a call center answers with an automated message saying, in essence, "we are closed," as Clover's did for three days, that is not "happenstance"—it is an error by the plan that is captured and reflected in the data. AR 64. There will, of course, be edge cases: that is why CMS affords plans the chance to request modification of the data underlying their Star Ratings during the plan preview period, in quality bonus payment appeals, and (if necessary) in district court. *See, e.g., UnitedHealthcare Benefits of Tex., Inc.*, *v. CMS*, No. 6:24-cv-357, 2024 WL 4870771, at *10 (E.D. Tex. Nov. 22, 2024) (reversing CMS's disposition of a call); *Humana*, 806 F. Supp. 3d at 648 (upholding CMS's disposition of three calls). Clover has declined to pursue these avenues. Its position amounts to a claim that if *other parties* litigate the application of a standard to their circumstances, the standard itself must be arbitrary and capricious. *See* Br. at 49. This is not the law. The mere existence of litigation over the application of a standard does not render that standard arbitrary and capricious.

Finally, the sensitivity of the measure does not render it arbitrary and capricious. Br. at 49. CMS has explained that it does not want its test calls to cause a "burden" for plans, and a lower number of calls furthers that purpose. 83 Fed. Reg. at 16551. That a measure is "sensitive" does not mean that it is inaccurate, and Clover presents no evidence that its score on the Call Center measures fails to reflect its performance. If it believed otherwise, it could have sought further review.

Ultimately, Clover would prefer that the Call Center measures be eliminated

for the 2026 Star Ratings because doing so would improve its score.[20] This is a policy dispute with CMS, and courts applying the arbitrary and capricious standard do not take sides in policy disputes. *See PEACH*, 87 F.3d at 1246. Because the agency has explained why it tests plans' call center proficiency, and because Clover's arguments against the measure lack merit, the agency did not act arbitrarily and capriciously in including the call center measures in the Star Ratings.

### B. The Medication Adherence measures are not arbitrary and capricious.

Clover asserts that three Part D measures capturing medication adherence are arbitrary and capricious. Br. at 41-48. Clover is mistaken.

CMS assesses medication adherence with respect to three categories of drugs: those used to treat diabetes, hypertension (high blood pressure), and cholesterol. AR 252, 255, 257. The inclusion of these conditions, and not others, is not accidental: diabetes, hypertension, and cholesterol are chronic conditions treated by drugs that patients commonly begin taking and remain on for a long time. When a treating physician adjusts a patient's dose, or switches a patient from one drug to another drug in the same class (for example, from atorvastatin to rosuvastatin, which are both cholesterol-lowering drugs), a patient who continues to fill the new prescription will not be scored as non-adherent. *See* AR 371. Moreover, the measures apply only to patients with a treatment period of at least 91 days in a given measurement year who

[20] The agency did in fact propose to phase out the Call Center measures in the future, Br. at 50, and recently finalized that proposal, 91 Fed. Reg. 17384, 17504 (Apr. 6, 2026). That does not imply that they are arbitrary and capricious now. As CMS explained, average performance on these measures "was very high," implying that they have been successful at improving (most) plans' ability to provide necessary information to callers speaking in foreign languages or using assistive devices. 90 Fed. Reg. 54984, 54,966 (Nov. 28, 2025).

fill their prescriptions at least twice, omitting patients who demonstrate intolerance to medications and discontinue them shortly after starting them.

The Medication Adherence measures thus capture an important element of care quality. For the vast majority of patients who are prescribed (on a long-term basis) medication for high cholesterol, high blood pressure, or diabetes, *actually taking* those medications regularly is strongly correlated with improved health outcomes. Insurers, along with treating physicians, play an important role in medication adherence. It is far from arbitrary and capricious for CMS to determine that medication adherence with respect to drugs used to treat three chronic and potentially life-threatening conditions is a valid metric for measuring an insurance plan's quality. All things being equal, an insurer that drives better medication adherence among its beneficiaries is providing better care.

This is not to say that the medication adherence measures are perfect. Nor is perfection required. *See FCC v. Prometheus Radio Project*, 592 U.S. 414, 427 (2021) (lack of "perfect empirical or statistical data" is "not unusual in day-to-day agency decisionmaking within the Executive Branch"); *District 4 Lodge of the International Association of Machinists and Aerospace Workers Local Lodge v. Raimondo*, 40 F.4th 36, 41 (1st Cir. 2022) (on arbitrary and capricious review, court does "not require perfect accuracy"). CMS has consistently been forthright about certain limitations of the data underlying its medication adherence measures. In 2018, when CMS codified its approach to future changes to Star Ratings methodology, it took comments on existing measures. "A few commenters requested that CMS consider excluding

beneficiary prescriptions from these measures or create a reporting mechanism that allows plans to identify prescriptions for removal that are documented as 'discontinued' or prescriptions with therapy changes; the commenter stated that this would avoid the appearance that beneficiaries with discontinued medication are non-adherent." 83 Fed. Reg. at 16553. CMS responded, citing a 2012 memo stating that the proposal to reflect physician-ordered discontinuations in the medical adherence measures would be inconsistent with "privacy protections and data validation." *Id.*; *see also* AR 144-45. CMS also explained that "requiring physicians to attest to therapy changes or discontinuation of a prior prescription would be an added burden and counterproductive." *Id.* These explanations are consistent with those that CMS provided Clover in response to its 2025 inquiry. *See* AR 22. CMS added that "Clover Health is not uniquely impacted by the Medication Adherence measure specifications." AR 23. Because Star Ratings reflect plan performance relative to other plans, and there is no evidence that Clover's beneficiaries are more likely to discontinue medications for high cholesterol, diabetes, or high blood pressure under a physician's direction, there is no reason to believe that any imprecision in the measures particularly harms any single MAO.[21]

