APPEAL,CLOSED,DISCSTAY

# U.S. District Court
# Southern District of Georgia (Brunswick)
# CIVIL DOCKET FOR CASE #: <u>2:25−cv−00142−LGW−BWC</u>

Clover Insurance Company v. Department of Health and Human Services et al
Assigned to: Judge Lisa G. Wood
Referred to: Magistrate Judge Benjamin W. Cheesbro
 rel Case:  2:26−cv−00061−LGW−BWC
Cause: 05:702 Administrative Procedure Act

Date Filed: 11/07/2025
Date Terminated: 05/29/2026
Jury Demand: None
Nature of Suit: 899 Other Statutes: Administrative Procedures Act/Review or Appeal of Agency Decision
Jurisdiction: U.S. Government Defendant

## Plaintiff

**Clover Insurance Company**
*TERMINATED: 05/29/2026*

represented by **Andrew D. Prins**
Latham & Watkins LLP
555 11th Street NW
Suite 1000
Washington, DC 20004
202−637−2200
Fax: 202−637−2201
Email: andrew.prins@lw.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**James B. Durham**
Hall, Booth & Smith, PC
3528 Darien Hwy.
Suite 300
Brunswick, GA 31525
912−554−0093
Fax: 912−554−1973
Email: jdurham@hallboothsmith.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nicholas L. Schlossman**
Latham & Watkins LLP
300 Colorado Street
Suite 2400
Austin, TX 78701
737−910−7300
Fax: 737−910−7301
Email: nicholas.schlossman@lw.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rachael Lynn Westmoreland**

Latham & Watkins LLP
555 11th Street NW
Suite 1000
Washington, DC 20004
202−637−2200
Fax: 202−637−2201
Email: rachael.westmoreland@lw.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Department of Health and Human Services**
*TERMINATED: 05/29/2026*

represented by **Otto Woelke Leithart**
U.S. Attorney's Office − Savannah
P.O. Box 8970
22 Barnard Street, Suite 300
Savannah, GA 31401
912−652−4422
Email: woelke.leithart@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Centers for Medicare & Medicaid Services**
*TERMINATED: 05/29/2026*

represented by **Otto Woelke Leithart**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Robert F. Kennedy, Jr.**
*in his official capacity as Secretary of the United States Department of Health and Human Services*
*TERMINATED: 05/29/2026*

represented by **Otto Woelke Leithart**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Mehmet Oz**
*in his official capacity as Administrator, Centers for Medicare & Medicaid Services*
*TERMINATED: 05/29/2026*

represented by **Otto Woelke Leithart**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 11/07/2025 | 1 | COMPLAINT against All Defendants, filed by Clover Insurance Company. (Attachments: # 1 Civil Cover Sheet)(pts) (Entered: 11/10/2025) |

2

| | | |
|---|---|---|
| 11/10/2025 | | Filing fee: $ 405, receipt number AGASDC–4183858 (pts) (Entered: 11/10/2025) |
| 11/10/2025 | 2 | Summons Issued as to All Defendants, U.S. Attorney and U.S. Attorney General (pts) (Main Document 2 replaced on 11/10/2025) (pts). (Entered: 11/10/2025) |
| 11/10/2025 | 3 | Corporate Disclosure Statement by Clover Insurance Company identifying Clover Health Holdings, Inc.; Clover Health Investments, Corp. as Corporate Parent.. (pts) (Entered: 11/10/2025) |
| 11/10/2025 | 4 | RULE 26(f) ORDER. Signed by Magistrate Judge Benjamin W. Cheesbro on 11/10/2025. (pts) (Entered: 11/10/2025) |
| 11/10/2025 | 5 | MOTION for Leave to Appear Pro Hac Vice *Andrew D. Prins* Receipt Number AGASDC–4184691, Fee Amount $200, by Clover Insurance Company. Responses due by 11/24/2025. (Durham, James) (Entered: 11/10/2025) |
| 11/10/2025 | 6 | MOTION for Leave to Appear Pro Hac Vice *N. Schlossman* Receipt Number AGASDC–4184707, Fee Amount $200, by Clover Insurance Company. Responses due by 11/24/2025. (Durham, James) (Entered: 11/10/2025) |
| 11/10/2025 | 7 | MOTION for Leave to Appear Pro Hac Vice *R. Westmoreland* Receipt Number AGASDC–4184711, Fee Amount $200, by Clover Insurance Company. Responses due by 11/24/2025. (Durham, James) (Entered: 11/10/2025) |
| 11/10/2025 | 8 | Summons Submitted (Durham, James) (Entered: 11/10/2025) |
| 11/10/2025 | 9 | Summons Submitted (Durham, James) (Entered: 11/10/2025) |
| 11/10/2025 | | MOTIONS REFERRED: 5 MOTION for Leave to Appear Pro Hac Vice *Andrew D. Prins* Receipt Number AGASDC–4184691, Fee Amount $200, 7 MOTION for Leave to Appear Pro Hac Vice *R. Westmoreland* Receipt Number AGASDC–4184711, Fee Amount $200, 6 MOTION for Leave to Appear Pro Hac Vice *N. Schlossman* Receipt Number AGASDC–4184707, Fee Amount $200. (csr) (Entered: 11/10/2025) |
| 11/10/2025 | 10 | Summons Issued as to the U.S. Attorney and U.S. Attorney General. (csr) (Entered: 11/10/2025) |
| 11/12/2025 | 11 | Litigants' Bill of Rights by Clover Insurance Company. (Durham, James) (Entered: 11/12/2025) |
| 11/13/2025 | 12 | TEXT ORDER granting 5 Motion for Leave to Appear Pro Hac Vice by Andrew Prins. James Durham has entered an appearance in this case and vouches to satisfy the obligations of local counsel. Local R. 83.4. Signed by Magistrate Judge Benjamin W. Cheesbro on November 13, 2025. (edd) (Entered: 11/13/2025) |
| 11/13/2025 | 13 | TEXT ORDER granting 6 Motion for Leave to Appear Pro Hac Vice by Nicholas Schlossman. James Durham has entered an appearance in this case and vouches to satisfy the obligations of local counsel. Local R. 83.4. Signed by Magistrate Judge Benjamin W. Cheesbro on November 13, 2025. (edd) (Entered: 11/13/2025) |
| 11/13/2025 | 14 | TEXT ORDER granting 7 Motion for Leave to Appear Pro Hac Vice by Rachael Westmoreland. James Durham has entered an appearance in this case and vouches to satisfy the obligations of local counsel. Local R. 83.4. Signed by Magistrate Judge Benjamin W. Cheesbro on November 13, 2025. (edd) (Entered: 11/13/2025) |
| 11/18/2025 | 15 | AFFIDAVIT of Service for Summons & Complaint served on Margaret Heap on 11/13/2025, filed by Clover Insurance Company. (Durham, James) (Entered: |

| | | |
|---|---|---|
| | | 11/18/2025) |
| 11/18/2025 | 16 | AFFIDAVIT of Service for Summons & Complaint served on Department of Health and Human Services on 11/17/25, filed by Clover Insurance Company. (Durham, James) (Entered: 11/18/2025) |
| 11/18/2025 | 17 | AFFIDAVIT of Service for Summons & Complaint served on Mehmet Oz on 11/17/25, filed by Clover Insurance Company. (Durham, James) (Entered: 11/18/2025) |
| 11/18/2025 | 18 | AFFIDAVIT of Service for Summons & Complaint served on Robert F. Kennedy, Jr. on 11/17/25, filed by Clover Insurance Company. (Durham, James) (Entered: 11/18/2025) |
| 11/20/2025 | 19 | AFFIDAVIT of Service for Summons & Complaint served on Pamela Bondi on 11/19/25, filed by Clover Insurance Company. (Durham, James) (Entered: 11/20/2025) |
| 11/24/2025 | 20 | AFFIDAVIT of Service for Summons & Complaint served on Centers for Medicare & Medicaid Services on 11/21/25, filed by Clover Insurance Company. (Durham, James) (Entered: 11/24/2025) |
| 11/26/2025 | | Set/Reset Deadlines: Department of Health and Human Services, Mehmet Oz, Robert F. Kennedy, Jr. answers due 1/16/2026; Centers for Medicare & Medicaid Services answer due 1/20/2026. (jsh) (Entered: 11/26/2025) |
| 12/11/2025 | 21 | MOTION to Dismiss by Centers for Medicare & Medicaid Services, Department of Health and Human Services, Robert F. Kennedy, Jr, Mehmet Oz. Responses due by 12/26/2025. (Leithart, Otto) (Entered: 12/11/2025) |
| 12/17/2025 | 22 | RESPONSE in Opposition re 21 MOTION to Dismiss filed by Clover Insurance Company. (Attachments: # 1 Exhibit)(Durham, James) (Entered: 12/17/2025) |
| 12/17/2025 | 23 | MOTION to Expedite by Clover Insurance Company. Responses due by 12/31/2025. (Durham, James) (Entered: 12/17/2025) |
| 12/18/2025 | 24 | NOTICE of Intent *to Reply* by Centers for Medicare & Medicaid Services, Department of Health and Human Services, Robert F. Kennedy, Jr, Mehmet Oz re 21 MOTION to Dismiss , 22 Response in Opposition to Motion. (Leithart, Otto) (Entered: 12/18/2025) |
| 12/31/2025 | 25 | REPLY to Response to Motion re 21 MOTION to Dismiss filed by Centers for Medicare & Medicaid Services, Department of Health and Human Services, Robert F. Kennedy, Jr, Mehmet Oz. (Leithart, Otto) (Entered: 12/31/2025) |
| 01/14/2026 | 26 | MOTION to Stay by Centers for Medicare & Medicaid Services, Department of Health and Human Services, Robert F. Kennedy, Jr, Mehmet Oz. Responses due by 1/28/2026. (Attachments: # 1 Text of Proposed Order)(Leithart, Otto) (Entered: 01/14/2026) |
| 01/14/2026 | | MOTIONS REFERRED: 26 MOTION to Stay (thb) (Entered: 01/14/2026) |
| 01/16/2026 | 27 | RESPONSE in Opposition re 26 MOTION to Stay filed by Clover Insurance Company. (Durham, James) (Entered: 01/16/2026) |
| 01/16/2026 | 28 | NOTICE of Intent *to Reply* by Centers for Medicare & Medicaid Services, Department of Health and Human Services, Robert F. Kennedy, Jr, Mehmet Oz re 27 Response in Opposition to Motion, 26 MOTION to Stay . (Leithart, Otto) (Entered: 01/16/2026) |

| | | |
|---|---|---|
| 01/22/2026 | 29 | MOTION Exceed Page Limitation by Clover Insurance Company. Responses due by 2/5/2026. (Attachments: # 1 Text of Proposed Order)(Durham, James) (Entered: 01/22/2026) |
| 01/23/2026 | | MOTIONS REFERRED: 29 MOTION Exceed Page Limitation. (jsh) (Entered: 01/23/2026) |
| 01/28/2026 | 30 | TEXT ORDER granting 29 Plaintiff's Motion to Exceed Page Limits. Plaintiff shall have up to 60 pages for its motion for summary judgment. Defendants shall have up to 60 pages for any desired responses to the motion. Signed by Magistrate Judge Benjamin W. Cheesbro on January 28, 2026. (edd) (Entered: 01/28/2026) |
| 01/28/2026 | 31 | REPLY to Response to Motion re 26 MOTION to Stay filed by Centers for Medicare & Medicaid Services, Department of Health and Human Services, Robert F. Kennedy, Jr, Mehmet Oz. (Leithart, Otto) (Entered: 01/28/2026) |
| 01/28/2026 | 32 | NOTICE of Filing by Centers for Medicare & Medicaid Services, Department of Health and Human Services, Robert F. Kennedy, Jr, Mehmet Oz re 31 Reply to Response to Motion (Attachments: # 1 Exhibit Joint Mtn, 125cv693 (DDC), Doc 9)(Leithart, Otto) (Entered: 01/28/2026) |
| 02/02/2026 | 33 | NOTICE of Filing by Clover Insurance Company *Administrative Record* (Attachments: # 1 Exhibit AR Part I, # 2 Exhibit AR Part II)(Durham, James) (Entered: 02/02/2026) |
| 02/02/2026 | 34 | MOTION for Summary Judgment by Clover Insurance Company. Responses due by 2/23/2026. (Attachments: # 1 Exhibit 1, # 2 Exhibit Ex. A to Dec., # 3 Exhibit Ex. B to Dec., # 4 Exhibit Ex. C to Dec., # 5 Exhibit Ex. D to Dec., # 6 Exhibit Ex. E to Dec., # 7 Exhibit Ex. F to Dec., # 8 Exhibit Ex. G to Dec., # 9 Exhibit Ex. H to Dec., # 10 Exhibit Ex. I to Dec., # 11 Exhibit Ex. J to Dec., # 12 Exhibit Ex. K to Dec., # 13 Exhibit Ex. L to Dec., # 14 Exhibit Ex. M to Dec., # 15 Exhibit Ex. N to Dec., # 16 Exhibit Ex. O to Dec., # 17 Exhibit Ex. P to Dec., # 18 Exhibit Ex. Q to Dec., # 19 Exhibit Ex. R to Dec., # 20 Exhibit Ex. S to Dec.)(Durham, James) (Entered: 02/02/2026) |
| 02/02/2026 | 35 | Statement of Material Facts re 34 MOTION for Summary Judgment by Clover Insurance Company. (Durham, James) (Entered: 02/02/2026) |
| 02/02/2026 | 36 | NOTICE issued re: 34 MOTION for Summary Judgment by Clover Insurance Company. Responses due by 2/23/2026. (Attachments: # 1 Exhibit 1, # 2 Exhibit Ex. A to Dec., # 3 Exhibit Ex. B to Dec., # 4 Exhibit Ex. C to Dec., # 5 Exhibit Ex. D to Dec., # 6 Exhibit Ex. E to Dec., # 7 Exhibit Ex. F to Dec., # 8 Exhibit Ex. G to Dec., # 9 Exhibit Ex. H to Dec., # 10 Exhibit Ex. I to Dec., # 11 Exhibit Ex. J to Dec., # 12 Exhibit Ex. K to Dec., # 13 Exhibit Ex. L to Dec., # 14 Exhibit Ex. M to Dec., # 15 Exhibit Ex. N to Dec., # 16 Exhibit Ex. O to Dec., # 17 Exhibit Ex. P to Dec., # 18 Exhibit Ex. Q to Dec., # 19 Exhibit Ex. R to Dec., # 20 Exhibit Ex. S to Dec.)(Durham, James) (cmr) (Entered: 02/02/2026) |
| 02/19/2026 | 37 | MOTION to Stay re 36 Notice of Motion Issued,, 34 MOTION for Summary Judgment by Centers for Medicare & Medicaid Services, Department of Health and Human Services, Robert F. Kennedy, Jr, Mehmet Oz. Responses due by 3/5/2026. (Attachments: # 1 Text of Proposed Order)(Leithart, Otto) (Entered: 02/19/2026) |
| 02/20/2026 | 38 | RESPONSE in Opposition re 37 MOTION to Stay re 36 Notice of Motion Issued,, 34 MOTION for Summary Judgment filed by Clover Insurance Company. (Durham, |

| | | James) (Entered: 02/20/2026) |
|---|---|---|
| 02/26/2026 | 39 | ORDER granting 26 Motion to Stay and stay and stays discovery and discovery–related deadlines. Parties are directed to confer within 14 days of a ruling on Defendants' 21 Motion to Dismiss and then submit their Rule 26(f) report 7 days after their conference, and this stay will be automatically lifted upon the issuance of a Court order ruling on Defendants' Motion to Dismiss. Signed by Magistrate Judge Benjamin W. Cheesbro on 02/26/2026. (jlh) (Entered: 02/26/2026) |
| 03/18/2026 | 40 | ORDER denying 21 Motion to Dismiss; denying as moot 23 Motion to Expedite. The parties are ORDERED, within seven days of the date of this Order, to show cause as to why this case should not be transferred to the United States District Court for the District of Columbia under 28 U.S.C. § 1404(a). Signed by Judge Lisa G. Wood on 3/18/2026. (jsh) (Entered: 03/18/2026) |
| 03/18/2026 | | Set/Reset Deadlines: Show Cause Response due by 3/25/2026. (jsh) (Entered: 03/18/2026) |
| 03/24/2026 | 41 | RESPONSE to 40 Order on Motion to Dismiss,, Order on Motion to Expedite, filed by Centers for Medicare & Medicaid Services, Department of Health and Human Services, Robert F. Kennedy, Jr, Mehmet Oz. (Leithart, Otto) (Entered: 03/24/2026) |
| 03/25/2026 | 42 | RESPONSE to 40 Order on Motion to Dismiss,, Order on Motion to Expedite, filed by Clover Insurance Company. (Attachments: # 1 Affidavit Declaration of Sherry Smith, # 2 Affidavit Declaration of Deven Killough, # 3 Affidavit Declaration of Parker Newell, # 4 Affidavit Declaration of Caitlin Arnold, # 5 Affidavit Declaration of Paula Kreissler, # 6 Affidavit Declaration of Clay Thornton, # 7 Exhibit 1)(Durham, James) (Entered: 03/25/2026) |
| 04/01/2026 | 43 | MOTION *FOR RELIEF FROM 26(F) CONFERENCE AND REPORT* by Centers for Medicare & Medicaid Services, Department of Health and Human Services, Robert F. Kennedy, Jr, Mehmet Oz. Responses due by 4/15/2026. (Leithart, Otto) (Entered: 04/01/2026) |
| 04/01/2026 | 44 | NOTICE by Centers for Medicare & Medicaid Services, Department of Health and Human Services, Robert F. Kennedy, Jr, Mehmet Oz re 43 MOTION *FOR RELIEF FROM 26(F) CONFERENCE AND REPORT of filing of Proposed Order* (Leithart, Otto) (Entered: 04/01/2026) |
| 04/01/2026 | | MOTIONS REFERRED: 43 MOTION *FOR RELIEF FROM 26(F) CONFERENCE AND REPORT. (csr) (Entered: 04/01/2026)* |
| 04/01/2026 | 45 | MOTION for Briefing Schedule by Centers for Medicare & Medicaid Services, Department of Health and Human Services, Robert F. Kennedy, Jr, Mehmet Oz. Responses due by 4/15/2026. (Attachments: # 1 Text of Proposed Order)(Leithart, Otto) (Entered: 04/01/2026) |
| 04/01/2026 | | MOTIONS REFERRED: 45 MOTION for Briefing Schedule. (csr) (Entered: 04/01/2026) |
| 04/02/2026 | 46 | RESPONSE to Motion re 45 MOTION for Briefing Schedule filed by Clover Insurance Company. (Durham, James) (Entered: 04/02/2026) |
| 04/02/2026 | 47 | NOTICE by Clover Insurance Company re 46 Response to Motion *PROPOSED ORDER* (Durham, James) (Entered: 04/02/2026) |

| | | |
|---|---|---|
| 04/03/2026 | 48 | ORDER granting Defendants' 43 Motion Motion for Relief from 26(f) Conference and Report and staying discovery and all other Rule 26 obligations; granting in part and denying in part 45 Motion for Briefing Schedule. Defendants shall respond to Plaintiff's motion for summary judgment and file their cross−motion for summary judgment on or before April 8, 2026. Signed by Magistrate Judge Benjamin W. Cheesbro on 04/03/2026. (jlh) (Entered: 04/03/2026) |
| 04/03/2026 | | Set/Reset Deadlines: Compliance re cross−motion for summary judgment due by 4/8/2026. (jlh) (Entered: 04/03/2026) |
| 04/08/2026 | 49 | NOTICE of Filing by Centers for Medicare & Medicaid Services, Department of Health and Human Services, Robert F. Kennedy, Jr, Mehmet Oz *Certified Administrative Record* (Leithart, Otto) (Entered: 04/08/2026) |
| 04/08/2026 | 50 | RESPONSE in Opposition re 34 MOTION for Summary Judgment *and Cross Motion for Summary Judgment* filed by Centers for Medicare & Medicaid Services, Department of Health and Human Services, Robert F. Kennedy, Jr, Mehmet Oz. (Attachments: # 1 Exhibit Goldstein Declaration)(Leithart, Otto) (Entered: 04/08/2026) |
| 04/09/2026 | 51 | MOTION for Summary Judgment by Centers for Medicare & Medicaid Services, Department of Health and Human Services, Robert F. Kennedy, Jr, Mehmet Oz. Responses due by 4/30/2026. (Attachments: # 1 Exhibit Goldstein Declaration)(Leithart, Otto) (Entered: 04/09/2026) |
| 04/10/2026 | 52 | NOTICE issued re: 51 MOTION for Summary Judgment by Centers for Medicare & Medicaid Services, Department of Health and Human Services, Robert F. Kennedy, Jr, Mehmet Oz. Responses due by 4/30/2026. (thb) (Entered: 04/10/2026) |
| 04/24/2026 | 53 | MOTION for Leave to File Excess Pages by Clover Insurance Company. Responses due by 5/8/2026. (Attachments: # 1 Text of Proposed Order)(Durham, James) (Entered: 04/24/2026) |
| 04/27/2026 | | MOTIONS REFERRED: 53 MOTION for Leave to File Excess Pages. (jsh) (Entered: 04/27/2026) |
| 04/27/2026 | 54 | RESPONSE to Motion re 53 MOTION for Leave to File Excess Pages filed by Centers for Medicare & Medicaid Services, Department of Health and Human Services, Robert F. Kennedy, Jr, Mehmet Oz. (Leithart, Otto) (Entered: 04/27/2026) |
| 04/28/2026 | 55 | TEXT ORDER granting 53 Plaintiff's Motion to Exceed Page Limits. Plaintiff shall have 45 pages for its combined response to Defendants' cross−motion for summary judgment and reply in support of Plaintiff's motion for summary judgment. Defendants shall have an additional five days for response. Signed by Magistrate Judge Benjamin W. Cheesbro on April 28, 2026. (edd) (Entered: 04/28/2026) |
| 04/28/2026 | 56 | MOTION for Leave of Absence as to Centers for Medicare & Medicaid Services, Department of Health and Human Services, Robert F. Kennedy, Jr, Mehmet Oz for dates of : 05/06/26−05/07/26, 05/11/26, 05/27/26−06/05/26, 07/02/26−07/06/26 by Centers for Medicare & Medicaid Services, Department of Health and Human Services, Robert F. Kennedy, Jr, Mehmet Oz. Responses due by 5/12/2026. (Attachments: # 1 Text of Proposed Order)(Leithart, Otto) (Entered: 04/28/2026) |
| 04/28/2026 | | MOTIONS REFERRED: 56 MOTION for Leave of Absence as to Centers for Medicare & Medicaid Services, Department of Health and Human Services, Robert F. Kennedy, Jr, Mehmet Oz for dates of : 05/06/26−05/07/26, 05/11/26, |

| | | |
|---|---|---|
| | | 05/27/26–06/05/26, 07/02/26–07/06/26. (jsh) (Entered: 04/28/2026) |
| 04/29/2026 | 57 | RESPONSE in Opposition re 51 MOTION for Summary Judgment , 34 MOTION for Summary Judgment *& Reply in Support of Plaintiff's Motion for Summary Judgment* filed by Clover Insurance Company. (Attachments: # 1 Exhibit, # 2 Exhibit)(Durham, James) (Entered: 04/29/2026) |
| 05/04/2026 | 58 | TEXT ORDER granting 56 Motion for Leave of Absence by Woelke Leithart for the dates of: May 6 and 7, 2026; May 11, 2026; May 27, 2026 through and including June 5, 2026; and July 2, 2026 through and including July 6, 2026. Signed by Magistrate Judge Benjamin W. Cheesbro on May 4, 2026. (edd) (Entered: 05/04/2026) |
| 05/06/2026 | 59 | ORDER re 40 Order to Show Cause. The Court holds that transfer is not warranted, and this case should remain in the Southern District of Georgia. Signed by Judge Lisa G. Wood on 5/6/2026. (pts) (Entered: 05/06/2026) |
| 05/13/2026 | 60 | RESPONSE to 57 Response in Opposition to Motion, filed by Clover Insurance Company filed by Centers for Medicare & Medicaid Services, Department of Health and Human Services, Robert F. Kennedy, Jr, Mehmet Oz. (Attachments: # 1 Exhibit Supplemental Goldstein Declaration)(Leithart, Otto) (Entered: 05/13/2026) |
| 05/27/2026 | 61 | ORDER granting in part and denying in part Plaintiff's 34 Motion for Summary Judgment; denying Defendants' Cross 51 Motion for Summary Judgment; setting aside CMS's 2026 Star Rating for Clover; and ordering Defendants to recalculate that rating in a manner consistent with this Order. Signed by Judge Lisa G. Wood on 05/27/2026. (jlh) (Entered: 05/27/2026) |
| 05/28/2026 | 62 | MOTION for Reconsideration re 61 Order on Motion for Summary Judgment,,, by Centers for Medicare & Medicaid Services, Department of Health and Human Services, Robert F. Kennedy, Jr, Mehmet Oz. Responses due by 6/11/2026. (Leithart, Otto) (Entered: 05/28/2026) |
| 05/29/2026 | 63 | RESPONSE in Opposition re 62 MOTION for Reconsideration re 61 Order on Motion for Summary Judgment,,, filed by Clover Insurance Company. (Durham, James) (Entered: 05/29/2026) |
| 05/29/2026 | 64 | ORDER granting in part and denying in part 62 Motion for Reconsideration re 61 Order on Motion for Summary Judgment. Signed by Judge Lisa G. Wood on 5/29/2026. (gmc) (Entered: 05/29/2026) |
| 05/29/2026 | 65 | JUDGMENT pursuant to 61 , 64 Orders. Signed by Judge Lisa G. Wood on 5/29/2026. (gmc) (Entered: 05/29/2026) |
| 07/09/2026 | 66 | NOTICE of Hearing by telephone ***The Status Conference only applies to participants in case 2:26cv061 not 2:25–cv–00142***<br><br>Status Conference by telephone regarding mediation set for 7/10/2026 01:30 PM before Magistrate Judge Brian K. Epps. Please dial 855–244–8681, enter access Code 2318 763 6923 to access the teleconference.(cjc) Modified on 7/9/2026 (cjc). (Entered: 07/09/2026) |
| 07/21/2026 | 67 | NOTICE OF APPEAL as to 64 Order on Motion for Reconsideration, 61 Order on Motion for Summary Judgment,,, 40 Order on Motion to Dismiss,, Order on Motion to Expedite, 65 Judgment by Centers for Medicare & Medicaid Services, Department of Health and Human Services, Robert F. Kennedy, Jr, Mehmet Oz. (Leithart, Otto) (Entered: 07/21/2026) |

| 07/22/2026 | | Set/Reset Deadlines: Compliance due by 8/5/2026 re Transcript Information Form. (thb) (Entered: 07/22/2026) |
| --- | --- | --- |

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
### BRUNSWICK DIVISION

| | | |
|---|---|---|
| CLOVER INSURANCE COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:25-cv-142 |
| | ) | |
| U.S. DEPARTMENT OF HEALTH AND | ) | |
| HUMAN SERVICES, ET AL., | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' NOTICE OF APPEAL

Defendants appeal this Court's May 29, 2026, judgment—including its order granting in part and denying in part defendants' motion for reconsideration, its order granting in part plaintiff's motion for summary judgment, and its order denying defendants' motion to dismiss—to the United States Court of Appeals for the Eleventh Circuit. *See* ECF Nos. 40, 61, 64, 65.