The agency's explanations more than satisfy the arbitrary and capricious standard. CMS has explained that, while it might be preferable to incorporate physician-ordered discontinuations into the medication adherence measures, it is

---

[21] Indeed, Clover expressed no reservations about these imperfections in 2024, when its Star Ratings performance was "driven by exceptional performance on . . . Medication Adherence." https://investors.cloverhealth.com/news-releases/news-release-details/clover-health-ppo-medicare-advantage-plans-earn-4-star-rating/ (Last accessed April 8, 2026).

impossible to do so consistent with other obligations regarding patient privacy and data integrity. The question for the agency, then, is whether to have medication adherence measures that reflect limitations on available data or whether to eliminate them altogether because the data are not perfect. The agency has explained its decision, and Clover's arbitrary and capricious claim should fail.

Clover's arguments to the contrary ignore the governing arbitrary-and-capricious standard. The point of the Medication Adherence measures is to compare plans' ability to drive patients' adherence to medications that are prescribed to treat common long-term, chronic health conditions, meaning that physician-ordered discontinuations might be expected for a lower proportion of total prescriptions than other medications. In other words, even if the data codes as non-adherent some patients that, in an ideal world, would *not* be so coded, it still provides useful insights. Clover says that CMS has "ignored an important aspect of the problem," Br. at 45, but it cites a Federal Register document and a portion of the Administrative Record where CMS acknowledges the problem and explains why it cannot resolve it consistent with its other obligations. Clover ignores CMS's reasonable explanation that patient privacy and data integrity concerns *prevent* the solution that Clover would prefer. CMS is not required to overcome all possible objections to its underlying data before including a measure in the Star Ratings. It is required to make a reasonable choice and explain it, and it has done so.

Clover's claim that the same patient might be coded non-adherent one year and adherent the next, Br. at 45-46, does not make sense. CMS acknowledges that if

a physician discontinues a prescription after more than ninety days such that a patient fills that prescription for less than 80% of the days in a measurement year, the patient will be deemed non-adherent in that year.[22] In the next year, the patient will (presumably) not have a prescription at all—because it was discontinued the previous year—and so will not appear in either the numerator or the denominator of the Medication Adherence measure. That hypothetical patient is "not non-adherent in those later years," Br. at 46, because there is no prescription to adhere to.

Similarly, CMS was not required to change its practices based on the data Clover provided. Br. at 45-46. There is no dispute that the patients cited by Clover were non-adherent as CMS defines that term; they filled prescriptions twice and had a treatment period of at least 91 days but did not fill them for 80% of the days in a measurement year. This, by longstanding definition, is non-adherence. AR 252, 255, 257-58. CMS did not ignore Clover's evidence; it explained that the measure specifications are established in advance of the measurement year and cannot, consistent with CMS regulations, be modified mid-year. AR 22 (citing 42 C.F.R. §§ 422.164(d) & 423.184(d)).

Finally, CMS has neither ignored nor impermissibly modified its guidance. AR 46-48. CMS has calculated the Medication Adherence measures the same way for years, including this year. It gathers data to determine how many patients are prescribed (for at least 91 days and two separate fills) a drug ("or another in its

---

[22] Clover also takes issue with the 80% threshold, calling it "arbitrary." Br. at 44. But the 80% threshold for medication adherence is supported by literature and clinical studies. *See, e.g.*, https://pmc.ncbi.nlm.nih.gov/articles/PMC6256123/pdf/fphar-09-01290.pdf (Last accessed April 8, 2026).

therapeutic category) during a measurement year. AR 252, 255, 257. That group is the denominator. The numerator consists of those who fill that prescription for at least 80% of the days covered by the measurement year. *Id.* CMS has *never* attempted to measure whether the prescription itself was discontinued during the measurement year, for the patient privacy and data integrity reasons described above. To the extent that the 2026 Technical Notes omit the phrase "as directed," the measure specifications have not changed.

Clover had no objection to CMS's Medication Adherence measures when it was performing well on them. *See supra* n.1. Its current challenge reflects little more than an effort to improve its score on the 2026 Star Ratings. But CMS has satisfied its APA obligations with respect to the Medication Adherence measures, and Clover's challenge—should this Court reach it—fails.

## CONCLUSION

For the foregoing reasons, this Court should grant Defendants' Motion for Summary Judgment and deny Clover's.

Respectfully submitted this 8th day of April, 2026,

MARGARET E. HEAP
UNITED STATES ATTORNEY

*/s/ O. Woelke Leithart*
Idaho Bar No. 9257
Assistant United States Attorney
U.S. Attorney's Office
Post Office Box 8970
Savannah, Georgia 31412
Telephone: (912) 652-4422
E-mail: Woelke.Leithart@usdoj.gov