MARGARET E. HEAP
UNITED STATES ATTORNEY

*/s/ O. Woelke Leithart*
Idaho Bar No. 9257
Assistant United States Attorney
U.S. Attorney's Office
Post Office Box 8970
Savannah, Georgia 31412
Telephone: (912) 652-4422
E-mail: Woelke.Leithart@usdoj.gov

1

# In the United States District Court
# for the Southern District of Georgia
# Brunswick Division

CLOVER INSURANCE COMPANY,

    Plaintiff,

    v.

U.S. DEPARTMENT OF HEALTH AND
HUMAN SERVICES, et al.,

    Defendants.

2:25-CV-142

## ORDER

Before the Court is Defendants' motion for reconsideration. Dkt. No. 62. Plaintiff has responded in opposition. Dkt. No. 63 For the reasons set forth below, the motion is **GRANTED in part** and **DENIED in part.**

## BACKGROUND

The underlying facts of this lawsuit were set forth in the Court's March 18, 2026 Order, dkt. no. 40, the Court's May 6, 2026 Order, dkt. no. 59, and the Court's May 27, 2026 Order, dkt. no. 61. For this reason, the Court need not restate the facts and underlying law in full here. At a high level, this case involves the Medicare Advantage Program, a sub-program of the federal Medicare program. Dkt. No. 1 ¶¶ 1, 4; MSP Recovery Claims, Series LLC v. QBE Holdings, Inc., 965 F.3d 1210, 1214 (11th Cir. 2020) (citing MSPA Claims 1, LLC v. Kingsway Amigo Ins. Co., 950 F.3d

764, 767 (11th Cir. 2020)). The Medicare Advantage Program allows Medicare-eligible individuals to elect to receive their benefits through private insurers called Medicare Advantage Organizations ("MAOs"), rather than having the Centers of Medicare & Medicaid Services (Defendant "CMS") pay medical providers directly for medical care. MSP Recovery Claims, Series LLC v. Metro. Gen. Ins. Co., 40 F.4th 1295, 1298 (11th Cir. 2022) (citing 42 U.S.C. §§ 1395c to 1395i-6, 1395j to 1395w-6). Each year, CMS gives each "Medicare Advantage Plan" offered by MAOs a one-to-five "Star Rating" intended to communicate the quality of that plan. Elevance Health, Inc. v. Becerra, 736 F. Supp. 3d 1, 4 (D.D.C. 2024). In the present action, Clover—an MAO—challenges its 2026 Star Rating, arguing that various "measures" used by CMS in this Star Rating calculation amount to violations of the Administrative Procedure Act ("APA") and the private non-delegation doctrine. See generally Dkt. No. 1.

Clover initiated this action on November 7, 2025, seeking declaratory and injunctive relief. Id. ¶¶ 232-73. Clover names as Defendants the Department of Health and Human Services ("HHS"); Robert F. Kennedy, Jr., in his official capacity as Secretary of HHS; CMS; and Mehmet Oz, in his official capacity as Administrator of CMS. See generally id. On December 11, 2025, Defendants jointly moved to dismiss this case or, in the alternative, transfer this case for improper venue pursuant to 42 U.S.C. § 1406. Dkt. No. 21;

2

12

see also 28 U.S.C. § 1406 (providing for transfer of case filed in the wrong division or district). Clover also moved to expedite ruling on that motion. Dkt. No. 23 at 2. On March 18, 2026, the Court held that venue was proper in the Southern District of Georgia, denying Defendants' motion to dismiss or transfer pursuant to Section 1406 and ordering the parties to present their views on the propriety of *sua sponte* transfer under 42 U.S.C. § 1404(a). Dkt. No. 40 at 35-40. After Plaintiff and Defendants submitted additional briefing in response to this Court's show-cause Order, dkt. nos. 41, 42, the Court held that transfer is not warranted under 28 U.S.C. § 1404(a), and the case remained in the Southern District of Georgia, dkt. no. 59.

The subject of the present motion for reconsideration is this Court's May 27, 2026 Order on the parties' cross-motions for summary judgment, dkt. no. 61. By way of background, Clover moved for summary judgment on February 2, 2026. Dkt. No. 34. In its prior briefing on the venue dispute, Clover noted that Defendants failed to file a timely response to Clover's motion for summary judgment. Dkt. No. 42 at 7. Defendants subsequently moved for an updated briefing schedule on April 1, 2026. Dkt. No. 45.

On April 3, 2026, the Court granted in part and denied in part Defendants' motion for an updated briefing schedule, stating that Defendants shall respond to Plaintiff's motion for summary judgment and file their cross-motion for summary judgment on or

3

before April 8, 2026. Dkt. No. 48. Defendants timely responded, and, in the same document filed a cross-motion for summary judgment. Dkt. Nos. 50, 51.[1]

Pursuant to the Court's updated briefing schedule provided by the April 3, 2026 Order, Clover was required to respond to Defendants' cross-motion for summary judgment and reply in support of its motion for summary judgment on or before April 29, 2026. Id. at 2-3. Relevant to the present motion, if Defendants elected to file a reply in support of their cross-motion for summary judgment, they were required to do so by May 8, 2026. Id. at 3.

However, on April 24, 2026, Clover moved for leave to exceed the page limits contemplated by this Court's Local Rules with respect to its combined response to Defendants' cross motion for summary judgment and reply in support of Clover's motion for summary judgment. Dkt. No. 54. Buried in Defendants' response to

---

[1] As noted in the Court's May 27, 2026 Order, dkt. no. 61 at 15 n.6, Defendants responded to Clover's motion for summary judgment and, in the same document, moved for summary judgment. Dkt. Nos. 50, 51. This document appears twice on the docket, once docketed as Defendants' Response brief and once docketed as Defendants' cross-motion for summary judgment. Dkt. No. 50 (docketed as Defendants' response brief, filed April 8, 2026); Dkt. No. 51 (docketed as Defendants' cross motion for summary judgment, filed April 9, 2026); see also Dkt. No. 51 at 1 n.1 (Defendants' explanation for the repeated filing). These separate filings, though, are substantively identical. Dkt. Nos. 50, 51. As a result, though Defendants' cross motion is a separate docket entry filed one day after the April 8, 2026 deadline, there exists no timeliness concern regarding Defendants' cross-motion for summary judgment.

Clover's motion to exceed applicable page limits, rather than by motion, Defendants requested that they be given five additional days to reply in support of their cross-motion for summary judgment. Dkt. No. 54 at 1. In a text Order issued on April 28, 2026, the Magistrate Judge indicated that "Defendants shall have an additional five days for response" past the May 8, 2026 deadline previously set. Dkt. No. 55. Defendants filed a reply brief in support of their cross-motion for summary judgment on May 13, 2026, dkt. no. 60.

On May 27, 2026, the Court ruled on the parties' cross motions for summary judgment, declining to consider Defendants' May 13, 2026 reply brief as untimely. Dkt. No. 61 at 1 n.1. In doing so, the Court granted in part and denied in part Plaintiff's motion for summary judgment, dkt. no. 34, and denied Defendants' motion for summary judgment, dkt. no. 51. Dkt. No. 61 at 71. Defendants now move for reconsideration, asking the Court to reconsider its ruling on the cross-motions for summary judgment and stating that Defendants' reply brief was timely filed pursuant to the five-day extension previously issued by the Court, dkt. no. 62, and Plaintiff replied in opposition, dkt. no. 63.

## LEGAL AUTHORITY

"The Federal Rules of Civil Procedure do not specifically authorize motions for reconsideration." <u>Moon v. Cincinnati Ins. Co.</u>, 975 F. Supp. 2d 1326, 1328 (N.D. Ga. 2013), <u>aff'd</u>, 592 F.

App'x 757 (11th Cir. 2014). "Nevertheless, such motions are common in practice." Id. Courts often employ the standard for a motion to alter or amend judgment under Federal Rule of Civil Procedure 59(e) when asked to reconsider a summary judgment order as Defendants request here. See Mays v. U.S. Postal Serv., 122 F.3d 43, 46 (11th Cir. 1997) (Where "the relief sought was the setting aside of the grant of summary judgment [or] denial of the defendant's motion for summary judgment," the motion may be "properly characterized as a Rule 59(e) motion to alter or amend the judgment."); see also Dkt. No. 75 at 2 (relying on the Rule 59(e) standard to bring this motion).

"Although Rule 59(e) does not set forth the grounds for relief, district courts in this Circuit have identified three that merit reconsideration of an order: (1) an intervening change in controlling law; (2) the availability of new evidence; and (3) the need to correct clear error or prevent manifest injustice." Gold Cross EMS, Inc. v. Children's Hosp. of Ala., 108 F. Supp. 3d 1376, 1379 (S.D. Ga. 2015) (citations omitted). "A movant must 'set forth facts or law of a strongly convincing nature to induce the court to reverse its prior decision.'" Id. (quoting Cover v. Wal-Mart Stores, Inc., 148 F.R.D. 294, 294 (M.D. Fla. 1993)). "An error is not 'clear and obvious' if the legal issues are 'at least arguable.'" Id. at 1380 (first quoting United States v. Battle, 272 F. Supp. 2d 1354, 1358 (N.D. Ga. 2003); then quoting Am. Home

6

Assurance Co. v. Glenn Estess & Assocs., Inc., 763 F.2d 1237, 1239 (11th Cir. 1985)).

"Reconsideration is vested in the district court's sound discretion, and the grant of a motion to reconsider is an 'extraordinary remedy to be employed sparingly.'" Diamond Crystal Brands, Inc. v. Wallace, 563 F. Supp. 2d 1349, 1352 (N.D. Ga. 2008) (quoting Richards v. United States, 67 F. Supp. 2d 1321, 1322 (M.D. Ala. 1999)) (citing Fla. Ass'n of Rehab. Facilities, Inc. v. State of Fla. Dep't of Health & Rehab. Servs., 225 F.3d 1208, 1216 (11th Cir. 2000); Brogdon v. Nat'l Healthcare Corp., 103 F. Supp. 2d 1322, 1338 (N.D. Ga. 2000)). "A motion for reconsideration cannot be used to 'relitigate old matters, raise argument or present evidence that could have been raised prior to the entry of judgment.'" Wilchombe v. TeeVee Toons, Inc., 555 F.3d 949, 957 (11th Cir. 2009) (quoting Michael Linet, Inc. v. Vill. of Wellington, 408 F.3d 757, 763 (11th Cir. 2005)). "This prohibition includes new arguments that were previously available, but not pressed." Id. (internal quotation marks omitted) (quoting Stone v. Wall, 135 F.3d 1438, 1442 (11th Cir. 1998)).

## DISCUSSION

Defendants challenge the Court's decision not to consider their reply brief, invoking the need to correct clear error or prevent manifest injustice as the reason for reconsideration. Dkt. No. 62. The Court holds that Defendants' reply brief was timely

filed. Dkt. Nos. 55, 62. However, upon review of this reply brief, and fully considering its contents, dkt. no. 62, in conjunction with the remainder of the record which has already been considered, dkt. nos. 33, 34, 50, 51, 57, the Court further holds that it did not err in granting in part and denying in part Plaintiff's motion for summary judgment and denying Defendants' motion for summary judgment. In other words, the same result is proper—even after considering the reply.

To this end, Clover indicates that "Defendants' reply brief is almost entirely duplicative of the Defendants' 60-page opposition to summary judgment and cross-motion for summary judgment that the Court considered, and comprehensively addressed, in its decision on summary judgment." Dkt. No. 63 at 1. This is correct. Defendants make the following arguments in their reply brief: (I) The Medicare rulemaking provision (42 U.S.C. § 1395hh(a)(2)) does not apply to Star Ratings because Star Ratings do not "govern" payment for services, scope of benefits, or eligibility; (II) CMS did not violate congressional directives in its selection of Star Ratings measure specifications; (III) CMS did not violate its regulatory notice and comment obligations; and (IV) the Court need not consider any remaining claims by Clover because such claims are meritless. Dkt. No. 60.

First, with respect to the statutory rulemaking provision, Defendant argues about the meaning of the term "govern" and whether

8

18

Star Ratings fall within that definition. Id. at 2-11. These same arguments were presented in Defendants' joint motion reply and cross motion for summary judgment. Dkt. No. 50 at 17-23. The Court gave due consideration to these interpretive arguments, addressing the meaning of the word "govern" as used in 42 U.S.C. § 1395hh(a)(2) in a full-length statutory interpretation analysis. Dkt. No. 61 at 60-71. Through this, the Court reached the "best reading" of this provision, and the arguments presented in Defendants' reply brief—arguments duplicative of the arguments in its prior briefing which were, in fact, considered—do not change this conclusion. Id.; Dkt. Nos. 50, 51, 61; see also Loper Bright Enters. v. Raimondo, 603 U.S. 369, 412 (2024) (requiring that courts determine the "best reading" of a statute).

Next, Defendants' second point can be split into three substantive arguments: argument discussing (A) the meaning of "based on" in 42 U.S.C. § 1395w-23(o)(4)(A); (B) how a surrounding provision, 42 U.S.C. § 1395w-21(d)(4), should weigh on the scope of the Secretary's data-collection power; and (C) CMS did not violate the "types of data" restriction" in 42. U.S.C. § 1395w-22(e)(3)(B)(i). Dkt. No. 60 at 11-19. Defendants' interpretation of "based on" in Section 1395w-23(o)(4)(A) was addressed in their opening brief, dkt. no. 51 at 27-35, and the Court meaningfully engaged with these interpretive arguments in ruling on the cross-motions for summary judgment, dkt. no. 61 at 19-39. Defendants

9

also previously discussed the impact of surrounding provision Section 1395w-21(d)(4). Dkt. No. 51 at 30-32. The Court already considered these arguments, did not find them persuasive, and ultimately reached its own interpretation of the Secretary's data collection power. Dkt. No. 61 at 40-56; see also Batmasian, 319 F.R.D. at 406 (citing Motorists Mut. Ins. Co., 2009 WL 5065223, at *1 (holding that court's failure to consider reply brief in support of summary judgment motion before ruling did not require court to grant motion for reconsideration where court did not rely on the legal arguments addressed by reply in reaching decision)). Finally, with respect to the "types of data restriction," the Court, again, properly considered the interpretation of "types of data," including Defendants' proposed interpretation, in reaching its conclusion. Compare Dkt. No. 60 at 17-19, with Dkt. No. 51 at 35-44. See also Dkt. No. 61 at 40-60. In fact, the Court, without considering Defendants' reply brief, reached a favorable result for Defendants with respect to the "types of data" challenge. Dkt. No. 61 at 40-60.

Third, with respect to the regulatory notice-and-comment obligations discussed in the reply brief, the Court did not reach this argument. Dkt. No. 61 at 71 n.20. This is because, based on the remainder of the Court's ruling on the cross-motions for summary judgment, none of which should be disturbed by the instant motion for reconsideration, the Court need not rule on the

10

regulatory notice-and-comment issue. <u>See</u> <u>id.</u> The District Court for the Southern District of Florida reached a similar issue in <u>Batmasian</u>, ultimately noting that the court's "prior Order, . . . did not rely upon, or make any determination related to" one of the arguments in plaintiffs' reply brief. 319 F.R.D. at 406. The court's decision not to rely upon that argument in plaintiffs' reply brief did not provide sufficient reason for reconsideration in <u>Batmasian</u>, <u>id.</u>, and the same can be said with respect to the regulatory notice-and-comment arguments in this case.

Finally, the section of Defendants' reply brief which discusses Clover's "remaining claims" does not warrant reconsideration either. Dkt. No. 60 at 22-25. This section discusses how omitting certain measures would impact the Star Rating calculation. <u>Id.</u> at 22. In formulating the relief described in its May 27, 2026 Order, the Court directed CMS to redetermine Clover's 2026 Star Rating in accordance with its Order but did not dispositively rule on what Clover's new 2026 Star Rating would be. Dkt. No. 61 at 71-72 n.21 (citing <u>Elevance Health</u>, 736 F. Supp. 3d at 25-26 (holding that, in formulating relief in Star Ratings litigation, "courts should, where possible, leave it to administrative agencies to determine in the first instance how best to implement a judicial decision that alters the relevant legal framework.")). This renders immaterial Defendants' contentions about the impact that omitting certain measures would

11

have on the Star Rating calculation because the Court did not rely on such arguments in reaching its result. Motorists Mut. Ins. Co., 2009 WL 5065223, at *1 (similar).

The other "remaining claims" discussed by Defendants in their reply brief focus on the merits of Plaintiff's private non-delegation and "arbitrary and capricious" challenges. Dkt. No. 60 at 23-26. Like the regulatory notice-and-comment arguments, the challenged Order does not rely upon or ultimately rule on the merits of the private non-delegation challenge or the arbitrary and capricious challenge. Dkt. No. 61 at 39 n.13. In fact, the Court explicitly stated that it "expresse[d] no opinion on the merits of those arguments." Id. Accordingly, because the Court's decision did not rest in any way on either of these arguments, the Court's decision not to consider Defendants' reply brief does not amount to a commit a "manifest error of law." See id.; see also Batmasian, 319 F.R.D. at 406.

In sum, upon consideration of the reply brief filed by Defendants in support of their cross-motion for summary judgment, the Court finds that there exists no "clear error" or "manifest injustice" plaguing the ultimate decision reached in its May 27, 2026 Order. See Gold Cross EMS, 108 F. Supp. 3d at 1379.

## CONCLUSION

For these reasons, Defendants' motion for reconsideration, dkt. no. 62, is **GRANTED in part** and **DENIED in part.** The Court

12

**GRANTS** the motion to the extent it requests the Court to consider the reply brief. The Court **DENIES** the motion to the extent it requests the Court to alter any of the conclusions contained in the May 27, 2026 Order, aside from the decision not to consider the reply.

   **SO ORDERED** this 29th day of May, 2026.

_____
HON. LISA GODBEY WOOD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

13

AO 450 (GAS Rev 09/20) Judgment in a Civil Case

# United States District Court
## *Southern District of Georgia*

CLOVER INSURANCE COMPANY,

    Plaintiff,

            **v.**

U.S. DEPARTMENT OF HEALTH AND HUMAN
SERVICES, et al.,

    Defendants.

**JUDGMENT IN A CIVIL CASE**

CASE NUMBER: 2:25cv142

☐ **Jury Verdict.** This action came before the Court for a trial by jury. The issues have been tried and the jury has rendered its verdict.

☑ **Decision by Court.** This action came before the Court. The issues have been considered and a decision has been rendered.

### IT IS ORDERED AND ADJUDGED

that in accordance with the order of this Court dated May 27, 2026, the Court grants in part and denies in part Plaintiff's motion for summary judgment and denies Defendants' cross motion for summary judgment. Judgment is entered in this case and this civil action stands closed.

Approved by: _____

HON. LISA GODBEY WOOD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

May 29, 2026
*Date*

John E. Triplett, Clerk of Court
*Clerk*

_____
*(By) Deputy Clerk*

GAS Rev 10/2020

# In the United States District Court
# for the Southern District of Georgia
# Brunswick Division

CLOVER INSURANCE COMPANY,

    Plaintiff,

    v.

U.S. DEPARTMENT OF HEALTH AND
HUMAN SERVICES, et al.,

    Defendants.

2:25-CV-142

## ORDER

Before the Court are a motion for expedited summary judgment filed by Plaintiff Clover Insurance Company, dkt. no. 34, and a cross-motion for summary judgment filed by Defendants Centers for Medicare and Medicaid Services, Department of Health and Human Services, Robert F. Kennedy, Jr., and Mehmet Oz, dkt. no. 51. Upon due consideration of the motions, the briefs,[1] the administrative

---

[1] Defendants filed a reply brief in support of their cross-motion for summary judgment on May 13, 2026, dkt. no. 60, past the May 8, 2026 deadline to do so under the Court's April 3, 2026 Order, dkt. no. 48. This is not the first time Defendants have failed to comply with briefing deadlines in this matter. Dkt. No. 48 at 3-4. In fact, the very Order which set the updated briefing schedule acknowledged but excused a prior failure by Defendants to file a timely response to Plaintiff's motion for summary judgment. Id. In light of these repeated failures to comply with the Court's deadlines, Defendants' failure to abide by a direct order of this Court, and the expedited timeframe at play in this matter which the Court has recognized on multiple occasions, dkt. no. 40 at 39, dkt. no. 59 at 15, the Court declines to consider Defendants' reply brief in support of their cross-motion for summary judgment, dkt. no. 60, when resolving the pending motions. Brandenburg v. Bd. of

25

record, and governing law, the Court **GRANTS in part and DENIES in part** Plaintiff's motion, dkt. no. 34, and **DENIES** Defendants' motion, dkt. no. 51.

### BACKGROUND[2]

In the fall of each year, the Centers for Medicare and Medicaid Services ("CMS") assign a "Star Rating" for health insurance plans, wherein these plans are rated on a one-to-five-star scale intended to reflect the plan's quality. See Blue Cross & Blue Shield of Mass., Inc. v. Kennedy, 808 F. Supp. 3d 139, 140–41 (D.D.C. 2025). When Plaintiff Clover Insurance Company

---

Regents of Univ. Sys. of Ga., No. CV 106-152, 2011 WL 4055214, at *2 (S.D. Ga. Sept. 12, 2011) (declining to allow plaintiff to file late brief in direct conflict with the Court's prior order), aff'd, 518 F. App'x 628 (11th Cir. 2013); see also Eq. Lifestyle Props., Inc. v. Fla. Mowing & Landscape Serv., Inc., 556 F.3d 1232, 1240 (11th Cir. 2009) ("A district court has inherent authority to manage its own docket 'so as to achieve the orderly and expeditious disposition of cases.'" (citation omitted)).

[2] The present action centers on whether a federal agency acted in accordance with applicable constitutional principles, statutes, and regulations. Dkt. No. 1. As explained infra, the district court's role at the motion for summary judgment stage is not to parse out potential factual disputes, but to resolve questions of law in a manner mirroring an appellate court. See Ctr. for Biological Diversity v. McAleenan, 404 F. Supp. 3d 218, 233 (D.D.C. 2019); Georgia v. Wheeler, 418 F. Supp. 3d 1336, 1348 (S.D. Ga. 2019). The focal point of such an analysis is the administrative record, "not some new record made initially in the reviewing court." Wheeler, 418 F. Supp. 3d at 1348 (citation omitted). This being so, the Court's factual recitation functions only to provide background on the instant matter and should not be interpreted as findings of fact. To the extent the Court relies upon Plaintiff's summary judgment exhibits, the Court, again, does so only to provide background, not to circumvent the administrative record.

2

("Clover"), an insurance plan provider, received a 2026 Star Rating that was lower than it expected, Clover initiated the instant lawsuit. See generally Dkt. No. 1; see also Dkt. No. 34-1 ¶¶ 6–8.

On multiple occasions, the Court has summarized the statutory and regulatory scheme underlying the present matter. See Dkt. Nos. 40, 59. With this being said, a proper understanding of this complex statutory and regulatory background is especially important to proper adjudication at the present procedural juncture. As such, the Court will, again, establish this background before delving into the facts of the case.

## I.   Statutory and Regulatory Background

### A.   The Medicare Advantage Program

Title XVIII of the Social Security Act, 42 U.S.C. § 1395 et seq. (the "Medicare Act"), establishes the federal Medicare program. See Humana Inc. v. U.S. Dep't of Health & Human Servs., 806 F. Supp. 3d 642, 644 (N.D. Tex. 2025). This program was enacted to provide healthcare assistance to elderly individuals, as well as individuals laboring under certain disabilities and individuals suffering from certain health conditions. See generally 42 U.S.C. § 1395 et seq.; see also Elevance Health, Inc. v. Becerra, 736 F. Supp. 3d 1, 4 (D.D.C. 2024); MSP Recovery Claims, Series LLC v. QBE Holdings, Inc., 965 F.3d 1210, 1214 (11th Cir. 2020) (citing MSPA Claims 1, LLC v. Kingsway Amigo Ins. Co., 950 F.3d 764, 767 (11th Cir. 2020)); Humana, 806 F. Supp. 3d at 644. The Secretary

3

(here, Defendant Robert F. Kennedy, Jr., dkt. no. 1) administers this program through CMS. Humana, 806 F. Supp. 3d at 644. CMS is a branch of the United States Department of Health and Human Services ("HHS"). Elevance Health, Inc. v. Kennedy, 795 F. Supp. 3d 861, 864 (N.D. Tex. 2025).

Medicare can be split into four parts: Parts A, B, C, and D. Id.; 42 U.S.C. § 1395 et seq.; see also Parts of Medicare, Medicare.gov, https://www.medicare.gov/basics/get-started-with-medicare/medicare-basics/parts-of-medicare (last accessed May 19, 2026). Parts A and B establish "traditional Medicare," under which beneficiaries are entitled to have Defendant CMS pay medical providers directly for covered medical care. See MSP Recovery Claims, Series LLC v. Metro. Gen. Ins. Co., 40 F.4th 1295, 1298 (11th Cir. 2022) (citing 42 U.S.C. §§ 1395c to 1395i-6, 1395j to 1395w-6). Part C, however, establishes the "Medicare Advantage Program." 42 U.S.C. §§ 1395w-21–1395w-29. The Medicare Advantage Program provides a "private option" to Medicare beneficiaries, where individuals may "elect to have a private insurer of the individual's choice provide Medicare benefits." Metro. Gen. Ins. Co., 40 F.4th at 1298 (citing 42 U.S.C. §§ 1395w-21 to 1395w-28); Elevance Health, 736 F. Supp. 3d at 4; Scan Health Plan v. Dep't of Health & Human Servs., No. 1:23-CV-03910 (CJN), 2024 WL 2815789, at *1 (D.D.C. June 3, 2024). Then, through Part D plans—which are also operated by private insurers—individuals who enroll in either

4

28

traditional *or* Part C plans may also choose to supplement their benefits by enrolling in prescription drug plans ("PDPs"), which provide "subsidized prescription drug insurance coverage." 42 U.S.C. §§ 1395w-101 et seq.; id. § 1395w-101(a)(1). This case concerns Parts C and D. See generally Dkt. No. 1.

When beneficiaries choose the "private option" and enroll in Medicare Advantage Plans, the entities which provide these Part C plans are known as "Medicare Advantage Organizations" ("MAOs"). Metro. Gen. Ins. Co., 40 F.4th at 1298 (citing 42 U.S.C. §§ 1395w-21 to 1395w-28). Clover is an MAO. No. 34-1 ¶¶ 6-8. To provide Part C coverage in a given geographic area, MAOs like Clover must contract with CMS and "agree to offer coverage for a price lower than CMS's 'benchmark' rate," defined as the maximum amount CMS is willing to pay to cover an average beneficiary in each county. Blue Cross & Blue Shield of Mass., 808 F. Supp. 3d at 141 (citing 42 U.S.C. § 1395w-23(n); 42 C.F.R. § 422.254); AvMed, Inc. v. Becerra, No. CV 20-3385, 2021 WL 2209406, at *1 (D.D.C. June 1, 2021).

These contracts between CMS and MAOs results from an annual "bidding process" for MAOs. 42 U.S.C. § 1395w-23(n). In short, during this bidding process, (1) CMS calculates its benchmark for a particular geographic area; (2) MAOs submit "bids" to CMS indicating the payment amount it would accept to cover a beneficiary in that area; (3) if the MAO's "bid" is lower than

5

CMS's benchmark rate, CMS returns a portion of that difference to the MAO in the form of a "rebate." AvMed, 2021 WL 2209406, at *1 (citing 42 U.S.C. §§ 1395w-23(b)(1)(B), 1395w-23(a)(1)(B), 1395w-23(a)(1)(E)). The payment an MAO receives from CMS also depends on its annual "Star Rating." 42 U.S.C. §§ 1395w-23(o)(4), 1395w-24(b)(1)(C)(v); see also Blue Cross & Blue Shield of Mass., 808 F. Supp. 3d at 141.

### B. Star Ratings

CMS's Star Ratings system, in essence, functions like a grading system for Medicare Advantage and Part D plans. Elevance Health, 736 F. Supp. 3d at 4 (citing 42 U.S.C. § 1395w-23(o)); Blue Cross & Blue Shield of Mass., 808 F. Supp. 3d at 141 (citing Policy and Technical Changes to Medicare Programs, 83 Fed. Reg. 16,440, 16,520 (Apr. 16, 2018) (codified in scattered sections of 42 C.F.R.)); Scan Health Plan, 2024 WL 2815789, at *1. Pursuant to this system, plans receive an annual rating on a one-to-five-star scale: a one-star rating is the lowest-quality rating, and a five-star rating reflects the highest quality. See Elevance Health, 736 F. Supp. 3d at 4 (citing 42 U.S.C. § 1395w-23(o)); see generally 42 C.F.R. § 422.166. These ratings are measured in half-star increments, meaning an MAO contract may be assigned a rating of one star, 1.5 stars, and so on. 42 C.F.R. § 422.166(c)(3). At its core, "[t]he MA and Part D Star Ratings system is designed to provide information to the beneficiary that is a true reflection

6

of the plan's quality and encompasses multiple dimensions of high quality care." 83 Fed. Reg. at 16,520.

CMS releases these Star Ratings in the fall of each year. Prior to this annual release, however, CMS has "plan preview" periods during which MAOs can preview certain Star Ratings data and preliminary calculations. 42 C.F.R. § 422.166(h)(2). When calculating 2026 Star Ratings,[3] CMS indicated that there were two such periods, with some data pages becoming available during the first plan preview and others becoming available only during the second preview period. See, e.g., 2026 Part C & D Star Ratings Technical Notes at 31, 87, 195–210 (updated Sept. 25, 2025), cms.gov/files/document/2026-star-ratings-technical-notes.pdf [hereinafter 2026 Technical Notes]; Dkt. No. 33-2 at 2 (2026 Technical Notes as included in this case's administrative record).

The process used to assign Star Ratings to each MAO contract is, in a word, complicated.[4] See Kennedy, 795 F. Supp. 3d at 864 (same); see also 42 C.F.R. § 422.166 ("Calculation of Star Ratings"). Each year, CMS scores Part C or D plans using a variety

---

[3] Star Ratings for a given plan year are calculated and released in the calendar year prior to the plan period, meaning 2026 Star Ratings were calculated and released in 2025.

[4] The Court's summary of the Star Rating calculation process is just that: a summary. This explanation is included to provide necessary background information for the parties' dispute, but the Court notes that there exist additional nuances and complexities in the Star Ratings calculation which have been omitted from this summary.

of "meaningful measures." See 2026 Technical Notes at 14; Dkt. No. 33-2 at 10. More specifically, CMS assigns each MAO contract ratings for a variety of quality and performance "measures"—thirty-three "Part C" measures for Medicare Advantage plans and twelve "Part D" measures for PDPs. See 2026 Technical Notes at 38—105 (listing and describing each measure in the 2026 Star Ratings calculations); Dkt. No. 33-2 at 36-118 (same). The measures considered and their respective weights may change from year to year. Dkt. No. 33-2 at 10 (describing changes between 2025 and 2026 Star Rating calculations).

As an example of these measures, one measure considered in 2026 Star Rating calculations, D06, is labeled "getting needed prescription drug needs" and is intended to "assess the ease with which a beneficiary gets the medicines their doctor prescribed." 2026 Technical Notes at 91. Measure C01 on "Breast Cancer screening" measures the percentage of women within a certain age range who had a mammogram within a specified time period. Id. at 38. While measures quantify various characteristics of a contract, CMS contends that the 2026 measure framework primarily "focuses on measures related to person-centered care, equity, safety, affordability and efficiency, chronic conditions, wellness and prevention, seamless care coordination, and behavioral health." Id. at 10.

These measures are calculated based on a variety of data sources, and CMS employs various calculation methods depending on the source of the data being analyzed. According to CMS, the four categories of data sources used to calculate measure-level ratings include: data collected by health and drug plans, surveys of plan enrollees, data collected by CMS contractors, and administrative data collected by CMS. See 2026 Technical Notes at 14; Dkt. No. 33-2 at 14. CMS gathers this data in multiple ways, but all data collection falls into two primary categories: (1) data from distinct "measurement systems," and (2) data collected pursuant to some other source of authority. AvMed, 2021 WL 2209406, at *13. The three main measurement systems referenced in the present action include the Healthcare Effectiveness Data and Information Set ("HEDIS"), a data set of performance measures; (2) the Medicare Health Outcomes Survey ("HOS"), a quality-improvement-focused outcome measure utilizing patient-reported data; and (3) the Consumer Assessment of Healthcare Providers and Systems ("CAHPS"), a family of consumer and patient surveys focused on the interpersonal aspects of healthcare. Dkt. No. 33-2 at 204–07; 2026 Technical Notes at 191–92; see also AvMed, 2021 WL 2209406, at *6.[5]

---

[5] Clover refers to HEDIS, CAHPS, and HOS data as "data collected . . . as a component of plans' quality improvement programs." Dkt. No. 34 at 5.

9

Using this data, CMS assigns each measure a numerical value, which CMS then converts into a measure-specific rating. Blue Cross & Blue Shield of Fla., Inc. v. Dep't of Health & Human Servs., 786 F. Supp. 3d 1, 5 (D.D.C. 2025) (citing Elevance Health, 736 F. Supp. 3d at 7). These measure-level ratings each carry a certain amount of weight when factored into the overall Star Rating. 42 C.F.R. § 422.166; Blue Cross & Blue Shield of Fla., 786 F. Supp. 3d at 5 (citing Elevance Health, 736 F. Supp. 3d at 7). After this complex web of calculations is completed, the result is a final Star Rating of each plan reported in half-star increments. 42 C.F.R. §§ 422.166(c)(3), (d)(2)(iv); id. §§ 423.186(c)(3), (d)(2)(iv).

Once Star Ratings are finalized, "CMS displays the star ratings in its online and print resources available to Medicare beneficiaries." HMO La., Inc. v. Dep't of Health & Human Servs., 793 F. Supp. 3d 150, 153 (D.D.C. 2025) (citing 42 C.F.R. § 422.166(h)). One such resource is the "Plan Finder" tool, an online resource created by CMS which displays information about available plans, including the Star Ratings of the plans. Elevance Health, 736 F. Supp. 3d at 5 (citing 42 C.F.R. § 422.166(h) (governing posting and display of ratings)). The result is that higher-rated plans may attract more customers. Id. Star Ratings also carry financial implications, as plans earning a "four-Star" rating or higher bid against a higher benchmark, which may result

10

in a larger difference between their bid and that benchmark, meaning, potentially, an increased rebate, and, in short, more federal funding. Blue Cross & Blue Shield of Fla., 786 F. Supp. 3d at 4 (citing 42 U.S.C. §§ 1395w-23(o)(1), (3)(A)(i), 1395w-24(b)(1)(C); 42 C.F.R. § 422.260)). Rebates awarded to higher-rated plans are also calculated using a higher percentage of the difference between the plan's bid and the benchmark when compared to lower-rated plans, leading to, again, more federal funding. Id. (citing 42 U.S.C. § 1395w-24(b)(1)(C)(v); 42 C.F.R. § 422.266(a)(2)(ii)). With this backdrop in mind, the Court will now address the present dispute.

## II. Factual and Procedural Background

Clover is an artificial intelligence-powered "physician enablement company" that provides Medicare Advantage plans and derives all of its revenue from the Medicare Advantage Program. Dkt. No. 34-1 ¶¶ 6-8. According to Clay Thornton, Clover's Chief Financial Officer, the company provides Medicare Advantage plans to over 150,000 members. Id. ¶ 6. On October 9, 2025, CMS published Clover's 2026 Star Rating of 3.5 Stars. Dkt. No. 34-1 ¶¶ 21, 38; Dkt. No. 34-6. CMS also published Clover's measure-specific Star Ratings on its website. Dkt. No. 34-1 ¶¶ 22, 25; Dkt. Nos. 34-2, 34-6. Clover brings the present action to challenge this Star Rating. See generally Dkt. No. 1.

11

Prior to the initiation of this action, Clover objected to some of the measures considered by CMS in the Star Rating calculation. See, e.g., Dkt. No. 33-1 at 10–17, 19–22, 119–20. In fact, throughout the 2025 plan year, Clover submitted several objections to CMS, expressing concern regarding the medication adherence measures which formed a part of Part D Star Ratings. Id. at 15–16, 19–22. In response, CMS contended that it was, in essence, too late for Clover to make such a challenge: changes to Star Rating measures needed to occur during a specific timeframe governed by CMS regulations, and measures could not be modified during a measurement year. Id. at 23–24.

Then, during the plan preview period for the 2026 Star Ratings, Clover, again, contacted CMS and expressed concerns about some of the measures which factored into the Star Rating calculation. Id. at 35–44, 66–67, 112–17, 132. CMS responded to these concerns but did not change or remove the data inputs challenged by Clover. Id. at 134–37. Further, during the "Second Plan Preview" period, CMS released preliminary Star Ratings for Medicare Advantage plans, including preliminary ratings for various individual measures. Id. at 138–44. Prior to this point, Clover had expected to earn a 2026 Star Rating at or close to four Stars, but, when it reviewed the data released pursuant to the Second Plan Preview, it became apparent that this was not the case.

12

Id.; Dkt. No. 1 ¶ 217. In sum, Clover received a preliminary Star Rating of 3.5 Stars. Dkt. No. 1 ¶ 217.

As a result, Clover, again, wrote to CMS, contending that CMS erred in including a variety of measures in Clover's 2026 Star Rating calculation. Dkt. No. 33-1 at 140-44. In this memorandum, dated September 16, 2026, Clover identified certain "unlawful" measures in the 2026 Star Rating calculation and requested that CMS re-calculate Clover's 2026 Star Rating without the challenged measures. Id. This too was unavailing for Clover. Id. at 138. In response, CMS rejected Clover's request as "outside the scope of the plan preview" process. Id. On October 9, 2025, CMS posted Clover's final 2026 Star Rating of 3.5 Stars. Dkt. No. 34-1 ¶¶ 21, 38; Dkt. No. 34-6. Clover, again, objected to certain measures used in this Star Rating calculation—this time raising its objections in federal court. Dkt. No. 1.

Clover filed suit in this Court on November 7, 2025 to challenge its 2026 Star Rating. Id. At a very high level, Clover contends that, pursuant to the statutes promulgated by Congress and associated regulations, CMS may only consider certain measures when it calculates Star Ratings. Id. ¶¶ 112-206. Clover also argues that, when CMS wants to change a measure or add a new one, those statutes and regulations provide a procedure to do that—a procedure which, according to the complaint, CMS failed to follow. Id. ¶¶ 106-11. The complaint then states it was these allegedly

erroneous measures which led Clover to receive a reduced rating of 3.5 Stars, rather than the four Stars to which Clover believes it is entitled. Id. ¶¶ 8, 218, 222. The result of this reduced rating is harm to Clover's reputation, alongside deprivation of "approximately $120 million in statutorily mandated quality bonus and related payments" which Clover believes it would have received had CMS calculated its 2026 Star Rating in accordance with applicable law. Id. ¶¶ 8, 43, 225, 228.

In the present action, Clover names as Defendants: HHS; Robert F. Kennedy, Jr., in his official capacity as Secretary of HHS; CMS; and Mehmet Oz, in his official capacity as Administrator of CMS. See generally id. The complaint presents six counts: five counts alleging violations of the Administrative Procedure Act (Counts I-V) and one count charging Defendants with violating the private non-delegation doctrine stemming from both Article II, § 1 of the United States Constitution and the Fifth Amendment (Count VI). Id. ¶¶ 232–73.

On December 11, 2025, Defendants moved to dismiss or transfer this action under 28 U.S.C. § 1406, contending that the Southern District of Georgia is an improper venue to adjudicate Clover's claims. Dkt. No. 21. The Court denied that motion but, noting the possibility of sua sponte transfer under 28 U.S.C. § 1404(a), ordered the parties to present their views on the propriety of Section 1404(a) transfer in accordance with the Eleventh Circuit's

14

requirements. Dkt. No. 40 at 35-40. Both parties subsequently responded. Dkt. Nos. 41, 42. On May 6, 2026, the Court held that transfer is not warranted under 28 U.S.C. § 1404(a), and, thus, the case remained in the Southern District of Georgia. Dkt. No. 59.

Now pending before the Court are two motions: Clover's motion for expedited summary judgment,[6] dkt. no. 34, and Defendants' cross-motion for summary judgment, dkt. no. 51.[7] Clover filed a joint response and reply brief, expressing support for its motion for summary judgment and opposing Defendants' cross-motion. Dkt. No. 57.

### LEGAL STANDARD

This case involves five claims under the Administrative Procedure Act ("APA") and one constitutional claim alleging a violation of the private non-delegation doctrine. Dkt. No. 1. When analyzing these types of claims at the summary judgment stage to

---

[6] As noted in the Court's previous Orders in this matter, Clover's requests for expedited adjudication are based on the timeframe in which CMS has represented it may update a plan's Star Rating in response to judicial decision-making. Dkt. No. 40 at 39 (citing Dkt. No. 23 ¶¶ 2, 6); Dkt. No. 59 at 5; see generally Dkt. No. 23 (Clover's previous motion to expedite).

[7] Defendants responded to Clover's motion for summary judgment and, in the same document, moved for summary judgment. Dkt. Nos. 50, 51. This document appears twice on the docket, once docketed as Defendants' Response brief (Dkt. No. 50) and once docketed as Defendants' cross-motion for summary judgment (Dkt. No. 51). See also Dkt. No. 51 at 1 n.1 (Defendants' explanation for the repeated filing). These separate filings, though, are substantively identical. Dkt. Nos. 50, 51.

15

discern whether a federal agency acted properly and within its power, a district court does not employ the ordinary summary judgment standard provided by Federal Rule of Civil Procedure 56. See Wheeler, 418 F. Supp. 3d at 1348 (citing 5 U.S.C. § 706(2)); Marshall Cnty. Health Care Auth. v. Shalala, 988 F.2d 1221, 1226 (D.C. Cir. 1993). Instead, in cases challenging agency action, "[t]he entire case on review is [ordinarily] a question of law, and only a question of law," Marshall, 988 F.2d at 1226, "and, therefore, the summary judgment standard functions slightly differently," McAleenan, 404 F. Supp. 3d at 233.

Under the APA, a district court may "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] without observation of procedure required by law." Wheeler, 418 F. Supp. 3d at 1348 (citing 5 U.S.C. § 706 (2)). "[W]hen a party seeks review of agency action under the APA [before a district court], the district judge sits as an appellate tribunal" addressing issues of law, and the challenges to agency action are adjudicated on cross-motions for summary judgment. Id. (quoting Am. Biosci., Inc. v. Thompson, 269 F.3d 1077, 1083 (D.C. Cir. 2001)) (citing Fla. Fruit & Vegetable Ass'n v. Brock, 771 F.2d 1455, 1459 (11th Cir. 1985) ("The summary judgment procedure is particularly appropriate

16

in cases in which the court is asked to review . . . a decision of a federal administrative agency.")); Henry v. Sec'y of Treasury, 266 F. Supp. 3d 80, 86 (D.D.C. 2017) ("[T]he reviewing court generally . . . reviews the [agency's] decision as an appellate court addressing issues of law.").

Based on the unique standards governing cross-motions for summary judgment in an APA action, "the standards set forth in Federal Rule of Civil Procedure 56 do not apply." Wheeler, 418 F. Supp. 3d at 1348 (citing Fulbright v. McHugh, 67 F. Supp. 3d 81, 89 (D.D.C. 2014), aff'd sub nom. Fulbright v. Murphy, 650 F. App'x 3 (D.C. Cir. 2016)). This being so, the question at this procedural posture is not whether there is a genuine issue of material fact, but rather whether there is a valid challenge to agency action. Id. (citation omitted). In other words, summary judgment "serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." Elevance Health, 736 F. Supp. 3d at 13 (quoting Sierra Club v. Mainella, 459 F. Supp. 2d 76, 90 (D.D.C. 2006)). Under this standard, the entire case on review is a question of law. Id. (citing Shalala, 988 F.2d at 1226).

To determine the validity of a challenge in the present context, "[t]he district court applies the APA's 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance

17

with law' standard to determine whether 'the evidence in the administrative record permitted the agency to make the decision it did.'" <u>Humana</u>, 806 F. Supp. 3d at 646 (citing 5 U.S.C. § 706(2); <u>MRC Energy Co. v. U.S. Citizenship & Immigr. Servs.</u>, No. 3:19-cv-2003-K, 2021 WL 1209188, at *3 (N.D. Tex. Mar. 31, 2021)). When applying this standard, the focal point "should be the administrative record already in existence, not some new record made initially in the reviewing court." <u>Camp v. Pitts</u>, 411 U.S. 138, 142 (1973).

A similar standard governs challenges to agency action under the private non-delegation doctrine—a challenge under the United States Constitution. <u>McAleenan</u>, 404 F. Supp. 3d at 233. To explain, "in the context of *ultra vires* and constitutional separation of powers claims, there are no questions of fact, because whether or not a statute or the Constitution grants the [Executive Branch] the power to act in a certain way is a pure question of law." <u>Id.</u> (citation omitted). "The same can be said of any questions of interpretation that a federal court may have to answer in parsing out the meaning of any relevant statutes." <u>Am. Fed'n of Gov't Emps., AFL-CIO v. Trump</u>, 318 F. Supp. 3d 370, 394 (D.D.C. 2018), <u>rev'd and vacated on other grounds</u>, 929 F.3d 748 (D.C. Cir. 2019); <u>see also</u> <u>McAleenan</u>, 404 F. Supp. 3d at 233 (applying this standard to analyze a constitutional non-delegation challenge against

18

secretary of federal governmental agency, among other federal government defendants).

## DISCUSSION

The present dispute centers around one core question: did CMS abide by applicable constitutional, statutory, and regulatory requirements when it considered certain measures to calculate Clover's 2026 Star Rating? Dkt. Nos. 34, 50, 51, 57. Clover contends that CMS erroneously considered twenty different measures when calculating Clover's 2026 Star Rating. Dkt. No. 34 at 10. More specifically, Clover claims that some of these measures should not have been considered by CMS because the measure derived from data not collected under 42 U.S.C. § 1395w-22(e) as part of plans' quality improvement programs. Id. at 24–31. Some measures, according to Clover, were erroneously considered because they were based on "types of data not collected as of November 1, 2003." Id. at 31–36. Clover then challenges CMS's use of all twenty disputed measures for lack of compliance with notice and comment procedures. Id. at 10, 36–40, 53–59. Some measures are challenged on "arbitrary and capricious" grounds. Id. at 40–50. Finally, Clover raises a private non-delegation doctrine challenge with respect to one of the disputed measures. Id. at 50–53.

## I. Challenge to Measures Based on Data Not Collected under 42 U.S.C. § 1395w-22(e)

In its first challenge, Clover contends that CMS erred in

19

considering ten measures when it calculated Clover's 2026 Star Rating because those measures were not based on data collected under 42 U.S.C. § 1395w-22(e). Id. at 24-31. The measures challenged on this basis include: Medication Adherence, Diabetes (D08); Medication Adherence, Hypertension (D09); Medication Adherence, Cholesterol (D10); Phone Call Center (C33); Phone Call Center (D01); Appeals Decisions (C32); Rating of Drug Plan (D05); Getting Needed Drugs (D06); Medication Therapy Management Completion (D11); and Pharmacy Statin Use (D12). Dkt. No. 34 at 10; Dkt. No. 1 ¶ 236.

In raising this challenge, Clover states that Congress imposed certain statutory directives governing what types of measures CMS may consider in the Star Rating analysis. See generally Dkt. Nos. 34, 57. One such statutory directive cited by Clover is found in 42 U.S.C. § 1395w-23(o)(4)(A), which reads: "[t]he quality rating for a plan shall be determined according to a 5-star rating system (*based on the data collected under section 1395w-22(e)* of this title)." 42 U.S.C. § 1395w-23(o)(4)(A) (emphasis added); see also Dkt. No. 34 at 24. The cross-reference to Section 1395w-22(e) refers to data collected pursuant to plans' "quality improvement program[s]," under which "each MA organization shall provide for the collection, analysis, and reporting of data that permits the measurement of health outcomes and other indices of quality." Id. § 1395-22(e)(3)(A)(i).

20

44

Clover contends, and Defendants do not dispute, that the data sources for Section 1395w-22(e)'s "quality improvement program" data are HEDIS, HOS, or CAHPS. Dkt. No. 34 at 25-26; Dkt. No. 51 at 28; 69 Fed. Reg. 46866-01, 46,886 (Aug. 3, 2004) (identifying HEDIS, HOS, and CAHPS as the required measurement systems within the quality improvement program). Defendants also do not dispute that, in determining Clover's 2026 Star Rating, CMS relied upon some measures using non-HEDIS, HOS, or CAHPS data. Dkt. No. 51 at 29 ("Depending on whether the Part C improvement measure is included, 78% or 80% by measure weight of the Part C Star Ratings draw data from HEDIS, HOS, and CAHPS."). With these concessions in mind, the Court will address (A) whether any of the ten measures subject to the present challenge actually rely on data which was not collected under 42 U.S.C. § 1395w-22(e), and if so, (B) whether a proper interpretation of 42 U.S.C. § 1395w-23(o)(4)(A) allows CMS to consider such measures in calculating Clover's 2026 Star Rating.

### A.    The Disputed Data Measures

The administrative record supports the contention that each of the ten measures subject to this challenge stem from data beyond what is collected pursuant to the required statutory authority. More specifically, the primary data sources for some measures are identified as HEDIS, HOS, CAHPS, or some combination thereof, for some of the measures. See, e.g., Dkt. No. 33-2 at 63 (measure C16

identifying HEDIS-HOS as primary data source), 72 (measure C21 identifying HEDIS as primary data source), 74 (measure C22 identifying CAHPS as primary data source).[8] On the other hand, eight of the ten challenged measures have the following primary data sources, none of which are HEDIS, HOS, or CAHPS:

- **D08, D09, D10, and D12**: Based on "Prescription Drug Event (PDE) Data" submitted by drug plans to CMS Drug Data Processing Systems, which stems from CMS's "annual Part D payment reconciliation" rather than quality improvement programs. Dkt. No. 33-2 at 105–11, 116–18.
- **C33 and D01**: Based on "Call Center" monitoring data collected by CMS. Id. at 91, 93. CMS has explicitly stated that telephone call center data like this "are not collected directly from the sponsoring organizations for the primary purpose of quality measurement so they are not information collections governed by section 1852(e) [of the Social Security Act]," another name for 42 U.S.C. § 1395w-22(e)(3)(B)(i)–(ii). 83 Fed. Reg. at 16,531–32; AvMed, 2021 WL 2209406, at *2 n.3.
- **C32**: Based on "Independent Review Entity ('IRE')" data, which is data prepared by a CMS contractor, the IRE, measuring the percent of CMS Part C appeals which were upheld by the entity. Dkt. No. 33-2 at 89–90. Like call center data, CMS has indicated that the collection of this data is not governed by Section 1395w-22(e). See 83 Fed. Reg. 16,440-01, 16,531–32.
- **D11**: Based on "Part D Plan Reporting" data, defined by CMS as data "reported by contracts to CMS per the Part D Reporting Requirements." Dkt. No. 33-2 at 113–14.

---

[8] As explained infra, the fact that a measure is based on HEDIS, HOS, or CAHPS data does not automatically mean that the measure is "based on" data collected under Section 1395w-22(e). Rather, the first step of the Court's inquiry is to determine whether the data sources for each measure match any of the quality improvement program data sources: HEDIS, HOS, or CAHPS. If that is so, the second step is to consider whether the data factoring into that measure was actually collected under CMS's Section 1395w-22(e) authority rather than a different source of statutory authority which also utilizes HEDIS, HOS, or CAHPS as a data source.

22

Whether the remaining two measures, D05 and D06, are based on Section 1395w-22(e) data is less clear cut, but the Court concludes that they are not. The administrative record indicates that the primary data source for measures D05 and D06 is CAHPS. Dkt. No. 33-2 at 101-02. While it may, on its face, seem like this data was collected as part of the quality improvement program, this is not so. See 42 U.S.C. § 1395w-23(o)(4)(A). In short, a measure's utilization of CAHPS data is not, standing alone, a sufficient condition to make that data "collected under section 1395w-22(e)." Id. This is because there are two different sources of data collection authority relevant to this inquiry: Part C authority to collect data (for example, via Section 1395w-22(e)(3)) and Part D authority to collect data (for example, via Section 1395w-104(d)). Part D gives the Secretary the authority to conduct consumer satisfaction surveys regarding PDP sponsors and prescription drug plans "in a manner similar to the manner such surveys are conducted for MA organizations and MA plans under part C." 42 U.S.C. § 1395w-104(d).

Both D05 and D06 provide an example of how the Secretary may exercise this Part D authority: by collecting information, under D05, on beneficiaries' ratings of their Part D drug plan, and, under D06, on beneficiaries' beliefs regarding how easily they may obtain their prescription drugs using their Part D plan. Dkt. No. 33-2 at 100-02. Because these two measures use data collected under

23

Part D authority, not Part C, where Section 1395w-22(e)'s grant of authority is located, neither measure D05 nor measure D06 rely on "data collected under section 1395w-22(e)." 42 U.S.C. § 1395w-23(o)(4)(A). Nor do the remaining eight challenged measures, identified supra, which do not stem from HEDIS, HOS, or CAHPS data at all.

### B.    Interpretation of 42 U.S.C. § 1395w-23(o)(4)(A)

Having established that the ten disputed measures relied upon data not collected under Section 1395w-22(e), the Court may now reach the parties' primary dispute on this issue: the proper interpretation of 42 U.S.C. § 1395w-23(o)(4)(A). See generally Dkt. Nos. 34, 40, 51, 57. When addressing issues of statutory interpretation in a post-Chevron world, courts "'must exercise their independent judgment' to determine whether an agency's interpretation of the statutes it administers comports with the agency's statutory authority." Philip Morris USA Inc. v. U.S. Food and Drug Administration, 801 F. Supp. 3d 1353, 1367 (S.D. Ga. 2025) (quoting Loper Bright Enters. v. Raimondo, 603 U.S. 369, 412 (2024)); see also Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 843 (1984) (holding that federal courts must defer to reasonable agency constructions of ambiguous statutory terms), overruled by Loper Bright, 603 U.S. at 412-13. Here, the Court uses this independent judgment to answer one key question: what did Congress mean when it stated in Section 1395w-23(o)(4)(A)

24

that quality ratings shall be "based on" data collected pursuant to Section 1395w-22(e)?

To answer this question, Clover contends that Section 1395w-23(o)(4)(A) is best read as mandating that CMS consider *only* data collected pursuant to Section 1395w-22(e) in the Star Rating calculus; CMS *may not* consider measures based on non-Section 1395w-22(e) data in this inquiry under Clover's view. Dkt. No. 34 at 24-26; Dkt. No. 57 at 8-9. On the other hand, Defendants claim that "based on" does not imply exhaustiveness, instead stating that Section 1395w-23(o)(4)(A) leaves CMS with the discretion to consider measures which are not based on Section 1395w-22(e) data. Dkt. No. 51 at 28-29. In light of the statutory "text, structure, and purpose," Org. of Pro. Aviculturists, Inc. v. U.S. Fish & Wildlife Serv., 130 F.4th 1307, 1314 (11th Cir. 2025), the Court holds that Clover has provided a proper interpretation of Section 1395w-23(o)(4)(A). Dkt. Nos. 34, 57.

"The starting point for statutory interpretation is the language of the statute." United States v. Dawson, 64 F.4th 1227, 1236 (11th Cir. 2023) (citing United States v. Aldrich, 566 F.3d 976, 978 (11th Cir. 2009)). As an initial matter, the Court looks to the "plain and ordinary meaning of the statutory language as it was understood at the time the law was enacted." Id. (quoting United States v. Chinchilla, 987 F.3d 1303, 1308 (11th Cir. 2021)). Should that inquiry reveal that the statutory language is clear

25

and unambiguous, the Court looks no further and will employ that plain meaning. Id.

Analysis of the plain text of the phrase "based on" reveals that the phrase can carry multiple different meanings depending on the context in which it is used. See Cooper v. Blue Cross & Blue Shield of Fla., Inc., 19 F.3d 562, 567 (11th Cir. 1994) ("[T]he general definition of 'based on' is 'supported by'." (citations omitted)); United States ex rel. Lockhart v. Gen. Dynamics Corp., 529 F. Supp. 2d 1335, 1340 n.3 (N.D. Fla. 2007) (stating that "[o]ther courts have agreed" with the Eleventh Circuit's general definition of "based on" (citing United States ex rel. Fine v. Advanced Scis., Inc., 99 F.3d 1000, 1006 (10th Cir. 1996); United States ex rel. Butler v. Magellan Health Servs., Inc., 74 F. Supp. 2d 1201, 1210 (M.D. Fla. 1999))); see also United States v. Brown, 996 F.3d 1171, 1187, 1194 (11th Cir. 2022) (en banc) (describing jurors' duty to render a verdict, "find the required facts" and "render a verdict based on those facts," and later "stress[ing]" that the court does not allow the use of metrics beyond the law and those facts found by jurors in deliberations); United States v. Robinson, No. 1:07 CR 135, 2014 WL 12843524, at *3 (N.D. Ohio Aug. 15, 2014) (in the sentencing context, interpreting "based on" to connote "basis or foundation" (citing United States v. Jackson, 678 F.3d 442, 445 (6th Cir. 2012) (analyzing "based on" as meaning "a relevant part of the analytic framework"))); United States v.

26

Bank of Farmington, 166 F.3d 853, 863 (7th Cir. 1999) (stating that "'based upon' does not mean 'similar (even identical) to' but 'derived from'"); Adv. Tr. & Life Escrow Servs., LTA v. Protective Life Ins. Co., 93 F.4th 1315, 1326 (11th Cir. 2024) (considering insurance policy and stating "[n]othing about the plain and ordinary meaning of the phrase 'based on' connotes exclusivity" (quoting Slam Dunk I, LLC v. Conn. Gen. Life Ins. Co., 853 F. App'x 451, 455 (11th Cir. 2021))). In fact, Clover even admits this, noting that the meaning of "based on" is context-specific rather than a fixed definition. Dkt. No. 57 at 13 (citing Base, The American Heritage Dictionary 148 (4th ed. 2000) (defining "base" as "[t]he fundamental principle or underlying concept of a system")).

The plain meaning of a statutory term, however, "does not turn solely on dictionary definitions of its component words in isolation." Dawson, 64 F.4th at 1237. "Rather, '[t]he plainness or ambiguity of statutory language is determined [not only] by reference to the language itself, [but as well by] the specific context in which that language is used, and the broader context of the statute as a whole.'" Id. (citing Yates v. United States, 574 U.S. 528, 537 (2015)); see also Turner v. U.S. Att'y Gen., 130 F.4th 1254, 1258 (11th Cir. 2025) (indicating that the court must "interpret statutory language according to its plain meaning as understood within its statutory context" (citations omitted)).

27

This includes the way in which a phrase is used within a particular statutory subsection, as well as how that statutory subsection functions within the larger act as a whole. Wachovia Bank, N.A. v. United States, 455 F.3d 1261, 1267 (11th Cir. 2006) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the *overall statutory scheme*." (emphasis added) (citations and quotation marks omitted)).

The parties heavily dispute the impact that surrounding statutory provisions should have on the Court's interpretation of Section 1395w-23(o)(4)(A). Defendants point to two other provisions within Medicare's broader statutory scheme to argue that, when Congress intended for something to be "based on" a defined and exclusive set of information, it made this exhaustiveness explicit. Dkt. No. 51 at 28–29 (first citing 42 U.S.C. § 1395w-23(c)(5); then citing id. § 1395w-23(c)(4)(C)(v)). Clover's response is twofold. First, Clover addresses both of the "exclusive" provisions cited by Defendants and explains why, in Clover's opinion, these provisions should not cast doubt on Clover's interpretation of "based on" as exclusive in Section 1395w-23(o)(4)(A). Dkt. No. 57 at 10 n.4. Clover also provides its own examples of surrounding provisions to argue that (1) "based on" is used in an exclusive sense throughout the Medicare Act, and (2) when Congress sought to communicate *non*-exclusivity, it made

28

that intent explicit, yet it did not do so here. Id. at 10–11.

Based on the statutory context arguments raised by the parties, two conclusions come to light. First, while Congress does make exclusivity explicit in the two provisions cited by Defendants, Congress did so given the unique context of those two provisions—context which is inapplicable to Section 1395w-23(o)(4)(A). To explain, it is true that the two provisions highlighted by Defendants—42 U.S.C. §§ 1395w-23(c)(5) and 1395w-23(c)(4)(C)(v)—make explicit that the respective analysis should be based "only on" or based "entirely on" certain data. Dkt. No. 51 at 28–29. Specifically, Section 1395w-23(c)(5) provides that, in determining the "blended capitation rate"—a rate utilized in the determination of payments to contracting plans within certain geographic regions—the Secretary shall determine a budget neutrality adjustment factor "so that the aggregate of payments under this part [subject to exceptions] shall equal the aggregate payments that would have been made under this part if payment were based *entirely on* area-specific capitation rates." 42 U.S.C. § 1395w-23(c)(5); see also Minn. ex rel. Hatch v. United States, 102 F. Supp. 2d 1115, 1118 (D. Minn. 2000) (defining "blended capitation rates"), aff'd sub nom. Minn. Senior Fed'n, Metro. Region v. United States, 273 F.3d 805 (8th Cir. 2001). Section 1395w-23(c)(4)(C)(v), also cited by Defendants, dkt. no. 51 at 28–29, provides that "index values shall be computed *based only on*

29

53

the beneficiary population who are 65 years of age or older and who are not determined to have end stage renal disease." 42 U.S.C. § 1395w-23(c)(4)(C)(v) (emphasis added).

While Congress inserted additional modifiers into the phrase "based on" to communicate exclusivity in these two circumstances, this, too, must be read in context. With respect to Defendants' first example, Section 1395w-23(c)(5), the general statutory directive is that CMS must factor two types of capitation rates into the "blended capitation rate" calculation: the "annual area-specific Medicare+Choice capitation rate" and the "input-price-adjusted annual national Medicare+Choice capitation rate." 42 U.S.C. § 1395w-23(c)(1)(A)(i)-(ii). But, as noted by Clover, dkt. no. 57 at 10 n.4, the "based entirely on" clause in Section 1395w-23(c)(5) instead says, in essence, that a budget neutrality factor takes into account a hypothetical, different world, where the Secretary considered one, *not both*, of the capitation rates in the blended capitation rate inquiry—a modification from the general statutory directive which directly precedes this hypothetical. 42 U.S.C. § 1395w-23(c)(1)(A)(i)-(ii). This hypothetical "carving back" of the factors from the general statutory directive for a particular purpose—calculation of a specific budget neutrality factor—is what makes Section 1395w-23(c)(5) unique and necessitates the phrase "based entirely on" to denote exclusivity.

Section 1395w-23(c)(4)(C)(v), Defendants' second example of

30

how Congress alters "based on" to denote exclusivity, serves a similar purpose: carving out a certain data set which would otherwise be considered under the ordinary statutory command. Dkt. No. 51 at 28–29. This, again, is a provision regarding calculation of capitation rates. See generally 42 U.S.C. § 1395w-23(4)(c)(4). Throughout the subsection governing calculation of these rates, Congress refers to "beneficiaries" in a general sense—a term, in the Medicare context, which extends not only to seniors, but also to certain individuals with disabilities or end-stage renal disease. See Becerra v. Empire Health Found. for Valley Hosp. Med. Ctr., 597 U.S. 424, 424 (2022); Hapeville Dialysis Ctr., LLC v. City of Atlanta, Ga., 545 F. App'x 870, 871 (11th Cir. 2013). Thus, by clarifying that index values should be based *only* on beneficiaries who are over 65 years of age and who have not been identified as having end-stage renal disease, Section 1395w-23(c)(4)(C)(v), again, represents a departure from the ordinary meaning of "beneficiary," necessitating the word "only" to signal that modification.

Here, though, Section 1395w-23(o)(4)(A) is distinct from Defendants' two examples where the phrase "based on" needed modified language to make exclusivity abundantly clear. Section 1395w-23(o)(4)(A), unlike Defendants' two examples, does not involve capitation rates, dkt. no. 51 at 28-29, does not pose a hypothetical carving back of what is otherwise a statutory

31

requirement, and does not carve back the definition of an otherwise-broader group of beneficiaries. In fact, Section 1395w-23(o)(4)(A) *creates* the obligation to consider certain data sets, rather than carving back an obligation which already exists, by mandating that a five-star system be used to determine quality ratings and identifying the specific data set which should impact that calculus: data collected under Section 1395w-22(e).[9]

The second conclusion gleaned from statutory context is that surrounding provisions use "based on" to communicate specific information which should factor into a particular calculation or definition, and, when Congress allows for consideration of information *beyond* that which is specifically identified, it makes that intent explicit. For example, 42 U.S.C. § 1395w-24(b)(1)(C)(iii) provides that a plan's rebate percentage should be "based on" the specific "system under section 1395w-

---

[9] Defendants also point to separate Part D provisions in the Medicare Act which allow CMS to disseminate information beyond the information communicated by Section 1395w-22(e) data. Dkt. No. 51 at 32–33 (citing 42 U.S.C. §§ 1395w-21(d), 1395w-101(c)(1), 1395w-101(c)(2)(A)). This does not undermine Clover's interpretation of Section 1395w-(o)(4)(A). This is because there are distinctions between general information dissemination, one CMS task with its own statutorily defined scope, and the narrower task of calculating a plan's Star Rating, a separate and distinct CMS task with a separate and distinct scope. See Dkt. No. 57 at 7–8. If anything, the fact that CMS has access to data beyond Section 1395w-22(e) data pursuant to its data dissemination authority lends further credence to Clover's interpretation of Section 1395w-(o)(4)(A): Congress knew the scope of data available to CMS, yet specifically carved out a distinct portion of that data to factor into Star Rating calculations.

32

23(o)(4)(A)." Section 1395w-23(k)(2)(B)(ii) provides that the numerator of a particular fraction should be "based on" a specific formula: the "difference between [the] demographic rate and [the] risk rate." Section 1395w-23(n)(2)(C)(i) identifies the output of a specific provision, "subparagraph (A)(i)," as the basis for annual area rankings carried out by the Secretary.

Contrast this with other provisions in both Section 1395w-23 and the Medicare Act at large which grant the Secretary the authority to consider data sources and information beyond that which is specifically identified by Congress. For example, Section 1395w-23(o)(4)(D)(ii) provides that "the quality rating of the continuing contract is based *primarily* on" a particular measurement period—making it clear that the particular measurement period need not be the only information considered, as long as it is the quality rating's "primary" basis. 42 U.S.C. § 1395w-23(o)(4)(D)(ii) (emphasis added). In Section 1395mm(a)(1)(B), Congress specifically lists various factors which the Secretary should consider in creating "classes of members," then gives the Secretary the authority to consider "such other factors as the Secretary determines to be appropriate." Other subsections of the Medicare Act follow a similar pattern. See id. §§ 1395m(c)(2)(B)(i) (instructing CMS to review the "frequency for performing screening mammography, based on age and *such other factors as the Secretary believes to be pertinent*" (emphasis added)), 1395rr-1(e)(3)(B)

33

(noting that CMS must identify individuals "based on such medical conditions, diagnostic standards, and other criteria as the Secretary specifies").

With these different uses of "based on" throughout the Medicare Act in mind, assuming the phrase "based on," standing alone, already gives CMS authority to consider both the identified data or factors *and* other data or factors that it deems appropriate would render superfluous Congress's explicit grant of such discretion in some—but not all—of the provisions using this phrase. Generally speaking, the Eleventh Circuit counsels against constructions of a statute which would render a "clause, sentence, or word" "superfluous, void, or insignificant." In re Walter Energy, Inc., 911 F.3d 1121, 1146 (11th Cir. 2018) (quoting TRW Inc. v. Andrews, 534 U.S. 19, 31 (2001) (alterations adopted)). Even further, this shows that Congress knew how to provide the Secretary with discretion to consider information beyond what is specifically identified—and chose not to—meaning the "familiar 'easy-to-say-so-if-that-is-what-was-meant' rule of statutory interpretation has full force here." Pinares v. United Techs. Corp., 973 F.3d 1254, 1261 (11th Cir. 2020). In other words, "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." Id. (first quoting

34

Russello v. United States, 464 U.S. 16, 23 (1983); then citing Va. Uranium, Inc. v. Warren, 587 U.S. 761, 765 (2019) ("In this, as in any field of statutory interpretation, it is our duty to respect not only what Congress wrote but, as importantly, what it didn't write."); Animal Legal Def. Fund v. USDA, 789 F.3d 1206, 1217 (11th Cir. 2015) ("Where Congress knows how to say something but chooses not to, its silence is controlling." (quotation omitted))). Here, based on Congress's silence on discretion to consider additional data beyond Section 1395w-22(e) data, alongside the Court's analysis of the parties' remaining arguments on statutory context, the Court holds that a plain reading of Section 1395w-23(o)(4)(A) is ambiguous, but it does favor Clover's interpretation.

When faced with an ambiguous statute, some courts consult extratextual sources such as legislative history to shed more light on a statute's true meaning. Bostock v. Clayton Cnty., Ga., 590 U.S. 644, 674 (2020). To the extent this is instructive in interpreting Section 1395w-23(o)(4)(A), both the legislative history of the Star Rating program and general principles governing agency power lend further support to Clover's, and, now, this Court's, interpretation of the provision's plain text.[10] After all,

---

[10] The Court notes that legislative history often makes it "difficult to say with assurance" what Congress's intent was in drafting a particular statutory provision. Lamie v. U.S. Tr., 540 U.S. 526, 541 (2004). This being so, while the Court explains how the legislative history falls in line with its interpretation of Section 1395w-23(o)(4)(A), the primary basis of the Court's

35

extratextual considerations such as legislative history, for those who take such considerations into account, are "meant to clear up ambiguity, not create it." Id. (citation omitted).

By way of reminder, the Star Ratings system was created to communicate plan quality, ultimately helping beneficiaries compare plans and choose a health coverage option which is best for them. See Becerra, 736 F. Supp. 3d at 5; HMO La., 793 F. Supp. 3d at 153. Before Congress codified this five-star rating system in Section 1395w-23(o)(4)(A), this "plan comparison" goal was facilitated by a different statutory provision: 42 U.S.C. § 1395w-22(2)(A)(xii) (1997). This subsection provided that the "quality assurance program" of a Medicare+Choice plan[11] shall "make available information on quality and outcomes measures to facilitate beneficiary comparison and choice of health coverage options." Id. Importantly, the prior version of this statute allowed the Secretary to facilitate this goal "in such form and on such quality and outcomes measures as the Secretary determines to

---

overall conclusion is still the plain meaning of the words, in their proper context, which actually appear in the Medicare Act—not conjecture about the words which were proposed during the legislative process but ultimately deleted. See id. at 539-41 (expressing a preference for the "plain meaning" over the "more controversial realm of legislative history" but nonetheless how the legislative processes "lend some support" to petitioner's perspective).

[11] The Medicare Advantage program was originally called Medicare+Choice. Humana Med. Plan, Inc. v. W. Heritage Ins. Co., 832 F.3d 1229, 1235 n.2 (11th Cir. 2016)

be appropriate"—a broad grant of discretion to the Secretary to utilize whatever measures he or she deems fit. Id.

When Congress codified the Star Rating system in 2010,[12] it dialed back this discretion, instead identifying only Section 1395w-22(e) as the relevant source of data for quality rating calculations and omitting the clause previously granting the Secretary the ability to consider other measures within his or her discretion. Compare 42 U.S.C. § 1395w-22(2)(A)(xii) (1997), with id. § 1395w-23(o)(4)(A). While it is difficult to discern with confidence the intent of Congress by looking at legislative history alone, the Court does, at the very least, presume that Congress intended its 2010 changes to the Medicare Act "to have real and substantial effect." SEC v. Spartan Sec. Grp., Ltd., 164 F.4th 1231, 1268 (11th Cir. 2026) (quoting Intel Corp. Inv. Pol'y Comm. v. Sulyma, 589 U.S. 178, 189 (2020)). It is this Court's role to respect not only what Congress wrote (a clause providing Section 1395w-22(e) data should be the basis for quality ratings), but also what it did not write (a clause giving the Secretary discretion to consider other data he or she deems fit in quality

---

[12] The "quality determination" provision in 42 U.S.C. § 1395w-23(o)(4)(A) referencing the five-star rating system first appears in the version of this provision enacted on March 30, 2010. 42 U.S.C § 1395w-23(o)(4)(A) (2010). Though Congress has passed multiple updates to Section 1395w-23 since then, the text of Subsection 1395w-23(o)(4)(A) enacted in March 2010 is identical to the current version of this subsection.

37

rating determinations, even though this clause appears in both surrounding provisions of the present Medicare Act and prior versions of the Medicare Act addressing how CMS is to communicate plan quality to beneficiaries). Va. Uranium, 587 U.S. at 765.

In sum, congressional silence on this additional discretion is controlling, Animal Legal Def. Fund, 789 F.3d at 1217, and this conclusion is bolstered by general principles governing the power wielded by federal agencies. As the United States Supreme Court has stated, "[a]gencies may play the sorcerer's apprentice but not the sorcerer himself." Alexander v. Sandoval, 532 U.S. 275, 291 (2001). The "sorcerer" in the analogy, Congress, may confer some limited power on federal governmental agencies, id., but "an agency literally has no power to act . . . unless and until Congress confers power upon it." La. Pub. Serv. Comm'n v. Fed. Commc'ns Comm'n (LPSC), 476 U.S. 355, 357 (1986). Clover's interpretation of Section 1395w-23(o)(4)(A) falls in line with these limits on agency power, as this interpretation allows CMS to consider the specific data Congress gave it the power to consider without implying additional discretion which Congress declined to grant the agency. Id.

In sum, the Court concludes that the plain text of 42 U.S.C. § 1395w-23(o)(4)(A), when read alongside surrounding statutory provisions in the Medicare Act, supports the conclusion that CMS may *only* base its quality rating calculations on measures using

38

data collected under Section 1395w-22(e). While the statutory "text is king" in the realm of statutory interpretation, the Court nonetheless notes how legislative history and general principles of agency power also support its conclusion. <u>Loving v. IRS</u>, 917 F. Supp. 2d 67, 79 (D.D.C. 2013), <u>aff'd</u>, 742 F.3d 1013 (D.C. Cir. 2014). Based on this, and the Court's conclusion that the ten challenged measures rely on non-Section 1395w-22(e) data, the Court holds that CMS erred in considering the following measures in calculating Clover's 2026 Star Rating:

- Medication Adherence, Diabetes (D08);
- Medication Adherence, Hypertension (D09);
- Medication Adherence, Cholesterol (D10);
- Phone Call Center (C33);
- Phone Call Center (D01);
- Appeals Decisions(C32);
- Rating of Drug Plan (D05);
- Getting Needed Drugs (D06);
- Medication Therapy Management Completion (D11); and
- Pharmacy Statin Use (D12).[13]

## II. Remaining Challenges

The Court's interpretation of 42 U.S.C. § 1395-23(o)(4)(A), explained <u>supra</u>, narrows the scope of remaining measures challenged by Clover which need be addressed. These remaining

---

[13] The Court's holding with respect to these measures is limited to Clover's challenge to consideration of data not collected under 42 U.S.C. § 1395w-22(e). To the extent Clover asserts additional challenges to measures D08, D09, D10, C33, D01, C32, D05, D06, D11, and D12—such as challenges for alleged lack of notice-and-comment, arbitrary and capricious agency action, and a private non-delegation doctrine violation—the Court expresses no opinion on the merits of those arguments.

measures include: Improving Mental Health (C05); Reducing Falling (C15); Getting Needed Care (C22); Rating of Health Care Quality (C25); Care Coordination (C27); Improving Bladder Control (C16); Annual Flu Vaccine (C03); Improving Physical Health (C04); Getting Care Quickly (C23); and Customer Service (C24). See Dkt. No. 34 at 10. Clover asserts two challenges to these remaining measures: (A) improper reliance on post-2003 data in the quality rating calculation, and (B) CMS's alleged failure to engage in the required notice-and-comment process before considering these measures.

### A.    Challenge to Measures Relying on Post-2003 Types of Data

Clover claims that CMS erred in considering two measures—Reducing Falling (C15) and Care Coordination (C27)[14]—because these measures were allegedly based on data "that were not the 'types of data' collected by the Secretary as of November 1, 2003." Dkt. No. 1 ¶ 242; see also Dkt. No. 34 at 10; Dkt. No. 57 at 18. This argument stems from 42 U.S.C. § 1395w-22(e)(3)(B)(i). The Court will first analyze the proper interpretation of this provision

---

[14] Clover initially challenged measures C05, C22, and C25 for falling outside of the "types of data" collected as of November 1, 2003. See Dkt. No. 1 ¶ 243. However, pursuant to its brief in response to Defendants' cross motion for summary judgment, dkt. no. 57 at 18, Clover withdraws this "types of data" challenge with respect to those three measures. Accordingly, the Court declines to rule on whether CMS erred in considering C05, C22, and C25 in the Star Rating inquiry because those measures are not the "types of data" collected as of November 1, 2003.

40

before reaching the precise measures disputed by Clover.

### 1. Interpretation of 42 U.S.C. § 1395w-22(e)(3)(B)(i)

In 2003, Congress granted the Secretary authority to collect certain types of data pursuant to the quality improvement program outlined in 42 U.S.C. § 1395w-22(e). See 42 U.S.C. § 1395w-22(e)(3) ("Data"). Congress also placed guardrails—in other words, outer limits—on the types of data which may be collected by the Secretary. See id. § 1395w-22(e)(3)(B)(i)—(iii). The limitation disputed by the parties is found in 42 U.S.C. § 1395w-22(e)(3)(B)(i), which states "[t]he Secretary shall not collect under subparagraph (A) data on quality, outcomes, and beneficiary satisfaction to facilitate consumer choice and program administration other than the types of data that were collected by the Secretary as of November 1, 2003."

This provision was added through the Medicare Modernization Act of 2003, effective 2006, which substantially amended many of the statutory provisions previously governing the federal Medicare program. See AvMed, 2021 WL 2209406, at *2 (citing Pub. L. No. 108-173, § 722(a)(2), 117 Stat. 2066, 2347–48 (2003)). In its subsequent rulemaking, CMS interpreted the Medicare Modernization Act's amendments to mean the agency could continue to collect both CAHPS and HEDIS data, which were collected as of November 1, 2003. Id. (citing 69 Fed. Reg. at 46,886). Here, the parties dispute

41

what qualifies as the "data that were collected by the Secretary as of November 1, 2003" and whether the data forming the basis of measures C25 and C27 fall within that scope. Dkt. Nos. 34, 50, 51, 57. Resolving this dispute, again, is a question of statutory interpretation, this time the proper interpretation of 42 U.S.C. § 1395w-22(e)(3)(B)(i).[15]

To this end, Clover agrees with prior CMS representations that Section 1395w-22(e)(3)(B)(i) means that the agency may continue to require MA plans to "collect, analyze, and report their performance by using the measurement systems that are currently required, such as HEDIS, Health Outcomes of Seniors (HOS), and CAHPS, as appropriate for the type of plan." Dkt. No. 34 at 31 (quoting 69 Fed. Reg. at 46,886). But, according to Clover, this does not give CMS the broad statutory discretion to add or subtract

---

[15]   The District Court for the District of Columbia addressed a similar issue involving the meaning of Section 1395w-22(e)(3)(B) in 2021 in AvMed, 2021 WL 2209406, at *7-14. However, to the extent that court's analysis lends some guidance to the present dispute, AvMed's ultimate conclusion was reached by following the now-abandoned framework provided by the United States Supreme Court in Chevron, 467 U.S. at 846. See Loper Bright, 603 U.S. at 412 (overruling Chevron). As such, though some of the interpretative points in AvMed may remain instructive, the Court nonetheless notes that it exercises its independent judgment in interpreting Section 1395w-22(e)(3)(B)(i) in light of the United States Supreme Court's holding in Loper Bright. See Philip Morris, 801 F. Supp. 3d at 1367 (citing Loper Bright, 603 U.S. at 412).

42

"whatever data collections it wishes" from the HEDIS, HOS, and CAHPS systems, just because that data happens to appear in the same systems that were in place in 2003. Id. at 31–32. Instead, Clover contends that the "types of data" which the Secretary may collect pursuant to Section 1395w-22(e)(3)(B)(i) include only "data in common with the specific data collections, i.e., the specific survey questions, administered as of November 1, 2003 as part of the HEDIS, HOS, and CAHPS systems under § 1395w-22(e)." Id.

On the contrary, Defendants maintain that "types of data" refers to the systems in existence in 2003: HEDIS, HOS, and CAHPS. Dkt. No. 51 at 39. While CMS contends that it has the discretion to "add, delete, or modify" measures within those three systems, it does not agree with Clover's contention that it can "jam" "whatever data collections it wishes" into those systems, because there are other entities exerting control over HEDIS, HOS, and CAHPS which provide checks on CMS. Id. at 38–39.

The Court has already outlined the general framework for statutory interpretation, explained supra, and need not explain that framework in great detail a second time. In short, statutory interpretation "begins with the text." Ross v. Blake, 578 U.S. 632, 638 (2016) (citations omitted). Subparagraph (A) of Section 1395w-22(e)(3) requires that "subject to subparagraph (B), . . . as part of the quality improvement program, . . . each MA

43

organization shall provide for the collection, analysis, and reporting of data that permits the measurement of health outcomes and other indices of quality." 42 U.S.C. § 1395w-22(e)(3)(A)(i). The disputed limitation appears in subparagraph (B), which reads:

**(B) Limitations**

**(i) Types of data**

The Secretary shall not collect under subparagraph (A) data on quality, outcomes, and beneficiary satisfaction to facilitate consumer choice and program administration other than the types of data that were collected by the Secretary as of November 1, 2003.

**(ii) Changes in types of data**

Subject to subclause (iii), the Secretary may only change the types of data that are required to be submitted under subparagraph (A) after submitting to Congress a report on the reasons for such changes that was prepared in consultation with MA organizations and private accrediting bodies.

**(iii) Construction**

Nothing in the subsection shall be construed as restricting the ability of the Secretary to carry out the duties under section 1395w-21(d)(4)(D) of this title.

Id. § 1395w-22(e)(3)(B). The relevant inquiry concerns the meaning of "types of data" in Section 1395w-22(e)(3)(B)(i)'s limitation when read within the broader scope of Section 1395w-22(e)(3).

The general framework gleaned from subparagraphs (A) and (B) is that (1) the quality improvement requires MAOs to submit certain data to the Secretary regarding "health outcomes and other indicia of quality"; (2) the Secretary is the individual who has the

44

statutory power to "collect" this quality improvement data; and (3) when the Secretary is collecting this quality improvement data on "quality, outcomes, and beneficiary satisfaction," the data collected may *only* be the types of data that the Secretary collected as of November 1, 2003. 42 U.S.C. §  1395w-22(e)(3). While this plain text places the role of the Secretary in context, it does little to shed light on what Congress meant by "types of data" when it added this subsection in 2003. Bostock, 590 U.S. at 674 ("[T]he law's ordinary meaning at the time of enactment usually governs."). Nor does Congress define the term "types of data" to clarify what qualifies as a type of data that the Secretary collected as of November 1, 2003.

"To determine the ordinary meaning of a term, [courts] often look to dictionary definitions for guidance." In re Walter, 911 F.3d at 1143 (citation omitted). Thus, the ordinary meaning of the noun "type," as understood in 2003, lends some guidance to the statutory interpretation inquiry. Id. Generally speaking, a "type" exists when there are "qualities common to a number of individuals that serve to distinguish them as an identifiable class or kind," often suggesting "strong and clearly marked similarities throughout the items included, so that each is typical of the group." Webster's III New Int'l Dictionary 2476 (2002); see also Six W. Retail Acquisition, Inc. v. Sony Theatre Mgmt. Corp., No. 97 CIV.5499(LAP), 2004 WL 691680, at *13 n.11 (S.D.N.Y. Mar. 31,

45

2004) (defining "type" as "a group of persons or things that share common traits or characteristics distinguishing them as an identifiable group or class" (citing Webster's II New College Dictionary 1193 (2001))), aff'd sub nom. Six W. Retail Acquisition, Inc. v. Sony Pictures Ent. Corp., 124 F. App'x 73 (2d Cir. 2005).

This plain language definition could support either side's interpretation: under Clover's interpretation, the "common quality" of the data could be its appearance in specific survey questions asked as of November 1, 2003, dkt. no. 34 at 31; under Defendants' interpretation, the "common characteristic" of the data could be that it is part of the HEDIS, HOS, or CAHPS system, dkt. no. 51 at 39. As a result, there exists textual footing for both Clover and Defendants' interpretations of Section 1395w-22(e)(3)(B)(i), the statute is ambiguous, and the Court may look to sources beyond the statute's plain language. Consol. Bank, N.A., Hialeah, Fla. v. U.S. Dep't of Treasury, Off. of Comptroller of Currency, 118 F.3d 1461, 1464 (11th Cir. 1997) (citations omitted).

The parties travel in two different directions when turning to extratextual information, with Clover relying primarily on legislative history triggering Section 1395w-22(e)(3)(B)(i)'s restriction and Defendants focusing on CMS's interpretation of Section 1395w-22(e)(3)(B)(i) both at the time of enactment and throughout the two decades since then. Dkt. Nos. 34, 51, 57. First, regarding legislative history, Clover argues that, when Congress

46

passed the Medicare Modernization Act of 2003, it placed limitations on the Secretary's quality improvement data collection power, in part, out of concern that the Secretary may impose unduly burdensome data reporting requirements on MAOs without such limitations. Dkt. No. 34 at 32-34. Clover contends that the Secretary could sidestep this limitation under Defendants' interpretation of Section 1395w-22(e)(3)(B)(i) because the Secretary could demand data unrelated to the November 1, 2003 survey questions as long as that data was collected under the umbrella of HEDIS, HOS, or CAHPS. Id.

While legislative history supports Clover's contention that Congress sought to ease administrative and reporting costs on MAOs by enacting the Medicare Modernization Act of 2003, it does not follow that Defendants' interpretation of Section 1395w-22(e)(3)(B)(i) would allow the Secretary to "evade Congress's chosen restrictions." Id. at 34. When Congress enacted Section 1395w-22(e)(3)(B)(i) in 2003, it amended the original statute which created the Medicare Advantage Program: the Balanced Budget Act of 1997. See AvMed, 2021 WL 2209406, at *10. Under the Balanced Budget Act, the Secretary was to be provided with such access to information collected as may be appropriate to monitor and ensure the quality of care. 42 U.S.C. § 1395w-22(2)(A)(vi) (1997). The Secretary then had the statutory authority to implement this quality assurance program by regulation and by using measures he

47

or she deemed appropriate, ultimately serving the goal of facilitating plan comparison through beneficiary access to information. Id. § 1395w-22(2)(A)(xii); see also AvMed, 2021 WL 2209406, at *10.

Pursuant to the previous grant of authority over the quality assurance program outlined in the 1997 statute, CMS maintained a lot of authority over the reporting requirements imposed on Medicare Advantage programs. AvMed, 2021 WL 2209406, at *10. The regulations passed pursuant to this statutory authority reflect this considerable authority. See, e.g., id.; 42 C.F.R. § 422.152(c)(1) (1998) (requiring that MAOs measure performance using standard measures required by HCFA—CMS's predecessor—and giving HCFA discretion over what "uniform data collection and reporting instruments" may be required as part of these standard measures); see also United States ex rel. Sarasola v. Aetna Life Ins. Co., 319 F.3d 1292, 1293 n.1 (11th Cir. 2003) ("CMS is the successor to Health Care Financing Administration ('HCFA').") (citing 42 C.F.R. § 400.200)). However, at this time, CMS did not specify the particular measures for which reporting would be required, as the agency sought to maintain flexibility and allow reporting requirements to evolve alongside new developments. See 63 Fed. Reg. 34,968-01, 34,993 (June 26, 1998) (leaving "flexibility for the specific reporting and performance requirements to progress as [CMS] learn[s] more about performance

48

measurement"). CMS reiterated this flexibility-centered approach in 2000, providing "[o]ur requirements may change in future years as the HEDIS instrument evolves and as other measurement instruments are developed." 65 Fed. Reg. 40,169, 40,221 (June 29, 2000); see also AvMed, 2021 WL 2209406, at *10.

The Medicare Modernization Act, though, curtailed the Secretary's data-collection flexibility. Replacing CMS's broad discretion to impose on MAOs whatever reporting requirements it deemed fit, Congress enacted Section 1395w-22(e)(3), limiting the Secretary's collection power to only certain types of data. 42 U.S.C. § 1395w-22(e)(3). Taking the implications of these changes into account, Clover's reading of congressional intent in enacting the disputed provision grows more compelling: Congress sought to end the "moving goalposts" plaguing data collection and "stop CMS from imposing different reporting and performance requirements on plans." Dkt. No. 33 at 33. In fact, in 2018, CMS actually recognized a similar idea, stating that the modern reporting system reflects an effort to strike a balance between adequate measurement of quality and "minimiz[ing] [the] reporting burden for the industry." 83 Fed. Reg. at 16,520.

Even assuming it was Congress's intent to place limits on the Secretary's ability to change data collection burdens on MAOs, it does not necessarily follow that Clover's approach is the better reading of Section 1395w-22(e)(3)(B)(i). This is because both

49

Clover and Defendants propose interpretations of Section 1395w-22(e)(3)(B)(i) which limit the Secretary's authority, just in different ways. On one hand, Clover's interpretation limits the Secretary to only those survey questions which were asked as of November 2003. Dkt. No. 34 at 34-39; Dkt. No. 57 at 17. On the other, CMS's interpretation limits the Secretary to only collect data pursuant to the HEDIS, HOS, or CAHPS systems. Dkt. No. 51 at 28, 35-39.

Even further, to the extent Clover is concerned that allowing CMS to stray beyond the precise 2003 survey questions would enable the Secretary to "evade" congressional limitations on collection power, these concerns are alleviated by the checks on CMS provided in Section 1395w-22(e)(3)(B)(ii). Dkt. No. 34 at 34; 42 U.S.C. § 1395w-22(e)(3)(B)(ii). In sum, if the Secretary wants to alter the data reporting responsibilities as the HEDIS, HOS, or CAHPS systems evolve or other systems are developed, 65 Fed. Reg. at 40,221, it may have to report to Congress and consult with MAOs and private accreditation bodies before doing so.[16] See 42 U.S.C. § 1395w-22(e)(3)(B)(i)-(ii); Dkt. No. 51 at 28. This provides the necessary checks on CMS in response to congressional concern

---

[16] This consultation and reporting requirement is triggered only by "change[s]" in the types of data which are required to be submitted to CMS. 42 U.S.C. § 1395w-22(e)(3)(B)(ii). What qualifies as a "change" triggering this requirement is a separate issue of statutory interpretation which the Court need not address at this time.

without adopting an inflexible interpretation of the data collection power which backs the agency into a corner.

The D.C. District Court in AvMed shed light on what these limits would look like in practice, providing, "[f]or example, if CMS wanted to replace the CAHPS requirement with a new 'type of data' on consumer satisfaction that was not collected as of November 1, 2003, that change would require consultation with MA plans and a report to Congress." AvMed, 2021 WL 2209406, at *13. Though the Court need not precisely define what constitutes a "change[] in types of data" triggering Section 1395w-22(e)(3)(B)(ii)'s consultation and reporting requirement to resolve the present dispute, AvMed's analysis of this issue, at the very least, casts doubt on Clover's contention that allowing CMS to alter survey questions within HEDIS, HOS, and CAHPS would eviscerate the limits on collection power placed by Congress in 2003. Dkt. No. 34 at 34.

Finally, turning to the extratextual concerns highlighted by Defendants: agency interpretation. Dkt. No. 51 at 38. It is no secret that, since the Supreme Court's holding in Loper Bright, agency interpretation is not given the same weight it used to receive in the statutory interpretation inquiry. 603 U.S. at 412 (overruling Chevron, 467 U.S. 837, which previously required that federal courts defer to reasonable interpretations of an ambiguous statute). But this does not render agency interpretations entirely

51

irrelevant in discerning the "best reading" of a statute. Id. at 412. In fact, Loper Bright explains how, dating back to decades following Marbury v. Madison, 5 U.S. 137 (1803), courts could accord "due respect to Executive branch interpretations of federal statutes" without undermining the exercise of independent judgment now mandated by Loper Bright. 603 U.S. at 370. In these early days, as long as the views of the Executive Branch did not "supersede" the judiciary's independent review, Executive interpretations could nonetheless *inform* judicial review, especially "when an Executive Branch interpretation was issued roughly contemporaneously with enactment of the statute and remained consistent over time." Id. As a result, in the modern administrative state, "[c]ourts exercising independent judgment in determining the meaning of statutory provisions, consistent with the APA, may—as they have from the start—seek aid from the interpretations of those responsible for implementing particular statutes." Id. at 371 (citing Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944)); see also Turner v. Atlanta Indep. Sch. Sys., 805 F. Supp. 3d 1277, 1295 (N.D. Ga. 2025) (holding, post-Loper Bright, that the "tradition of considering executive branch guidance extends into the modern administrative state").

This being so, CMS's interpretation of Section 1395w-22(e)(3)(B)(i) both at the time of enactment and over time lend further credence to Defendants' contention that CMS should not be

limited to the 2003 survey questions. Dkt. No. 51 at 38–39. In 2004, the year after the Medicare Modernization Act was enacted, CMS made its interpretation of the disputed provision very clear, stating "[w]e interpret [Section 1395w-22(e)(3)(B)(i)] to mean that we can continue to require MA coordinated care plans to collect, analyze, and report their performance by using the measurement systems that are currently required, such as HEDIS, Health Outcomes of Seniors (HOS), and CAHPS, as appropriate for the type of plan. We believe that, consistent with private sector practices, we would be allowed to add, delete, or modify measures within these systems." 69 Fed. Reg. at 46,886. CMS also acknowledged the checks placed on its authority under the new statutory scheme, noting that "[c]hanges to these measurement systems are generally reviewed and approved by a committee with representatives from managed care plans, beneficiary advocacy groups, private and public health care purchasers." Id. While not dispositive in the present case, these statements lend credence to Defendants' present arguments because, temporally, the statements closely followed Section 1395w-22(e)(3)(B)(i)'s enactment, and the statements present a forthright summary of the power wielded by the agency while simultaneously appreciating the limits placed on that power. Id.; Loper Bright, 603 U.S. at 370.

CMS's 2004 interpretation gains additional credibility in the Court's present analysis because it has been reaffirmed by CMS in

the two decades since the Medicare Modernization Act was enacted. For example, in 2010, CMS restated its duty to collect data within its statutory limits and noted that such collection continued to be facilitated by HEDIS, which began in 1997, CAHPS, also beginning in 1997, and HOS, dating back to 1998. 75 Fed. Reg. 71,190-01, 71,219 (Nov. 22, 2010). In 2005, some commenters actually expressed concern that Section 1395w-22(e)(3) left CMS with *too little* flexibility to collect data due to congressional reporting requirements, wherein CMS reaffirmed that its ability to "make changes within each of the existing measurement systems, such as HEDIS," gave it the flexibility it needed. 70 Fed. Reg. 4,588-01, 4,635 (Jan. 28, 2005).

Then, in 2018, CMS again contended that its data collection did not expand beyond Section 1395w-22(e)(3)(B)(i)'s limitation because it continued to collect quality of care data from MAOs through HEDIS, and, though it had, since 1998, "revised and updated" the *precise* physical and mental health data collected through HOS, it nonetheless collected the same "types of data—clinical measures, beneficiary experiences, and changes in physical and mental health, respectively" which were the focus of HOS surveys at its inception. 83 Fed. Reg. at 16,531. This added an additional nuance to CMS's summary of its data collection guardrails: not only was it bound by its existing three systems (HEDIS, HOS, and CAHPS), in line with its approach expressed

54

throughout the previous fourteen years, but its modifications within those systems stayed true to the "types of data," meaning the *substantive subjects covered by the survey questions*, which were deemed relevant as of November 1, 2003. Id.

This nuanced 2018 rendition, the Court holds, is the best reading of Section 1395w-22(e)(3)(B): the "types of data" collected by the Secretary as of November 1, 2003 are the broad categories of HEDIS, HOS, and CAHPS-only survey questions, including, *but not limited to*, "clinical measures, beneficiary experiences, and changes in physical and mental health" which were collected as of that date. Id.; see also 83 Fed. Reg. at 16,531. The Court finds more-than-adequate support for this conclusion through its own holistic review of the statutory text, surrounding provisions, the parties' briefs, and the extratextual sources raised within them. See Dkt. Nos. 34, 50, 51, 57.

Like the parties' interpretations in the instant matter, this interpretation meaningfully engages with both the Secretary's power and its limitations, giving it a strong textual footing based on a plain reading of the provision within subparagraphs (A) and (B). 42 U.S.C. § 1395w-22(e)(3)(A)—(B). However, the Court interprets the limitation on the Secretary's data collection power in a manner which provides more discretion than the interpretation posed by Clover (limiting Secretary to 2003 survey questions) and less discretion than the interpretation posed by Defendants

55

(limiting Secretary to existing HEDIS, HOS, and CAHPS systems). Dkt. Nos. 34, 50, 51, 57. Limiting CMS to the HEDIS, HOS, and CAHPS systems is in line with the agency's contemporary interpretation of Section 1395w-22(e)(3)(B) in 2004 and its interpretations throughout the two decades since then. 75 Fed. Reg. at 71,219; 70 Fed. Reg. at 4,635; 83 Fed. Reg. at 16,531. And limiting CMS to particular categories of data within its existing systems mitigates concerns about the burden of data collection on MAOs—concerns highlighted by Clover's argument regarding legislative history. Dkt. No. 34 at 31–32. In sum, to comply with the statutory guardrails set by 42 U.S.C. § 1395w-22(e)(3)(B)(i), CMS's systems must remain unchanged from those which were utilized as of November 1, 2003 (HEDIS, HOS, and CAHPS), the overarching categories of questions within those systems must stay the same, but the *exact* survey questions asked from year to year can change within these confines.

### 2.   The Disputed Measures

Applying the above-described test to the disputed measures, the Court holds that the limitation in Section 1395w-22(e)(3)(B)(i) does not preclude CMS from considering measures C15 and C27 in Clover's 2026 Star Rating calculation. First, the primary data source for measure C15 is HEDIS-HOS, and the data source description of this measure outlines a set of HOS survey questions. Dkt. No. 33-2 at 62. This meets the preliminary

requirement that the correct data systems be utilized. Second, regarding substance, CMS's 2026 Technical Notes explain that this metric tracks the "percentage of Medicare members 65 years of age and older who had a fall or had problems with balance or walking in the past 12 months, who were seen by a practitioner in the past 12 months (denominator) and who received a recommendation for how to prevent falls or treat problems with balance or walking from their current practitioner." Id. To measure this, CMS asked the following questions:

- In the past 12 months, did you talk with your doctor or other health provider about falling or problems with balance or walking?

- Did you fall in the past 12 months?

- In the past 12 months have you had a problem with balance or walking?; and

- Has your doctor or other health provider done anything to help prevent falls or treat problems with balance or walking?

Id. In sum, these survey questions track mobility-focused "beneficiary experiences" with falling and problems with balance or walking, as well as "change in physical health"-centered data addressing whether subsequent treatment sought to address these mobility issues. Id.; see also 83 Fed. Reg. at 16,531 (describing "beneficiary experiences" as a "type of data" for Section 1395w-22(e)(3)(B)(i) purposes).

Like the 2026 questions, the 2003 HOS Survey questions inquire about mobility-focused beneficiary experiences, asking if a

57

beneficiary's health limited their ability to "walk[] more than a mile," "walk[] several blocks," or "walk[] one block." Dkt. No. 34-10 at 4. The 2003 Survey also asks a set of more specific questions regarding conditions which could interfere with balance or ability to walk, such as "numbness or loss of feeling in [the beneficiary's] feet" and "sores or wounds on [the beneficiary's] feet that did not heal." Id. at 8. And, albeit phrased in a more general sense than the 2026 questions, the 2003 Survey also tracks "changes in health" over the last twelve months by asking "compared to one year ago, how would you rate your health in general now?" Id. at 4. As such, while the precise language of the survey questions has evolved over time, both the system (HEDIS-HOS) and the data category (beneficiary experience and health changes surrounding walking and mobility issues) has not, and Measure C15 does not run afoul of the limitations in Section 1395w-22(e)(3)(B)(i).

The same comparison can be done with respect to Measure C27. This measure, like C15, relies on a proper data system utilized in 2003: CAHPS. Dkt. No. 33-2 at 80-81. The survey questions incorporated into 2026 Star Ratings ask about beneficiary experience, this time with a particular focus on their personal doctor's access to medical records and important health information, frequency of follow-up communications from doctors after testing, the timeliness of such results, efforts by doctors

58

to speak about prescription medications taken by the beneficiary, care management by the doctor, and the beneficiary's impression of how informed their personal doctor was about other care received from specialists. Id. In other words, this is a "beneficiary experience" focused measure inquiring about a personal doctor's preparedness, access to information, and ability to coordinate personalized care based on the individual's unique concerns and health history. Id.; 83 Fed. Reg. at 16,531.

The 2003 CAHPS Survey provided by Defendants elicits beneficiary experience information of a similar nature, asking, for example, if the individual's personal doctor or nurse knew the important facts and decisions about their health care, listened carefully to them, knew about their individual health problems affecting day-to-day life, spent enough time with them, and explained information in a manner which that individual beneficiary could understand. Dkt. No. 51-1 at 11, 15. This 2003 data set elicits the same general category of data as the Measure C27 questions (beneficiary experience), it concerns the same type of medical provider (a personal doctor or nurse), and it tracks the same general subject matter (tailoring care to the beneficiary's unique healthcare needs). Compare id. with Dkt. No. 33-2 at 80-81. Accordingly, Measure C27, like Measure C15, is an example of how CMS may alter the exact questions it asks in a survey without collecting data beyond the "types of data" which

59

were collected as of November 1, 2003. In short, Measure C27 does not run afoul of the limitations in Section 1395w-22(e)(3)(B)(i), either.

### B.    Notice-and-Comment Challenge

Finally, Clover challenges the remaining measures due to CMS's alleged failure to engage in the required "notice and comment" rulemaking procedure before including these measures in Clover's 2026 Star Rating Calculation. Dkt. No. 1 ¶¶ 246–57. Importantly, Clover lodges two distinct notice-and-comment challenges: one based on *regulatory* notice-and-comment requirements (Count III) and one based on *statutory* notice and comment requirements (Count IV). Id. The Court begins with the statutory challenge. Looking only at the remaining measures, those subject to this challenge include: Improving Mental Health (C05); Reducing Falling (C15);[17] Getting Needed Care (C22); Rating of Health Care Quality (C25); Care Coordination (C27); Improving Bladder Control (C16); Annual Flu Vaccine (C03); Improving Physical Health (C04); Getting Care Quickly (C23); and Customer Service (C24). Dkt. No. 1 ¶¶ 253–57.

Clover's statutory notice-and-comment challenge stems from 42 U.S.C. § 1395hh(a)(2), which reads: "No rule, requirement, or other

---

[17] The Court's conclusion regarding whether Measures C15 and C27 circumvent the limitation in Section 1395w-22(e)(3)(B)(i), explained supra, does not impact the notice-and-comment inquiry.

statement of policy (other than a national coverage determination) that establishes or changes a substantive legal standard governing the scope of benefits, the payment for services, or the eligibility of individuals, entities, or organizations to furnish or receive services or benefits under this subchapter shall take effect unless it is promulgated by the Secretary by regulation under paragraph (1)." Paragraph (1) grants the Secretary the power to "prescribe such regulations as may be necessary to carry out the administration of the insurance programs" under the federal Medicare program. Id. § 1395hh(a)(1).

In other words, the relevant test is that the Medicare Act requires notice-and-comment rulemaking for "any (1) 'rule, requirement, or other statement of policy' that (2) 'establishes or changes' (3) a 'substantive legal standard'" that (4) governs "the scope of benefits, the payment for services, or the eligibility of individuals, entities, or organizations to furnish or receive services or benefits." Allina Health Servs. v. Price, 863 F.3d 937, 943 (D.C. Cir. 2017) (citing 42 U.S.C. § 1395hh(a)(2)), aff'd sub nom. Azar v. Allina Health Servs., 587 U.S. 566 (2019); 42 U.S.C. § 1395hh(a)(1). Clover contends that all four requirements are met with respect to CMS's specifications for determining Star Ratings measures, including the specifications which appear in CMS's annual Technical Notes. Dkt. No. 57 at 35–36. While Defendants do not claim that the Secretary

61

proceeded by notice-and-comment rulemaking before relying upon these specifications, Defendants instead contend that the Star Rating measure specifications do not trigger Section 1395hh(a)(1)'s notice-and-comment requirement. Dkt. No. 51 at 25 ("[A]s CMS clarified in 2018, none of the Star Ratings measure specifications are codified in the Code of Federal Regulations"); 83 Fed. Reg. at 16,536–37 (CMS's response to commenters' proposals for introduction of new measures by rulemaking).

First, Star Ratings measure specifications qualify as "statement[s] of policy" for the purpose of Section 1395hh(a)(2). Azar, 587 U.S. at 572. This is because these specifications, and the agency's annual Technical Notes announcing how these specifications are to be utilized that year, "let the public know [the agency's current adjudicatory approach] to a critical question involved in calculating" ratings for Medicare Advantage plans nationwide. Id. (alterations adopted) (quoting Syncor Int'l Corp. v. Shalala, 127 F. 3d 90, 94 (D.C. Cir. 1997)).

Next, regarding whether Star Ratings measure specifications "establish[] or change a substantive legal standard," the parties do not dispute that the Star Rating calculation process changes when measure specifications change. See generally Dkt. Nos. 34, 51, 57; 42 U.S.C. § 1395hh(a)(2). But one question still remains with respect to this element: whether the Star Rating calculation qualifies as a "substantive legal standard" which is established

62

or changed by measure specifications. Id. The Court holds that it does.

Appellate and district courts have taken various approaches regarding what counts as a "substantive legal standard" for Section 1395hh(a)(2) purposes, and the Supreme Court has yet to rule on the issue. See, e.g., Price, 863 F.3d at 943; Agendia, Inc. v. Becerra, 4 F.4th 896, 904 (9th Cir. 2021). The Supreme Court in Azar v. Allina Health Services held that the phrase "substantive legal standard" in Section 1395hh(a)(2) cannot bear the same construction as the term "substantive rule" in the APA, but it limited its holding to that narrow issue based on the arguments presented by the parties on appeal. 587 U.S. at 579 ("In doing so, we follow the well-worn path of declining 'to issue a sweeping ruling when a narrow one will do.'" (quoting McWilliams v. Dunn, 582 U.S. 183, 198 (2017))). In doing so, the Court did not explicitly adopt petitioner or respondent's proposed definition of "substantive legal standard." Id.

While the Eleventh Circuit has not reached this precise issue, either, it has nonetheless used the phrase "substantive legal standard" to describe the minimum standards a claimant must meet to have a right to recovery on various constitutional claims. Keith v. DeKalb Cnty., 749 F.3d 1034, 1047 n.44 (11th Cir. 2014) (citing Marsh v. Butler Cnty., Ala., 268 F.3d 1014, 1024 (11th Cir. 2001)). This use of the phrase in reference to the minimum requirement to

63

be entitled to a right mimics the definition of "substantive legal standard" set by the D.C. Circuit in Allina Health Services v. Price, 863 F.3d at 943, before that case was appealed to the Supreme Court under the name Azar v. Allina Health Services, 587 U.S. 566. There, the D.C. Circuit held that a "'substantive legal standard' at a minimum includes a standard that 'creates, defines, and regulates the rights, duties, and powers of parties.'" Price, 863 F.3d at 943 (citing Black's Law Dictionary (10th ed. 2014) ("'Substantive law' is law that 'creates, defines, and regulates the rights, duties, and powers of parties.'")).

Here, while the Court need not define the outer boundaries of what constitutes a "substantive legal standard," Defendants do not directly dispute that the 2026 Star Rating calculations meet this "minimum" set by the D.C. Circuit. See Dkt. No. 51 at 17–23 (disputing whether Star Rating technical specifications "govern" but not whether they establish or change a "substantive legal standard"); Price, 863 F.3d at 943. For example, per both federal statute and its own regulations, CMS must use Star Ratings in determining the final applicable rebate percentage owed to a particular plan, with plans receiving higher quality ratings being entitled to a higher percentage rebate. 42 U.S.C. § 1395w-24(b)(1)(C)(v); 42 C.F.R. § 422.266(a)(2)(ii). In this way, CMS's Star Rating calculations function to define the scope of MAOs' legal rights to rebates by impacting the percent of per capita

savings a plan can receive. 42 U.S.C. § 1395w-24(b)(1)(C)(v); 42 C.F.R. § 422.266(a)(2)(ii); Blue Cross & Blue Shield of Fla., 786 F. Supp. 3d at 4–5 (explaining rebates); Price, 863 F.3d at 943 (drawing the same conclusion with respect to HHS Medicare fractions because such fractions "define the scope of hospitals' legal rights to payment" for certain treatment services).

Finally, CMS's inclusion of the disputed measures in Clover's 2026 Star Rating calculation governs payment for services.[18] "Govern" can take on multiple meanings depending on whether the verb is used transitively (with a direct object) or intransitively (without a direct object). S. Ass'n of Colls. & Schs. Comm'n on Colls., Inc. v. Bennett Coll., No. 1:21-CV-03060-VMC, 2022 WL 5241217, at *5 (N.D. Ga. Sept. 23, 2022) (conducting a similar analysis of the verb "withdraw"), aff'd, No. 22-13289, 2023 WL 2231773 (11th Cir. Feb. 27, 2023). Here, "govern" is used transitively to refer to "the scope of benefits, the payment for services, or the eligibility of individuals, entities, or organizations to furnish or receive services or benefits." 42

_____

[18] Because the final notice-and-comment "governing scope of benefits, the payment for services, or the eligibility of individuals, entities, or organizations to furnish or receive services or benefits" is phrased disjunctively, meeting any one of these three conditions satisfies this element of Section 1395hh(a)(2)'s notice-and-comment test. 42 U.S.C. § 1395hh(a)(2). That being so, because the Court holds that the measure specifications govern payment for services, it declines to rule on whether the specifications govern the scope of benefits or eligibility to furnish services or benefits.

65

U.S.C. § 1395hh(a)(2). That being so, "govern" used this way, is defined as "to constitute a rule or law for; serve as a precedent or deciding principle for." Webster's III New Int'l Dictionary 982. The decisive impact of that which "governs" is greater than mere "influence," which, used transitively, means "to affect or alter the conduct, thought, or character of by indirect or intangible means." Id. at 1160; see also Humana, 806 F. Supp. 3d at 648. Based on these definitions, it is possible for a "rule, requirement, or other statement of policy" to carry "influence" without necessarily "governing" if the influence is not sufficiently decisive. Webster's III New Int'l Dictionary 982; Humana, 806 F. Supp. 3d at 648.

Star Ratings measure specifications govern the payment for services because they serve as a "deciding principle" for such payments. Webster's III New Int'l Dictionary 982. Defendants contend that this cannot be so because "a plan's obligation to provide insurance (i.e., pay for services on behalf of Medicare beneficiaries) is wholly independent of its Star Rating." Dkt. No. 51 at 19. But limiting "payment for services" to only payments by MAOs for beneficiaries' healthcare services is an unduly narrow interpretation of this phrase; the Medicare Act provides for payments for services flowing between multiple parties in multiple different directions, including payments *by CMS to plans.* See Metro. Gen. Ins. Co., 40 F.4th at 1298; Dkt. No. 57 at 37.

66

The basic structure of the Medicare Advantage program—in comparison to traditional Medicare—provides support for this interpretation. See Metro. Gen. Ins. Co., 40 F.4th at 1298. By way of reminder, under the traditional Medicare model, CMS pays medical providers directly for beneficiaries' care. Id. But Medicare Advantage contemplates a different payment model: CMS pays MAOs a monthly amount per beneficiary, called a "capitation fee," for which the MAO provides the benefit service of "at least the same benefits as an enrollee would receive under traditional Medicare." United States ex rel. Butler v. Shikara, No. 20-80483-CV, 2025 WL 2506617, at *2 (S.D. Fla. Aug. 11, 2025) (citing W. Heritage, 832 F.3d at 1235; 42 U.S.C. §§ 1395w-22(a), 1395w-23); Elevance Health, 736 F. Supp. 3d at 4; Scan Health Plan, 2024 WL 2815789, at *1. For plans with bids below the benchmark, a rebate (if any) is added to the calculation of such payments by CMS to MAOs for plan offerings. 42 U.S.C. § 1395w-23(a)(1)(B)(i). Accordingly, the Medicare Advantage Program, by definition, contemplates "payments for services" flowing from CMS to MAOs. Id.

Defendants then contend that monthly payments given to each MAO are based on capitation rates, not Star Ratings—meaning CMS satisfies its notice-and-comment obligations by establishing the capitation rate each year by the notice-and-comment process described in 42 U.S.C. § 1395w-23(b)(2). See Dkt. No. 51 at 19. While it is true that monthly payments are based in part on

capitation rates, it is incorrect to characterize CMS's payments for MAOs' services as completely unrelated to Star Ratings. 42 U.S.C. § 1395w-23; see also Elevance Health, 736 F. Supp. 3d at 4 ("The amount the insurer receives varies depending in part on the demographic and health characteristics of each beneficiary and in part on the performance of the healthcare plan." (citing United Healthcare Ins. Co. v. Becerra, 16 F.4th 867, 873 (D.C. Cir. 2021))).

Other district courts analyzing the Star Rating system have recognized the close tie between these ratings and payments by CMS for a MAO's services, noting that "CMS is . . . *obligated* by statute to offer additional funding to plans with better Star Ratings." Scan Health Plan, 2024 WL 2815789, at *1 (emphasis added) (citing 42 U.S.C. § 1395w-23(o), 1395w-24(b)(1)(C)). The fact that the ratings trigger statutorily mandated funding increases is more than mere "influence" or an "indirect" effect; it is a deciding principle in the payment amount, even if capitation rates similarly play a crucial role in the payment for services. Webster's III New Int'l Dictionary 982, 1160; see also Humana, 806 F. Supp. 3d at 648.

The statutory text similarly supports this connection between Star Ratings and CMS-to-MAO payments by outlining the applicable payment scheme. 42 U.S.C. § 1395w-23. Within the payment scheme, the core function of Star Ratings is for use in "applications for

68

increase." 42 U.S.C. § 1395w-23(o)(4)(A). In other words, the benchmark against which qualifying plans bid in the following calendar year increases based on an "applicable percentage." Id. §§ 1395w-23(n)(1)(B), 1395w-23(o)(1). Plans receiving a four-star rating or higher "qualify for an increased benchmark against which to bid in the following contract year." Elevance Health, 736 F. Supp. 3d at 6 (citing 42 U.S.C. § 1395w-23(o)(1) (increasing, for qualifying plans, the applicable percentage that calculates the benchmark); id. § 1395w-23(o)(3)(A)(i) (describing a qualifying plan as a plan that earns a rating of four stars or higher)). The benchmark is of great importance in the plan payment calculation because payment computation hinges on whether a plan's bid fell below, at, or above benchmark. 42 U.S.C. § 1395w-23(a)(1)(B)(i)–(ii) (providing different payment calculation instructions for "plans with bids below benchmark" versus "plans with bids at or above benchmark").

Star Ratings have even more control over payment when it comes to rebates, an element of the payment received by plans. Id. § 1395w-23(a)(1)(B)(i). For reference, in the equation defining what "payment . . . for service benefits" a plan should receive, Congress indicated that payment for plans bidding below benchmark is the monthly bid amount as adjusted in accordance with the statute, "plus the amount (if any) of any rebate under subparagraph (E)." Id. While plans receive payment based on the difference

69

between the benchmark and their bid amount, the rebate payment actually owed by CMS is a percentage of that difference. Elevance Health, 736 F. Supp. 3d at 6; 42 U.S.C. § 1395w-24(b)(1)(C)(v). The final percentage figure deciding a rebate payment amount is governed by a plan's Star Rating: plans rated 4.5 stars or more receive seventy percent, plans of at least 3.5 stars and less than 4.5 stars receive sixty-five percent, and plans rated less than 3.5 stars receive a fifty percent rebate. 42 U.S.C. § 1395w-24(b)(1)(C)(v). Again, this is not merely an indirect influence over payment; Star Ratings have statutorily-mandated, deciding control over the rebate payment which a plan can receive from CMS for its Medicare Advantage services.[19]

---

[19] Defendants also express concern that requiring notice-and-comment regulation for Star Rating measures would create an "unworkable" system. Dkt. No. 51 at 24-25. But, as other courts have noted, sometimes a statutory requirement "imposes an independent and meaningful burden on agencies." See Colo. Wild Pub. Lands v. U.S. Forest Serv., 691 F. Supp. 3d 149, 161 (D.D.C. 2023) (citations omitted); see also 83 Fed. Reg. at 16,535 (comment seeking introduction of new measures by rulemaking in an effort to "allow[] greater lead time for plans to incorporate new measures, support[] stability in the Star Rating program, maximize[] stakeholder input, and provide[] additional transparency in the Star Ratings selection process"). In the words of the Supreme Court, "[i]f the government doesn't like Congress's notice-and-comment policy choices, it must take its complaints there." Azar, 587 U.S. at 581 (citations omitted). Courts are not free to rewrite statutory requirements under the guise of policy concerns. Id. at 581-82. In addition, to the extent Defendants express concern that this interpretation of the notice-and-comment provision will undermine Star Ratings calculations for all MAOs, the Court notes that CMS already codifies by regulation significant details regarding Star Ratings calculations, and the regulations already require that CMS "propose and finalize new measures through

In sum, CMS's decision to include the ten remaining disputed measures in Clover's 2026 Star Rating calculation triggers the notice-and-comment requirements in Section 1395hh(a)(2). "The Medicare Act therefore required [CMS] to engage in notice-and-comment rulemaking" before deciding to include these measures in the Star Rating calculation. Price, 863 F.3d at 943–44. Because CMS did not undertake the required notice-and-comment rulemaking with respect to these ten measures, the manner in which Clover's 2026 Star Rating was calculated is procedurally invalid. Id. (similar).[20]

### CONCLUSION

The Court **GRANTS in part** and **DENIES in part** Plaintiff's motion for summary judgment, dkt. no. 34, and **DENIES** Defendants' cross motion for summary judgment, dkt. no. 51. CMS's 2026 Star Rating for Clover is hereby **SET ASIDE,** and Defendants are **ORDERED** to recalculate that rating in a manner consistent with this Order.[21]

---

rulemaking" in advance of the measurement period. 42 C.F.R. §§ 422.164(c)(2), 422.166. The Court's holding on the statutory notice-and-comment requirement builds upon this existing regulatory approach to ensure compliance with Congressional directives.

[20] Clover also challenges three of the 2026 measures for alleged failure by Defendants to comply with regulatory notice-and-comment procedures. See Dkt. No. 1 ¶¶ 246–52; Dkt. No. 34 at 37–40; Dkt. No. 57 at 21–25. In light of the Court's decision on statutory notice and comment requirements, it need not rule on whether Defendants complied with these regulations.

[21] Clover requests a declaration that Defendants' use of certain measures was unlawful under the APA. Dkt. No. 1 at 66. Clover also requests an Order "setting aside and vacating Clover's 2026 Star

SO ORDERED this 27th day of May, 2026.

_____
HON. LISA GODBEY WOOD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

---

Rating," "directing CMS to recalculate Clover's 2026 Star Rating," and "directing CMS to determine Clover's 2026 Star Rating as 4 Stars." Id. Other courts dealing with Star Ratings-related litigation have noted, in formulating relief, that "courts should, where possible, leave it to administrative agencies to determine in the first instance how best to implement a judicial decision that alters the relevant legal framework." Elevance Health, 736 F. Supp. 3d at 25–26 (citing Ctr. for Biological Diversity v. Regan, 734 F. Supp. 3d 1, 63-65 (D.D.C. Apr. 12, 2024)). As such, like Elevance Health, the Court will simply set aside Clover's 2026 Star Rating and order CMS to redetermine that Star Rating in a manner consist with this Order. Id.

72

# In the United States District Court
## for the Southern District of Georgia
## Brunswick Division

CLOVER INSURANCE COMPANY,

    Plaintiff,

    v.

U.S. DEPARTMENT OF HEALTH AND
HUMAN SERVICES, et al.,

    Defendants.

2:25-CV-142

## ORDER

This action is before the Court on Defendants' motion to dismiss or transfer venue. Dkt. No. 21. The motion has been fully briefed, dkt. nos. 21, 22, 25, and is ripe for review. For the reasons given below, Defendants' motion to dismiss or transfer, dkt. no. 21, is **DENIED**.

## BACKGROUND

In the complaint,[1] Plaintiff Clover Insurance Company ("Clover") challenges the 2026 "Star Rating" it received in

---

[1] When considering a motion filed pursuant to Rule 12(b)(3), a court accepts the facts in the plaintiff's complaint as true. Drake v. JWN Inc., No. CV218-026, 2018 WL 9415068, at *2 (S.D. Ga. July 30, 2018) (citing Simbaqueba v. U.S. Dep't of Def., No. CV309-066, 2010 WL 2990042, at *2 (S.D. Ga. May 28, 2010), report and recommendation adopted, 2010 WL 2990041 (July 29, 2010)). Should there exist any inconsistencies between the complaint and extrinsic evidence which the Court finds to be properly considered, the Court "must draw all reasonable inferences and resolve all

connection with the federal government's Medicare Advantage Program. Dkt. No. 1 ¶¶ 1, 4. First, though the Court need not wade too deeply into the complex statutory scheme governing Medicare to rule on the pending motion to dismiss or transfer venue, it is nonetheless necessary to review generally the statutory and regulatory scheme underlying Clover's claims before reaching the complaint's factual allegations. Accordingly, the Court begins by addressing the federal government's Star Rating system and its statutory and regulatory backdrop. The Court will then address how Clover's allegations fit within that structure.

## I.   Statutory and Regulatory Backdrop

The Medicare program was enacted to provide healthcare assistance for the elderly and individuals laboring under certain disabilities. See generally 42 U.S.C. § 1395 et seq.; see also Elevance Health, Inc. v. Becerra, 736 F. Supp. 3d 1, 4 (D.D.C. 2024); MSP Recovery Claims, Series LLC v. QBE Holdings, Inc., 965 F.3d 1210, 1214 (11th Cir. 2020) (citing MSPA Claims 1, LLC v. Kingsway Amigo Ins. Co., 950 F.3d 764, 767 (11th Cir. 2020)). This case concerns a statutory sub-scheme under the umbrella of Medicare: the Medicare Advantage Program.

Under traditional Medicare, as contemplated by Parts A and B of the Medicare Act, beneficiaries are entitled to have the federal

---

factual conflicts in favor of the plaintiff." Id. (quoting Wai v. Rainbow Holdings, 315 F. Supp. 2d 1261, 1268 (S.D. Fla. 2004)).

Centers of Medicare & Medicaid Services (Defendant "CMS") pay medical providers directly for medical care. MSP Recovery Claims, Series LLC v. Metro. Gen. Ins. Co., 40 F.4th 1295, 1298 (11th Cir. 2022) (citing 42 U.S.C. §§ 1395c to 1395i-6, 1395j to 1395w-6). However, under Parts C and D of the Medicare program, individuals may receive Medicare benefits through private insurers. Becerra, 736 F. Supp. 3d at 4. More specifically, the Medicare Advantage Program, otherwise known as Part C of the Medicare Act, allows eligible individuals to instead "elect to have a private insurer of the individual's choice provide Medicare benefits." Metro. Gen. Ins. Co., 40 F.4th at 1298 (citing 42 U.S.C. §§ 1395w-21 to 1395w-28). Pursuant to the Medicare Advantage program, private Medicare Advantage Organizations ("MAOs") are the entities which provide these Medicare benefits. Id. (citing 42 U.S.C. § 1395w-28). Part D of the Medicare Program then contemplates "subsidized prescription drug insurance coverage" for beneficiaries who enroll in traditional or Part C plans. Becerra, 736 F. Supp. 3d at 4.

Congress's goal in creating the Medicare Advantage program, in short, was to "harness the power of private sector competition to stimulate experimentation and innovation that would ultimately create a more efficient and less expensive Medicare system." Humana Med. Plan, Inc. v. W. Heritage Ins. Co., 832 F.3d 1229, 1235 (11th Cir. 2016) (quoting In re Avandia Mktg., Sales Pracs. & Prods. Liab. Litig., 685 F.3d 353, 363 (3d Cir. 2012)); see also H.R.

3

Rep. No. 105-217, at 585 (1997), 1997 U.S.C.C.A.N. 176, 205-06 (Conf. Rep.). To carry out this purpose, CMS contracts with MAOs to provide Medicare-covered benefits to enrollees through Medicare Advantage Plans ("MA Plans"). Humana Med. Plan, 832 F.3d at 1235; see also HMO La., Inc. v. Dep't of Health & Human Servs., 793 F. Supp. 3d 150, 153 (D.D.C. 2025). In effect, the Medicare Advantage program "aims to reduce Medicare costs through semi-privatization; it permits Medicare to effectively sub-contract its duties to private insurers." MSPA Claims 1, LLC v. Tenet Fla., Inc., 918 F.3d 1312, 1316 (11th Cir. 2019) (citing Parra v. PacifiCare of Ariz., Inc., 715 F.3d 1146, 1152-53 (9th Cir. 2013)).

In the fall of each year, CMS rates Medicare Advantage plans on a one-to-five-star scale, known as the "Star Ratings" system. See Becerra, 736 F. Supp. 3d at 4 (citing 42 U.S.C. § 1395w-23(o)); Blue Cross & Blue Shield of Mass., Inc. v. Kennedy, 808 F. Supp. 3d 139, 141 (D.D.C. 2025) (citing Policy and Technical Changes to Medicare Programs, 83 Fed. Reg. 16,440, 16,520 (Apr. 16, 2018) (codified in scattered sections of 42 C.F.R.)). These "Star Ratings" are intended to communicate the quality of each plan, where a one-star rating is the lowest-quality rating and a five-star rating reflects the highest quality. Id.; 42 C.F.R. § 422.166(a)(4); see also HMO La., 793 F. Supp. 3d at 153 ("The ratings are intended to be 'a true reflection of plan quality and

4

enrollee experience' based on 'complete, accurate, and reliable' data." (quoting 83 Fed. Reg. 16,440, 16,520-21 (Apr. 16, 2018))).

The Star Ratings affect both federal funding allocation and plan enrollment. Blue Cross, 808 F. Supp. 3d at 141-43. First, while the complex web of Medicare laws explains in great detail how this occurs, Star Ratings impact the payments that plans receive from CMS: Medicare Advantage plans with higher star ratings are generally eligible to receive more annual federal funds from CMS than lower-rated plans. Id. at 141-42; see also Becerra, 736 F. Supp. 3d at 5 (describing this system in greater detail). Second, regarding plan enrollment, "higher scoring plans are likely to attract additional customers, while lower scoring plans may lose customers." Becerra, 736 F. Supp. 3d at 6. This market impact stems from public reporting of Star Ratings, as "CMS displays the star ratings in its online and print resources available to Medicare beneficiaries." HMO La., 793 F. Supp. 3d at 153 (citing (42 C.F.R. § 422.166(h)).

One such online resource is the Medicare "Plan Finder" tool, a web service maintained by CMS. Becerra, 736 F. Supp. 3d at 5 (citing 42 C.F.R. § 422.166(h) (governing posting and display of ratings)). At a high level, beneficiaries use this tool to "shop" for plans, meaning the Plan Finder displays information about available plans in a member's jurisdiction, including plans' star ratings, to allow beneficiaries to compare plans and find the best

5

fit for them. Id.; Blue Cross, 808 F. Supp. 3d at 142. As a result, "contracts with higher Star Ratings prove more attractive to beneficiaries." Blue Cross, 808 F. Supp. 3d at 142.

Federal Regulations promulgated by CMS provide great detail about how Star Ratings are calculated. See 42 C.F.R. §§ 422.166, 422.162(a). CMS also publishes Technical Notes, providing granular detail about how ratings are calculated each year. See Medicare 2026 Part C & D Star Ratings Technical Notes (updated Sept. 25, 2025), cms.gov/files/document/2026-star-ratings-technical-notes.pdf. In sum, the Technical Notes describing 2026 Star Rating calculations identify meaningful "measures" to be used in such calculations, and the authorized measures fall into five broad categories:

> (1)   Outcomes:   Outcome   measures   reflect improvements in a beneficiary's health and are central to assessing quality of care.
>
> (2)   Intermediate outcomes: Intermediate outcome measures reflect actions taken which can assist in improving a beneficiary's health status. Diabetes Care – Blood Sugar Controlled is an example of an intermediate outcome measure where the related outcome of interest would be better health status for beneficiaries with diabetes.
>
> (3)   Patient   experience:   Patient   experience measures reflect beneficiaries' perspectives of the care they received.
>
> (4)   Access: Access measures reflect processes and issues that could create barriers to receiving needed care. Plan Makes Timely Decisions about Appeals is an example of an access measure.

(5)  Process: Process measures capture the health care services provided to beneficiaries which can assist in maintaining, monitoring, or improving their health status.

Id. at 1. The data input into the Star Ratings calculation come from four main categories of data sources: (1) health and drug plans, (2) surveys of enrollees, (3) data collected by CMS contractors, and (4) CMS administrative data. Id. at 5.

## II.  The Present Action

With this backdrop in mind, Clover brings the present action to challenge its 2026 Star Rating. See generally Dkt. No. 1. According to the complaint, Clover is an artificial intelligence-powered "technology and physician-enablement company" providing Medicare Advantage plans to over 100,000 beneficiaries across multiple states—including Georgia. Id. ¶¶ 2-3. On October 9, 2025, CMS published Clover's final 2026 Star Rating as 3.5 Stars, though Clover contends that it should have been awarded a "Four Star" rating. Id. ¶¶ 8, 43. This reduced rating, according to the complaint, harms Clover's reputation and deprives both the company and its members of "approximately $120 million in statutorily mandated quality bonus and related payments." Id. ¶ 8.

In challenging its 2026 Star Rating, Clover contends that CMS erred in its calculations by considering data points beyond those measures identified by Congress without following applicable procedures to do so. Id. ¶¶ 8, 51. In other words, Clover argues

7

103

that "CMS has admittedly departed from the measures of clinical quality and health outcomes that Congress authorized, instead relying on a host of other measures that have little or nothing to do with quality"—causing harm to Clover and, allegedly, undermining the goals of the Medicare system. Id. ¶¶ 8-9.

Clover filed suit in this Court on November 7, 2025, naming as Defendants the Department of Health and Human Services ("HHS"); Robert F. Kennedy, Jr., in his official capacity as Secretary of HHS; CMS; and Mehmet Oz, in his official capacity as Administrator of CMS. See generally id. The six-count complaint seeks declaratory and injunctive relief, alleging multiple violations of the Administrative Procedure Act ("APA") (Counts I-V) and a private non-delegation violation stemming from both Article II, § 1 of the United States Constitution and the Fifth Amendment. Id. ¶¶ 232-73. Defendants now move to dismiss or transfer the case under Federal Rule of Civil Procedure 12(b)(3), arguing that venue is improper in the Southern District of Georgia. Dkt. No. 21. Separately, Clover moves to expedite resolution of this motion so as to leave sufficient time for Defendants to "make necessary changes to increase Clover's funding for the next year" within the proper timeframe. Dkt. No. 23 at 2.

## LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 12(b)(3), a party may move to dismiss a claim for improper venue. Fed. R. Civ. P.

12(b)(3); <u>Simbaqueba</u>, 2010 WL 2990042, at *2. When a defendant moves to dismiss or transfer based on improper venue, "[t]he plaintiff has the burden of showing that venue in the forum is proper." <u>Pinson v. Rumsfield</u>, 192 F. App'x 811, 817 (11th Cir. 2006). When analyzing a motion to dismiss or transfer under Rule 12(b)(3), a district court "must accept the facts in the plaintiff's complaint as true." <u>Simbaqueba</u>, 2010 WL 2990042, at *2.

When a Rule 12(b)(3) motion is "predicated upon key issues of fact, the court may consider matters outside the pleadings." <u>Id.</u> (citing <u>Curry v. Gonzales</u>, No. 105-2710, 2006 WL 3191178, at *2 (N.D. Ga. Oct. 31, 2006)).[2] Where conflicts exist between the allegations in the complaint and the evidence outside of the pleadings, the court "must draw all reasonable inferences and resolve all factual conflicts in favor of the plaintiff." <u>Bell v. Rosen</u>, No. CV214-127, 2015 WL 5595806, at *2 (S.D. Ga. Sept. 22, 2015) (citing <u>Wai</u>, 315 F. Supp. 2d at 1268); <u>see also</u> <u>Simbaqueba</u>, 2010 WL 2990042, at *2.

If a district court finds venue to be improper, it "shall

---

[2] Attached to Clover's response to Defendants' motion to dismiss or transfer venue is a declaration from Clay Thornton, the Chief Financial Officer of Clover. Dkt. No. 22-1 ¶ 3. This declaration outlines Mr. Thornton's experience and responsibilities in his role at Clover, alongside various reasons why Mr. Thornton believes the present matter is sufficiently connected to the Southern District of Georgia. <u>See generally</u> <u>id.</u>

dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." 28 U.S.C. § 1406(a); see also C.M. v. Noem, 796 F. Supp. 3d 1198, 1218 (S.D. Fla. 2025).

**DISCUSSION**

Resolution of the present motion to dismiss or transfer boils down to two primary inquiries: (1) whether venue is proper in the Southern District of Georgia; and (2) whether, based in part on the venue analysis, this case should be adjudicated in this District, transferred to another district, or dismissed wholesale. The Court finds that venue is proper in the Southern District of Georgia but defers its decision on whether transfer would be proper under 28 U.S.C. § 1404 until it receives additional briefing from the parties on this issue.

## I.    Venue is proper in the Southern District of Georgia.

Both Defendants HHS and CMS are federal entities. See 42 U.S.C. § 202; Alabama v. Ctrs. for Medicare & Medicaid Servs., 674 F.3d 1241, 1243 (11th Cir. 2012); Andujar v. Agency for Health Care Admin., No. 6:20-CV-1804-RBD-EJK, 2021 WL 11645444, at *2 (M.D. Fla. Apr. 7, 2021) (characterizing HHS and CMS as federal entities), report and recommendation adopted, 2021 WL 11645443 (Apr. 26, 2021). 28 U.S.C. § 1391(e) instructs plaintiffs where to file civil actions when, like Defendants Kennedy and Oz in this case, "a defendant is an officer or employee of the United States

10

or any agency thereof acting in his official capacity or under color of legal authority, or an agency of the United States." Under this provision, venue is proper in the judicial district where:

>   (A) a defendant in the action resides,

>   (B) a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or

>   (C) the plaintiff resides if no real property is involved in the action.

28 U.S.C. § 1391(e)(1); see also Green v. Kendall, No. 1:23-CV-03024-ELR, 2024 WL 6874234, at *3 (N.D. Ga. July 2, 2024) (same).

Here, Clover—the party carrying the burden to show venue is proper when faced with Defendants' challenge—does not attempt to rely upon subsections (A) or (C) of 28 U.S.C. § 1391(e)(1) to argue that venue lies in the Southern District of Georgia. Dkt. No. 22 at 5-16; Pinson, 192 F. App'x at 817. Instead, the parties exclusively dispute whether "a substantial part of the events or omissions giving rise to the claim" occurred in the Southern District of Georgia within the meaning of 28 U.S.C. § 1391(e)(1)(B). Dkt. Nos. 21, 22, 25. Because whether this "substantial part" requirement is satisfied depends on "key issues of fact," the Court may properly consider matters outside the pleadings when deciding the 12(b)(3) motion, including the declaration of Clay Thornton filed as an attachment to Clover's response to the instant motion. Dkt. No. 22-1; Simbaqueba, 2010 WL

11

2990042, at *2 (citing Curry, 2006 WL 3191178, at *2).

To determine where "a substantial part of the events or omissions giving rise to the claim occurred," "[o]nly the events that directly give rise to a claim are relevant." Jenkins Brick Co. v. Bremer, 321 F.3d 1366, 1371 (11th Cir. 2003);[3] see also Eakin v. Rosen, No. CV215-42, 2015 WL 8757062, at *4 (S.D. Ga. Dec. 11, 2015) (quoting Jenkins Brick, 321 F.3d at 1371). Accordingly, the Court must "focus on relevant activities of the defendant[s], not of the plaintiff[s]," and the Court may consider "only those acts and omissions that have a close nexus to the wrong." Jenkins Brick, 321 F.3d at 1371–72. "[O]f the places where the events have taken place, only those locations hosting a

---

[3] While the Eleventh Circuit in Jenkins Brick interpreted a previous iteration of the general venue provision rather than Section 1391(e)(1)(B), the statutory language interpreted in that case is identical to the instructive language in this one. 321 F.3d at 1371. Compare 28 U.S.C. § 1391(b)(2) ("A civil action may be brought in a judicial district *in which a substantial part of the events or omissions giving rise to the claim occurred.*" (emphasis added)), with id. § 1391(e)(1)(B) (providing for civil actions "brought in any judicial district in which *a substantial part of the events or omissions giving rise to the claim occurred*" (emphasis added)). Accordingly, multiple district courts in this Circuit have relied upon the principles identified in Jenkins Brick to determine whether venue is proper under Section 1391(e)(1). See, e.g., Doe 1 v. Bondi, 785 F. Supp. 3d 1268, 1279 n.7 (N.D. Ga. 2025); Russo v. Raimondo, No. 24-0186-WS-M, 2024 WL 4571431, at *2 (S.D. Ala. Oct. 24, 2024) ("[Section 1391(e)(1)(B)'s] language parallels that of Section 1391(b)(2), the general venue provision, and the parties agree that [Jenkins Brick], which construed the identical language under a previous iteration of that provision, governs the construction of Section 1391(e)(1)(B).").

12

'substantial part' of the events are to be considered." Id. at 1371.

This "substantial part" language "contemplates some cases in which venue will be proper in two or more districts." Id. In fact, Congress passed this provision "to broaden the venue of civil actions which could previously have been brought only in the District of Columbia." Schlanger v. Seamans, 401 U.S. 487, 490 n.4 (1971). As such, Clover is "not required to select the venue with the *most* substantial nexus to the dispute; rather, [Clover] must simply choose a venue where a substantial part of the events occurred, even if a greater part of the events occurred elsewhere." Eakin, 2015 WL 8757062, at *4 (emphasis in original) (quoting Morgan v. N. MS Med. Ctr., Inc., 403 F. Supp. 2d 1115, 1122 (S.D. Ala. 2005)); see also TruServ Corp. v. Neff, 6 F. Supp. 2d 790, 792 (N.D. Ill. 1998) ("The test is not whether a majority of the activities pertaining to the case were performed in a particular district, but whether a substantial portion of the activities giving rise to the claim occurred in the particular district." (citing Pfeiffer v. Insty Prints, No. 93 C 2937, 1993 WL 443403, at *2 (N.D. Ill. Oct. 29, 1993))). For venue purposes, the Eleventh Circuit interprets this "substantial part" language to require *more* relevant conduct than the minimum contacts inquiry embedded in the personal jurisdiction analysis. Eakin, 2015 WL 8757062, at *4 (citing Jenkins Brick, 321 F.3d at 1372 (disapproving of line

13

of cases from other jurisdictions because "its flavor was that of a 'minimum contacts' personal jurisdiction analysis rather than a proper venue analysis" and mere contact was not enough to make venue proper)).

Based on the applicable venue statute and authority interpreting the controlling language, Defendants argue that "a substantial part of the events or omissions giving rise to the claim" did not occur in the Southern District of Georgia. Dkt. Nos. 21, 25. In doing so, Defendants contend that Clover's core allegation is that Defendants "made decisions" which harmed Clover—decisions which were made in Maryland or the District of Columbia. Dkt. No. 21 at 4-5. In response, Clover contends that the Southern District of Georgia is a proper forum because of "Defendants' collection of and reliance upon unauthorized data from Clover's Medicare Advantage beneficiaries in this District" and subsequent publication of "an erroneous and derogatory Star Rating" to beneficiaries within this District. Dkt. No. 22 at 7, 10.

Upon due consideration of the parties' arguments, applicable venue principles, and relevant statutory, regulatory, and judicial authority, the Court holds that Clover has met its burden to show that venue is proper in the present forum. Pinson, 192 F. App'x at 817; see generally Dkt. No. 22. This is because (A) it is proper to consider in the venue analysis both the location from which

14

data was collected and the location of the alleged harm, and (B) when these categories of allegations are considered, a "substantial part" of the events giving rise to Clover's claims occurred in the Southern District of Georgia. See 28 U.S.C. § 1391(e)(1)(B).

> **A.    The Court may consider the data collection and harm from Star Rating publication as events "giving rise" to Clover's claims.**

Preliminarily, relevant to the question of venue under Section 1391(e)(1)(B)'s "substantial part" provision is the nature of the six claims pursued by Clover, as this weighs on what "events or omissions" gave rise to them. See Eakin, 2015 WL 8757062, at *4 (describing the general nature of plaintiffs' libel and slander per se claims before ascertaining whether a substantial part of the events giving rise to the claims occurred in the Southern District of Georgia). Here, Counts I through V involve alleged violations of the APA. Dkt. No. 1 ¶¶ 232-65. The APA requires federal courts to hold unlawful and set aside federal agency actions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege, or immunity; in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; or without observance of procedure required by law. 5 U.S.C. § 706(2); see also Florida v. United States, 660 F. Supp. 3d 1239, 1272-78 (N.D. Fla. 2023); Kansas v. U.S. Dep't of Lab., 749 F.

Supp. 3d 1363, 1376 (S.D. Ga. 2024), reconsideration denied, No. 2:24-CV-76, 2024 WL 5697302 (S.D. Ga. Aug. 29, 2024). "'Law,' in this context, 'means, of course, any law, and not merely those laws that the agency itself is charged with administering.'" Kansas, 749 F. Supp. 3d at 1376 (quoting FCC v. Nextwave Pers. Communs. Inc., 537 U.S. 293, 300 (2003)). And courts may set aside agency actions under APA Section 706(2) if the actions violate an agency's own regulations, as "an agency is bound by its own regulations." Blue Cross, 808 F. Supp. 3d at 144-45 (first citing Nat'l Env't Dev. Ass'n's Clean Air Project v. EPA, 752 F.3d 999, 1008-09 (D.C. Cir. 2014); then citing Erie Blvd. Hydropower, LP v. FERC, 878 F.3d 258, 269 (D.C. Cir. 2017)).

Counts I and II, alleging agency action "not in accordance with law, in violation of statutory right, [and] in excess of statutory authority," challenge the Star Rating calculation because CMS allegedly collected and utilized data not contemplated by federal statute or its own agency regulations. Dkt. No. 1 ¶¶ 232-45. Counts III and IV, alleging agency action "without observance of procedure required by law or not in accordance with law," involve the proper procedure required when CMS makes changes to "measures" used in the Star Ratings calculation. Id. ¶¶ 246-57; 42 C.F.R. § 422.164. Count V charges CMS with "arbitrary and capricious" action for its alleged "failure to rely upon congressionally authorized data and follow required notice-and-

16

comment procedures," leading CMS to apply purportedly inappropriate measures in the Star Ratings calculation. Dkt. No. 1 ¶ 258-65. Finally, Count VI involves CMS's alleged outsourcing of "its decision-making function" in violation of the private non-delegation doctrine, which Clover, again, ties to the unauthorized use of certain measures in the Star Rating calculation—this time, the "Reviewing Appeal Decision" measure, which is tied to decisions of the IRE, a CMS contractor. Id. ¶¶ 266-73; see also FCC v. Consumers' Rsch., 606 U.S. 656, 696-97 (2025) (defining the private non-delegation doctrine). At bottom, all of Clover's claims against Defendants boil down to the following sequence of alleged events: (1) Defendants collected certain data measures and relied upon these measures when it calculated 2026 Star Ratings; (2) some of these measures were not the kinds of measures which were authorized by Congress or the Agency's own regulations at the time the data was collected and used, and use of one such measure violates the non-delegation doctrine; (3) Defendants did not take the proper steps to approve these new measures before they relied on them; and (4) these improper calculations led to Clover receiving a lower Star Rating than it should have received, causing harm.[4] See generally Dkt. No. 1.

---

[4] While this summary of the events precipitating Clover's claims is at a high level of generality, it functions only to narrow down what events are relevant to the venue analysis. The Court does not seek to opine on whether Clover plausibly alleges the elements of

17

### 1.    Data Collection from this District

When the nature of Clover's claims is made apparent, so too are the ties between the present action and this District. See Eakin, 2015 WL 8757062, at *5. First, it is proper to consider in the venue analysis that healthcare data, some of which factored into the unauthorized measures, was collected from beneficiaries in the Southern District of Georgia. See, e.g., Dkt. No. 1 ¶¶ 51, 211-19. To support the contention that data was collected from beneficiaries in this District, the complaint and the additional declaration filed by Clover provide:

- Clover provides its Medicare Advantage plans to thousands of members in the Southern District of Georgia, including members residing "within Glynn, Camden, McIntosh, Long, Wayne, Appling, and Jeff Davis counties, along with practically every other county within this District";

- CMS utilized "unauthorized forms of data concerning Clover's members located within this District" in its 2026 Star Rating calculation;

- In May 2025, Clover provided data to CMS to "show that CMS's Medication Adherence measures . . . were arbitrary and capricious," identifying erroneous Medication Adherence data from 733 members, including members in this District, but CMS did not remedy this issue despite repeated attempts by Clover to challenge the "unlawful measures";

- Georgia is Clover's second-largest market by total membership;

- The unauthorized data use challenged by Clover includes data regarding its members, "including

---

its claims, but rather includes this summary in the interest of clarity.

thousands of members within this District," such as Clover's members' drug prescribing histories, outcomes of members' coverage appeals, members' evaluation of their healthcare quality, their healthcare outcomes, and their satisfaction; and

- Because thousands of Clover members reside in this District, "a substantial proportion of the foregoing data collected and utilized to determine Clover's Star Rating originates in this District."

Dkt. No. 1 ¶¶ 3, 51, 211–19; Dkt. No. 22-1 ¶¶ 6, 11. In light of the fact that all factual allegations should be taken as true and reasonable inferences should be drawn in Clover's favor, these allegations give rise to a reasonable inference that, in calculating Clover's 2026 Star Rating, (1) Defendants collected a substantial amount of member information from beneficiaries within the Southern District of Georgia, (2) data from this District factored into the unauthorized "measures" in the Star Rating calculation, and (3) CMS failed to remedy errors in data entries regarding members in this District. Dkt. No. 1 ¶¶ 3, 51, 211; Dkt. No. 22-1 ¶¶ 6, 11; see also Simbaqueba, 2010 WL 2990042, at *2; Bell, 2015 WL 5595806, at *2 (citing Wai, 315 F. Supp. 2d at 1268).

In the pending motion to dismiss or transfer venue, Defendants urge this Court to disregard the data collection from members in this District when conducting the venue analysis, claiming that "[t]he *collection* of data about members in this District has no connection to Clover's allegation that Defendants' *calculation* of its 2026 Star Rating was illegal." Dkt. No. 25 at 4-5. Based on

19

this contention, Defendants state that "[t]he gathering of data within this District" is not relevant to the venue analysis because such collection is only "tangentially" connected to the dispute in litigation and is not an event that "directly gives rise to a claim." Dkt. No. 21 at 5 (citing Rogers v. Civ. Air Patrol, 129 F. Supp. 2d 1334, 1339 (M.D. Ala. 2001)). However, this is an unduly narrow characterization of the events relevant to the venue analysis. Even though Defendants' "decision" to rely upon certain measures in the Star Rating calculation is one of the factual events which Clover seeks to challenge directly in all six claims, the Eleventh Circuit's analysis in Jenkins Brick does not support "confin[ing] the universe of relevant events" to only that one factual predicate. Russo, 2024 WL 4571431, at *3 (citing Jenkins Brick, 321 F.3d at 1372).

Rather, in Jenkins Brick, the panel identified three relevant events which had a sufficiently "close nexus" to plaintiffs' claim for breach of employee's non-compete clause such that the events could be considered in the venue analysis: (1) the negotiation of the underlying contract, (2) the execution or signing of the contract, and (3) the alleged breach. 321 F.3d at 1372–73. In other words, though the only factual event directly challenged was the purported breach of the non-compete itself, the court considered in the venue analysis the location(s) directly related to the formation and execution of the agreement, rather than looking only

20

116

at the location of the actions allegedly constituting breach. <u>Id.</u>

The same analysis may be conducted in the present action. <u>See generally</u> Dkt. No. 1. The single fact that an ultimate calculation is challenged as unauthorized and unconstitutional does not mean that another occurrence (such as the collection of the very data underlying the challenged calculation) cannot be an event that gives rise to the claim. <u>See</u> <u>Russo</u>, 2024 WL 4571431, at *4. In other words, the record does not lend support to Defendants' contention that there is "no connection" between the allegedly unauthorized data collection and the Star Rating calculation when the precise reason Clover challenges the Star Rating calculation is for Defendants' use of the unauthorized data they allegedly collected. <u>Id.</u>; Dkt. No. 25 at 4-5. Not only are the data collection and ultimate calculation "connected"—they are practically interwoven into one sequence of allegedly unlawful activity leading directly to the claims pursued in this action.

Defendants also contend that it is a mistake to consider the data collection in the venue analysis because data collection is "not itself wrongful." Dkt. No. 25 at 3 (citing <u>Woodke v. Dahm</u>, 70 F.3d 983, 985-86 (8th Cir. 1995); <u>Jenkins Brick</u>, 321 F.3d at 1372). Specifically, Defendants argue that data collection in this District is not a "legal predicate" to Clover's challenge that is "necessary to support" such a claim. <u>Id.</u> at 3-4. To support this, Defendants state that the wrong alleged by Clover, the calculation

21

of the Star Rating using unauthorized data, "would still exist if CMS had, for example, used publicly available data that it was statutorily forbidden from using." Id. at 4.

It is true, as noted by Defendants, that the Eleventh Circuit in Jenkins Brick approved of the analytical framework employed in Woodke, wherein the Eighth Circuit declined to consider an event in the venue analysis because that event was "not itself wrongful." Jenkins Brick, 321 F.3d at 1372. However, while the Eleventh Circuit approved of the "analytical framework" used in Woodke because it "considered as relevant only those acts or omissions that have a close nexus to the wrong," nowhere in the Jenkins Brick opinion does the court adopt an explicit rule stating that only acts which are, standing alone, wrongful may be considered in the venue inquiry. Id. In fact, the Eleventh Circuit in the same opinion considered in its venue analysis both the location of contract negotiation, which is "not itself wrongful," and the location of contract execution, which is "not itself wrongful," either. Id. at 1372–73. This, at the very least, cautions the Court against inferring a categorical bar against considering actions which are not themselves wrongful in the venue inquiry, despite Defendants' arguments otherwise. Dkt. Nos. 21, 25.[5]

_____

[5] Even if it were proper to interpret Jenkins Brick as establishing a requirement that an event be "in itself unlawful" for it to be relevant to venue, Clover's allegations would likely suffice under that standard. While data collection in a general sense is not

22

Likewise, Defendants' arguments regarding a "legal" versus "factual" predicate do not foreclose consideration of the data collection in the venue analysis. Dkt. No. 25 at 3-4. In formulating this argument, Defendants point to a sister court's analysis in Russo v. Raimondo, where the court drew distinctions between the factual and legal predicates at play in Woodke. 2024 WL 4571431, at *3; Dkt. No. 25 at 3-4. By way of background, Woodke was a trademark violation case where plaintiff's only federal claim was under the Lanham Act. 70 F.3d at 983-85. There, the defendant manufactured trailers in the Northern District of Iowa, then circulated an advertisement displaying said trailer which, allegedly, violated plaintiff's rights under the federal Lanham Act. Id. Importantly, the claimed trademark violation was tied to the advertisement rather than the manufacturing itself, and the plaintiff provided "no evidence of any advertising or sales of the infringing advertisement in the Northern District of Iowa." Id. at 985. Accordingly, the Eighth Circuit held that, though the manufacturing of the trailer featured in the challenged

_____

unlawful, Clover instead alleges that Defendants engaged in unauthorized data collection which extended beyond its statutory authority. See, e.g., Dkt. No. 1 ¶¶ 133-46 (emphasizing the limits Congress placed on the types of data to be collected by Defendants pursuant to the Medicare Advantage program and indicating that Defendants collected and utilized a broader range of data than was authorized); see also Dkt. No. 22 at 10. Clover also alleges that member data specifically pulled from this District was part of that erroneous or unauthorized collection. Dkt. No. 1 ¶ 211.

23

advertisement was a factual predicate, meaning "a necessary event, in a causal sense," to the alleged wrong, the manufacturing of the trailer in the Northern District of Iowa, standing alone, did not render that district a proper venue for the trademark suit because the manufacturing was not a *legal* predicate to the claim. Id. at 985–86.

Even applying Woodke's analytical framework—the framework later approved by the Eleventh Circuit in Jenkins Brick, 321 F.3d at 1372—there are distinctions between Woodke and the present matter which warrant a different result. The scope of actions which gave rise to Woodke's only federal claim, a trademark claim challenging only the *advertisements*, was limited by the nature of the claim itself, as the key venue-impacting actions were those related to the dissemination of the challenged advertisement itself in various districts, not the manufacturing of the trailer featured within them. 70 F.3d at 983–85. But what Clover challenges in the present matter, as explained supra, is the entire sequence of data collection by Defendants and subsequent use of allegedly unauthorized data in the Star Rating calculation in a manner that exceeded statutory, regulatory, and constitutional limits imposed on Defendants. Id.; Dkt. No. 1. In other words, while the manufacturing of the trailer in Woodke was not challenged in the trademark claim, the data collection here is an integral part of the challenged agency activity. 70 F.3d at 983–85; Dkt. No. 1

24

¶¶ 125 (arguing that certain collections of data under Medicare Part B exceeded Defendants' statutory authority), 234-37 (noting that Congress placed limitations on the collection, analysis or reporting of data and arguing that Defendants acted in a manner which exceeded those limits in collecting and using unauthorized data).

Finally, Defendants contend that it is a mistake to consider the "mere collection of data about members in this District" as an "event giving rise to its claim[s]" because "Clover would have no cause of action if Defendants had collected the same data but taken no action with it." Dkt. No. 25 at 2. In other words, Defendants contend in their reply brief that it is a mistake to consider the data collection in the venue analysis because, if *only* the data collection from this District were considered, without considering subsequent utilization of that data in other districts, Clover would not have a cause of action. Id. This view, however, falls out of line with the venue inquiry contemplated by both the applicable venue statute and Eleventh Circuit caselaw. To explain, the relevant venue provision states that a suit may be brought in the judicial district where "a *substantial part* of the events or omissions giving rise to the claim occurred." 28 U.S.C. § 1391(e)(1)(B) (emphasis added). Nowhere in this provision did Congress state that, for the "substantial part" test to be met, a defendant's actions in the relevant District must establish *every*

25

*single element required to state a claim.* Id. To impose such a requirement in the present case is to increase the burden on Clover to establish venue well beyond what Congress requires. Id.

If Defendants' perspective were correct—that it is a mistake to consider events occurring in a particular district under Section 1391(e)(1)(B) unless a party would be able to state a claim based on the events in that district *alone*—this would lead to monumental changes in the venue inquiry. Dkt. No. 25 at 2. This Court has explicitly stated that "[i]n applying the amended version of [the venue statute] in Jenkins Brick,[6] the Eleventh Circuit determined that the new language contemplates venue not only in 'the place where the wrong has been committed' but also in 'those locations hosting a "substantial part" of the events' giving rise to the claim." Bell, 2015 WL 5595806, at *5 (citing Jenkins Brick Co., 321 F.3d at 1371). Consider, to cite an example given in Jenkins Brick, a breach of contract action where "the agreement is executed in Oregon; the defendant fails to deliver goods to New York and California; and the defendant makes an anticipatory repudiation of the rest of the contract from its home office in Utah." 321 F.3d at 1371. The "substantial part" inquiry functions to allow a court to look at each of these underlying events to discern whether a

---

[6] The "substantial part" language was added to the venue inquiry in 1990. Jenkins Brick, 321 F.3d at 1371. Before then, the general venue provision "provided for venue only in the single district 'in which the claim arose.'" Id.

26

"substantial part" of the events occurred in the relevant forum—even if each underlying event occurred in a different place. Id. And the inquiry would necessarily function the same way in an action challenging federal agency actions where Defendants collected data from, among other places, the Southern District of Georgia; Defendants incorporated that data into an allegedly erroneous calculation formulated in Washington, D.C. and Maryland; and Defendants published that erroneous calculation on a web service available nationwide, including in the Southern District of Georgia. See generally Dkt. No. 1. In short, based on Jenkins Brick, the Court is not "mistaken" if it considers data collection that occurred in this District, even if it, viewed alone, is not the entire basis for Clover's causes of action. 321 F.3d at 1371; Dkt. No. 25 at 2.

> **2.    Publication of Clover's Star Rating within this District and Resulting Reputational and Business Harm**

Second, the parties dispute whether the Court may consider in the venue analysis Clover's alleged reputational damage from the publication of the decreased 2026 Star Rating to beneficiaries in this District. Dkt. Nos. 1, 21, 22, 25. To this end, Clover contends, by virtue of the complaint and Mr. Thornton's declaration, that:

- Defendants "unlawfully decreas[ed] Clover's 2026 Star Rating from 4 to 3.5 Stars and broadly publish[ed] that determination within this

27

123

District;"

- One such publication occurred via the "Plan Finder" tool in October 2025, where beneficiaries input their zip code to find plans available to them;

- Inputting a Brunswick, Georgia zip code produces a list beginning with multiple "4.5-Star" plans, and Clover is listed ninth on that list at 3.5 Stars;

- CMS "harmed Clover's reputation and ability to attract and retain members in this District;"

- CMS harmed Clover's ability to continue to expand in this District; and

- Defendants' publication of Clover's 3.5 Star Rating will likely force Clover to "reduce or cease its operations within counties in the Southern District of Georgia, including Glynn, Camden, McIntosh, Long, Wayne, Appling, and Jeff Davis counties."

Dkt. No. 1 ¶ 51; Dkt. No. 22-1 ¶¶ 9-11. When taken as true with reasonable inferences drawn in Clover's favor, these allegations provide that (1) Defendants allegedly engaged in unlawful calculation of Clover's 2026 Star Rating; (2) Defendants published that Star Rating in this District; (3) this Star Rating made Clover appear lower on the list of available plans published by Defendants' web services to individuals in this District; and (4) this harmed Clover's business in this District and will make it difficult for Clover to continue to operate in its current state within this District. Dkt. No. 1 ¶ 51; Dkt. No. 22-1 ¶¶ 9-11; see also Simbaqueba, 2010 WL 2990042, at *2; Bell, 2015 WL 5595806, at *2 (citing Wai, 315 F. Supp. 2d at 1268).

Defendants first argue that Clover's alleged reputational

28

injury in this District is not relevant to the venue inquiry because the venue analysis "focus[es] on relevant activities of the defendant, not of the plaintiff." Dkt. No. 25 at 6 (quoting Jenkins Brick, 321 F.3d at 1371-72 (citations omitted)). While this is a correct statement of law in generality, the fact that the venue issue is defendant-focused does not render inapposite the location of Clover's harm. This Court in Bell v. Rosen addressed a similar argument in a case involving purported defamatory statements which were posted online. 2015 WL 5595806, at *5. There, to support venue, plaintiffs claimed that the defendants' allegedly defamatory statements harmed their reputations in the Southern District of Georgia. Id. There, the Court reasoned that "[t]he harm to Plaintiffs' reputations in this District, by itself, would likely not be a sufficiently substantial event to establish venue" because, as noted by Defendants in the instant matter, "the inquiry into relevant events focuses on the actions of Defendants." Id. But that reputational harm, when "coupled with Defendants' *publication* in this District," rendered venue proper. Id. (citing Kravitz v. Niezgoda, No. CIV.A. 12-487, 2012 WL 4321985, at *4 (S.D. Pa. Sept. 21, 2012) ("In defamation cases, it is not enough that the plaintiff may have suffered harm in a particular district . . . . 'Injury in conjunction with another event, however, may make a district a proper venue.'")). The same can be said of the present matter, as Clover does not

29

allege current and future reputational harm in the Southern District of Georgia in *isolation*, but rather states that Clover "broadly publiciz[ed]" the Star Rating determination within this District, which is, according to the complaint, home to thousands of Medicare Advantage beneficiaries. Dkt. No. 1 ¶ 51.

Defendants nonetheless declare that there is a "dispositive difference" between Bell's defamation analysis and the present case: the defendant's action of "publication" in Bell was part of the plaintiff's theory of recovery, as publication of a libelous or slanderous statement was essential to recovery under the applicable defamation statute. Dkt. No. 25 at 6 (citing Bell, 2015 WL 5595806, at *4). On the other hand, according to Defendants, Clover's alleged reputational harm does not impact the venue inquiry in this case because the "APA bars actions 'seeking monetary compensation for an injury to . . . reputation,'"[7] making such reputational harm irrelevant to the venue inquiry. Dkt. No. 25 at 7.

While Defendants claim that it is "unclear why Clover believes that a non-redressable alleged harm should be relevant to this Court's venue analysis," Clover's response brief and APA caselaw solve that mystery. Id. at 7 n.4. Defendants' action of

---

[7] Clover does not seek monetary relief in this case, nor do Defendants claim otherwise. Dkt. No. 25 at 7 & n.7. Defendants simply point to this principle within the APA to argue that reputational harm is not relevant. Id.

30

"publication" of the Star Ratings in the Southern District of Georgia, allegedly leading to reputational harm and market loss, is part of Clover's theory of recovery under the APA because, according to the United States Supreme Court, "whether one calls injury a restriction on who may sue or an element of the cause of action, the relevant, undisputed point is that a plaintiff cannot sue under the APA unless she is '*injured in fact by agency action*.'" Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys., 603 U.S. 799, 808 (2024) (emphasis added) (quoting Dir., Off. of Workers' Compen. Programs, Dep't of Lab. v. Newport News Shipbldg. & Dry Dock Co., 514 U.S. 122, 127 (1995)).

While Clover does not seek monetary damages for harm it allegedly suffered due to the publication of its Star Rating in this District, the cited reputational harm "gives rise" to Clover's APA claims because it is that very harm which brings Clover within the class of entities eligible to bring an APA claim. Id.; Dkt. No. 1 at 66 (prayer for relief seeking only declaratory judgment and injunctive relief). In short, the harm is not only relevant to Clover's APA claims, it is *required* to bring them. Id.; see also 5 U.S.C. § 702 ("A person *suffering legal wrong because of agency action*, *or adversely affected or aggrieved* by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." (emphasis added)). As a result, like the collection of data from this District, the publication of Star Ratings and

31

subsequent harm to Clover's business opportunities and reputation in this District may also be properly considered as events giving rise to Clover's claims within the meaning of 28 U.S.C. § 1391(e)(1)(B).

**B.    A substantial part of the events giving rise to Clover's claims occurred in the Southern District of Georgia.**

Based on the events properly considered in the venue inquiry, the Court holds that the events which occurred in this District are sufficiently substantial so as to support venue in this forum. Pinson, 192 F. App'x at 817. "Substantiality is a qualitative inquiry, and is 'determined by assessing the overall nature of the plaintiff's claims and the nature of the specific events or omissions in the forum.'" TrakSouth Civ. Contractors, LLC v. Branch Banking & Tr. Co., No. CV 113-197, 2014 WL 12936989, at *2 (S.D. Ga. Aug. 4, 2014) (quoting Daniel v. Am. Bd. of Emergency Med., 428 F.3d 408, 432-33 (2d Cir. 2005)).

As noted by Clover, the fact that "significant acts giving rise to Clover's claim occurred in Washington, D.C." does not undercut the appropriateness of the present forum. Dkt. No. 22 at 10. This Court in Bell discussed the difficulty of assessing venue where the "'wrong' does not center on physical acts or omissions," such as online defamation actions. 2015 WL 5595806, at *6 (quoting Cap. Corp. Merch. Banking, Inc. v. Corp. Colocation, Inc., No. 6:07-cv-1626-Orl-19KRS, 2008 WL 4058014, at *3 (M.D. Fla. Aug. 27,

32

2008)). In the online defamation context, "because the harm from an online defamatory statement can occur in any place where the website or forum is viewed, no one forum should be expected to stand out as a particularly strong candidate for venue." Id. (citing Cap. Corp., 2008 WL 4058014, at *3). The present case, involving allegedly unauthorized agency calculations and negative market and reputational impact stemming from online publication, presents similar difficulties because the harm from the online Star Rating publication could be viewed by beneficiaries in any of the states where Clover does business, such as "Georgia, South Carolina, New Jersey, Pennsylvania, and Texas." Dkt. No. 1 ¶ 3.

With these potential difficulties in mind, the Court need not decide today whether transactional venue would be proper in every single district where Clover does business. Id. (listing states where Clover plans are offered). Instead, the Court need only discuss the sufficiency of events hosted by the Southern District of Georgia, a district within a state which is of great importance in Clover's Medicare Advantage dealings. Dkt. No. 22-1 ¶ 6; Dkt. No. 1 ¶ 51. The record outlines the pivotal role played by the State of Georgia in Clover's business operations, as "Georgia is Clover's second-largest market after New Jersey by total membership." Dkt. No. 22-1 ¶ 6. And Clover is particularly involved in the provision of Medicare Advantage plans in the Southern District of Georgia, "provid[ing] Medicare Advantage plans to

33

thousands of seniors located across the Southern District of Georgia, including within Glynn, Camden, McIntosh, Long, Wayne, Appling, and Jeff Davis counties, along with practically every other county within this District." Dkt. No. 1 ¶ 51.

Based on these allegations, not only do the data collection from this District, publication in this District, and resulting injury to Clover in this District qualify as "events giving rise" to Clover's claims, but the prevalence of the South Georgia market in Clover's business dealings supports the notion that the contacts underlying Clover's claims weigh heavily in the Southern District of Georgia. Bell, 2015 WL 5595806, at *6 (noting that it is proper to consider as instructive the relative "weight of the contacts" in the venue inquiry, though this test is not dispositive on the venue issue (citing Buckley v. Robertson, No. CIV.A. 1:96-CV-996-V, 1997 WL 33642373, at *3 (S.D. Ala. Apr. 18, 1997) (finding that pre-amendment decisions applying the "weight of the contacts" test "remain important sources of guidance"); Turner v. Sedgwick Claims Mgmt. Servs., Inc., No. 7:14-CV-1244-LSC, 2015 WL 225495, at *11 (N.D. Ala. Jan. 16, 2015))). The substantiality of these events is bolstered by the Court's statement in Bell, where it held that "[reputational] harm, coupled with Defendants' publication, ma[d]e this District a proper venue for Plaintiffs' claims." 2015 WL 5595806, at *5 (citations omitted). In contrast, Clover sets forth not only the publication and reputational harm which were

34

130

sufficient in <u>Bell</u>, but also the role data collection from South Georgia played in the very formation of the challenged Star Rating. <u>Id.</u>; Dkt. No. 1 ¶¶ 3, 211; Dkt. No. 22-1 ¶¶ 6, 11.

At bottom, while Defendants' motion may demonstrate why Clover could have filed this action elsewhere, this is insufficient to overcome Clover's showing that a substantial part of the events occurred in the Southern District of Georgia. <u>See</u> Dkt. No. 21 at 6 (listing other locations where suit could have been filed); <u>see also</u> <u>Bell</u>, 2015 WL 5595806, at *5. As a result, Defendants' motion to dismiss or transfer is **DENIED,** because both the request for dismissal and alternative request for transfer are premised on Defendants' argument that venue is improper in the Southern District of Georgia. Dkt. No. 21 (discussing the issue of dismissal or transfer for "improper venue" pursuant to Federal Rule of Civil Procedure 12(b)(3) and 28 U.S.C. § 1406(a) but failing to make any additional request for relief should the Court find venue is proper).

**II. This Court's ruling that venue lies in the Southern District of Georgia does not rule out the potential for transfer under 28 U.S.C. § 1404.**

Though venue lies in the Southern District of Georgia, there is an additional avenue through which transfer may occur: 28 U.S.C. § 1404(a), the statute governing transfer from a proper venue to another proper venue. Defendants' Rule 12(b)(3) motion to dismiss or transfer discusses the potential for transfer as an alternative

35

to wholesale dismissal, but it does so within the context of 28 U.S.C. § 1406(a), the statute contemplating transfers from an *improper* venue to a proper venue. Dkt. No. 21 at 6; Dkt. No. 25 at 10. Clover, too, addresses the potential for transfer but cabins this discussion to Section 1406(a) and its preference for transfer to the District of Columbia should the "Court find[] venue is lacking." Dkt. No. 22 at 16. As such, neither party has expressly addressed the potential for Section 1404(a) transfer. Dkt. Nos. 21, 22, 25.

However, even if Section 1404(a) transfer is not specifically sought by a party, it is not outside of this Court's discretion to consider *sua sponte* whether transfer under Section 1404(a) should occur. Hisey v. Qualtek USA, LLC, 753 F. App'x 698, 704 n.5 (11th Cir. 2018) ("Indeed, we have a 'long-approved practice of permitting a court to transfer a case *sua sponte* [under § 1404(a)][.]'"(quoting Tazoe v. Airbus S.A.S., 631 F.3d 1321, 1336 (11th Cir. 2011) (alterations adopted))). But such *sua sponte* transfers under Section 1404(a) are authorized only when "the parties are first given the opportunity to present their views on the issue." Tazoe, 631 F.3d at 1336 (quoting Costlow v. Weeks, 790 F.2d 1486, 1488 (9th Cir. 1986)). "Before transferring *sua sponte* under section 1404(a), 'the judge should, at minimum, issue an order to show cause why the case should not be transferred, and

36

thereby afford the parties an opportunity to state their reasons.'" Id. (quoting Starnes v. Small, 512 F.2d 918, 934 (D.C. Cir. 1974)).

While the parties' briefing, at first glance, may seem like both sides already had an opportunity to be heard on the issue of transfer, this was in the context of only a Section 1406(a) transfer, not a Section 1404(a) transfer. Dkt. Nos. 21, 22, 25. And this is not a distinction without a difference, as a transferor court's status as an improper versus proper venue impacts what considerations govern the transfer inquiry. Compare Atl. Marine Const. Co., Inc. v. U.S. Dist. Ct. for W. Dist. of Tex., 571 U.S. 49, 62 (2013) ("[A] district court considering a § 1404(a) motion . . . must evaluate both the convenience of the parties and various public-interest considerations."); id. at 62 n.6 (listing the public and private factors considered in Section 1404(a) analysis and providing that "some weight" must be given to plaintiff's choice of forum in this analysis (first citing Piper Aircraft Co. v. Reyno, 454 U.S. 235, 241 n.6 (1981); then citing Norwood v. Kirkpatrick, 349 U.S. 29, 32 (1955))); with Isaac v. Liberty Corr. Inst., No. 20-CV-23645, 2020 WL 5752243, at *1–2 (S.D. Fla. Sept. 4, 2020) (describing factors which impact whether Section 1406 transfer, rather than dismissal, would be "in the interest of justice," including the potential for an action to be timed-barred with dismissal, whether plaintiff filed in the improper forum in good faith, and other potential prejudice on either party), report

37

and recommendation adopted sub nom. Isaac v. Fla. Dep't of Corr., 2020 WL 5750097 (Sept. 25, 2020); see also Ellis v. Great S.W. Corp., 646 F.2d 1099, 1105 n.7 (5th Cir. 1981) (suggesting there exist certain situations where litigants would care whether a transfer was effectuated under Section 1404(a) versus 1406(a)).

The Court notes, however, that, even if Section 1404(a) transfer has not specifically been briefed, the parties' arguments do allude to various reasons why this case would be better suited for adjudication elsewhere—specifically, the District for the District of Columbia. See Dkt. No. 21 at 5-6; Dkt. No. 22 at 14-15; Dkt. No. 25 at 10. Alongside giving some weight to a plaintiff's choice of forum, courts considering Section 1404 transfer look to factors relating to the parties' private interests, including "relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive." Atl. Marine, 571 U.S. at 62 n.6 (citing Piper Aircraft, 454 U.S. at 241 n.6). Courts also consider public-interest factors such as "the administrative difficulties flowing from court congestion; the local interest in having localized controversies decided at home; [and] the interest in having the trial of a diversity case in a forum that is at home

38

with the law." Id. (citing Norwood, 349 U.S. at 32). In its response to the motion to dismiss or transfer, Clover contends that Washington, D.C. is where Defendant HHS resides and where its Secretary, Defendant Kennedy, performs his official duties, favoring the convenience-focused private interest factors such as ease of access to sources of proof, cost of attendance for witnesses, and any other practical considerations. Dkt. No. 22 at 17; Atl. Marine, 571 U.S. at 62 n.6. Clover also indicates that the principal location of its own counsel is in Washington, D.C. Dkt. No. 22 at 17.

Finally, and perhaps most importantly, Clover alleges in its separate motion to expedite that the parties are operating on an expedited schedule due to the timeframe for Defendants to make changes to bonus payments to plans pursuant to judicial decision-making and the deadline for Clover to submit its annual "bid" to participate in the Medicare Advantage Program. Dkt. No. 23 ¶ 2; see also id. ¶¶ 2, 6 (requesting expedited judgment on the motion to transfer or dismiss such that the court would have sufficient time to review and decide a motion for summary judgment by May 29, 2026). To this end, Clover indicates that the District Court for the District of Columbia "has the fewest pending cases per judgeship of any of the districts that Defendants identify." Dkt. No. 22 at 15 & n.3 (citing U.S. Courts, U.S. District Court Caseloads, https://www.uscourts.gov/sites/default/files/document

39

135

/fcms_na_distprofile0630.2025.pdf). Defendants also indicate that they have no objection to transfer to the District of Columbia should this Court decide to not dismiss the present action under 28 U.S.C. § 1406. Dkt. No. 25 at 10. As such, in the interest of fairness and completeness, alongside the parties' briefing suggesting adjudication in another district may be more convenient and conducive to their expedited schedule, the Court **ORDERS** the parties, within **seven days** of the date of this Order, to show cause as to why this case should not be transferred to the United States District Court for the District of Columbia under 28 U.S.C. § 1404(a).

**CONCLUSION**

Defendants' motion to dismiss or, in the alternative, motion to transfer under 28 U.S.C. 1406, dkt. no. 21, is **DENIED.**[8] With respect to the lingering potential for transfer from a proper venue to another proper venue, the parties are **ORDERED**, within **seven days** of the date of this Order, to show cause as to why this case should not be transferred to the United States District Court for the District of Columbia under 28 U.S.C. § 1404(a).

---

[8] Plaintiff's motion to expedite a ruling on Defendants' motion to dismiss or transfer, dkt. no. 23, is **DENIED as moot.**

SO ORDERED this 18th day of March, 2026.

_____
HON. LISA GODBEY WOOD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

41